Nos. 20-1343, *et al.* (consolidated)

In the

# United States Court of Appeals
# For the District of Columbia Circuit

———————————

CONSTELLATION MYSTIC POWER, LLC,

*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

———————————

On Petition for Review of Orders of the Commission

———————————

## JOINT APPENDIX – VOLUME I OF V
## *** PUBLIC APPENDIX—SEALED MATERIAL IN SEPARATE SUPPLEMENT ***

———————————

Matthew R. Christiansen
Robert H. Solomon
Robert M. Kennedy
Carol J. Banta
FEDERAL ENERGY REGULATORY
   COMMISSION
888 First Street, N.E.
Washington, D.C. 20426
T: (202) 502-8904
*robert.kennedy@ferc.gov*

*Counsel for Respondent Federal
Energy Regulatory Commission*

Matthew A. Fitzgerald
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716
*mfitzgerald@mcguirewoods.com*

*Counsel for Petitioner Constellation
Mystic Power, LLC*

**CASE SCHEDULED FOR ORAL
ARGUMENT ON MAY 5, 2022**

*(Additional counsel listed inside)*

*(Counsel continued)*

Carrie Hill Allen
Senior Vice President & Deputy
   General Counsel
Constellation Energy Corp.
101 Constitution Ave, NW
Suite 400E
Washington, DC  20001
T: (202) 637-0344
*carrie.allen@constellation.com*

Noel H. Symons
Katlyn A. Farrell
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, D.C. 20006
T: (202) 857-1700
*nsymons@mcguirewoods.com*
*kfarrell@mcguirewoods.com*

*Counsel for Petitioner Constellation Mystic Power, LLC*

Seth A. Hollander
Assistant Attorney General—
Special Litigation
CONNECTICUT OFFICE OF THE
   ATTORNEY GENERAL
10 Franklin Square
New Britain, CT 06051
T: (860) 827-2681
*seth.hollander@ct.gov*

Scott H. Strauss
Jeffrey A. Schwarz
Amber L. Martin Stone
SPIEGEL & MCDIARMID LLP
1875 Eye Street NW
Suite 700
Washington, DC 20006
T: (202) 879-4000
*scott.strauss@spiegelmcd.com*

*Counsel for Petitioner Connecticut Public Utilities Regulatory Authority*

Andrew W. Minikowski
Julie Datres
CONNECTICUT OFFICE OF
   CONSUMER COUNSEL
10 Franklin Square
New Britain CT 06051
T: (860) 827-2922
*andrew.minikowski@ct.gov*

*Counsel for Petitioner Connecticut Office of Consumer Counsel*

Robert Snook
Assistant Attorney General—
    Environment
CONNECTICUT OFFICE OF THE
    ATTORNEY GENERAL
10 Franklin Square
New Britain, CT 06051
T: (860) 827-2620
*Robert.Snook@ct.gov*

Kirsten S. P. Rigney
Legal Director, Bureau of Energy
Technology Policy
CONNECTICUT DEPARTMENT OF
    ENERGY AND ENVIRONMENTAL
    PROTECTION
10 Franklin Square
New Britain, CT 06051
T: (860) 827-2984
*kirsten.rigney@ct.gov*

*Counsel for Petitioner Connecticut Department of Energy and Environmental Protection*

Jason Marshall
General Counsel
NEW ENGLAND STATES COMMITTEE
    ON ELECTRICITY, INC.
424 Main Street
Osterville, MA 02655
T: (617) 913-0342
*jasonmarshall@nescoe.com*

Phyllis G. Kimmel
PHYLLIS G. KIMMEL LAW OFFICE PLLC
1717 K Street, NW
Suite 900
Washington, DC 20006
T: (202) 787-5704
*pkimmel@pgklawoffice.com*

*Counsel for Petitioner the New England States Committee on Electricity, Inc.*

Ashley M. Bond
DUNCAN & ALLEN LLP
1730 Rhode Island Avenue, NW
Suite 700
Washington, DC 20036
T: (202) 289-8400
*amb@duncanallen.com*

Maura Healey
Attorney General for the
    Commonwealth of Massachusetts
Christina Belew
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL OF
    MASSACHUSETTS
One Ashburton Place, 18th Floor
Boston, MA 02108
T: (617) 963-2380
*christina.belew@mass.gov*

*Counsel for Petitioner the Attorney General of the Commonwealth of Massachusetts*

Michael J. Thompson
Ryan J. Collins
Elizabeth P. Trinkle
WRIGHT & TALISMAN, PC
1200 G Street, N.W., Suite 600
Washington, D.C. 20005
T: (202) 393-1200
*thompson@wrightlaw.com*
*collins@wrightlaw.com*
*trinkle@wrightlaw.com*

Maria A. Gulluni
Vice President and General Counsel
Christopher J. Hamlen
Assistant General Counsel – Markets
ISO NEW ENGLAND INC.
One Sullivan Road
Holyoke, MA 01040-2841
T: (413) 540-4473
*mgulluni@iso-ne.com*
*chamlen@iso-ne.com*

*Counsel for Intervenor ISO New England Inc.*

Scott H. Strauss
Jeffrey A. Schwarz
Amber L. Martin Stone
SPIEGEL & MCDIARMID LLP
1875 Eye Street, N.W.
Suite 700
Washington, D.C. 20006
T: (202) 879-4000
*scott.strauss@spiegelmcd.com*

John P. Coyle
DUNCAN & ALLEN LLP
1730 Rhode Island Avenue, N.W.
Suite 700
Washington, D.C. 20036
T: (202) 289-8400
*jpc@duncanallen.com*

*Counsel for Intervenors*
*Massachusetts*
*Municipal Wholesale Electric*
*Company and New Hampshire*
*Electric Cooperative, Inc.*

*Counsel for Intervenors Braintree Electric*
*Light Department, et al.*

TABLE OF CONTENTS

| Volume I – PUBLIC APPENDIX | | |
|---|---|---|
| **Record Item No.** | **Record Index Description** | **Page** |
| 2 | Selected Excerpts, Constellation Mystic Power, LLC submits tariff filing per 35.12: Constellation Mystic Cost of Service to be effective 6/1/2022 under ER18-1639 (May 16, 2018) | |
| | • Transmittal | JA1 |
| | • Attachment A | JA31 |
| | • Attachment B | JA85 |
| | • Attachment C (MYS-001 through MYS-005) | JA187 |
| | • Attachment D (MYS-006 through MYS-009) | JA245 |
| | • Attachment E (MYS-010 through MYS-012) | JA319 |
| **Volume II – PUBLIC APPENDIX** | | |
| **Record Item No.** | **Record Index Description** | **Page** |
| 75 | Order Accepting and Suspending Filing and Establishing Hearing Procedures, Constellation Mystic Power, LLC, 164 FERC ¶ 61,022 (July 13, 2018) | JA566 |
| 119 | Selected Excerpts, Motion for Clarification and Rehearing of Massachusetts Attorney General Maura Healey of the July 13, 2018 Order under ER18-1639 (Aug. 13, 2018) | |
| | • Motion for Rehearing at 6-16 | JA599 |
| 125 | Selected Excerpts, Prepared Answering Testimony of Richard R. Levitan and Robert G. Ethier on behalf of ISO New England Inc. under ER18-1639 (Aug. 16, 2018) | |
| | • Ex. ISO-002 at 6-7, 19-23 | JA610 |
| | • Ex. ISO-001 at 5-6, 26-27, 31-32 | JA617 |

| 129 | Selected Excerpts, Summary of Prepared Testimony of Dr. Jonathan Lesser on Behalf of the Eastern New England Consumer-Owned Systems under ER18-1639 (Aug. 23, 2018) | |
| | • Ex. ENC-0001 at 24-28 | JA623 |
| 130 | Selected Excerpts, Summary of Prepared Testimony of Dr. Jonathan Lesser on Behalf of the Eastern New England Consumer-Owned Systems under ER18-1639 (Aug. 23, 2018) | |
| | • Ex. ENC-0001 at 96-102 (Table 13) | JA628 |
| | • Ex. ENC-0019 at 5-6 | JA635 |
| 139 | Selected Excerpts, Direct and Answering Testimony and Exhibits of Staff Witness Megan McComb under ER18-1639 (Aug. 23, 2018) | |
| | • Ex. S-0001 (Second Revised) at 8-11; 22 | JA637 |
| | • Ex. S-0003 at 1, 3 | JA642 |
| | • Ex. S-0004 | JA644 |
| | • Ex. S-0006 | JA647 |
| 142 | Selected Excerpts, Direct and Answering Testimony and Exhibits of Staff Witness Jonathan Siems under ER18-1639 (Aug. 23, 2018) | |
| | • Ex. S-0023 at 2 | JA650 |
| 146 | Selected Excerpts, Direct and Answering Testimony and Exhibits of Staff Witness Robert Keyton under ERl8-1639 (Aug. 23, 2018) | |
| | • Ex. S-0009 at 48-52 | JA651 |
| | • Ex. S-0012 at 4 | JA656 |
| | • Ex. S-0013 at 16 | JA657 |
| 152 | Selected Excerpts, Testimony of Repsol Energy North America Corporation under ER18-1639 (Aug. 24, 2018) | |
| | • Ex. REP-005 | JA658 |

| 153 | Selected Excerpts, Answering Testimony of Boris Steffen on Behalf of the Eastern New England Consumer-Owned Systems under ER18-1639 (Aug. 24, 2018) | |
| --- | --- | --- |
| | • Ex. ENC-0030 at 26, 28, 31-36, 46-48, 50-60 | JA714 |
| | • Ex. ENC-0032 | JA736 |
| | • Ex. ENC-0034 at 36 | JA743 |
| | • Ex. ENC-0036 at 44 | JA744 |
| 164 | Selected Excerpts, Motion to Replace Incorrectly August 24, 2018 Redacted Testimony of Boris J. Steffen on Behalf of the Eastern New England Consumer-Owned Systems under ER18-1639 (Aug. 28, 2018) | |
| | • Ex. ENC-0030 | JA745 |
| | • Ex. ENC-0032 | JA801 |
| 176 | Selected Excerpts, Prepared Cross-Answering Testimony and Exhibits of Robert G. Ethier on behalf of ISO New England Inc. under ER18-1639 (Sept. 4, 2018) | |
| | • Ex. ISO-015 at 14 | JA808 |
| 187 | Selected Excerpts, Motion of the Connecticut Parties for Leave to File Revised Testimony and Exhibits Out of Time of David C. Parcell under ER18-1639 (Sept. 13, 2018) | |
| | • Ex. CT-001 at 13, 19 | JA809 |
| | • Ex. CT-009 | JA811 |
| 189 | Selected Excerpts, Revised Testimony of Constance T. Cannady, et al. on behalf of New England States Committee on Electricity under ER18-1639 (Sept. 13, 2018) | |
| | • Ex. NES-004 | JA936 |
| 195 | Selected Excerpts, Prepared Rebuttal Testimony and Exhibits of Mr. William B. Berg, et al. on behalf of | |

| | Constellation Mystic Power, LLC under ER18-1639 (Sept. 14, 2018) | |
|---|---|---|
| | • Ex. MYS-0053 at 6; 27-28 | JA943 |
| 229 | Selected Excerpts, Motion of Commission Trial Staff to File Corrected / Revised Exhibits [S-0001 (CUI_PRIV HC), S-0001 (Public), S-0022 (CUI_PRIV _HC), S-0022 (Public), and S-0030 (CUI_PRIV HC)] under ER18-1639 (Sept. 25, 2018) | |
| | • Ex. S-0022 REVISED at 14-15 | JA946 |
| 239 | Selected Excerpts, Transcript of 10/3/18 Hearing held in Washington, DC re Constellation Mystic Power, LLC under ER18-1639 (Oct. 4, 2018) | |
| | • Transcript at 1040-1042; 1162-1164 | JA948 |
| 243 | Selected Excerpts, Second Revised Direct and Answering Testimony of Commission Trial Staff Witness Meagan K. McComb [Exhibit S-0001] under ER18-1639 (Oct. 4, 2018) | |
| | • Ex. S-0001 at 12-13, 21-22 | JA956 |
| 252 | Selected Excerpts, Certification of Record in Constellation Mystic Power, LLC of Presiding Administrative Law Judge Steven L. Sterner (Part 1) under ER18-1639 (Oct. 12, 2018) | |
| | • Ex. CT-010 at 9 | JA960 |
| | • Ex. CT-064 | JA961 |
| | • Ex. MYS-0001 | JA962 |
| | • Ex. MYS-0006 | JA991 |

| Volume III – PUBLIC APPENDIX | | |
|---|---|---|
| **Record Item No.** | **Record Index Description** | **Page** |
| 253 | Selected Excerpts, Certification of Record in Constellation Mystic Power, LLC of Presiding Administrative Law Judge Steven L. Sterner (Part 2) under ER18-1639 (Oct. 12, 2018) | |
| | • Ex. MYS-0014 | JA1009 |
| | • Ex. MYS-0016 at 3 | JA1040 |
| | • Ex. MYS-0020 | JA1041 |
| | • Ex. MYS-0022 | JA1058 |
| | • Ex. MYS-0024 | JA1169 |
| | • Ex. MYS-0029 at 6 | JA1171 |
| | • Ex. MYS-0037 | JA1172 |
| | • Ex. MYS-0038 | JA1208 |
| | • Ex. MYS-0046 | JA1210 |
| | • Ex. MYS-0047 | JA1214 |
| | • Ex. MYS-0048 | JA1218 |
| | • Ex. MYS-0053 at 6 | JA1223 |
| | • Ex. MYS-0080 at 12-17, 52 | JA1224 |
| | • Ex. NEE-050 at 17 | JA1231 |
| | • Ex. NES-028 at 7, 26-27 | JA1232 |
| 257 | Selected Excerpts, Transcript of the 10/8/2018 hearing held in Washington DC re Constellation Mystic Power LLC under ER18-1639 (Oct. 15, 2018) | |
| | • Transcript at 1738-39 | JA1235 |
| 266 | Selected Excerpts, Initial Brief of the Attorney General of Massachusetts under ER18-1639 (Nov. 2, 2018) | |
| | • Brief at 38-39 | JA1238 |
| 267 | Selected Excerpts, Initial Brief of ISO New England Inc. under ER l8-1639 (Nov. 2, 2018) | |
| | • Brief at 4 | JA1240 |

| | | |
|---|---|---|
| 272 | Selected Excerpts, Initial Brief of the New England States Committee on Electricity under ER18-1639 (Nov. 2, 2018) | |
| | • Brief at 40 | JA1241 |
| 274 | Selected Excerpts, Initial Brief of the Commission Trial Staff under ER18-1639 (Nov. 2, 2018) | |
| | • Brief at 73-79, 94-95 | JA1242 |
| 276 | Selected Excerpts, Initial Brief of the Connecticut Public Utilities Regulatory Authority, et al. (the CT Parties) under ER18-1639 (Nov. 2, 2018) | |
| | • Brief at 5, 17-18, 29-30 | JA1251 |
| 301 | Selected Excerpts, Reply Brief of the Commission Trial Staff under ER18-1639 (Nov. 16, 2018) | |
| | • Brief at 43-45 | JA1256 |
| 304 | Selected Excerpts, Reply Brief of Constellation Mystic Power, LLC under ER18-1639 (Nov. 16, 2018) | |
| | • Brief at 87 | JA1259 |
| 313 | Order Accepting Agreement, Subject to Condition and Directing Briefs, Constellation Mystic Power, LLC, 165 FERC ¶ 61,267 (Dec. 20, 2018) | JA1260 |
| 316 | Request for clarification or, in the alternative, rehearing of the New England States Committee on Electricity (NESCOE) in Docket No. ER18-1639 (Jan. 22, 2019) | JA1372 |
| 317 | Request for Rehearing of Constellation Mystic Power, LLC of the December 20, 2018 Order under Docket No. ER18-1639 (Jan. 22, 2019) | JA1381 |
| 319 | Petition for Rehearing of the Connecticut Parties under ER18-1639 (Jan. 22, 2019) | JA1488 |
| 335 | Selected Excerpts, Constellation Mystic Power, LLC submits tariff filing per 35: Mystic Agreement Compliance Filing to be effective 6/1/2022 under ER18-1639 (Mar. 1, 2019) | |

|  |  |  |
|---|---|---|
|  | • Transmittal at 6 | JA1506 |
|  | • Attachment B at 13, 87 | JA1507 |
| **Volume IV – PUBLIC APPENDIX** | | |
| **Record Item No.** | **Record Index Description** | **Page** |
| 343 | Selected Excerpts, Protest of New England States Committee on Electricity to March 1, 2019 Constellation Mystic Power, LLC tariff filing under ER18-1639 (Mar. 22, 2019) |  |
|  | • Protest at 2-4 | JA1509 |
| 345 | Selected Excerpts, Protest of the Connecticut Parties to March 1, 2019 Constellation Mystic Power, LLC tariff filing under ER18-1639 (Mar. 22, 2019) |  |
|  | • Protest at 6-9 | JA1512 |
| 374 | Order Granting Clarification in Part, Denying Clarification in Part, and Addressing Arguments Raised on Rehearing, Constellation Mystic Power, LLC, 172 FERC ¶ 61,043 (July 17, 2020) | JA1516 |
| 375 | Order on Clarification, Directing Compliance, and Addressing Arguments Raised on Rehearing, Constellation Mystic Power, LLC, 172 FERC ¶ 61,044 (July 17, 2020) | JA1549 |
| 376 | Order on Compliance and Directing Further Compliance, Constellation Mystic Power, LLC, 172 FERC ¶ 61,045 (July 17, 2020) | JA1626 |
| 378 | Petition for Rehearing of Connecticut Public Utilities Regulatory Authority, et al. under ER18-1639 (Aug. 13, 2020) | JA1652 |
| 379 | Request for Rehearing of Connecticut Public Utilities Regulatory Authority, et al. under ER18-1639 (Aug. 13, 2020) | JA1672 |

| | | |
|---|---|---|
| 381 | Request for Clarification and Rehearing of New England States Committee on Electricity under ER18-1639 (Aug. 17, 2020) | JA1686 |
| 388 | Selected Excerpts, Constellation Mystic Power, LLC submits tariff filing per 35: Revised Mystic Agreement Compliance Filing to be effective 6/1/2022 under ER18-1639 (Sept. 15, 2020) | |
| | • Transmittal | JA1723 |
| | • Attachment A | JA1734 |
| | • Attachment B at 80-81 | JA1838 |
| | • Attachment C | JA1840 |
| | • Attachment C-1 | JA1855 |
| 420 | Order Addressing Arguments Raised on Rehearing, and Setting Aside Prior Order, in Part, Constellation Mystic Power, LLC, 173 FERC ¶ 61,261 (Dec. 21, 2020) | JA1917 |
| N/A | Selected Excerpts, Section 203 Application, Docket No. ER04-77-000 (March 19, 2004) | |
| | • Application at 14-15, 18-19 | JA1940 |
| N/A | Selected Excerpts, Petition of ISO New England Inc. for Waiver of Tariff Provisions, Docket No. ER18-1509-000 (May 2, 2018) | |
| | • Petition of ISO New England Inc. | JA1944 |
| | • Ex. ISO-1 at 3-31 | JA1980 |

| Volume V – SEALED SUPPLEMENT | | |
|---|---|---|
| **Record Item No.** | **Record Index Description** | **Page** |
| 153 | Selected Excerpts, Answering Testimony of Boris Steffen on Behalf of the Eastern New England Consumer-Owned Systems under ER18-1639 (Aug. 24, 2018) | |
| | • Ex. ENC-0030_PRIVILEGED at 50-60 | JA2009 |
| | • Ex. ENC-0043_PRIVILEGED at 60-61, 77 | JA2020 |
| 238 | Selected Excerpts, Transcript of 10/01/2018 Hearing held in Washington, DC re Constellation Mystic Power, LLC under ER18-1639 (Oct. 4, 2018) | |
| | • Transcript at 498-500; 502-503; 524-527 | JA2023 |
| 252 | Selected Excerpts, Certification of Record in Constellation Mystic Power, LLC of Presiding Administrative Law Judge Steven L. Sterner (Part 1) under ER18-1639 (Oct. 12, 2018) | |
| | • Ex. ENC-0062_PRIVILEGED at 2-3 | JA2035 |
| | • EX. ENC-0064_PRIVILEGED | JA2037 |
| | • Ex. ENC-0081_PRIVILEGED | JA2041 |
| | • Ex. ENC-0083_PRIVILEGED at 2 | JA2081 |
| | • Ex. ENC-0084_PRIVILEGED at 14 | JA2082 |
| | • Ex. ENC-0107_PRIVILEGED | JA2083 |
| 253 | Selected Excerpts, Certification of Record in Constellation Mystic Power, LLC of Presiding Administrative Law Judge Steven L. Sterner (Part 2) under ER18-1639 (Oct. 12, 2018) | |
| | • Ex. MYS-0037_CUI_PRIV_HC at 8-10, 12-13 | JA2085 |
| 255 | Selected Excerpts, Transcript of the 10/5/2018 hearing held in Washington DC re Constellation Mystic Power LLC under ER18-1639 (Oct. 15, 2018) | |
| | • Transcript at 1534; 1539-40; 1579-1594 | JA2090 |

| 388 | Selected Excerpts, Constellation Mystic Power, LLC submits tariff filing per 35: Revised Mystic Agreement Compliance Filing to be effective 6/1/2022 under ER18-1639 (Sept. 15, 2020) | |
|---|---|---|
| | • Attachment C at 8-10 | JA2112 |
| 406 | Selected Excerpts, Initial Brief on Return on Equity of Constellation Mystic Power, LLC under ER18-1639 (Sept. 28, 2020) | |
| | • Attachment B at 4-6, 8-10 | JA2115 |

### CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2022, the foregoing was filed electronically with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  All participants in the case are registered CM/ECF users and the system will serve them.

Dated:  February 17, 2022    */s/ Matthew A. Fitzgerald*
             Matthew A. Fitzgerald

             *Counsel for Petitioner Constellation*
             *Mystic Power, LLC*

McGuireWoods LLP
2001 K Street N.W.
Suite 400
Washington, DC 20006-1040
Phone: 202.857.1700
Fax: 202.857.1737
www.mcguirewoods.com

Noel Symons
Direct: 202.857.2929

# McGuireWoods

nsymons@mcguirewoods.com

## CONTAINS REQUEST FOR PRIVILEGED TREATMENT

May 16, 2018

Ms. Kimberly D. Bose
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

**Re:** ***Constellation Mystic Power, LLC***
**Docket No. ER18-   -000**
**Annual Fixed Revenue Requirement, Capital Expense Recovery, and**
**Stipulated Variable Cost Recovery for Mystic 8 & 9 Fuel Security Service**

Dear Secretary Bose:

Pursuant to section 205 of the Federal Power Act ("FPA")[1] and Part 35 of the Federal Energy Regulatory Commission's ("Commission") regulations,[2] Constellation Mystic Power, LLC ("Mystic") submits the attached, executed[3] Cost-of-Service Agreement between Mystic, Exelon Generation Company, LLC ("ExGen") and ISO New England, Inc. ("ISO-NE") to be designated as Mystic Rate Schedule No. 1 ("Cost-of-Service Agreement" or "Agreement") to the Commission for approval.  The Agreement provides cost-of-service compensation to Mystic for continued operation of its Mystic 8 and 9 natural gas-fired generating units ("Mystic 8 & 9"), which ISO-NE has requested be retained to ensure fuel security for the New England region, for the period of June 1, 2022 to May 31, 2024.[4]

Mystic 8 & 9 are uneconomic, and without the proposed Cost-of-Service Agreement, will be retired.  Unfortunately, the attribute that makes Mystic 8 & 9 attractive to ISO-NE for fuel

---

[1]      16 U.S.C. § 824d (2012).
[2]      18 C.F.R. Part 35 (2017).
[3]      In the Cost-of Service Agreement, ISO-NE noted that its execution did not signify acceptance of the Agreement's terms related to the Annual Fixed Revenue Requirement, Stipulated Variable Costs, and Monthly Fuel Supply Costs.
[4]      On March 23, 2018, ExGen submitted retirement de-list bids in ISO-NE's Forward Capacity Auction ("FCA") for Mystic 8 & 9 for FCA 13 (June 1, 2022 to May 31, 2023).  As explained in its May 1, 2018 filing in the Waiver Proceeding, ISO-NE identified Mystic 8 & 9 as critical to fuel security in the New England region and requested that they be retained to ensure fuel security.

Atlanta | Austin | Baltimore | Brussels | Charlotte | Charlottesville | Chicago | Dallas | Houston | Jacksonville | London | Los Angeles - Century City
Los Angeles - Downtown | New York | Norfolk | Pittsburgh | Raleigh | Richmond | San Francisco | Tysons | Washington, D.C. | Wilmington

**JA1**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 2

security reasons is part of what makes the units uneconomic: their reliance on expensive imported liquefied natural gas ("LNG"). Mystic has only one source of fuel, the Everett Marine Terminal LNG import facility ("Everett").[5] Since their development, the Mystic units have secured fuel pursuant to a contract for supply from Everett. More recently, that contractual relationship has been in dispute. Exelon, rather than resolve that dispute through litigation or some other process, which would be costly and uncertain, has chosen to purchase Everett to provide a firm supply to meet existing capacity supply obligations for the Forward Capacity Auction ("FCA") 9, 10, 11 and 12 Capacity Commitment Periods. But not all of the Mystic units cleared in FCA 12, and even with ownership of Everett, the cost of the firm LNG supply itself is high.

Mystic submitted a Retirement De-List Bid for Mystic 8 & 9 because it determined that its expected revenues from ISO-NE capacity, energy and ancillary services markets would not be sufficient to support continued operation of Mystic 8 & 9 beginning in 2021 when the added costs associated with a reliable fuel supply from Everett were taken into account. Indeed, Mystic 9 did not clear in FCA 12 in March 2018. Accordingly, Mystic decided to retire units 8 & 9 after satisfying its current capacity supply obligations. As the ISO-NE Tariff requires in such circumstances,[6] Mystic submitted a retirement de-list bid on March 23, 2018, including the requisite supporting financial analysis, with the intention of selecting the unconditional retirement option on July 6, 2018.[7]

ISO-NE quickly communicated to the market concerns it had identified about the possible loss of Mystic 8 & 9 during the FCA 13 and FCA 14 time-periods, and concluded that the retirement would lead to load shedding exposure and a failure to maintain ten-minute operating reserves, a violation of NERC standards.[8] ISO-NE informed Exelon of its reliability determination, and initiated a dialogue. During that dialogue, Exelon committed to ISO-NE that it would keep Mystic 8 & 9 in operation during the period in which ISO-NE identified the fuel security need under the cost of service compensation to which it would be entitled if were retained for transmission reliability under the Tariff, provided that it had certainty with respect to the rates, terms, and conditions prior to taking on additional capacity supply obligations.

On May 1, 2018, ISO-NE filed a request in Docket No. ER18-1509-000 (the "Waiver Proceeding") that the Commission approve its determination that Mystic is needed and required

---

[5]    As discussed further below, Mystic evaluated alternative fuel supplies, and found them to be untimely, risky, and uneconomic.

[6]    ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.1.2.3.1.5.

[7]    More generally, merchant generators in New England, including Mystic, (*See Mystic Development, LLC*, 114 FERC ¶ 61,200 (2006)) have faced significant problems receiving sufficient returns in ISO-NE markets to stay in business. According to ISO-NE, more than 4,600 megawatts ("MW")—an amount equal to about 16% of the region's current generating capacity—will shut down between 2013 and 2021. Retirements of Non-Gas Fired Power Plants, ISO-New England (last visited May 1, 2018), https://www.iso-ne.com/about/regional-electricity-outlook/grid-in-transition-opportunities-and-challenges/power-plant-retirements.

[8]    ISO New England Inc., Petition for Waiver of Tariff Provisions, at 3, Docket No. ER18-1509-000 (filed May 1, 2018). *See also* page 2 of ISO-NE's April 10, 2018 Presentation entitled "Fuel-Security Reliability Need for Mystic 8 & 9", available at https://www.iso-ne.com/static-assets/documents/2018/04/npc_20180406_addl_II.pdf.

**JA2**

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 3

to meet fuel security in the region during the relevant period.[9]  ISO-NE also asked for waiver of the Tariff provisions that require Mystic to elect on July 6, 2018 whether to unconditionally retire and to establish a new deadline of January 4, 2019.  ISO-NE also explained why it was reasonable for the Commission to waive the current Tariff provisions to allow a two-year term for the Cost-Of-Service Agreement.[10]  According to ISO-NE, a key factor in its decision to retain Mystic 8 & 9 is that, while the units are gas-fired generators, they do not rely upon the constrained New England natural gas pipeline system, but rather depend on Everett.[11]  Consequently, removing Mystic 8 & 9 from service would significantly compound the fuel security risks already facing the region's bulk electric system.[12]

In sum, the Agreement is fundamental to meeting a critical fuel security need for the region.  In return for this fuel security service, the Agreement provides for Mystic to recover its fixed and variable costs of operating Mystic 8 & 9 over the term of the Agreement.  The Agreement is based on the *pro forma* cost-of-service agreement contained in ISO-NE Market Rule 1, Appendix I ("Appendix I"),[13] as modified and updated by the Parties to address Mystic's unique circumstances, including the special value ISO-NE places on continued sourcing of fuel from Everett, and on the continued provision of surplus LNG from Everett to third parties.  That fuel security need is fully detailed in the filing made by ISO-NE in the Waiver Proceeding, and is not at issue here.  Rather, this proceeding concerns the narrow question of whether the terms of the Agreement are just and reasonable and whether the cost-of-service rates contained in the Agreement are correctly calculated and supported.  They are, for the reasons set forth below.

It is critical that the Agreement be accepted expeditiously to ensure Mystic just and reasonable cost recovery before the deadline for Mystic to accept the reliability service obligation or unconditionally retire.  Mystic has indicated its willingness to continue to operate Units 8 & 9 as ISO-NE has requested, but Mystic is not in a position to accept the risk of an unknown rate, or the risk that material terms and conditions of the Agreement may be changed.  Accordingly, in the Waiver Proceeding, ISO-NE has asked that the deadline for Mystic to make its decision whether to unconditionally retire, or to accept the reliability service obligation, be extended until January 4, 2019.[14]  Therefore, Mystic requests that, if the Commission cannot accept the Agreement as filed, it issue an order within 60 days that clearly defines the scope of the case and establishes a process to resolve any issues on an expedited basis so that the Commission can issue an order accepting the Agreement by December 21, 2018, with an effective date of June 1, 2022 (i.e., the beginning of the FCA 13 Capacity Commitment Period).  As discussed below, Mystic also proposes additional measures to expedite and streamline this proceeding.

---

[9]      *See generally id.*; *see also* ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.1.2.3.1.5.

[10]     ISO New England Inc., Petition for Waiver of Tariff Provisions at 23-25.

[11]     *Id.* at 2-3.

[12]     *Id.* at 3.

[13]     ISO-NE FERC Tariff No. 3, Market Rule 1, Section III, Appendix I ("Appendix I").

[14]     ISO New England Inc., Petition for Waiver of Tariff Provisions at 29 (explaining that this deadline will provide the ISO with sufficient time to enter, and confirm the accuracy of, all required data before FCA 13 is held on February 4, 2019).

**JA3**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 4

This filing demonstrates that the Agreement will enable Mystic to recover its just and reasonable fixed and variable costs to provide the required fuel security service during the FCA 13 and the FCA 14 Capacity Commitment Periods, and no more. This filing also demonstrates that the terms and conditions that differ from the form cost-of-service agreement in Appendix I properly reflect the fuel security needs of ISO-NE, Mystic's LNG fuel supply from Everett, and the unique operational limitations of Mystic 8 & 9, as well as the need to update the form agreement to take into account changes to the Tariff since it was last modified in 2008.[15] For example:

- Mystic has agreed to enhanced performance penalties in the form of modifications to the capacity performance penalties (including the inability to receive Capacity Performance Payments other than as an offset against negative Capacity Performance Payments) and a new Winter Fuel Security Penalty at the request of ISO-NE to provide additional incentives for the units to be available to meet the region's fuel security need in the winter.

- Because the sole source of fuel for Mystic is vaporized LNG from Everett, the Cost-of-Service Agreement includes recovery of the actual monthly fuel supply costs incurred at Everett. This is necessary to ensure that Mystic has adequate fuel supply to provide the needed reliability service and to ensure that it receives adequate revenues to stay in operation during the reliability term. As explained below, because Exelon is in the process of acquiring Everett, Mystic provides detail and support for this expense to show that provision of fuel supply via Everett on a cost-of-service basis, in addition to being the source of the fuel security desired by the ISO, is the least-cost, firm fuel supply option.

- Provisions of the Agreement have been modified to reflect the unique operational considerations necessitated by Mystic 8 & 9's LNG supply via Everett, the limitations of the storage tanks at Everett, and third-party transactions.

- Provisions have been added to the Agreement whereby Mystic and its affiliates will provide ISO-NE with information regarding its fuel supply plans for winter months and other information relating to third-party sales.

Mystic's annual and monthly fixed revenue requirements are cost-justified as demonstrated by the cost-of-service analysis presented in the testimony and exhibits of Alan C. Heintz, Dr. Charles E. Olson, and William B. Berg. Mr. Heintz developed a full cost-of-service to support Mystic's annual revenue requirement based on the traditional cost-of-service formula.[16] In addition, Mr. Heintz developed a full cost-of-service to substantiate the fixed operations and maintenance/return on investment component of the Everett fuel supply costs that will be passed through to Mystic. Dr. Charles E. Olson determined the appropriate rate of return for Mystic in accordance with Opinion No. 531 and Commission precedent.[17] He provides a detailed discounted cash flow ("DCF") analysis to support his rate of return in accordance with

---

[15] *ISO New England Inc.,* 125 FERC ¶ 61,102, at PP 110-111 (2008), *reh'ing denied,* 130 FERC ¶ 61,089 (2010).

[16] *See* Heintz Testimony at 6.

[17] *See Coakley v. Bangor-Hydro Elec. Co.*, Opinion No. 531, 147 FERC ¶ 61,234 (2014).

**JA4**

Ms. Kimberly D. Bose
May 16, 2018
Page 5

Commission precedent and the Commission's two-stage DCF analysis for electric utilities. Mr. Berg provides background on Mystic's fuel supply and explains why the acquisition of Everett was the only timely option to meet existing capacity obligations, and will continue to be the least cost option for fuel supply during the Agreement's term. He also testifies that capital expenditures are necessary before and during the reliability term to reliably operate Mystic 8 & 9 and Everett based upon Good Utility Practice (which is the standard established by the ISO-NE Tariff for such circumstances[18]). Mr. Heintz concludes that "Mystic's revenue requirements are consistent with Commission precedent and that rates based on the enclosed cost of service are just and reasonable.[19]"

As noted above, this is a relatively narrow proceeding. Only the following subjects are at issue:

- Whether Mystic's full cost-of-service is appropriately calculated and supported
- Whether the agreed upon, modified terms of the form cost-of-service agreement are just and reasonable

On the other hand, other issues are clearly beyond the scope of this proceeding, such as:

- Whether Mystic is entitled to recover its cost-of-service for the contract term (ISO-NE has requested that the Commission grant Mystic reliability status,[20] and that status entitles Mystic to recover its full cost-of-service[21])
- Whether the contract term should be two years (addressed in the Waiver Proceeding[22])
- Whether it is appropriate to include recovery for future capital expenditures in the Agreement (addressed in the Waiver Proceeding[23])
- Effects that cost of service payments to Mystic may have on the market[24]

---

[18] ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.2.5.2.5.2(b).

[19] *See* Heintz Testimony at 16.

[20] ISO New England Inc., Petition for Waiver of Tariff Provisions, at 4).

[21] ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.2.5.2.5.1.

[22] ISO New England Inc., Petition for Waiver of Tariff Provisions, at 31-32.

[23] *Id.* at 27-28

[24] We respectfully disagree with ISO-NE's waiver filing on this point and note that at the May 4, 2018 NEPOOL Participants Committee meeting, ISO-NE's Executive Vice President and Chief Operating Officer clarified that issues of price suppression will be addressed in "Chapter 2" of the stakeholder process, which is expected to be completed in November 2018. *See* ISO New England Inc., Petition for Waiver of Tariff Provisions, at 33 n. 65. Any effect of out of market payments to Mystic are a result of the reliability designation, not the amount of cost-of-service compensation, which is the issue in this proceeding. But in any event, it is well established that short-term out-of-market solutions are sometimes necessary, as here, to provide bridges as more lasting market modifications are being developed and implemented. *See, e.g., Devon Power LLC*, 107 FERC ¶ 61,240, at P 72, *order on reh'g*, 109 FERC ¶ 61,154, at PP 25, 27, 29 (2004), *order on reh'g*, 110 FERC ¶ 61,315 (2005); *Bridgeport Energy, LLC*, 113 FERC ¶ 61,311, at P 39 (2005); *Milford Power Co., LLC*, 110 FERC ¶ 61,299, at PP 72, 81, *order on reh'g*, 112 FERC ¶ 61154, at PP 22-23, 32 (2005); *Norwalk Power, LLC*, 120 FERC ¶ 61,048, at P 64 (2007), *reh'g denied*, 122 FERC ¶ 61,273 (2008). *See also* ISO-NE's May 15, 2018 Presentation entitled "Reliability Reviews for Fuel Security: Criteria for Unit Retention in the Forward Capacity Market (FCM)",

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 6

- The proper allocation of the costs of Mystic's cost-of-service (the executed Agreement omits a provision of the form agreement regarding cost allocation, because the ISO proposes to address cost allocation at a later date[25])
- Whether unmodified terms of the form cost-of-service agreement are just and reasonable (they have already been found to be so[26])

This division of issues has a practical effect beyond administrative efficiency. It separates the largely factual cost-of-service and contractual issues in this proceeding from the largely legal and policy issues in the Waiver Proceeding. That will help narrow the issues for settlement and hearing judge proceedings, and increase the likelihood that a timely resolution can be achieved. We expect market participants to raise a variety of issues in this proceeding that have nothing to do with the justness and reasonableness of Mystic's proposed Cost-of-Service Agreement or the proposed rate, such that the chances for timely settlement may well turn on whether the order issued by the Commission makes clear that those issues are not on the table in this proceeding.

Therefore, we respectfully request that the Commission clearly delineate the issues within the scope of the proceeding in its order and adopt streamlined settlement procedures as discussed below, to ensure that these generating units will operate at a just and reasonable rate during the period needed for fuel security.

I.     **BACKGROUND**

   A.  **MYSTIC 8 & 9**

Mystic 8 is a 703.32 MW (summer) natural gas-fired electric generating station and Mystic 9 is a 713.90 MW (summer) natural gas-fired electric generating station, both of which are located in the greater Boston, Massachusetts area of Everett, Massachusetts.[27] Mystic 8 began commercial operations in April 2003 and Mystic 9 began commercial operations in June 2003. Both units are located within the Northeast Massachusetts/Boston ("NEMA") load pocket. Mystic is authorized to sell capacity, energy, and ancillary services under market-based rates.[28] Mystic has been granted exempt wholesale generator status by the Commission.[29]

---

available at https://www.iso-ne.com/static-assets/documents/2018/05/a8_reliability_criteria_for_fuel_security_final.pptx.

[25]     ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.2.5.2.5.1(c).

[26]     *See, e.g., ISO New England Inc.,* 125 FERC ¶ 61,102 (2008).

[27]     Mystic units 1-6 have been decommissioned. Mystic also submitted retirement delist bids for units 7 and Jet, and those units were not designated as units needed for reliability. ISO-NE Petition for Waiver of Tariff Provisions at 2.

[28]     *Sithe Fore River Development LLC*, Letter Order, Nov. 29, 2000, Docket Nos. ER01-41-000 and ER01-42-000; *Mystic I, LLC*, Letter Order, June 4, 2004, Docket Nos. ER04-657-000, ER04-657-001, ER04-660-000, ER04-660-001 (reflecting name change to Mystic I, LLC); *Mystic I, LLC*, 111 FERC ¶ 61,378 (2005) (accepting updated market-based rate analysis).

[29]     *Sithe Mystic Development, LLC,* 93 FERC ¶ 62,208 (2000).

**JA6**

Ms. Kimberly D. Bose
May 16, 2018
Page 7

The Mystic Facility is interconnected to Eversource Energy's transmission system.[30]
Mystic is owned by Constellation Mystic Power, LLC, a Delaware limited liability company,
which is a wholly-owned subsidiary of ExGen, which is in turn, a wholly-owned subsidiary of
Exelon Corporation ("Exelon").

Mystic 8 & 9 have capacity supply obligations through May 31, 2021.  Mystic 8 has a
capacity supply obligation through FCA 12, May 31, 2022, because it was retained for
transmission reliability in the FCA 12 auction.

## B. EVERETT MARINE TERMINAL

Mystic 8 & 9 are the only natural gas-fired units in the United States that are directly
connected to an LNG import regasification facility, Everett.[31]  Everett is the sole source of fuel
for Mystic 8 & 9, and is the longest-operating LNG import facility in the United States.[32]  It
includes 3.4 BCF of storage capacity and has connections to two outbound interstate pipeline
systems, Algonquin Gas Transmission System and Tennessee Gas Pipeline System, a local gas
distribution utility, and Mystic.[33]  Everett has vaporization send out capacity of 715 Mcf/day.[34]

On March 29, 2018, ExGen announced an agreement to acquire the membership interests
of Distrigas of Massachusetts, LLC, a subsidiary of Engie Gas & LNG Holdings LLC
(collectively, "Engie") and owner of Everett, to ensure the continued reliable supply of fuel to
Mystic 8 & 9 to meet their existing capacity supply obligations.[35]   The transaction is scheduled
to close in the fourth quarter of 2018.[36]

## C. THE NEED FOR THE AGREEMENT

In the Waiver Proceeding, ISO-NE establishes the need to grant Mystic a modified form
of reliability status over a two-year period.[37]  Accordingly, the reliability need is not at issue in
this proceeding.  However, we provide some background information here.

In ISO-NE's Operational Fuel-Security Analysis, which studied possible resource
combinations and outage scenarios during the 2024/2025 winter,[38] ISO-NE identified fuel-
security risk—the possibility that power plants will not have or be able to get the fuel they need
to run, particularly in winter—as the foremost challenge to a reliable power grid in New

---

[30]     Exhibit No. MYS-012, Interconnection Agreement at 1-125.

[31]     *See* Berg Testimony at 5.

[32]     *See* Berg Testimony at 5.

[33]     *See* Berg Testimony at 5.

[34]     *See* Berg Testimony at 5.

[35]     *See* Berg Testimony at 5-6; Exhibit No. 002 to Berg Testimony (press release).

[36]     *See* Berg Testimony at 5.

[37]     *See* ISO New England Inc., Petition for Waiver of Tariff Provisions (requesting waiver of application for
certain provisions to Market Rule 1), Ex. ISO-1 at 4-5.

[38]     *Operational Fuel Security Analysis* at 4, ISO New England (January 17, 2018) https://www.iso-
ne.com/about/regional-electricity-outlook/grid-in-transition-opportunities-and-challenges/fuel-security.

Ms. Kimberly D. Bose
May 16, 2018
Page 8

England.[39]  ISO-NE identified LNG imports as a critical component of future power system reliability.[40]  On multiple occasions in recent winters, the ISO has had to manage the system with uncertainty about whether power plants could arrange for the fuel—primarily natural gas— needed to run.[41]  Indeed, fuel procurement, transportation, and storage play a pivotal role in power system operations particularly "during winter when fuel for nearly half the region's generating capacity may become inaccessible due to priority demand for natural gas from the heating sector."[42]

In its study, ISO-NE identified Mystic 8 & 9 and their non-pipeline source of natural gas, Everett,[43] as critical to grid reliability.  ISO-NE concluded that an outage of Everett and a resulting outage of Mystic 8 & 9 "would cause 24 hours of load shedding over seven days…" and "[i]f the outage occurred on a system with maximum retirements and maximum renewables, twice as many load shedding hours would be required, at 49 hours over 11 days."[44]  In sum, an extended outage of any of the key facilities highlighted in the study, notably Everett and Mystic 8 & 9, "would result in frequent energy shortages that would require frequent and long periods of rolling blackouts."[45]

As discussed in the Waiver filing, ISO-NE specifically studied the reliability need for Mystic during 2022/2023 and 2023/2024 and summarized the results of that analysis in the testimony of Peter T. Brandien.  According to Mr. Brandien, "[T]he ISO's analyses show that, without Mystic 8 & 9, in a cold winter similar to that experienced in 2014-2015, the ISO will have to resort to reductions in service during the 2022-2023 and 2023-2024 Capacity Commitment Periods, even under the most optimistic winter operating scenarios. These reductions in service potentially include load shedding (controlled outages or rolling blackouts around the New England region – not just in the Boston area). "[46]

## II.    THE ANNUAL FIXED REVENUE REQUIREMENT IS JUST AND REASONABLE

Mystic 8 & 9's annual fixed revenue requirement of $218,974,263 for 2022-2023 and $ 186,951,485 for 2023-2024 are provided in Schedule 3 of the Cost-of-Service Agreement.  These amounts are cost-justified and are supported in detail by the testimony and exhibits of Alan C. Heintz and Dr. Charles Olson.  As set forth below and in the attached testimony, the proposed revenue requirements are just and reasonable.

---

[39]     *Id.* at 4.
[40]     *Id.*
[41]     *Id.* at 6.
[42]     *Operational Fuel Security Analysis* at 6, ISO New England (January 17, 2018) https://www.iso-ne.com/about/regional-electricity-outlook/grid-in-transition-opportunities-and-challenges/fuel-security.
[43]     In addition to providing all of the natural gas needs of Mystic 8 & 9, the Everett facility can potentially provide 0.3 Bcf/d into the Algonquin and Tennessee interstate gas pipeline system and 0.135 Bcf/d to the local gas utility's distribution system. *Id.* at 23.
[44]     *Operational Fuel Security Analysis* at 45, ISO New England (January 17, 2018) https://www.iso-ne.com/about/regional-electricity-outlook/grid-in-transition-opportunities-and-challenges/fuel-security.
[45]     *Id.* at 50.
[46]     ISO New England Inc., Petition for Waiver of Tariff Provisions, Ex. ISO-1 at 4-5.

**JA8**

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 9

## A. Full Cost of Service Recovery is Appropriate

Under the ISO-NE Tariff, Mystic is entitled to its full cost-of-service if it is designated as a unit needed for reliability. The ISO-NE tariff provides that the Internal Market Monitor will assess the calculation of retirement delist bids to determine whether they are consistent with going-forward costs, *i.e.*, expected cash flows, reasonable expectations regarding capacity performance payments, and the resource's reasonable opportunity costs.[47] But, if the resource is needed for reliability reasons, the resource can elect to be compensated on a cost-of-service basis, unless the resource declines to be retained for reliability.[48] In particular, the ISO-NE Tariff provides that a resource needed for reliability is entitled to elect a cost-of-service recovery:

> In cases where…a Retirement De-List Bid for the capacity of an entire resource has been rejected for reliability reasons…, the resource will be paid either (i) in the same manner as all other capacity resources, except that payment shall be made on the basis of its Commission-approved Permanent De-List Bid or Commission-approved Retirement De-List Bid for the relevant Capacity Commitment Period instead of the Forward Capacity Market Clearing Price or (ii) under the terms of a cost-of-service agreement pursuant to Section III, Appendix I. Resources must notify the ISO of their election within six months after the ISO files the results of the relevant Forward Capacity Auction with the Commission.[49]

Therefore, because Mystic submitted a retirement delist bid for units that are needed for reliability, it is entitled under the Tariff to cost-of-service recovery unless Mystic declines to be retained for reliability.

This is consistent with Commission precedent. In prior cost-of-service reliability proceedings in ISO-NE, the Commission has rejected contentions that a resource should be limited to going-forward costs and instead has allowed the recovery of a full cost-of-service as essential to ensure the units can operate to provide the identified reliability need:

> Consistent with our determinations in other RMR proceedings, the Commission will reject the intervenors' request to limit cost recovery to going-forward costs or to a form of levelized costs. This issue has been fully litigated in prior proceedings and we will not revisit it here. As we have previously found, full cost-of-service recovery is consistent with the cost-of-service provisions of Market Rule 1 and thus appropriate for RMR Agreements. Providing only minimum, marginal, and variable cost recovery to the Units may not allow Mystic to maintain the Units so that they can continue to operate reliably. It would defeat

---

[47]     ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.1.2.3.2.1.
[48]     ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.1.2.3.1.5.1(c) ("If the capacity associated with a…Retirement De-List Bid is needed for reliability reasons pursuant to this Section III.13.1.2.3.1.5.1, the de-list bid shall be rejected and the resource shall be entered into the Forward Capacity Auction pursuant to Section III.13.2.3.2(c) and compensated according to Section III.13.2.5.2.5, unless the resource declines to be retained for reliability as provided in Section III.13.1.2.3.1.5.1(d).").
[49]     ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.2.5.2.5.1(b).

Ms. Kimberly D. Bose
May 16, 2018
Page 10

the purpose of the RMR agreement, which is to ensure that the Units are available
for reliability purposes.[50]

This issue is well settled.[51]  And it is particularly apt here where, as discussed below, Mystic has
agreed, at ISO-NE's request, to enhanced performance penalties.  Therefore, in accordance with
the ISO-NE Tariff and Commission precedent, Mystic is entitled to recover its full cost-of-
service during the reliability term.

### B. The Cost of Service Study Demonstrates Mystic's Annual Fixed Revenue Requirement is Just and Reasonable

#### i. The Cost of Service Study Uses Test Year Actuals and Projections

Mystic witness Mr. Alan Heintz developed a full cost of service to support Mystic's
annual revenue requirement.  Mr. Heintz utilized an historic test period of calendar year 2017
actual expenses, and then projected those expenses forward to the term of the Cost-of-Service
Agreement.[52]  The total cost-of-service is based on the traditional formula of the sum of return
on rate base, income taxes, operations and maintenance expenses, depreciation expense, and
taxes other than income taxes.[53]  Mr. Heintz explains in detail in his testimony the components
of his cost-of-service study, the calculation of historic costs in the test period, how certain
categories of cost were projected to increase through 2024, and how he calculated the monthly
revenue requirement.[54]

In particular, Mr. Heintz testifies that he calculated rate base utilizing gross plant, less
accumulated depreciation.[55]  Gross plant was increased to include necessary capital additions to
the units that will occur from 2018 until the start of the reliability term in June, 2022 to maintain
the continued sound operation of the units under Good Utility Practice as demonstrated by Mr.
Berg.[56]  The accumulated depreciation balance reflects additional depreciation that will accrue in
each year.[57]  Operations and maintenance expense and administrative and general expense were
based on actual costs for 2017, escalated by 2.5% per year based on historical trends and the
average escalation for these expenses over the 2013-2017 period.[58]  Administrative and general
expenses are based on a labor allocator in accordance with Commission precedent.[59]

---

[50]      *Mystic Dev., LLC*, 114 FERC ¶ 61,200, at P 49 (2006), *aff'd on rehearing, Mystic Dev., LLC*, 116 FERC ¶
61,168, at P 45 (2006).

[51]      *Milford Power Co., LLC*, 110 FERC ¶ 61,299, at P 70 (2005); *PSEG Power Connecticut, LLC*, 110 FERC ¶
61,020, at P 30 (2005); *Bridgeport Energy, LLC*, 112 FERC ¶ 61,077, at P 46 (2005); *Pittsfield Generating Co.,
L.P.*, 115 FERC ¶ 61,059, at P 66 (2006).

[52]      *See* Heintz Testimony at 7.
[53]      *See* Heintz Testimony at 6.
[54]      *See* Heintz Testimony at 6-16.
[55]      *See* Heintz Testimony at 7.
[56]      *See* Heintz Testimony at 8.
[57]      *See* Heintz Testimony at 8.
[58]      *See* Heintz Testimony at 10.
[59]      *See, e.g., Kansas-Nebraska Natural Gas Co*., Opinion No. 731, 53 FPC 1691, at 1721 (1975); *Missouri
Power & Light*, 5 FERC ¶ 63,003, at 65,058-59 (1978).

**JA10**

Ms. Kimberly D. Bose
May 16, 2018
Page 11

Specifically, the administrative and general expenses of ExGen and Constellation, a business unit of ExGen, are directly assigned between "generation-unit related" or "other," and then "generation-unit related" is allocated between nuclear and non-nuclear units based on the wages and salaries of each to the total.[60]  Non-nuclear unit expenses are allocated to Mystic based on Mystic's salaries and wages in ratio to the total wages and salaries of generation related non-nuclear expense.[61]  "Other" administrative and general expenses not included in "generation-unit related" expenses that are otherwise related to plant operations were allocated in the same manner.[62]

Depreciation expense was based on a conservative remaining life of 2047; the estimated physical life of the units.[63]  Actual 2017 property taxes are directly assigned to Mystic and an increase occurs in 2022 to account for the retirement of Mystic 7 and then Mystic Jet.[64]  Because of ongoing litigation with the City of Everett over the property tax applicable to Mystic 8 & 9, Mystic proposes to update the property tax number in Mr. Heintz's cost of service with the amount of the actual 2022 property taxes for the 2022/2023 Capacity Commitment Period and the actual 2023 property taxes for 2023/2024 Capacity Commitment Period.

Mr. Heintz totaled the relevant expenses to determine the appropriate annual fixed revenue requirement and then derived a monthly fixed cost payment.  Mr. Heintz's detailed cost-of-service, calculations, and workpapers are provided in the exhibits to his testimony.  In sum, Mr. Heintz concludes that "Mystic's revenue requirements are consistent with Commission precedent and that rates based on the enclosed cost of service are just and reasonable."[65]

### ii.  The Rate of Return is Consistent with Commission Precedent

Mystic proposes an overall rate of return of 8.46%, based on a cost of debt of 4.76%, return on equity of 10.26% and a capital structure of 32.7% debt and 67.3% equity.  Dr. Charles E. Olson demonstrates in his attached testimony the reasonableness of the rate of return, and it is consistent with Commission precedent as detailed below.  Therefore, Mystic requests that the Commission approve the proposed rate of return, capital structure, and cost of debt as just and reasonable.

### 1.  Capital Structure

The Commission prefers using the capital structure of the rate applicant if the applicant issues its own debt, non-guaranteed by another entity, has a bond rating, and has an equity ratio within the historical range approved by the Commission.[66]  Mystic does not, however, issue its

---

60    *See* Heintz Testimony at 10.
61    *See* Heintz Testimony at 10.
62    *See* Heintz Testimony at 10.
63    *See* Heintz Testimony at 10.
64    ISO New England Inc., Petition for Waiver of Tariff Provisions, at 2.
65    *See* Heintz Testimony at 16.
66    *See Transcontinental Gas Pipe Line Corp.*, Opinion No. 414, 80 FERC ¶ 61,157, at 61,667 (1997).

**JA11**

Ms. Kimberly D. Bose
May 16, 2018
Page 12

own debt nor does it have a credit rating.[67]  In those circumstances, the Commission will impute the capital structure of the corporate parent unless the parent's capital structure is anomalous.[68] The Commission's policy is to look at the capital structure of the organization that does the financing for the regulated entity, provided the result is a just and reasonable rate.[69]  In this case, Mystic is indirectly wholly-owned by ExGen, which issues its own debt and has its own bond rating.[70]  Further, ExGen's equity ratio of 67.3% equity and 32.7% debt falls within the range approved by the Commission in prior cases.[71]  Therefore, it is appropriate to use the capital structure of Mystic's parent, which issues its own debt, has its own credit rating, and has an equity ratio within the historical range approved by the Commission.

## 2. Cost of Debt

In accordance with Commission precedent, Mystic uses the cost of debt of 4.76 percent of its indirect parent company ExGen.[72]  The cost of long term debt was based on ExGen's actual bond issuances as of December 1, 2017.

## 3. Return on Equity

Dr. Olson performed a detailed DCF analysis to determine the appropriate return on equity for Mystic in accordance with Opinion No. 531 and Commission precedent.[73]  A DCF analysis could not be performed directly on Mystic since it is not a publicly traded company.[74] Instead, a DCF analysis on a proxy group of other entities that are publicly traded was required, resulting in an imputed return on equity.[75]  Dr. Olson determined that the most reasonable approach was to develop a proxy group of companies with similar risk profiles as Exelon Corporation, the ultimate parent, for several reasons.[76]  Among them, such a proxy group would consist of large, diversified electric companies, it would represent a robust and diversified proxy

---

[67]     *See* Olson Testimony at 7.
[68]     *Williams Natural Gas Co*., 84 FERC ¶ 61,080, at 61,356 (1998); *see also Transcontinental Gas Pipe Line Co.*, Opinion No. 414-A, 84 FERC ¶ 61,084, at P 61,413 (1998) ("[T]he Commission will utilize an imputed capital structure (most often that of the corporate parent) if the record in a particular case reveals that the pipeline's own equity ratio is so far outside the range of other equity ratios approved by the Commission and the range of proxy company equity ratios that it is unreasonable."); *Trailblazer Pipeline Co.*, 106 FERC ¶ 63,005, at P 68 (2004) ("Commission policy dictates the use of the corporate parent's capital structure where a pipeline is not publicly traded and does not issue its own debt, provided the use of the parent does not create anomalous results…. [I]n order to impute a parent's capital structure, the parent must issue its own debt.").
[69]     *Enbridge Pipelines (KPC)*, 100 FERC ¶ 61,260, at PP 173, 184-185 (2002); *Transcontinental Gas Pipe Line Co.*, Opinion No. 414-A, 84 FERC ¶ 61,084 at 61,415.
[70]     *See* Olson Testimony at 7.
[71]     *Pac. Gas Transmission Co.*, 62 FERC ¶ 61,109, at 61,778-79 (1993) (approving 68.86% equity structure).
[72]     *See Enbridge Pipelines (KPC)*, 100 FERC ¶ 61,260, at P 61,943 (2002) ("When the Commission imputes the capital structure of a corporate parent to a subsidiary, it also imputes the parent's costs of debt and preferred stock to the subsidiary."); *Michigan Gas Storage Co.*, 87 FERC ¶ 61,038, at 61,166, *order on reh'ing,* 89 FERC ¶ 61,131 (1999); *Kentucky-West Virginia Gas Co.*, Opinion No. 7, 2 FERC ¶ 61,139, at 61,327 (1978).
[73]     *See Coakley v. Bangor-Hydro Elec. Co.*, Opinion No. 531, 147 FERC ¶ 61,234 (2014).
[74]     *See* Olson Testimony at 8.
[75]     *See* Olson Testimony at 8.
[76]     *See* Olson Testimony at 8.

**JA12**

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 13

group, and it would be very difficult to develop a sufficient enough proxy group of merchant generation companies similar in risk to Mystic or ExGen.[77]  Therefore, Dr. Olson adhered to the national proxy group approved by the Commission in Opinion No. 531, and identified companies within the group with comparable risk to Exelon.[78]

Dr. Olson began his analysis by identifying the universe of companies identified as Electric Utilities by The Value Line Investment Survey.[79]  "This list can be viewed as the universe of utilities that are available for comparative analysis."[80]  Dr. Olson then eliminated companies that were not comparable in risk to Exelon, in that their corporate credit ratings were more than one notch above or below Exelon's credit rating under either the S&P ratings or the Moody's ratings.[81]  Dr. Olson also eliminated companies that are much smaller than Exelon. Exelon's 2017 revenues were $30 billion; utilities with less than $2 billion in revenue were eliminated.[82]  This type of proxy group screen has been approved by the Commission in the past.[83]

In accordance with Commission precedent, Dr. Olson eliminated a company with a negative forecasted growth rate,[84] and one that did not pay dividends during the relevant time period.[85]  Dr. Olson removed three companies that were involved in significant merger or acquisition activity during the study period.  Dr. Olson did not remove Dominion Resources, however, from the proxy group because of its recent acquisition of SCANA Corporation because Dominion is far larger than SCANA and the purchase did not have a material impact on its share price.[86]  The remaining seven proxy companies were all consistent with the Commission's prior exclusion of low-end outliers, as none of these companies has a DCF result within 100 basis points of the six-month average utility bond yield.[87]

---

[77]     *See* Olson Testimony at 8.

[78]     *See* Olson Testimony at 9; *see Coakley*, Opinion No. 531, 147 FERC ¶ 61,234 at P 96.

[79]     *See* Olson Testimony at 13; *see Coakley*, Opinion No. 531, 147 FERC ¶ 61,234 at P 100.

[80]     *See* Olson Testimony at 13.

[81]     *See* Olson Testimony at 13; *See, e.g., Coakley*, Opinion No. 531, 147 FERC ¶ 61,234 at P 106 (affirming finding that it is appropriate to exclude from the proxy group those utilities with corporate credit ratings more than one notch above or below the New England Transmission Owners' credit ratings and stating "purpose of the credit rating band screen is to include in the proxy group only those companies whose credit ratings approximate those of the utilities whose rate is at issue."); *id.*  P 107 ("If a company is more than one notch above or below the credit ratings of the utilities whose rates are at issue based on *either* the S&P ratings *or* the Moody's ratings, that company shall be excluded from the proxy group."); *Tallgrass Transmission, LLC*, 125 FERC ¶ 61,248, at P 77 (2008); PATH LLC, 122 FERC ¶ 61,188, at PP 95, 101-102, *order on reh'ing,* 133 FERC ¶ 61,152 (2008).

[82]     *See* Olson Testimony at 13.

[83]     *Southern Cal. Edison Co.*, Opinion No. 445, 92 FERC ¶ 61,070, at 61,265 (2000) (approving of Trial Staff proxy selection criteria based in part on total revenues because they reflected companies of comparable risk to subject utility in size, business profile, and level of generation).

[84]     *Seaway Crude Pipeline Co., LLC*, Opinion No. 546, 154 FERC ¶ 61,070, at P 196 (2016).

[85]     *See* Olson Testimony at 13; *see Coakley*, Opinion No. 531, 147 FERC ¶ 61,234 at P 112.

[86]     *See* Olson Testimony at 14; *see Coakley*, Opinion No. 531, 147 FERC ¶ 61,234 at P 114 (noting that elimination of a proxy company based on merger or acquisition activity is contingent on a demonstration that the subject utility is involved in a major transaction that results in a distortion of the DCF inputs); *Kern River Gas Transmission Co.*, 126 FERC ¶ 61,034, at PP 79-81 (2009).

[87]     *See* Olson Testimony at 13; *Coakley*, Opinion No. 531, 147 FERC ¶ 61,234 at PP 122-123 (adding 100 basis points to 4.61% six-month average of *Moody's* "Baa" utility bond yields during study period to adopt 5.61%

**JA13**

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 14

Dr. Olson then performed the Commission's two-stage DCF analysis with his proxy group of comparable companies utilizing both short and long-term growth estimates.[88]  From this calculation, he determined the range of cost of equity estimates.  To determine the appropriate placement of Mystic's return on equity within this zone of reasonableness, Dr. Olson evaluated Mystic's risk in comparison to the proxy group.  Dr. Olson concluded that Mystic was more risky:

> In contrast to the electric utilities in the Value Line Investment Survey of electric utilities or in the above proxy group, both of which consist of electric utilities with diversified activities and markets, Mystic's only assets are two gas fired generating units in one geographic region.  Diversified companies, both in terms of assets and geographic markets, can more easily sustain downturns in one market or another.   The business risk is heightened in this case because Mystic is a merchant generator.  While it is my understanding that Mystic has been designated as a unit that is needed for reliability reasons in ISO-NE, the term of that designation is for two years.  Investors would be unlikely to view Mystic's two-year reliability designation as sufficient to overcome the disparities in business risk it has with the proxy group, given that retirement and the cessation of any recovery in investment appears a likely possibility after this brief two-year window.  It is likely that a stand-alone credit rating for Mystic would fall below that of the proxy group.[89]

In addition, Dr. Olson concluded that anomalous capital market conditions currently exist because the major central banks still hold vast quantities of government and housing bonds ensuring that long-term government bond yields are clearly below where they would be without this intervention.[90]  From these factors, Dr. Olson determined that the just and reasonable return on equity should be set at the midpoint of the upper half of the zone of reasonableness.  When placing the return on equity above the median or midpoint, the Commission has traditionally used the measure of central tendency of the top half of the zone or for very risky companies the top of the zone of reasonableness.[91]  Dr. Olson's conclusion is consistent with Commission precedent.

In addition, his conclusion is conservative.  The Commission has approved the use of a proxy rate of return for merchant generators on numerous occasions.  The basis is that those generators are generally more risky than the interconnected transmission owning utility, and therefore, the transmission owning utility's rate of return is a reasonable, conservative proxy.  For example, the Commission has approved the use of the rate of return of the interconnected

---

low-end threshold); *PATH, LLC*, Opinion No. 554, 158 FERC ¶ 61,050, at PP 235 n.406, 248 (adding 100 basis points to 4.66% six-month average of *Moody's* "Baa" utility bond yields to adopt 5.66% low-end threshold).

[88]      *See* Olson Testimony at 14-15; *Coakley*, Opinion No. 531, 147 FERC ¶ 61,234 at PP 36, 39, 122.

[89]      *See* Olson Testimony at 17.

[90]      *See* Olson Testimony at 18; *Coakley*, Opinion No. 531, 147 FERC ¶ 61,234 at P 142.

[91]      *Assoc. of Bus. Advocating Tariff Equity v. MISO*, 156 FERC ¶ 61,234, at P 276 (2016); *Portland Nat. Gas Transmission Syst.*, Opinion No. 524, 142 FERC ¶ 61,197, at P 382 (2013).

**JA14**

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 15

utility for merchant generators providing reactive service or black start service.[92]  The same is true for merchant generators providing reliability service in ISO-NE.  In those cases, the Commission has repeatedly approved the use of a proxy return on equity for merchant generators as a conservative estimate for generating facilities providing reliability service.[93]  In this case, Mystic is interconnected to Eversource Energy,[94] which has a 10.57 percent return on equity.[95]  Therefore, it would be appropriate to use the 10.57 percent return on equity of Mystic's interconnected utility, Eversource Energy, in this proceeding.  At a minimum, this demonstrates that Dr. Olson's analysis is conservative.

### C.  Capital Expense Recovery

The ISO-NE Tariff provides that a resource needed for reliability may make application to the Commission pursuant to Section 205 of the Federal Power Act to receive just and reasonable compensation for any capital improvements that are necessary in order to continue operation to meet the identified reliability need.[96]  ISO-NE's Tariff contemplates that this filing be made separately from the resource's cost-of-service filing.  ISO-NE requested waiver of this provision, however, to permit Mystic to include in this cost-of-service filing any necessary capital expenditures.[97]  This will afford all interested parties the ability to address all cost-of-service matters in a single proceeding, and as detailed above, it will promote the efficient resolution of these issues prior to the expected deadline for Mystic to unconditionally retire.[98]  Consistent with ISO-NE's request, this filing provides support for Mystic's capital expenditures.  We note that permitting recovery of such costs is particularly important in a circumstance like this one, where the service being procured is for fuel security purposes, and where the ISO has requested, and Mystic has agreed to, performance penalties over and above those of ordinary capacity performance resources, as detailed below.

---

[92]      *See, e.g., Bluegrass Generation Co., L.L.C.*, 118 FERC ¶ 61,214, at P 86 (2007) ("Thus, it has been the Commission's general policy to allow an IPP to use the authorized rate of return and return on common equity of an interconnected utility for reactive power compensation, because as we stated in *Calpine Fox*, an interconnected utility's return is a conservative estimate of a merchant generator's return because the merchant generator faces more risk."); *Indiana Mun. Power Agency*, 114 FERC ¶ 61,008, at P 20 (2006) ("The Commission has accepted the use of proxies by non-public utility generators like IMPA that are not subject to traditional rate regulation."); *Calpine Fox, LLC*, 113 FERC ¶ 61,047, at P 17 (2005); *New England Power Pool*, 92 FERC ¶ 61,020, at 61,041 (2000) (basing the return on equity for black start service on the average of the NEPOOL transmission providers' Commission-approved returns on equity).

[93]      *See, e.g., Norwalk Power, LLC*, 120 FERC ¶ 61,048, at P 48 (2007) (adopting 10.88 percent return on equity for generator providing reliability service in ISO-NE as a conservative proxy); *Milford Power Co., LLC*, 110 FERC ¶ 61,299, at P 72 (2005) (same); *Bridgeport Energy, LLC*, 112 FERC ¶ 61,077, at P 48 (2005) (same).

[94]      Exhibit No. MYS-012, at 1-125, Interconnection Agreement.

[95]      Exhibit No. MYS-012, at 187, Eversource Energy Tariff.

[96]      ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.2.5.2.5.2.

[97]      ISO New England Inc., Petition for Waiver of Tariff Provisions at 6, 27-28.  Other provisions of the Tariff related to the capital improvement filing were not waived.  Therefore, Mystic will provide notice of this filing in accordance with ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.2.5.2.5.2(a), and will make the required showing to recover capital expenses as provided in ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.2.5.2.5.2(b).

[98]      ISO New England Inc., Petition for Waiver of Tariff Provisions at 28.

**JA15**

Ms. Kimberly D. Bose
May 16, 2018
Page 16

Mystic proposes to recover the capital expenditures necessary to reliably operate the units over the two-year reliability term of the Cost-of-Service Agreement.[99]  This approach is just, reasonable, and consistent with Commission-approved reliability service agreements.[100]  Any other approach would be unjust and unreasonable, because Mystic, as mandated by the Tariff, currently has no future opportunity to recover these costs past the reliability term upon its retirement.  Mystic is willing, however, to provide a "clawback" process to refund certain capital expenditures incurred during the reliability term if the units remain in service past the termination date.[101]  The ISO-NE Tariff does not contemplate such a provision, but this item could be addressed in the settlement process if this matter is set for hearing and settlement.

The Tariff requires that in order to receive just and reasonable compensation for a capital expenditure a resource must file an explanation of need with the Commission that explains why the capital expenditure is necessary in order to meet the reliability need identified by ISO-NE.[102]  The testimony and exhibits of William B. Berg establish that the capital expenditures proposed here meet the standard in the Tariff.  In particular, Mr. Berg provides in his exhibits a detailed explanation of every capital expense that will be required for Mystic and Everett during the reliability term, the reason for each expense, the cost, and the basis for the cost estimate.[103]  As detailed, those expenditures are necessary to perform and their costs are based on inspections, known service-duty wear, historical need and amounts, manufacturer requirements, and the age of the units and components.[104]  Mr. Berg testifies that each of these expenditures is necessary to perform to ensure the reliable operation of the units in accordance with Good Utility Practice, and that these items were contained in ExGen's budget for Mystic 8 & 9 at the time of the most recent update, with one exception: capital expenses related to enhanced critical infrastructure protection requirements that directly result from Mystic 8 & 9's designation as reliability-must-run units have been added.

For these reasons, Mystic requests approval and recovery of the capital expenditures detailed in the testimony of Mr. Berg as just and reasonable.

## III.  PROPOSED MODIFICATIONS TO THE FORM COST-OF-SERVICE AGREEMENT ARE JUST AND REASONABLE

The proposed Cost-of-Service Agreement is based upon the previously approved ISO-NE Tariff form cost-of-service agreement.  The Agreement is provided in Attachment A, and Attachment B is a blackline showing all changes from the ISO-NE form agreement.  The changes are just and reasonable and necessary to enable Mystic 8 & 9 to continue to meet ISO-

---

[99]     Neither the ISO-NE Tariff nor the form cost-of-service agreement specifies how or over what length of time a retirement de-list bid generator should recover capital expenditures.

[100]    *See AES Huntington Beach, L.L.C.*, 142 FERC ¶ 61,017 (2013) (accepting filed cost-of-service reliability agreement for two synchronous condensers in which Capital Items were recovered under Schedule L over 4- and 5-year periods, reflecting the expected reliability use of each facility).

[101]    *See* MISO, FERC Electric Tariff, Module C, § 38.2.7e(i).

[102]    ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.2.5.2.5.2.(b).

[103]    *See* Berg Testimony at 19-22; Ex. No. MYS-005.

[104]    *See* Berg Testimony at 20-21.

Ms. Kimberly D. Bose
May 16, 2018
Page 17

NE's fuel security need.  In addition, they have been negotiated with and agreed to by ISO-NE.
Accordingly, the Agreement is executed by ISO-NE and Mystic.[105]

### A.  Monthly Fuel Supply Charge

Mystic 8 & 9 are interconnected to the neighboring Everett LNG facility, and Everett is
the sole source of fuel to Mystic 8 & 9.[106]  Mystic is the only natural gas fired generation facility
directly connected to an LNG import facility, which makes both facilities critically important to
the fuel security need identified by ISO-NE.  Everett is currently owned by Engie.[107]  Mystic and
Engie have an existing contract for the supply of gas from Everett, but that contract is in dispute
and litigation to resolve the dispute could take years.  Exelon concluded that the least cost, most
timely and reliable means of securing firm fuel to meet Mystic's existing capacity supply
commitments prior to the term of the Agreement was to acquire the Everett facility.

The testimony of Mr. William Berg explains how, after extensive discussions with Engie,
Exelon determined that acquisition of Everett was the best and most reliable option for Exelon to
meet its existing capacity supply obligations through May 31, 2022 without significant risk of
non-performance.  In fact, as Mr. Berg explains, because the alternatives to Everett included new
infrastructure investment, permitting and construction, and could not be completed in time to
meet existing capacity supply obligations, the available alternatives were not viable options in
the period before the reliability term.[108]

The alternatives also were not viable alternatives for the two-year term of the Agreement.
As Mr. Berg explains, Exelon has no interest in taking on the additional commercial risk of new
investment for any continued operation of Mystic during the two-year term, and the primary
options evaluated to replace Everett's supply were significantly more expensive than simply
continuing to use Everett for that two-year period.  Specifically, the primary alternatives were (1)
a lateral pipeline with additional compression to interconnect to the Algonquin Gas Transmission
and Tennessee Gas Pipeline systems that would allow for additional fuel supply via pipeline in
the summer season coupled with Ultra Low Sulfur Diesel dual fuel capability in the winter at a
combined construction cost of approximately $575 million, and (2) a Hubline lateral to the
Algonquin Gas Transmission system plus upstream winter supply capacity from the Canaport
LNG facility at a construction cost of approximately $750 million.[109]

The proposed cost of service charge to Mystic for continuing to use the existing Everett
facility is much less costly than incurring the costs for either new infrastructure alternatives to
meet a two year fuel security need.[110]  That is unsurprising, as the Everett charge is simply a two
year slice of the costs of that facility, because the investment in Everett will be sunk by the time
of the reliability term and Exelon needs Everett to meet Mystic's existing capacity supply

---

[105]    *See* note 3, *infra*.
[106]    *See* Berg Testimony at 5.
[107]    *See* Berg Testimony at 5.
[108]    *See* Berg Testimony at 6, 13.
[109]    *See* Berg Testimony at 11-12.
[110]    *See* Berg Testimony at 11-12.

Ms. Kimberly D. Bose
May 16, 2018
Page 18

obligations, as discussed above. The alternative options also required either dual fuel capability or supplemental supply in the winter to address any supply constraints from the interstate natural gas pipeline system (and the natural gas priority demand of heating on those systems), which increased risk of environmental restrictions on dispatch.[111] Finally, the alternatives were for *new* facilities, and therefore, had significant timing, permitting, construction, and financing risk which made their ultimate viability uncertain. In short, continued fuel supply from Everett is the least cost and most certain supply option during the term of the Agreement. And it is the fuel source that ISO-NE wants Mystic to use.

The fuel supply via Everett will be provided as follows. An affiliate of Mystic and an indirect subsidiary of ExGen, Constellation LNG, LLC ("Constellation LNG"), will enter into an agreement to receive regasification services at Everett for LNG supply that it obtains through upstream LNG commodity agreements. Constellation LNG also will receive administrative and collateral support from ExGen for a cost-based fee.[112] Constellation LNG will pass those costs (as adjusted for any credits), without mark-up, to Mystic monthly. The Fuel Supply Agreement is Exhibit MYS-004 to Mr. Berg's testimony.[113]

Typically, fuel supply costs are included in the cost of service in various forms.[114] Because fuel supply for Mystic will be provided by an affiliate, Constellation LNG, Mystic has provided additional details to demonstrate the prudence of the costs that will be incurred under its Fuel Supply Agreement. Even if the most restrictive standard for affiliate transactions is conservatively applied, it is appropriate to benchmark fuel purchases against the market cost of alternatives.[115] Mr. Berg testifies that a rational non-affiliate that purchased Everett would seek to push the price charged for LNG supply closer to the cost of the next cheapest alternative, which as discussed above are significantly higher.[116] Constellation LNG has not taken this approach, however. Instead, Constellation LNG is charging Mystic a cost-of-service rate, thereby providing further assurance that the affiliate fuel purchase is prudent.[117] Put differently, taken together the two analyses show that (i) Everett is the least cost alternative, and (ii) that least-cost alternative is being charged at cost, plus a return, rather than at a higher level that a rational non-affiliate might charge.

---

[111]    *See* Berg Testimony at 12-13.

[112]    *See* Berg Testimony at 14.

[113]    The Fuel Supply Agreement is being provided for informational purposes as cost support for the Cost-of-Service Agreement. As such, the Fuel Supply Agreement is not, and will not be, a filed rate. However, Section 3.9 of the Cost-of-Service Agreement (which, once accepted, will be a filed rate) requires that Mystic make an informational filing with the Commission in the event of modifications to any material term of the Fuel Supply Agreement, and further requires ISO-NE's prior written consent to changes to certain terms.

[114]    *See, e.g.*, *Southern California Edison Co.*, 53 FERC ¶ 61,408, at 62,418-19 (1990).

[115]    See 18 C.F.R. § 35.44(b)(2) ("...a franchised public utility that has captive customers or that owns or provides transmission service over jurisdictional transmission facilities, may not purchase or receive non-power goods and services from a market-regulated power sales affiliate or a non-utility affiliate at a price above market."). Application of this standard to Mystic is conservative because Mystic is not a franchised utility or a transmission provider.

[116]    *See* Berg Testimony at 18.

[117]    *See* Berg Testimony at 18.

**JA18**

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 19

Mystic witness Heintz developed a full cost-of-service to substantiate the fixed
operations and maintenance/return on investment component of Everett's costs. Mr. Heintz
again used an historic test period of calendar year 2017 actual expenses, and then projected those
expenses into the years 2022 through 2024.[118] The total cost-of-service was based on the
traditional formula of the sum of return on rate base, income tax, operations and maintenance
expense, depreciation, and taxes other than income taxes.[119] Mr. Heintz explains the
components of his cost-of-service study, the calculation of historic costs in the test period, how
certain categories of cost were projected to increase through 2024, and how he calculated the
monthly fixed costs of Everett.[120]

For example, Mr. Heintz testifies how he calculated rate base based on a gross plant less
accumulated depreciation.[121] Gross plant was also increased to include necessary capital
additions to Everett that will occur from 2018 through May of 2022 to maintain the facility's
reliable operation.[122] With respect to the capital expenditures required at the Everett facility
during the term of the Agreement, a different process was necessarily followed than was used for
Mystic capital expenditures during the term, because Exelon does not yet own Everett. During
the course of the due diligence related to the acquisition, Everett's current owner provided
information as to its budgets and projected facility costs. That information was reviewed from
an engineering perspective and an expected operational budget for Everett was developed. The
costs for capital expenditures at Everett are taken directly from this budgeting process. In
addition, Mystic provides a separate line item to operations and maintenance expense in its cost-
of-service to accurately track when these one-time expenditures are fully recovered.[123]

Everett operations and maintenance expense, administrative and general expense, and
taxes other than income taxes were based on actual costs for 2017, escalated by 2.5% per year
based on historical trends and projections.[124] Depreciation expense was based on a conservative
remaining life of 2047. Mr. Heintz utilized the same remaining life for Everett as Mystic.[125]
And the same rate of return for Mystic was utilized in the cost of service analysis for Everett.[126]
In sum, Mr. Heintz concludes that the cost of service analysis demonstrates that the fixed
operations and maintenance/return on investment component included in the Fuel Supply
Agreement are justified on a cost-of-service basis.[127] The fixed operations and
maintenance/return on investment component is identified in the Fuel Supply Agreement as
follows: for Months in Contract Year 2022: $7,328,074.00/month; for Months in Contract Year
2023: $6,856,381.00/month; for Months in Contract Year 2024: $6,658,432.00/month.

---

[118]     *See* Heintz Testimony at 12.
[119]     *See* Heintz Testimony at 11-14.
[120]     *See* Heintz Testimony at 11-14.
[121]     *See* Heintz Testimony at 12.
[122]     *See* Heintz Testimony at 12.
[123]     *PSEG Power Connecticut, LLC*, 110 FERC ¶ 61,020, at P 42 (requiring one-time capital maintenance
expenses to be recovered in a separate mechanism in the cost-of-service), *reh'ing granted in part,* 110 FERC ¶
61,020 (2005).
[124]     *See* Heintz Testimony at 13-14.
[125]     *See* Heintz Testimony at 14.
[126]     *See* Heintz Testimony at 13.
[127]     *See* Heintz Testimony at 16.

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 20

     Schedule 3 of the proposed Cost-of-Service Agreement provides that the actual monthly fuel supply cost incurred by Mystic to obtain gas from the Everett facility will be recovered separately.[128]  The monthly fuel supply cost will also be credited with half of the margin on any forward third-party sales of LNG.[129] All the margin (100 percent) earned on near-term sales to third parties is credited against Mystic's fuel supply cost and will reduce the costs to consumers. The Cost-of-Service Agreement also provides that ISO-NE has the right to audit and verify documentation on the margin earned on any third-party sales.[130]

     Mystic has considered two options, however, for how much of the net margin on forward third-party sales to include in the revenue credit.  In the option reflected in the Fuel Supply Agreement, 50 percent of the margin will be retained by Mystic with the remainder credited against the monthly fuel supply cost.[131]  This option was requested by ISO-NE to create a strong incentive for Constellation LNG to make economic third-party sales to boost fuel reliability in the region and reduce net service costs of Mystic.  Under this option, Constellation LNG would also bear credit and performance risk with respect to these third party forward sales.  Under the option originally proposed by Mystic, 100 percent of the margin attributable for all forward third-party sales would be credited against the monthly fuel supply cost, directly benefiting customers but without the incentive for Constellation LNG to aggressively market third party sales and without credit or performance risks being borne by Constellation LNG.  Mystic requests that the Commission find that ISO-NE's preferred methodology to allow Constellation LNG to retain some portion of the margin is just and reasonable.  However, Mystic is willing to adopt the original methodology of crediting 100 percent of margin to customers if that is the Commission's preference, and ISO-NE has indicated that it also would accept such a modification, although ISO-NE has stated that it would be concerned that a 100% credit would limit Mystic's willingness to sell LNG to the gas utilities and other generators that also depend on Everett for fuel supply.

     In addition to the fixed operations and maintenance/return on investment component, the monthly fuel supply costs in Schedule 3 will also include the variable operations and maintenance expense associated with regassification services, a monthly fee of $127,750 for administrative and general support services provided by ExGen to Constellation LNG, and a credit and collateral support fee based on the value of the transaction, which depends on whether the support required is a letter of credit or utilization of cash.[132]  In the course of arranging for supply for Mystic and third-party sales of LNG, Constellation LNG may also incur pipeline

---

[128]     Attachment A, Cost of Service Agreement at Schedule 3, Part 2.

[129]     Attachment A, Cost of Service Agreement at Schedule 3, Part 2. Forward third-party sales are defined as sales that occur more than three months in advance of delivery.  Such forward sales typically come in two types: contracts with a demand and variable charge, and option contracts, in which the purchaser pays for the ability to call on gas deliveries at a time in the future. After consideration of the increased variable costs associated with the sale to third-parties and the impact that additional sales of LNG will have on the limited storage at the 3.4 BCF storage tanks, 50% of the amount remaining from the demand charge or the option payment will be credited against Mystic's monthly fuel supply costs and thereby flowed directly back to consumers.

[130]     Attachment A, Cost of Service Agreement at 6.2.

[131]     Attachment A, Cost of Service Agreement at Schedule 3, Part 2.

[132]     *See* Berg Testimony at 14-15.

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 21

transportation agreement costs (to facilitate the sale of excess vapor) and costs (or payments) associated with cancelling or diverting scheduled cargos. Finally, the monthly fuel supply charge in Schedule 3 provides for an Actual Fuel Cost Adjustment, which allows for the credit or debit of any differences between the fuel cost components of the Stipulated Variable Costs set forth in Section 3.4 and Schedule 1 and the commodity cost of fuel for the Resources in accordance with the terms of the FSA for the relevant month. We are aware that, for market mitigation purposes, the Internal Market Monitor prefers to use fuel index prices for the purposes of establishing Reference Levels rather than setting the reference level at the actual contractual price of fuel delivered to a unit.[133] While Mystic is hopeful that Internal Market Monitor will allow the actual contractual price of fuel delivered to Mystic (which is calculated on a weighted average daily cost of gas basis) to be used for the Reference Levels, which are called Stipulated Variable Costs in the Agreement, the Agreement provides a means by which Mystic will recover any actual fuel costs that exceed the fuel cost components of the Stipulated Variable Costs and refund any amounts where the fuel cost in the Stipulated Variable Costs results in Mystic recovering more than its actual fuel costs.

### B. Modifications to Accommodate Mystic's Unique Operational Restrictions.

Upstream fuel supply contracts for LNG typically contain a minimum level of must-take cargos, which must be scheduled in advance, with significant penalties for diversion or cancellation. This necessitates certain modifications to the form cost-of-service agreement. For example, with fuel supply planned for a colder than normal winter, during normal or warm winters, Mystic would be dispatched at a lower level, leaving too much gas in storage at Everett to accommodate a full cargo of LNG upon the fixed delivery date. This is more than a theoretical possibility because Mystic's onsite storage is 3.4 BCF, while a typical cargo ship will deliver 3.0 BCF of LNG. In such circumstances, the Cost-Of-Service Agreement permits Mystic to request to self-schedule to burn gas to allow for more storage capacity.[134] The proposed Cost-of-Service Agreement, however, requires Constellation LNG and Mystic to optimize the displacement of the natural gas under the most economic option, *i.e.*, to self-schedule, to pay the penalty to divert the cargo, or sell the gas at a loss (but less of a loss than self-scheduling or diversions) to third parties.[135]

Contrasting scenarios could also arise. During colder than planned for conditions, Mystic may be dispatched more, leaving a smaller than anticipated supply of gas until the next fixed cargo delivery date. In those circumstances, the Cost-of-Service Agreement also permits Mystic to offer using an opportunity cost of scarce fuel, much like opportunity cost pricing for pumped storage hydroelectric facilities.[136] The price for natural gas at the Algonquin city-gate may also exceed the world LNG price. In that scenario, the sale of natural gas by Constellation LNG onto

---

[133]    *See* Internal Market Monitor of ISO New England Inc., Motion to Intervene, Comments, and Limited Protest, Docket No. ER17-933, at 3 (filed February 24, 2017) ("The IMM is obligated under the ISO Tariff to calculate Reference Levels using market-based prices. ExGen provides no justification for its request to use the fuel contract price as a basis for calculating Reference Levels…").

[134]    Attachment A, Cost of Service Agreement at 3.5.

[135]    *Id.* at Schedule 3, Part 2.

[136]    *Id.* at 3.4.1.4.

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 22

the market could be more economic than burning the gas through Mystic.  The Cost-of-Service Agreement permits Mystic to offer into the energy market utilizing the opportunity cost of the higher scenario, allowing the market to determine the most efficient use of the natural gas.[137] Both types of adders require the approval of ISO-NE and the Internal Market Monitor.

These modifications to the Cost-of-Service Agreement will ensure that that the Mystic facility will be dispatched in manner designed to maximize the benefit to the region of the LNG delivered to Everett.

### C.  Term

The form cost-of-service agreement provides that it will be in effect for at least twelve months, but may be terminated thereafter upon 120 days written notice.[138]  The proposed Cost-of-Service Agreement properly modifies the effective date to two 12-month terms.[139]  ISO-NE requested waiver of the existing term provision in the Waiver Proceeding,[140] and the merits of that request should be addressed in that proceeding.  However, Mystic provides the following discussion for informational purposes.

ISO-NE identified through its reliability study that Mystic 8 & 9 would be required to meet the fuel security needs of the electric grid in both June 2022 to May 2023 and June 2023 to May 2024.[141]  ISO-NE's analysis demonstrated that the loss of the Mystic 8 & 9 units and the Everett facility, could lead to depletion of the ISO-NE's 10-minute operating reserves during more than 80 hours, and as much as 24 hours of rolling blackouts over seven days during the 2022-2023 and 2023-2024 winters.[142]  In addition, since Mystic 8 & 9 are sourced by the Everett facility, they do not rely on the seriously constrained New England natural gas pipeline system, and therefore, ISO-NE also concluded that Mystic 8 & 9's retirement would present an unacceptable fuel security risk.[143]  ISO-NE explained that the two-year term will ensure reliability of the system until ISO-NE and its stakeholders can develop, and market participants have an opportunity to make any investments needed to implement a market-based fuel security solution for the region.  It is worth noting that it is unlikely that a stakeholder process, filing, and Commission approval of such a mechanism could be accomplished before the time by which Mystic would need to submit a new retirement delist bid for FCA 14, in March of 2019.[144]  Indeed, in recent stakeholder discussions, ISO-NE has indicated that the new market mechanism will not be filed until June 2019 – three months *after* the retirement delist bid deadline for FCA 14.  Therefore, the two-year term is necessary to meet the fuel security service need required by ISO-NE and to provide adequate time to develop and implement a market-based solution.

---

137    *Id.*
138    ISO-NE FERC Tariff No. 3, Market Rule 1, Appendix I at 2.2.
139    Attachment A, Cost of Service Agreement at Schedule 2.2.
140    ISO New England Inc., Petition for Waiver of Tariff Provisions, at 5, 23-25.
141    *Id.* at 4, 23-25.
142    *Id.* at 10-12.
143    *Id.* at 2.
144    *Id.* at 5.

**JA22**

Ms. Kimberly D. Bose
May 16, 2018
Page 23

Nearly every reliability agreement in ISO-NE has been for a term in excess of one year in order to meet the particular reliability need and allow sufficient time to remedy the applicable market inefficiency. For example, in the early 2000s, termination dates in a series of reliability service agreements were based upon the implementation of a market design change, the location installed capacity or forward capacity market mechanism, which was not expected to be in place for several years from the effective date of the reliability agreements.[145] The treatment proposed by ISO-NE in the Waiver Proceeding tracks this model.

### D. Conditions Precedent

Under the ISO-NE tariff, Mystic is entitled to cost-of-service recovery because it submitted a delist bid that was rejected for reliability reasons, unless Mystic declines to be retained for reliability.[146] The issue in the Waiver Proceeding, however, is that the time periods under the ISO-NE Tariff for the election and approval of its cost-of-service occur much *later* than Mystic's deadline to decide whether to unconditionally retire.[147] Under the ISO-NE Tariff, Mystic must submit its retirement decision within ten (10) business days of being informed that it is needed for reliability.[148] This decision takes place before it can challenge any Internal Market Monitor review of its retirement delist bid price, elect to receive cost-of-service rates, or obtain approval of its cost-of-service rates.[149] Indeed, the ISO-NE Tariff provides that a cost-of-service election will be made within six months of the forward capacity auction and generally anticipates the determination of the cost-of-service after the auction.[150] Therefore, under the current tariff, Mystic would have to decide whether to unconditionally retire *before* it knows whether the necessary contract terms and conditions have been accepted and whether it will receive enough revenues to stay in operation to meet the reliability need.

To address this incongruity, ISO-NE requested a waiver of tariff provisions to allow a January 4, 2019 deadline for Mystic to decide whether to unconditionally retire in order to provide as much time as possible for Mystic to obtain approval of the Cost-of-Service

---

[145]    *See, e.g., Norwalk Power, LLC*, 120 FERC ¶ 61,048, at P 64 (2007) ("The termination date of the proposed RMR agreements has been addressed in prior RMR orders. The Commission has stated that it would consider RMR agreements that expire when the LICAP mechanism is implemented. The FCM Settlement Agreement explicitly states that the beginning of the first commitment period (June 1, 2010) will be considered to be the implementation or effectiveness of a LICAP mechanism. Thus, consistent with prior RMR orders, we will not restrict the instant RMR Agreement to a one-year term."); *Bridgeport Energy, LLC*, 113 FERC ¶ 61,311, at P 39 (2005); *Milford Power Co.*, 112 FERC ¶ 61,154, at P 32 (2005).

[146]    ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.2.5.2.5.1(b).

[147]    The first forward capacity market auction under the current construct in ISO-NE was held in February 2008 (for a June 1, 2010 forward capacity period), after the most recent reliability must-run agreements were entered and filed at the Commission. *See Norwalk Power, LLC*, 122 FERC ¶ 61,273 (2008) (order addressing last cost of service reliability agreement in ISO-NE that was filed on April 26, 2007). Therefore, this is the first cost-of-service agreement in ISO-NE that has been entered and filed after the current forward capacity market construct was implemented in ISO-NE.

[148]    ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.1.2.3.1.5.1(d).

[149]    *Id.* at Section III.13.1.2.4(a), Section III.13.1.2.4.1,Section III.13.2.5.2.5.1(b), Section III.13.8.1.

[150]    *Id.* at Section III.13.1.2.3.1.5.1(c).

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 24

Agreement while still allowing enough time to be included or excluded from the FCA 13 auction that takes place in February 2019.[151]

In addition, the Cost-of-Service Agreement provides as conditions precedent that the Commission must issue an order accepting the Cost-of-Service Agreement and the annual fixed revenue requirement by December 21, 2018, and both Mystic and ISO-NE must accept the Commission approved Agreement by January 3, 2019.[152]  This will allow Mystic the opportunity to obtain approval of its cost-of-service and the terms and conditions of the Agreement before it decides to participate in FCA 13.

Mystic is unwilling to undertake capacity supply obligations for FCA 13 blindly, without knowing the rate or terms and conditions under which it will provide service.  As discussed in Mr. Berg's testimony, Exelon's intention has been to operate Mystic through the term of its existing capacity supply obligations and then exit this business.  Mystic estimates that, beginning in 2021, the costs and risks of operating these facilities, which include significant global and domestic commodity risk and operational risk, will far outweigh the revenue opportunity available through the ISO-NE markets.  Exelon's strategy, which has been well articulated over the past several years, is to reduce exposure to commodity risk and not to increase it.[153]  Thus, to continue to operate beyond the term of its existing obligations, Mystic will need to determine whether the compensation and non-rate terms of service under the Agreement are adequate and provide protection from or compensation for the risks of continued operation.  The conditions precedent provide Mystic protection to render the Cost-of-Service Agreement ineffective if it is not approved prior to the deadline to unconditionally retire or if the costs approved in the Agreement are insufficient.  In short, the reciprocal conditions precedent are appropriate to protect both Mystic and ISO-NE.

### E.  Market Penalties

The Cost-of-Service Agreement contains enhanced performance penalties, requested by ISO-NE, that provide additional incentives for Mystic to be available to meet the fuel security need during the reliability term.  Section 3.6 of the Agreement imposes a stricter Capacity Performance penalty by assigning a higher capacity supply obligation during the winter months of December, January, and February.  In addition, each unit will be subject to performance penalties and performance payments consistent with their supply obligations, but cannot be paid a net performance payment.  While performance payments can be used to offset performance penalties, any cumulative balance of performance payments will be reset to zero before winter to incentivize winter performance, and again will be reset to zero at the end of the Capacity Commitment Period.[154]  Section 3.7 of the Agreement adds a winter fuel security penalty to further ensure that Mystic provides the needed fuel security service in winter.  Specifically, Mystic is subject to a penalty rate during the winter period (December 1 through the last day of

---

[151]     ISO New England Inc., Petition for Waiver of Tariff Provisions at 4 (requesting waiver of ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.1.2.4.1 and 13.1.2.3.1.5.1).
[152]     Attachment A, Cost of Service Agreement at Schedule 2.1.
[153]     Exelon Corp., Form 10-K, U.S. Securities and Exchange Commission, at 19 (filed Feb. 9, 2018).
[154]     Attachment A, Cost of Service Agreement at 3.6.

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 25

February), when (i) Capacity Scarcity Conditions exist, (ii) the region is experiencing fuel scarcity, and (iii) when Mystic is unavailable due to a lack of fuel as evidenced by its storage tanks falling below certain prescribed levels.[155]  Since reserve constraint penalty factors ("RCPFs") are used under the Tariff to determine when Capacity Scarcity Conditions exist, the penalty rate is determined based on the applicability certain of RCPFs at the Mystic Nodes. Mystic faces significant exposure under these penalties – up to $30 million a month in December, January and February and up to $110.3 million in a single Capacity Commitment Period as a result of both the Winter Fuel Security Penalty and the enhanced Capacity Performance penalty.

## F.  Stipulated Variable Cost Recovery

Article 3 and Schedule 1 of the Cost-of-Service Agreement provide that Mystic will offer into the energy market at Stipulated Variable Costs that are intended to act as the Reference Levels for the units, and which are subject to the Internal Market Monitor's approval.  The provisions and formula regarding the Stipulated Variable Cost are generally straightforward and simply reflect an update in the manner by which offers are calculated today as opposed to in 2008.  As discussed above, the Stipulated Variable Cost recovery has also been modified to account for the fuel opportunity cost of LNG where LNG may be less expensive than natural gas at the Algonquin city-gate or where it would be more economic to sell LNG to third parties as opposed to burning through Mystic.[156] Also discussed above is the addition of a second type of fuel opportunity cost – one which reflects the fact that due to Mystic's unique constraints related to the logistics of LNG supply, there may be times in which fuel will be scarce and it should be conserved for the hours in which ISO-NE needs the Mystic units the most.  The formula has also been modified to account (via a "Fuel Variable/Other Costs" component) for the fact that a fuel index price will not reflect the price of the LNG product delivered to Everett, a delivery point that is unique in the world.  In sum, the modifications to the form agreement are necessary to update the Stipulated Variable Costs to current operational circumstances or to address the particular supply requirements of the Mystic units.

## IV.  REQUEST FOR EXPEDITED CONSIDERATION

Mystic has three related requests related to expediting and streamlining this proceeding.

First, the Agreement provides as conditions precedent that the Commission issue an order accepting the Cost-of-Service Agreement and the annual fixed revenue requirement by December 21, 2018, and both Mystic and ISO-NE must accept the Commission approved Agreement by January 3, 2019.[157]  Accordingly, Mystic respectfully requests that the Commission accept the Cost-of-Service Agreement and the fixed and variable cost-justified rates provided as just and reasonable, without suspension or hearing, prior to December 21, 2018. This will enable Mystic to know whether it will receive sufficient revenues to stay in operation to

---

[155]     Attachment A, Cost of Service Agreement at 3.7.
[156]     *Id.* at 3.4.
[157]     *Id.* at Schedule 2.1.

Document Accession #: 20180516-5048   Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 26

meet the fuel security need and whether the needed terms and conditions have been accepted before its decision to take on additional capacity supply obligations for FCA13. If the Commission sets this matter for hearing or settlement judge proceedings, Mystic recognizes that this timeline does not permit time for a hearing. Even obtaining approval of a settlement in that timeframe will be a challenge, particularly in the event that the settlement is contested. To give the settlement process the best possible chance of succeeding, we ask that the Commission direct the immediate appointment of a settlement judge (without the usual five day wait) and require the settlement judge to establish an aggressive timetable for settlement proceedings, including establishing a timetable to facilitate reaching a settlement in principle with as many parties as possible by September 28, 2018, and the filing of a settlement agreement by October 10, 2018. In our estimation, that is the timeframe needed to allow action on a contested settlement, if necessary, by December 21, 2018.

Second, Mystic asks that the Commission further facilitate the settlement process by resolving on the merits as many issues as possible in the order establishing the settlement process.

Finally, Mystic also respectfully requests pursuant to Rule 101,[158] for good cause shown, that if this matter is set for hearing and held in abeyance for settlement negotiations before a settlement judge under Rule 603,[159] that (i) the requirement that the settlement judge certify or provide a settlement report to the Commission[160] be waived and any contested or uncontested offer of settlement be transmitted directly to the Commission in order to expedite approval of any such offer of settlement, and (ii) that the time for initial comments on any settlement be shortened to ten (10) days from the submission of the offer of settlement and the time for reply comments shortened to fifteen (15) days from the submission of the offer of settlement. Mystic believes that a settlement judge can play an essential role in helping the parties arrive at settlement expeditiously, but believes that the Commission will have sufficient understanding of this matter to be able to reach a determination on a settlement based upon the pleadings submitted by interested parties.

## V.   REQUEST FOR PRIVILEGED TREATMENT

Pursuant to 18 C.F.R. Section 388.112,[161] Mystic respectfully requests privileged treatment for the following testimony and exhibits:

- Schedules 1 and 2 of the Cost-Of-Service Agreement in Attachments A and B;
- Exhibit Nos. MYS-003 to Mr. Berg's testimony that relates to the acquisition of Everett from Engie; and

---

[158]   18 C.F.R. § 385.101(e).
[159]   18 C.F.R. § 385.603.
[160]   *Cities of Anaheim, Azusa, Banning, Colton and Riverside, California v. CAISO*, 101 FERC ¶ 61,392, at P 12 (2002).
[161]   18 C.F.R. § 388.112.

**JA26**

Ms. Kimberly D. Bose
May 16, 2018
Page 27

- Workpapers in the cost-of-service study attached to Mr. Heintz's testimony as Exhibit No. MYS-009.

These documents contain commercial data, trade secrets, and financial information that is confidential and privileged– specifically Schedule 1 and 2 to the Cost-Of-Service Agreement in Attachments A and B, Exhibit No. MYS-003, and Exhibit No. MYS-009 contain confidential information related to the purchase of the Everett facility and otherwise contain trade secrets and confidential commercial data.[162] Accordingly, good cause exists for the Commission to grant this request for privileged treatment. A public redacted version of the testimony and exhibits detailed above is also provided. In accordance with Section 388.112(2)(i), Mystic is attaching a proposed protective order based on the Commission's Model Protective Order[163] and attached hereto as Attachment G.[164]

Mystic is filing a motion contemporaneously with this filing asking the Commission to enter an order adopting the protective order.[165]

## VI.    COMPLIANCE WITH THE COMMISSION'S FILING REQUIREMENTS

Mystic respectfully requests that the Commission accept the proposed Cost-of-Service Agreement for filing. A description of the rate and the justification for the rate are set forth in this transmittal letter and in the testimony and exhibits of Mr. Berg, Mr. Heintz, and Dr. Olson.[166] Mystic requests waiver of any of the Commission's cost-of-service data requirements and any of the Commission's other regulations under Part 35 that are not necessary for this filing, including but not limited to, the Commission's regulations at 18 C.F.R. § 35.13(d) requiring submission of Period II cost data.[167] Mystic requests waiver of any other Commission regulation as necessary for the proposed Cost-of-Service Agreement to become effective as requested. Mystic submits the following information in accordance with Part 35 of the Commission's regulations:

### A.    REQUESTED EFFECTIVE DATE[168] AND REQUEST FOR WAIVER OF PRIOR NOTICE REQUIREMENT

In accordance with the ISO-NE Tariff, Mystic respectfully requests that the Commission permit the Cost-of-Service Agreement to become effective on June 1, 2022, the first day of FCA

---

[162] 18 C.F.R. § 388.107(d).

[163] Mystic's proposed Protective Order is identical to the "Model Protective Order" available on the Commission's website, but for minor formatting changes.

[164] 18 C.F.R. § 35.13(b)(2)(i).

[165] *See, e.g., Tricon Energy Ltd. v. Colonial Pipeline Company*, 157 FERC ¶ 61,099 (2016) (Commission granting motion for protective order).

[166] 18 C.F.R. § 35.13(b)(4)-(5).

[167] *See PSEG Power Connecticut, LLC*, 111 FERC ¶ 61,441, at PP 42-44 (2005); *Milford Power Company, LLC*, 112 FERC ¶ 61,154, at PP 40-41 (2005); *Mystic Development, LLC*, 114 FERC ¶ 61,200, at P 61 (2006).

[168] *See* 18 C.F.R. § 35.13(b)(2).

**JA27**

Ms. Kimberly D. Bose
May 16, 2018
Page 28

13.[169] Because Mystic is following the process established by the ISO-NE Tariff and requested in the Waiver Proceeding, waiver of prior notice requirements should not be necessary. However, out of an abundance of caution, Mystic requests such waiver to the extent necessary, and submits that good cause exists to grant such a waiver because this is the timeline established between the Tariff and the relief requested in the Waiver Proceeding.

### B. MISCELLANEOUS

There are no costs that have been included with this filing that have been alleged or judged in any administrative or judicial proceeding to be illegal, duplicative, or unnecessary costs that are demonstrably the product of discriminatory employment practices.[170] There are no additional agreements, contract or otherwise, that are required for the filing of the rate.[171]

### C. NOTICE AND SERVICE[172]

Mystic has served a copy of this filing upon ISO-NE and the persons listed in Attachment H.[173]

### D. COMMUNICATIONS

Mystic requests that communications regarding this filing be addressed to the following individuals, whose names should be placed on the Commission's official service list for this proceeding:[174]

David O. Dardis
Exelon Corporation
1310 Point Street, 8th floor
Baltimore, MD 21231
410-470-3416
david.dardis@exeloncorp.com

Carrie Hill Allen
Jeanne J. Dworetzky
101 Constitution Ave, 400E
Washington, DC 20001
202-637-0344
Carrie.allen@exeloncorp.com
Jeanne.dworetzky@exeloncorp.com

Noel Symons
John P. Perkins, III
Colin Francis
Elizabeth McErlean
McGuireWoods LLP
2001 K Street NW
Suite 400
Washington, D.C. 20006
(202) 857-2929
nsymons@mcguirewoods.com
jperkins@mcguirewoods.com
cfrancis@mcguirewoods.com
emcerlean@mcguirewoods.com

---

[169]    ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.2.5.2.5.1(b).
[170]    *See* 18 C.F.R. § 35.13(b)(7).
[171]    *See* 18 C.F.R. § 35.13(b)(6).
[172]    *See* 18 C.F.R. § 35.13(b)(3).
[173]    *See* ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.2.5.2.5.2(a).
[174]    Mystic respectfully requests waiver of 18 C.F.R. §385.203(b)(3), so that more than two persons may be designated for service on the official service list in this proceeding.

**JA28**

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

Ms. Kimberly D. Bose
May 16, 2018
Page 29

### E. CONTENTS OF FILING[175]

Mystic is submitting the following documents with this filing:

1. Transmittal Letter;
2. Attachment A – Mystic Rate Schedule FERC No. 1; Public Redacted and Non-Public Privileged Versions;
3. Attachment B – Blackline showing changes from the ISO Tariff form cost-of-service agreement to the submitted agreement; Public Redacted and Non-Public Privileged Versions;
4. Attachment C – Prepared Direct Testimony and Exhibits of William B. Berg (Exhibit Nos. MYS-001 through MYS-005; Public Redacted and Non-Public Privileged Versions of Exhibit No. 3);
5. Attachment D – Prepared Direct Testimony and Exhibits of Alan C. Heintz (Exhibit Nos. MYS-006 through MYS-009; Public Redacted and Non-Public Privileged Versions of Exhibit No. MYS-009);
6. Attachment E – Prepared Direct Testimony and Exhibits of Charles E. Olson (Exhibit Nos. MYS-010 through MYS-012);
7. Attachment F – Attestation of Bryan Wright;[176]
8. Attachment G – Proposed Protective Order;
9. Attachment H – List of Recipients; and
10. Attachment I – Index of Exhibits

### VII. CONCLUSION AND REQUESTS FOR APPROVAL

For the foregoing reasons, Mystic respectfully requests that the Commission:

- Accept the Agreement and its fixed and variable cost-justified rates provided as just and reasonable, prior to December 21, 2018, with an effective date of June 1, 2022;
- Approve as just and reasonable the modifications to the form cost-of-service agreement shown in Attachment B and discussed above;
- Issue an order within 60 days establishing streamlined settlement judge proceedings by:
  - o Resolving as many issues as possible on the pleadings;
  - o Directing the Chief Administrative Law Judge to immediately appoint a Settlement Judge;
  - o Directing the Settlement Judge to establish a timetable to facilitate reaching a settlement in principle with as many parties as possible by

---

[175] *See* 18 C.F.R. § 35.13(b)(1).
[176] *See* 18 C.F.R. § 35.13(d)(6).

Ms. Kimberly D. Bose
May 16, 2018
Page 30

September 28, 2018, and the filing of a settlement agreement by October 10, 2018;

o Waiving the requirement that the Settlement Judge certify or provide a settlement report to the Commission[177] such that any contested or uncontested offer of settlement be transmitted directly to the Commission; and

o Shortening the time for initial comments on any offer of settlement to ten (10) days from the submission of the offer of settlement and the time for reply comments to fifteen (15) days from the submission of the offer of settlement.

Respectfully submitted,

*/s/    Noel Symons*
Noel Symons

*Counsel for Constellation Mystic Power, LLC*

cc:     ISO-NE
        State Utility Commissions
        NEPOOL

Enclosures

---

[177]     *Cities of Anaheim, Azusa, Banning, Colton and Riverside, California v. CAISO*, 101 FERC ¶ 61,392, at P 12 (2002).

**JA30**

# Attachment A

# Public Redacted
# Mystic Rate Schedule FERC No. 1

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

# COST-OF-SERVICE AGREEMENT

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

# COST-OF-SERVICE AGREEMENT

## Table of Contents

ARTICLE 1 -  DEFINITIONS AND RULES OF INTERPRETATION

    1.1      Definitions

    1.2      Interpretations

    1.3      Construction

ARTICLE 2 -  TERM

    2.1      Effective Date and Term

    2.2      Termination

    2.3      Consequence of Termination or Expiration.

    2.4      Survival

ARTICLE 3 -  RIGHTS AND OBLIGATIONS

    3.1      In General

    3.2      Insurance

    3.3      Bilateral Agreements

    3.4      Supply Offers

    3.5      Self-Scheduling

    3.6      Capacity Performance Payments

    3.7      Winter Fuel Security Penalty

    3.8      Fuel Supply Information Sharing

    3.9      Fuel Supply Management and Third-Party Sales

    3.10    Minimization of Out-of-Market Impacts

ARTICLE 4 -  COMPENSATION AND SETTLEMENT

    4.1      In General

    4.2      Variable Cost Recovery

    4.3      Fixed-Cost Recovery

    4.4      Revenue Credit

ARTICLE 5 -  MARKET MONITORING

    5.1      Mitigation

**JA33**

5.2     Adjustment

ARTICLE 6 -  REPORTING

6.1     Variable Cost and Resource Characteristic Reporting

6.2     Books and Records; Audit Rights

ARTICLE 7 –   RESOURCE OPERATION AND MAINTENANCE

7.1     Planned and Forced Outages

7.2     Additional and Other Expenses

ARTICLE 8 -  FORCE MAJEURE EVENTS

8.1     Notice of Force Majeure Event

8.2     Effect of Force Majeure Event

8.3     Remedial Efforts

ARTICLE 9 -  REMEDIES

9.1     Damages and Other Relief

9.2     Termination by Default

9.3     Waiver

9.4     Beneficiaries

ARTICLE 10 - COVENANTS OF THE PARTIES

10.1    ISO

10.2    Owner

10.3    Lead Market Participant

ARTICLE 11 - MISCELLANEOUS PROVISIONS

11.1    Assignment

11.2    Notices

11.3    Parties' Representatives

11.4    Effect of Invalidation, Modification, or Condition

11.5    Amendments

11.6    Governing Law

11.7    Entire Agreement

11.8    Independent Contractors

11.9    Execution Counterparts

**JA34**

11.10    Confidentiality

11.11    Submittal to the Commission

SCHEDULE 1         Information on Marginal Cost

SCHEDULE 2         Resource Characteristics

SCHEDULE 3         Supplemental Capacity Payment

**JA35**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

## COST-OF-SERVICE AGREEMENT

This COST-OF-SERVICE AGREEMENT ("Agreement") is made as of the 15ᵗʰ day of May, 2018, among Constellation Mystic Power, LLC, a Delaware limited liability company ("Owner"), Exelon Generation Company, LLC, a Pennsylvania limited liability company ("Lead Market Participant") and ISO New England Inc., a Delaware non-stock corporation ("ISO").

### RECITALS

A.      Owner is the owner of Mystic 8 (Asset ID No.1478), a 703.32 MW (summer claimed capability) electrical generating station together with appurtenant facilities and structures, and Mystic 9 (Asset ID No. 1616), a 713.90 MW (summer claimed capability) electric generating station together with appurtenant facilities and structures, both located in Everett, Massachusetts (each a "Resource" and collectively the "Resources").

B.      Owner is a wholly-owned, indirect subsidiary of Lead Market Participant, which is a Market Participant in the ISO New England Markets.  Lead Market Participant operates and administers the Resources in accordance with the ISO New England Filed Documents and the ISO New England System Rules and causes energy, capacity and ancillary services from the Resources to be offered for sale into the New England Markets.

C.      The sole source of fuel for the Resources is Engie North America's liquefied natural gas ("LNG") import terminal located in Everett, Massachusetts (the "LNG Terminal").  In its January 17, 2018 Operational Fuel-Security Analysis, ISO identified the combination of the Resources and the LNG Terminal as one of four key facilities which, in the event of an extended outage, "would result in frequent energy shortages that would require frequent and long periods of rolling blackouts."  On March 29, 2018, Lead Market Participant announced an agreement to purchase the LNG Terminal to ensure the continued reliable supply of fuel to the Resources while they remain in operation.

D.      ISO is the Regional Transmission Organization for New England and is responsible for the operation of the New England Control Area to ensure short-term reliability and the

**JA36**

administration of the New England Markets.

E.    Lead Market Participant submitted a Retirement De-List Bid for the Resources for the Forward Capacity Auction for the Capacity Commitment Period starting June 1, 2022 (FCA 13).

F.    ISO concluded that the Resources will be needed for reliability purposes during the Term and expects the Resources may be required to run out-of-economic merit order to address fuel security risks that threaten the reliability of the ISO New England transmission system.

G.    The Parties have agreed (i) that Owner shall cause an FPA Section 205 proceeding to be initiated to establish the Annual Fixed Revenue Requirement and (ii) to enter into this Agreement for supplying energy, ancillary services and capacity from the Resources into the New England Markets and thereby (x) set the rate by which Owner shall receive its fixed costs for the Resources from Market Participants, (y) govern how the Lead Market Participant shall cause bids to be made, and (z) ensure that the Owner receives its variable costs of supply.

NOW THEREFORE, in consideration of the agreements and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound by this Agreement as of the Effective Date, the Parties covenant and agree as follows:

<div align="center">

**ARTICLE 1**

**DEFINITIONS AND RULES OF INTERPRETATION**

</div>

**1.1.    Definitions.**

Except for the terms defined below and in the attached schedules, capitalized terms shall be as defined in the ISO New England Filed Documents and the ISO New England System Rules.

1.1.1.    **"Additional Expenses"** shall mean costs associated with O&M Items in excess of the Fixed O&M Expenses.

**JA37**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

1.1.2. **"Annual Fixed Revenue Requirement"** or **"AFRR"** shall have the meaning set forth in Schedule 3.

1.1.3. **"Availability"** means the capability of the Resources, in whole or in part, at any given time, to produce energy, capacity, or ancillary services in accordance with Good Utility Practice, and "Available" shall be construed accordingly.

1.1.4. **"Effective Date"** shall have the meaning set forth in Section 2.1.

1.1.5. **"Fixed O&M Expenses"** shall have the meaning set forth in Schedule 3.

1.1.6. **"Force Majeure Event"** means any act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm or flood, explosion, any order, regulation or restriction imposed by a Governmental Authority, or any other cause beyond a Party's control.

1.1.7. **"Forced Outage"** means any outage of the Resources (other than a Planned Outage) that (i) is taken consistent with Good Utility Practice and applicable NERC criteria and (ii) fully or partially curtails the Resources' ability to supply energy, capacity and/or ancillary services.

1.1.8. **"FPA"** means the Federal Power Act.

1.1.9. **"Governmental Authority"** means the government of any nation, state or other political subdivision thereof, including any entity lawfully exercising executive, military, legislative, judicial, regulatory, or administrative functions of or pertaining to a government.

1.1.10. **"ISO"** shall have the meaning set forth in the preamble of this Agreement and, where applicable and appropriate, its assignee and/or designee.

1.1.11. **"ISO Market Monitoring"** means the Internal Market Monitor for the ISO.

1.1.12. **"ISO New England Filed Documents"** means the ISO New England Inc. Transmission, Markets and Services Tariff, as may be amended from time to time.

**JA38**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

1.1.13. **"ISO New England System Rules"** means all manuals, operating procedures and other requirements of ISO, as each may be amended from time to time.

1.1.14. **"Law"** means any law, treaty, code, rule, regulation, or order or determination of an arbitrator, court or other Governmental Authority, or any license, permit, certificate, authorization, qualification, or approval granted by a Governmental Authority to the extent binding on a Party or any of its property.

**1.1.15. "Lead Market Participant"** shall have the meaning set forth in the preamble of this Agreement and, where applicable and appropriate, its assignee and/or designee.

1.1.16. **"LNG" and "LNG Terminal"** shall have the meanings set forth in the recitals.

1.1.17. **"Month"** means the period beginning at 12:00 a.m. on the first day of the calendar month and ending at 12:00 a.m. of the first day of the next succeeding calendar month.

1.1.18. **"Monthly Reports"** shall have the meaning set forth in Section 4.4.4.

1.1.19. **"Monthly Settlement"** means the monthly settlement process set forth in the ISO New England System Rules.

1.1.20. **"Notice of Additional Expenses"** shall have the meaning set forth in Section 7.1.2(e).

1.1.21. **"Notice of Forced Outage"** shall have the meaning set forth in Section 7.1.2(b).

1.1.22. **"Notice of Shut-down"** shall have the meaning set forth in Section 7.1.2(c).

1.1.23. **"O&M"** means operations and maintenance.

1.1.24. **"O&M Expenses"** see "Fixed O&M Expenses."

1.1.25. **"O&M Items"** means fixed O&M costs of repairs of the Resources and replacements of any part of the Resources to correct or avoid any impairment of the capability of the Resources to supply energy, capacity and/or ancillary services, which Owner expenses during the same calendar year in which it is performed, in accordance with Owner's accounting practices.

**JA39**

Document Accession #: 20180516-5048        Filed Date: 05/16/2018

1.1.26.  **"Owner"** shall have the meaning set forth in the preamble of this Agreement and, where applicable and appropriate, its assignee and/or designee.

1.1.27.  **"Party"** means either the ISO or Owner or Lead Market Participant as the context requires, and "Parties," means ISO and Owner and/or Lead Market Participant, as the context requires.

1.1.28.  **"Periodic Cost Report"** shall have the meaning set forth in Section 6.1.1.

1.1.29.  **"Planned Outage,"** means a planned interruption, in whole or in part, in the electrical output of a Resource to permit Owner to perform maintenance and repair of the Resource, including O&M Items.

1.1.30.  **"Resource(s)"** shall have the meaning set forth in the Recitals.

1.1.31.  **"Resource Characteristics"** shall have the meaning set forth in Section 3.4

1.1.32.  **"Revenue Credit"** shall have the meaning set forth in Section 4.4.1.

1.1.33.  **"Shut-down"** shall have the meaning set forth in Section 7.1.2(c).

1.1.34.  **"Shut-down Date"** shall have the meaning set forth in Section 7.1.2(f).

1.1.35.  **"Stipulated Marginal Cost"** shall have the meaning set forth in Section 3.4.

1.1.36.  **"Stipulated No-Load Cost"** shall have the meaning set forth in Section 3.4.

1.1.37.  **"Stipulated Regulation Offer"** shall have the meaning set forth in Section 3.4

1.1.38.  **"Stipulated Start-Up Cost"** shall have the meaning set forth in Section 3.4.

1.1.39.  **"Stipulated Variable Cost"** shall have the meaning set forth in Section 3.4.

1.1.40.  **"Substitute Unit"** shall have the meaning set forth in Section 7.1.2(b).

1.1.41.  **"Supplemental Capacity Payment"** shall have the meaning set forth in Schedule 3.

1.1.42.  **"Term"** shall have the meaning set forth in Section 2.1.

**JA40**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1.1.43.  **"Variable O&M"** shall be the amount specified in Schedule 1.

## 1.2.    Interpretation.

In this Agreement, unless otherwise indicated or otherwise required by the context, the following rules of interpretation shall apply:

1.2.1.    Reference to and the definition of any document (including this Agreement, ISO New England Filed Documents and the ISO New England System Rules) shall be deemed a reference to such document as it may be amended, supplemented, revised, or modified from time to time and any document that is a successor thereto.

1.2.2.    The article and section headings, and other captions in this Agreement, are for the purpose of reference only and do not limit or affect its meaning.

1.2.3.    Defined terms in the singular shall include the plural and vice versa, and the masculine, feminine or neuter gender shall include all genders.

1.2.4.    Accounting terms used herein shall have the meanings given to them under generally accepted accounting principles within the United States consistently applied.

1.2.5.    The term "including" when used herein shall be by the way of example only and shall not be considered in any way a limitation.

## 1.3.    Construction.

This Agreement has been drafted by the Parties hereto and shall not be construed against any Party as the sole drafter.

## ARTICLE 2
## TERM

## 2.1.    Effective Date and Term.

Subject to the terms of this Section 2.1, this Agreement shall be effective at the beginning of the operating hour ending at 1:00 a.m., June 1, 2022 (the "Effective Date") and shall terminate at the end of the operating hour beginning at 11:00 p.m. as of the date of the termination as provided in Section 2.2 ("Term").  As conditions precedent to the effectiveness of this

**JA41**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Agreement, (i) the Commission must issue an order accepting the terms of the Agreement and establishing the Annual Fixed Revenue Requirement ("AFRR") by December 21, 2018; and (ii) each of the Parties must re-execute this Agreement by January 3, 2019 as written confirmation that the Party accepts the Commission-approved Agreement and AFRR. If either of the foregoing conditions precedent is not met, this Agreement shall be deemed ineffective and any signatures hereto shall be rescinded.

**2.2.    Termination.**

This Agreement may be terminated as follows:

Once this Agreement is effective, it shall remain in effect for at least two 12-month Capacity Commitment Periods and shall terminate no sooner than May 31, 2024. Owner or Lead Market Participant shall provide timely notice of any such termination of this Agreement to the Commission.

2.2.1.    In order to meet a reliability need, ISO-NE may elect to continue this Agreement beyond its two-Capacity Commitment Period term for subsequent Capacity Commitment Periods upon written notice given no later than the March 1 that is 39 months prior to the start of the subsequent Capacity Commitment Period. Owner shall confirm within 15 days of receipt of ISO-NE's notice that it is willing and able to extend the term.

2.2.2.    Upon 30 days' notice to the Owner and Lead Market Participant, the ISO may unilaterally terminate this Agreement if, over the twelve (12) month period preceding the notice, the ISO determines that the average value over all hours in that period of the ratio of the Resource's Economic Maximum Limit (as it may be redeclared from time to time) to the Resource's Capacity Supply Obligation is less than fifty percent (50%). Owner and Lead Market Participant shall retain all of their existing rights to challenge the ISO's calculation of the aforementioned ratio under the ISO Billing Policy.

2.2.3.    This Agreement may be terminated as provided in Section 7.1.2, Section 9.2 and Section 11.4.

**2.3.    Consequence of Termination or Expiration.**

Inasmuch as the Lead Market Participant submitted a Retirement De-List Bid, the Parties

**JA42**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

acknowledge that, upon termination, the provisions of Market Rule 1 Section III.13 applicable to resources that have submitted Retirement De-List Bids and been retained for reliability or fuel security shall apply.

### 2.4.    Survival.

Notwithstanding the termination of this Agreement, the Parties shall continue to be bound by the provisions of this Agreement which by their nature are intended to, and shall, survive such termination.

## ARTICLE 3
## RIGHTS AND OBLIGATIONS

### 3.1.    In General.

During the Term, the Resources will be listed Generating Capacity Resources with Capacity Supply Obligations.  The Resources' Capacity Supply Obligations shall be in the amount of their summer Qualified Capacity (specifically 703 MW for Mystic 8 and 714 MW for Mystic 9) during all months except for December, January, and February, during which months their Capacity Supply Obligation shall equal the Resources' winter Qualified Capacity (specifically 842 MW for Mystic 8 and 858 MW for Mystic 9).  The Owner and Lead Market Participant shall operate, maintain and administer the Resources in accordance with (a) this Agreement, (b) the ISO New England Filed Documents, (c) the ISO New England System Rules, and (d) Good Utility Practice, as applicable. Nothing herein shall be construed to require the Owner or Lead Market Participant to take action that is contrary to Good Utility Practice.

### 3.2.    Insurance.

Owner or Lead Market Participant shall arrange for and maintain an appropriate level of liability and property insurance with respect to the Resources consistent with Good Utility Practice.

### 3.3.    Bilateral Agreements.

The Resources will not be subject to any bilateral agreement for the sale or control of energy or ancillary services from the Resources, unless the Owner or Lead Market Participant provides the ISO with a copy of the proposed agreement at least 30 days in advance of the

**JA43**

agreement's effective date and obtains ISO's prior written consent.  If ISO does not respond within 30 days, ISO will be deemed to have consented. Notwithstanding the foregoing, during the Term, Owner or Lead Market Participant shall only have the ability to purchase replacement capacity for periods during which the Resource(s) (i) are on ISO-approved Planned Outage(s) or, (ii) are on Forced Outage(s) and ISO has approved the purchase of replacement capacity.

### 3.4.    Supply Offers.

For each day, the Lead Market Participant shall offer for sale energy and ancillary services (which include Regulation and Reserves) into the New England Markets from the Resources, based on the characteristics and operating parameters specified in Schedule 2 (the "Resource Characteristics") and consistent with the ISO New England Filed Documents and ISO New England System Rules.  Supply Offers shall be equal to the Stipulated Variable Costs as provided below.  Supply Offers also shall not exceed Energy Market Reference Levels as determined using the marginal cost formulas specified in Appendix A to Market Rule 1 of the Tariff.  Lead Market Participant shall use commercially reasonable efforts to cause the submittal of Supply Offers for Economic Minimum Limit and Economic Maximum Limit that are consistent with ambient air forecasts and /or environmental permit parameters.  Lead Market Participant also shall offer Regulation into the New England Markets from the Resource based on the Resource Characteristics using only Stipulated Regulation Offers as defined below.

3.4.1.    The Stipulated Variable Costs shall be self-adjusting formulary rates accepted by the Commission pursuant to the FPA Section 205 proceeding initiated by Owner.  The inputs to the formula below shall be updated daily or at the most frequent time interval permitted under the ISO New England System Rules. Stipulated Variable Costs shall be determined according to the definitions below using parameter values from Schedule 1.

**Stipulated Variable Cost = Stipulated Start Up +Stipulated No Load + Stipulated Marginal**
$$\text{Cost} \qquad\qquad \text{Cost} \qquad\qquad \text{Cost}$$

<u>Where</u>

**JA44**

**Stipulated Start Up Cost** = Start-Up Fuel  x   Fuel Price +  Start-Up O&M  +  Station Service
($)                      (MMBtu)         ($/MMBtu)          ($)

**Stipulated No-Load Cost** = No-Load Fuel  x   Fuel Price +   No Load O&M
($/hr)                   (MMBtu/hr)       ($/MMBtu)        ($/hr)

**Stipulated Marginal Cost** = Incremental Heat Rate  x  Fuel Price +   Variable O&M
($/MWh)                   (MMBtu/MWh)          ($/MMBtu)          ($/MWh)

And

Fuel Price = Fuel Index + Fuel Variable/ + Emissions Cost + Fuel Opp. Cost + Op Permit Adder
Price          Other Costs
($/MMBtu)       ($/MMBtu)         ($/MMBtu)         ($/MMBtu)           ($/MMBtu)

Station Service =          Station Service                x          Energy Price
(S)                      (MWh) from Schedule 1                  ($/MWh)

Emissions Cost =          Emissions Rates        x          Applicable Emissions Price
($/MMBtu)                (lbs/MMBtu)                        ($/ton)

3.4.1.1        "Applicable Emission Price" shall mean the applicable emissions allowance price ($/ton) from Evolution Markets Inc. (or successor) converted to pounds ($/lbs) using appropriate pounds/ton conversion ratio.

3.4.1.2        "Energy Price" shall mean cost of energy used to supply station service, calculated using a method permitted under ISO New England Filed Documents and ISO New England System Rules.

3.4.1.3        "Fuel Index Price" shall mean the current daily price determined using a world LNG index or, alternatively, and subject to approval by ISO Market Monitoring, the weighted average cost of gas in the storage tank adjacent to the LNG Terminal.

3.4.1.4        "Fuel Opportunity Cost" or "Fuel Opp. Cost" shall mean (i) the amount, if any, by which the AGT (citygate) fuel index price exceeds the Fuel Index Price, and/or (ii) the opportunity cost associated with a limited supply of fuel, as approved by ISO and ISO Market Monitoring.

3.4.1.5        "Fuel Variable/Other Costs" shall mean the additional amount, if any, to be

10

**JA45**

added to the Fuel Index Price to reflect other costs associated with the Fuel Index Price to properly reflect the cost of delivered fuel at the LNG Terminal. Fuel Variable/Other Costs shall be subject to approval of ISO Market Monitoring.

3.4.1.6    "Operating Permit Adder" shall mean either: (i) the opportunity cost associated with the limit on emissions contained in the operating permit and/or (ii) the cost associated with exceeding the emissions rate contained in the operating permit.

3.4.1.7    "Stipulated Regulation Offer" shall mean the actual offer for providing Regulation from the Resource, subject to any cap specified in Market Rule 1, as may be amended from time to time.

**3.5.    Self-Scheduling.**

As long as a fuel limitation does not result, and subject to the ISO New England System Rules, the ISO New England Operating Documents and the compensation provisions of Article 4, the Lead Market Participant may request to self-schedule the Resources for operational and maintenance considerations, including testing, and fuel management purposes. Alternatively, rather than self-scheduling for fuel management purposes, the Owner's affiliate shall sell fuel to third parties or reject a fuel shipment if Owner and/or Lead Market Participant reasonably believes that action will reduce overall costs to ratepayers. ISO System Operations may accept or not accept the self-schedule in its sole discretion.

**3.6    Capacity Performance Payments.**

The Resources shall be subject to negative Capacity Performance Payments and eligible for positive Capacity Performance Payments consistent with other Resources with Capacity Supply Obligations; provided, however, that positive Capacity Performance Payments shall be used solely as a credit against negative Capacity Performance Payments and shall not otherwise accrue to the benefit of the Resources, but net negative Capacity Performance Payments shall affect the amount of the Revenue Credit. Specifically:

    i.    Within each month, positive Capacity Performance Payments accrued by a Resource can be used to offset negative Capacity Performance Payments accrued by either Resource, creating a net monthly Capacity Performance Payment position for both Resources, which may be positive or negative ("Net Monthly Station Position").

**JA46**

ii.     During the first two months of a Capacity Commitment Period, the Net Monthly Station Position for the second month of the Capacity Commitment Period shall be added to the first, creating an "Accrued Penalty Balance" for the month of July. Thereafter, at the end of each month within the Capacity Commitment Period, the Accrued Penalty Balance shall be calculated as the prior month's Accrued Penalty Balance plus the current month's Net Monthly Station Position; provided, however, that for the month of June of each Capacity Commitment Period, the prior month's Accrued Penalty Balance shall be zero and June's Accrued Penalty Balance shall be equal to its Net Monthly Station Position.

iii.    If the prior month's Accrued Penalty Balance is zero or negative, and the current month's Net Monthly Station Position is negative or zero, then the Revenue Credit for the month shall be increased by the amount of the absolute value of the Net Monthly Station Position, thereby charging any negative Capacity Performance Payment to the Owner.

iv.     If the prior month's Accrued Penalty Balance is negative, and the current month's Net Monthly Station Position is positive, then the Revenue Credit for the month shall be reduced by the lesser of the Net Monthly Station Position and the absolute value of the prior month's Accrued Penalty Balance.

v.      If the prior month's Accrued Penalty Balance is positive and the current month's Net Monthly Station Position is negative, and the prior month's Accrued Penalty Balance is greater than or equal to the absolute value of the current month's Net Monthly Station Position, then there will be no adjustment to the Revenue Credit for that month. If the absolute value of the Net Monthly Station Position exceeds the prior month's Accrued Penalty Balance, then the Revenue Credit shall be increased by the amount by which the absolute value of the Net Monthly Station Position exceeds the prior month's Accrued Penalty Balance.

vi.     If the prior month's Accrued Penalty Balance is zero or positive and the current month's Net Monthly Station Position is zero or positive, there shall be no adjustment to the Revenue Credit for that month.

vii.    Notwithstanding the foregoing, any positive Accrued Penalty Balance shall be reset to $0 on each December 1. For the avoidance of doubt, the Resources shall not be

**JA47**

permitted to apply positive Accrued Penalty Balances from one Capacity Commitment Period to another.

### 3.7. Winter Fuel Security Penalty.

From December 1 through the last day of February, the Resources shall be subject to an additional Winter Fuel Security Penalty when the following three conditions are met: (i) Capacity Scarcity Conditions exist and either or both Resources have a Capacity Performance Score that is negative, (ii) the volume in the storage tank at the LNG Terminal at 8 a.m. of the day during which the interval occurred is less than 510,000 MCF, provided that, if the interval occurs between 48 hours and 6 hours in advance of the next scheduled arrival of an LNG cargo, this minimum volume requirement shall be 375,000 MCF, and provided further, that if the interval occurs less than 6 hours in advance of the next schedule arrival of an LNG cargo, this minimum tank volume shall be 330,000 MCF, and (iii) the amount calculated by subtracting the mid-point price, in $/MMBtu, for the Henry Hub, as published in Platt's Gas Daily for the gas day in which the Capacity Scarcity Condition occurred, from the mid-point price, in $/MMBtu, for the Algonquin City-Gates, as published in Platt's Gas Daily for the relevant day, is greater than $17.50/MMBtu (the "Winter Fuel Security Penalty"). The penalty rate shall be equal to the sum of the System Ten Minute Spinning Reserve (System TMSR), System Ten Minute Non-Spinning Reserve (TMNSR), and System Ten Minute Operating Reserve (System TMOR) Reserve Constraint Penalty Factors applied at the Node or Nodes at which the Mystic units are settled during the interval in which Capacity Scarcity Conditions exist, calculated consistent with Section III.2.7A(a-e) of the Tariff, using the following stated values: System TMSR of $50/MWh, TMNSR of $1,500/MWh, and System TMOR of $1,000/MWh. Any Winter Fuel Security Penalty shall be calculated in the same manner as Capacity Performance Payments (i.e., consistent with Sections III.13.7.2.2., III.13.7.2.3, III.13.7.2.4), with the exception that the calculations will not be on a Resource-specific basis but with the two Resources' Capacity Performance Scores combined to form a single Capacity Performance Score for the Mystic station. The maximum penalty that can be assessed in any month pursuant to Section 3.6 and 3.7 shall be $18.49 million, except for the months of December, January, and February, where the maximum assessed penalty in any month shall be $30 million. The maximum penalty assessed pursuant to these Sections 3.6 and 3.7 shall not exceed $110.30 million per Capacity Commitment Period.

**JA48**

**3.8     Fuel Supply Information Sharing.**

The Lead Market Participant shall provide ISO with a 24/7 Operations contact for the LNG Facility and will authorize that contact to promptly provide ISO with operational information reasonably requested by ISO, including storage tank volumes, scheduled LNG cargoes, and outages of the LNG Facility.  In addition, Lead Market Participant shall provide ISO with a daily report regarding (i) storage tank inventory, (ii) next scheduled cargo (expected amount in MMBtu), and (iii) aggregate sendout of (a) third party sales of both vapor (by pipeline) and (b) LNG for that day.

**3.9     Fuel Supply Management and Third-Party Sales.** The Owner, Lead Market Participant and their affiliates shall exercise Good Utility Practice with respect to the fuel supply arrangements for the Resources.  Owner, which is a party to a Fuel Supply Agreement with Constellation LNG, LLC for the supply of fuel to Mystic 8 & 9, shall not modify any material term of that Agreement without providing ISO with a copy of the proposed modification and submitting an informational filing to the Commission, in the docket in which this Cost of Service Agreement is approved, that shows the proposed modifications at least 15 days in advance of the modification's effective date and, with respect to any modification to the conceptual method for calculating any margin earned on any third-party sales of LNG re-gasified through the LNG Facility, obtains ISO's prior written consent.   Owner and Lead Market Participant and/or their affiliates shall meet with ISO (i) prior to the commencement of the Term of this Agreement to discuss the fuel supply plan for the first twelve months of the Term, and (ii) prior to September 1 of each year of the Term to discuss the overall fuel supply plan (i.e., the number of cargos scheduled for both Mystic and third-party sales) for the Winter months of December through March.  To the extent that the fuel supply plan is modified after the meeting with ISO (such as through the addition or subtraction of a scheduled LNG cargo), Owner or Lead Market Participant will provide timely notice of same to ISO.

**3.10     Minimization of Out-Of-Market Impacts.**

The Lead Market Participant shall cooperate with ISO in good faith, in light of the fuel supply available to the Resources, to minimize the market impacts of reliability commitments in the energy market.

**JA49**

# ARTICLE 4
# COMPENSATION AND SETTLEMENT

## 4.1.    In General.

The Lead Market Participant is subject to charges and credits for services in the New England Markets, including the Supplemental Capacity Payment, in accordance with the ISO New England System Rules and the ISO New England Filed Documents, with settlement taking place in the normal weekly and monthly settlement processes as they may be amended from time to time.  The Supplemental Capacity Payment shall be settled through the account of the Lead Market Participant.  The Lead Market Participant and the Owner must comply with all ISO requirements for customer and asset registration.

## 4.2.    Variable Cost Recovery.

In order to provide for recovery of variable costs, the Supply Offers applicable to the Resources as determined in accordance with Section 3.4. shall be included in the calculation of Net Commitment Period Compensation ("NCPC") and the Revenue Credit as defined below.  All NCPC shall be paid in accordance with applicable ISO settlement procedures.
In addition, to the extent that Mystic's actual fuel costs differ from sum of the "Fuel Index Price" and/or the "Fuel Variable/Other Cost" components of its "Stipulated Variable Costs" approved by ISO Market Monitoring, and such difference precludes Buyer from recovering its actual fuel costs because of the operation of the Revenue Crediting mechanism in Section 4.4.3, the difference between Mystic's actual fuel costs for such month and the amount Mystic is permitted to recover for fuel in its Stipulated Variable Costs for such month shall be added to the following month's Fuel Supply Cost.

## 4.3.    Fixed-Cost Recovery.

Lead Market Participant shall be entitled to a Supplemental Capacity Payment for the Resource for each Month, calculated in accordance with Schedule 3, which ISO shall cause to be paid by Participants through the monthly settlement process for the New England Markets. The Annual Fixed Revenue Requirement shall be as determined by the Commission pursuant to an FPA Section 205 proceeding initiated by Owner.

**JA50**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**4.4.    Revenue Credit.**

4.4.1.    In General. All revenues related to the Resources less the Stipulated Variable Costs ("Revenue Credit") shall reduce the Supplemental Capacity Payment in accordance with the formulas in Schedule 3.

4.4.2.    Capacity Base Payments and Capacity Performance Payments. The Revenue Credit shall include (i) the Capacity Base Payment, as determined in accordance with the Tariff, and (ii) the net negative Capacity Performance Payments as determined in accordance with Section 3.6 above.  The Capacity Base Payment shall be calculated as the product of the Resources' combined summer Qualified Capacity for the applicable Capacity Commitment Period and the Capacity Clearing Price in the appropriate Capacity Zone. For the avoidance of doubt, Lead Market Participant shall not receive Capacity Performance Payments (positive or negative) calculated pursuant to the Tariff, and shall instead only receive Capacity Performance Payments calculated pursuant to Section 3.6 above.

4.4.3.    Revenues Received in the New England Markets. All revenues related to the Resources earned in the New England Markets settled by ISO (in addition to the revenues earned in the Forward Capacity Market above), less the Stipulated Variable Cost of producing those revenues as represented by the Supply Offers and less the variable costs of producing revenues for Regulation as represented by the Stipulated Regulation Offer, shall be included in the calculation of the Revenue Credit.  Inframarginal revenue shall be reduced for Stipulated Variable Costs in excess of hourly revenue to the extent that the unit was self-scheduled in order to manage fuel delivery obligations. Monthly inframarginal revenue is the sum of all daily inframarginal revenue values. If the revenues related to the Resources are not paid on a Resource specific basis, the ISO shall allocate such revenues to the Resources that are subject to this Agreement.

4.4.4.    Other Revenues. Any revenues related to the Resources' sales that have not been settled by ISO (including from bilateral agreements, emission credits, release of firm transportation arrangements, sale of surplus equipment, etc.), less any incremental costs directly related to securing additional revenue that are not already accounted for in the Annual Fixed Revenue Requirement or Stipulated Variable Costs, will be included in the Revenue

**JA51**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Credit. These incremental costs may not be greater than the incremental revenues on a case-by-case basis. The Owner or Lead Market Participant shall report all such other revenues, or the absence thereof, to ISO in a monthly report (the "Monthly Report").

# ARTICLE 5

## MARKET MONITORING

**5.1.    Mitigation.**

Although this Agreement provides for Supply Offers that do not exceed thresholds identified in Appendix A, Market Rule 1, nothing herein shall preclude the ISO from otherwise applying any provision of Appendix A or Appendix B to Market Rule 1 to Owner, Lead Market Participant, or any Affiliate of either, the Resources, or any other resources of Owner, Lead Market Participant, or any Affiliate thereof, including mitigation of Supply Offers for Resources covered by this Agreement to the applicable Stipulated Variable Cost as defined in Section 3.4 and Schedule 1.

**5.2.    Adjustment.**

Subject to prior consultation with the Lead Market Participant, Supply Offers that exceed Stipulated Variable Cost will be automatically adjusted by ISO Market Monitoring to Stipulated Variable Cost.

# ARTICLE 6

## REPORTING

**6.1.    Variable Cost and Resource Characteristic Reporting.**

6.1.1.    Owner or Lead Market Participant shall update the components of Stipulated Variable Costs that are not publicly available as they may change from time to time on a timely basis, along with supporting information as requested, in a format approved by ISO and consistent with the formulas provided in Section 3.4 and Schedule 1 (the "Periodic Cost Report").  If Owner or Lead Market Participant fails to provide updated information on a timely basis, Supply Offers may be adjusted to Stipulated Variable Costs based on the information on file. ISO will give Owner 30 days' prior written notice of any change in the form of the Periodic

**JA52**

Cost Report.

6.1.2.    The Resource Characteristics applicable to the Resources during the Term are set forth in Schedule 2 hereto. Owner or Lead Market Participant shall provide ISO with updated Resource Characteristics set forth on a revised Schedule 2 immediately upon any change of those Resource Characteristics. If ISO does not agree to the revised Schedule, the Schedule in effect shall remain in effect during the Term pending alternative dispute resolution in accordance with Appendix D to Market Rule 1.

**6.2.    Books and Records; Audit Rights.**

ISO shall have the right, at any time upon reasonable notice, to examine at reasonable times the books and records of Owner and Lead Market Participant to the extent necessary to audit and verify the accuracy of all reports, statements, invoices, charges, or computations pursuant to this Agreement.  The Parties acknowledge and agree that ISO may perform audits of the Monthly Reports and the Periodic Cost Reports as well as a final audit of all expenses incurred under this Agreement upon completion of the Term.  Owner or Lead Market Participant's affiliates shall exercise reasonable efforts to secure the ability to provide ISO, subject to a non-disclosure agreement, copies of any contracts between Owner or Lead Market Participant's Affiliates and third-parties for the sale of fuel from the LNG Facility during the Term and any contracts between Owner or Lead Market Participant's Affiliates and third parties for the supply of fuel to the LNG Facility during the Term.  Upon ISO request, Owner or Lead Market Participant also shall provide copies of any affiliate fuel supply agreements involving the LNG Terminal in effect during the Term and documentation of the margin earned on any third-party sales of LNG re-gasified through the LNG Facility for purposes of verifying the crediting of such margin against the cost of the Resources' fuel supply from Constellation LNG, LLC.  All information provided during the course of such an examination shall be treated as confidential information under the ISO New England Information Policy and any other applicable ISO Protocols.

## ARTICLE 7
## RESOURCE OPERATION AND MAINTENANCE

**7.1.    Planned and Forced Outages.**

**JA53**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

7.1.1.   Planned Outages. Lead Market Participant shall be entitled to take one or both of the Resources out of operation or reduce the net capability of one or both of the Resources during Planned Outages, in accordance with the schedule for Planned Outages as established and implemented pursuant to the ISO New England System Rules, the Transmission, Markets and Services Tariff and the MPSA.

7.1.2.   Forced Outages.

(a)     Generally.  Lead Market Participant shall be entitled to take the Resources out of operation or reduce the net capability of the Resources upon the occurrence of a Forced Outage.

(b)     Notice of Forced Outage. In the event of a Forced Outage that is anticipated to last for more than twenty-five (25) days, in addition to any other notification obligation arising under ISO New England System Rules, the Transmission, Markets and Services Tariff and the MPSA, Lead Market Participant shall promptly notify ISO in writing of its occurrence, estimated duration, and whether Additional Expenses are expected to be required to return the Resource(s) to service (a "Notice of Forced Outage").  Lead Market Participant shall also inform ISO of the availability of any previously retired unit (the "Substitute Unit") and the costs and time required to bring the Substitute Unit back into service and to retire the Resource(s) on Forced Outage.

(c)     Notice of Shut-down. As soon as reasonably practicable after the date of a Notice of Forced Outage but in no event greater than thirty (30) days from the start of such Forced Outage, any Party may, after assessing the nature, expected duration, and expected incurrence of Additional Expenses, notify the other Parties in writing of its determination that the Resource(s) shall, subject to the provisions of Section 7.1.2(e), be Shut-down (a "Notice of Shut-down") and if such notice applies to the entirety of both Resources that this Agreement should be terminated.

(d)     Supplemental Capacity Payment. In the event that either of the Resources is Shut-down, Owner or Lead Market Participant shall only remain entitled to receive the Supplemental Capacity Payment based on the AFRR through the Shut-down Date; provided that with respect to a Shut-down applying only to a unit, Owner shall have the right but not

19

**JA54**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

the obligation to terminate this Agreement.  If Owner or Lead Market Participant opts not to terminate this Agreement, Owner or Lead Market Participant may file amendments to the AFRR with the Commission.

(e)      Option to Approve Additional Expenses. With respect to a Notice of Shut-down made by Lead Market Participant, if within thirty (30) days of receipt of Lead Market Participant's Notice of Shut-down ISO provides written notice to Lead Market Participant that it is willing to pass through for payment by the Participants in the Monthly Settlement process of the New England Markets such Additional Expenses (a "Notice of Additional Expenses") that may be required to recover from such Forced Outage, Lead Market Participant agrees that it will, with reasonable dispatch, take the action requested by ISO, i.e., not Shut-down the Resource(s) and make such Additional Expenses as paid to it by the Participants to return the Resource(s) to service from such Forced Outage, or make such expenditures as paid to it by the Participants to bring the Substitute Unit into service and retire the Resource(s) on Forced Outage. The Parties agree that a Notice of Additional Expenses shall be immediately effective, and Lead Market Participant shall be entitled to begin receiving payments from ISO pursuant thereto, as of the day following the date the Owner or Lead Market Participant files a request under Section 205 of the FPA with the Commission to recover from ISO the Additional Expenses identified in the Notice of Additional Expenses. Payments will be made subject to refund pending the approval of such Additional Expenses by the Commission. The Parties further agree that Lead Market Participant is obligated to use commercially reasonable efforts to minimize Additional Expenses and that the amounts approved under the Notice of Additional Expenses are subject to offset by any proceeds from any and all third-party sources, including insurance proceeds, paid to Lead Market Participant to return the Resource(s) from the Forced Outage. Lead Market Participant shall make a subsequent reconciliation ("true-up") filing with the Commission and refund any payments for Additional Expenses paid to Lead Market Participant that are disallowed by the Commission, or that exceed the amount actually expended by the Lead Market Participant, after offsets.

(f)      Shut-down Date. With respect to a Notice of Shut-down issued by ISO pursuant to Section 7.1.2(c), the "Shut-down Date" shall be that date ten (10) days after the receipt of such Notice of Shut-down by the Owner. With respect to a Notice of Shut-down issued by Lead

**JA55**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Market Participant pursuant to Section 7.1.2(c), the "Shut-down Date" shall be that date thirty (30) days after the receipt of such Notice of Shut-down by ISO unless ISO has issued a Notice of Additional Expenses in accordance with Section 7.1.2(e), in which case no Shut-down Date will have occurred with respect to such Notice of Shut-down or the Shut-down Date will be the date on which the Substitute Unit is brought back into service. As of the Shut-down Date, the interconnection rights for the Resource(s) shall terminate and the status of the Resource will be converted to retired.

**7.2.    Additional and Other Expenses.**

Except as provided for in Section 7.1, Owner and Lead Market Participant shall (i) not be required or otherwise obligated to incur any Additional Expenses and (ii) not be required to enter into any additional agreements or incur any additional costs, including fixed-fuel costs, that Owner is not already obligated to enter into, or incur, as the case may be, that are not otherwise contemplated by, and being recovered by Owner Lead Market Participant pursuant to, the Annual Fixed Revenue Requirement.  To the extent that ISO provides notice of shut-down pursuant to 7.1.2(f) and such notice will result in Owner's or Lead Market Participant's failure to recover certain costs that were reasonably incurred for operation of Resources and that are unable to be avoided using commercially reasonable efforts, Owner or Lead Market Participant shall be entitled to make a Section 205 filing to recover those costs at the Commission.

<div align="center">

**ARTICLE 8**
**FORCE MAJEURE EVENTS**

</div>

**8.1.    Notice of Force Majeure Event.**

If either Party is unable to perform its obligations under this Agreement due to a Force Majeure Event, the Party unable to perform shall promptly notify the other Party.

**8.2.    Effect of Force Majeure Event.**

8.2.1. If the Availability of the Resource is reduced by reason of a Force Majeure Event, Section 7.1.2 shall apply (i.e., a Force Majeure Event shall be deemed to create a Forced Outage).  Subject to reduction as explicitly set forth in this Agreement and to Sections 7.1.2, 9.2, and 11.4, Lead Market Participant shall continue to receive the Supplemental Capacity

**JA56**

Payment without any other reduction while the Force Majeure Event continues.

8.2.2. Neither Party will be considered in default as to any obligation under this Agreement if prevented from fulfilling the obligation due to an event of Force Majeure.  Notwithstanding the foregoing, no event of Force Majeure affecting either Party shall excuse that entity from any payment, charge, penalty, financial consequence or settlement responsibility that it is obligated to make hereunder.  A Party whose performance is hindered by an event of Force Majeure shall make all reasonable efforts to perform its obligations.

### 8.3.    Remedial Efforts.

The Party unable to perform by reason of a Force Majeure Event shall use reasonable efforts to remedy its inability to perform and to mitigate the consequences of the Force Majeure Event as soon as reasonably practicable; provided that (i) no Party shall be required to settle any strike, walkout, lockout, or other  labor dispute on terms which, in the Party's sole discretion, are contrary to its interests and (ii) subject to Sections 7.1.2 and 7.2, the Party unable to perform shall, as soon as practicable, advise the other Party of the reason for its inability to perform, the nature of any corrective action needed to resolve performance, and its efforts to remedy its inability to perform and to mitigate the consequences of its inability to perform and shall advise the other Party of when it estimates it will be able to resume performance of its obligations under this Agreement.

### ARTICLE 9

### REMEDIES

### 9.1.    Damages and Other Relief.

9.1.1.    Liability of ISO. ISO shall not be liable to Owner or Lead Market Participant for actions or omissions by ISO in performing its obligations under this Agreement, provided it has not willfully breached this Agreement or engaged in willful misconduct.  To the extent Owner or Lead Market Participant has claims against ISO, Owner or Lead Market Participant may only look to the assets of ISO for the enforcement of such claims and may not seek to enforce any claims against the directors, members, officers, employees or agents of ISO who, Owner and Lead Market Participant acknowledge and agree, have no personal liability for

**JA57**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

obligations of ISO by reason of their status as directors, members, officers, employees or agents of ISO.

9.1.2.    Liability of Owner.  Except as explicitly provided herein, Owner and Lead Market Participant shall not be liable to ISO for actions or omissions by Owner or Lead Market Participant in performing their obligations under this Agreement, provided that Owner or Lead Market Participant has not willfully breached this Agreement or engaged in willful misconduct.

9.1.3.    Limitation of Liability.  In no event shall Owner or Lead Market Participant be liable to ISO or ISO be liable to Owner or Lead Market Participant for any incidental, consequential, multiple or punitive damages, loss of revenues or profits, attorneys' fees or costs arising out of, or connected in any way with the performance or non-performance of this Agreement.

9.1.4.    Indemnification.  Owner and Lead Market Participant shall indemnify, defend and save harmless ISO and its directors, officers, members, employees and agents from any and all damages, losses, claims and liabilities by or to third parties arising out of or resulting from the performance by ISO under this Agreement or the actions or omissions of Owner and Lead Market Participant in connection with this Agreement, except in cases of gross negligence or willful misconduct by ISO or its directors, officers, members, employees or agents.

## 9.2.    Termination for Default.

If ISO shall fail to perform any material obligation imposed on it by this Agreement and that obligation has not been suspended pursuant to this Agreement, Owner or Lead Market Participant, at its option, may terminate this Agreement by giving ISO written notice setting out specifically the circumstances constituting the default and declaring its intention to terminate this Agreement.  If Owner or Lead Market Participant shall fail to perform any material obligation imposed on it by this Agreement and that obligation has not been suspended pursuant to this Agreement, ISO may terminate this Agreement by giving Owner and Lead Market Participant written notice setting out specifically the circumstances constituting the default and declaring its intention to terminate this Agreement.  If the Party receiving the notice does not within ten (10) days after receiving the notice, remedy the

**JA58**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

default, the Party not in default shall be entitled by a further written notice to terminate this Agreement.  The Party not in default shall have a duty to mitigate damages.  Termination of this Agreement pursuant to this Section 9.2 shall be without prejudice to the right of any Party to collect any amounts due to it prior to the time of termination.

**9.3.    Waiver.**

The failure to exercise any remedy or to enforce any right provided in this Agreement or applicable Law shall not constitute a waiver of such remedy or right or of any other remedy or right.  A Party shall be considered to have waived any remedies or rights only if the waiver is in writing.

**9.4.    Beneficiaries.**

Except as is specifically set forth in this Agreement, nothing in this Agreement, whether express or implied, confers any rights or remedies under, or by reason of, this Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligations or liability of any third party, nor give any third person any rights of subrogation or action against any Party.

<div align="center">

**ARTICLE 10**

**COVENANTS OF THE PARTIES**

</div>

**10.1.    ISO represents and warrants to Owner and Lead Market Participant as follows:**

10.1.1.  ISO is a validly existing corporation with full authority to enter into this Agreement.

10.1.2.   ISO has taken all necessary measures to have the execution and delivery of this Agreement authorized, and upon the execution and delivery of this Agreement, this Agreement shall be a legally binding obligation of ISO.

10.1.3.  ISO has all regulatory authorizations necessary for it to perform its obligations under this Agreement.

10.1.4.  The execution, delivery, and performance of this Agreement are within ISO's powers and do not violate any of the terms and conditions in its governing documents, any contracts to which it is a party, or any Law applicable to it.

JA59

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**10.2.    Owner represents and warrants to ISO as follows:**

10.2.1.  Owner is a validly existing entity with full authority to enter into this Agreement.

10.2.2.  Owner has taken all necessary measures to have the execution and delivery of this Agreement authorized, and upon the execution and delivery of this Agreement, this Agreement shall be a legally binding obligation of Owner.

10.2.3.  Owner has, or has applied for, all regulatory authorizations necessary for it to perform its obligations under this Agreement.

10.2.4.  The execution, delivery, and performance of this Agreement are within the Owner's powers and do not violate any of the terms and conditions in its governing documents, any contracts to which it is a party, or any Law applicable to it.

**10.3.    Lead Market Participant represents and warrants to ISO as follows:**

10.3.1.  Lead Market Participant is a validly existing entity with full authority to enter into this Agreement.

10.3.2.  Lead Market Participant has taken all necessary measures to have the execution and delivery of this Agreement authorized, and upon the execution and delivery of this Agreement, this Agreement shall be a legally binding obligation of Lead Market Participant.

10.3.3.  Lead Market Participant has, or has applied for, all regulatory authorizations necessary for it to perform its obligations under this Agreement.

10.3.4.  The execution, delivery, and performance of this Agreement are within the Lead Market Participant's powers and do not violate any of the terms and conditions in its governing documents, any contracts to which it is a party, or any Law applicable to it.

<div align="center">

**ARTICLE 11**

**MISCELLANEOUS PROVISIONS**

</div>

**11.1. Assignment.**

11.1.1.  None of the Parties shall assign its rights or delegate its duties under this Agreement

**JA60**

without the prior written consent of the other Parties, which consent shall not be unreasonably withheld, conditioned, or delayed. Any such assignment or delegation made without such written consent shall be null and void. Upon any assignment made in compliance with this Article 11.1, this Agreement shall inure to and be binding upon the successors and assigns for the assigning Parties.

11.1.2.  Notwithstanding Section 11.1.1, each Party may, without the need for consent from the other Parties (and without relieving itself from liability hereunder), transfer or assign this Agreement: (i) to an Affiliate, or (ii) where such transfer is incident to a merger or consolidation with, or transfer of all, or substantially all, of the assets of the transferor to another person, business entity, or political subdivision or public corporation created under the Laws governing the creation and existence of the transferor which shall as a part of such succession assume all of the obligations of the assignor or transferor under this Agreement; provided, however, that any Party who transfers or assigns this Agreement as provided in subsections "i" or "ii" of this Section 11.1.2 shall provide timely notice to the other Party or Parties of such change, including the effective date and changes, if any, to the nominations under Section 11.2 and Exhibits A or B, as appropriate. Any Party may collaterally assign its rights in this Agreement to its lenders without the need for consent from the other Party. To the extent that any Party seeks to transfer its rights and obligations to a successor entity, such Party shall seek to assign this Agreement to such successor entity, pursuant to this Section 11.1.2.

11.1.3.  Upon 60 days' notice from Owner or Lead Market Participant, Lead Market Participant's function as Lead Market Participant under this Agreement may be assigned to another entity fully capable of fulfilling this role consistent with the ISO New England Filed Documents and the ISO New England System Rules. The Owner, the current Lead Market Participant and any successor Lead Market Participant must comply with all ISO requirements for Customer Asset registration. Owner is not obligated to assign the Lead Market Participant role to another entity.

**11.2.    Notices.**
Except as otherwise expressly provided in this Agreement or required by Law, all notices,

**JA61**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

consents, requests, demands, approvals, authorizations and other communications provided for in this Agreement shall be in writing and shall be sent by personal delivery, certified mail, return receipt requested, facsimile transmission, or by recognized overnight courier service, to the intended Party at such Party's address set forth below. All such notices shall be deemed to have been duly given and to have become effective: (a) upon receipt if delivered in person or by facsimile; (b) two days after having been delivered to an air courier for overnight delivery; or (c) seven days after having been deposited in the United States mail as certified or registered mail, return receipt requested, all fees pre-paid, addressed to the applicable addresses set forth below. Each Party's address for notices shall be as follows (subject to change by notice in accordance with the provisions of this Section 11.2):

**JA62**

| OWNER AND LEAD MARKET PARTICIPANT: | ISO: |
|---|---|
| NOTICES & CORRESPONDENCE | NOTICES & CORRESPONDENCE |
| | Robert Ethier |
| Senior Vice President – Wholesale Trading | Vice President |
| Exelon Generation Company | ISO New England Inc. |
| 1310 Point Street, 8th Floor | One Sullivan Road |
| Baltimore, MD  21231 | Holyoke, MA 01040 |
| Tel:  (410) 470-8115 | Tel: (413) 540-4412 |
| Fax:  (443) 213-3424 | Fax: (413) 540-4226 |

with a copy to:

| General Counsel | Maria Gulluni |
|---|---|
| Exelon Generation Company | Legal Department |
| 1310 Point St., 8th Floor | ISO New England Inc. |
| Baltimore, MD  21231 | One Sullivan Road |
| Tel:  (410) 470-3416 | Holyoke, MA 01040 |
| Fax:  (443) 213-3556 | Tel: (413) 540-4473 |
| | Fax: (413) 535-4379 |

The foregoing notice provisions may be modified by providing written notice, in accordance with ISO Protocols established from time-to-time.

### 11.3.    Parties' Representatives.

All Parties to this Agreement shall ensure that throughout the term of this Agreement, duly appointed representatives are available for communications between the Parties. The representatives shall have full authority to deal with all day-to-day matters arising under this Agreement. Acts and omissions of representatives shall be deemed to be acts and omissions of the Party. Owner, Lead Market Participant and ISO shall be entitled to assume that the representatives of the other Parties are at all times acting within the limits of the authority given by the representatives' Party. Owner's and Lead Market Participant's representatives shall be identified on Exhibit A. ISO's representatives shall be identified on Exhibit B. The Parties may at any time replace their representatives by sending the other Parties a revision to its respective Exhibit.

### 11.4.    Effect of Invalidation, Modification, or Condition.

Each covenant, condition, restriction, and other term of this Agreement is intended to be, and shall be construed as, independent and severable from each other covenant, condition,

**JA63**

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

restriction, and other term. If any covenant, condition, restriction, or other term of this Agreement is held to be invalid or otherwise modified or conditioned by any Governmental Authority, the invalidity, modification, or condition of such covenant, condition, restriction, or other term shall not affect the validity of the remaining covenants, conditions, restrictions, or other terms hereof. If an invalidity, modification, or condition has a material impact on the rights and obligations of the Parties, the Parties shall make a good faith effort to renegotiate and restore the benefits and burdens of this Agreement as they existed prior to the determination of the invalidity, modification, or condition. If the Parties fail to reach agreement, then the Party whose rights and obligations have been adversely affected may, in its sole discretion, terminate this Agreement or refer the dispute for resolution under the Alternative Dispute Resolution provisions in Appendix D of Market Rule 1.

### 11.5.    Amendments.

Any amendments or modifications of this Agreement shall be made only in writing and duly executed by all Parties to this Agreement.  Such amendments or modifications shall become effective only after the Parties have received any authorizations required from the Commission.  The Parties agree to negotiate in good faith any amendments to this Agreement that are needed to reflect the intent of the Parties as expressed herein, or, following Commission approval of such cost increases, any material increases in the costs of owning and operating the Resources.

### 11.6.    Governing Law.

This Agreement shall be governed by and construed under the Laws of the Commonwealth of Massachusetts without regard to conflicts of laws principles.

### 11.7.    Entire Agreement.

This Agreement consists of the terms and conditions set forth herein, as well as the Appendices hereto, which are incorporated by reference herein and made a part hereof.  This Agreement contains the entire agreement between the Parties and supersedes all prior negotiations, undertakings, agreements and business term sheets.

**JA64**

**11.8.    Independent Contractors.**

Owner, Lead Market Participant and ISO acknowledge that as between Owner and/or Lead Market Participant and ISO there is an independent contractor relationship, and that nothing in this Agreement shall create any joint venture, partnership, or principal/agent relationship between the Parties. Neither Owner or Lead Market Participant nor ISO shall have any right, power, or authority to enter into any agreement or commitment, act on behalf of, or otherwise bind the other Party in any way.

**11.9.    Execution and Counterparts.**

This Agreement may be executed in one or more counterparts each of which shall be deemed an original and all of which shall be deemed one and the same agreement.  This Agreement shall become effective upon Commission approval and final execution, as set forth in Section 2.1 hereof.  Initial execution of this Agreement excludes (in the case of ISO) acceptance of the Annual Fixed Revenue Requirement, Stipulated Variable Costs, and Monthly Fuel Supply Costs.

**11.10.   Confidentiality.**

Confidential information identified as such by a Party and provided to the other Party pursuant to this Agreement shall be governed by the ISO New England Information Policy, subject to the following:

11.10.1. Nothing herein or therein shall limit the right of a Party to file a copy of this Agreement with the Commission, without redaction, to the extent that law, regulation, or agency order makes such filing necessary or appropriate.

11.10.2. Notwithstanding anything in this Agreement to the contrary, if during the course of an investigation or otherwise, the Commission requests that a Party (the "responding Party") provide to it information that has been designated by the other Party to be treated as confidential under this Agreement, the responding Party shall provide the requested information to the Commission or its staff within the time provided for in the request for information. The responding Party shall promptly notify the other Party upon receipt of any such request and either Party, consistent with 18 CFR § 388.112, may, but shall not be

**JA65**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

required, to request that the information be treated as confidential and non-public by the Commission and its staff and that the information be withheld from public disclosure.

**11.11.    Submittal to the Commission.**

The Parties acknowledge and agree that (i) the Annual Fixed Revenue Requirement and any subsequent changes thereto to the formula for calculating Stipulated Variable Costs shall be established pursuant to an FPA Section 205 proceeding to be initiated by application of Owner; and (ii) this Agreement constitutes the basis for Owner's recovery of its fixed and variable costs for operating and maintaining the Resources during the Term.

**JA66**

**IN WITNESS WHEREOF**, this Agreement has been executed as of the date first above written.

CONSTELLATION MYSTIC POWER, LLC

By: _____
Name: David O. Dardis
Title: Assistant Secretary

ISO NEW ENGLAND INC.

By: _____
Name:
Title:

EXELON GENERATION COMPANY, LLC

By: _____
Name: Ravi Ganti
Title: Senior Vice President, Portfolio Management and Strategy

**JA67**

**IN WITNESS WHEREOF**, this Agreement has been executed as of the date first above written.


CONSTELLATION MYSTIC POWER, LLC


By: _____
Name: David O. Dardis
Title: Assistant Secretary


ISO NEW ENGLAND INC.

By: _____
Name: Gordon vanWelie
Title: President and Chief Executive Officer


EXELON GENERATION COMPANY, LLC


By: _____
Name: Ravi Ganti
Title: Senior Vice President, Portfolio Management and Strategy

**JA68**

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

**IN WITNESS WHEREOF**, this Agreement has been executed as of the date first above written.


CONSTELLATION MYSTIC POWER, LLC


By: _____
Name: David O. Dardis
Title: Assistant Secretary


ISO NEW ENGLAND INC.


By: _____
Name:
Title:


EXELON GENERATION COMPANY, LLC


By: _____
Name: Ravi Ganti
Title:  Senior Vice President, Portfolio Management and Strategy

**JA69**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

## EXHIBIT A

## OWNER'S AND LEAD MARKET PARTICIPANT'S
## REPRESENTATIVES

Same as contact information.

**JA70**

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

**EXHIBIT B**

**ISO'S REPRESENTATIVES**

Same as contact information.

**JA71**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

Document Accession #: 20180516-5048        Filed Date: 05/16/2018

**Public Version—Privileged Material Redacted**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**SCHEDULE 3**

**SUPPLEMENTAL CAPACITY PAYMENT**

For each Obligation Month during the Term, a Supplemental Capacity Payment shall be calculated for the Resource(s) as set forth below.

Section III.13 references are to Market Rule 1, Section III.13 – Forward Capacity Market.

The Annual Fixed Revenue Requirement (AFRR) for the Resources for Capacity Commitment Period 2022/2023 is $218,974,263 and Capacity Commitment Period 2023/2024 is $186,951,485.

The AFRR is the cost-of-service for the Resource, including annual fixed operation and maintenance expense and annual expenses, depreciation, amortization, taxes and return, as accepted by the Commission; provided, however, that, due to the ongoing litigation with the City of Everett, the taxes other than income tax component of the AFRR ($15,500,445.00) shall be updated such that $15,500,445.00 shall be replaced with (i) the amount that is equal to the actual property tax applicable to Mystic for 2022 for Obligation Months within Capacity Commitment Period 2022/2023 and (ii) the amount that is equal to the actual property tax applicable to Mystic for 2023 for Obligation Months within Capacity Commitment Period 2023/2024. The annual fixed operation and maintenance expense is the fixed operating & maintenance expense component of the AFRR.

(Part 1)

Supplemental Capacity Payment =  Maximum Monthly Fixed Cost Payment

Less: Winter Fuel Security Penalty for Obligation Month

Less: Revenue Credits for the Obligation Month

Provided that for any given Capacity Commitment Period the monthly Supplemental Capacity Payments are capped so that the cumulative value of the Supplemental Capacity Payments minus the Monthly Fuel Supply Cost, plus the Revenue Credits shall not exceed the AFRR (subject to the additional provisions of Part 4 if applicable).

In the event that the Supplemental Capacity Payment would otherwise be less than zero in any

**JA82**

Obligation Month, the Supplemental Capacity Payment for that Obligation Month shall be zero and the negative remainder shall roll-forward for crediting in a future Obligation Month. For the last Obligation Month of the Term, the ISO shall charge the Owner for any unapplied roll-forward amount and shall refund that using the same FERC-determined allocator that is used to fund the Supplemental Capacity Payment.

(Part 2)

Maximum Monthly Fixed Cost Payment = [AFRR / 12] + Monthly Fuel Supply Cost

The Monthly Fuel Supply Cost is equal to the Fuel Supply Cost (as defined in the Fuel Supply Agreement between Constellation Mystic, LLC and Constellation LNG, LLC ("FSA")) for the Obligation Month.  For the avoidance of doubt, the Monthly Fuel Supply Cost will reflect the Fixed O& M/Return on Investment Costs, Variable O & M Costs, New Regulatory Costs (if any), the Administrative Services Fee, Pipeline Transportation Agreement Costs, Diversion Costs (credited or debited), Daily Gas Sales Costs (credited or debited), the Third-Party Sales Credit for Demand Charges (credited), and the Actual Fuel Cost Adjustment charged under and defined in the FSA.  The Actual Fuel Cost Adjustment allows for the credit or debit of any differences between the fuel cost components of the Stipulated Variable Costs set forth in Section 3.4 and Schedule 1 and the commodity cost of fuel for the Resources in accordance with the terms of the FSA for the Obligation Month.

(Part 3)

The purpose of the Revenue Credit is to recognize that the Resource has earned revenues from sources other than this Supplemental Capacity Payment. The Supplemental Capacity Payment is reduced accordingly so that the Resource has a total payment potential during the Capacity Commitment Period equal to its Annual Fixed Revenue Requirement plus Monthly Fuel Supply Costs that are not recovered through Stipulated Variable Costs.  The Supplemental Capacity Payments are reduced by any Winter Fuel Security Penalties and negative Capacity Performance Payments not offset by positive Capacity Performance Payments as addressed in Section 3.6.

Revenue Credit for the Obligation Month =

Capacity Base Payment for the Obligation

Month calculated in accordance with Section

**JA83**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

4.4.2 above.

Plus:    the absolute value of negative Capacity Performance Payments for the Obligation Month as addressed in Section 3.6 above

Less:    positive Capacity Performance Payments credited to Owner/Lead Market Participant as addressed in Section 3.6 above

Plus:    All other revenues related to the Resource (i.e., all revenues except for revenues from the New England Forward Capacity Market) that are in excess of Stipulated Variable Costs.

(Part 4)

If this Agreement terminates other than at the end of a Capacity Commitment Period:

The monthly Supplemental Capacity Payments are capped so that the cumulative value of Supplemental Capacity Payments minus the Monthly Fuel Supply Cost plus Revenue Credits shall not exceed the prorated AFRR.

(Part 5)

While the roll-forward provisions of Part 1 provide that the Supplemental Capacity Payment cannot result in a monthly charge to the Resource because of a Supplemental Capacity Payment that calculates to a negative amount, nothing in this Agreement provides that the sum of all charges and credits for the Resource cannot result in a net amount owed to the ISO for any Obligation/Operating Month.

**JA84**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

# Attachment B

# Public Redacted Blackline Showing Changes from the ISO Tariff Form Cost-of-Service Agreement to the Submitted Agreement

**JA85**

~~SECTION III~~

~~MARKET RULE~~

~~1 APPENDIX I~~

~~FORM OF~~

## COST-OF-SERVICE AGREEMENT

~~APPENDIX I~~

~~FORM OF~~

## COST-OF-SERVICE AGREEMENT
### Table of Contents

ARTICLE 1 ——— DEFINITIONS AND RULES OF INTERPRETATION

    1.1    Definitions

    1.2    Interpretations

    1.3    Construction


ARTICLE 2 ——— TERM

    2.1    Effective Date and Term

    2.2    Termination

    2.3    Consequence of Termination or Expiration.

    ~~2.3~~2.4    Survival


ARTICLE 3 ——— RIGHTS AND OBLIGATIONS

    3.1    In General

    3.2    Insurance

    3.3    Bilateral Agreements

    3.4    Supply Offers

    3.5    Self-Scheduling


    3.6    Capacity Performance Payments

    3.7    Winter Fuel Security Penalty

    3.8    Fuel Supply Information Sharing

    3.9    Fuel Supply Management and Third-Party Sales

    3.10    Minimization of Out-of-Market Impacts

ARTICLE 4 ——— COMPENSATION AND SETTLEMENT

    4.1    In General

    4.2    Variable Cost Recovery

    4.3    Fixed-Cost Recovery

    4.4    Revenue Credit

**JA87**

ARTICLE 5 —— MARKET MONITORING

5.1      Mitigation

5.2     Adjustment

5.3     Dual Fuel Resources

ARTICLE 6 ──── REPORTING

6.1     Variable Cost and Resource Characteristic Reporting

6.2    Books and Records; Audit Rights

ARTICLE 7 – RESOURCE OPERATION AND MAINTENANCE
        7.1    Planned and Forced Outages
        7.2    Additional and Other Expenses


ARTICLE 8 – FORCE MAJEURE EVENTS
        8.1    Notice of Force Majeure Event
        8.2    Effect of Force Majeure Event
        8.3    Remedial Efforts


ARTICLE 8 - FORCE MAJEURE EVENTS
        8.1    Notice of Force Majeure Event
        8.2    Effect of Force Majeure Event
        8.3    Remedial Efforts

ARTICLE 9 ——— REMEDIES
        9.1    Damages and Other Relief
        9.2    Termination by Default
        9.3    Waiver
        9.4    Beneficiaries


ARTICLE 10 - COVENANTS OF THE PARTIES
        10.1    ISO
        10.2    Owner
        10.3    Lead Market Participant


ARTICLE 11 - MISCELLANEOUS PROVISIONS
        11.1    Assignment
        11.2    Notices
        11.3    Parties' Representatives
        11.4    Effect of Invalidation, Modification, or Condition
        11.5    Amendments
        11.6    Governing Law
        11.7    Entire Agreement
        11.8    Independent Contractors

**JA90**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

11.9     Execution Counterparts

11.10    Confidentiality

~~11.11~~ Submittal to the Commission

11.11   SCHEDULE 1

Information on Marginal Cost

SCHEDULE 2           Resource Characteristics

SCHEDULE 3           Supplemental Capacity Payment

**JA93**

## COST-OF-SERVICE AGREEMENT

This COST-OF-SERVICE AGREEMENT ("Agreement") is made as of the ~~——~~15th day of ~~————————, 20~~May, 2018, among ~~————~~Constellation Mystic Power, LLC, a Delaware limited liability company ("Owner"), ~~a——{fill in type of legal entity},~~

~~——~~Exelon Generation Company, LLC, a Pennsylvania limited liability company ("Lead Market Participant~~"), a {fill in type of legal entity}, acting as agent for Owner,~~") and ISO ~~NEW ENGLAND INC~~New England Inc., a Delaware non-stock corporation ("ISO").

## RECITALS

~~A.——~~Owner is the owner of ~~————~~Mystic 8 (Asset ID No.~~——~~1478), a ~~———— MW~~703.32 MW (summer claimed capability) electrical generating station together with appurtenant facilities and structures~~,~~, and Mystic 9 (Asset ID No. 1616), a 713.90 MW (summer claimed capability) electric generating station together with appurtenant facilities and structures, both located ~~at~~

A.    ~~——(~~the "in Everett, Massachusetts (each a "Resource~~"). {If the station is comprised of more than one unit, describe~~all units at the station, including their MW and Asset IDs, and then define the units that are subject to this Agreement as "~~" and collectively the "~~Resources~~"}~~").

B.    ~~[~~Owner is ~~[the direct~~a wholly-owned, indirect subsidiary of ~~/affiliate of /unaffiliated with the] {specify relationship between Owner and~~Lead Market Participant~~} Lead Participant, [,~~ which is a Market Participant~~/both of which are Participants in the New England Markets.] Owner operates the Resource~~ in ~~accordance with~~the ISO New England ~~Filed Documents~~Markets. Lead Market Participant operates ~~and~~ ~~the ISO New England System Rules. Lead Participant~~ administers the ~~Resource~~Resources in accordance with the ISO New England Filed Documents and the ISO New England System Rules and causes energy, capacity and ancillary services from the ~~Resource~~Resources to be offered for sale into the New England Markets ~~on behalf of Owner~~.

C.    The sole source of fuel for the Resources is Engie North America's liquefied natural

**JA94**

gas ("LNG") import terminal located in Everett, Massachusetts (the "LNG Terminal"). In its January 17, 2018 Operational Fuel-Security Analysis, ISO identified the combination of the Resources and the LNG Terminal as one of four key facilities which, in the event of an extended outage, "would result in frequent energy shortages that would require frequent and long periods of rolling blackouts." On March 29, 2018, Lead Market Participant announced an agreement to purchase the LNG Terminal to ensure the continued reliable supply of fuel to the Resources while they remain in operation.

C.D.    ISO is the Regional Transmission Organization for New England and is responsible for the operation of the New England Control Area to ensure short-term reliability and the administration of the New England Markets.

**JA95**

administration of the New England Markets.

[Owner /

D.E.     Lead Market Participant] submitted a [Permanent De-list Bid / Non-Price Retirement Request]De-List Bid for the Resources for the Forward Capacity Auction for the Capacity Commitment Period starting June 1, ——,2022 (FCA 13).

E.F.     ISO concluded that the Resource[s]Resources will be needed for reliability purposes during the Term and expects the ResourceResources may be required to run out-of-economic merit order to relieveaddress fuel security risks that threaten the reliability of the ISO New England transmission constraints; and as a result [rejected the Permanent De-list Bid / did not accept the Non-Price Retirement Request].system.

**JA96**

F.G.    The Parties have agreed (i) that Owner shall cause an FPA Section 205 proceeding to be initiated to establish the Annual Fixed Revenue Requirement and (ii) to enter into this Agreement for supplying energy, ancillary services and capacity from the ~~Resource[s] into the New England Markets and thereby~~ Resources into the New England Markets and thereby (x) set the rate by which Owner shall receive its fixed costs for the Resources from Market Participants, (y) govern how the Lead Market Participant shall cause bids to be made, and (z) ensure that the Owner receives its variable costs of supply. ~~(x) set the rate by which Owner shall receive its fixed costs for the Resource[s] from Participants and (y) govern how the Lead Participant shall cause bids to be made such that Owner receives from the Participants its variable costs for such supply.~~

NOW THEREFORE, in consideration of the agreements and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound by this Agreement as of the Effective Date, the Parties covenant and agree as follows:

**JA97**

**ARTICLE 1**

**DEFINITIONS AND RULES OF INTERPRETATION**

**1.1.     Definitions.**

Except for the terms defined below and in the attached schedules, capitalized terms shall be as defined in the ~~Tariff, or other applicable market rules~~ISO New England Filed Documents and the ISO New England System Rules.

1.1.1.     **"Additional Expenses"** shall mean costs associated with O&M Items in excess of the Fixed O&M Expenses.

**JA98**

1.1.2.    **"Annual Fixed Revenue Requirement"** or **"AFRR"** shall have the meaning set forth in Schedule 3.

1.1.3.    **"Availability"** means the capability of the ~~Resource~~Resources, in whole or in part, at any given time, to produce energy, capacity, or ancillary services in accordance with Good Utility Practice, and "Available" shall be construed accordingly.

1.1.4.    **"Effective Date"** shall have the meaning set forth in Section 2.1.

1.1.5.    **"Fixed O&M Expenses"** shall have the meaning set forth in Schedule 3.

1.1.6.    **"Force Majeure Event"** means any act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm or flood, explosion, any order, regulation or restriction imposed by a Governmental Authority, or any other cause beyond a Party's control. ~~Governmental Authority, or any other cause beyond a Party's control.~~

1.1.7.    **"Forced Outage"** means any outage of the ~~Resource~~Resources (other than a Planned Outage) that (i) is taken consistent with Good Utility Practice and applicable NERC criteria and (ii) fully or partially curtails the ~~Resource's~~Resources' ability to supply energy, capacity and/or ancillary services.

1.1.8.    **"FPA"** means the Federal Power Act.

1.1.9.    **"Governmental Authority"** means the government of any nation, state or other political subdivision thereof, including any entity lawfully exercising executive, military, legislative, judicial, regulatory, or administrative functions of or pertaining to a government.

**JA99**

1.1.10.  **"ISO"** shall have the meaning set forth in the preamble of this Agreement and, where applicable and appropriate, its assignee and/or designee.

1.1.11.  **"ISO Market Monitoring"** means the Internal Market Monitor for the ISO.

1.1.12.  **"ISO New England Filed Documents"** means the ISO New England Inc. Transmission, Markets and Services Tariff, as may be amended from time to time.

1.1.13. **"ISO New England System Rules"** means all manuals, operating procedures and other requirements of ISO, as each may be amended from time to time.

~~1.1.10.~~1.1.14.     **"Law"** means any law, treaty, code, rule, regulation, or order or determination of an arbitrator, court or other Governmental Authority, or any license, permit, certificate, authorization, qualification, or approval granted by a Governmental Authority to the extent binding on a Party or any of its property.

1.1.15. **"Lead Market Participant"** shall have the meaning set forth in the preamble of this Agreement and, where applicable and appropriate, its assignee and/or designee.

1.1.16. **"LNG" and "LNG Terminal"** shall have the meanings set forth in the recitals.

~~1.1.11.~~1.1.17.     **"Month"** means the period beginning at 12:00 a.m. on the first day of the calendar month and ending at 12:00 a.m. of the first day of the next succeeding calendar month.

~~1.1.12.~~1.1.18.     **"Monthly Reports"** shall have the meaning set forth in Section 4.4.4.

~~1.1.13.~~1.1.19.     **"Monthly Settlement"** means the monthly settlement process set forth in the ISO New England ~~Manuals~~System Rules.

~~1.1.14.~~1.1.20.     **"Notice of Additional Expenses"** shall have the meaning set forth in Section 7.1.2(e).

~~1.1.15.~~1.1.21.     **"Notice of Forced Outage"** shall have the meaning set forth in Section 7.1.2(b).

~~1.1.16.~~1.1.22.     **"Notice of Shut-down"** shall have the meaning set forth in Section 7.1.2(c).

1.1.23. **"O&M"** means operations and maintenance.

~~1.1.17.~~1.1.24.     **"O&M Expenses"** see "Fixed O&M Expenses~~"~~."

~~1.1.18.~~1.1.25.     **"O&M Items"** means fixed O&M costs of repairs of the ~~Resource~~Resources and replacements of any part of the ~~Resource~~Resources to correct or avoid any impairment of the capability of the ~~Resource~~Resources to supply energy, capacity and/or

**JA101**

ancillary services, which Owner expenses during the same calendar year in which it is performed, in accordance with Owner's accounting practices.

1.1.19.1.1.26.    **"Owner"** shall have the meaning set forth in the preamble of this Agreement and, where applicable and appropriate, its assignee and/or designee.

1.1.20.1.1.27.    **"Party"** means either the ISO or Owner or Lead Market Participant as the context requires, and "Parties," means ISO and Owner and/or Lead Market Participant, as the context requires.

1.1.21.1.1.28.    **"Periodic Cost Report"** shall have the meaning set forth in Section 6.1.1.

**JA103**

1.1.22.1.1.29.    **"Planned Outage,"** means a planned interruption, in whole or in part, in the electrical output of a Resource to permit Owner to perform maintenance and repair of the Resource, including O&M Items.

1.1.23.1.1.30.    **"Resource"(s)"** shall have the meaning set forth in the Recitals.

1.1.24.1.1.31.    **"Resource Characteristics"** shall have the meaning set forth in Section 3.4

1.1.32.  **"Revenue Credit"** shall have the meaning set forth in Section 4.4.1.

1.1.25.1.1.33.    **"Shut-down"** shall have the meaning set forth in Section 7.1.2(c).

1.1.26.1.1.34.    **"Shut-down Date"** shall have the meaning set forth in Section 7.1.2(f).

1.1.27.1.1.35.    **"Stipulated Marginal Cost"** shall have the meaning set forth in Section 3.4.

1.1.28.1.1.1.    ~~**"Stipulated Variable Cost"** shall have the meaning set forth in Section 3.4.~~

1.1.29.1.1.1.    ~~**"Stipulated Start-Up Cost"** shall have the meaning set forth in Section 3.4.~~

1.1.30.1.1.36.    **"Stipulated No-Load Cost"** shall have the meaning set forth in Section 3.4.

1.1.31.1.1.37.    **"Stipulated Regulation Offer"** shall have the meaning set forth in Section 3.4

1.1.38.  **"Stipulated Start-Up Cost"** shall have the meaning set forth in Section 3.4.

1.1.39.  **"Stipulated Variable Cost"** shall have the meaning set forth in Section 3.4.

1.1.40.  **"Substitute Unit"** shall have the meaning set forth in Section 7.1.2(b).

1.1.32.1.1.41.    **"Supplemental Capacity Payment"** shall have the meaning set forth in Schedule 3.

1.1.33.1.1.42.    **"Term"** shall have the meaning set forth in Section 2.1.

**JA104**

~~1.1.34.~~1.1.43. _____ **"Variable O&M"** shall be the amount specified in Schedule 1.

**1.2.    Interpretation.**

In this Agreement, unless otherwise indicated or otherwise required by the context, the following rules of interpretation shall apply:

~~1.2.1.~~ Reference to and the definition of any document (including this Agreement, ISO New England Filed Documents and the ISO New England System Rules) shall be deemed a reference to such document

1.2.1.   as it may be amended, supplemented, revised, or modified from time to time and any document that is a successor thereto.

1.2.2.   The article and section headings, and other captions in this Agreement, are for the purpose of reference only and do not limit or affect its meaning.

1.2.3.   Defined terms in the singular shall include the plural and vice versa, and the masculine, feminine or neuter gender shall include all genders.

1.2.4.   Accounting terms used herein shall have the meanings given to them under generally accepted accounting principles within the United States consistently applied.

1.2.5.   The term "including" when used herein shall be by the way of example only and shall not be considered in any way a limitation.

**1.3.    Construction.**

This Agreement has been drafted by the Parties hereto and shall not be construed against any Party as the sole drafter.

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

# ARTICLE 2

# TERM

**2.1.     Effective Date and Term.**

~~If ISO has not notified the Owner that the Resource is no longer needed for reliability reasons by 12:00 am on June 1 of the year preceding the Capacity Commitment Period for which [the Permanent De-List Bid was rejected / the Non-price Retirement Request was not accepted],~~ Subject to the terms of this Section 2.1, this Agreement shall be effective at the beginning of the operating hour ending at 1:00 a.m., June 1, ~~200___~~ 2022 (the "Effective Date") and shall terminate at the end of the operating hour beginning at 11:00 p.m. as of the date of the termination ~~of the [last] Resource~~ as provided in Section 2.2 ("Term"). As conditions precedent to the effectiveness of this

**JA107**

Agreement, (i) the Commission must issue an order accepting the terms of the Agreement and establishing the Annual Fixed Revenue Requirement ("AFRR") by December 21, 2018; and (ii) each of the Parties must re-execute this Agreement by January 3, 2019 as written confirmation that the Party accepts the Commission-approved Agreement and AFRR. If either of the foregoing conditions precedent is not met, this Agreement shall be deemed ineffective and any signatures hereto shall be rescinded.

**2.2.    Termination.**

This Agreement may be terminated as follows:

2.2.1.        Once this Agreement is effective, it shall remain in effect for at least ~~a~~two 12-month Capacity Commitment ~~Period. ISO~~Periods and shall terminate ~~this Agreement as to [ the/a ] Resource effective any time~~after such minimum 12-month term upon one hundred twenty (120) days written notice to~~ no sooner than May 31, 2024. ~~O~~wner ~~when ISO determines that [the/a] Resource is no longer needed for system reliability. The one hundred twenty day notice may be issued by ISO prior to the completion of the minimum 12-month term. If two~~ or ~~more Resources are subject to this Agreement, the Agreement may be terminated with respect to one or more individual Resources. The Agreement terminates as of the date that ISO has terminated the Agreement with respect to all of the Resources that were subject to the Agreement as of the Effective date. Owner shall~~Lead Market Participant shall provide timely notice of any such termination of this Agreement to the Commission.

2.2.1.    In order to meet a reliability need, ISO-NE may elect to continue this Agreement beyond its two-Capacity Commitment Period term for subsequent Capacity Commitment Periods upon written notice given no later than the March 1 that is 39 months prior to the start of the subsequent Capacity Commitment Period. Owner shall confirm within 15 days of receipt of ISO-NE's notice that it is willing and able to extend the term.

2.2.2.    Upon 30 ~~days~~days' notice to the Owner and Lead Market Participant, the ISO may unilaterally terminate this Agreement if, over the twelve (12) month period preceding the notice, the ISO determines that the average value over all hours in that period of the ratio of the Resource's Economic Maximum Limit (as it may be redeclared from time to time) to the Resource's Capacity Supply Obligation is less than fifty percent (50%). Owner and Lead Market Participant shall retain all of ~~its~~their existing rights to challenge the ISO's calculation of the aforementioned ratio under the ISO Billing Policy.

**JA108**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

2.2.3.  This Agreement may be terminated as provided in Section 7.1.2, Section 9.2 and Section 11.4.

2.2.4.**2.3.**   **Consequence of Termination or Expiration.** **[One of the following alternatives shall be applicable to each Resource]**


[Inasmuch as the ~~Owner~~Lead Market Participant submitted a ~~Permanent~~Retirement De-List Bid, the Parties

acknowledge that, upon termination, the provisions of Market Rule 1, Section III.13.2.5.2.5 apply and as of the date of termination the Resource is de-listed, relieved of its Capacity Supply Obligation, and no longer receives compensation under the Agreement. In addition, the Resource is no longer eligible to participate as an Existing Resource in any reconfiguration auction, Forward Capacity Auction, or Capacity Supply Obligation Bilateral for the then current Capacity Commitment Period or subsequent periods of Capacity Commitment Periods.] Section III.13 applicable to resources that have submitted Retirement De-List Bids and been retained for reliability or fuel security shall apply.

[Inasmuch as the Owner submitted a Non-Price Retirement Request, unless pursuant to Market Rule 1 Section III.13.1.2.3.1.5 the Commission has directed that the obligation to retire be removed, upon termination the provisions of Market Rule 1 Section III.13.2.5.2.5 shall apply, and, as of the date of termination, the Resource is de-listed, relieved of its Capacity Supply Obligation, and no longer receives compensation under this Agreement. In addition, upon termination of the Agreement, the interconnection rights for the Resource shall terminate and the status of the Resource will be converted to retired.]

2.3.2.4. **Survival.**

Notwithstanding the termination of this Agreement, the Parties shall continue to be bound by the provisions of this Agreement which by their nature are intended to, and shall, survive such termination.

**JA111**

## ARTICLE 3
## RIGHTS AND OBLIGATIONS

### 3.1.    In General.

During the Term, the ~~Resource is a~~Resources will be listed Generating Capacity ~~Resource~~Resources with ~~a~~Capacity Supply Obligations. The Resources' Capacity Supply Obligations shall be in the amount of their summer Qualified Capacity (specifically 703 MW for Mystic 8 and 714 MW for Mystic

9) during all months except for December, January, and February, during which months their Capacity Supply Obligation~~.~~ shall equal the Resources' winter Qualified Capacity (specifically 842 MW for Mystic 8 and 858 MW for Mystic 9). The Owner and Lead Market Participant shall operate, maintain and administer the ~~Resource~~Resources in accordance with (a) this Agreement,~~-~~

(b) the ISO New England Filed Documents, (c) the ISO New England System Rules, and (d) Good Utility Practice, as applicable. Nothing herein shall be construed ~~as~~to require the Owner or Lead Market Participant to take action that is contrary to Good Utility Practice.

### 3.2.    Insurance.

Owner or Lead Market Participant shall arrange for and maintain an appropriate level of liability and property insurance with respect to the ~~Resource~~Resources consistent with Good Utility Practice.

### 3.3.    Bilateral Agreements.

The ~~Resource~~Resources will not be subject to any bilateral agreement for the sale or control of energy~~, capacity,~~ or ancillary services from the ~~Resource~~Resources, unless the Owner or Lead Market Participant~~, as applicable,~~ provides the ISO with a ~~written~~ copy of the proposed agreement at least 30 days in advance. ~~If, upon the Effective Date, the Owner is not the registered Owner in~~ of the

**JA112**

agreement's effective date and obtains ISO's ~~Customer and Asset Management System (CAMS) for the full output of the Resource, the Owner shall provide the~~prior written consent. If ISO ~~with a written copy of any agreement between the Owner and the Registered Owner~~does not respond within ~~seven~~30 days, ISO will be deemed to have consented. Notwithstanding the foregoing, during the Term, Owner or Lead Market Participant shall only have the ability to purchase replacement capacity for periods during which the Resource(s) (i) are on ISO-approved Planned Outage(s) or, (ii) are on Forced Outage(s) and ISO has approved the purchase of replacement capacity.

### 3.4.    Supply Offers.

For each day, the Lead Market Participant shall offer for sale energy and ancillary services (which include Regulation and Reserves) into the New England Markets from the ~~Resource~~Resources, based on the characteristics and operating parameters specified in Schedule 2 (the "Resource Characteristics") and ~~with~~consistent with the ISO New England Filed Documents and ISO New England System Rules. Supply Offers shall be equal to the Stipulated Variable Costs as provided below. ~~Lead~~Supply Offers also shall not exceed Energy Market Reference Levels as determined using the marginal cost formulas specified in Appendix A to Market Rule 1 of the Tariff. Lead Market Participant shall use commercially reasonable efforts to cause the submittal of Supply Offers for ~~hourly values of~~ Economic Minimum Limit and Economic Maximum Limit that are consistent with ambient air forecasts and /or environmental permit parameters. [Lead Market Participant also shall offer Regulation into the New England Markets from the Resource based on the Resource Characteristics using only Stipulated Regulation Offers as defined below.~~]~~.

**JA113**

3.4.1.   The Stipulated Variable Costs shall be self-adjusting formulary rates accepted by the Commission pursuant to the FPA Section 205 proceeding initiated by Owner ~~and~~. The inputs to the formula below shall be updated daily or at the most frequent time interval permitted under the ISO New England System Rules. Stipulated Variable Costs shall be determined according to the definitions below using parameter values from Schedule 1.



Stipulated ~~Marginal~~   =   ~~(Fuel + O&M + Other) Cost~~   ~~("SMC") per MWh~~

~~Where:~~

~~Fuel~~   =   ~~Heat Rate, MMBTU/MWh x (Fuel Index Price, $MMBTU, +Approved Fuel~~ Variable ~~Transportation Service Charges, $MMBTU) + Fuel~~ Cost ~~Other per MWh]~~

~~O&M~~   =   ~~Variable O&M for energy production per MWh as specified in Schedule 1~~

~~Other~~   =   ~~(SO2 Allowance Adder + NOx Allowance Adder + CO2 Allowance Adder + Other Allowance Adder + Operating Permit Adder)~~

**~~Stipulated Variable~~   =   ~~Stipulated Marginal Cost +~~= Stipulated Start ~~Costs~~ Up ~~Cost + +~~Stipulated No- Load ~~Cost~~+ Stipulated Marginal Cost   Cost   Cost**

Where~~:~~

**Stipulated Start- Up** ~~=     ( Cost =~~ **Cost =** Start-Up Fuel ~~Use~~ x  Fuel ~~Index~~ Price~~,~~

~~Cost per Start                        $/MMBTU) +~~  + Start-Up O&M ~~+ Start-Up Other (as specified in~~
~~Schedule 1) +~~  Station Service ($)          (MMBtu)          ($/MMBtu)  ($)

**Stipulated No-Load** ~~=     ( Cost =~~ No- Load Fuel ~~Use, MMBTU~~ x  Fuel ~~Index~~
~~Cost per Service                      Price, $/MMBTU) + Fuel Cost Ancillaries + Hour~~  +
No
 Load O&M ~~+ No-Load Other (as specified in Schedule 1~~($/hr)     (MMBtu/hr)
                         ($/MMBtu)                    ($/hr)

~~The~~ **Stipulated Marginal Cost** =  Incremental Heat Rate  x   Fuel Price +   Variable
O&M ($/MWh)          (MMBtu/MWh)          ($/MMBtu)          ($/MWh)

And

Fuel Price = Fuel Index + Fuel Variable/ + Emissions Cost + Fuel Opp. Cost + Op Permit Adder
             Price      Other Costs
           ($/MMBtu)   ($/MMBtu)      ($/MMBtu)          ($/MMBtu)          ($/MMBtu)

Station Service =     Station Service       x     Energy Price
 (S)                 (MWh) from Schedule 1       ($/MWh)

Emissions Cost =     Emissions Rates       x     Applicable Emissions Price
 ($/MMBtu)           (lbs/MMBtu)                 ($/ton)

3.4.1.1      "Applicable Emission Price" shall mean the applicable emissions allowance price ($/ton) from Evolution Markets Inc. (or successor) converted to pounds ($/lbs) using appropriate pounds/ton conversion ratio.

3.4.1.2      "Energy Price" shall mean cost of energy used to supply station service, calculated using a method permitted under ISO New England Filed Documents and ISO New England System Rules.

3.4.1.3      "Fuel Index Price" shall mean the current daily price~~, using the third party data as specified~~ determined using a world LNG index or, alternatively, and subject to approval by ISO Market Monitoring, the weighted average cost of gas in the storage tank adjacent to the LNG Terminal.

3.4.1.4      "Fuel Opportunity Cost" or "Fuel Opp. Cost" shall mean (i) the amount, if any, by which the AGT (citygate) fuel index price exceeds the Fuel Index Price, and/or (ii) the opportunity cost associated with a limited supply of fuel, as approved by ISO and ISO Market Monitoring.

**JA115**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

3.4.1.5          "Fuel Variable/Other Costs" shall mean the additional amount, if any, to be

added to the Fuel Index Price to reflect other costs associated with the Fuel Index Price to properly reflect the cost of delivered fuel at the LNG Terminal. Fuel Variable/Other Costs shall be subject to approval of ISO Market Monitoring.

3.4.1.13.4.1.6  "Operating Permit Adder" shall mean either: (i) the opportunity cost associated with the limit on Schedule 1, applicable to the delivery point specified on Schedule 1 emissions contained in the operating permit and/or (ii) the cost associated with exceeding the emissions rate contained in the operating permit.

3.4.1.23.4.1.7  ["""Stipulated Regulation Offer" shall mean the actual offer for providing Regulation from the Resource, which shall not exceed $[100] or thesubject to any cap specified in Market Rule 1, as may be amended from time to time. [Note: Owner/Lead Participant to discuss with Market Monitoring if Resource has supplied regulation service]].

**3.5.    Self-Scheduling.**

**JA117**

As long as a fuel limitation does not result, and subject to the ISO New England System Rules, the ISO New England Operating Documents and the compensation provisions of Article 4, the Lead Market Participant may request to self-schedule the ~~Resource~~Resources for operational and maintenance considerations, including testing, and fuel management purposes~~.~~. Alternatively, rather than self-scheduling for fuel management purposes, the Owner's affiliate shall sell fuel to third parties or reject a fuel shipment if Owner and/or Lead Market Participant reasonably believes that action will reduce overall costs to ratepayers. ISO System Operations may accept or not accept the self--schedule in its sole discretion.

**3.6    Capacity Performance Payments.**

The Resources shall be subject to negative Capacity Performance Payments and eligible for positive Capacity Performance Payments consistent with other Resources with Capacity Supply Obligations; provided, however, that positive Capacity Performance Payments shall be used solely as a credit against negative Capacity Performance Payments and shall not otherwise accrue to the benefit of the Resources, but net negative Capacity Performance Payments shall affect the amount of the Revenue Credit.  Specifically:

    i.    Within each month, positive Capacity Performance Payments accrued by a Resource can be used to offset negative Capacity Performance Payments accrued by either Resource, creating a net monthly Capacity Performance Payment position for both Resources, which may be positive or negative ("Net Monthly Station Position").

**JA118**

ii.     During the first two months of a Capacity Commitment Period, the Net Monthly Station Position for the second month of the Capacity Commitment Period shall be added to the first, creating an "Accrued Penalty Balance" for the month of July. Thereafter, at the end of each month within the Capacity Commitment Period, the Accrued Penalty Balance shall be calculated as the prior month's Accrued Penalty Balance plus the current month's Net Monthly Station Position; provided, however, that for the month of June of each Capacity Commitment Period, the prior month's Accrued Penalty Balance shall be zero and June's Accrued Penalty Balance shall be equal to its Net Monthly Station Position.

iii.    If the prior month's Accrued Penalty Balance is zero or negative, and the current month's Net Monthly Station Position is negative or zero, then the Revenue Credit for the month shall be increased by the amount of the absolute value of the Net Monthly Station Position, thereby charging any negative Capacity Performance Payment to the Owner.

iv.    If the prior month's Accrued Penalty Balance is negative, and the current month's Net Monthly Station Position is positive, then the Revenue Credit for the month shall be reduced by the lesser of the Net Monthly Station Position and the absolute value of the prior month's Accrued Penalty Balance.

v.     If the prior month's Accrued Penalty Balance is positive and the current month's Net Monthly Station Position is negative, and the prior month's Accrued Penalty Balance is greater than or equal to the absolute value of the current month's Net Monthly Station Position, then there will be no adjustment to the Revenue Credit for that month. If the absolute value of the Net Monthly Station Position exceeds the prior month's Accrued Penalty Balance, then the Revenue Credit shall be increased by the amount by which the absolute value of the Net Monthly Station Position exceeds the prior month's Accrued Penalty Balance.

vi.    If the prior month's Accrued Penalty Balance is zero or positive and the current month's Net Monthly Station Position is zero or positive, there shall be no adjustment to the Revenue Credit for that month.

vii.   Notwithstanding the foregoing, any positive Accrued Penalty Balance shall be reset to $0 on each December 1. For the avoidance of doubt, the Resources shall not be

**JA119**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

permitted to apply positive Accrued Penalty Balances from one Capacity Commitment Period to another.

**3.7.     Winter Fuel Security Penalty.**

From December 1 through the last day of February, the Resources shall be subject to an additional Winter Fuel Security Penalty when the following three conditions are met: (i) Capacity Scarcity Conditions exist and either or both Resources have a Capacity Performance Score that is negative, (ii) the volume in the storage tank at the LNG Terminal at 8 a.m. of the day during which the interval occurred is less than 510,000 MCF, provided that, if the interval occurs between 48 hours and 6 hours in advance of the next scheduled arrival of an LNG cargo, this minimum volume requirement shall be 375,000 MCF, and provided further, that if the interval occurs less than 6 hours in advance of the next schedule arrival of an LNG cargo, this minimum tank volume shall be 330,000 MCF, and (iii) the amount calculated by subtracting the mid-point price, in $/MMBtu, for the Henry Hub, as published in Platt's Gas Daily for the gas day in which the Capacity Scarcity Condition occurred, from the mid-point price, in $/MMBtu, for the Algonquin City-Gates, as published in Platt's Gas Daily for the relevant day, is greater than $17.50/MMBtu (the "Winter Fuel Security Penalty"). The penalty rate shall be equal to the sum of the System Ten Minute Spinning Reserve (System TMSR), System Ten Minute Non-Spinning Reserve (TMNSR), and System Ten Minute Operating Reserve (System TMOR) Reserve Constraint Penalty Factors applied at the Node or Nodes at which the Mystic units are settled during the interval in which Capacity Scarcity Conditions exist, calculated consistent with Section III.2.7A(a-e) of the Tariff, using the following stated values: System TMSR of $50/MWh, TMNSR of $1,500/MWh, and System TMOR of $1,000/MWh. Any Winter Fuel Security Penalty shall be calculated in the same manner as Capacity Performance Payments (i.e., consistent with Sections III.13.7.2.2., III.13.7.2.3, III.13.7.2.4), with the exception that the calculations will not be on a Resource-specific basis but with the two Resources' Capacity Performance Scores combined to form a single Capacity Performance Score for the Mystic station. The maximum penalty that can be assessed in any month pursuant to Section 3.6 and 3.7 shall be $18.49 million, except for the months of December, January, and February, where the maximum assessed penalty in any month shall be $30 million. The maximum penalty assessed pursuant to these Sections 3.6 and 3.7 shall not exceed $110.30 million per Capacity Commitment Period.

**3.8     Fuel Supply Information Sharing.**

The Lead Market Participant shall provide ISO with a 24/7 Operations contact for the LNG Facility and will authorize that contact to promptly provide ISO with operational information reasonably requested by ISO, including storage tank volumes, scheduled LNG cargoes, and outages of the LNG Facility. In addition, Lead Market Participant shall provide ISO with a daily report regarding (i) storage tank inventory, (ii) next scheduled cargo (expected amount in MMBtu), and (iii) aggregate sendout of (a) third party sales of both vapor (by pipeline) and (b) LNG for that day.

**3.9     Fuel Supply Management and Third-Party Sales.** The Owner, Lead Market Participant and their affiliates shall exercise Good Utility Practice with respect to the fuel supply arrangements for the Resources. Owner, which is a party to a Fuel Supply Agreement with Constellation LNG, LLC for the supply of fuel to Mystic 8 & 9, shall not modify any material term of that Agreement without providing ISO with a copy of the proposed modification and submitting an informational filing to the Commission, in the docket in which this Cost of Service Agreement is approved, that shows the proposed modifications at least 15 days in advance of the modification's effective date and, with respect to any modification to the conceptual method for calculating any margin earned on any third-party sales of LNG re-gasified through the LNG Facility, obtains ISO's prior written consent. Owner and Lead Market Participant and/or their affiliates shall meet with ISO (i) prior to the commencement of the Term of this Agreement to discuss the fuel supply plan for the first twelve months of the Term, and (ii) prior to September 1 of each year of the Term to discuss the overall fuel supply plan (i.e., the number of cargos scheduled for both Mystic and third-party sales) for the Winter months of December through March. To the extent that the fuel supply plan is modified after the meeting with ISO (such as through the addition or subtraction of a scheduled LNG cargo), Owner or Lead Market Participant will provide timely notice of same to ISO.

**3.10    Minimization of Out-Of-Market Impacts.**

The Lead Market Participant shall cooperate with ISO in good faith, in light of the fuel supply available to the Resources, to minimize the market impacts of reliability commitments in the energy market.

**JA121**

# ARTICLE 4

# COMPENSATION AND SETTLEMENT

### 4.1.    In General.

The ~~Owner~~Lead Market Participant is subject to charges and credits for services in the New England Markets, including the Supplemental Capacity Payment, in accordance with the ISO New England System Rules and the ISO New England ~~Administrative Procedures~~Filed Documents, with settlement taking place in the normal weekly and monthly settlement processes as they may be amended from time to time. ~~If an entity other than the Owner has been registered as the Owner in the ISO's Customer and Asset Registration System ("Registered Owner"), then the~~The Supplemental Capacity Payment shall be settled through the account of the ~~Registered Owner unless the Owner has a settlement account with the ISO and, after consent by ISO, the Owner, Registered Owner and Lead~~Lead Market Participant ~~provide written authorization to settle the Supplemental Capacity Payment through the Owner's Settlement Account. The Owner, Registered Owner and~~. The Lead Market Participant and the Owner must comply with all ISO requirements for customer and asset registration.

### 4.2.    Variable Cost Recovery.

In order to provide for recovery of variable costs, the Supply Offers applicable to the ~~Resource~~Resources as determined in accordance with Section 3.4. shall be included in the calculation of Net Commitment Period Compensation ("NCPC") and the Revenue Credit as defined below. All NCPC shall be paid in accordance with applicable ISO settlement procedures.

In addition, to the extent that Mystic's actual fuel costs differ from sum of the "Fuel Index Price" and/or the "Fuel Variable/Other Cost" components of its "Stipulated Variable Costs" approved by ISO Market Monitoring, and such difference precludes Buyer from recovering its actual fuel costs because of the operation of the Revenue Crediting mechanism in Section 4.4.3, the difference between Mystic's actual fuel costs for such month and the amount Mystic is permitted to recover for fuel in its Stipulated Variable Costs for such month shall be added to the following month's Fuel Supply Cost.

### 4.3.    Fixed-Cost Recovery.

~~Owner~~Lead Market Participant shall be entitled to a Supplemental Capacity Payment for the Resource for each Month, calculated in accordance with Schedule 3, which ISO shall cause to

**JA122**

be paid by Participants through the monthly settlement process for the New England Markets. The Annual Fixed Revenue Requirement shall be as determined by the Commission pursuant to an FPA Section 205 proceeding initiated by Owner.

**JA123**

**4.4.     Revenue Credit.**

4.4.1.    In General. All revenues related to the ~~Resource~~Resources less the ~~variable costs of producing those~~

4.4.1.    ~~revenues~~Stipulated Variable Costs ("Revenue Credit") shall reduce the

Supplemental Capacity Payment in accordance with the formulas in Schedule 3.

FCA

4.4.2.  Capacity Base Payments and Capacity Performance Payments. The Revenue Credit shall include (i) the FCACapacity Base Payment, as it has been adjusted for Peak Energy Rent and Availability Penaltiesdetermined in accordance with the normal FCA settlement. The adjusted amount is allowed to beTariff, and

4.4.2.    (ii) the net negative Capacity Performance Payments as determined in the calculation of the Revenue Credit and to increase the Supplemental Capacity Payment (when that part of the calculation is viewed in isolation). Provided, however, any Availability Credits earned pursuant to the provisions of Market Rule 1,accordance with Section III.13.7.2.7.1.4 3.6 above. The Capacity Base Payment shall be ignored for calculating the Revenue Creditcalculated as the product of the Resources' combined summer Qualified Capacity for the applicable Capacity Commitment Period and the Capacity Clearing Price in the appropriate Capacity Zone. For the avoidance of doubt, Lead Market Participant shall inure to the benefit of the Owner, subject to the maximum earnings provision of Schedule 3, Part 1not receive Capacity Performance Payments (positive or negative) calculated pursuant to the Tariff, and shall instead only receive Capacity Performance Payments calculated pursuant to Section 3.6 above.

4.4.3.    Revenues Received in the New England Markets. All revenues related to the ResourceResources earned in the New England Markets settled by ISO (in addition to the revenues earned in the Forward Capacity Market above), less the Stipulated Variable Cost of producing those revenues as represented by the Supply Offers and less the variable costs of producing revenues for Regulation as represented by the Stipulated Regulation Offer, shall be included in the calculation of the Revenue Credit. For self-scheduled hours, inframarginalInframarginal revenue shall not be reduced for Stipulated Variable Costs in excess of hourly revenue to the extent that the unit was self- scheduled in order to manage fuel delivery obligations. Monthly inframarginal revenue is the sum of all daily positive inframarginal revenue values. If the revenues related to the ResourceResources are not paid on a Resource specific basis, the ISO shall allocate such revenues to the Resources that are subject to this Agreement.

4.4.4.    Other Revenues. Any revenues related to the ResourceResources' sales that have not been settled by ISO (including from bilateral agreements, emission credits, release of firm transportation arrangements, sale of surplus equipment, etc.), less any incremental costs directly related to securing additional revenue that are not already accounted for in the Annual Fixed Revenue Requirement or Stipulated Variable Costs, will be included in the Revenue

**JA125**

4.4.4.    Credit. These incremental costs may not be greater than the incremental revenues on a case-_by-case basis. The Owner ~~and~~or Lead Market Participant shall report all such other revenues, or the absence thereof, to ISO in a monthly report (the "Monthly Report").

# ARTICLE 5

# MARKET

# MONITORING

**5.1.    Mitigation.**

Although this Agreement provides for Supply Offers that do not exceed thresholds identified in Appendix A, Market Rule 1, nothing herein shall preclude the ISO from otherwise applying any provision of Appendix A or Appendix B to Market Rule 1 to Owner or, Lead Market Participant, or any Affiliate of Owner or Lead Participant, either, the ResourceResources, or any other resources of Owner or, Lead Market Participant, or any Affiliate of Owner or Lead Participantthereof, including mitigation of Supply Offers for Resources covered by this Agreement to the applicable Stipulated Variable Cost as defined in Section 3.4 and Schedule 1.

**5.2.    Adjustment.**

After Subject to prior consultation with the Lead Market Participant, Supply Offers that exceed Stipulated Variable Cost are subject to adjustmentwill be automatically adjusted by ISO Market Monitoring to Stipulated Variable Cost.

**5.3.    Dual Fuel Resources [If dual fuel].**

The Lead Participant is required to submit Supply Offers reflecting the fuel to be used. If the Lead Participant is to submit Supply Offers based on the higher cost fuel, it must advise ISO Market Monitory as soon as practicable in advance of submitting such an offer and provide a written explanation as to the cause, Availability implications and expected duration.

# ARTICLE 6

# REPORTING

**6.1.     Variable Cost and Resource Characteristic Reporting.**

6.1.1.    Owner or Lead Market Participant shall update the components of Stipulated Variable Costs that are not publicly available as they may change from time to time on a timely basis, along with supporting information as requested, in a format approved by ISO and consistent with the formulas provided in Section 3.4 and Schedule 1 (the

6.1.1.    "Periodic Cost Report"). If Owner or Lead Market Participant fails to provide updated information on a timely basis, Supply Offers may be adjusted to Stipulated Variable Costs based on the information on file. ISO will give Owner 30 daysdays' prior written notice of any change in the form of the Periodic Cost Report.

JA128

Cost Report.

6.1.2.   The Resource Characteristics applicable to the ~~Resource~~Resources during the Term are set forth in Schedule 2 hereto. Owner or Lead Market Participant shall provide ISO with updated Resource Characteristics set forth on a revised Schedule 2 immediately upon any change of those Resource Characteristics. If ISO does not agree to the revised Schedule, the Schedule in effect shall remain in effect during the Term pending alternative dispute resolution in accordance with Appendix D to Market Rule 1.

**6.2.    Books and Records; Audit Rights.**

ISO shall have the right, at any time upon reasonable notice, to examine at reasonable times the books and records of Owner and Lead Market Participant to the extent necessary to audit and verify the accuracy of all reports, statements, invoices, charges, or computations pursuant to this Agreement. The Parties acknowledge and agree that ISO may perform audits of the Monthly Reports and the Periodic Cost Reports as well as a final audit of all expenses incurred under this Agreement upon completion of the Term. Owner or Lead Market Participant's affiliates shall exercise reasonable efforts to secure the ability to provide ISO, subject to a non-disclosure agreement, copies of any contracts between Owner or Lead Market Participant's Affiliates and third-parties for the sale of fuel from the LNG Facility during the Term and any contracts between Owner or Lead Market Participant's Affiliates and third parties for the supply of fuel to the LNG Facility during the Term. Upon ISO request, Owner or Lead Market Participant also shall provide copies of any affiliate fuel supply agreements involving the LNG Terminal in effect during the Term and documentation of the margin earned on any third-party sales of LNG re-gasified through the LNG Facility for purposes of verifying the crediting of such margin against the cost of the Resources' fuel supply from Constellation LNG, LLC. All information provided during the course of such an examination shall be treated as confidential information under the ISO New England Information Policy and any other applicable ISO Protocols.

**JA129**

# ARTICLE 7

## RESOURCE OPERATION AND MAINTENANCE

**7.1.     Planned and Forced Outages.**

7.1.1.   Planned Outages. ~~Owner~~Lead Market Participant shall be entitled to take one or both of the ~~Resource~~Resources out of operation or reduce the net capability of one or both of the ~~Resource~~Resources during Planned Outages, in accordance with the schedule for Planned Outages as established and implemented pursuant to the ISO New England System Rules, the Transmission, Markets and Services Tariff and the MPSA.

7.1.2.   Forced Outages.

(a)       Generally. ~~Owner~~Lead Market Participant shall be entitled to take the ~~Resource~~Resources out of operation or reduce the net capability of the ~~Resource~~Resources upon the occurrence of a Forced Outage.

(b)       Notice of Forced Outage. In the event of a Forced Outage that is anticipated to last for more than ~~ten (10~~twenty-five (25) days, in addition to any other notification obligation arising under ISO New England System Rules, the Transmission, Markets and Services Tariff and the MPSA, ~~Owner~~Lead Market Participant shall promptly notify ISO ~~Reliability Contract Services~~ in writing of its occurrence, estimated duration, and whether Additional Expenses are expected to be required to return the Resource(s) to service (a "Notice of Forced Outage"). ~~Owner~~Lead Market Participant shall also inform ISO of the availability of any previously retired unit (the "Substitute Unit") and the costs and time required to bring the Substitute Unit back into service and to retire the Resource(s) on Forced Outage.

(c)       Notice of Shut-down. As soon as reasonably practicable after the date of a Notice of Forced Outage but in no event greater than thirty (30) days from the start of such Forced Outage, ~~either~~any Party may, after assessing the nature, expected duration, and expected incurrence of Additional Expenses, notify the other Parties in writing of its determination that the Resource(s) shall, subject to the provisions of Section 7.1.2(e), be Shut-down (a "Notice of Shut-down") and if such notice applies to the ~~entire Resource~~entirety of both Resources that this Agreement should be terminated.

(d)       Supplemental Capacity Payment. In the event that either of the ~~Resource~~Resources is ~~Shutdown~~Shut- down, Owner or Lead Market Participant shall only remain entitled to receive the Supplemental Capacity Payment based on the AFRR through the Shut-down Date; provided that with respect to a Shut-down applying only to a unit, Owner shall have the right but not

**JA131**

~~down Date; provided that with respect to a Shut-down applying only to a unit, this Agreement shall remain in full force and effect with respect to the remaining unit(s). Owner~~the obligation to terminate this Agreement. If Owner or Lead Market Participant opts not to terminate this Agreement, Owner or Lead Market Participant may file amendments to the AFRR with the Commission.

~~(e)~~     Option to Approve Additional Expenses. With respect to a Notice of ~~Shutdown~~Shut-down made by ~~Owner~~Lead Market Participant, if within thirty (30) days of receipt of ~~Owner's~~Lead Market Participant's Notice of Shut-down ISO provides written notice to ~~Owner~~Lead Market Participant that it is willing to pass through for payment by the Participants in the Monthly Settlement process of the New England Markets such Additional Expenses (a "Notice of Additional Expenses") that may be required to recover from such Forced Outage, ~~Owner~~Lead Market Participant agrees that it will, with reasonable dispatch, take the action requested by ISO, i.e., not Shut-down the Resource(s) and make such Additional Expenses as paid to it by the Participants to return the Resource(s) to service from such Forced Outage, or make such expenditures as paid to it by the Participants to bring the Substitute Unit into service and retire the Resource(s) on Forced Outage. The Parties agree that ~~the effectiveness of~~ a Notice of Additional Expenses shall be immediately effective, and ~~Owner~~Lead Market Participant shall be entitled to begin receiving payments from ISO pursuant thereto, as of the day following the date the Owner or Lead Market Participant files a request under Section 205 of the FPA with the Commission to recover from ISO the Additional Expenses identified in the Notice of Additional Expenses. Payments will be made subject to refund pending the approval of such Additional Expenses by the Commission. The Parties further agree that ~~Owner~~Lead Market Participant is obligated to use ~~its best~~commercially reasonable efforts to minimize Additional Expenses and that the amounts approved under the Notice of Additional Expenses are subject to offset by any proceeds from any and all third-party sources, including insurance proceeds, paid to ~~Owner~~Lead Market Participant to return the Resource(s) from the Forced Outage. ~~Owner~~Lead Market Participant shall make a subsequent reconciliation

(e)     ("true-up") filing with the Commission and refund any payments for Additional Expenses paid to ~~Owner~~Lead Market Participant that are disallowed by the Commission, or that exceed the amount actually expended by the ~~Owner~~Lead Market Participant, after offsets.

(f)     Shut-down Date. With respect to a Notice of Shut-down issued by ISO pursuant to Section 7.1.2(c), the "Shut-down Date" shall be that date ten (10) days after the receipt of such Notice of Shut–down by the Owner. With respect to a Notice of Shut-down issued b

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

~~Owner~~Lead

USCA Case #20-1343    Document #1935613    Filed: 02/17/2022    Page 149 of 580

Market Participant pursuant to Section 7.1.2(c), the "Shut-down Date" shall be that date thirty-(f) (30) days after the receipt of such Notice of ShutdownShut-down by ISO unless ISO has issued a Notice of Additional Expenses in accordance with Section 7.1.2(e), in which case no Shut-down Date will have occurred with respect to such Notice of Shut-down or the Shut-down Date will be the date on which the Substitute Unit is brought back into service. As of the ShutdownShut-down Date, the interconnection rights for the Resource(s) shall terminate and the status of the Resource will be converted to retired.

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

**7.2.    Additional and Other Expenses.**

Except as provided for in Section 7.1, Owner and Lead Market Participant shall (i) not be required or otherwise obligated to incur any Additional Expenses and (ii) not be required to enter into any additional agreements or incur any additional costs, including fixed-fuel costs, that Owner is not already obligated to enter into, or incur, as the case may be, that are not otherwise contemplated by, and being recovered by Owner ~~pursuant to, the Annual Fixed Revenue Requirement~~Lead Market Participant pursuant to, the Annual Fixed Revenue Requirement. To the extent that ISO provides notice of shut- down pursuant to 7.1.2(f) and such notice will result in Owner's or Lead Market Participant's failure to recover certain costs that were reasonably incurred for operation of Resources and that are unable to be avoided using commercially reasonable efforts, Owner or Lead Market Participant shall be entitled to make a Section 205 filing to recover those costs at the Commission.

## ARTICLE 8
## FORCE MAJEURE EVENTS

**8.1.    Notice of Force Majeure Event.**

If ~~any~~either Party is unable to perform its obligations under this Agreement due to a Force Majeure Event, the Party unable to perform shall promptly notify the other Party.

**8.2.    Effect of Force Majeure Event.**

8.2.1. If the Availability of the Resource is reduced by reason of a Force Majeure Event, Section 7.1.2 shall apply (i.e.~~.~~, a Force Majeure Event shall be deemed to create a Forced Outage). Subject to reduction ~~by the COS Availability Penalty~~as explicitly set forth in this Agreement and to Sections 7.1.2, 9.2, and 11.4, ~~Owner~~Lead Market Participant shall continue to receive the Supplemental Capacity ~~Payment without any other reduction while the Force Majeure Event continues~~.

Payment without any other reduction while the Force Majeure Event continues.

8.2.2. Neither Party will be considered in default as to any obligation under this Agreement if prevented from fulfilling the obligation due to an event of Force Majeure. Notwithstanding the foregoing, no event of Force Majeure affecting either Party shall excuse that entity from any payment, charge, penalty, financial consequence or settlement responsibility that it is obligated to make hereunder. A Party whose performance is hindered by an event of Force Majeure shall make all reasonable efforts to perform its obligations.

**8.3.    Remedial Efforts.**

The Party unable to perform by reason of a Force Majeure Event shall use reasonable efforts to remedy its inability to perform and to mitigate the consequences of the Force Majeure Event as soon as reasonably practicable; provided that (i) no Party shall be required to settle any strike, walkout, lockout, or other

labor dispute on terms which, in the Party's sole discretion, are contrary to its interests and (ii) subject to Sections 7.1.2 and 7.2, the Party unable to perform shall, as soon as practicable, advise the other Party of the reason for its inability to perform, the nature of any corrective action needed to resolve performance, and its efforts to remedy its inability to perform and to mitigate the consequences of its inability to perform and shall advise the other Party of when it estimates it will be able to resume performance of its obligations under this Agreement.

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

**ARTICLE 9**

**REMEDIES**

**9.1.    Damages and Other Relief.**

9.1.1.    Liability of ISO. ISO shall not be liable to Owner or Lead Market Participant for actions or omissions by ISO in performing its obligations under this Agreement, provided it has not willfully breached this Agreement or engaged in willful misconduct. To the extent Owner or Lead Market Participant has claims against ISO, Owner andor Lead Market Participant may only look to the assets of ISO for the enforcement of such claims and may not seek to enforce any claims against the directors, members, officers, employees or agents of ISO who, Owner and Lead Market Participant acknowledge and agree, have no personal liability for-

**JA138**

~~9.1.1.~~     obligations of ISO by reason of their status as directors, members, officers, employees or agents of ISO.

9.1.2.     Liability of Owner. Except as explicitly provided ~~by the COS Availability Penalty~~herein, Owner and Lead Market Participant shall not be liable to ISO for actions or omissions by Owner or Lead Market Participant in performing their obligations under this Agreement, provided that Owner or Lead Market Participant has not willfully breached this Agreement or engaged in willful misconduct.

9.1.3.     Limitation of Liability. In no event shall Owner ~~and~~or Lead Market Participant be liable to ISO or ISO be liable to Owner ~~and~~or Lead Market Participant for any incidental, consequential, multiple or punitive damages, loss of revenues or profits, ~~attorneys~~attorneys' fees or costs arising out of, or connected in any way with the performance or non-performance of this Agreement.

9.1.4.     Indemnification. Owner and Lead Market Participant shall indemnify, defend and save harmless ISO and its directors, officers, members, employees and agents from any and all damages, losses, claims and liabilities by or to third parties arising out of or resulting from the performance by ISO under this Agreement or the actions or omissions of Owner and Lead Market Participant in connection with this Agreement, except in cases of gross negligence or willful misconduct by ISO or its directors, officers, members, employees or agents.

**9.2.     Termination for Default.**

**JA139**

~~If any Party~~If ISO shall fail to perform any material obligation imposed on it by this Agreement and that obligation has not been suspended pursuant to this Agreement, Owner or Lead Market Participant, at its option, may terminate this Agreement by giving ISO written notice setting out specifically the circumstances constituting the default and declaring its intention to terminate this Agreement. If Owner or Lead Market Participant shall fail to perform any material obligation imposed on it by this Agreement and that obligation has not been suspended pursuant to this Agreement, ~~the other Party, at its option,~~ISO may terminate this Agreement by giving ~~the Party in default~~Owner and Lead Market Participant written notice setting out specifically the circumstances constituting the default and declaring its intention to terminate this Agreement. If the Party receiving the notice does not within ten (10) days after receiving the notice, remedy the

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

default, the Party not in default shall be entitled by a further written notice to terminate this Agreement. The Party not in default shall have a duty to mitigate damages. Termination of this Agreement pursuant to this Section 9.2 shall be without prejudice to the right of any Party to collect any amounts due to it prior to the time of termination.

**9.3.    Waiver.**

The failure to exercise any remedy or to enforce any right provided in this Agreement or applicable Law shall not constitute a waiver of such remedy or right or of any other remedy or right. A Party shall be considered to have waived any remedies or rights only if the waiver is in writing.

**9.4.    Beneficiaries.**

Except as is specifically set forth in this Agreement, nothing in this Agreement, whether express or implied, confers any rights or remedies under, or by reason of, this Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligations or liability of any third party, nor give any third person any rights of subrogation or action against any Party.

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

# ARTICLE 10

# COVENANTS OF THE PARTIES

**10.1.    ISO represents and warrants to Owner and Lead Market Participant as follows:**

10.1.1.  ISO is a validly existing corporation with full authority to enter into this Agreement.

10.1.2.   ISO has taken all necessary measures to have the execution and delivery of this Agreement authorized, and upon the execution and delivery of this Agreement, this Agreement shall be a legally binding obligation of ISO.

10.1.3.  ISO has all regulatory authorizations necessary for it to perform its obligations under this Agreement.

10.1.4.  The execution, delivery, and performance of this Agreement are within ISO's powers and do not violate any of the terms and conditions in its governing documents, any contracts to which it is a party, or any Law applicable to it.

**JA142**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

**10.2.    Owner represents and warrants to ISO as follows:**

10.2.1.  Owner is a validly existing entity with full authority to enter into this Agreement.

10.2.2.  Owner has taken all necessary measures to have the execution and delivery of this Agreement authorized, and upon the execution and delivery of this Agreement, this Agreement shall be a legally binding obligation of Owner.

10.2.3.  Owner has, or has applied for, all regulatory authorizations necessary for it to perform its obligations under this Agreement.

10.2.4.  The execution, delivery, and performance of this Agreement are within the Owner's powers and do not violate any of the terms and conditions in its governing documents, any contracts to which it is a party, or any Law applicable to it.

**JA143**

**10.3.    Lead Market Participant represents and warrants to ISO as follows:**

10.3.1.    Lead Market Participant is a validly existing entity with full authority to enter into this Agreement.

10.3.2.    Lead Market Participant has taken all necessary measures to have the execution and delivery of this Agreement authorized, and upon the execution and delivery of this Agreement, this Agreement shall be a legally binding obligation of ~~Agent~~Lead Market Participant.

10.3.3.    Lead Market Participant has, or has applied for, all regulatory authorizations, necessary for it to perform its obligations under this Agreement.

10.3.4.    The execution, delivery, and performance of this Agreement are within the Lead ~~Participants~~Market Participant's powers and do not violate any of the terms and conditions in its governing documents, any contracts to which it is a party, or any Law applicable to it.

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

# ARTICLE 11

## MISCELLANEOUS PROVISIONS

**11.1. Assignment.**

11.1.1. None of the Parties shall assign its rights or delegate its duties under this Agreement-

11.1.1.    without the prior written consent of the other ~~Party~~Parties, which consent shall not be unreasonably withheld, conditioned, or delayed. Any such assignment or delegation made without such written consent shall be null and void. Upon any assignment made in compliance with this Article 11.1, this Agreement shall inure to and be binding upon the successors and assigns for the assigning Parties.

11.1.2.  Notwithstanding Section 11.1.1, each Party may, without the need for consent from the other ~~Party~~Parties (and without relieving itself from liability hereunder), transfer or assign this Agreement: (i) to an Affiliate, or (ii) where such transfer is incident to a merger or consolidation with, or transfer of all, or substantially all, of the assets of the transferor to

11.1.2.    another person, business entity, or political subdivision or public corporation created under the Laws governing the creation and existence of the transferor which shall as a part of such succession assume all of the obligations of the assignor or transferor under this Agreement. ~~Provided~~; provided, however, that any Party who transfers or assigns this Agreement as provided in subsections "i" or "ii" of this Section 11.1.2 shall provide timely notice to the other Party or Parties of such change, including the effective date and changes, if any, to the nominations under Section 11.2 and Exhibits A or B, as appropriate. Any Party may collaterally assign its rights in this Agreement to its lenders without the need for consent from the other Party. To the extent that any Party seeks to transfer its rights and obligations to a successor entity, such Party shall seek to assign this Agreement to such successor entity, pursuant to this Section 11.1.2.

11.1.3.  Upon 60 ~~days~~days' notice from Owner or Lead Market Participant, ~~the~~ Lead Market Participant's ~~role~~function as Lead Market Participant under this Agreement may ~~terminate and then this function must~~ be assigned ~~by Owner~~ to another entity fully capable of fulfilling this role consistent with the ISO New England Filed Documents and the ISO New England System Rules. The Owner, the current Lead Market Participant~~,~~ and ~~the~~any successor Lead Market Participant must comply with all ISO requirements for Customer Asset registration. Owner is not obligated to assign the Lead Market Participant role to another entity ~~and may assume this role, if it is qualified to do so, by notifying the ISO~~.

**JA146**

11.1.4.  The Owner may designate a new Registered Owner by providing 30 days notice under the Agreement and a written copy of any agreement between the Owner and the new registered Owner. The Owner, the Registered Owner and the Lead Participant must comply with all ISO requirements for Customer and Asset registration.

**11.2.   Notices.**

Except as otherwise expressly provided in this Agreement or required by Law, all notices,

consents, requests, demands, approvals, authorizations and other communications provided for in this Agreement shall be in writing and shall be sent by personal delivery, certified mail, return receipt requested, facsimile transmission, or by recognized overnight courier service, to the intended Party at such Party's address set forth below. All such notices shall be deemed to have been duly given and to have become effective: (a) upon receipt if delivered in person or by facsimile; (b) two days after having been delivered to an air courier for overnight delivery; or (c) seven days after having been deposited in the United States mail as certified or registered mail, return receipt requested, all fees pre-paid, addressed to the applicable

 addresses set forth below. Each Party's address for notices shall be as follows (subject to change by notice in accordance with the provisions of this Section 11.2):

OWNER AND LEAD MARKET PARTICIPANT:——_ISO:

| NOTICES & CORRESPONDENCE | NOTICES & CORRESPONDENCE |
|---|---|
| | [TO COME] |
| | Mark H. |
| Freise, Reliability Contracts Manager Robert Ethier Senior Vice President – Wholesale Trading | Robert Ethier Senior Vice President Vice President |
| Exelon Generation Company | ISO New England Inc. |
| 1310 Point Street, 8th Floor | One Sullivan Road |
| Baltimore, MD  21231 | Holyoke, MA 01040 |
| Tel:  (410) 470-8115 | Tel: (413) 540-4429 4412 |
| Fax:  (443) 213-3424 | Fax: (413) 540-4226 (413) 535-4156 |

with a copy to:

| Theodore Paradise Senior General Counsel | Maria Gulluni Legal Department |
|---|---|
| Exelon Generation Company | ISO New England Inc. |
| 1310 Point St., 8th Floor | One Sullivan Road |
| Baltimore, MD  21231 | Holyoke, MA 01040 |
| Tel:  (410) 470-3416 | Tel: (413) 540-4585 4473 |
| Fax:  (443) 213-3556 | Fax: (413) 535-4379 |

The foregoing notice provisions may be modified by providing written notice, in accordance with ISO Protocols established from time-to-time.

**11.3.    Parties' Representatives.**

USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 165 of 580

All Parties to this Agreement shall ensure that throughout the term of this Agreement, duly appointed representatives are available for communications between the Parties. The representatives shall have full authority to deal with all day-to-day matters arising under this Agreement. Acts and omissions of representatives shall be deemed to be acts and omissions of the Party. Owner, Lead Market Participant and ISO shall be entitled to assume that the representatives of the other ~~Party~~Parties are at all times acting within the limits of the authority given by the representatives' Party. Owner's and Lead ~~Participants~~Market Participant's representatives shall be identified on Exhibit A. ISO's representatives shall be identified on Exhibit B. The Parties may at any time replace their representatives by sending the other ~~Party~~Parties a revision to its respective Exhibit.

**11.4.    Effect of Invalidation, Modification, or Condition.**

Each covenant, condition, restriction, and other term of this Agreement is intended to be, and shall be construed as, independent and severable from each other covenant, condition,

restriction, and other term. If any covenant, condition, restriction, or other term of this Agreement is held to be invalid or otherwise modified or conditioned by any Governmental Authority, the invalidity, modification, or condition of such covenant, condition, restriction, or other term shall not affect the validity of the remaining covenants, conditions, restrictions, or other terms hereof. If an invalidity, modification, or condition has a material impact on the rights and obligations of the Parties, the Parties shall make a good faith effort to renegotiate and restore the benefits and burdens of this Agreement as they existed prior to the determination of the invalidity, modification, or condition. If the Parties fail to reach agreement, then the Party whose rights and obligations have been adversely affected may, in its sole discretion, terminate this Agreement or refer the dispute for resolution under the Alternative Dispute Resolution provisions in Appendix D of Market Rule 1.

**11.5.   Amendments.**

Any amendments or modifications of this Agreement shall be made only in writing and duly executed by all Parties to this Agreement. Such amendments or modifications shall become effective only after the Parties have received any authorizations required from the Commission. The Parties agree to negotiate in good faith any amendments to this Agreement that are needed to reflect the intent of the Parties as expressed herein ~~and to reflect any changes to the design of the New England Markets that are approved by the Commission from time to time~~, or, following Commission approval of such cost increases, any material increases in the costs of owning and operating the Resources.

**11.6.   Governing Law.**

This Agreement shall be governed by and construed under the Laws of the Commonwealth of Massachusetts without regard to conflicts of laws principles.

JA151

**11.7.    Entire Agreement.**

~~11.7.~~

This Agreement consists of the terms and conditions set forth herein, as well as the Appendices hereto, which are incorporated by reference herein and made a part hereof. This Agreement contains the entire agreement between the Parties and supersedes all prior negotiations, undertakings, agreements and business term sheets.

**11.8.    Independent Contractors.**

Owner (and, Lead Market Participant, as Owner's representative) and ISO acknowledge that as between Owner and/or Lead Market Participant and ISO there is an independent contractor relationship, and that nothing in this Agreement shall create any joint venture, partnership, or principal/agent relationship between the Parties. Neither Owner or Lead Market Participant nor ISO shall have any right, power, or authority to enter into any agreement or commitment, act on behalf of, or otherwise bind the other Party in any way.

**11.9.    Execution and Counterparts.**

This Agreement may be executed in one or more counterparts each of which shall be deemed an original and all of which shall be deemed one and the same agreement. This Agreement shall become effective upon Commission approval and final execution, as set forth in Section 2.1 hereof. Initial execution of this Agreement excludes (in the case of ISO) acceptance of the Annual Fixed Revenue Requirement, Stipulated Variable Costs, and Monthly Fuel Supply Costs.

**11.10.    Confidentiality.**
~~11.10.~~

Confidential information identified as such by a Party and provided to the other Party pursuant to this Agreement shall be governed by the ISO New England Information Policy, subject to the following:

11.10.1. Nothing herein or therein shall limit the right of a Party to file a copy of this Agreement with the Commission, without redaction, to the extent that law, regulation, or agency order makes such filing necessary or appropriate.

~~11.10.2.~~ Notwithstanding anything in this Agreement to the contrary, if during the course of an
11.10.2.  investigation or otherwise, the Commission requests that a Party (the "responding Party") provide to it information that has been designated by the other Party to be treated as confidential under this Agreement, the responding Party shall provide the requested information to the Commission or its staff within the time provided for in the request for information. The responding Party shall promptly notify the other Party upon receipt of any such request and either Party, consistent with 18 CFR § 388.112, may, but shall not be

**JA153**

Document Accession #: 20180516-5048        Filed Date: 05/16/2018

required, to request that the information be treated as confidential and non-public by the Commission and its staff and that the information be withheld from public disclosure.

**11.11.   Submittal to the Commission.**

The Parties acknowledge and agree that (i) the Annual Fixed Revenue Requirement and any subsequent changes thereto to the formula for calculating Stipulated Variable Costs shall be established pursuant to an FPA Section 205 proceeding to be initiated by application of Owner provided, however, that any application for changes to the formula for calculating Stipulated Variable Costs shall be made only under Section 206; (ii) this Agreement ; and (ii) this Agreement constitutes the basis for Owner's recovery of its fixed and variable costs for operating and maintaining the ResourceResources during the Term.

**IN WITNESS WHEREOF,** this Agreement has been executed as of the date first above written.

CON        I°?YSEZX, LLC

By:            '2

Name: David 0. Dardis
Title: Assistant Secretary

ISO NEW ENGLAND INC.

By: _____ ___
Name:
Title:

EXELON GENERATION COMPANY, LLC

By: _____ ___
Name: Ravi  Ganti
Title: Senior Vice President, Portfolio Management and Strategy

**JA156**

**IN WITNESS WHEREOF,** this Agreement has been executed as of the date first above written.


[OWNER NAME]

CONSTELLATION MYSTIC POWER, LLC


By: _____    _____    _____    _____

Name: David 0. Dardis

Title: Assistant Secretary


ISO NEW ENGLAND INC. ENGLn,C.

*cr:r:-uv*

By: _____    _____

Name: G rdon vanWelie

Title:


[LEAD PARTICIPANT NAME]

Title: Pr ident and Chief Executive Officer


EXELON GENERATION COMPANY, LLC


By: _____    _____    _____    _____

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Name: Ravi Ganti

Title:

Title: Senior Vice President, Portfolio Management and Strategy

**IN WITNESS WHEREOF,** this Agreement has been executed as of the date first above written .


CONSTELLATION MYSTIC POWER, LLC


By: .   .   .   .   .   .   .   .   .   .   .   .   .   .   .
Name: David 0 . Dardis
Title: Assistant Secretary


ISO NEW ENGLAND INC.


By: .   .   .   .   .   .   .   .   .   .   .   .   .   .
Name:
Title:


EXELONG


**By:** _ _ _ _ _  -\-1   .J,.J>-=--.,,@. ==---   -   -   -   -   -   -
Name: Ravi         ti
Title: Senior Vice President, Portfolio Management and Strategy

JA159

**EXHIBIT A**

**OWNER'S AND LEAD MARKET
PARTICIPANT'S REPRESENTATIVES**

[OWNER AND LEAD PARTICIPANT TO PROVIDE]

Kevin Kirby

Vice President, Market Operations ISO New England Inc.

One Sullivan Road Holyoke, MA 01040

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Same as contact information.

**EXHIBIT B**

**ISO'S REPRESENTATIVES**

Same as contact information.

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**Public Version—Privileged Material Redacted**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**SCHEDULE 3**

**SUPPLEMENTAL CAPACITY PAYMENT**

For each Obligation Month during the Term, a Supplemental Capacity Payment shall be calculated for the Resource[(s]) as set forth below. The Supplemental Capacity Payment shall be charged to Regional Network Load in the affected Reliability Region.

Section III.13 references are to Market Rule 1, Section III.13 – Forward Capacity Market.

The Annual Fixed Revenue Requirement (AFRR) for the [generating station / Resource] is $_____.

The Annual Fixed O&M ExpensesResources for the [generating station / Resource]Capacity Commitment Period 2022/2023 is $218,974,263 and Capacity Commitment Period 2023/2024 is $_____.

$186,951,485.

The AFRR is the cost-of-service for the [generating station / Resource], including annual fixed operation and maintenance expense and annual expenses, depreciation, amortization, taxes and return, as accepted by the Commission. The Annual Fixed O&M Expenses; provided, however, that, due to the ongoing litigation with the City of Everett, the taxes other than income tax component of the AFRR ($15,500,445.00) shall be updated such that $15,500,445.00 shall be replaced with (i) the amount that is equal to the actual property tax applicable to Mystic for 2022 for Obligation Months within Capacity Commitment Period 2022/2023 and (ii) the amount that is equal to the actual property tax applicable to Mystic for 2023 for Obligation Months within Capacity Commitment Period 2023/2024. The annual fixed operation and maintenance expense is the fixed operating & maintenance expense component of the AFRR. Where the AFRR and the Annual Fixed O&M Requirement have been determined for a generating station that is composed of two or more Resources, each shall be allocated to the Resources pro-rata according to their Capacity Supply Obligations as of the Effective Date. [list the allocated amounts below.]

(Part 1)

Supplemental Capacity Payment =

**JA180**

Plus: Maximum Monthly Fixed Cost Payment

> Less: ~~Total COS Availability Penalties~~Winter Fuel Security Penalty for ~~the~~ Obligation Month Less: Revenue ~~Credit~~Credits for the Obligation Month

~~Providing~~Provided that for any given Capacity Commitment Period the monthly Supplemental Capacity Payments are capped so that the cumulative value of the Supplemental Capacity Payments minus the Monthly Fuel Supply Cost, plus the Revenue Credits ~~plus Availability Credits (as defined in Section III.13.7.2.7.1.4)~~ shall not exceed the AFRR (subject to the additional provisions of Part ~~5~~4 if applicable).

In the event that the Supplemental Capacity Payment would otherwise be less than zero in any

Obligation Month, the Supplemental Capacity Payment for that Obligation Month shall be zero and ~~any unapplied COS Availability Penalty or Revenue Credit~~ <u>the negative remainder</u> shall roll-forward for crediting in a future Obligation Month.

For the last Obligation Month of the Term, the ISO shall charge the Owner for any unapplied roll-forward amount and shall refund that ~~amount to Regional Network Load (subject to the additional provisions of Part 5 below if applicable).~~ using the same FERC-determined allocator that is used to fund the Supplemental Capacity Payment.


(Part 2)

Maximum Monthly Fixed Cost Payment = ~~AFRR~~ [AFRR / 12] + Monthly Fuel Supply Cost The Monthly Fuel Supply Cost is equal to the Fuel Supply Cost (as defined in the Fuel Supply Agreement between Constellation Mystic, LLC and Constellation LNG, LLC ("FSA")) for the Obligation Month. For the avoidance of doubt, the Monthly Fuel Supply Cost will reflect the Fixed O& M/Return on Investment Costs, Variable O & M Costs, New Regulatory Costs (if any), the Administrative Services Fee, Pipeline Transportation Agreement Costs, Diversion Costs (credited or debited), Daily Gas Sales Costs (credited or debited), the Third-Party Sales Credit for Demand Charges (credited), and the Actual Fuel Cost Adjustment charged under and defined in the FSA. The Actual Fuel Cost Adjustment allows for the credit or debit of any differences between the fuel cost components of the Stipulated Variable Costs set forth in Section 3.4 and Schedule 1 and the commodity cost of fuel for the Resources in accordance with the terms of the FSA for the Obligation Month.

~~COS Price = Maximum Monthly Fixed Cost Payment / Capacity Supply Obligation~~


~~The Total COS Availability Penalty for the Obligation Month equals the sum of the COS Availability Penalties for each Shortage Event that has been defined and recognized in accordance with Sections III.13.7.1.1.1 through III.13.7.1.1.4. The COS Availability Penalty for each Shortage Event shall be determined in accordance with the provisions of Section III.13.7.2.7.1.2, except that it shall be based on the COS Price instead of the Capacity Clearing Price and the Annual Fixed Revenue Requirement instead of the Resource's Annualized FCA Payment. The per day and per month COS availability penalties assessed shall be subject to the caps set forth in Section III.13.7.2.7.1.3, except that the caps shall be based on the Annual Fixed Revenue Requirement rather than the Resource's Annualized FCA Payment. The sum of Total COS Availability Penalties for each Capacity Commitment Period shall not exceed the Annual Fixed Revenue Requirement.~~


(Part 4~~3~~)

The purpose of the Revenue Credit is to recognize that the Resource has earned revenues from

**JA183**

sources other than this Supplemental Capacity Payment. The Supplemental Capacity Payment is reduced accordingly so that the Resource ~~receives~~has a total payment ~~for its capacity~~potential during the Capacity Commitment Period equal to its Annual Fixed Revenue Requirement plus Monthly Fuel Supply Costs that are not recovered through Stipulated Variable Costs. The Supplemental Capacity Payments are reduced ~~for~~by any ~~COS Availability~~Winter Fuel Security Penalties and negative Capacity Performance Payments not offset by positive Capacity Performance Payments as addressed in Section 3.6.


Revenue Credit for the Obligation Month =

    ~~Plus:~~ ~~FCA~~ Capacity Base Payment for the

        Obligation Month calculated in accordance

        with Section

4.4.2 above.

Plus:Less: PER Adjustment     the absolute value of negative Capacity Performance Payments for the Obligation Month Less:      Availability Penalty for the Obligation Monthas addressed in Section 3.6 above

Less:   positive Capacity Performance Payments credited to Owner/Lead Market Participant as addressed in Section 3.6 above

Plus:   All other revenues related to the Resource (i.e.:, all revenues except for revenues from the New England Forward Capacity Market) that are in excess of Stipulated OfferVariable Costs.

Provided, however, any Availability Credits earned according to the provisions of

**JA185**

Section III.13.7.2.7.1.4 shall be ignored for calculating this Revenue Credit and shall inure to the benefit of the Owner subject to the provisions of Part 1.

Where the FCA Payment, PER Adjustment and Availability Penalty for the Obligation Month are the amounts calculated in the normal monthly settlement based on the Capacity Clearing Price for the Capacity Zone and the provisions of Section III.13.7.

(Part 5)

(Part 4)

If this Agreement terminates other than at the end of a Capacity Commitment Period:

5.1     The ISO shall credit the Resource for Availability Penalties and COS Availability Penalties during that Capacity Commitment Period that are in excess of the pro-rated Annualized FCA Payment and AFRR respectively. The ISO shall charge the appropriate Market Participants defined in Section III.13.7.3 and Regional Network Load in the Reliability Region according to which entities had received the benefit of these excess Availability Penalties and COS Availability Penalties.

5.2 The monthly Supplemental Capacity Payments are capped so that the cumulative value of Supplemental Capacity Payments minus the Monthly Fuel Supply Cost plus Revenue Credits plus Availability Credits (as defined in Section III.13.7.2.7.1.4) shall not exceed the prorated AFRR.

(Part 65)

While the roll-forward provisions of Part 1 provide that the Supplemental Capacity Payment cannot result in a monthly charge to the Resource because of a Supplemental Capacity Payment that calculates to a negative amount, nothing in this Agreement provides that the sum of all charges and credits for the Resource cannot result in a net amount owed to the ISO for any Obligation/Operating Month.

**JA186**

# Attachment C

# Public Redacted Prepared Direct Testimony and Exhibits of William B. Berg

# (Exhibit No. MYS-001 through Exhibit No. MYS-005)

**JA187**

<u>**Exhibit No. MYS-001**</u>

**Prepared Direct Testimony of William B. Berg**

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

**CONSTELLATION MYSTIC POWER, LLC     )          Docket No. ER18-\_\_\_-000**

**PREPARED DIRECT TESTIMONY**
**OF**
**WILLIAM B. BERG**

**ON BEHALF OF**
**CONSTELLATION MYSTIC POWER, LLC**

**JA189**

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

Exhibit No. MYS-001
Docket No. ER18-___-000

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

**CONSTELLATION MYSTIC POWER, LLC  )  Docket No. ER18-___-000**

**Summary of Prepared Direct Testimony of**
**William B. Berg**

1    Mr. Berg provides testimony supporting the request of Constellation Mystic Power,

2    LLC ("Mystic") that the Commission approve a cost-of-service agreement

3    ("Mystic Agreement" or "Agreement") for Mystic units 8 and 9 ("Mystic 8&9")

4    during the term of June 1, 2022 to May 31, 2024 ("Term").  Mr. Berg's testimony

5    explains that fuel supply via the Everett Marine Terminal ("Everett") is the least

6    cost option for ensuring that Mystic 8&9 can meet its obligations to ISO New

7    England Inc. ("ISO-NE") under the Mystic Agreement.  Mr. Berg's testimony also

8    explains the terms of the contract for fuel supply via Everett are cost-justified,

9    appropriate and reasonable.  Cost recovery for fuel supply is provided for in the

10   Agreement in two ways.  First, the variable costs of fuel burned at Mystic will

11   generally be recovered through Mystic's Stipulated Variable Cost offers into the

12   energy market.  The remaining costs of Mystic's fuel supply will be recovered via

13   a separate monthly Fuel Supply Charge in Schedule 3.  As discussed further below,

14   the monthly Fuel Supply Charge will be reduced by 50 percent of the net margin

15   that is earned from forward third-party sales of LNG or vapor.  Mr. Berg explains

16   the functioning of these mechanisms, and why the mechanisms are appropriate. Mr.

17   Berg also supports projected capital expenditures for Mystic 8&9 and Everett and

**JA190**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-001

Docket No. ER18-____-000

1        discusses the property tax dispute involving Mystic 8&9 through the period of the

2        Mystic Agreement.  Calculation of the actual cost of service of Everett is provided

3        in the testimony and workpapers of witness Alan Heintz.

**JA191**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-001
Docket No. ER18-___-000
Page 1 of 24

## UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

CONSTELLATION MYSTIC POWER, LLC    )    Docket No. ER18-___-000

## PREPARED DIRECT TESTIMONY OF
## WILLIAM B. BERG

1   **I.**     **Introduction and Experience**

2   **Q1.**    **Please state your name, business address, and position**.

3   A1.    My name is William B. Berg.  My business address is 300 Exelon Way, Kennett

4        Square, PA 19348.  I am a Vice President of Wholesale Market Development

5        for Exelon Corporation ("Exelon").

6   **Q2.**    **On whose behalf are you testifying?**

7   A2.    I am testifying on behalf of Constellation Mystic Power, LLC ("Mystic").

8   **Q3.**    **Please describe your professional experience.**

9   A3.    I have worked in the electric power industry for over 25 years, and in that time

10        I have developed an understanding of market dynamics in regulated and

11        deregulated markets. I have served in my current position as Vice President of

12        Wholesale Market Development at Exelon since July 2014.  Prior to that, from

13        2005 to 2014, I held positions of increasing responsibility at Exelon and

14        performed many of the same functions I perform in my current role except with

15        respect to a smaller geographic area. Before joining Exelon, from 2001 to 2004,

16        I worked for Reliant Energy and was responsible for wholesale market

17        development for the PJM region.  Throughout my time with Exelon and Reliant,

18        I have consistently worked closely with the various commercial units to

**JA192**

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

1     understand the business needs of the companies to ensure alignment with

2     competitive market development. From 1992 to 2001, I worked for the Florida

3     Public Service Commission, a state regulatory agency that regulates a

4     traditional cost of service, rather than a competitive, electric system. I held

5     many roles of increasing responsibility while at the Commission, and my last

6     role was Chief Advisor to its then Chairman, J. Terry Deason, providing

7     technical analysis on federal initiatives and state electric policy.

8  **Q4.   What are your duties in your current position?**

9  A4.    In my current role, I manage Exelon's wholesale policy development in all

10     competitive wholesale electricity markets in which Exelon is engaged (PJM

11     Interconnection, L.L.C., ISO New England Inc. ("ISO-NE"), Electric

12     Reliability Council of Texas, Southwest Power Pool, Midcontinent Independent

13     System Operator, Inc., and New York Independent System Operator, Inc.) to

14     help ensure outcomes that are aligned with Exelon's business strategy. In this

15     role, I work closely with the various business units within Exelon (electric

16     generation, retail, demand response, commodities trading, and utility interests)

17     to understand the business needs of the Corporation, and I participate in

18     strategic decisions regarding whether to make capital investments in generation

19     capacity and whether to retire units.

20  **Q5.   Have you previously testified before FERC or the courts on utility-related**
21     **matters?**

22  A5.    Yes, I have provided testimony before the Federal Energy Regulatory

23     Commission ("FERC" or "Commission") in proceedings such as the September

**JA193**

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

1    8, 2014 workshop on uplift which was part of the Commission's *Price*

2    *Formation in Energy and Ancillary Services Markets Operated by Regional*

3    *Transmission Organizations and Independent System Operators*, Docket No.

4    AD14-14-000.  In addition, in 2015, I provided testimony before the United

5    States Court of Appeals for the District of Columbia Circuit in *White Stallion*

6    *Energy Center, LLC v. U.S. EPA*, Case No. 12-1100.

7    **Q6.**   **Please describe your educational background.**

8    A6.   I hold a Bachelor of Arts in Business Administration with a Minor in Economics

9    from Lenoir-Rhyne University and a Master of Arts in Applied Economics from

10    the University of Central Florida, College of Business.

11    **II.**   **Background and purpose of testimony**

12    **Q7.**   **Please provide an overview of the instant proceeding.**

13    A7.   The instant proceeding involves Mystic 8&9, which ISO-NE has determined

14    are needed for fuel security and to help ensure system reliability for the period

15    June 1, 2022 to May 31, 2024.  In this proceeding, Exelon is filing the cost-of-

16    service agreement between Mystic, Exelon Generation Company, LLC

17    ("ExGen") and ISO-NE ("Mystic Agreement" or "Agreement"), together with

18    cost support and supporting testimony, for that time-period (the "Term").

19    Mystic is the owner of Mystic 8&9, and ExGen is the Lead Market Participant.

20    In my testimony, I refer to Mystic and ExGen collectively as "Mystic."

21    **Q8.**   **Please describe Mystic 8&9.**

22    A8.   Mystic 8&9 are located in Boston, Massachusetts and are 2-on-1 combined

23    cycle gas turbines with summer claimed capability of 703 MW and 714 MW,

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1    respectively.  As noted above, the units are owned by Mystic, which is a wholly-

2    owned, indirect subsidiary of ExGen, which is a direct, wholly-owned

3    subsidiary of Exelon Corporation.  Mystic 8&9 are fueled by revaporized

4    liquefied natural gas ("LNG"), the sole source of which is the Everett Marine

5    Terminal ("Everett"), located on the property adjacent to Mystic 8&9.

6    **Q9.    What is the purpose of your testimony in this proceeding?**

7    A9.    The primary purpose of my testimony is to provide background and context for

8    this cost of service proceeding, to describe how Mystic determined that Everett

9    will be the lowest cost solution to obtain firm fuel supply for Mystic 8&9 and

10   to explain and support the fuel costs to be recovered through the Mystic

11   Agreement.  I support both the mechanisms for fuel cost recovery, and the

12   reasonableness of those mechanisms.  Actual cost of service analysis and

13   support is provided by witness Alan Heintz.  Finally, I also testify as to expected

14   capital expenditures for both Mystic and Everett from now until the end of the

15   Term and property taxes for Mystic.

16   **Q10.    What have you reviewed in preparing your testimony?**

17   A10.    I have reviewed internal analyses of the feasibility and economics of three

18   options for providing fuel supply for Mystic 8&9 during the Term of the Mystic

19   Agreement.  This includes studies and financial analyses, as well as assessments

20   of the regulatory and other risks associated with each option.  In addition, I have

21   also reviewed internal long-term planning materials for future necessary capital

22   expenditures for Mystic 8&9 and Everett.

1  **Q11.  Was your testimony prepared by you or under your direct supervision?**

2  A11.  Yes.

3  **Q12.  Are you sponsoring any exhibits to your testimony?**

4  A12.  Yes.  In addition to my testimony, I am sponsoring:

5  • Exhibit No. MYS-002 Form 8-K Securities and Exchange Commission

6  Filing and a press release, both dated March 29, 2018;

7  • Exhibit No. MYS-003  Comparison of Alternatives;

8  • Exhibit No. MYS-004  Fuel Supply Agreement; and

9  • Exhibit No. MYS-005 Workbook: Capital Costs of Mystic 8&9 and Everett.

10  **III.    Retirement De-List Bid for Mystic 8&9 in FCA 13.**

11  **Q13.  Please describe Everett.**

12  A13.  Everett is the longest-operating LNG import terminal in the U.S.  It includes

13  3.4 BCF storage capacity and is interconnected to two outbound interstate

14  pipeline systems, a local distribution company ("LDC") facility, and Mystic

15  8&9.  Everett has maximum coincident vaporization send out capacity of 715

16  Mcf/day (0.715 Bcf/day).  As noted above, Everett is the sole source of gas

17  supply for Mystic 8&9.

18  **Q14.  Who owns Everett?**

19  A14.  Distrigas of Massachusetts, LLC, which is a subsidiary of Engie Gas & LNG

20  Holdings LLC (collectively "Engie") currently own Everett.  Distrigas of

21  Massachusetts, LLC is being acquired by another ExGen subsidiary,

22  Constellation LNG, LLC ("Constellation LNG"), with closing scheduled to

23  take place during the fourth quarter of 2018.  Exhibit No. MYS-002 is a Form

**JA196**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

1        8-K Securities and Exchange Commission Filing and a press release, both dated

2        March 29, 2018, announcing that transaction.

3    **Q15.**    **Why is Exelon acquiring the Everett facility?**

4    A15.    Mystic has existing capacity supply obligations for the four capability periods

5        prior to the cost-of-service period.  Mystic needs firm supply to meet those

6        existing obligations.  Mystic has an existing contract for supply of gas from

7        Everett with Engie, but that contract has been the subject of disagreement

8        among the parties for some time, and any litigation on the contract likely would

9        take years to resolve.   After extensive discussions with Engie, ExGen

10        determined that acquisition of Everett was the best and most reliable option for

11        Mystic to meet its existing capacity supply obligations through May 2022

12        without significant risk of non-performance.  Mystic and ExGen carefully

13        considered other options, in the event that the contract dispute with Engie could

14        not be solved, as discussed below.  However, none of those other options – each

15        of which would involve the construction of new infrastructure – could be

16        operational in time to fulfill Mystic's existing capacity supply obligations.

17        And, with respect to fuel supply options during the Term of the Agreement,

18        none of the alternatives were more economical than the continued use of the

19        Everett Marine Terminal and fuel supply via the proposed Fuel Supply

20        Agreement between Mystic and Constellation LNG ("FSA").

**JA197**

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

1  **Q16.  ExGen submitted a Retirement De-List Bid for Mystic 8&9 in FCA 13.**
2  **Please explain why it did so.**

3  A16.  Mystic has existing capacity supply obligations ("CSOs") through May of

4  2022 (in FCA 12, only Mystic 8 received a CSO), and the acquisition of

5  Everett ensures that Mystic can meet its existing obligations.  Mystic

6  submitted a Retirement De-List Bid for Mystic 8&9 because it determined

7  that its expected revenues from ISO-NE capacity, energy and ancillary

8  services markets would not be sufficient to support continued operation of

9  Mystic 8&9 beginning in 2021 when the added costs associated with a reliable

10  fuel supply from Everett were taken into account. The results of FCA 12

11  confirmed this assessment.  Accordingly, on March 23, 2018, as required by

12  the ISO-NE Tariff,[1] Mystic submitted a Retirement De-List Bid with the

13  intention of selecting the unconditional retirement option on July 6, 2018.

14  Furthermore, at the time of the Retirement De-List Bid submission and under

15  the ISO-NE market design as it exists today, Mystic has no expectation of

16  earning sufficient compensation to continue operating Mystic 8&9.  The units

17  also subject Mystic to exposure to global and domestic commodity risk and

---

[1]     ISO-NE FERC Tariff No. 3, Market Rule 1, Section III.13.1.2.3.1.5.

**JA198**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-001
Docket No. ER18-___-000
Page 8 of 24

1    other risks related to the operation of an LNG import facility and two large

2    generation stations.

3    **Q17.   Why not simply continue to move forward under the Retirement De-List**
4    **process set forth in the Tariff?**

5    A17.   The ISO NE Tariff provides Mystic with two options under the Retirement

6    Delist process.  First, Mystic could attempt to resolve with the Internal Market

7    Monitor and possibly through a FERC proceeding the ability to recover its

8    going forward costs.  Second, assuming that ISO-NE has the authority to

9    retain Mystic 8&9 for fuel security, Mystic could elect to submit to cost-of-

10    service compensation through a FERC proceeding that the ISO-NE Tariff

11    contemplates beginning after Mystic has agreed to accept another Capacity

12    Supply Obligation.   Neither of these two options is tenable.  Putting aside

13    whether the Internal Market Monitor would accept Exelon's determination of

14    appropriate Going Forward Costs for Mystic 8&9 for FCA 13, Exelon's

15    management has no interest in operating these facilities (which, with respect

16    to Everett, is a new business that entails a different risk profile than power

17    generation) at annual Going Forward Costs with inadequate compensation for

18    all of the risks or any opportunity to earn a return.  Under the alternative path

19    where Mystic might be able to obtain cost-of-service compensation, the

20    deadlines set forth in ISO-NE's Tariff would require Mystic to determine by

21    July 7, 2018 whether to maintain operations as requested by ISO-NE long

22    before knowing what amount the Commission would authorize it to recover

23    through a cost of service proceeding and the resolution of many modifications

**JA199**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1      to the pro forma cost of service agreement that both impose additional

2      obligations and risks on the Mystic and Everett facilities and accommodate

3      the unique Mystic/Everett circumstances.  Mystic cannot concede its right to

4      retire prior to the resolution of a cost-of-service case.  While every traditional

5      generation facility is required to secure adequate fuel supply, there has never

6      been a cost-of-service case involving this unique combination of assets and

7      the particular provisions necessary to address sole source LNG supply.

8    **Q18.**   **What price will Mystic 8&9 pay for fuel from Everett during the Term of**
9           **the Mystic Agreement?**

10   A18.   As discussed in more detail below, Mystic will pay a price for fuel equal to the

11          actual LNG cost delivered to Everett.  Mystic will also pay a monthly Fuel

12          Supply Charge equal to the costs of operating Everett (including a return on

13          investment), pipeline transportation costs, costs/credits associated with

14          diversion or cancellation of cargos (if any), and an administrative services fee

15          for the back-office and other administrative services required to arrange for fuel

16          supply and credit and collateral costs required to support the purchases of LNG.

17          These costs will be recovered via the Mystic Agreement, which is based on the

18          pro forma cost of service agreement from Appendix I of the ISO-NE Tariff.

19          The cost of the fuel itself will be recovered largely through Section 4.4.3 of the

20          Mystic Agreement, which provides that the portion of energy revenue earned

21          by Mystic 8&9 that remains after subtracting the Stipulated Variable Costs of

22          producing energy (including the cost of fuel) will be deducted from the Annual

23          Fixed Revenue Requirement via the Revenue Crediting mechanism. To the

**JA200**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1  extent that the fuel cost components of the Stipulated Variable Costs differ from

2  Mystic's actual fuel costs, there will be a credit or debit of any differences

3  between the fuel cost components of the Stipulated Variable Costs and the

4  actual cost of fuel for the Resources (an "Actual Fuel Cost Adjustment") under

5  the FSA.  We are aware that the Internal Market Monitor prefers to use fuel

6  index prices for the purposes of establishing Reference Levels rather than

7  setting the reference level at the actual contractual price of fuel delivered to a

8  unit.  While we are hopeful that the Internal Market Monitor will allow the

9  actual contractual price of fuel delivered to Mystic (which is calculated on a

10  weighted average daily cost of gas basis) to be used for Stipulated Variable

11  Costs (which act as the Reference Levels in this context), the Agreement (in

12  combination with the FSA) provides a means by which Mystic will recover any

13  actual fuel costs that exceed the fuel cost components of the Stipulated Variable

14  Costs and refund any amounts where the fuel cost in the Stipulated Variable

15  Costs would otherwise result in Mystic recovering more than its actual fuel

16  costs.   The other costs associated with Mystic's fuel supply will be recovered

17  by a monthly Fuel Supply Charge reflected in Schedule 3, which will reflect a

18  credit for forward third-party sales of LNG from Everett.  Below, I provide an

19  explanation of why this method of fuel supply cost recovery is appropriate.  The

20  FSA that details these charges and credits is provided in Exhibit No. MYS-004.

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-001
Docket No. ER18-___-000
Page 11 of 24

1    **Q19.    Is continued use of Everett gas supply the least cost option for fueling**
2    **Mystic during the Term of the Mystic Agreement?**

3    A19.    Yes.  Acquiring Everett was the best option for meeting our existing capacity

4              supply obligations for FCA 10, FCA 11 and FCA 12 because, among other

5              things, no other alternatives could address both the winter and non-winter fuel

6              supply needs of Mystic 8&9 comprehensively nor could they be constructed

7              and placed in service soon enough to meet Mystic's existing capacity supply

8              obligations.  So, when the Mystic Agreement begins, Constellation LNG

9              already will own Everett and Everett will be a sunk cost.  Accordingly, the cost

10            of fuel supply included in the FSA treats that cost as plant in service adjusted

11            for additions to plant and reduced by accumulated depreciation in the interim.

12            So, the question is whether any alternatives to Everett would be more cost

13            effective over the Term of the Mystic Agreement.  That is, because the fuel

14            security need identified by ISO-NE is for two years, the costs of alternatives

15            should be evaluated in the context of meeting that two-year need.  This analysis

16            showed that, as one might expect, investment in the substantial new

17            infrastructure necessary to replace Everett supply is both more costly and riskier

18            than simply continuing to use the existing infrastructure, Everett.  Also, while

19            we believe that Mystic 8&9 and Everett should continue to operate for the

20            foreseeable future given their importance to both gas and electric regional

21            reliability, and we are optimistic that there will be some combination of market

22            design changes and customer opportunities to support these facilities long-term,

23            we do not yet know what these changes/opportunities will be or when they will

**JA202**

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

1    be in place.  So, it would be imprudent for Mystic to invest hundreds of millions

2    of incremental dollars on alternative sources of fuel supply for the June 2022

3    through May 2024 time-period.

4        We considered two primary alternatives to Everett: (1) a lateral pipeline

5    with additional compression to interconnect to the Algonquin Gas Transmission

6    system and Tennessee Gas Pipeline system that would allow for additional fuel

7    supply via pipeline in the summer season of 250,000 MMBtu/day coupled with

8    Ultra Low Sulfur Diesel dual fuel capability in the winter, and (2) a Hubline

9    lateral to the Algonquin Gas Transmission system plus upstream winter

10    supply/capacity from the Canaport LNG facility located in New Brunswick.  In

11    fact, we spent considerable time and resources negotiating a precedent

12    agreement with a potential pipeline partner, but ultimately determined, given

13    the extremely high costs and various other issues described below, that we could

14    not justify moving forward with either project.  Specifically, the lateral pipeline

15    with compression and dual fuel capability had a construction cost of

16    approximately $575 million and the Hubline lateral had a construction cost of

17    approximately $750 million plus added costs for upstream winter supply.  As

18    shown on the bar chart attached as Exhibit No. MYS-003, these costs far exceed

19    the costs of Everett that will be recovered under the FSA for Everett supply

20    over the two-year Term.

21    **Q20.**    **Were there other issues associated with the alternative options?**

22    A20.    Yes.  First, both alternative projects had substantial credit assurance and

23    guarantee requirements in addition to their substantial overall capital costs.

**JA203**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1      Second, while option 1 – lateral plus dual fuel – provided access to

2      competitively-priced domestic gas supply in the summer, limited upstream

3      pipeline capacity during winter months would require the Mystic facility to

4      rely on the oil-fired capability during the winter.  It is likely that the ability to

5      burn oil would be significantly restricted by environmental emissions limits,

6      such as the $CO_2$ emissions limits set forth in Department of Environmental

7      Protection regulations promulgated under the Massachusetts Global Warming

8      Solutions Act.  Third, both alternatives would require the construction of new

9      facilities and each had significant permitting and construction risks that made

10     it uncertain whether they could be available by June 2022.  Potentially

11     required permits for the new construction included those related to interstate

12     gas transportation and siting, waterways, site development, building, site

13     plan, conservation, storm water, and air quality.  Intense local public and

14     political opposition was possible to any new pipeline project and this

15     opposition had the potential to significantly delay any new projects.  In

16     addition, any construction of new pipeline facilities on the Mystic site could

17     potentially interfere with Mystic's existing permits (e.g., Chapter 91 Mass

18     Public Waterfront Act and Mass Energy Facilities Siting Board), adding

19     further uncertainty.  These projects were also susceptible to higher than

20     anticipated costs given this uncertainty, their scope, and risks.  Fourth, the

21     supply of natural gas in the winter was a priority for meeting the fuel

22     requirements of Mystic 8&9.  The dual fuel capability for option one and the

23     additional cost for upstream gas (that is, either additional pipeline

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1   infrastructure or Canaport LNG supply) for option two added significant

2   costs to those options, but they were necessary in the winter to address any

3   supply constraints from interstate natural gas pipelines.  LNG supply into

4   Everett is not typically constrained in the winter and provides the highest

5   level of certainty of reliable fuel supply for Mystic.

6   In short, having already made the investment in Everett to meet our

7   existing capacity supply obligations, continued use of that asset for the two-

8   year Term of the Mystic Agreement makes far more sense than developing

9   expensive and potentially risky new infrastructure to meet that same two-year

10  need.

11  **Q21.  How will the LNG be procured?**

12  A21.  Constellation LNG will be entering into arms-length contracts with third parties

13  who have access to gas that can be delivered to Everett. Mystic will be charged

14  for the actual cost of LNG it consumes from Everett at the daily weighted

15  average cost of gas ("WACOG") of all LNG in the storage tanks adjacent to

16  Everett on the applicable day of delivery.  Thus, Mystic will be charged the

17  market prices for gas.  *See* Exhibit No. MYS-004, Fuel Supply Agreement at 1.

18  **Q22.  What other services are required to secure Everett fuel supply for Mystic**

19  **8&9?**

20  A22.  Back office, credit support, collateral support, and other administrative and

21  general services are required.  These services will be provided by ExGen to

22  Constellation LNG for a cost-based fee similar to the fees that ExGen charges

23  other affiliates for comparable services, or $1.533 million per year.  The fee for

**JA205**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

1    credit and collateral support services by ExGen to Constellation LNG is based

2    on the value of the transaction and depends on whether the support required is

3    a letter of credit or utilization of cash.  In addition, fixed and variable O & M

4    costs to operate the Everett facility will be incurred, including regasification

5    costs; additional regulatory costs to operate the LNG facility could arise from

6    new laws; pipeline costs to secure the ability to sell excess vapor will arise; a

7    return on investment must be factored into the costs to operate Everett; and

8    diversion costs may be incurred to redirect LNG tankers on fixed delivery

9    schedules when inadequate storage is available on site.  All of these costs will

10   be incurred to operate Everett.

11   **Q23.  How will Constellation LNG recover these costs from Mystic 8&9?**

12   A23.   The FSA passes through these costs (i.e., the Everett Costs, administrative

13          services fee, credit and collateral costs, regulatory costs, pipeline transportation

14          costs, LNG tanker diversion/cancellation costs, and the commodity cost of fuel

15          for Mystic 8&9) without mark-up to Mystic 8&9 via Schedule 3 to the Mystic

16          Agreement.

17   **Q24.  Will Everett be used solely to regasify LNG for Mystic 8&9?**

18   A24.   No, Mystic expects that if and when the Cost-of-Service Agreement becomes

19          effective for the 22/23 (FCA-13) and 23/24 (FCA-14) Capacity Commitment

20          Periods, Constellation LNG will market on a forward basis sales to third party

21          of LNG and LNG vapor that are regasified at Everett.  Such forward sales

22          typically come in two types: contracts with demand and variable charges, and

23          option contracts, in which the purchaser pays for the ability to call on gas

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1    deliveries at a time in the future. After consideration of the increased variable

2    costs associated with the sale to third-parties and the impact that additional sales

3    of LNG will have on the limited storage at the 3.4 BCF storage tanks, 50 percent

4    of the amount remaining from the demand charge or the option payment will be

5    credited against Mystic's monthly fuel supply costs and thereby flowed directly

6    back to consumers.  This crediting mechanism is described in detail in the FSA

7    as "Third-Party Sales Credit for Demand Charges." The credit for forward

8    third-party sales margin will be reflected in the monthly fuel supply bill from

9    Constellation LNG to Mystic.

10    **Q25.   How will any such forward sales of LNG vapor to third parties be treated?**

11    A25.   In discussions with ISO-NE, Mystic initially proposed that 100 percent of the

12    margin attributable to all forward (defined as at least three months forward)

13    third-party sales would be credited against the monthly full supply cost, directly

14    benefiting customers and Constellation LNG would receive no margin from

15    those sales.  However, ISO-NE requested that forward sales be structured to

16    create a strong incentive for Constellation LNG to make economic third-party

17    sales to strengthen regional fuel reliability and reduce net service costs of

18    Mystic.  Accordingly, as reflected in the FSA, 50 percent of the margin from

19    forward sales of LNG and LNG vapor to third parties will be retained by Mystic

20    with the remainder credited against the monthly fuel supply cost. Further,

21    Constellation LNG will bear credit and performance risk with respect to these

22    third-party forward sales.  So, after consideration of the increased variable costs

23    associated with the sale to third-parties and the impact that additional sales of

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1    LNG will have on the limited storage at the 3.4 BCF storage tanks, 50 percent

2    of the amount remaining from the demand charge or the option payment will be

3    credited against the Mystic's monthly fuel supply costs and thereby flowed

4    directly back to consumers.  This crediting mechanism is described in detail in

5    the FSA as "Third-Party Sales Credit for Demand Charges."  The credit for

6    forward third-party sales margin will be reflected in the monthly fuel supply

7    bill from Constellation LNG to Mystic.  Furthermore, the FSA contains

8    language under which a monthly credit for third party sales margin which is

9    larger than the sum of the monthly (non-commodity) charges to Mystic will be

10    carried forward and applied to next month's fuel supply charge.

11  **Q26.**  **Please describe how Everett plans to conduct fuel optimization, and does**
12    **this result in a different crediting or debiting mechanism for third party**
13    **sales other than the "Third-Party Sales Credit for Demand Charges"**
14    **described above?**

15  A26.  Constellation LNG will arrange LNG supply to the Everett facility sufficient to

16    meet the Mystic capacity obligations under the Mystic Agreement under colder

17    than normal winter weather.  In some circumstances, particularly when winter

18    weather is warmer than normal, Constellation and Mystic will have to "make

19    room in the tank" for the next scheduled delivery.  When Everett has more LNG

20    than is needed to supply Mystic 8&9 to meets its reliability need or if scheduled

21    deliveries of LNG exceed storage, sales or dispatch of natural gas will be made

22    on the most economical basis available, which could include, self-scheduling

23    Mystic 8&9 or sales on the Everett interconnected interstate natural gas

24    pipelines.  Any margin earned on these "spot" sales after consideration of the

**JA208**

1    commodity cost of the gas (calculated on a weighted average cost of gas

2    (WACOG) basis), and any variable costs and collateral costs, will be credited

3    against the fuel supply cost charged Mystic under the FSA.  This crediting or

4    debiting mechanism is described in detail as "Daily Gas Sales" in the attached

5    FSA.

6    **Q27.**    **Please explain why you believe it is appropriate for Mystic 8&9 to be**
7            **charged the full cost of service of the Everett Marine Terminal?**
8

9    A27.    As I explained above, purchase of Everett and recovery of its full cost of service

10    is far and away the least cost fuel supply option for Mystic.  The fixed costs

11    charged under the FSA will be markedly below the $575-$750 million

12    construction costs of the next cheapest comprehensive alternatives.  A rational

13    non-affiliate that purchased the Everett facility in those circumstances would

14    seek to both undercut the competition and recover its investment plus a return.

15    Such a non-affiliate might choose to push the price charged closer to the cost of

16    the next cheapest alternative.  We have opted not to take that approach, but

17    rather to have the services that are provided to Mystic by any affiliates be on a

18    cost of service basis.  In addition, we recognize the Commission and third

19    parties' interest in ensuring that the common ownership of Mystic and Everett

20    does not result in recovering excessive costs for the supply of fuel to Mystic.

21    Cost-of-service regulation is the time-tested regulatory mechanism to ensure

22    just and reasonable rates where market-based pricing is unworkable.  Thus, we

23    believe that Everett is entitled to recover its full cost of service and any third-

24    party would require such cost recovery as a minimum for providing LNG

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-001
Docket No. ER18-___-000
Page 19 of 24

1      vaporization services.  The testimony of Mr. Heintz and Dr. Olson demonstrate

2      that the return and fixed cost components in the FSA are justified on a cost of

3      service basis.   While it is Constellation's intent to make third-party sales from

4      Everett, and at ISO-NE's request the FSA provides an incentive to do so, it is

5      uncertain what those sales will be at this time.  As a result, Constellation LNG

6      will credit whatever sales actually occur as described above.

7  **Q28.  How has Mystic addressed capital expenditures for the Term?**

8  A28.    Exhibit No. MYS-005 provides a listing and a description of every capital

9      expense that will be required for Mystic and Everett during the Term of the

10      Mystic Agreement, the reason for each expense and the cost estimate.  Each of

11      the capital expenditures listed in Exhibit NO. MYS-005 are necessary for

12      Mystic to perform its obligations to ISO-NE under the Mystic Agreement, and

13      their costs are based on inspections, known service-duty wear, historical need

14      and amounts, manufacturer requirements, and the age of the units and

15      components.   Further, each of these expenditures are necessary to ensure the

16      reliable operation of the units in accordance with Good Utility Practice and are

17      contained in ExGen's long term planning budget materials for Mystic 8&9 with

18      one exception:  expenditures related to NERC's enhanced critical infrastructure

19      protection ("CIP") requirements that directly result from Mystic 8&9's

20      designation as cost of service units have been added.  In sum, with this

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

1    exception, all capital expenditures were previously budgeted for Mystic 8&9 to

2    maintain reliable operations consistent with Good Utility Practice.

3            With respect to the capital expenditures required at the Everett facility,

4    which ExGen has not yet acquired, a different process was followed. During

5    the course of the due diligence related to the acquisition, Everett's current

6    owner provided information as to its budgets and projected facility costs. That

7    information was reviewed from an engineering perspective and an expected

8    operational budget for Everett was developed. The costs for capital

9    expenditures at Everett are taken directly from this budgeting process.

10           Mystic provides a separate line item to operations and maintenance

11   expense in its cost-of-service to accurately track these one-time expenditures of

12   both Mystic and Everett.

13   **Q29.   What will Mystic's capital expenditures be during the Term?**

14   A29.   As shown in Exhibit No. MYS-005, Mystic will have capital expenditures of

15           $29,282,629 for the period of June 1, 2022 through December 31, 2022,

16           $19,553,123 for calendar year 2023 and $1,044,827 for the first 5 months of

17           2024. Note that Exelon internally accounts for its capital expenditures on a

18           calendar year basis but is presenting them here on a capacity commitment

19           period basis. These expenditures are necessary to perform to ensure the reliable

20           operation of the units in accordance with Good Utility Practice. The project

**JA211**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1     costs are based on historical need and amounts, service and operational wear,

2     manufacturer requirements, and age of the units and components.

3    **Q30. What will Everett's capital expenditures be during the Term?**

4    A.30.  As shown in Exhibit No. MYS-005, Everett will have capital expenditures of

5     $7,000,000 for the period of June 1, 2022 through December 31, 2022,

6     $5,575,000 for calendar year 2023 and $1,000,000 for the first 5 months of

7     2024. Like the capital expenditures for Mystic 8&9, these capital expenditures

8     are needed to ensure the reliable operation of the facility in accordance with

9     Good Utility Practice. They are based on an engineering review of materials

10     provided by Engie in the due diligence process.

11    **Q31.**    **Please explain why you have included expenditures for compliance with**
12         **the North American Reliability Corporation's ("NERC") CIP-002-5.1a**
13         **Requirement R1.1.**

14    A31.  Once ISO-NE, as planning coordinator for the Mystic units, has designated

15     Mystic 8&9 as resources needed to ensure reliability for the ISO-NE region for

16     a period longer than one year, their classification under NERC Reliability

17     Standard CIP-002-5.1a Requirement R1.1 will automatically change from "low

18     impact" to "medium impact" BES Cyber Systems, subject to all of the key

19     cybersecurity controls mandated by the CIP Reliability Standards. The

20     Guidelines & Technical Basis supporting guidance for Criterion 2.3 explains

21     that this criterion is intended to capture those units needed for regional

22     reliability. As the units are currently considered "low impact" units, this change

23     in classification will necessitate extensive investment in IT upgrades,

24     equipment changes and other expenditures. I note that not all of the costs

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

1    associated with these CIP upgrades will be capital expenditures.  There will also

2    be some O&M expense, including some prior to the Term.  However, all such

3    expenditures are solely related to the reliability status of the units during the

4    Term, and as such should be fully recoverable.

5    **Q32.  If Mystic 8&9 are subject to retirement under the current ISO-NE Tariff**
6    **after 2024, why would you plan on investing in capital expenditures?**

7    A32.  ISO-NE has determined that Mystic 8&9 are needed for reliability purposes.

8    The ISO-NE tariff requires that we run our units in accordance with Good

9    Utility Practice.   In addition, at ISO-NE's request, Mystic has agreed to

10   enhanced performance penalties, over and above those normally applied to

11   capacity resources, reflecting the extra importance attached to having these

12   resources available during the cost of service Term.  That means that we must

13   do what is necessary to keep our units running when they are needed for

14   reliability.  This includes making necessary repairs and capital additions to keep

15   the units running reliably.   And as noted above, additional investments are

16   required to reflect enhanced CIP requirements that spring directly from the

17   reliability designation. In my opinion, based upon consultation with operational

18   personnel and the other factors I previously identified, the proposed capital

19   expenditures are reasonable and prudent to meet the Good Utility Practice

20   standard.

21   **Q33.  How has Mystic addressed capital expenditures prior to the Term of the**
22   **Agreement?**

23   A33.  Exhibit No. MYS-005 also provides a listing and a description of every capital

24   expense that will be required for Mystic and Everett prior to the cost of service

**JA213**

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

1    term, the reason for each expense and the estimated cost.  Each of the capital

2    expenditures listed in Exhibit No. MYS-005 are necessary for Mystic to meet

3    its current capacity supply obligations, and Mystic's costs are based on

4    inspections, known service-duty wear, historical need and amounts,

5    manufacturer requirements, and the age of the units and components.   Further,

6    each of these expenditures are necessary to ensure the reliable operation of the

7    units in accordance with Good Utility Practice.  Similar to capital expenditures

8    during the Term, the costs for capital expenditures at Everett during the interim

9    period prior to the Term are based on budgets and projected facility costs.  The

10   capital expenditures of Mystic and Everett incurred during the interim period

11   will increase the gross plant balances of those facilities.

12   **Q34.    How have you treated property taxes for purposes of the Agreement?**

13   A34.   The City of Everett, Massachusetts has filed a complaint in Massachusetts

14   Superior Court requesting to revoke a 1999 tax increment financing agreement

15   related to Mystic 8&9 and order damages for alleged past due tax amounts.

16   Exelon is vigorously contesting this complaint.  The outcome of that litigation,

17   which could take years to conclude, could increase or decrease Mystic's

18   property taxes in the test period utilized by Mr. Heintz (2017) and beyond.  To

19   address this uncertainty, we have included a provision in the Agreement

20   providing that the taxes other than income tax component of Schedule 3 of the

21   Agreement will be updated to reflect an amount equal to the actual property tax

22   applicable to Mystic for the FCA 13 and FCA 14 capacity commitment periods.

23   In Massachusetts, property taxes are billed quarterly and the City of Everett

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1   operates on a fiscal year. Thus, Mystic receives the first quarter bill each July,

2   which must be paid by the end of July. The second quarter bill arrives in

3   October, the third in January and the final bill for the fiscal year arrives in April.

4   Accordingly, by June 1, 2022, Mystic will have paid the entire annual tax for

5   fiscal year 2022 and will be able to make this update.

6   **Q35.  Please summarize your testimony**

7   A35.   For the reasons I state above, I recommend that the Commission accept the

8   Mystic Agreement and permit Mystic to recover the full cost of its fuel supply

9   via Everett, less credits, over the Term, along with the costs of the capital

10  expenditures and property tax payments.

11  **Q36.  Does this conclude your direct testimony?**

12  A36.   Yes.

**JA215**

Document Accession #: 20180516-5048        Filed Date: 05/16/2018

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746 (2012), I state under penalty of perjury that the foregoing

testimony is true and correct to the best of my knowledge, information, and belief.

Executed this _14_ day of May, 2018.

William B. Berg

**JA216**

<u>**Exhibit No. MYS-002**</u>

**Form 8-K Securities and Exchange Commission Filing and a
Press Release, both dated March 29, 2018**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

---

## FORM 8-K

---

### CURRENT REPORT
Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934

**March 29, 2018**

**Date of Report (Date of earliest event reported)**

---

| Commission File Number | Exact Name of Registrant as Specified in Its Charter; State of Incorporation; Address of Principal Executive Offices; and Telephone Number | IRS Employer Identification Number |
|---|---|---|
| 1-16169 | **EXELON CORPORATION**<br>**(a Pennsylvania corporation)**<br>10 South Dearborn Street<br>P.O. Box 805379<br>Chicago, Illinois 60680-5379<br>(312) 394-7398 | 23-2990190 |
| 333-85496 | **EXELON GENERATION COMPANY, LLC**<br>**(a Pennsylvania limited liability company)**<br>300 Exelon Way<br>Kennett Square, Pennsylvania 19348-2473<br>(610) 765-5959 | 23-3064219 |

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐     Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐     Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐     Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐     Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company     ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**JA218**

USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 234 of 580

**Section 8 - Other Events**
**Item 8.01. Other Events.**

On March 29, 2018, Exelon Generation Company, LLC (Generation) issued a press release reporting that it has formally notified grid operator ISO New England Inc. of its plans to retire the Mystic Generating Station's Units 7, 8, 9 and the Jet unit on June 1, 2022. Absent any regulatory reforms to properly value reliability and regional fuel security, these units will not participate in the Forward Capacity Auction scheduled for February 2019. Generation also announced an agreement to purchase ENGIE North America's liquified natural gas (LNG) import terminal to ensure the continued reliable supply of fuel to Mystic Units 8 and 9 while they remain operating. Closure of the transaction is dependent upon regulatory review by the Department of Energy for LNG import authorization and, as necessary, authorization from the U.S. Department of Justice. The transaction is expected to close in the fourth quarter of 2018. A copy of this press release is attached as Exhibit 99.1 to this Current Report on Form 8-K.

**Section 9 - Financial Statements and Exhibits**
**Item 9.01. Financial Statements and Exhibits**

*(d)   Exhibits.*

| Exhibit No. | Description |
|---|---|
| 99.1 | Exelon Corporation Press Release |

\* \* \* \* \*

This report contains certain forward‑looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 that are subject to risks and uncertainties. The factors that could cause actual results to differ materially from the forward‑looking statements made by Exelon Corporation and Exelon Generation Company, LLC (Registrants) include those factors discussed herein, as well as the items discussed in (1) the Registrants' 2017 Annual Report on Form 10-K in (a) ITEM 1A. Risk Factors, (b) ITEM 7. Management's Discussion and Analysis of Financial Condition and Results of Operations, and (c) ITEM 8. Financial Statements and Supplementary Data: Note 23, Commitments and Contingencies; and (2) other factors discussed in filings with the SEC by the Registrants. Readers are cautioned not to place undue reliance on these forward‑looking statements, which apply only as of the date of this report. The Registrants do not undertake any obligation to publicly release any revision to their forward‑looking statements to reflect events or circumstances after the date of this report.

**JA219**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrants have duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**EXELON CORPORATION**

/s/ Jonathan W. Thayer

Jonathan W. Thayer
Senior Executive Vice President and Chief Financial Officer
Exelon Corporation

**EXELON GENERATION COMPANY, LLC**

/s/ Bryan P. Wright

Bryan P. Wright
Senior Vice President and Chief Financial Officer
Exelon Generation Company, LLC

March 29, 2018

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

**EXHIBIT INDEX**

Exhibit No.   Description

99.1          Exelon Corporation Press Release

**JA221**

Exhibit No. MYS-002

**Exhibit 99.1**

**Release**

PRIVILEGED & CONFIDENTIAL

Contact:     Stephanie Jacobson                                                    **FOR IMMEDIATE RELEASE**
              Exelon Generation Communications
              610-765-5809
              stephanie.jacobson@exeloncorp.com

## EXELON GENERATION FILES TO RETIRE MYSTIC GENERATING STATION IN 2022, ABSENT ANY REGULATORY SOLUTION

*Exelon Generation also reaches agreement with ENGIE to purchase neighboring LNG import terminal to ensure a reliable supply of fuel to meet current capacity commitments*

**Everett, MA (March 29, 2018) -** Exelon Generation today announced it has filed with the ISO New England Inc. (ISO-NE) to retire Mystic Generating Station's Units 7, 8, 9, and the Jet unit on June 1, 2022. Absent any regulatory reforms to properly value reliability and regional fuel security, these units will not participate in the Forward Capacity Auction scheduled for February 2019.

"Mystic has a strong track record as a source of reliable, around-the-clock electric supply to over two million homes in New England," said Ron DeGregorio, president of Exelon Power. "However, the ISO-NE market fails to properly reflect the reliability and fuel security benefits that these power plants provide to the region."

"Today is a difficult day, not only for the talented men and women who have dedicated themselves to operating Mystic safely and reliably every day, but also for their families, their communities, and all of their colleagues here at Exelon," continued DeGregorio. "We are committed to open and honest dialogue with employees in the coming months."

ISO-NE recently stated that it may propose interim and long-term market rule changes to address system resiliency in light of significant reliability risks identified in ISO-NE's January 2018 fuel security report. Changes to market rules are necessary because critical units to the region, like Mystic 8 and 9, cannot recover future operating costs including the cost of securing fuel. To the extent that changes are timely filed and approved by the Federal Energy Regulatory Commission, Exelon Generation may reconsider the retirement of the Mystic units.

In a related move, Exelon Generation also announced an agreement to purchase ENGIE North America's LNG import terminal to ensure the continued reliable supply of fuel to Mystic Units 8 and 9 while they remain operating. Exelon also looks forward to continuing ENGIE's mission of providing safe, reliable LNG to gas utilities, marketers, and other market participants throughout New England.

**JA222**

**News Release**

Transaction closure is dependent upon regulatory review by the U.S. Department of Energy for LNG import authorization and, as necessary, authorization from the U.S. Department of Justice. The transaction is expected to close in the fourth quarter of 2018.

The Everett Marine Terminal, also known as the Distrigas Terminal, is the longest-operating LNG import facility of its kind in the United States. The facility has connections with two interstate pipeline systems, as well as a local gas utility's distribution system. It employs 50 people and pays $7 million in state and local taxes.

Mystic Generating Station is a 2,000-megawatt natural gas- and oil-fueled power plant. Mystic Units 7, 8 and 9 are the operating units at the plant; Units 1-6 are decommissioned. Mystic employs 110 full-time workers, more than 200 local union craftsmen for seasonal readiness outages, and pays $15 million per year in local taxes that support municipal government, schools, libraries, parks and other services. Exelon is committed to holding informational meetings with employees over the next several months to ensure transparency throughout the process.

# # #

**Exelon Generation** , a subsidiary of Exelon Corporation (NYSE: EXC), is one of the largest, most efficient clean energy producers in the U.S., with a generating capacity of around 35,000 megawatts.  Exelon Generation operates the largest U.S. fleet of carbon-free nuclear plants with 20,300 megawatts of capacity from 23 reactors at 14 facilities in Illinois, Maryland, New Jersey, New York and Pennsylvania.  Exelon Generation also operates a diverse mix of wind, solar, landfill gas, hydroelectric, natural gas and oil facilities in 18 states with around 15,000 megawatts. Exelon Generation has an industry-leading safety record and is an active partner and economic engine in the communities it serves by providing jobs, charitable contributions and tax payments that help towns and regions grow. Follow Exelon Generation on Twitter @ExelonGen, view the Exelon Generation channel on YouTube, and visit:
http://www.exeloncorp.com/companies/exelon-generation.

**Cautionary Statements Regarding Forward-Looking Information**
This press release contains certain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, that are subject to risks and uncertainties. The factors that could cause actual results to differ materially from the forward-looking statements made by Exelon Corporation and Exelon Generation Company, LLC (Registrants) include those factors discussed herein, as well as the items discussed in (1) Exelon's 2017 Annual Report on Form 10-K in (a) ITEM 1A. Risk Factors, (b) ITEM 7. Management's Discussion and Analysis of Financial Condition and Results of Operations and (c) ITEM 8. Financial Statements and Supplementary Data: Note 23, Commitments and Contingencies; and (2) other factors discussed in filings with the SEC by the Registrants. Readers are cautioned not to place undue reliance on these forward-looking statements, which apply only as of the date of this press release. Neither of the Registrants undertakes any obligation to publicly release any revision to its forward-looking statements to reflect events or circumstances after the date of this press release.

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

## Exhibit No. MYS-003

## Public Redacted Comparison of Alternatives

**JA224**

**Public Version—Privileged Material Redacted**

# Exhibit No. MYS-004

## Fuel Supply Agreement

**JA226**

# TRANSACTION CONFIRMATION
# FOR IMMEDIATE DELIVERY


**Constellation**
An Exelon Company

Date: May 15, 2018

Transaction Confirmation #:

This Transaction Confirmation is subject to the Base Contract between Seller and Buyer. The terms of this Transaction Confirmation are binding unless disputed in writing within 2 Business Days of receipt unless otherwise specified in the Base Contract.

| **SELLER:** | **BUYER:** |
|---|---|
| Constellation LNG, LLC<br>1310 Point Street, 8th Floor<br>Baltimore, MD 21231<br>Phone: 410-470-3500<br>Fax: 443-213-3558 | Constellation Mystic Power, LLC<br>1310 Point Street, 8th Floor<br>Baltimore, MD 21231<br>Phone: 410-470-3500<br>Fax: 443-213-3558 |
| Base Contract No._____<br>Transporter:_____<br>Transporter Contract Number:_____ | Base Contract No._____<br>Transporter:_____<br>Transporter Contract Number:_____ |

**Condition Precedent:** Commencement of service under this Transaction Confirmation is expressly subject to ExGen, or one of its Affiliates, acquiring and owning the LNG Terminal as of the commencement of the Delivery Period, as defined below.

**Performance Obligation:** Firm, No-Notice Service

**Quantity:** Full requirements for Buyer's Mystic Plant.

**Delivery Period:** June 1, 2022 – May 31, 2024 ("Initial Delivery Period"); provided, however, this Confirmation shall automatically renew beyond the initial term for any period in which a Reliability-Must-Run Contract (or its equivalent) is in effect for the Mystic Plant ("Extended Delivery Period")(the Initial Delivery Period and the Extended Delivery Period, if any, shall be referred to collectively as the "Delivery Period").

**Delivery Point:** The custody transfer meter at the high-pressure pipeline interconnection between the LNG Terminal and the Mystic Plant.

**Contract Price:** The price per MMBtu for Gas delivered by Seller to Buyer during the Delivery Period shall be Daily WACOG Price for the Day of delivery.

**JA227**

**Gas Supply Costs/Fees:**  In addition to the Contract Price, each Month during the Delivery Period Buyer shall pay to Seller the following costs and fees associated with Seller's provision of Firm, No-Notice Service to Buyer:

> *Fixed O & M/Return on Investment Costs.*  Each Month during the Initial Delivery Period Buyer shall pay to Seller the following charge for the costs of regassification service from the LNG Terminal, which is paid by Seller to DOMAC pursuant to the LNG Terminal Services Agreement:

> > For Months in Contract Year 2022:  $7,328,074.00/month
> > For Months in Contract Year 2023:  $6,856,381.00/month
> > For Months in Contract Year 2024:  $6,658,432.00/month

The Fixed O & M/Return on Investment Costs for any Extended Delivery Period shall be established and approved by the applicable Governmental Authority prior to the commencement of such Extended Delivery Period.

*Variable O&M Costs.*  Each Month Buyer shall reimburse and pay to Seller the variable operating costs of the LNG Terminal paid by Seller to DOMAC for the applicable Month pursuant to the LNG Terminal Services Agreement.

*New Regulatory Costs.*  If and to the extent that Seller is required to pay DOMAC any New Regulatory Costs associated with a change in law under the LNG Terminal Services Agreement, Seller shall pass through those costs to Buyer and Buyer shall pay those costs to Seller as they become due.

*Administrative Services Fee.*  Each Month during the Initial Delivery Period Buyer shall pay to Seller $127,750.00, which is the Administrative Services Fee paid by Seller to ExGen for the applicable Month pursuant to the Intercompany Services Agreement. Payment amounts for the Administrative Services Fee for any Extended Delivery Period shall be established and approved by the applicable Governmental Authority prior to the commencement of such Extended Delivery Period.

*Credit and Collateral Costs.*  Each Month Buyer shall reimburse and pay to Seller the actual credit and collateral costs associated with purchases of LNG to serve Buyer and Third-Party Customers, which are the costs Seller pays ExGen for the applicable Month pursuant to the Intercompany Services Agreement. The credit and collateral support costs in the Intercompany Services Agreement are based on the actual costs of (i) ExGen's credit revolver (for letters of credit), and (ii) either the rate of return ExGen could have earned on existing short-term investment accounts or the cost of outstanding commercial paper and/or Exelon money pool balances if ExGen is in a borrowed position, as applicable (for cash utilization), to support Seller.

**JA228**

*Pipeline Transportation Agreement Costs.* Each Month Buyer shall reimburse and pay to Seller the demand and commodity charges associated with any pipeline transportation agreements held by Seller or DOMAC pursuant to which Seller or DOMAC transports and sells Gas from the LNG Terminal to Third-Party Customers.

*Diversion Costs.* In the event Seller incurs any net fees associated with the diversion of one or more LNG cargo ships scheduled to deliver LNG to the LNG Terminal during a Month, Buyer shall reimburse and pay to Seller any such net fees relating to the diversion. In the event Seller incurs a net benefit associated with the diversion of one or more LNG cargo ships scheduled to deliver LNG to the LNG Terminal during a Month, Seller shall credit such amount to Buyer's invoice for such Month.

*Daily Gas Sales.* Each Day during the Delivery Period, Seller shall calculate for each sale of Gas and/or LNG to Third-Party Customers the difference between the Contract Price for each such transaction and the applicable Daily WACOG Price pursuant to the following formula:

[Contract Price – Daily WACOG Price] x Third-Party Sales Quantity

> Where:
>
> *Contract Price* shall mean the contract price per MMBtu for the applicable Third-Party Customer transaction.
>
> *Daily WACOG Price* shall mean the Daily WACOG Price for the applicable Day
>
> *Third-Party Sales Quantity* shall mean the Quantity of LNG or Gas sold and delivered to the Third-Party Customer in the applicable Day under the applicable transaction on a MMBtu basis.

If the result of such calculation is positive, such amount shall be a credit to Buyer's Fixed O&M Costs for such Month. If the result of such calculation is negative, such amount shall be a debit to Buyer's Fixed O&M Costs for such Month. Each Month, Seller shall net and offset all such calculations for such Month and credit or debit such net amount to Buyer's Fixed O&M Costs for such Month.

**Third-Party Sales Credit for Demand Charges:**

During any period for which a Reliability-Must-Run Contract (or its equivalent) is in effect for the Mystic Plant:

(i) For each Gas or LNG sales transaction between Seller and a Third-Party Customer entered into less than three (3) Months in advance of the commencement date of the Delivery Period of such transaction, Seller shall credit to Buyer the entire Demand Charge associated with such transaction (if any).

**JA229**

(ii)  For each Gas or LNG sales transaction between Seller and a Third-Party Customer entered into three (3) or more Months in advance of the commencement date of the Delivery Period of such transaction (a "Forward Transaction"), Seller shall credit to Buyer the Demand Charge associated with such Forward Transaction (if any), less Seller's Incentive.

Where:

**Seller's Incentive = Forward Sale Margin multiplied by 50%**

Where:

**Forward Sale Margin =**

**Contract Revenue - Contract Incremental Cost – Tank Congestion Charge**

Where:

**Contract Revenue** = the sum of fixed payments due from the Third-Party Customer under such Forward Transaction during a given Capacity Commitment Period

**Contract Incremental Cost =** the anticipated total variable cost to be incurred by Seller in accepting an LNG cargo delivered to the LNG Terminal during such Capacity Commitment Period, <u>multiplied by</u> the maximum quantity of Gas (in BCF) or LNG (in BCF equivalent) to be delivered under such Forward Transaction during such Capacity Commitment Period, <u>divided by</u> 3 BCF

**Tank Congestion Charge** = the cost, if any, associated with (i) the increased need for uneconomic self-scheduling at the Mystic Plant or (ii) short-term vaporization LNG from the LNG Terminal with a negative margin, that is attributable to such Forward Transaction.  No later than six (6) months prior to the commencement of performance under any Reliability-Must-Run Contract in effect for the Mystic Plant, the ISO shall approve the methodology of calculating a Tank Congestion Charge; provided, that the conceptual outline of such methodology is set forth in Schedule A.

(iii)  If the applicable transaction is a Forward Sale Transaction, Seller's incentive shall be deducted ratably from the fixed payments due from the Third-Party Customer under such Forward Sale Transaction during such Capacity Commitment Period; if the applicable transaction is a Forward Option Transaction, Option Payment will be credited (net of Seller's margin) pro rata over the delivery months of LNG or Gas deliveries set forth in such transaction during such Capacity Commitment Period.

(iv)     Seller's Incentive shall be calculated at the time of contract execution for the related Forward Transaction.  There shall be no subsequent adjustment to such Seller's

**JA230**

Incentive calculation based on actual deliveries of Gas or LNG thereunder. Notwithstanding the preceding provisions of this subsection (iii), in the event of Seller's non-performance of a Forward Transaction for which a Seller's Incentive amount has been calculated and which results in a reduction of the fixed payments received by Seller thereunder, the amount of the Seller's Incentive shall be reduced by the product of (a) the reduction of the fixed payment, multiplied by (b) 50%.

(v)    Seller shall not be entitled to reduce the credit due to Buyer pursuant to subsection (ii) due to (a) Seller's payment of any cover costs associated with Seller's non-performance of a Forward Transaction or (b) the failure by a Third-Party Customer to pay amounts owed to Seller under a Forward Transaction.

(vi)    For the avoidance of doubt, a Seller's Incentive amount shall only be applied in periods in which a fixed payment under a Forward Sale Transaction has been received by Seller from the related Third-Party customer. In the case of a Forward Option Payment, a Seller's Incentive amount shall only be applied in periods in which LNG or Gas is delivered to and payment made by the related Third-Party Customer.

(vii)    Seller shall be precluded from entering into any Forward Transaction in which the contract price per MMBtu for the applicable Forward Transaction is less than Seller's cost of LNG supply (on an MMBtu basis) for the contract delivery period at the time of execution of such Forward Transaction.

(viii)    In the event that Seller's credit to Buyer under subsection (ii) above in any Month exceeds Buyer's net payment to Seller for such Month, the difference between such credit mount and Buyer's invoice amount for such Month shall be carried forward and setoff against Buyer's invoice amount for the following Month. If a credit to Buyer still exists at the end of any Reliability-Must-Run Contract, Seller shall promptly pay such amount to Buyer.

**Monthly Invoice:**  Seller shall invoice Buyer for Gas delivered and received in the preceding Month and for any other applicable charges set forth herein.  Such invoice shall contain the following line items:

1. Commodity Cost (the sum of the Daily WACOG x Daily Quantity Delivered)
2. Fuel Supply Cost
   a. Fixed O & M/Return on Investment Costs
   b. Variable O & M Costs
   c. New Regulatory Costs (if any)
   d. Administrative Services Fee
   e. Credit and Collateral Costs
   f. Pipeline Transportation Agreement Costs
   g. Diversion Costs (credit or debit)
   h. Daily Gas Sales Costs (credit or debit)
   i. Third-Party Sales Credit for Demand Charges (credit)
   j. Actual Fuel Cost Adjustment (as defined below)

**JA231**

**Actual Fuel Cost Adjustment:** To the extent that Buyer's actual fuel costs in item #1 differ from sum of the "Fuel Index Price" and/or the "Fuel Variable/Other Cost" components of its "Stipulated Variable Costs" approved by the ISO IMM, and such difference precludes Buyer from recovering its actual fuel costs because of the operation of the Revenue Crediting mechanism contained in any Reliability-Must-Run Contract (or its equivalent), the difference between Buyer's actual fuel costs for such Month (item #1) and the amount Buyer is permitted to recover for fuel in its Stipulated Variable Costs for such Month shall be added as a separate line item (j) in the following Month's invoice and Buyer shall pay to Seller such costs. To the extent that Buyer's actual fuel costs in item #1 differ from sum of the "Fuel Index Price" and/or the "Fuel Variable/Other Cost" components of its "Stipulated Variable Costs" approved by the ISO IMM, and such difference will result in Buyer recovering more than its actual fuel costs as a result, the difference between the sum of the "Fuel Index Price" and/or the "Fuel Variable/Other Cost" and Buyer's actual fuel costs for such Month (item #1) shall be subtracted as a separate line item (j) in the following Month's invoice and Buyer shall pay to Seller such costs.

**Nominations:** No later than 2 p.m. Eastern Prevailing Time on the Day prior to the Day of delivery (day 0), Buyer shall provide to Seller a non-binding forecast of the quantity of Gas that Buyer elects to have delivered to the Delivery Point for the next Day (day 1). Should Buyer subsequently request additional volumes, Seller shall promptly confirm the scheduling of such additional volumes and deliver such additional volumes to Buyer.

**Force Majeure:** For the purposes of this Transaction Confirmation, Section 11.2 in the Base Contract shall be deleted and the following inserted in lieu thereof:

> "Force Majeure shall include, but not be limited to acts of God; fires; floods; storms or storm warnings; hurricanes; riots; insurrections; acts of war (whether declared or otherwise); blockades; acts of the public enemy; epidemics; landslides; lightning; washouts; arrests and restraints of governments and peoples; acts of a Government Authority (such as necessity for compliance with any court order, law, statute, ordinance, regulation, or policy having the effect of law promulgated by a governmental authority having jurisdiction); labor strikes, lock-outs, and similar organized labor actions involving a substantial portion of the affected Party's workforce; explosions, breakage, or accident to machinery, lines of pipe, terminalling facilities or electric generating facilities (including both turbine and non-turbine equipment); malfunctioning (or non-functioning) of turbine or non-turbine equipment at the Mystic Plant which renders such facilities wholly or partly unable to operate; the necessity of making repairs or required alterations to machinery, lines of pipe, terminalling facilities or electric generating facilities (but not including any scheduled maintenance); unplanned outages at the LNG Terminal; unplanned outages at the Mystic Plant; an event qualifying as Force Majeure hereunder which prevents or impedes performance on the part of a Third-Party transporting or delivering Gas or LNG to or on behalf of Seller; or any other causes, whether of the kind enumerated herein or otherwise, beyond the reasonable control of and without the fault, negligence, or willful misconduct of the Party

**JA232**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018     Exhibit No. MYS-004

claiming Force Majeure. The term Force Majeure shall apply equally to events preventing or impeding the operations of the LNG Terminal, the Mystic Plant, any interstate pipeline or other gas transporter which is required to receive, transport or deliver Gas to be sold or purchased hereunder, any LNG carrier transporting LNG to be terminalled by Seller at the LNG Terminal and resold as Gas to Buyer, any LNG supplier furnishing LNG to be terminalled by Seller at the LNG Terminal and resold as Gas to Buyer, or any transmitter of electric energy from the Mystic Plant. For purposes of this definition, a "Third-Party" shall be deemed to include any Affiliate of Buyer or Seller. Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance."

**Definitions:** Capitalized terms not defined herein shall have the meaning ascribed to them in the Base Contract.

"**Capacity Commitment Period**" is the one-year period from June 1 through May 31 for which obligations are assumed and payments are made in the Forward Capacity Market.

"**Contract Year**" shall mean each period of twelve (12) consecutive months commencing on January 1st and ending on the following December 31st; provided that the first Contract Year shall begin on June 1st and the last Contract Year shall terminate as of such expiration or termination date of any Reliability-Must-Run Agreement (or equivalent).

"**Daily WACOG Price**" shall mean weighted average cost of all LNG (on a MMBtu basis) in the storage tank located at the LNG Terminal on the applicable Day of delivery.

"**Day**" shall mean a calendar day.

"**Demand Charge**" shall mean a reservation fee or an option fee that a Third-Party Customer pays to Seller for the right to purchase and receive Gas and/or LNG from Seller via the LNG Terminal over an established period of time, where such costs are to be incurred whether the service is used or not.

"**DOMAC**" shall mean Distrigas of Massachusetts LLC and its successors.

"**ExGen**" shall mean Exelon Generation Company, LLC and its successors.

"**FERC**" shall mean the U.S. Federal Energy Regulatory Commission or any successor agency.

"**Forward Option Transaction**" shall mean any Forward Transaction in which the Third-Party Customer is granted a purchase option for Gas or LNG.

**JA233**

"**Forward Sale Transaction**" shall mean any Forward Transaction in which the Third-Party Customer is not granted a purchase option for Gas or LNG.

"**Government Approvals**" - shall mean all certificates, permits, licenses, approvals and authorizations from any Governmental Authority necessary to effectuate the transactions contemplated by this Agreement.

"**Governmental Authority**" - shall mean any federal, state or local governmental agency or other authority in the United States of America or other country having jurisdiction over any aspect of the activities and transactions contemplated by this Agreement, including but not limited to FERC, ISO, and ISO IMM.

"**Intercompany Services Agreement**" shall mean that certain Services Agreement by and between Seller and ExGen executed contemporaneously herewith pursuant to which ExGen provides Seller certain management, administrative and other services described in the agreement.

"**ISO**" shall mean ISO New England, and any successor thereto.

"**ISO IMM**" shall mean the internal market monitoring unit of ISO.

"**LNG**" shall mean Natural Gas in a liquid state at a temperature that is at or below its point of boiling and at or near atmospheric pressure.

"**LNG Terminal**" shall mean the facilities owned and operated by Seller's affiliate, Distrigas of Massachusetts LLC or its successor, that are located in Everett, Massachusetts, which are related to receiving LNG, storing and delivering LNG, vaporizing LNG, and delivering Vaporized LNG to Buyer and Third-Party Customers.

"**LNG Terminal Services Agreement**" shall mean that certain LNG Terminal Services Agreement by and between Seller and DOMAC executed contemporaneously herewith.

"**Management Services Fee**" shall mean the monthly fee paid by Seller to ExGen for services rendered under the Intercompany Services Agreement.

"**Month**" shall mean a calendar month commencing at 00:00:01 hours Eastern Prevailing Time on the first day of such month and ending at 00:00:00 hours Eastern Prevailing Time of the last day of such month.

"**Mystic Plant**" shall mean natural gas-fired, combined cycle electric power generation facility owned and operated by Buyer located in Everett, Massachusetts.

"**New Regulatory Costs**" shall mean those costs paid by Seller to DOMAC pursuant to the LNG Terminal Services Agreement resulting from, among other things, new

**JA234**

requirements (or changes to existing requirements) imposed on the LNG Terminal or DOMAC by any Governmental Authority which requires DOMAC to incur any material cost in excess of the costs which would have been incurred by DOMAC absent such change in law.

**"Third-Party Customers"** shall mean those customers other than Buyer or its successors purchasing and receiving LNG and/or Gas from Seller via the LNG Terminal.

| Seller: **Constellation LNG, LLC** | Buyer: **Constellation Mystic Power, LLC** |
|---|---|
| By: | By: |
| Title: *Vice President* | Title: *Assistant Secretary* |
| Date: May 15, 2018 | Date: May 15, 2018 |

9

**JA235**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018     Exhibit No. MYS-004

## Schedule A

In connection with the incentive provision in this Transaction Confirmation, Seller, Buyer and ISO New England have agreed that the calculation of the incremental cost of third party forward sales from the LNG Terminal should include an ex ante estimate of any increase in "tank congestion costs" that are attributable to such third part sales. Tank congestion costs can arise from "forced" sales of Gas to either Buyer for the Mystic Plant or Third-Party Customers that are necessary to make room in the tank for an incoming cargo. As contracted volume from the tank increases, and ship frequency increases, the magnitude of such forced sales also increases.

Seller, Buyer and ISO New England have agreed on a conceptual methodology to estimate the increase in tank congestion costs utilizing a monte carlo simulation of winter dispatch from the LNG Terminal under a "Mystic Plant sales only" base case compared to a "Mystic Plant plus third party sales" change case with equivalent delivery reliability.   The change in forced sales and the associated change in forced sale margin between the base case and the change case will be used to calculate the tank congestion costs term in the Forward Sale Margin formula. The monte carlo simulation model will generate hundreds of individual scenarios of daily average temperature in Boston based on decades of daily winter temperature history. For each of these daily temperature scenarios, the model will determine the economic dispatch from the LNG Terminal based on a relationship between average temperature and AGT daily prices. The tank dispatch will honor the physical constraints of the tank and the need to have room in the tank to accept scheduled deliveries. In each scenario, the level of forced sales will be calculated together with the associated margin, and aggregated to an expected level of margin from forced sales. This expected value will be used for the tank congestion costs calculation.

As an example of this approach, consider a forward sale of a winter daily option of 100,000 mcf/day. Assume that the expected margin associated with forced sales between the Mystic-only case and the Mystic plus 200,000 mcf/day daily options decreased by $20 million over the winter. In that circumstance, the tank congestion costs applicable to the Forward Sale Margin calculation for the 100,000 mcf/day sale would be half of $20 million, or $10 million.

**JA236**

<u>**Exhibit No. MYS-005**</u>

**Capital Costs of Mystic 8&9 and Everett**

**JA237**

Document Accession #: 20180516-5048        Filed Date: 05/16/2018

Exhibit No. MYS-005
Page 1 of 7

**Mystic and EMT Capex Summary**

**Generic Assumptions**

| | |
|---|---|
| EOL | 2047 |
| Tax Rate | 27.32% |

| Bonus Depreciation | 100% | 100% | 100% | 100% | 100% | 80% | 60% |
|---|---|---|---|---|---|---|---|
| 20-Yr MACRs | 3.75% | 7.22% | 6.68% | 6.18% | 5.71% | 5.29% | 4.89% |

| | '22/'23 | '23/'24 | COS |
|---|---|---|---|
| | 52,951,423 | 10,504,156 | 63,455,579 |

**Capex Modeling**

**Annual Capex Totals**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | |
|---|---|---|---|---|---|---|---|---|
| Mystic 89 | 10,023,000 | 21,009,000 | 9,050,000 | 26,253,000 | 53,782,629 | 7,053,123 | 3,343,447 | |
| Everett Marine Terminal | 5,100,000 | 8,525,000 | 10,275,000 | 9,175,000 | 8,000,000 | 5,575,000 | 4,450,000 | |
| Total | 15,123,000 | 29,534,000 | 19,325,000 | 35,428,000 | 61,782,629 | 12,628,123 | 7,793,447 | Total Capital | 181,614,199 |

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | |
|---|---|---|---|---|---|---|---|---|
| Mystic Rate Base | 10,023,000 | 21,009,000 | 9,050,000 | 26,253,000 | 12,000,000 | | | |
| EMT Rate Base | 5,100,000 | 8,525,000 | 10,275,000 | 9,175,000 | 1,000,000 | | | **TIE-OUT** |
| Mystic COS | | | | | 29,282,629 | 19,553,123 | 1,044,827 | **With Workbook** |
| EMT COS | | | | | 7,000,000 | 5,575,000 | 1,000,000 | Jan'18-May'24 | Jun-Dec'24 |
| Total | 15,123,000 | 29,534,000 | 19,325,000 | 35,428,000 | 49,282,629 | 25,128,123 | 2,044,827 | 175,865,579 | 5,748,620 | - |

**Mystic Incremental Depreciation Modeling**

**Mystic Depreciation Adjustments**

**Book Depreciation**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | |
|---|---|---|---|---|---|---|---|---|
| 2018 Capital | 334,100 | 334,100 | 334,100 | 334,100 | 334,100 | 334,100 | 334,100 | 7,684,300 | - |
| 2019 Capital | | 724,448 | 724,448 | 724,448 | 724,448 | 724,448 | 724,448 | 16,662,310.34 | - |
| 2020 Capital | | | 323,214 | 323,214 | 323,214 | 323,214 | 323,214 | 7,433,928.57 | - |
| 2021 Capital | | | | 972,333 | 972,333 | 972,333 | 972,333 | 22,363,666.67 | - |
| 2022 Capital | | | | | 461,538 | 461,538 | 461,538 | 10,615,384.62 | - |
| Incremental Annual Book Depreciation | 334,100 | 1,058,548 | 1,381,763 | 2,354,096 | 2,815,634 | 2,815,634 | 2,815,634 | | |

**Net Book Basis**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Rolling Adjusted Book Basis (Net) | 9,688,900 | 29,639,352 | 37,307,589 | 61,206,493 | 70,390,859 | 67,575,225 | 64,759,590 |

**Tax Depreciation**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| 2018 Capital | 10,023,000 | | | | | | |
| 2019 Capital | | 21,009,000 | | | | | |
| 2020 Capital | | | 9,050,000 | | | | |
| 2021 Capital | | | | 26,253,000 | | | |
| 2022 Capital | | | | | 12,000,000 | | |
| Incremental Annual Tax Depreciation | 10,023,000 | 21,009,000 | 9,050,000 | 26,253,000 | 12,000,000 | 0 | 0 |

**Net Tax Basis**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Rolling Adjusted Tax Basis (Net) | - | - | - | - | - | - | - |

| **ADIT Adjustment** | (2,647,007) | (8,097,471) | (10,192,433) | (16,721,614) | (19,230,783) | (18,461,551) | (17,692,320) |
|---|---|---|---|---|---|---|---|

**EMT Incremental Depreciation Modeling**

**Mystic Depreciation Adjustments**

**Book Depreciation**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | |
|---|---|---|---|---|---|---|---|---|
| 2018 Capital | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 3,910,000 | - |
| 2019 Capital | | 293,966 | 293,966 | 293,966 | 293,966 | 293,966 | 293,966 | 6,761,206.90 | - |
| 2020 Capital | | | 366,964 | 366,964 | 366,964 | 366,964 | 366,964 | 8,440,178.57 | - |
| 2021 Capital | | | | 339,815 | 339,815 | 339,815 | 339,815 | 7,815,740.74 | - |
| 2022 Capital | | | | | 38,462 | 38,462 | 38,462 | 884,615.38 | - |
| Incremental Annual Book Depreciation | 170,000 | 463,966 | 830,930 | 1,170,745 | 1,209,206 | 1,209,206 | 1,209,206 | | |

**Net Book Basis**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Rolling Adjusted Book Basis (Net) | 4,930,000 | 12,991,034 | 22,435,105 | 30,439,360 | 30,230,154 | 29,020,948 | 27,811,742 |

**JA238**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-005
Page 2 of 7

| Tax Depreciation | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| 2018 Capital | 5,100,000 | | | | | | |
| 2019 Capital | | 8,525,000 | | | | | |
| 2020 Capital | | | 10,275,000 | | | | |
| 2021 Capital | | | | 9,175,000 | | | |
| 2022 Capital | | | | | 1,000,000 | | |
| Incremental Annual Tax Depreciation | 5,100,000 | 8,525,000 | 10,275,000 | 9,175,000 | 1,000,000 | 0 | 0 |
| | | | | | | | |
| **Net Tax Basis** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** |
| Rolling Adjusted Tax Basis (Net) | - | - | - | - | - | - | - |
| | | | | | | | |
| **ADIT Adjustment** | **(1,346,876)** | **(3,549,151)** | **(6,129,271)** | **(8,316,033)** | **(8,258,878)** | **(7,928,523)** | **(7,598,168)** |

**JA239**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-005
Page 3 of 7

Capital Expenditure Supporting Detail

Mystic 8 Projects

| | 2018 | 2019 | 2020 | 2021 | Reason for Expected Expenditure | Description of Project |
|---|---|---|---|---|---|---|
| [SMBC17007] MYD8 Compressors | - | - | - | 353,000 | Based on annual equipment inspections and known service-duty wear | Replacement of single instrument/plant air compressor; i.e., 8SAI-CMPR-0001C |
| [SMBC17008] MYD8 BOP Capital | - | - | 700,000 | 700,000 | Based on expected balance of plant capital requirements, derived from historical observa | Expected balance of plant requirements |
| [SMBC18001] MYD8 6.9KV Room A/C Replacement | 150,000 | - | | | Based on equipment age (not directly related to unit generation/operating profile) | Replacement of Block 8 6.9kV switchgear room Air Conditioning |
| [SMBC18002] MYD8 DCS Console Upgrades | 350,000 | - | | | Based on expectation that OEM will no longer support the equipment by this time | Replacement of Control Room HMI consoles and cabinets |
| [SMBC18004] MYD8 GT81 Non-EOH Upgrades | 300,000 | - | | | Based on annual equipment inspections and known service-duty wear | Replacement of GT equipment not scheduled under LTSA, i.e, Hydrogen Seals |
| [SMBC18004] MYD8 GT82 Non-EOH Upgrades | 300,000 | | 300,000 | | Based on annual equipment inspections and known service-duty wear | Replacement of GT equipment not scheduled under LTSA, i.e, Hydrogen Seals |
| [SMBC18005] MYD8 Inlet Filter & Evap Coole | 1,000,000 | | | | Based on annual equipment inspections and known service-duty wear | Gas Turbine Air Inlet Air Filters and Evaporative Cooling Media, GT 81 and GT 82 |
| [SMBC18006] MYD8 Capital Motors | 250,000 | 859,000 | 500,000 | 250,000 | Based on annual equipment inspections and known service-duty wear | Replacement of whole motor or capital component of a qualifying motor under the Exelon Capital Process. Example would be 8SCD-PP-0001 A stator rewind. |
| [SMBC18007] MYD8 Capital Valves | 250,000 | 750,000 | 500,000 | 250,000 | Based on annual equipment inspections and known service-duty wear | Replacement of whole valve or capital component of a qualifying motor under the Exelon Capital Process. Example would be 8SBF-LCV-0011 plug and cage replacement. Usually |
| [SMBC18008] MYD8 GT82 Turb Cylinder Coolin | 350,000 | | | | Based on Upgrade Technology | Install new external source of cooling air for GT shutdown cooing |
| [SMBC18009] MYD8 ST 8S Valves (even) | 500,000 | | | | Based on annual equipment inspections and known service-duty wear | Inspection, refurbishment and replacement of capital component of Steam Turbine 8S even numbered stop and control valves under the Exelon Capital Process |
| [SMBC19001] MYD8 SCR CO Catalyst | - | 5,500,000 | | | Based on annual equipment inspections and known service-duty wear | Replacement of emission controls catalysts in the HRSGs |
| [SMBC19002] MYD8 6.9KV Breaker Replacement | - | 350,000 | | | Based on annual equipment inspections and known service-duty wear | Replacement of 6.9kV breaker ; i.e.; harmonic frequency transformer supply |
| [SMBC19003] MYD8 Battery Replacement | - | 250,000 | | | Based on equipment age (not directly related to unit generation/operating profile) | Replacent of the full bank of Block 8 batteries |
| [SMBC19004] MYD8 Building Roof Upgrades | - | 250,000 | | | Based on equipment age (not directly related to unit generation/operating profile) | Main Turbine Building Rubber Roofing Block 8 |
| [SMBC19005] MYD8 Boiler Feed Pump Barrel | - | 200,000 | | | Based on annual equipment inspections and known service-duty wear | Block 8 Boiler feed pump barrel, example would be 8SBF PP 0001A |
| [SMBC19006] MYD8 Boiler Feed Pump Motor | - | 200,000 | | | Based on annual equipment inspections and known service-duty wear | Block 8 Boiler feed pump motor, example would be 8SBF PP 0001A |
| [SMBC19007] MYD8 DS 008 Replacement | 800,000 | 800,000 | | | Based on annual equipment inspections and known service-duty wear | Replace existing HR By Pass Desuperheater |
| [SMBC19008] MYD8 GT 81/82 Exp Jts 00 | - | 400,000 | | | Based on annual equipment inspections and known service-duty wear | Gas Turbine Exhaust Duct Expansion Joint Replacement. Per Gas Turbine a the 00 joint |
| [SMBC19009] MYD8 GT 81/82 Exp Jts 01 | - | 400,000 | | | Based on annual equipment inspections and known service-duty wear | Gas Turbine Exhaust Duct Expansion Joint Replacement. Per Gas Turbine a the 01 joint |
| [SMBC19010] MYD8 L-0 Blade Replacements | - | 2,000,000 | | | Based on annual equipment inspections and known service-duty wear | Replacement of last row of low pressure steam turbine blades |
| [SMBC19011] MYD8 Penetration Seals HRSGs | - | 125,000 | 125,000 | | Based on annual equipment inspections and known service-duty wear | Heat Recovery Steam Generator pipe penetration seals |
| [SMBC19012] MYD8 Roof Fan Vent Replacement | - | 100,000 | | | Based on equipment age (not directly related to unit generation/operating profile) | Replacement of select building roof ventilation fans |
| [SMBC19013] MYD8 Steam Attemperators | - | 100,000 | 100,000 | 100,000 | Based on annual equipment inspections and known service-duty wear | Replacement of Steam Attemperators. Examples are the 81HP DS 0006 and the 82HR DS 0023 |
| [SMBC19014] MYD8 AVR Replacement | - | 1,500,000 | | | Based on expectation that OEM will no longer support the equipment by this time | Replacement of the Generator Automatic Voltage Regulators |
| [SMBC20003] MYD8 GT82 Non-EOH Upgrades | - | | 350,000 | | Based on annual equipment inspections and known service-duty wear | Replacement of GT equipment not scheduled under LTSA, i.e, Hydrogen Seals |
| [SMBC20004] MYD8 Fuel Gas Valve Replacemen | - | | 450,000 | | Based on annual equipment inspections and known service-duty wear | Replacment of Gas Turbine Fuel pressure/flow control valves |
| [SMBC20005] MYD8 High Cycle Valve Program | - | | 400,000 | | Based on annual equipment inspections and known service-duty wear | Replacement of whole valve or capital component of a qualifying motor under the Exelon Capital Process. Example would be 8SBF-LCV-0011 plug and cage replacement. Usually |
| [SMBC19008] MYD8 ST8S Valves (odd) | - | | | 500,000 | Based on annual equipment inspections and known service-duty wear | Inspection, refurbishment and replacement of capital component of Steam Turbine 8S odd numbered stop and control valves under the Exelon Capital Process |
| [SMBC21003] MYD8 CRI GT81 | - | | | 9,000,000 | Based on annual equipment inspections and known service-duty wear | Remove, Transport, dissassemble, static and dynamic inspection, replace companants as necessary |
| [SMBC21004] MYD8 CRI GT82 | - | | | 9,000,000 | Based on annual equipment inspections and known service-duty wear | Remove, Transport, dissassemble, static and dynamic inspection, replace companants as necessary |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-005
Page 4 of 7

| | 2018 | 2019 | 2020 | 2021 | Reason for Expected Expenditure | Description of Project |
|---|---|---|---|---|---|---|
| [SM8C22015] MYD8 Stack Elevator | 300,000 | | | | Based on Facility Enhancement | Installation of a new stack elevator on Block 8 |
| **Mystic 8 Total** | **4,550,000** | **13,784,000** | **3,425,000** | **20,153,000** | | |
| check | - | - | - | - | | |
| | | | | | | |
| **Mystic 9 Projects** | 2018 | 2019 | 2020 | 2021 | Reason for Expected Expenditure | Description of Project |
| [SM9C17005] MYD9 GT93 Non-EOH Upgrades | 300,000 | - | | | Based on annual equipment inspections and known service-duty wear | Replacement of GT equipment not scheduled under LTSA, i.e, Hydrogen Seals |
| [SM9C17008] MYD9 ST96 Valves (odd) | 500,000 | 500,000 | | | Based on annual equipment inspections and known service-duty wear | Inspection, refurbishment and replacement of capital component of Steam Turbine 96 odd numbered stop and control valves under the Exelon Capital Process |
| [SM9C17009] MYD9 TEG Fan Alpha Replacent | - | 1,000,000 | | | Based on annual equipment inspections and known service-duty wear | Replacement of TEG fan (alpha) |
| [SM9C18001] MYD9 GT94 Non-EOH Upgrades | 350,000 | - | | | Based on annual equipment inspections and known service-duty wear | Replacement of GT equipment not scheduled under LTSA, i.e, Hydrogen Seals |
| [SM9C18002] MYD9 6.9KV Room A/C Replacemen | 150,000 | - | | | Based on equipment age (not directly related to unit generation/operating profile) | Replacement of Block 9  6.9kV switchgear room Air Conditioning |
| [SM9C18003] MYD9 DCS Console Upgrades | 350,000 | - | | | Based on expectation that OEM will no longer support the equipment by this time | Replacement of the Foxboro DCS system on Block 9 |
| [SM9C18004] MYD9 GT93/GT94 Exp JTs 00 | 200,000 | 200,000 | | | Based on annual equipment inspections and known service-duty wear | Gas Turbine Exhaust Duct Expansion Joint Replacement. Per Gas Turbine a the 00 joint |
| [SM9C18005] MYD9 GT93/GT94 Exp JTs 01 | 200,000 | 200,000 | | | Based on annual equipment inspections and known service-duty wear | Gas Turbine Exhaust Duct Expansion Joint Replacement. Per Gas Turbine a the 01 joint |
| [SM9C18006] MYD9 Inlet Filter & Evap Coole | 1,000,000 | - | | | Based on annual equipment inspections and known service-duty wear | Gas Turbine Air Inlet Air Filters and Evaporative Cooling Media, GT 93 and GT 94 |
| [SM9C18007] MYD9 0008 DS | 800,000 | 800,000 | | | Based on annual equipment inspections and known service-duty wear | Replace existing HR By Pass Desuperheater |
| [SM9C18008] MYD9 Capital Motors | 650,000 | 250,000 | 500,000 | 250,000 | Based on annual equipment inspections and known service-duty wear | Block 8 Boiler feed pump motor, example would be 8S8F PP 0001A |
| [SM9C18009] MYD9 Capital Valves | 673,000 | 250,000 | 500,000 | 250,000 | Based on annual equipment inspections and known service-duty wear | Replacement of whole valve or capital component of a qualifying motor under the Exelon Capital Process. Example would be 8S8F-LCV-0011 plug and cage replacement. Usually |
| [SM9C19001] MYD9 Building Ventilation | - | 250,000 | | | Based on equipment age (not directly related to unit generation/operating profile) | Replacement of select building roof ventilation fans |
| [SM9C19002] MYD9 Battery Replacement | - | 250,000 | | | Based on annual equipment inspections and known service-duty wear | Replacemnt of the full bank of Block 8 batteries |
| [SM9C19003] MYD9 Building Roof Upgrades | - | 250,000 | | | Based on equipment age (not directly related to unit generation/operating profile) | Main Turbine Building Rubber Roofing Block 9 |
| [SM9C19004] MYD9 Boiler Feed Pump Barrel | - | 200,000 | | | Based on annual equipment inspections and known service-duty wear | Block 9 Boiler feed pump barrel, example would be 9S8F PP 0001A |
| [SM9C19005] MYD9 Boiler Feed Pump Motor | - | 200,000 | | | Based on annual equipment inspections and known service-duty wear | Block 9 Boiler feed pump motor, example would be 9S8F PP 0001A |
| [SM9C19006] MYD9 6.9KV Breaker Replacement | - | 500,000 | | | Based on annual equipment inspections and known service-duty wear | Replacement of 6.9kV breaker ; i.e.; harmonic frequency transformer supply |
| [SM9C19007] MYD9 94 MGT 001 Valve Seat | - | 350,000 | | | Based on annual equipment inspections and known service-duty wear | Replace valve seat |
| [SM9C19008] MYD9 Lube Oil Cooler | - | 300,000 | | | Based on annual equipment inspections and known service-duty wear | Replace GT Lube oil cooler |
| [SM9C19009] MYD9 Penetration Seals HRSGs | - | 125,000 | 125,000 | | Based on annual equipment inspections and known service-duty wear | Heat Recovery Steam Generator pipe penetration seals |
| [SM9C19010] MYD9 Steam Attemperators | - | 100,000 | 100,000 | 100,000 | Based on annual equipment inspections and known service-duty wear | Replacement of Steam Attemporators. Examples are the 93HP DS 0006 and the 94HR DS 0023 |
| [SM9C19011] MYD9 AVR Replacement | - | 1,500,000 | | | Based on expectation that OEM will no longer support the equipment by this time | Replacement of the Generator Automatic Voltage Regulators |
| [SM9C20001] MYD9 Elevator | - | - | 2,400,000 | | Based on Facility Enhancement | Installation of a new elevator on Block 9 |
| [SM9C20002] MYD9 L-0 Blade Replacements | - | - | 2,000,000 | | Based on annual equipment inspections and known service-duty wear | Replacement of last row of low pressure steam turbine blades |
| [SM9C21001] MYD9 SCR CO Catalyst | - | - | | 5,500,000 | Based on annual equipment inspections and known service-duty wear | Replacement of emission controls catalysts in the HRSGs |
| [SM9C22014] MYD9 Stack Elevator | 300,000 | | | | Based on Facility Enhancement | Installation of a new stack elevator on Block 9 |
| **Mystic 9 Total** | **5,473,000** | **7,225,000** | **5,625,000** | **6,100,000** | | |
| check | - | - | - | - | | |
| | | | | | | |
| **TOTAL MYSTIC 8 & 9 CAPITAL** | **10,023,000** | **21,009,000** | **9,050,000** | **26,253,000** | | |

**Capital Expenditure Suppporting Detail**

Jan-May 2022
2022 COS
2023 COS
2024 COS
Jun-Dec 2024

**Mystic 8 Projects**

| | 2022 | 2023 | 2024 | Reason for Expected Expenditure | Description of Project |
|---|---|---|---|---|---|
| [5M8C22001] MYD8 BOP Capital | 700,000 | - | - | Based on expected balance of plant capital requirements, derived from historical observations of annual spend | Items covered by Exelon Capital Process |
| [5M8C22002] MYD8 GT81 & GT82 Exp Joints 00 | 120,000 | - | - | Based on annual equipment inspections and known service-duty wear | Gas Turbine Exhaust Duct Expansion Joint Replacement. Per Gas Turbine a the 00 joint |
| [5M8C22003] MYD8 GT81 & GT82 Exp Joints 01 | 120,000 | - | - | Based on annual equipment inspections and known service-duty wear | Gas Turbine Exhaust Duct Expansion Joint Replacement. Per Gas Turbine a the 01 joint |
| [5M8C22004] MYD8 Capital Motors | 250,000 | - | - | Based on annual equipment inspections and known service-duty wear | Replacement of whole motor or capital component of a quilifying motor under the Exelon Capital Process. Example would be 85CD-PP-0001 A stator rewind. |
| [5M8C22005] MYD8 Capital Valves | 250,000 | - | - | Based on annual equipment inspections and known service-duty wear | Replacement of whole valve or capital component of a quilifying motor under the Exelon Capital Process. Example would be 85BF-LCV-0011 plug and cage replacement. Usually reserved for Balance of Plant valves |
| [5M8C22006] MYD8 ST 85 Valves (even) | 500,000 | - | - | Based on annual equipment inspections and known service-duty wear | Inspection, refurbishment and replacement of capital component of Steam Turbine 85 odd numbered stop and control valves under the Exelon Capital Process |
| [5M8C22008] MYD8 Steam Attemperators | 100,000 | - | - | Based on annual equipment inspections and known service-duty wear | Replacement of Steam Attemporators. Examples are the 81HP DS 0006 and the 82HR DS 0023 |
| [5M8C22009] MYD8 Waterfront Rip Rap | 500,000 | - | - | Based on equipment age (not directly related to unit generation/operating profile) | Reperation of the shore line along the Mytic River |
| [5M8C22010] MYD8 Transmssn Trnsfrmr Prote | 750,000 | - | - | Based on expectation that OEM will no longer support the equipment by this time | Replacement of ABB Micom Transformer Relay Protection at Units 81, 82 and 85 |
| [5M8C22011] MYD8 Generator Projection Refr | 450,000 | - | - | Based on expectation that OEM will no longer support the equipment by this time | Replacement of REG 216 Generator Relay Protection at Units 81, 82 and 85 |
| [5M8C22012] MYD8 GT SFC Refresh | 3,500,000 | - | - | Based on expectation that OEM will no longer support the equipment by this time | Replacement of Static Frequency Converter at Units 81 and 82. Static Frequency Converter are the starters for each Gas Turbine |
| [5M8C22013] MYD8 LCB II Replacement | 250,000 | - | - | Based on expectation that OEM will no longer support the equipment by this time | Replacement of Current differential protection relays with interface to Transmition Operator |
| [5M8C22014] MYD8 UPS Replacement | 375,000 | - | - | Based on expectation that OEM will no longer support the equipment by this time | Repalcement of Uninteruptable power supply and battery charging equipment, is one unit |
| [5M8C2xxxx] 108569-MYD 8 BOP Capital | - | 715,534 | 731,379 | Based on expected balance of plant capital requirements, derived from historical observations of annual spend | Expected balance of plant requirements |
| [5M8C2xxxx] Battery Replacement | - | - | 261,207 | Based on equipment age (not directly related to unit generation/operating profile) | Replacemt of the full bank of Block 8 batteries |
| [5M8C2xxxx] Bldg Roof Upgrades | - | - | 261,207 | Based on equipment age (not directly related to unit generation/operating profile) | Main Turbine Building Rubber Roofing Block 8 |
| [5M8C2xxxx] MYD-8 Inlet Filter & Evap Cooler | - | 1,226,630 | - | Based on annual equipment inspections and known service-duty wear | Gas Turbine Air Inlet Air Filters and Evaporative Cooling Media, GT 81 and GT 82 |
| [5M8C2xxxx] MYD-8 Capital Motors | - | 255,548 | 261,207 | Based on annual equipment inspections and known service-duty wear | Condensate Pump Stator |
| [5M8C2xxxx] MYD-8 Capital Valves | - | 255,548 | 261,207 | Based on annual equipment inspections and known service-duty wear | Level Control Valve Plugs and Cages |
| [5M8C2xxxx] MYD8 GT81 Inlet Screens | - | 1,942,164 | - | Based on equipment age (not directly related to unit generation/operating profile) | Air Inlet Filter House Inlet Screens |
| [5M8C2xxxx] MYD8 GT82 Inlet Screens | - | 1,942,164 | - | Based on equipment age (not directly related to unit generation/operating profile) | Air Inlet Filter House Inlet Screens |
| [5M8C2xxxx] Penetration Seals HRSGs | - | - | 156,724 | Based on annual equipment inspections and known service-duty wear | Heat Recovery Steam Generator pipe penetration seals |
| [5M8C2xxxx] Steam Attemperators | - | 102,219 | 104,483 | Based on annual equipment inspections and known service-duty wear | Reheat Steam Desuperheater |
| **Mystic 8 Total** | **7,865,000** | **6,439,808** | **2,037,413** | | |
| check | - | - | - | | |

**Mystic 9 Projects**

| | 2022 | 2023 | 2024 | Why Necessary In Year Modeled? | Detail |
|---|---|---|---|---|---|
| [5M9C22001] MYD9 CRI GT93 | 9,000,000 | - | - | Based on annual equipment inspections and known service-duty wear | Remove, Transport, dissassemble, static and dynamic inspection,replace componants as necessary |
| [5M9C22002] MYD9 CRI GT94 | 9,000,000 | - | - | Based on annual equipment inspections and known service-duty wear | Remove, Transport, dissassemble, static and dynamic inspection,replace componants as necessary |
| [5M9C22003] MYD9 GT93/GT94 Exp Jts 00 | 120,000 | - | - | Based on annual equipment inspections and known service-duty wear | Gas Turbine Exhaust Duct Expansion Joint Replacement. Per Gas Turbine a the 00 joint |
| [5M9C22004] MYD9 GT93/GT94 Exp Jts 01 | 120,000 | - | - | Based on annual equipment inspections and known service-duty wear | Gas Turbine Exhaust Duct Expansion Joint Replacement. Per Gas Turbine a the 01 joint |
| [5M9C22005] MYD9 Capital Motors | 250,000 | - | - | Based on annual equipment inspections and known service-duty wear | Replacement of whole motor or capital component of a quilifying motor under the Exelon Capital Process. Example would be 96CD-PP-0001 A stator rewind. |
| [5M9C22006] MYD9 Capital Valves | 250,000 | - | - | Based on annual equipment inspections and known service-duty wear | Replacement of whole valve or capital component of a quilifying motor under the Exelon Capital Process. Example would be 96BF-LCV-0011 plug and cage replacement. Usually reserved for Balance of Plant valves |
| [5M9C22007] MYD9 Steam Attemperators | 100,000 | - | - | Based on annual equipment inspections and known service-duty wear | Reheat Steam Desuperheater |
| [5M9C22008] MYD9 Waterfront Rip Rap | 500,000 | - | - | Based on annual equipment inspections and known service-duty wear | Repair of the shore line along the Mytic River |
| [5M9C22009] MYD9 Transmssn Trnsfrmr Protec | 750,000 | - | - | Based on expectation that OEM will no longer support the equipment by this time | Replacement of ABB Micom Transformer Relay Protection at Units 93, 94 and 96 |
| [5M9C22010] MYD9 Generator Projection | 450,000 | - | - | Based on expectation that OEM will no longer support the equipment by this time | Replacement of REG 216 Generator Relay Protection at Units 93,94 and 96 |
| [5M9C22011] MYD9 GT SFC | 3,500,000 | - | - | Based on expectation that OEM will no longer support the equipment by this time | Replacement of Static Frequency Converter at Units 93 and 94. Static Frequency Converter are the starters for each Gas Turbine |
| [5M9C22012] MYD9 LCB II Replacement | 250,000 | - | - | Based on expectation that OEM will no longer support the equipment by this time | Replacement of Current differential protection relays with interface to Transmittion Operator |
| [5M9C22013] MYD9 UPS Replacement | 375,000 | - | - | Based on expectation that OEM will no longer support the equipment by this time | Repalcement of Uninteruptable power supply and battery charging equipment, is one unit |
| [5M9C22015] MYD9 ST 96 Valves (even) | 500,000 | - | - | Based on annual equipment inspections and known service-duty wear | HP Stop valve, RH Stop Valve, LP Stop and Control Valve |
| [5M9C2xxxx] Battery Replacement | - | - | 261,207 | Based on equipment age (not directly related to unit generation/operating profile) | Replacemt of the full bank of Block 9 batteries |
| [5M9C2xxxx] Bldg Roof Upgrades | - | - | 261,207 | Based on equipment age (not directly related to unit generation/operating profile) | Main Turbine Building Rubber Roofing Block 9 |
| [5M9C2xxxx] MYD-9 Capital Motors | - | 255,548 | 261,207 | Based on annual equipment inspections and known service-duty wear | Replacement of whole motor or capital component of a quilifying motor under the Exelon Capital Process. Example would be 96CD-PP-0001 A stator rewind. |
| [5M9C2xxxx] MYD-9 Capital Valves | - | 255,548 | 261,207 | Based on annual equipment inspections and known service-duty wear | Replacement of whole valve or capital component of a quilifying motor under the Exelon Capital Process. Example would be 96BF-LCV-0011 plug and cage replacement. Usually reserved for Balance of Plant valves |
| [5M9C2xxxx] Penetration Seals HRSGs | - | - | 156,724 | Based on annual equipment inspections and known service-duty wear | Heat Recovery Steam Generator pipe penetration seals |
| [5M9C2xxxx] Steam Attemperators | - | 102,219 | 104,483 | Based on annual equipment inspections and known service-duty wear | Reheat Steam Desuperheater |
| **Mystic 9 Total** | **25,165,000** | **613,315** | **1,306,034** | | |
| check | - | - | - | | |

**Mystic 8 & 9 Common Projects**

| | 2022 | 2023 | 2024 | Why Necessary In Year Modeled? | Detail |
|---|---|---|---|---|---|
| Common - Boiler Move Costs | 12,000,000 | - | - | Continued operation of M8/9 beyond May 2022 requires this relocation given the sale of the M1-7 property | Move/Replace the Auxilliary steam boiler to directly provide starting steam to Mystic 8&9 in the absence of Mystic 7 |
| NERC-CIP Incremental Capex | 8,752,629 | - | - | Capex required for the expected change to "medium impact" facility designation | Costs for labor, equipment, hardware and software required to upgrade NERC-CIP infrastructure |

| | 2022 | 2023 | 2024 |
|---|---|---|---|
| **TOTAL MYSTIC 8 & 9 CAPITAL** | **53,782,629** | **7,053,123** | **3,343,447** |

| PLANNING YEARS | Jan-May'22 | Jun-Dec'22 | Jan-May'23 | Jun-Dec'23 | Jan-May'24 | Jun-Dec'24 |
|---|---|---|---|---|---|---|
| Total Mystic 8&9 Capital | 12,000,000 | 29,282,629 | 15,668,794 | 3,884,329 | 1,044,827 | 2,298,620 |
| CHECK | - | | | | | |

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-005
Page 6 of 7

**Capital Expenditure Supporting Detail**

**Everett Marine Terminal Projects**

| | 2018 | 2019 | 2020 | 2021 | Reason for Expected Expenditure | Description of Project |
|---|---|---|---|---|---|---|
| Recoat LNG Storage Tanks (incl Outer Shell Welds) | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | Based on equipment age (not directly related to unit generation/operating profile) | Full strip to bare metal prep and recoat |
| DeNOx Refurbishment Replacement (SCR) | | | 250,000 | 2,800,000 | Based on annual equipment inspections and known service-duty wear | Emissions Controls compliance |
| Safety and Relief Valve Replacements | 100,000 | 100,000 | 100,000 | 100,000 | Based on annual equipment inspections and known service-duty wear | Safety and Relief Valve Replacements |
| Regulatory Instrumentation Replacement | 100,000 | 100,000 | 100,000 | 100,000 | Based on annual equipment inspections and known service-duty wear | Regulatory Instrumentation Replacement |
| Site Water Removal System Improvements | 350,000 | 350,000 | 350,000 | 350,000 | Based on annual equipment inspections and known service-duty wear | Storm Water Management |
| CEMS Replacement | | | 300,000 | | Based on expectation that OEM will no longer support the equipment by this time | Emissions Controls compliance |
| Plant Wide DCS System Upgrade | | | 1,000,000 | 1,000,000 | Based on expectation that OEM will no longer support the equipment by this time | Replacement of Distributed Control Systems Main Control room and HEX Control Room |
| Jetty / Dock Structure Major Maint (Childs Report) | 1,000,000 | 1,000,000 | 1,000,000 | 300,000 | Based on equipment age (not directly related to unit generation/operating profile) | Major Structural Repairs to the unloading dock |
| Firewater Main Replacement/Upgrade | | 500,000 | 500,000 | | Based on equipment age (not directly related to unit generation/operating profile) | Firewater Main Replacement/Upgrade |
| Deluge System Replacement | | | 200,000 | | Based on equipment age (not directly related to unit generation/operating profile) | Fire Protection Deluge Equipment |
| Hot Air Bypass for SCR (HAB) Replacement | | 300,000 | 400,000 | | Based on annual equipment inspections and known service-duty wear | Emissions Controls Equipment |
| BOP Maintenance Capital | 500,000 | 500,000 | 500,000 | 500,000 | Based on annual equipment inspections and known service-duty wear | Emergent Material Conditions |
| Cryogenic Valve Replacement | 100,000 | 100,000 | 100,000 | 100,000 | Based on annual equipment inspections and known service-duty wear | Cryogenic Valve Replacement |
| BOP Capital Valves | - | - | 100,000 | 100,000 | Based on annual equipment inspections and known service-duty wear | Replacement Balance of Plant Capital Valve or Capitilized Valve Component; ie aux boiler level control valve |
| BOP Capital Motors | - | - | 100,000 | 100,000 | Based on annual equipment inspections and known service-duty wear | Replacement Balance of Plant Capital Motor or Capitilized Motor Component; ieBoiler Feed Pump Motor |
| BOP Capital Pumps | - | - | 100,000 | 100,000 | Based on annual equipment inspections and known service-duty wear | Replacement Balance of Plant Capital pump or Capitilized pump Component; ieBoiler Feed Pump |
| Boil-off Compressor Upgrade | - | - | 200,000 | 1,000,000 | Based on annual equipment inspections and known service-duty wear | Boil-off Compressor Upgrade |
| MV Electrical System Replacements | 200,000 | - | | | Based on annual equipment inspections and known service-duty wear | Electrical Switchgear and breakers at Medium Voltage system |
| Hi Pressure Expansion Booster Pump Replacement | 150,000 | 175,000 | | | Based on annual equipment inspections and known service-duty wear | Hi Pressure Expansion Booster Pump Replacement |
| Hi Pressure Expansion Vaporizer Refurbishment | | | 150,000 | 125,000 | Based on annual equipment inspections and known service-duty wear | Hi Pressure Expansion Vaporizer Refurbishment |
| Ship Berthing Improvements | 100,000 | - | | | Based on equipment age (not directly related to unit generation/operating profile) | Ship Berthing Improvements |
| Hi Pressure Expansion Reliability Program | - | | 325,000 | | Based on annual equipment inspections and known service-duty wear | Capital Component of vaporizer system dedicated to Mystic Station |
| Replace Ryan 71, 72 & 73 Controls | - | 300,000 | | | Based on expectation that OEM will no longer support the equipment by this time | Replace Ryan 71, 72 & 73 Controls |
| MP Hot Water System Upgrades | - | 300,000 | | | Based on expectation that OEM will no longer support the equipment by this time | Upgrade to Medium Pressure Gas System Vaporizer-tube bundles |
| PI Historian | - | 100,000 | | | Based on expectation that OEM will no longer support the equipment by this time | Control Data Historian replacement |
| Access Road Repaving | | | 2,000,000 | 2,000,000 | Based on expectation that OEM will no longer support the equipment by this time | Access Road structural base replacement through paving |
| Metering Improvements | | | 200,000 | | Based on expectation that OEM will no longer support the equipment by this time | Fuel Transfer Measurement upgrades |
| **Everett Marine Terminal Total** | **5,100,000** | **8,525,000** | **10,275,000** | **9,175,000** | | |
| check | | - | - | - | | |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-005
Page 7 of 7

| Capital Expenditure Supporting Detail | Jan-May 2022 |
| | 2023 COS |
| | 2023 COS |
| | 2024 COS |
| Everett Marine Terminal Projects | Jun-Dec 2024 |

| | 2022 | 2023 | 2024 | Reason for Expected Expenditure | Description of Project |
|---|---|---|---|---|---|
| Rescue LNG Storage Tanks (incl Outer Shell Weeks) | 2,500,000 | | | Based on annual equipment age (not directly related to unit generation/operating profile) | Full strip to bare metal prep and recoat |
| DeNOx Refurbishment Replacement (SCR) | 400,000 | | | Based on annual equipment inspections and known service duty wear | Emissions Controls compliance |
| Safety and Relief Valve Replacements | 100,000 | 100,000 | 100,000 | Based on annual equipment inspections and known service duty wear | Safety and Relief Valve Replacements |
| Regulatory Instrumentation Replacement | 100,000 | 100,000 | 100,000 | Based on annual equipment inspections and known service duty wear | Regulatory Instrumentation Replacement |
| Site Water Removal System Improvements | 350,000 | | | Based on annual equipment inspections and known service duty wear/unit generation/operating profile | Storm Water Management |
| Hazard System Review and Upgrade | | | 150,000 | Based on annual equipment inspections and known service duty wear | Hazard System Review and Upgrade |
| Plant Wide DCS System Upgrade | 1,000,000 | 1,000,000 | 1,000,000 | Based on expectation that OEM will no longer support the equipment by this time | Replacement of Distributed Control Systems Main Control room and HEX Control Room |
| Jetty / Dock Structure Major Maint (Childs Report) | 300,000 | | | Based on equipment age (not directly related to unit generation/operating profile) | Major Structural Repairs to the unloading dock |
| Corrosion Control (Rectifier) Upgrade / Dock | 300,000 | | | Based on annual equipment inspections and known service duty wear | Cathodic Protection System selective replacement and upgrades at the unloading dock |
| Liquid Level Gauge Replacement | 400,000 | | | Based on annual equipment inspections and known service duty wear | Level Indication in the two storage tanks |
| Repellite (top off) LNG Tank | 450,000 | | | Based on annual equipment inspections and known service duty wear | Tank interstitial thermal insulation replenishment |
| LP/MP/HP Vaporization Replacement | | 1,500,000 | 1,500,000 | Based on annual equipment inspections and known service duty wear | Low, Medium and High Pressure system Liquid Natural Gas Vaporizers |
| Vapor Return Blower Replacement | | 900,000 | | Based on annual equipment inspections and known service duty wear | Boil off vapor capture equipment |
| BOP Maintenance Capital | 500,000 | 500,000 | 500,000 | Based on annual equipment inspections and known service duty wear | Emergent Material Conditions |
| Plant Steam Modifications | 700,000 | 700,000 | 700,000 | Based on annual equipment inspections and known service duty wear | Package Boiler Burner Management |
| Cryogenic Valve Replacement | 100,000 | 100,000 | 100,000 | Based on annual equipment inspections and known service duty wear | Cryogenic Valve Replacement |
| BOP Capital Valves | 100,000 | 100,000 | 100,000 | Based on annual equipment inspections and known service duty wear | Replacement Balance of Plant Capital Valve or Capitlized Valve Component; is a a boiler level control valve |
| BOP Capital Motors | 100,000 | 100,000 | 100,000 | Based on annual equipment inspections and known service duty wear | Replacement Balance of Plant Capital Motor or Capitlized Motor Component; aBoiler Feed Pump Motor |
| BOP Capital Pumps | 100,000 | 100,000 | 100,000 | Based on annual equipment inspections and known service duty wear | Replacement Balance of Plant Capital pump or Capitlized pump Component; aBoiler Feed Pump |
| Boil off Compressor Upgrade | 100,000 | | | Based on annual equipment inspections and known service duty wear | Boil off Compressor Upgrade |
| MV Electrical System Replacements | 100,000 | | | Based on annual equipment inspections and known service duty wear | Electrical Switchgear and breakers at Medium Voltage system |
| CR Halon System Replacement | | 875,000 | | Based on equipment age (not directly related to unit generation/operating profile) | Control Room Fire Protection System Replacement from a Halon system |
| Ship Berthing Improvements | | 100,000 | | Based on equipment age (not directly related to unit generation/operating profile) | Ship Berthing Improvements |
| **Everett Marine Terminal Total** | **8,000,000** | **5,175,000** | **4,450,000** | | |

check

| PLANNING YEARS | Jan-May '22 | Jun-Dec '22 | Jan-May '23 | Jun-Dec '23 | Jan-May '24 | Jun-Dec '24 |
|---|---|---|---|---|---|---|
| Total Monte A&A Capital | 1,000,000 | 7,000,000 | 5,000,000 | 4,175,000 | 1,000,000 | 3,450,000 |
| CHECK | | | | | | |

**JA244**

**Attachment D**

**Public Redacted Prepared Direct Testimony and Exhibits of Alan C. Heintz**

**(Exhibit No. MYS-006 through Exhibit No. MYS-009)**

## Exhibit No. MYS-006

## Prepared Direct Testimony of Alan C. Heintz

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

CONSTELLATION MYSTIC POWER, LLC     )          Docket No. ER18-___-000

PREPARED DIRECT TESTIMONY
OF
ALAN C. HEINTZ

ON BEHALF OF
CONSTELLATION MYSTIC POWER, LLC

JA247

Exhibit No. MYS-006

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

**CONSTELLATION MYSTIC POWER, LLC  ) Docket No. ER18-\_\_\_-000**

**Summary of Prepared Direct Testimony of**
**Alan C. Heintz**

1    Mr. Heintz provides testimony and workpapers supporting the request of

2    Constellation Mystic Power, LLC ("Mystic") that the Commission approve the

3    cost-of-service agreement for the provision of reliability services to ensure fuel

4    security in ISO New England Inc. ("ISO-NE") by Mystic units 8 & 9 (the "Mystic

5    8&9").  Mr. Heintz's testimony explains and supports the revenue requirements

6    associated with the provision by Mystic 8&9 of reliability service to ISO-NE during

7    the period June 1, 2022 to May 31, 2024.  He also provides the cost of service

8    calculation for the Everett facility, which is reflected in the fixed operations and

9    maintenance/return on investment component of the fuel supply costs for Mystic

10   8&9.  These cost of service analyses demonstrate that the proposed rates are just

11   and reasonable.

**JA248**

## UNITED STATES OF AMERICA
### BEFORE THE
### FEDERAL ENERGY REGULATORY COMMISSION

**CONSTELLATION MYSTIC POWER, LLC** )  **Docket No. ER18-\_\_\_-000**

### PREPARED DIRECT TESTIMONY OF
### ALAN C. HEINTZ

1  **I.    Introduction and Experience**

2  **Q1.    Please state your name, business address, and position**.

3  A1.    My name is Alan C. Heintz.  My business address is Brown, Williams,

4          Moorhead & Quinn, Inc. ("BWMQ"), 1155 Fifteenth Street, NW, Suite 1040,

5          Washington, DC 20005.

6  **Q2.    On whose behalf are you testifying?**

7  A2.    I am testifying on behalf of Constellation Mystic Power, LLC ("Mystic").

8  **Q3.    Please describe your professional experience.**

9  A3.    I was employed by the Federal Energy Regulatory Commission ("FERC" or

10          "Commission") from November 1985 to February 1995.  I served as a Public

11          Utilities Specialist in the Rate Filings Branch from November 1985 to October

12          1989.  In November 1989, I was promoted to Section Chief in the Division of

13          Applications and was responsible for supervising the review of the terms,

14          conditions, and rates of electric rate applications for such services as

15          interchange power, requirements power, and transmission.  During my tenure

16          at the FERC, I prepared or supervised the preparation of memoranda

17          recommending acceptance, rejection, deficiency, or investigation in hundreds

18          of cases.  These included cases that set important precedents on electric

**JA249**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1    transmission pricing, such as the merger compliance transmission tariffs for

2    Northeast Utilities, the first generation of open access transmission tariffs

3    ("OATT") filed by utilities such as Entergy Services Inc., Louisville Gas and

4    Electric Co., Florida Power & Light Co., Kansas City Power & Light Co., and

5    American Electric Power Service Corp., as well as the Pennsylvania Electric

6    Company case involving Penntech Papers, Inc  I also taught a one-year course

7    to FERC Staff and gave several presentations to the Edison Electric Institute

8    Interconnection and Interchange Arrangements Committee on the pricing of

9    power and transmission services.

10    From February 1995 through October 2000, I was a Vice President of

11    Stone & Webster Management Consultants, Inc  In this position, I provided

12    consulting services to numerous electric utilities on matters involving

13    requirements and off-system power rates, rate and implementation strategies for

14    developing OATT filings, and issues concerning the organization of

15    Independent System Operators ("ISO"), and Regional Transmission

16    Organizations ("RTO").  I also assisted several utilities in preparing their retail

17    delivery services filings.  In November 2000, I joined R.J. Rudden Associates,

18    Inc. as a Vice President, where I continued providing consulting services to the

19    electric industry.  I joined BWMQ in February 2004.

20    **Q4.    What are your duties in your current position?**

21    A4.    I provide consulting services on matters relating to power sales, transmission,

22    and ancillary service issues associated with FERC regulation of open access

23    transmission service, including issues arising from FERC's Order Nos. 888,

**JA250**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

1    889, 890, 2000, 679, and 1000.  I have been actively involved as a consultant

2    to several ISOs and RTOs, participants in organized electric markets, and

3    transmission-only entities.  I have advised these clients on formula transmission

4    rates, transmission and congestion pricing, and the treatment of pre-existing

5    arrangements, losses, and ancillary services.  In addition, I have provided advice

6    on transmission pricing matters to several transmission-owning members of the

7    PJM Interconnection, L.L.C., Midcontinent Independent System Operator, Inc.,

8    California Independent System Operator Corporation, ISO-NE, New York

9    Independent System Operator, Inc. and Southwest Power Pool, Inc.  In addition,

10    I have prepared numerous reliability must run and production costs of service.

11  **Q5.**    **Have you previously testified before FERC or before other regulatory**
12        **agencies and courts on utility-related matters?**

13  A5.    Yes.  During my tenure at the FERC, I was assigned to the Commission's

14        advisory staff and, therefore, was precluded from testifying before the FERC.

15        However, while at the FERC, I presented cases publicly to the FERC

16        Commissioners at their bi-weekly public meetings and was the technical contact

17        to the Commissioners in numerous cases.  Since leaving the FERC, I have filed

18        testimony before the FERC in numerous proceedings.  In addition to the FERC,

19        I have testified before the British Columbia Utilities Commission in Canada,

20        the Illinois Commerce Commission, the Maine Public Utilities Commission,

21        the United States Court of Federal Claims, and the United States District Court

22        in Florida.    A summary of my prior testimony is contained in

23        Exhibit No. MYS-007.

**JA251**

Document Accession #: 20180516-5048       Filed Date: 05/16/2018

1  **Q6.**    **Please describe your educational background.**

2  A6.    I received the degree of Bachelor of Science in Business and the degree of

3        Bachelor of Arts in Economics from the University of Colorado, Boulder,

4        Colorado, in May 1982.  I also received the degree of Master of Business

5        Administration in Finance from the George Washington University in

6        Washington, DC in December 1988.

7  **II.**    **Background and purpose of testimony**

8  **Q7.**    **Please provide an overview of the instant proceeding.**

9  A7.    The instant proceeding involves the provision of service from Mystic 8&9 to

10       provide fuel security within ISO-NE for the period June 1, 2022 to May 31,

11       2024.

12  **Q8.**    **Please describe Mystic 8&9.**

13  A8.    Mystic 8&9 are located in Boston, Massachusetts and are 2-on-1 combined

14       cycle gas turbines and have capacities of 703 MW and 714 MW, respectively.

15       The units are owned by Mystic, which is a wholly owned subsidiary of

16       Constellation Holdings, LLC, ("Constellation") which is a wholly owned

17       subsidiary of Exelon Generation Company, LLC, ("Exelon Generation") which

18       is in turn a wholly owned subsidiary of Exelon Corporation ("Exelon").

19  **Q9.**    **What is the purpose of your testimony in this proceeding?**

20  A9.    The purpose of my testimony is to explain and support the annual fixed revenue

21       requirement associated with Mystic 8&9 to provide such fuel security service

22       for the period of June 1, 2022 through May 31, 2024.

**JA252**

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

1   **Q10.  What are the revenue requirements based on and what have you**
2        **reviewed in preparing your testimony?**

3   A10.  The revenue requirements are based on the plant costs of Mystic 8&9 and the

4        expenses on Exelon's books and records.  I have reviewed Exelon's 2017

5        financials in preparing my testimony.  The fixed costs supported here do not

6        include fuel costs, except the fixed costs associated with the Everett Marine

7        Terminal ('EMT') discussed below.  As supported by Mr. Berg, the fixed costs

8        of the EMT facility will be reflected in the fuel supply costs for Mystic 8&9

9        and thus are properly included in the revenue requirement.  I detail those costs

10       and expenses here and in the attached exhibits.  Likewise, because the terminal

11       will continue to provide LNG to other gas utilities, marketers and other market

12       participants in New England, any third-party revenues will be credited to the

13       fixed cost supported here.

14   **Q11.  Was your testimony prepared by you or under your direct supervision?**

15   A11.  Yes.  My testimony was prepared by me or under my direct supervision.

16   **Q12.  Are you sponsoring any exhibits to your testimony?**

17   A12.  Yes.  In addition to my testimony, I am sponsoring:

18       •   Exhibit No. MYS-007 - a listing of the testimonies I have filed in
19          various proceedings;

20       •   Exhibit No. MYS-008 - the cost-of-service study; and

21       •   Exhibit No. MYS-009 - the workpapers supporting the cost-of-service
22          study.

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1    In referring to any Schedule, I am referring to a schedule in Exhibit No. MYS-

2    008 and in referring to any workpaper (e.g., WP-1), I am referring to a work

3    paper in Exhibit No. MYS-009.

4    **III.    Cost-of-Service Study for Mystic 8&9**

5    **Q13.    Please discuss the basis for the revenue requirements**.

6    A13.    The revenue requirements are based on the traditional sum of Operating &

7    Maintenance Expenses ("O&M"), Depreciation Expense, Taxes Other Than

8    Income Taxes, Income Taxes and Return on Rate Base.

9    **Q14.    Please describe the components of the cost-of-service study**.

10   A14.    The cost-of-service study, including the revenue requirement analysis and

11   associated supporting schedules, is set out in Exhibit No. MYS-008 and consists

12   of the following Schedules:

13          Schedule A – Summary Cost of Service;

14          Schedule B – Capital Structure and Rate of Return;

15          Schedule C – Net Plant;

16          Schedule D – Rate Base Adjustments;

17          Schedule E – O&M Expense;

18          Schedule F – Corporate A&G;

19          Schedule G – Depreciation/Amortization Expense;

20          Schedule H – Taxes Other Than Income;

21          Schedule I – Revenue Credits;

22          Schedule J – Salaries and Wages Allocator; and

23          Schedule K – Everett Marine Terminal Fixed Costs

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

1    **Q15.    What is the test period for this filing?**

2    A15.    The test period for this filing comprises historical costs for the year 2017 and

3    estimated costs for 2018 through 2025.  I understand that Mystic is requesting

4    waiver of the Section 35.13 filing requirements.

5    **Q16.    How does the revenue requirement accommodate the term of the**
6    **Reliability Agreement?**

7    A16.    To accommodate the June 1, 2022 to May 31, 2024 term I calculated the

8    revenue requirement for 2017.  I then used the 2017 data to calculate projected

9    revenue requirements for the year 2018-2025. The annual fixed costs are then

10    divided by 12 to get a monthly fixed cost charge.

11    **Q17.    Are there any adjustments in the cost-of-service study?**

12    A17.    Yes.  The adjustments necessary to determine the fully adjusted cost-of-service,

13    rate base and cost of capital are discussed below.

14    **Q18.    Please explain how you developed the cost of capital.**

15    A18.    The cost of capital is developed on Schedule B in Exhibit No. MYS-008 and

16    consists of the pre-tax cost of capital supported by Mystic witness Dr. Charles

17    Olson.   Schedule B calculates the effective composite income tax rate of

18    27.32% reflecting the 8% state income tax rate and the 21.00% federal income

19    tax rate.

20    **Q19.    Please describe how you calculated rate base.**

21    A19.    Rate base reflects plant in service ("Gross Plant"), less accumulated

22    depreciation ("Net Plant").  Rate base also includes a subtractive adjustment

23    related to Accumulated Deferred Income Taxes ("ADIT") and an additive

24    adjustment to include an allowance for Cash Working Capital ("CWC").  CWC

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1    is calculated using the FERC standard 45 day or one-eighth of O&M expenses,

2    less fuel expenses. The rate base components of the revenue requirements,

3    except for CWC, are year-end balances. As set forth in WP-1, the Gross Plant

4    value includes the production plant investment and an allocation of general and

5    intangible plant at the site based on Mystic 8&9 plant in proportion to total

6    Mystic plant. As set forth in WP-1, the accumulated depreciation and

7    amortization was calculated consistent with the determination of Gross Plant.

8    The net book value by asset pursuant to Exelon's books and records is shown

9    on WP-5. Net Plant is the difference between the Gross Plant and the

10    accumulated depreciation. All asset retirement obligations have been excluded

11    in the development of Net Plant. The 2017 plant balances are based on Mystic's

12    books, and the plant balances for 2018-2025 use the 2017 Gross Plant value

13    with necessary capital expense additions to ensure the continued sound

14    operation of Mystic under Good Utility Practice as established by Mr. Berg.

15    Increases in plant balances for capital expenditures needed during the reliability

16    service period ("current year capex"), from June 1, 2022 to May 31, 2024, are

17    not reflected in increased plant balances in this cost-of-service. They are instead

18    recovered in the year they are incurred. The accumulated depreciation balance

19    reflects additional depreciation that will accrue in each year. This is shown in

20    Schedule C in Exhibit No. MYS-008 and shown in detail in WP-1.

21        ADIT was calculated as the difference between the book basis and the

22    tax basis of the assets multiplied by the composite tax rate. Consistent with

23    Commission precedent, the ADIT associated with the asset retirement

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1    obligations was excluded from the ADIT calculation.  This is shown in

2    Schedule D.

3          Working cash, consisting of prepayments and materials and supplies, is

4    calculated on Schedule D, and CWC is developed on Schedule A.    The

5    prepayments mainly consist of prepaid property taxes.  The working cash

6    allowance is calculated using the FERC standard 45 days of O&M and

7    administrative and general ("A&G") expense excluding fuel and purchased

8    power.

9    **Q20.    Please explain how the return on rate base is calculated.**

10   A20.   The return allowance is computed by multiplying the rate base by the proposed

11          after-tax return of 8.46%, which is developed in Schedule B together with the

12          income taxes discussed above.  Dr. Charles Olson supports the calculation of

13          the proposed rate of return.

14   **Q21.    Please explain how you calculated the O&M expenses.**

15   A21.   On Schedule E, the actual O&M expenses for 2017 are shown excluding fuel.

16          The O&M expenses for 2018 and beyond are the 2017 expenses escalated by

17          2.5% per year.  The 2.5% escalation is slightly above the estimated Consumer

18          Price Index average for 2018-2024 of 2.47% and considerably less than the

19          estimated Employment Cost Index average for 2018-2024 based on data from

20          IHS Markit.

21   **Q22.    Please explain how you calculated the A&G expenses.**

22   A22.   Schedule F shows the A&G expenses developed on WP-6.  In accordance with

23          Commission precedent, the A&G expenses are an allocation of the plant related

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

1    A&G expenses of Exelon, Exelon Generation, and Constellation to Mystic

2    based on the ratio of the wages and salaries at Mystic divided by the total wages

3    and salaries of each of the other generating units of Exelon. Specifically, the

4    overheads of Exelon Generation power and nuclear divisions are directly

5    assigned to generation unit-related or other, as are the Constellation overheads.

6    The generation-unit related A&G expenses are then allocated to non-nuclear

7    units and nuclear units based on labor.  The non-nuclear unit related overheads

8    are then allocated to Mystic 8&9 based on the wages and salaries at Mystic

9    divided by the total wages and salaries of the generation related non-nuclear

10    wages and salaries. The Exelon Generation "other" overheads, not included in

11    the power and nuclear divisions, that are related to plant related operations are

12    then allocated to non-nuclear units and then allocated to Mystic 8&9. The A&G

13    expenses for 2018 and beyond are the 2017 expenses escalated by 2.5% per

14    year.

15    **Q23.    Please explain how you calculated depreciation expenses.**

16    A23.    Depreciation expenses are shown on Schedule G and reflect a remaining life

17    until 2047.  The remaining life is based on the estimated physical life of the

18    units.  Asset Retirement related depreciation and accretion are not included in

19    the depreciation expenses consistent with Commission precedent.

20    **Q24.    Please explain how you calculated the taxes other than income taxes**.

21    A24.    Schedule H directly assigns the property taxes attributable to Mystic.  As noted

22    in Schedule H, Mystic 7 and jet units are expected to be retired before service

23    begins under this agreement, so the property taxes for the site are then only

1    attributable to Mystic 8&9. Exelon proposes to update the property taxes that

2    will be incurred to reflect actuals prior to each twelve month period of the

3    agreement.

4    **Q25.    Please explain how you calculated the revenue credits.**

5    A25.    Since revenue credits will be credited monthly under the reliability agreement.

6    Schedule I does not provide for revenue credits.  In this way, Mystic 8&9 will

7    not over-recover the fixed costs proposed herein.

8    **IV Cost-of-Service Study for Everett Marine Terminal**

9    **Q26.    Why did you evaluate the costs for the Everett Marine Terminal?**

10    A26.    I relied on the testimony of witness Mr. Berg, that fuel supply for Mystic 8&9

11    will be provided via the Everett Marine Terminal.

12    **Q27.    How did you account for the costs of the Everett Marine Terminal?**

13    A27.    My understanding is that the fixed costs and return on investment are included

14    in the Fuel Supply Agreement ("FSA") between ExGen subsidiary

15    Constellation LNG, LLC and Mystic.  My cost of service study for Everett

16    justifies the fixed costs and return on investment in the FSA.

17    **Q28.    Please describe how you calculated rate base for the Everett Marine**
18    **Terminal.**

19    A28.    Schedule K, page 3, shows the Gross Plant value.  Rate base reflects plant in

20    service ("Gross Plant"), less accumulated depreciation ("Net Plant").  Like

21    Mystic 8&9 above, the 2018-2025 plant balances reflect 2017 Gross Plant and

22    increased accumulated depreciation over time.  And again, plant balances

23    reflect increases for needed capital expenditures from 2018-2022 to ensure the

24    continued sound operation of the terminal under Good Utility Practice as

**JA259**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

1     demonstrated by Mr. Berg.  Increases in plant balances for current year capex

2     are not reflected in increased plant balances. They are instead recovered in the

3     year they are incurred.  Net Plant is the difference between the Gross Plant and

4     the accumulated depreciation.  All asset retirement obligations have been

5     excluded in the development of Net Plant.  This is shown in Schedule K and

6     shown in detail in WP-K4.

7     ADIT was calculated as the difference between the book basis and the

8     tax basis of the assets multiplied by the composite tax rate.  Consistent with

9     Commission precedent, the ADIT associated with the asset retirement

10     obligations was excluded from the ADIT calculation.  This is shown in

11     Schedule K, page 4

12     Working cash, consisting of prepayments, materials and supplies and

13     the required fuel inventory, is calculated on Schedule K, page 4, and CWC is

14     developed on Schedule K, page 1.   A large portion of the prepayments mainly

15     consist of prepaid property taxes.  The working cash allowance is calculated

16     using the FERC standard 45 days of O&M and administrative and general

17     ("A&G").  Also included is the lag associated with fuel purchases, assuming

18     $278 million in annual gas costs, the company would be floating an average of

19     15 days over the course of the year, resulting in cash working capital

20     requirements of $11.4 million ($278MM x (15 / 365)).

21     In addition, the company is required to maintain a level of gas inventory

22     on hand to ensure reliability of the system.  The inventory included in rate base,

23     is the average inventory expected to be maintained across the year.  The gas

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1    inventory is assumed to be on average 50% of the 3.4 BCF, resulting in average

2    inventory levels of $15.7 million.

3  **Q29.**  **Please explain how the return on rate base is calculated.**

4  A29.  The return allowance is computed by multiplying the rate base by the proposed

5    after-tax return of 8.46%, which is shown in Schedule K, page 2 together with

6    the income taxes discussed above.

7  **Q30.**  **Please explain how you calculated the O&M expenses.**

8  A30.  On Schedule K, page 5, the O&M expenses for 2017 are shown excluding fuel.

9    The O&M expenses for 2018 and beyond are the 2017 expenses escalated by

10    the same escalation factor of 2.5% per year as used for Mystic 8&9. Costs of

11    LNG Sold, Purchase Hedge Activity, Marine Transportation, Vaporization Fuel

12    & Terminal Losses and Uses, Pipeline Transportation, and Electricity

13    Purchases have been removed since they will be billed as incurred.  Property

14    Taxes have been excluded since they are included in Other Taxes.

15  **Q31.**  **Please explain how you calculated the A&G expenses.**

16  A31.  Schedule K, page 6, shows the A&G expenses developed on WP-K2.  The A&G

17    expenses are an allocation of the plant related A&G expenses of Exelon, Exelon

18    Generation, and Constellation to EMT as was discussed above for Mystic 8&9

19    based on the ratio of the wages and salaries at EMT divided by the total wages

20    and salaries of each of the other generating units of Exelon and EMT.  The

21    A&G expenses for 2018 and beyond are the 2017 expenses escalated by 2.5%

22    per year.

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

1  **Q32.   Please explain how you calculated depreciation expenses.**

2  A32.   Depreciation expenses are shown on Schedule K, page 7, and reflect a

3         remaining life until 2047.  I utilized the same remaining life for the Everett

4         Marine Terminal as Mystic 8&9, since the terminals main function is to supply

5         fuel to Mystic 8&9.  Asset Retirement related depreciation and accretion are

6         not included in the depreciation expenses consistent with Commission

7         precedent.

8  **Q33.   Please explain how you calculated the taxes other than income taxes**.

9  A33.   Schedule K, page 8, directly assigns the property taxes attributable to EMT.  I

10        escalated those property taxes by 1.5%.

11 **Q34.   Please explain how you calculated the revenue credits.**

12 A34.   Schedule K, page 9, provides for no revenue credits, in that the revenue from

13        third-party sales, will be credited monthly under the FSA.

14        **V.      Total Revenue Requirement and Conclusions**

15 **Q35.   Please indicate where in Schedule A the revenue requirements for**
16 **        Mystic 8&9 for years June 1, 2022 through May 31, 2024 are located.**

17 A35.   The revenue requirements for years 2022 through 2024 are located at line 26 of

18        Schedule A without the current year capex and line 29 with the current year

19        capex.

20 **Q36.   Did you calculate the monthly charge that would result from the revenue**
21 **        requirements for years 2022 through 2024?**

22 A36.   Yes.  I derived the monthly charges shown in line 27 of Schedule A by dividing

23        the annual charges by 12 without current year capex. Line 28 shows the monthly

24        charges with the current year capex.

**JA262**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1  **Q37.  Please indicate where the fixed costs and return on investment for the**
2  **Everett Marine Terminal for years 2022 through 2024 are located.**

3  A37.  The fixed costs and return on investment for years 2022 through 2024 are

4  located at line 26 of page 1 of Schedule K without current year capex and line

5  29 with current year capex.

6  **Q38.  What is the total revenue requirement you calculate for Mystic's**
7  **provision of reliability service in years 2022 through 2024?**

8  A38.  The total monthly revenue requirement for Mystic's provision of service to

9  meet ISO-NE's required fuel security service needs including the current year

10  capex is $19,670,384 from June 1, 2022 to December 31, 2022, $16,256,315

11  from January 1, 2023 to December 31, 2023, and $14,631,456 from January 1,

12  2024 to May 31, 2024.

13  **Q39.  What are your conclusions regarding Mystic's revenue requirements**
14  **associated with providing reliability service for June 1, 2022 through**
15  **May 31, 2024?**

16  A39.  It is my conclusion that Mystic's revenue requirements are consistent with

17  Commission precedent and that rates based on the enclosed cost of service are

18  just and reasonable.

19  **Q40.  Does this conclude your direct testimony?**

20  A40.  Yes.

**JA263**

USCA Case #20-1343    Document #1935613    Filed: 02/17/2022    Page 279 of 580

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746 (2012), I state under penalty of perjury that the foregoing testimony is true and correct to the best of my knowledge, information, and belief.

Executed this _15_ day of May, 2018.

Alan C. Heintz

## Exhibit No. MYS-007

**Listing of Testimonies Filed in Various Proceedings**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

**Exhibit No. MYS-007**
**Page 1 of 13**

SUMMARY OF TESTIMONY EXPERIENCE
ALAN C. HEINTZ

| # | JURISDICTION | CASE OR DOCKET NO. | CLIENT | APPROXIMATE DATE | SUBJECT MATTER |
|---|---|---|---|---|---|
| 1 | FERC | ER95-836-000 | Maine Public Service Company | 1995 | Rates, Terms and Conditions for Open Access Transmission Services |
| 2 | FERC | ER95-854-000 | Kentucky Utilities Company | 1995 | Rates, Terms and Conditions for Open Access Transmission Services |
| 3 | FERC | ER95-1686-000 ER96-496-000 | Northeast Utilities Service Company | 1996 | Rates, Terms and Conditions for Open Access Transmission Services |
| 4 | FERC | ER96--58-000 | Allegheny Power Services Corporation | 1995 & 1996 | Rates, Terms and Conditions for Open Access Transmission Services |
| 5 | FERC | OA96-138-000 | Consolidated Edison Company of New York, Inc. | 1997 | Rates, Terms and Conditions for Open Access Transmission Services |
| 6 | FERC | ER96-1208-000 | Interstate Power Company | 1996 | Rates, Terms and Conditions for Open Access Transmission Services |
| 7 | British Columbia Utilities Commission | | Bonneville Power Administration | 1997 | Rates, Terms and Conditions for Open Access Transmission Services |
| 8 | FERC | ER98-1438-000 EC98-24-000 | Midwest ISO Transmission Owners | 1998 & 1999 | Rates, Terms and Conditions for Midwest ISO Tariff |
| 9 | FERC | EC98-2770-000 ER98-2770-000 ER98-2786-000 | Midwest Independent System Operator Transmission Owners | 1999 | Reasonableness of the conditions to be placed on the merging parties |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

**Exh. No. MYS-007**
**Page 2 of 13**

| # | JURISDICTION | CASE OR DOCKET NO. | CLIENT | APPROXIMATE DATE | SUBJECT MATTER |
|---|---|---|---|---|---|
| 10 | Illinois Commerce Commission | 99-0117 | Commonwealth Edison Company | 1998 | Cost of service for Retail Distribution Services Tariff |
| 11 | FERC | ER99-3110-000 | Nevada Power Company | 1998 | Rates, Terms and Conditions for Open Access Transmission Services |
| 12 | FERC | ER99-4415-000 | Illinois Power Company | 1999 | Rates, Terms and Conditions for Open Access Transmission Services |
| 13 | FERC | ER99-4470-000 | Commonwealth Edison Company | 1999 | Rates, Terms and Conditions for Open Access Transmission Services |
| 14 | U.S. District Court, FL | 92-35-CIV-ORL-3A22 | Florida Power and Light Company | 1999 | Rates, Terms and Conditions for Network Service in an anti-trust case |
| 15 | U.S. Court of Federal Claims, DC | 97-268C | Carolina Power & Light Company | 1999 | Cost recovery of Decontamination & Decommissioning Fund Assessments |
| 16 | FERC | ER98-496-006 ER98-2160-004 | Dynegy | 1999 | Rates for Must Run units |
| 17 | FERC | ER00-980-000 | Bangor Hydro Electric Company | 1999 | Rates, Terms and Conditions for Open Access Transmission Services |
| 18 | Maine Public Utilities Commission | 99-185 | Bangor Hydro Electric Company | 2000 | Rates, Terms and Conditions for Open Access Transmission Services |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

**Exh. No. MYS-007**
**Page 3 of 13**

| # | JURISDICTION | CASE OR DOCKET NO. | CLIENT | APPROXIMATE DATE | SUBJECT MATTER |
|---|---|---|---|---|---|
| 19 | FERC | EL00-98-000, et al. | Dynegy Power Marketing, Inc. | 2000 | Nexus between fuel and emissions costs and the market prices in California |
| 20 | Illinois Commerce Commission | No. 01-0423 | Commonwealth Edison Company | 2001 | Direct, Rebuttal and Surrebuttal: Cost of service for Retail Distribution Services Tariff |
| 21 | FERC | ER01-2992 | Commonwealth Edison Company | 2001 | Rates, Terms and Conditions for Open Access Transmission Services |
| 22 | FERC | ER01-123.004 | Midwest ISO Transmission Owners | 2001 | Super Region Adjustment for the MISO/ARTO Super Region |
| 23 | FERC | ER01-2999 | Illinois Power Company | 2001 | Rates, Terms and Conditions for Open Access Transmission Services |
| 24 | FERC | ER01-3142, et. al | Midwest ISO Transmission Owners | 2001 | Revised treatment of Network Upgrades |
| 25 | FERC | ER01-3142, et. al | Midwest ISO Transmission Owners | 2001 | Uncertainties that support a higher ROE |
| 26 | FERC | EL000-95-045, et.al | Dynegy, Mirant, Reliant and Williams | 2001 & 2002 | Costing of emissions and start-up costs |
| 27 | FERC | EC02-23 & ER02-320 | Trans-Elect, Inc. | 2001 & 2002 | Support of rates and ratemaking methodology for new transmission company |
| 28 | FERC | | Sithe New Boston, LLC | 2001 & 2002 | Cost of Service for Must Run Unit |
| 29 | FERC | RM01-12 | SeTrans | 2002 | Allocation of FTRs/CRRs |

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**Exh. No. MYS-007**
**Page 4 of 13**

| # | Jurisdiction | Case or Docket No. | Client | Approximate Date | Subject Matter |
|---|---|---|---|---|---|
| 30 | FERC | EL02-111 | Midwest ISO Transmission Owners | 2002 | Through and Out Rates |
| 31 | FERC | ER02-2595 | Midwest ISO Transmission Owners | 2002 | Cost Allocation for FTR and Market Administration |
| 32 | FERC | ER03-37 | Sierra Pacific and Nevada Power | 2003 | Ancillary Service Rates |
| 33 | FERC | ER03-626 | Empire District Electric Co. | 2003 | Cost of Service; Wholesale Requirements Customers |
| 34 | FERC | EL-02-25-001, et. al | Public Service Co. of Colorado | 2003 | Fuel Adjustment Clause |
| 35 | FERC | ER03-959 | Exelon Framingham LLC, et al. | 2003 | Production Cost of Service |
| 36 | FERC | ER03-1187 | Commonwealth Edison | 2003 | Black Start Rates |
| 37 | FERC | ER03-1223 | Montana Megawatt | 2003 | Production Formula Rates |
| 38 | FERC | ER03-1335 | Commonwealth Edison | 2003 | Transmission Tariff Rates |
| 39 | FERC | ER03-1354 | Black Hills Power Company, et al. | 2003 | Joint transmission Tariff Rates |
| 40 | FERC | ER03-1328 | Nevada Power | 2003 | Transmission Tariff Rates |
| 41 | FERC | EL02-111, et. Al | Midwest ISO Transmission Owners | 2004 | Long-term Transmission Pricing Plan |
| 42 | FERC | ER05-14 | Sierra Pacific | 2004 | Transmission Tariff Rates |
| 43 | FERC | ER05-26 | Mirant Kendall, LLC | 2004 | Reliability Must Run Agreement and Rates |

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**Exh. No. MYS-007**
**Page 5 of 13**

| # | JURISDICTION | CASE OR DOCKET NO. | CLIENT | APPROXIMATE DATE | SUBJECT MATTER |
|---|---|---|---|---|---|
| 44 | Illinois Commerce Commission | No.04-0779 | NICOR Gas Company | 2004 | Distribution Service Embedded Cost of Service Study |
| 45 | FERC | ER05-163 | Milford Power Company LLC | 2004 | Reliability Must Run Agreement and Rates |
| 46 | FERC | EL02-111, et. al | Midwest ISO Transmission Owners | 2004 | Seams Elimination |
| 47 | FERC | EL00-95, et. al | Portland General Electric Company | 2005 | California Refund Proceeding |
| 48 | FERC | ER05-447 | Midwest ISO Transmission Owners | 2005 | Schedule 10 & 17 Recovery for Grandfathered Agreements |
| 49 | FERC | EL02-111, et. al | Midwest ISO Transmission Owners | 2005 | Seams Elimination |
| 50 | FERC | ER05-860 | Whiting Clean Energy | 2005 | Cost Based Power Rates |
| 51 | FERC | ER05-903 | Con. Ed. Energy Mass., Inc. | 2005 | Reliability Must Run Agreement and Rates |
| 52 | FERC | EL02-111, et. al | Midwest ISO Transmission Owners | 2005 | Seams Elimination |
| 53 | FERC | ER05-1050 | AmerGen Energy Company, L.L.C. | 2005 | Reactive power charges |
| 54 | Illinois Commerce Commission | No.05-0597 | Commonwealth Edison Co. | 2005 | Distribution Service Embedded Cost of Service Study |
| 55 | FERC | ER05-1179 | Berkshire Power Company, LLC | 2005 | Reliability Must Run Agreement and Rates |
| 56 | FERC | ER05-1243 | Basin Electric Power Cooperative | 2005 | Revised Transmission Cost of Service |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

**Exh. No. MYS-007**
**Page 6 of 13**

| # | JURISDICTION | CASE OR DOCKET NO. | CLIENT | APPROXIMATE DATE | SUBJECT MATTER |
|---|---|---|---|---|---|
| 57 | FERC | ER05-1304 & ER05-1305 | Mystic I, LLC and Mystic Development, LLC | 2005 | Reliability Must Run Agreement and Rates |
| 58 | FERC | ER05-273 | Midwest ISO Transmission Owners | 2005 | Proper Pricing for Regional Non-firm Redirects |
| 59 | FERC | ER05-515 | PHI and BGE | 2005 | Transmission Formula Rates |
| 60 | FERC | EL05-19 | Southwestern Public Service Company | 2005 | Production rates and Fuel Adjustment Clause, |
| 61 | FERC | ER06-427 | Mystic Development, LLC | 2006 | Reliability Must Run Agreement and Rates |
| 62 | FERC | ER06-822 | Fore River Development, LLC | 2006 | Reliability Must Run Agreement and Rates |
| 63 | FERC | ER06-819 | Consolidated Edison Energy Massachusetts, Inc | 2006 | Reliability Must Run Agreement and Rates |
| 64 | FERC | ER07-169 | Ameren Energy Marketing Company | 2006 | Ancillary service rates |
| 65 | FERC | ER06-1549 | Duquesne Light Company | 2006 | Transmission Formula Rates |
| 66 | FERC | ER07-170 | Ameren Energy, Inc. | 2006 | Ancillary service rates |
| 67 | FERC | ER06-787 | Idaho Power | 2006 & 2007 | Transmission Formula Rates |
| 68 | FERC | ER07-562 | Trans-Allegheny Interstate Line Company | 2007 | Transmission Formula Rates |
| 69 | FERC | ER07-583 | Commonwealth Edison | 2007 | Transmission Formula Rates |

**JA271**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

**Exh. No. MYS-007**
**Page 7 of 13**

| # | JURISDICTION | CASE OR DOCKET NO. | CLIENT | APPROXIMATE DATE | SUBJECT MATTER |
|---|---|---|---|---|---|
| 70 | FERC | ER07-1171 | Arizona Public Service Co. | 2007 | Transmission Formula Rates |
| 71 | Illinois Commerce Commission | No. 07-0566 | Commonwealth Edison Co. | 2007 | Distribution Service Embedded Cost of Service Study |
| 72 | FERC | ER07-1371 | Sierra Pacific Resources | 2007 | Transmission Rates |
| 73 | FERC | ER08-281 | Oklahoma Gas & Electric | 2007 | Transmission Formula Rates |
| 74 | FERC | ER08-313 | Southwestern Public Service | 2007 | Transmission Formula Rates |
| 75 | FERC | ER08-386 | Potomac-Appalachian Transmission Highline, LLC | 2007 | Transmission Formula Rates |
| 76 | FERC | ER08-374 | Atlantic Path 15, LLC | 2007 | Transmission Rates |
| 77 | Illinois Commerce Commission | No. 08-0363 | NICOR Gas Company | 2008 | Distribution Service Embedded Cost of Service Study |
| 78 | FERC | ER08-951 | PSEG Energy Resources & Trade, LLC | 2008 | Reactive Power Charges |
| 79 | FERC | ER08-1233 | Public Service Gas & Electric Company | 2008 | Transmission Formula Rates |
| 80 | FERC | ER08-1457 | PPL Electric Utilities Corp. | 2008 | Transmission Formula Rates |
| 81 | FERC | ER08-1584 | Black Hills Power | 2008 | Transmission Formula Rates |
| 82 | FERC | ER08-1600 | Basin Electric Power Coop | 2008 | Transmission Rates |

**JA272**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**Exh. No. MYS-007**
**Page 8 of 13**

| # | Jurisdiction | Case or Docket No. | Client | Approximate Date | Subject Matter |
|---|---|---|---|---|---|
| 83 | FERC | ER09-36 | Prairie Wind Transmission, LLC | 2008 | Transmission Formula Rates |
| 84 | FERC | ER09-35 | Tallgrass Transmission, LLC | 2008 | Transmission Formula Rates |
| 85 | FERC | ER09-75 | Pioneers Transmission, LLC | 2008 | Transmission Formula Rates |
| 86 | FERC | ER09-255 | Nebraska Public Power District | 2008 | Transmission Formula Rates |
| 87 | FERC | ER09-528 | ITC Great Plains, LLC | 2009 | Transmission Formula Rates |
| 88 | Illinois Commerce Commission | ER08-0532 | Commonwealth Edison Co. | 2009 | Distribution Service Embedded Cost of Service Study |
| 89 | FERC | ER08-370 & EL09-22 | Otter Tail Power Co. | 2009 | Formula Transmission Rate |
| 90 | FERC | ER10-152 | PPL Electric Utilities Corp. | 2009 | Revised Depreciation Method |
| 91 | FERC | ER09-1727 | ALLETE. INC | 2009 | Formula Transmission Rate |
| 92 | FERC | ER10-230 | KCP&L | 2009 | Formula Transmission Rates |
| 93 | FERC | ER10-455 | Ameren Energy Marketing Company | 2009 | Reactive Power Rates |
| 94 | FERC | ER10-516 | SCE&G | 2010 | Formula Transmission Rates |
| 95 | FERC | ER10-962 | Union Electric Company | 2010 | Reactive Power Rates |
| 96 | FERC | ER10-1149 | FP&L | 2010 | Formula Transmission Rates |

**JA273**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**Exh. No. MYS-007**
**Page 9 of 13**

| # | JURISDICTION | CASE OR DOCKET NO. | CLIENT | APPROXIMATE DATE | SUBJECT MATTER |
|---|---|---|---|---|---|
| 97 | FERC | ER10-1418 | Exelon Generation | 2010 | Reliability Must Run |
| 98 | FERC | ER10-1782 | Tampa Electric Company | 2010 | Formula Transmission Rates |
| 99 | FERC | ER10-2061 | Tampa Electric Company | 2010 | Formula Production Rates |
| 100 | FERC | ER11-1955 | Dairyland Power Coop. | 2011 | Reactive Rates |
| 101 | FERC | ER05-6 | MISO Transmission Owners | 2010 | Seams Elimination |
| 102 | FERC | ER11-2127 | Terra Gen Dixie Valley | 2010 | Transmission Rates |
| 103 | FERC | ER09-1148 | PPL Electric Utilities | 2011 | Formula Transmission Rates |
| 104 | FERC | ER11-3643 | PacifiCorp | 2011 | Formula Transmission Rates |
| 105 | FERC | ER11-3826 | Black Hills | 2011 | Transmission Rates |
| 106 | FERC | ER11-3643 | Puget Sound Energy | 2012 | Formula Transmission Rates |
| 107 | FERC | ER12-1378 | CLECO | 2012 | Formula Transmission Rates |
| 108 | FERC | ER12-1593 | DATC | 2012 | Formula Transmission Rates |
| 109 | FERC | ER12-2274 | PSE&G | 2012 | Abandonment Costs |
| 110 | FERC | ER12-2554 | Transource Missouri, LLC | 2012 | Formula Transmission Rate |
| 111 | FERC | ER13-1187 | MidAmerican | 2013 | Depreciation Rates under Formula |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exh. No. MYS-007
Page 10 of 13

| # | Jurisdiction | Case or Docket No. | Client | Approximate Date | Subject Matter |
|---|---|---|---|---|---|
| 112 | FERC | ER13-1207 | PacifiCorp | 2013 | Regulation Service |
| 113 | FERC | EL13-48 | PHI Companies | 2013 | Complaint involving Formula Rates |
| 114 | FERC | ER13-1207 | PacifiCorp | 2013 | Depreciation Rates under Formula |
| 115 | FERC | ER13-1605 | NV Energy | 2013 | Transmission and Ancillary Service Rates |
| 116 | FERC | ER13-782 | ITC | 2013 | Transmission Formula Rate |
| 117 | FERC | ER13-1962 & EL13-76 | AERG/AEM | 2013 | Reliability Must Run |
| 118 | FERC | ER14-108 | Entergy | 2013 | Reactive Power Rates |
| 119 | FERC | ER14-1210 | Illinois Power Marketing Company | 2014 | Reliability Must Run |
| 120 | FERC | ER14-1332 | DATC Path 15, LLC | 2014 | Transmission Cost of Service |
| 121 | FERC | ER14-1382 | Transource Missouri, LLC | 2014 | Transmission Formula |
| 122 | FERC | ER14-1425 | Cheyenne L, F & P | 2014 | Transmission Rates |
| 123 | FERC | ER14-1661 | MidAmerican Central California Transco, LLC | 2014 | Transmission Formula |
| 124 | FERC | ER14-1956 | Panther Creek Power Operating, LLC | 2014 | Reactive Power Rates |
| 125 | FERC | ER14-1969 | Public Service Company of Colorado | 2014 | Ancillary Services for Intermittent Resources |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

**Exh. No. MYS-007**
**Page 11 of 13**

| # | Jurisdiction | Case or Docket No. | Client | Approximate Date | Subject Matter |
|---|---|---|---|---|---|
| 126 | FERC | ER14-2502 | Entergy Power, LLC EAM Nelson Holding, LLC | 2014 | Reactive Power Rates |
| 127 | FERC | ER14-2619 | Illinois Power Marketing Company | 2014 | Reliability Must Run |
| 128 | FERC | ER14-2718 | Illinois Power Marketing Company | 2014 | Reliability Must Run |
| 129 | FERC | ER14-2751 & ER14-2752 | Xcel Energy Transmission Development Company, LLC and Xcel Energy Southwest Transmission Company, LLC | 2014 | Transmission Formula |
| 130 | FERC | ER15-13 | Transource Wisconsin, Inc. | 2014 | Transmission Formula |
| 131 | FERC | ER15-279 | Nebraska Public Power District | 2014 | Transmission Cost of Service |
| 132 | FERC | ER15-572 | New York Transco, LLC | 2015 | Transmission Formula |
| 133 | FERC | ER15-948 | Illinois Power Marking Company | 2015 | Reliability Must Run |
| 134 | FERC | ER15-958 | Transource Kansas, LLC | 2015 | Transmission Formula |
| 135 | FERC | ER15-949 | Southwestern Public Service Co. | 2015 | Demand Allocator |
| 136 | FERC | ER15-1047 | R.E. Ginna Nuclear Power Plant, LLC | 2015 | Reliability Support Services Agreement |
| 137 | FERC | ER15-1510 | First Energy Solutions Corp. | 2015 | Reactive Power Rates |
| 138 | FERC | EL15-51 | City Water and Light Plant of The City of Jonesboro | 2015 | Reactive Power Rates |
| 139 | FERC | ER15-1682 | TransCanyon DCR, LLC | 2015 | Transmission Formula |
| 140 | FERC | ER15-1719 | R.E. Ginna Nuclear Power Plant, LLC | 2015 | Reliability Support Services Agreement |
| 141 | FERC | ER15-1775 | Basin Electric Power Coop | 2015 | Transmission Formula |
| 142 | FERC | ER15-1809 | ATX Southwest, LLC | 2015 | Transmission Formula |

**JA276**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

**Exh. No. MYS-007**
**Page 12 of 13**

| # | JURISDICTION | CASE OR DOCKET NO. | CLIENT | APPROXIMATE DATE | SUBJECT MATTER |
|---|---|---|---|---|---|
| 143 | FERC | ER15-2102 | New York Power Authority | 2015 | Transmission Formula |
| 144 | FERC | ER15-2239 | NextEra Energy Transmission West, LLC | 2015 | Transmission Formula |
| 145 | FERC | ER15-2426 | Northern Indiana Public Service Co. | 2015 | Reactive Power Rates |
| 146 | FERC | ER15-2594 | South Central MCN LLC | 2015 | Transmission Formula |
| 147 | FERC | EL16-17 | City of West Memphis | 2015 | Reactive Power Rates |
| 148 | FERC | EL16-18 | Conway Corporation | 2015 | Reactive Power Rates |
| 149 | FERC | ER16-200 & 201 | Duke Energy Indiana, Inc. | 2015 | Reactive Power Rates |
| 150 | FERC | EL16-14 | Indiana Municipal Power Agency | 2015 | Reactive Power Rates |
| 151 | FERC | ER16-444 | Wabash Valley Power Association, Inc. | 2015 | Reactive Power Rates |
| 152 | FERC | ER16-835 | New York Power Authority | 2015 | Transmission Formula |
| 153 | FERC | EL15-85 | New Hampshire Transmission LLC | 2016 | Formula Rates |
| 154 | FERC | ER16-1832 | Entergy Louisiana, LLC | 2016 | Reactive Power Rates |
| 155 | FERC | ER16-2298 | Duke Energy Kentucky, Inc. | 2016 | Reactive Power Rates |
| 156 | FERC | ER16-2716 | NextEra Energy Transmission, MidAtlantic, LLC | 2016 | Transmission Formula |
| 157 | FERC | ER16-2717 | NextEra Energy Transmission, Midwest, LLC | 2016 | Transmission Formula |
| 158 | FERC | ER16-2719 | NextEra Energy Transmission, New York, Inc | 2016 | Transmission Formula |
| 159 | FERC | ER16-2720 | NextEra Energy Transmission, Southwest, LLC | 2016 | Transmission Formula |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

**Exh. No. MYS-007**
**Page 13 of 13**

| # | JURISDICTION | CASE OR DOCKET NO. | CLIENT | APPROXIMATE DATE | SUBJECT MATTER |
|---|---|---|---|---|---|
| 160 | FERC | ER17-441 | Black Hills, PRECorp Power Cooperative | 2016 | Transmission Rates |
| 160 | FERC | ER17-706 | GridLiance West Transco LLC | 2016 | Transmission Formula |
| 161 | FERC | ER17-802, et. al | Exelon Generation, LLC, et. al | 2017 | Reactive Power Rates |
| 162 | FERC | ER17-998 | DATC Path -15 | 2017 | Transmission Rates |
| 163 | FERC | ER17-1518 | CLECO | 2017 | Reactive Power Rates |
| 164 | FERC | ER17-1519 | PECO Energy Company | 2017 | Formula Transmission Rates |
| 165 | FERC | ER17-1730 | Entergy | 2017 | Reactive Power Rates |
| 166 | FERC | ER17-1731 | Entergy | 2017 | Reactive Power Rates |
| 167 | FERC | ER18-829 | Wisconsin Electric Power Company | 2018 | Reactive Power Rates |
| 168 | FERC | ER18-1222 | PSEG Energy Resources and Trade, LLC | 2018 | Reactive Power Rates |

## <u>Exhibit No. MYS-008</u>

## Cost-of-Service Study

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 1 of 22

**Mystic 8 & 9**
**Summary Revenue Requirement**

Schedule A
Page 1

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Summary of Results | | | | | | | | | | |
| 1 | Electric Plant in Service | 1,021,103,969 | 1,031,126,969 | 1,052,135,969 | 1,061,185,969 | 1,087,438,969 | 1,099,438,969 | 1,099,438,969 | 1,099,438,969 | 1,099,438,969 | Schedule C |
| 2 | Depreciation Reserve | 167,698,415 | 201,503,891 | 236,033,814 | 270,886,952 | 306,712,422 | 342,999,431 | 379,286,440 | 415,573,449 | 451,860,457 | Schedule C |
| 3 | Net Plant | 853,405,553 | 829,623,078 | 816,102,155 | 790,299,017 | 780,726,546 | 756,439,537 | 720,152,529 | 683,865,520 | 647,578,511 | Sum lines 1 & 2 |
| 4 | Accum. Deferred Inc. Taxes  (Accts. 281, 282, 283) | (94,286,517) | (95,968,191) | (100,489,308) | (101,799,304) | (107,679,209) | (109,546,867) | (108,118,056) | (106,685,074) | (105,250,338) | Schedule D |
| 5 | Accum. Deferred ITC -- Acct. 255 | | | | | | | | - | | Schedule D |
| 6 | Other Subtractive Adjust. | | | | | | | | | | Schedule D |
| 7 | Total Subtractive Adjustments | (94,286,517) | (95,968,191) | (100,489,308) | (101,799,304) | (107,679,209) | (109,546,867) | (108,118,056) | (106,685,074) | (105,250,338) | Sum lines 4-6 |
| 8 | Materials and Supplies | 20,503,410 | 21,035,995 | 21,541,395 | 22,079,930 | 22,631,928 | 23,197,726 | 23,777,669 | 24,372,111 | 24,981,414 | Schedule D |
| 9 | Prepayments | 524,242 | 524,242 | 524,242 | 524,242 | 524,242 | 524,242 | 524,242 | 524,242 | 524,242 | Schedule D |
| 10 | One eighth O&M (excluding Fuel & PP) | 5,386,698 | 5,521,365 | 5,659,399 | 5,800,884 | 5,945,906 | 7,388,001 | 6,582,429 | 6,746,989 | 6,915,664 | 1/8 O&M and A&G |
| 11 | Cash working capital | 26,414,350 | 27,061,602 | 27,725,036 | 28,405,056 | 29,102,076 | 31,109,969 | 30,884,340 | 31,643,343 | 32,421,320 | Sum lines 8-10 |
| 12 | Rate Base | 785,533,386 | 760,716,489 | 743,337,883 | 716,904,769 | 702,149,413 | 678,002,639 | 642,918,812 | 608,823,789 | 574,749,494 | Sum lines 3, 7 & 11 |
| 13 | Production O&M | 34,648,166 | 35,514,370 | 36,402,229 | 37,312,285 | 38,245,092 | 49,548,794 | 42,865,337 | 43,936,970 | 45,035,394 | Schedule E |
| 14 | Corporate Admin & General | 8,445,414 | 8,656,550 | 8,872,963 | 9,094,787 | 9,322,157 | 9,555,211 | 9,794,091 | 10,038,944 | 10,289,917 | Schedule F |
| 15 | Total O&M Expense | 43,093,580 | 44,170,920 | 45,275,193 | 46,407,072 | 47,567,249 | 59,104,005 | 52,659,428 | 53,975,914 | 55,325,312 | Sum lines 13 & 14 |
| 16 | Production | 33,471,375 | 33,805,475 | 34,529,923 | 34,853,138 | 35,825,471 | 36,287,009 | 36,287,009 | 36,287,009 | 36,287,009 | Schedule G |
| 17 | Total Depreciation Expense | 33,471,375 | 33,805,475 | 34,529,923 | 34,853,138 | 35,825,471 | 36,287,009 | 36,287,009 | 36,287,009 | 36,287,009 | Line 3 |
| 18 | Other Taxes | 9,307,629 | 9,307,629 | 9,307,629 | 9,307,629 | 9,307,629 | 15,500,445 | 15,500,445 | 15,500,445 | 15,500,445 | Schedule H |
| 19 | Total Taxes Other than Income | 9,307,629 | 9,307,629 | 9,307,629 | 9,307,629 | 9,307,629 | 15,500,445 | 15,500,445 | 15,500,445 | 15,500,445 | Line 18 |
| 20 | After Tax Rate of Return | 66,459,267 | 64,359,658 | 62,889,358 | 60,653,011 | 59,404,649 | 57,361,735 | 54,393,503 | 51,508,928 | 48,626,106 | Line 12 * Schedule B, line 4 |
| 21 | Tax on equity | 20,382,796 | 19,738,855 | 19,287,920 | 18,602,041 | 18,219,173 | 17,592,619 | 16,682,274 | 15,797,586 | 14,913,436 | Line 12 * Schedule B, line 5 |
| 22 | Pre-tax cost of capital | 86,842,063 | 84,098,513 | 82,177,278 | 79,255,052 | 77,623,822 | 74,954,355 | 71,075,777 | 67,306,514 | 63,539,542 | Sum lines 20 & 21 |
| 23 | Gross Revenue Requirement | 172,714,648 | 171,382,537 | 171,290,023 | 169,822,891 | 170,324,171 | 185,845,814 | 175,522,660 | 173,069,882 | 170,652,308 | Sum lines 15, 17, 19 & 22 |
| 24 | Revenue Credit | | | | | | | | | - | Schedule I |
| 25 | Current Year CapEx | | | | | | 29,282,629 | 19,553,123 | 1,044,827 | | Schedule C, page 1, line 9 |
| 26 | Revenue Requirement  (Without Current Year CapEx) | 172,714,648 | 171,382,537 | 171,290,023 | 169,822,891 | 170,324,171 | 185,845,814 | 175,522,660 | 173,069,882 | 170,652,308 | Line 23 less line 24 & plus line 25 |
| 27 | Monthly Revenue Requirement  (Without Current Year CapEx) | 14,392,887 | 14,281,878 | 14,274,169 | 14,151,908 | 14,193,681 | 15,487,151 | 14,626,888 | 14,422,490 | 14,221,026 | Line 26 / 12 |
| 28 | Monthly Revenue Requirement  (With Current Year CapEx) | 14,392,887 | 14,281,878 | 14,274,169 | 14,151,908 | 14,193,681 | 19,670,384 | 16,256,315 | 14,631,456 | 14,221,026 | |
| 29 | Annual Revenue Requirement (with Current Year CapEx) | 172,714,648 | 171,382,537 | 171,290,023 | 169,822,891 | 170,324,171 | 215,128,443 | 195,075,783 | 174,114,709 | 170,652,308 | |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

**Mystic 8 & 9**
**Cost of Capital**                                                                                           **Schedule B**
                                                                                                             **Page 1**

| Line No. | Description | $ Millions | | | |
|---|---|---|---|---|---|
| 1 | Long-term Debt | 32.7 | 32.7% | 4.76% | 1.56% |
| 2 | Preferred Stock | - | 0.0% | 0.00% | 0.00% |
| 3 | Common Equity | 67.3 | 67.3% | 10.26% | 6.90% |
| 4 | After Tax Rate of Return | 100.0 | 100.0% | | 8.46% |
| 5 | Tax on equity    ln 9 / (1 - ln 9) * (ln 2 + ln3) | | | | 2.59% |
| 6 | Pre-tax cost of capital | | | | 11.06% |
| | | | | | |
| | Income tax rates: | | | | |
| 7 | State | 8.00% | | | |
| 8 | Federal | 21.00% | | | |
| 9 | Effective | 27.320% | ln 7 + ln 8 - (ln 7 * ln 8) | | |

**JA281**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 3 of 22

**Mystic 8 & 9**
**Net Plant**

Schedule C
Page 1

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Electric Plant in Service | | | | | | | | | | |
| 1 | Production Plant | 1,021,103,969 | 1,031,126,969 | 1,052,135,969 | 1,061,185,969 | 1,087,438,969 | 1,099,438,969 | 1,099,438,969 | 1,099,438,969 | 1,099,438,969 | WP-1 |
| 2 | Gross Electric Plant in Service | 1,021,103,969 | 1,031,126,969 | 1,052,135,969 | 1,061,185,969 | 1,087,438,969 | 1,099,438,969 | 1,099,438,969 | 1,099,438,969 | 1,099,438,969 | |
| | Depreciation Reserve | | | | | | | | | | |
| 3 | Production Plant | 167,698,415 | 201,503,891 | 236,033,814 | 270,886,952 | 306,712,422 | 342,999,431 | 379,286,440 | 415,573,449 | 451,860,457 | WP-1 $ Schedule G |
| 4 | Total Depreciation Reserve | 167,698,415 | 201,503,891 | 236,033,814 | 270,886,952 | 306,712,422 | 342,999,431 | 379,286,440 | 415,573,449 | 451,860,457 | |
| | Net Electric Plant | | | | | | | | | | |
| 5 | | | | | | | | | | | |
| 6 | Production Plant | 853,405,553 | 829,623,078 | 816,102,155 | 790,299,017 | 780,726,546 | 756,439,537 | 720,152,529 | 683,865,520 | 647,578,511 | Line 2 - line 4 |
| 7 | Net Electric Plant in Service | 853,405,553 | 829,623,078 | 816,102,155 | 790,299,017 | 780,726,546 | 756,439,537 | 720,152,529 | 683,865,520 | 647,578,511 | |
| 8 | CapEx included in the rates | | 10,023,000 | 21,009,000 | 9,050,000 | 26,253,000 | 12,000,000 | | | | |
| 9 | Current Year CapEx | | | | | | 29,282,629 | 19,553,123 | 1,044,827 | | |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 4 of 22

**Mystic 8 & 9**
**Rate Base Adjustments**
102.5%

**Schedule D**
Page 1 of 2

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Accumulated Deferred Income Taxes | (94,286,517) | (95,968,191) | (100,489,308) | (101,799,304) | (107,679,209) | (109,546,867) | (108,118,056) | (106,685,074) | (105,250,338) | |
| 2 | Investment Tax Credits | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 3 | total Subtractive Adjustments | (94,286,517) | (95,968,191) | (100,489,308) | (101,799,304) | (107,679,209) | (109,546,867) | (108,118,056) | (106,685,074) | (105,250,338) | |
| 4 | Materials and Supplies | 20,503,410 | 21,015,995 | 21,541,395 | 22,079,930 | 22,631,928 | 23,197,726 | 23,777,669 | 24,372,111 | 24,981,414 | WP-2 |
| 5 | Prepayments | 524,242 | 524,242 | 524,242 | 524,242 | 524,242 | 524,242 | 524,242 | 524,242 | 524,242 | WP-3 |
| 6 | Total Additive Adjustments | 21,027,652 | 21,540,237 | 22,065,637 | 22,604,172 | 23,156,170 | 23,721,968 | 24,301,912 | 24,896,353 | 25,505,656 | |

**JA283**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 5 of 22

**Mystic 8 & 9**
**Rate Base Adjustments**
**ADIT**

Schedule D
Page 2 of 2

| | Tax Basis 2016 | 2017 Additions | Subtotal | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Tax Depreciation | | | | | | | |
| 1 Mystic 8 | 96,051,805 | 3,305,914 | 99,357,719 | 10,325,396 | 6,831,882 | 7,286,468 | 7,900,454 | 8,473,451 | 8,552,036 | 8,529,704 | 8,528,187 | 8,525,301 |
| 2 Mystic 8&9 | 247,117,815 | | 247,117,815 | 9,839,244 | 9,430,238 | 9,343,564 | 9,321,840 | 9,301,203 | 9,291,493 | 9,282,707 | 9,281,781 | 9,281,343 |
| 3 Mystic 9 | 191,706,258 | 14,496,318 | 206,202,576 | 26,436,417 | 13,482,469 | 13,265,118 | 13,223,528 | 13,189,310 | 13,157,199 | 13,123,552 | 13,110,719 | 13,107,639 |
| 4 Mystic Common | 2,555,410 | | 2,555,410 | 203,094 | 205,857 | 185,799 | 162,169 | 139,314 | 130,432 | 128,968 | 128,975 | 128,959 |
| | | | | | Tax Basis | | | | | | | |
| 5 Mystic 8 | | | | 89,032,322 | 82,200,441 | 74,913,973 | 67,013,519 | 58,540,068 | 49,988,032 | 41,458,329 | 32,930,142 | 24,404,841 |
| 6 Mystic 8&9 | | | | 237,278,571 | 227,848,333 | 218,504,769 | 209,182,929 | 199,881,726 | 190,590,234 | 181,307,526 | 172,025,745 | 162,744,402 |
| 7 Mystic 9 | | | | 179,766,159 | 166,283,689 | 153,018,571 | 139,795,043 | 126,605,733 | 113,448,534 | 100,324,982 | 87,214,263 | 74,106,624 |
| 8 Mystic Common | | | | 2,352,316 | 2,146,460 | 1,960,660 | 1,798,491 | 1,659,177 | 1,528,744 | 1,399,776 | 1,270,801 | 1,141,841 |
| 9 Mystic 8&9 Share of common | 0.939278261 | | | 2,209,480 | 2,016,123 | 1,841,606 | 1,689,284 | 1,558,429 | 1,435,916 | 1,314,779 | 1,193,635 | 1,072,507 |
| 10 Mystic 8&9 | Sum lines 5-7 & 9 | | | 508,286,532 | 478,348,586 | 448,278,919 | 417,680,775 | 386,585,956 | 355,462,717 | 324,405,616 | 293,363,785 | 262,328,374 |
| | | | | | Book Basis | | | | | | | |
| 11 Mystic | 33,471,375 | | | 853,405,553 | 819,934,178 | 786,462,803 | 752,991,428 | 719,520,052 | 686,048,677 | 652,577,302 | 619,105,927 | 585,634,552 |
| 12 Book Tax Difference | | | | (345,119,022) | (341,585,592) | (338,183,884) | (335,310,653) | (332,934,096) | (330,585,961) | (328,171,686) | (325,742,142) | (323,306,178) |
| Temporary Differences | | | | (345,119,022) | (341,585,592) | (338,183,884) | (335,310,653) | (332,934,096) | (330,585,961) | (328,171,686) | (325,742,142) | (323,306,178) |
| Tax CIT | 27.320% | | | (94,286,517) | (93,321,184) | (92,391,837) | (91,606,870) | (90,957,595) | (90,316,084) | (89,656,505) | (88,992,753) | (88,327,248) |

**Mystic 8&9 Capital Spend ($s)**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| For COS Workbook Modeling | 10,023,000 | 21,009,000 | 9,050,000 | 26,253,000 | 12,000,000 | | | 0 |

**Depreciation Adjustments**

Book Depreciation

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 2018 Capital | 334,100 | 334,100 | 334,100 | 334,100 | 334,100 | 334,100 | 334,100 | 334,100 |
| 2019 Capital | | 724,448 | 724,448 | 724,448 | 724,448 | 724,448 | 724,448 | 724,448 |
| 2020 Capital | | | 323,214 | 323,214 | 323,214 | 323,214 | 323,214 | 323,214 |
| 2021 Capital | | | | 972,333 | 972,333 | 972,333 | 972,333 | 972,333 |
| 2022 Capital | | | | | 461,538 | 461,538 | 461,538 | 461,538 |
| 2023 Capital | | | | | | | | |
| 2024 Capital | | | | | | | | |
| Total Book Depreciation Adder | 334,100 | 1,058,548 | 1,381,763 | 2,354,096 | 2,815,634 | 2,815,634 | 2,815,634 | 2,815,634 |
| Net Book Basis Adder | 9,688,900 | 29,639,352 | 37,307,589 | 61,206,494 | 70,390,860 | 67,575,226 | 64,759,593 | 61,943,959 |

Tax Depreciation

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| Bonus | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 0.800 | 0.600 |
| 20-Yr MACrs | 0.038 | 0.072 | 0.067 | 0.062 | 0.057 | 0.053 | 0.049 | |
| 2018 Capital | 10,023,000 | | | | | | | |
| 2019 Capital | | 21,009,000 | | | | | | |
| 2020 Capital | | | 9,050,000 | | | | | |
| 2021 Capital | | | | 26,253,000 | | | | |
| 2022 Capital | | | | | 12,000,000 | | | |
| 2023 Capital | | | | | | | | |
| 2024 Capital | | | | | | | | |
| Total Tax Depreciation Adder | 10,023,000 | 21,009,000 | 9,050,000 | 26,253,000 | 12,000,000 | - | - | - |
| Net Tax Basis Adder | - | | | | | | | |

| | | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|
| Tax Rate | 27.320% COS-specific | | | | | | | | |
| ADIT CapEx | | 2,647,007 | 8,097,471 | 10,192,433 | 16,721,614 | 19,230,783 | 18,461,552 | 17,692,321 | 16,923,090 |
| Total With CapEx | (94,286,517) | (95,968,191) | (100,489,308) | (101,799,304) | (107,679,209) | (109,546,867) | (108,118,056) | (106,685,074) | (105,250,338) |

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 6 of 22

**Mystic 8 & 9**
**Operation and Maintenance Expense**
102.5%

Schedule E

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Base Payroll | 6,333,235 | 6,491,566 | 6,653,855 | 6,820,201 | 6,990,706 | 7,165,474 | 7,344,611 | 7,528,226 | 7,716,432 | WP-4 |
| 2 | Overtime | 2,266,656 | 2,323,323 | 2,381,406 | 2,440,941 | 2,501,964 | 2,564,513 | 2,628,626 | 2,694,342 | 2,761,701 | WP-4 |
| 3 | Other Premium | 53,319 | 54,652 | 56,019 | 57,419 | 58,855 | 60,326 | 61,834 | 63,380 | 64,964 | WP-4 |
| 4 | Staff Augmentation | 1,387 | 1,421 | 1,457 | 1,493 | 1,531 | 1,569 | 1,608 | 1,648 | 1,690 | WP-4 |
| 5 | Fringe Benefits | 1,024,860 | 1,050,682 | 1,076,744 | 1,103,662 | 1,131,254 | 1,159,535 | 1,188,524 | 1,218,237 | 1,248,693 | WP-4 |
| 6 | Severance | 9,032 | 9,258 | 9,490 | 9,727 | 9,970 | 10,219 | 10,475 | 10,737 | 11,005 | WP-4 |
| 7 | Labor | 9,688,490 | 9,930,702 | 10,178,969 | 10,433,444 | 10,694,280 | 10,961,637 | 11,235,678 | 11,516,569 | 11,804,484 | WP-4 |
| 8 | Incentive | 968,632 | 992,848 | 1,017,669 | 1,043,111 | 1,069,188 | 1,095,918 | 1,123,316 | 1,151,399 | 1,180,184 | WP-4 |
| 9 | Stock Compensation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | WP-4 |
| 10 | Pension and OPEB | 649,871 | 666,118 | 682,771 | 699,840 | 717,336 | 735,270 | 753,651 | 772,493 | 791,805 | WP-4 |
| 11 | Labor Other | 1,618,503 | 1,658,966 | 1,700,440 | 1,742,951 | 1,786,525 | 1,831,188 | 1,876,968 | 1,923,892 | 1,971,989 | WP-4 |
| 12 | Contracting - Operations | 15,977,192 | 16,376,622 | 16,786,037 | 17,205,688 | 17,635,830 | 18,076,726 | 18,528,644 | 18,991,860 | 19,466,657 | WP-4 |
| 13 | Contracting-Non-Operations | 1,034,901 | 1,060,773 | 1,087,293 | 1,114,475 | 1,142,337 | 1,170,895 | 1,200,168 | 1,230,172 | 1,260,926 | WP-4 |
| 14 | Contracting - Outsourced | 781,676 | 801,218 | 821,249 | 841,780 | 862,825 | 884,395 | 906,505 | 929,168 | 952,397 | WP-4 |
| 15 | Materials | 2,971,497 | 3,045,785 | 3,121,929 | 3,199,977 | 3,279,977 | 3,361,976 | 3,446,026 | 3,532,176 | 3,620,481 | WP-4 |
| 16 | Contracting & Materials | 20,765,266 | 21,284,398 | 21,816,508 | 22,361,921 | 22,920,969 | 23,493,993 | 24,081,343 | 24,683,376 | 25,300,461 | WP-4 |
| 17 | Licensing and Telecom | 61,313 | 62,846 | 64,417 | 66,028 | 67,678 | 69,370 | 71,104 | 72,882 | 74,704 | WP-4 |
| 18 | Regulatory Fees/Permits | 29,462 | 30,199 | 30,954 | 31,727 | 32,521 | 33,334 | 34,167 | 35,021 | 35,897 | WP-4 |
| 19 | Transportation/ Fleet Serv | 5,641 | 5,782 | 5,927 | 6,075 | 6,227 | 6,382 | 6,542 | 6,705 | 6,873 | WP-4 |
| 20 | Facilities, Rentals, Utils | 1,255,648 | 1,287,039 | 1,319,215 | 1,352,196 | 1,386,000 | 1,420,651 | 1,456,167 | 1,492,571 | 1,529,885 | WP-4 |
| 21 | Office Expense | 162,214 | 166,269 | 170,426 | 174,687 | 179,054 | 183,530 | 188,118 | 192,821 | 197,642 | WP-4 |
| 22 | Charity / Contributions | 30,203 | 30,958 | 31,732 | 32,525 | 33,338 | 34,172 | 35,026 | 35,902 | 36,799 | WP-4 |
| 23 | Lobbying | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | WP-4 |
| 24 | Memberships/ Dues & Subscr | 7,396 | 7,581 | 7,771 | 7,965 | 8,164 | 8,368 | 8,577 | 8,792 | 9,011 | WP-4 |
| 25 | Seminars and Training | 47,982 | 49,181 | 50,411 | 51,671 | 52,963 | 54,287 | 55,644 | 57,035 | 58,461 | WP-4 |
| 26 | Asset Impairment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | WP-4 |
| 27 | CIAC / CIAM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | WP-4 |
| 28 | Other Expenses | 293,520 | 300,858 | 308,379 | 316,089 | 323,991 | 332,091 | 340,393 | 348,903 | 357,626 | WP-4 |
| 29 | Allowances / Bad Debt | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | WP-4 |
| 30 | Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | WP-4 |
| 31 | Travel & Entertainment | 402,368 | 412,427 | 422,738 | 433,306 | 444,139 | 455,242 | 466,623 | 478,289 | 490,246 | WP-4 |
| 32 | Accretion Expense | 230,863 | 236,634 | 242,550 | 248,614 | 254,829 | 261,200 | 267,730 | 274,423 | 281,284 | WP-4 |
| 33 | Business Srvs Contracted Srvs | (63,302) | (64,885) | (66,507) | (68,169) | (69,874) | (71,621) | (73,411) | (75,246) | (77,127) | WP-4 |
| 34 | EDSS Contracted Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | WP-4 |

**JA285**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 7 of 22

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 35 | Intercompany Oper Costs | 1,348 | 1,382 | 1,417 | 1,452 | 1,488 | 1,525 | 1,564 | 1,603 | 1,643 | WP-4 |
| 36 | Intercompany Operating Costs | 1,348 | 1,382 | 1,417 | 1,452 | 1,488 | 1,525 | 1,564 | 1,603 | 1,643 | WP-4 |
| 37 | O&M Non-Consolidated Affiliate | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | WP-4 |
| 38 | Codeblock Map Error | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | WP-4 |
| 39 | Other O&M | 2,575,907 | 2,640,304 | 2,706,312 | 2,773,970 | 2,843,319 | 2,914,402 | 2,987,262 | 3,061,944 | 3,138,492 | WP-4 |
| 39a | NERC-CIP | | | | | | 10,347,575 | 2,684,087 | 2,751,189 | 2,819,969 | |
| 40 | O&M | 34,648,166 | 35,514,370 | 36,402,229 | 37,312,285 | 38,245,092 | 49,548,794 | 42,865,337 | 43,936,970 | 45,035,394 | |

JA286

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 8 of 22

**Mystic 8 & 9**
**Corporate Administration and General Expense**
1.025

Schedule F
Page 1

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Source |
|----------|-------------|------|------|------|------|------|------|------|------|------|--------|
| 1 | Corporate Administration and General Expense | 8,445,414 | 8,656,550 | 8,872,963 | 9,094,787 | 9,322,157 | 9,555,211 | 9,794,091 | 10,038,944 | 10,289,917 | WP-6 |

**JA287**

USCA Case #20-1343    Document #1935613    Filed: 02/17/2022    Page 303 of 580

Exhibit No. MYS-008
Page 9 of 22

**Mystic 8 & 9**
**Depreciation**

Schedule G
Page 1

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Depreciation Expense Existing Plant | 33,471,375 | 33,471,375 | 33,471,375 | 33,471,375 | 33,471,375 | 33,471,375 | 33,471,375 | 33,471,375 | 33,471,375 | WP-4 |
| 2 | CapEx Depreciation | | 334,100 | 1,058,548 | 1,381,763 | 2,354,096 | 2,815,634 | 2,815,634 | 2,815,634 | 2,815,634 | Schedule D, Page 2 |
| 3 | Total Depreciation Exp | 33,471,375 | 33,805,475 | 34,529,923 | 34,853,138 | 35,825,471 | 36,287,009 | 36,287,009 | 36,287,009 | 36,287,009 | |

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 10 of 22

**Mystic 8 & 9**
**Other Taxes**

Schedule H
Page 1

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Source |
|----------|-------------|------|------|------|------|------|------|------|------|------|--------|
| 1 | Taxes Other than Income Taxes | 9,307,629 | 9,307,629 | 9,307,629 | 9,307,629 | 9,307,629 | 15,500,445 | 15,500,445 | 15,500,445 | 15,500,445 | WP-4 |

Note: Mystic 7 and the Jet will be retired by 2022 and the property tax amount will not change

**JA289**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 11 of 22

**Mystic 8 & 9**
**Revenue Credits**

**Schedule I**
Page 1

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|----------|-------------|------|------|------|------|------|------|------|------|------|
| 1 | Revenue Credits | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Revenue will be credited as received

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

<div align="right">Exhibit No. MYS-008<br>Page 12 of 22</div>

**Mystic 8 & 9**
**Salaries and Wages Allocator**                           **Schedule J**
                                                            Page 1

| Line No. | Description | Mystic 8 & 9 | |
|---|---|---|---|
| 1 | Mystic 8 & 9 Gross Plant | 1,021,103,969 | WP-1 |
| 2 | Mystic Gross Plant | 1,087,115,513 | WP-1 |
| 3 | Gross Plant Allocator | 93.9% | |
| | | | |
| 4 | Mystic Labor | 10,657,122 | WP-4 Page 1 |
| 5 | Fleet Labor | 146,162,113 | WP-6 |
| 6 | Mystic Gross Plant Allocator | 93.9% | |
| 7 | Mystic 8 & 9 Labor for Fleet | 7.29% | |

**JA291**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 13 of 22

**Everett**
**Summary Revenue Requirement**

Schedule K
Page 1

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Summary of Results | | | | | | | | | | |
| 1 | Electric Plant in Service | 60,000,000 | 65,100,000 | 73,625,000 | 83,900,000 | 93,075,000 | 94,075,000 | 94,075,000 | 94,075,000 | 94,075,000 | Schedule K, Page 3 |
| 2 | Depreciation Reserve | - | (2,170,000) | (4,633,966) | (7,464,895) | (10,635,640) | (13,844,847) | (17,054,053) | (20,263,260) | (23,472,466) | Schedule K, Page 3 |
| 3 | Net Plant | 60,000,000 | 62,930,000 | 68,991,034 | 76,435,105 | 82,439,360 | 80,230,153 | 77,020,947 | 73,811,740 | 70,602,534 | Sum lines 1 & 2 |
| 4 | Accum. Deferred Inc. Taxes (Accts. 281, 282, 283) | (68,300) | (1,415,176) | (4,254,389) | (7,382,603) | (10,035,499) | (10,368,419) | (10,357,981) | (10,282,467) | (10,146,958) | Schedule K, Page 4 |
| 5 | Accum. Deferred ITC – Acct. 255 | - | - | - | - | - | - | - | - | - | Schedule K, Page 4 |
| 6 | Other Subtractive Adjust. | - | - | - | - | - | - | - | - | - | Schedule K, Page 4 |
| 7 | Total Subtractive Adjustments | (68,300) | (1,415,176) | (4,254,389) | (7,382,603) | (10,035,499) | (10,368,419) | (10,357,981) | (10,282,467) | (10,146,958) | Sum lines 4-6 |
| 8 | Materials and Supplies | 7,314,327 | 7,497,185 | 7,684,615 | 7,876,730 | 8,073,648 | 8,275,490 | 8,482,377 | 8,694,436 | 8,911,797 | Schedule K, Page 4 |
| 8a | Fuel Inventory | - | - | 15,729,563 | 15,729,563 | 15,729,563 | 15,729,563 | 15,729,563 | 15,729,563 | 15,729,563 | Schedule K, Page 4 |
| 9 | Prepayments | 508,727 | 508,727 | 508,727 | 508,727 | 508,727 | 508,727 | 508,727 | 508,727 | 508,727 | Schedule K, Page 4 |
| 10 | One eighth O&M (excluding Fuel & PP) | 6,004,965 | 6,155,089 | 6,254,592 | 6,357,978 | 6,463,920 | 6,572,482 | 6,683,729 | 6,797,729 | 6,912,580 | 1/8 O&M and A&G |
| 10a | CWC - Fuel Lag | - | - | - | - | - | 11,407,409 | 11,407,409 | 11,407,409 | 11,407,409 | |
| 11 | Cash working capital | 13,828,019 | 14,161,001 | 30,177,497 | 30,472,998 | 30,775,858 | 42,493,670 | 42,811,805 | 43,137,864 | 43,470,076 | Sum lines 8-10 |
| 12 | Rate Base | 73,759,719 | 75,675,825 | 94,914,142 | 99,525,500 | 103,179,719 | 112,355,405 | 109,474,771 | 106,667,138 | 103,925,652 | Sum lines 3, 7 & 11 |
| 13 | Production O&M | 39,818,588 | 40,814,053 | 41,399,410 | 42,010,560 | 42,636,765 | 43,278,397 | 43,935,841 | 44,609,490 | 45,283,989 | Schedule K, Page 5 |
| 14 | Corporate Admin & General | 8,221,132 | 8,426,661 | 8,637,327 | 8,853,260 | 9,074,592 | 9,301,457 | 9,533,993 | 9,772,343 | 10,016,651 | Schedule K, Page 6 |
| 15 | Total O&M Expense | 48,039,720 | 49,240,713 | 50,036,737 | 50,863,821 | 51,711,357 | 52,579,854 | 53,469,834 | 54,381,833 | 55,300,640 | Sum lines 13 & 14 |
| 16 | Production | 2,000,000 | 2,170,000 | 2,463,966 | 2,830,930 | 3,170,745 | 3,209,207 | 3,209,207 | 3,209,207 | 3,209,207 | Schedule K, Page 7 |
| 17 | Total Depreciation Expense | 2,000,000 | 2,170,000 | 2,463,966 | 2,830,930 | 3,170,745 | 3,209,207 | 3,209,207 | 3,209,207 | 3,209,207 | Line 16 |
| 18 | Other Taxes | 6,829,312 | 7,000,045 | 7,175,046 | 7,354,422 | 7,538,283 | 7,726,740 | 7,919,908 | 8,117,906 | 8,320,854 | Schedule K, Page 8 |
| 19 | Total Taxes Other than Income | 6,829,312 | 7,000,045 | 7,175,046 | 7,354,422 | 7,538,283 | 7,726,740 | 7,919,908 | 8,117,906 | 8,320,854 | Line 18 |
| 20 | After Tax Rate of Return | 6,240,367 | 6,402,478 | 8,030,116 | 8,420,255 | 8,729,417 | 9,505,717 | 9,262,004 | 9,024,467 | 8,792,526 | Line 12 * Schedule K, Page 2, line 4 |
| 21 | Tax on equity | 1,913,896 | 1,963,615 | 2,462,805 | 2,582,459 | 2,677,278 | 2,915,366 | 2,840,620 | 2,767,768 | 2,696,633 | Line 12 * Schedule K, Page 2, line 5 |
| 22 | Pre-tax cost of capital | 8,154,263 | 8,366,092 | 10,492,921 | 11,002,715 | 11,406,695 | 12,421,083 | 12,102,624 | 11,792,235 | 11,489,159 | Sum lines 20 & 21 |
| 23 | Gross Revenue Requirement | 65,023,296 | 66,776,850 | 70,168,670 | 72,051,887 | 73,827,079 | 75,936,883 | 76,701,573 | 77,501,180 | 78,319,860 | Sum lines 15, 17, 19 & 22 |
| 24 | Revenue Credit | - | - | - | - | - | - | - | - | - | |
| 25 | Current Year CapEx | - | - | - | - | - | 7,000,000 | 5,575,000 | 1,000,000 | - | Schedule K, Page 9 |
| 26 | Revenue Requirement (Without Current Year CapEx) | 65,023,296 | 66,776,850 | 70,168,670 | 72,051,887 | 73,827,079 | 75,936,883 | 76,701,573 | 77,501,180 | 78,319,860 | Line 23 less lines 24 & 25 |
| 27 | Monthly Revenue Requirement (Without Current Year CapEx) | 5,418,608 | 5,564,738 | 5,847,389 | 6,004,324 | 6,152,257 | 6,328,074 | 6,391,798 | 6,458,432 | 6,526,655 | Line 26 / 12 |
| 28 | Monthly Revenue Requirement (With Current Year CapEx) | 5,418,608 | 5,564,738 | 5,847,389 | 6,004,324 | 6,152,257 | 7,328,074 | 6,836,381 | 6,658,432 | 6,526,655 | |
| 29 | Annual Revenue Requirement (with Current Year CapEx) | 65,023,296 | 66,776,850 | 70,168,670 | 72,051,887 | 73,827,079 | 82,936,883 | 82,276,573 | 78,501,180 | 78,319,860 | |

JA292

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

**Everett**
**Cost of Capital**                                                      **Schedule K**
**Page 2**

| Line No. | Description | $ Millions | | | |
|---|---|---|---|---|---|
| 1 | Long-term Debt | 32.7 | 32.7% | 4.76% | 1.56% |
| 2 | Preferred Stock | - | 0.0% | 0.00% | 0.00% |
| 3 | Common Equity | 67.3 | 67.3% | 10.26% | 6.90% |
| 4 | After Tax Rate of Return | 100.0 | 100.0% | | 8.46% |
| 5 | Tax on equity    ln 9 / (1 - ln 9) * (ln 2 + ln3) | | | | 2.59% |
| 6 | Pre-tax cost of capital | | | | 11.06% |
| | | | | | |
| | Income tax rates: | | | | |
| 7 | State | 8.00% | | | |
| 8 | Federal | 21.00% | | | |
| 9 | Effective | 27.320% | ln 7 + ln 8 - (ln 7 * ln 8) | | |

**JA293**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 15 of 22

**Everett**
**Net Plant**

Schedule K
Page 3

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Electric Plant in Service | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| 1 | Production Plant | | | | | | | | | |
| 2 | Gross Electric Plant in Service | 60,000,000 | 65,100,000 | 73,625,000 | 83,900,000 | 93,075,000 | 94,075,000 | 94,075,000 | 94,075,000 | 94,075,000 |
| | Depreciation Reserve | | | | | | | | | |
| 3 | Production Plant | | | | | | | | | |
| 4 | Total Depreciation Reserve | 0 | (2,170,000) | (4,633,966) | (7,464,895) | (10,635,640) | (13,844,847) | (17,054,053) | (20,263,260) | (23,472,466) |
| 5 | Net Electric Plant | | | | | | | | | |
| 6 | Production Plant | 60,000,000 | 62,930,000 | 68,991,034 | 76,435,105 | 82,439,360 | 80,230,153 | 77,020,947 | 73,811,740 | 70,602,534 |
| 7 | Net Electric Plant in Service | 60,000,000 | 62,930,000 | 68,991,034 | 76,435,105 | 82,439,360 | 80,230,153 | 77,020,947 | 73,811,740 | 70,602,534 |
| 8 | CapEx included in the rates | | 5,100,000 | 8,525,000 | 10,275,000 | 9,175,000 | 1,000,000 | | | |
| 9 | Current Year CapEx | | | | | | 7,000,000 | 5,575,000 | 1,000,000 | |

**JA294**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 16 of 22

**Everett**
**Rate Base Adjustments**
102.5%

**Schedule K**
Page 4

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Accumulated Deferred Income Taxes | (68,300) | (1,415,176) | (4,254,389) | (7,382,603) | (10,035,499) | (10,368,419) | (10,357,981) | (10,282,467) | (10,146,958) | WP-K3 |
| 2 | Investment Tax Credits | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 3 | total Subtractive Adjustments | (68,300) | (1,415,176) | (4,254,389) | (7,382,603) | (10,035,499) | (10,368,419) | (10,357,981) | (10,282,467) | (10,146,958) | |
| 4 | Materials and Supplies | 7,314,327 | 7,497,185 | 7,684,615 | 7,876,730 | 8,073,648 | 8,275,490 | 8,482,377 | 8,694,436 | 8,911,797 | WP-K4 |
| 5 | Fuel Inventory | | | 15,729,563 | 15,729,563 | 15,729,563 | 15,729,563 | 15,729,563 | 15,729,563 | 15,729,563 | |
| 6 | Prepayments | 508,727 | 508,727 | 508,727 | 508,727 | 508,727 | 508,727 | 508,727 | 508,727 | 508,727 | WP-K4 |
| 7 | Total Additive Adjustments | 7,823,054 | 8,005,912 | 23,922,905 | 24,115,020 | 24,311,938 | 24,513,780 | 24,720,667 | 24,932,726 | 25,150,087 | |

**JA295**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 17 of 22

**Everett**
**Operation and Maintenance Expense**
102.5%

Schedule K
Page 5

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | O&M | 33,984,198 | 34,833,803 | 35,704,648 | 36,597,264 | 37,512,196 | 38,450,001 | 39,411,251 | 40,396,532 | 41,406,445 |
| 2 | Cost of LNG Sold | (350,309) | (359,067) | (368,043) | (377,244) | (386,676) | (396,342) | (406,251) | (416,407) | (426,818) |
| 3 | Purchase Hedge Activity | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | Marine Transportation | (1,480,201) | (1,517,206) | (1,555,136) | (1,594,015) | (1,633,865) | (1,674,712) | (1,716,579) | (1,759,494) | (1,803,481) |
| 5 | Vaporization Fuel & Terminal Losses and Uses | (6,275) | (6,432) | (6,593) | (6,757) | (6,926) | (7,100) | (7,277) | (7,459) | (7,645) |
| 6 | Pipeline Transportation | (25,255) | (25,886) | (26,534) | (27,197) | (27,877) | (28,574) | (29,288) | (30,020) | (30,771) |
| 7 | Property Taxes | (6,829,312) | (7,000,045) | (7,175,046) | (7,354,422) | (7,538,283) | (7,726,740) | (7,919,908) | (8,117,906) | (8,320,854) |
| 8 | Electricity Purchases | (3,265,728) | (3,347,371) | (3,431,055) | (3,516,832) | (3,604,753) | (3,694,871) | (3,787,243) | (3,881,924) | (3,978,972) |
| 9 | S&c A&G | 670,193 | 686,948 | 704,122 | 721,725 | 739,768 | 758,262 | 777,218 | 796,649 | 816,565 |
| 10 | Fixed Gas Transportation Costs | 17,121,277 | 17,549,309 | 17,553,047 | 17,568,039 | 17,583,180 | 17,598,473 | 17,613,919 | 17,629,519 | 17,629,519 |
| 11 | NERC-CIP | - | - | - | - | - | - | - | - | - |
| 12 | TOTAL O&M | 39,818,588 | 40,814,053 | 41,399,410 | 42,010,560 | 42,636,765 | 43,228,397 | 43,935,841 | 44,609,490 | 45,283,989 |

| Fixed Gas Transportation Costs (Demand) Charges (in millions of dollars) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|
| Algonquin | $ 10.0 | $ 10.0 | $ 10.0 | $ 10.0 | $ 10.0 | $ 10.0 | $ 10.0 | $ 10.0 | $ 10.0 |
| TGP | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 |
| NatGrid | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 |
| Boston Gas | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 |
| **Sub-Total** | 16.6 | 16.6 | 16.6 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 |

| Variable Charges (in millions of dollars) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| Algonquin | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 |
| TGP | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| NatGrid | - | - | - | - | - | - | - | - | - |
| Boston Gas | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **Sub-Total** | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |

| Fixed + Variable Charges | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| **Total** | $ 17.1 | $ 17.1 | $ 17.1 | $ 17.1 | $ 17.2 | $ 17.2 | $ 17.2 | $ 17.2 | $ 17.2 |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 18 of 22

**Everett**
**Corporate Administration and General Expense**
102.5%

**Schedule K**
Page 6

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Corporate Administration and General Expense | 8,221,132 | 8,426,661 | 8,637,327 | 8,853,260 | 9,074,592 | 9,301,457 | 9,533,993 | 9,772,343 | 10,016,651 | WP-6 |

**JA297**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 19 of 22

**Everett**
**Depreciation**

**Schedule K**
Page 7

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Depreciation Expense | 2,000,000 | 2,170,000 | 2,463,966 | 2,830,930 | 3,170,745 | 3,209,207 | 3,209,207 | 3,209,207 | 3,209,207 | WP-K3 |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 20 of 22

**Everett**
**Other Taxes**
1.025

**Schedule K**
Page 8

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Taxes Other than Income Taxes | 6,829,312 | 7,000,045 | 7,175,046 | 7,354,422 | 7,538,283 | 7,726,740 | 7,919,908 | 8,117,906 | 8,320,854 | WP-K4 |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 21 of 22

**Everett**
**Revenue Credits**

**Schedule K**
Page 9

| Line No. | Description | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|----------|-------------|------|------|------|------|------|------|------|------|------|
| 1 | Revenue Credits | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Revenue will be credited as received | | | | | | | | | |

**JA300**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-008
Page 22 of 22

**Everett**
**Salaries and Wages Allocator**

**Schedule K**
Page 10

| Line No. | Description | Everett | |
|---|---|---|---|
| 1 | Everett Labor | 10,374,104 | WP-K4 |
| 2 | Non-Nuclear (Power) Fleet Labor | 146,162,113.3 | WP-K2 |
| 3 | Everett Labor for Fleet | 7.098% | |

**JA301**

# Exhibit No. MYS-009

## Public Redacted Workpapers Supporting
## Cost-of-Service Study

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

USCA Case #20-1343    Document #1935613    Filed: 02/17/2022    Page 326 of 580

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

JA313

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**Public Version—Privileged Material Redacted**

**JA317**

**Public Version—Privileged Material Redacted**

# Attachment E

# Prepared Direct Testimony and Exhibits of Charles E. Olson

# (Exhibit No. MYS-010 through Exhibit No. MYS-012)

## Exhibit No. MYS-010

## Prepared Direct Testimony of Charles E. Olson

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

CONSTELLATION MYSTIC POWER, LLC      )        Docket No. ER18-____-000

PREPARED DIRECT TESTIMONY
OF
DR. CHARLES E. OLSON

ON BEHALF OF
CONSTELLATION MYSTIC POWER, LLC

**JA321**

Exhibit No. MYS-010

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

**CONSTELLATION MYSTIC POWER, LLC  )  Docket No. ER18-___-000**

**Summary of Prepared Direct Testimony of**
**Charles E. Olson**

1    Based on the analyses that I have done, I recommend that the Mystic Units

2    be authorized a return on common equity capital of 10.26 percent.  My opinion is

3    based on a discounted cash flow (DCF) study of a group of electric and combination

4    companies comparable to Mystic's ultimate parent company, Exelon Corporation.

5    That study indicated that the required return on common equity falls in a range from

6    7.33 to 11.59 percent and 10.26 percent is the midpoint of values identified within

7    the upper half of the distribution.  I also conclude that the appropriate capital

8    structure to use is Mystic's parent, Exelon Generation Company, LLC (ExGen)'s

9    capital structure, which has an equity ratio of 67.28 percent and debt ratio of 32.72

10   percent.  ExGen's cost of debt, of 4.76 percent, is also the appropriate cost of debt

11   to use in this proceeding.

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

## UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

**CONSTELLATION MYSTIC POWER, LLC**    )    **Docket No. ER18-\_\_\_-000**

## PREPARED DIRECT TESTIMONY OF
## DR. CHARLES E. OLSON

1    **Q.**    **PLEASE STATE YOUR NAME AND ADDRESS**.

2    A.    Charles E. Olson, 10822 Alloway Drive, Potomac, Maryland 20854.

3    **Q.**    **WHAT IS YOUR OCCUPATION?**

4    A.    I am an economist.

5                 **I.  QUALIFICATIONS**

6    **Q.**    **PLEASE OUTLINE YOUR EDUCATION AND EXPERIENCE.**

7    A.    I attended and received the following degrees from the University of Wisconsin at

8        Madison:  B.B.A. in 1964 (Senior Honors), M.S. in 1966, and Ph.D. in 1968.  My doctoral

9        dissertation analyzed the structure of the electric power industry.

10         I joined the University of Maryland in 1968 as an Assistant Professor in the College

11        of Business and Management.  I taught graduate courses in managerial economics, public

12        utilities and transportation and undergraduate courses in public utilities and transportation.

13         In 1971, I was appointed Associate Professor and held that position until I left in

14        September 1976 to join Zinder Companies, Inc. (Zinder) as Senior Economist.  From

15        September 1976 until November 2000, I held various positions at Zinder, including Vice

16        President and President, and I also started my own consulting firm.  Since November 2000,

17        I have been a Professor and independent consultant.  Currently, I am Professor of the

18        Practice at the University of Maryland, Robert H. Smith School of Business where I teach

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1    courses in managerial economics and global economics. During the past ten years, I have

2    won numerous awards for teaching innovation and excellence.

3          During the past 40 plus years, I have authored and co-authored various papers,

4    articles, reports and other published material. These have been published in the <u>Public</u>

5    <u>Utilities Fortnightly</u>, <u>Land Economics</u>, the <u>Transportation Journal</u>, <u>Business Horizons</u>, and

6    the <u>Highway Research Record</u>.  The Institute of Public Utilities at Michigan State

7    University published a revised version of my thesis, which is titled "Cost Considerations

8    for Efficient Electricity Supply."  I have also contributed to two other volumes, <u>Regional</u>

9    <u>Economic Effects of Alternative Highway Systems</u> (Ballinger Publishing Co., 1974) and

10    <u>Studies in Electric Utility Regulation</u> (Ballinger Publishing Co., 1975).

11         I have given speeches, workshops and papers to many groups, both academic and

12    business.  I was a coordinator and lecturer in the American Gas Association's Annual Rate

13    Fundamentals Course at the University of Wisconsin form 1971 to 1996.  The topics I have

14    lectured on in this course include pricing, utility accounting, rate level determination, cost

15    of capital and cost of service analysis.  I also have lectured at other American Gas

16    Association short courses.

17         My consulting experience dates back to 1970. Since then, I have worked on more

18    than 400 rate and certificate cases and have presented testimony more than 300 times.  I

19    have testified before the Federal Communications Commission, the Postal Rate

20    Commission, the Federal Energy Regulatory Commission (FERC), the Interstate

21    Commerce Commission, the New York Energy Planning Board, the Dallas and Beaumont

22    City Councils and public utilities commissions in 40 states, the District of Columbia and

23    three Canadian provinces.  The cases involved electric, gas, water and telecommunications

24    utilities.  I have also testified in oil pipeline, LNG and taxi cases.  My testimony has covered

**JA324**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1    numerous subjects including fair rate of return, rate base, revenue requirements, revenue

2    and expense adjustments, pricing and rate design.

3          In addition, I have been a consultant on numerous other projects and studies

4    including a study of the Uniform System of Accounts for telephone companies and a study

5    of entry and fare determination policies for the taxicab industry in Washington, D.C.

6    Working for the Harvard Institute for International Development, I advised the government

7    of Colombia on public utility rates in 1969.  From 1977 to 1978, I directed a demand study

8    for the gas distribution utilities in New York.  Finally, I also directed a study on gas rate

9    design for the Economic Regulatory Administration from 1977 to 1978.

10          I have also done a significant amount of community service work, testifying in a

11    number of cases on a pro bono basis.  I have presented testimony before two congressional

12    committees.  I was a member of two Federal Power Commission (FPC) National Power

13    Survey Advisory Committees.  Finally, I was Vice Chairman of the former FPC's Gas

14    Policy Advisory Council: Transmission, Distribution and Storage-Technical Advisory

15    Task Force-Rate Design.

16               **II.  PURPOSE OF TESTIMONY**

17    **Q.**    **WHAT IS YOUR ASSIGNMENT IN THIS CASE?**

18    A.    Constellation Mystic Power, LLC (Mystic) has requested that I conduct a study to

19    determine the appropriate capital structure and rate of return, including return on equity

20    ("ROE") for the Company. The capital structure and rate of return is also applicable to the

21    investment in the Everett LNG Facility.

22              **III.  IDENTIFICATION OF EXHIBITS**

23    **Q.**    **DO YOU SPONSOR AN EXHIBIT IN SUPPORT OF YOUR TESTIMONY?**

**JA325**

1   A.    Yes. I sponsor Exhibit No. MYS-011 that consists of schedules regarding my ROE

2           analysis, capital structure, and cost of debt, and Exhibit No. MYS-012, which is

3           information on Mystic's interconnected utility's return on equity. These schedules and

4           exhibits were prepared by me or under my supervision.

5        **IV. SUMMARY OF TESTIMONY**

6   Q.    **WOULD YOU PLEASE SUMMARIZE YOUR TESTIMONY?**

7   A.    Yes. Based on the analyses that I have done, I recommend that the Mystic Units be

8           authorized a return on common equity capital of 10.26 percent. My opinion is based on a

9           discounted cash flow (DCF) study of a group of electric and combination companies

10         comparable to Mystic's ultimate parent company, Exelon Corporation. That study

11         indicated that the required return on common equity falls in a range from 7.33 to 11.59

12         percent and 10.26 percent is the midpoint of values identified within the upper half of the

13         distribution. I also conclude that the appropriate capital structure to use is Mystic's parent,

14         Exelon Generation Company, LLC (ExGen)'s capital structure, which has an equity ratio

15         of 67.28 percent and debt ratio of 32.72 percent. ExGen's cost of debt, of 4.76 percent, is

16         also the appropriate cost of debt to use in this proceeding.

17        **V. OVERVIEW OF COST OF CAPITAL**

18   Q.    **WILL YOU PLEASE EXPLAIN THE MEANING OF THE FAIR RATE OF**

19         **RETURN?**

20   A.    Any business, whether regulated or unregulated, must earn enough dollars of profit to

21         compensate present investors if new capital is to be attracted on reasonable terms. If new

22         capital cannot be attracted on reasonable terms, a business will have difficulty providing

23         reliable and adequate service. The fair rate of return is a percentage figure, which, when

24         applied to the appropriate rate base, will yield the earnings required to attract capital on

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1    reasonable terms. This amount, known as the earnings requirement, must be added to

2    reasonable operating expenses, depreciation and taxes to determine the total revenue

3    requirement that must be collected from the rates charged.

4    Q.    **HOW SHOULD THE RATE OF RETURN BE DETERMINED UNDER PUBLIC**

5          **UTILITY REGULATION?**

6    A.    The prevention of monopoly profits, i.e., a competitive result, suggests that the purpose of

7          public utility regulation with respect to rate of return is to permit the regulated company to

8          earn its cost of capital. By permitting a regulated company to earn its cost of capital,

9          regulation should prevent inadequate earnings as well. Earnings levels above the cost of

10         capital in the long-run imply excessive profits; likewise, long-run earnings levels below

11         the cost of capital indicate inability to attract capital on reasonable terms.

12         Under competition a firm cannot expect to earn more on a project it is about to

13         undertake than its cost of capital. If more were expected, the project would be undertaken

14         by the firm's competitors and the actual rate of return would be driven down. While more

15         than the cost of capital may be hoped for, the rational firm operating in a competitive

16         market cannot expect more than the competitive rate of return or cost of capital from a

17         given project. In a similar fashion, there is no reason to expect any non-regulated firm to

18         undertake a project that will produce a rate of return that is below the cost of capital.

19         Presumably, a public utility could earn more than its cost on at least some of its

20         projects; otherwise, there would be no reason for its being regulated. If the rate level

21         objective of utility regulation is to approximate what would happen in competitive markets,

22         then it follows that the average expected return on new investment is held to the cost of

23         capital. This does not mean that all new investments should be expected to earn the cost

24         of capital; the regulatory agency may have public policy-dictated, non-rate level objectives

**JA327**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1    that call for cross-subsidy between investments.  The point is that the average expected rate

2    of return on new investment in total should be equal to the cost of capital if the competitive

3    norm is taken as the standard.

4         A rate of return based on the cost of capital approach is consistent with the

5    guidelines set forth by the U.S. Supreme Court in the Bluefield (262 U.S. 679 [1923]) and

6    Hope (320 U.S. 591 [1944]) cases, as affirmed by the Court in Duquesne Light Company

7    v. Barasch, decided January 11, 1989  (98 PUR 4th 253 [1989]).  Essentially these cases

8    require that utilities be authorized returns that: (1) are comparable to alternative investment

9    opportunities of corresponding risk, (2) permit capital attraction on reasonable terms and

10   (3) maintain financial integrity.  A rate of return based on the cost of capital of the company

11   whose rates are at issue is consistent with these standards.

12   **Q.    HOW IS THE FAIR RATE OF RETURN DETERMINED FOR A REGULATED**

13   **ENTERPRISE?**

14   A.   The fair rate of return is determined through the use of the cost of capital approach.  Under

15   the cost of capital approach, separate determinations are made of the cost of each type of

16   capital utilized by the utility.  If, for example, a utility is financed with long-term debt,

17   preferred stock and common equity, the cost of each of these components is estimated

18   individually.   Then the cost rate of each component is weighted by the appropriate

19   percentage that it bears to the overall capitalization.  The sum of the weighted cost rates is

20   the overall cost of capital and is used as the basis of the fair rate of return.

21                **VI.  DESCRIPTION OF METHODOLOGY**

22   **Q.    DOES MYSTIC PROPOSE TO USE ITS CAPITAL STRUCTURE FOR**

23   **RATEMAKING PURPOSES?**

**JA328**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

1   A.    No. The Commission prefers using the capital structure of the rate applicant if the applicant

2         issues its own debt, non-guaranteed by another entity, has a bond rating, and has an equity

3         ratio within the historical range approved by the Commission. Mystic does not issue its

4         own debt or have a credit rating. In those circumstances, the Commission will impute a

5         capital structure, most often that of the corporate parent.

6             Mystic is indirectly wholly-owned by Exelon Generation Company, LLC (ExGen).

7         ExGen issues its own debt and has its own bond rating. Further, ExGen's common equity

8         ratio of 67.28 percent and a debt ratio of 32.72 percent falls within the range approved by

9         the Commission in prior cases. In these circumstances, it is appropriate to use the capital

10        structure of Mystic's parent, ExGen.

11   Q.    **IS EXGEN'S CAPITAL STRUCTURE A REASONABLE ONE TO UTILIZE FOR**

12         **RATEMAKING PURPOSES IN THIS CASE?**

13   A.    Yes, it is. The overall rate of return that is applied to the rate base is the product of the

14         following variables: capital structure, embedded cost of long-term debt capital, and the

15         appropriate return on common equity. In that the objective of ratemaking with respect to

16         return is a reasonable "end-result," it is not appropriate to view one of the variables that

17         impacts on the total return dollars in isolation. The common equity ratio proposed in this

18         case is reasonable relative to the debt ratio with which it is combined and the recommended

19         return on common equity capital.

20             Ultimately, a reasonable "end-result" can only be judged in terms of whether it will

21         permit capital attraction on reasonable terms. At the most basic level, the equity ratio must

22         be high enough to permit additional debt capital to be issued at any time without an adverse

23         effect on Exelon's financial health. If the capital structure does not permit some margin

24         for additional debt financing at all times, Exelon is subject to the potential adverse impact

1     of unanticipated tight credit conditions. Current credit market conditions illustrate the need

2     for financial flexibility. Companies in good financial health have access at low spreads

3     while the others only have access on unfavorable terms.

4   **Q.**   **WHAT COST OF DEBT IS MYSTIC PROPOSING IN THIS PROCEEDING?**

5   A.   Mystic is proposing to use the cost of debt of 4.76 percent of its parent company ExGen.

6     The cost of long term debt are based on ExGen's actual bond issuances and cost of

7     preferred equity as of December 1, 2017. The calculation of the cost of long-term debt is

8     set forth in Exhibit No. MYS-011.

9   **Q.**   **AFTER DETERMINING THAT MYSTIC'S PROPOSED CAPITAL STRUCTURE**

10       **AND COST OF DEBT ARE REASONABLE, HOW DID YOU DETERMINE AN**

11       **APPROPRIATE ROE FOR THE COMPANY?**

12  A.   A DCF study cannot be performed directly on Mystic since it is not a publicly traded

13      company. Instead, a DCF analysis must be performed on a proxy group of other entities

14      that are publicly traded, resulting in an imputed return on equity. I developed an estimate

15      of the return that investors would require to invest in the common stock of Mystic if it were

16      a traded company. Specifically, I prepared a DCF study of the cost of common equity to

17      companies with comparable risk to Exelon Corporation (Exelon), the ultimate parent, using

18      a group of large, diversified electric and combination companies. I chose a proxy group of

19      companies similar to Exelon for a variety of reasons, including the fact that a proxy group

20      of companies comparable to Exelon represents a robust and diversified proxy group, and it

21      would be very difficult to develop a large enough proxy group of merchant generation

22      companies similar to Mystic's or ExGen's particular risk or generation profile.

23   **Q.**   **WHAT MATERIALS DID YOU UTILIZE IN THE PREPARATION OF YOUR**

24       **TESTIMONY AND EXHIBITS?**

**JA330**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1  A.   The information I utilized was from standard financial sources, such as annual reports,

2       ratings reports and financial reports.

3  Q.   **WAS THE METHODOLOGY YOU USED TO EVALUATE THE COST OF**

4       **EQUITY FOR EXELON CONSISTENT WITH FERC PRECEDENT?**

5  A.   Yes, my recommendations are based on the results of the Commission's two-step DCF

6       methodology for electric utilities. Alternative benchmark methodologies could provide the

7       Commission with additional evidence by which to evaluate a just and reasonable return on

8       equity, but I have focused here on the DCF methodology.

9  Q.   **PLEASE EXPLAIN THE DCF METHODOLOGY YOU WILL USE TO**

10      **ESTIMATE THE RATE OF RETURN ON COMMON EQUITY CAPITAL IN THIS**

11      **CASE.**

12 A.   Equity owners share in the residual that remains from revenues after expenses, including

13      interest, are paid. Thus, there is no contractual relationship as to required earnings between

14      the common stockholder and the corporate entity. Earnings on equity can only be judged

15      in terms of whether they produce market prices for the common shares that permit capital

16      attraction on terms that are considered fair and reasonable.

17           From an investor's viewpoint the cost of common equity of a given entity or

18      company is the minimum expected return that will induce her to buy stock at the going

19      market price. Thus, the focus must be on what a reasonable investor – and not the analyst

20      -- would consider is a reasonable return. For example, if an investor will buy a stock that

21      is selling at $20.00 per share but will not buy it at a higher price, and expects to receive

22      $1.20 in dividends and to sell it in exactly one year at $21.20, the cost of capital is 12

23      percent, as shown below:

24                    Dividend Yield = ( $1.20 ÷ $20.00 )        = 6%

**JA331**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1          Growth = ($21.20 ÷     $20.00)-1     = 6%

2          Cost of common equity (k)         = 12%

3 Unfortunately, the task is not this easy because we do not know what investors really expect

4 when they decide to buy a given stock.

5       In my opinion, a reasonable way to go about estimating the cost of common equity

6 is to utilize the DCF approach. The DCF approach to estimating the cost of equity capital

7 is based on the premise that the investor is buying two things when she purchases common

8 stock, dividends and growth. Investors in American businesses have come to expect

9 growth in earnings and dividends per share of common stock because of a public policy

10 that is committed to increasing Gross Domestic Product (GDP). In addition, the experience

11 of most U.S. enterprises since the end of World War II has been one of increased dividends

12 and earnings per share. The cost of equity capital using the discounted cash flow method

13 is that discount rate which equates a given market price of a stock with the expected future

14 flow of dividends.

15       The discounted cash flow method is frequently expressed as a formula in which

16 "k", the cost of capital, is equal to D/MP (dividends divided by market price), the dividend

17 yield, plus "g", expected growth in dividends. Thus:

18                      $k = D/MP + g$

19       In utilizing this construct it must be assumed that "g" cannot exceed "k" because

20 that implies negative dividends. It must also be assumed that a growth rate, "g", that is

21 equivalent to a constant rate of growth to infinity can be estimated. Mathematically this is

22 true, but it is not important for purposes of application.

23       Implementation of the DCF approach requires the exercise of considerable

24 judgment concerning the views of investors. The real question is what affects investor

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1   expectations.  Estimating investor expectations is a difficult task because of the many

2   factors that affect capital markets in general and common stocks in particular.  The current

3   rate of unemployment, large Federal budget deficits, the trade deficit, credit markets,

4   potential inflation, foreign exchange rates and Federal Reserve Board policy all impact

5   significantly on investor judgments.  In addition to these factors, the appropriate return on

6   equity for Mystic is governed by all of the specific factors that influence its particular

7   situation.

8   **Q.**   **WHAT INFORMATION IS AVAILABLE AND USEFUL FOR PURPOSES OF**

9       **MAKING A DCF ESTIMATE OF THE COST OF EQUITY CAPITAL FOR**

10      **EXELON?**

11  A.   Investors are aware of current conditions in the economy.  Significant factors affecting the

12      decisions of investors include the situation in capital markets, current budget and trade

13      deficits, the potential for higher inflation, low unemployment and the ongoing recovery

14      from the great recession. This type of information is available in detail. Presumably,

15      investors utilize it, understand the state of the economy and have their own expectations

16      about GDP growth, interest rates and other factors.  These opinions influence their return

17      expectations and thereby determine the maximum price they will pay for various types of

18      securities.  Thus, because investors take the economic situation into account in their

19      decision-making, information concerning the economy is reflected in the prices of stocks

20      and bonds at any given time.

21              **VII.  APPLICATION OF DCF**

22  **Q.**   **YOU HAVE EXPLAINED THAT YOU UTILIZE THE DCF APPROACH FOR**

23      **PURPOSES OF DETERMINING THE RETURN ON COMMON EQUITY**

24      **CAPITAL.   YOU HAVE ALSO INDICATED THE KINDS OF ECONOMIC**

**JA333**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

1     **INFORMATION THAT INVESTORS CONSIDER IN ANALYZING POTENTIAL**

2     **INVESTMENTS AND HOW THIS INFORMATION IS "EMBEDDED" IN THE**

3     **PRICES PAID BY INVESTORS FOR COMMON STOCK AND OTHER**

4     **SECURITIES. WOULD YOU EXPLAIN HOW YOU WILL APPLY THE DCF**

5     **APPROACH IN THIS CASE?**

6  A.   The Mystic units whose return is at issue are held by ExGen and do not have publicly-

7     traded common shares. For this reason, a proxy or proxies must be employed in DCF

8     analysis. To estimate the cost of equity in this case, I will perform a DCF proxy analysis

9     for a group of comparable electric and combination companies. This is a common

10    technique for experts to use to estimate the cost of capital, and is an approach approved by

11    the Commission for electric utilities.

12  Q.   **WHAT MARKET INFORMATION IS AVAILABLE TO INVESTORS**

13     **REGARDING THE COMPANIES IN YOUR GROUP OF COMPARABLES?**

14  A.   Investors are likely to have the following information:

15          (1)  Market price data for common shares;

16          (2)  Past and present dividends;

17          (3)  Past and present earnings;

18          (4)  Past, present and forecasted capital expenditure data;

19          (5)  Yields on bonds and preferred stock;

20          (6)  Short and long-term forecasts by security analysts for earnings and

21              dividends; and

22          (7)  Regulatory commission rulings.

23  Q.   **HOW IS THIS INFORMATION UTILIZED BY INVESTORS?**

**JA334**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1   A.    It is reasonable to assume that such information is utilized in investment decision-making.

2          In all likelihood, the more recent the information, the more weight it is given.  However, it

3          is not reasonable to expect that past trends are ignored.  In addition to the above market

4          information, investors are aware of statements made by management and know that

5          regulated companies are involved in regulatory proceedings about rates and other issues.

6   Q.    **PLEASE EXPLAIN HOW YOU SELECTED YOUR COMPARABLE UTILITIES**

7          **FOR THE PURPOSE OF ESTIMATING THE COST OF COMMON EQUITY**

8          **USING THE DCF APPROACH.**

9   A.    I began with the group of electric and combination utilities that is covered by <u>The Value</u>

10        <u>Line Investment Survey</u> as electric utilities.  This group includes all of the major U.S.

11        electric utilities whose common shares trade on public markets.  This list can be viewed as

12        the universe of utilities that are available for comparative analysis.  There are forty-two

13        electric utilities that are followed by Value Line.  The next step was to eliminate companies

14        that are not comparable in risk to Exelon.  Twenty-one of these companies fall within the

15        range of one bond rating above or below the Exelon Corporation S&P rating of BBB and

16        the Moody's rating of Baa.  ExGen has the same bond rating as its parent. I also utilized a

17        revenue screen to eliminate those utilities that are much smaller than Exelon.  Exelon's

18        2017 revenues were $30 billion; utilities with less than $2 billion in revenue were

19        eliminated.  The logic is that size is a measure of risk.   In accordance with Commission

20        precedent, I also eliminated Entergy, a company that has a negative forecasted growth rate.

21        In addition, my proxy group is consistent with the Commission's prior exclusion of low-

22        end outliers, as none of my proxy companies has a DCF result within 100 basis points of

23        the six-month average utility bond yield.  I also eliminated one company, PG&E, that does

24        not currently pay dividends, and the remainder of my proxy group has not cut dividends or

**JA335**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1    announced a dividend cut over the last six months.  I removed 3 companies that are

2    involved in mergers.  One of them, Avista, has been bought out by a Canadian company.

3    Two, Westar and Great Plains are merging to form a new company and cannot be viewed

4    as separate companies.  I did not remove Dominion Resources from my proxy group

5    because of its recent acquisition of SCANA Corporation.  Dominion is far larger than

6    SCANA and the purchase did not have a material impact on its share price.  Finally, I did

7    not include Hawaiian Electric because it does not operate on the U.S. Mainland.

8    The remaining group of electric and combination utilities is as follows:

9    Ameren Corporation

10   AVANGRID, Inc.

11   CMS Energy

12   Dominion Resources

13   DTE Energy

14   Public Service Enterprises

15   Sempra Energy

16   In my view, a group of 7 utilities is more than adequate for purposes of obtaining a

17   reasonable DCF estimate of the cost of common equity capital.

18   **Q.    WHAT DIVIDEND YIELD SHOULD BE UTILIZED FOR YOUR COMPARABLE**

19   **COMPANIES IN ESTIMATING THE DCF COST OF EQUITY CAPITAL?**

20   A.    Exhibit No. MYS-011, Schedule No. 1 shows the dividend yields for the 7 selected

21   companies for the period October 2017 through March 2018.  I believe this period is long

22   enough to smooth out short-term fluctuations and short enough to avoid the use of stale

23   data.  The dividend yields were calculated monthly and averaged.  The dividend yields per

24   month were calculated by using the paid dividend for that month divided by the average of

**JA336**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

1    the monthly low and high stock prices for the month.  The range in the dividend yields is

2    from 2.96 percent to 4.02 percent.

3    **Q.    WHAT GROWTH RATE IS EXPECTED BY INVESTORS FOR THE ELECTRIC**

4    **AND COMBINATION COMPANIES YOU HAVE SELECTED?**

5    A.    Exhibit No. MYS-011, Schedule No. 2 presents the Yahoo Finance consensus 5-year

6    projected earnings growth rates for the proxy group of electric utilities.  There are a number

7    of organizations, such as Goldman Sachs, that provide individual estimates of expected

8    growth, but there are two organizations that compile these estimates and publish consensus

9    data.  Zacks is one of these.  The other is Yahoo Finance. The Yahoo Finance consensus

10    estimates of expected earnings growth for the comparable utilities in April 2018, are shown

11    on Schedule No. 2. The range is from 3.39 percent to 9.70 percent.

12        I have not presented any schedules that show historical growth rates.  Based on past

13    experience, I know there is substantial variation in these growth rate data and that it is

14    difficult to draw meaningful conclusions from these numbers.   It is also known that

15    financial analysts who make earnings forecasts are aware of historical growth rates.

16    Finally, FERC recognized in Opinion No. 396 that historical or sustainable growth rates

17    are embedded in analyst forecasts. This means the historical information is reflected in the

18    forecasts. Further, several academic studies have shown that analyst estimates are superior

19    to historical growth rates. Therefore, it is not necessary to use historical data as a separate

20    information input in deriving an estimated growth rate.   Indeed, it amounts to double

21    counting.

22    **Q.    DR. OLSON, YOU EARLIER MADE REFERERNCE TO FERC USING A TWO-**

23    **STAGE GROWTH MODEL FOR ELECTRIC UTILITIES.  WHY DOES FERC**

24    **USE A TWO-STAGE MODEL AND HOW DID YOU APPLY IT?**

**JA337**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

1    A.    FERC uses a two-stage model because the growth rates forecasted by analysts only covers

2          five years.  The second stage is a longer term forecast that covers the rest of the income

3          stream from the point at which future income is discounted to the point of not mattering.

4          FERC uses GDP forecasts as a proxy for growth between years beyond five to perpetuity.

5          The forecasts utilized by FERC are from the Energy Information Agency, Social Security

6          and IHS Markit.  These forecasts are highly correlated because they use similar techniques.

7          I did not use the IHS Markit service because it is a costly subscription that would not be

8          available to many investors.  The long-term EIA forecast is 4.3 percent and the Social

9          Security number is 4.7 percent.  The average is 4.5 percent which I used for second stage

10         growth.  I weighted the first stage of the two-step DCF model by two thirds and the second

11         stage by one-third per FERC policy.  The result of the weighting is the growth rates shown

12         on Schedule No. 2.

13   Q.    **WHAT IS YOUR CONCLUSION AS TO THE COST OF EQUITY FOR THE**

14         **COMPARABLE COMPANIES?**

15   A.    The cost of equity by utility is set forth on Schedule No. 3.  The cost of equity estimates

16         range from 7.33 to 11.59 percent.

17   Q.    **WHAT IS THE YIELD ADJUSTMENT FACTOR?**

18   A.    The yield adjustment factor is used to reflect the future payment of dividends.  When an

19         investor buys common shares in a company, it is the future dividends that will be received,

20         not past dividends.  I have increased the dividend by one-half the growth rate to reflect this.

21         For example, as shown on Schedule No. 1, the dividend yield for CMS Energy is 2.96

22         percent.  When the yield is multiplied by one plus half of the growth rate (1 plus 3.10%)

23         the result is 3.05 percent.

**JA338**

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

1  **Q.    WOULD INVESTORS LIKELY VIEW THE FIRMS IN THE VALUE LINE**

2  **INVESTMENT SURVEY OF ELECTRIC UTILITIES OR IN THE PROXY**

3  **GROUP DETAILED ABOVE AS COMPARABLE IN RISK TO MYSTIC?**

4  A.    No, Mystic is more risky.  In contrast to the electric utilities in the Value Line Investment

5  Survey of electric utilities or in the above proxy group, both of which consist of electric

6  utilities with diversified activities and markets, Mystic's only assets are two gas fired

7  generating units in one geographic region.  Diversified companies, both in terms of assets

8  and geographic markets, can more easily sustain downturns in one market or another.   The

9  business risk is heightened in this case because Mystic is a merchant generator.  While it

10  is my understanding that Mystic has been designated as a unit that is needed for reliability

11  reasons in ISO-NE, the term of that designation is for two years.  Investors would be

12  unlikely to view Mystic's two-year reliability designation as sufficient to overcome the

13  disparities in business risk it has with the proxy group, given that retirement and the

14  cessation of any recovery in investment appears a likely possibility after this brief two-year

15  window.  It is likely that a stand-alone credit rating for Mystic would fall below that of the

16  proxy group.

17  **Q.    WHY DID YOU NOT DEVELOP A PROXY GROUP OF COMPANIES WITH**

18  **COMPARABLE RISK TO MYSTIC OR EXGEN INSTEAD?**

19  A.    As detailed above, a proxy group of sufficient companies with primarily generation assets

20  in competitive energy markets akin to Mystic or ExGen would be difficult to develop.

21  Merchant generation companies have experienced significant risk and volatility, and have

22  been subject to bankruptcy and consolidation in the industry. When I looked for

23  unregulated proxy companies I found three with traded shares; they are Vistra, Dynegy and

24  NRG.  Vistra and Dynegy merged in April 2018.  They have a Moody's bond rating of

1    Ba2, well below that of Exelon or ExGen.  Further, the five-year growth rate for Vistra is

2    a negative 54 percent.  NRG also has a Moody's bond rating of Ba2.  I don't know of any

3    other independent generators with large fleets that would be comparable to ExGen.  My

4    conclusion is that a proxy approach of this type will not work.

5  **Q.    DO YOU HAVE AN OPINION ON WHETHER THE CAPITAL MARKETS ARE**

6  **CURRENTLY ANOMALOUS?**

7  A.    Yes, my opinion is that capital markets are currently anomalous.  The Federal Reserve

8    currently still holds more than $4.1 trillion in government and housing bonds in its

9    portfolio, compared to approximately $410 billion prior to the recession.  These bonds were

10    acquired so as to reduce long-term interest rates and thereby spur a depressed economy.

11    As the economy has shown signs of recovery, the Federal Reserve is putting these bonds

12    back on the market, albeit slowly.  The added supply is acting to push interest rates higher.

13    As inflation progresses and economic growth continues the central banks of Europe and

14    Japan will do the same thing.  Long-term government bond yields are clearly below where

15    they would be without the earlier actions of the major central banks.  The logical conclusion

16    is that capital markets are anomalous.  As the Commission has stated, a mechanical

17    application of the DCF methodology is inappropriate when anomalous capital conditions

18    exist because even though it is difficult to quantify the impact of artificially low interest

19    rates on the DCF inputs, the DCF methodology is subject to model risk in those

20    circumstances.  *See* Opinion No. 551, 156 FERC ¶ 61,234, PP 67, 125 (2016).

21  **Q.    WHAT RETURN ON COMMON EQUITY DO YOU RECOMMEND IN THIS**

22  **CASE?**

23  A.    When anomalous capital market conditions exist a mechanical application of the DCF

24    methodology to the measure of central tendency of the zone of reasonableness is

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1    inappropriate.  In addition, when a company has greater risks than the average company in

2    the proxy group, the Commission has selected a return on equity in the upper end of the

3    zone of reasonableness.    With this in mind I calculated the midpoint of the upper half of

4    the cost of equity estimates shown on Schedule No. 3.  The result is 10.26 percent, the

5    return on equity I recommend in this case.

6    **Q.    WHAT IS THE INTERCONNECTED UTILITY'S RETURN ON EQUITY AND**

7    **HOW DOES THAT FACTOR INTO YOUR ANALYSIS?**

8    A.    My understanding is that the Mystic units are interconnected to Eversource Energy.  The

9    interconnection agreement is attached in Exhibit No. MYS-012.  My understanding from

10   counsel is that the Commission often looks to the interconnected utility's return on equity

11   as a reasonable proxy for a merchant generator's return on equity.  Eversource Energy's

12   return on equity is 10.57 percent.  Eversource Energy's tariff is attached in Exhibit No.

13   MYS-012 and the return on equity is stated in Attachment D, Section II(A)(2)(iii).  This

14   further demonstrates that my recommended return on equity is conservative.

15   **Q.    DOES THIS CONCLUDE YOUR PREPARED DIRECT TESTIMONY?**

16   A.    Yes, it does.

**JA341**

## VERIFICATION

Pursuant to 28 U.S.C. § 1746 (2012), I state under penalty of perjury that the foregoing testimony is true and correct to the best of my knowledge, information, and belief.

Executed this 15th day of May, 2018.


_____
Charles E. Olson

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

<u>**Exhibit No. MYS-011**</u>

**Schedules Regarding ROE Analysis, Capital Structure, and
Cost of Debt**

**JA343**

Schedule No. 1

## EXELON CORPORATION

Dividend Yields for Comparable Companies
October 2017 – March 2018

| Company | Average Monthly Yield |
|---|---|
| Ameren Corporation | 3.10 % |
| AVANGRID, Inc. | 3.47 |
| CMS Energy | 2.96 |
| Dominion Resources | 4.02 |
| DTE Energy | 3.30 |
| Public Service Enterprises | 3.51 |
| Sempra Energy | 3.00 |

Source of Data: Yahoo Finance Historical

Prices

April 2018

**JA344**

Schedule No. 2

## EXELON CORPORATION

Growth Rates for Comparable Companies
April 2018

| Company | Yahoo Finance Growth Rates | Long Term Growth Rates |
|---|---|---|
| Ameren Corporation | 6.37 % | 5.75 % |
| AVANGRID, Inc. | 9.70 | 7.97 |
| CMS Energy | 7.04 | 6.19 |
| Dominion Resources | 6.55 | 5.87 |
| DTE Energy | 5.58 | 5.22 |
| Public Service Enterprises | 3.39 | 3.76 |
| Sempra Energy | 4.90 | 4.77 |

Source of Data: Yahoo Finance,
2018; EIA and Social Security Admin.

**JA345**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Schedule No. 3

## EXELON CORPORATION
### DCF Cost of Capital Estimate
### Using Comparable Companies, April 2018

| Company | Adjusted Yield | Long-Term Growth | Cost of Capital |
|---|---|---|---|
| Ameren Corporation | 3.19 % | 5.75 % | 8.94 % |
| AVANGRID, INC. | 3.62 | 7.97 | 11.59 |
| CMS Energy | 3.05 | 6.19 | 9.24 |
| Dominion Resources | 4.14 | 5.87 | 10.01 |
| DTE Energy | 3.39 | 5.22 | 8.61 |
| Public Service Enterprises | 3.57 | 3.76 | 7.33 |
| Sempra Energy | 3.07 | 4.77 | 7.84 |

**JA346**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-011
Page 4 of 6

Schedule No. 4

**Exelon Generation**
**Long-Term Debt By Issue**
**December 31, 2017**

| Series | Interest Rate | Issue Date | Maturity Date | Call / Put Date | Call Price | Debt Outstanding | Debt Issuance Expense | (Premium) / Discount | Net Amount to Company | Net Amount Per Bond | Effective Cost Rate | Original (At Issuance) Debt Issuance Expense | (Premium) / Discount | Net Amount to Company | Net Amount Per Bond | Effective Cost Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Senior Unsecured Notes** | | | | | | | | | | | | | | | | |
| 2009 Senior Unsecured Notes | 5.20% | 9/23/09 | 10/1/19 | Make whole | T + 30 | 600,000,000 | (814,650) | 203,951 | 598,981,399 | 99.83 | 5.22% | (4,320,000.00) | 1,170,000.00 | 594,510,000 | 99.09 | 5.32% |
| 2015 Senior Unsecured Notes A | 2.95% | 1/13/15 | 1/15/20 | Make whole | T + 25 | 750,000,000 | (2,291,909) | 57,966 | 747,650,125 | 99.69 | 3.02% | (5,700,000.00) | 142,500.00 | 744,157,500 | 99.22 | 3.12% |
| 2015 Senior Unsecured Notes B | 2.95% | 3/10/17 | 1/15/20 | Make whole | T + 25 | 250,000,000 | (1,029,197) | (1,616,930) | 250,587,733 | 100.24 | 2.86% | (1,337,500.00) | (2,237,500.00) | 250,900,500 | 100.36 | 2.82% |
| 2010 Senior Unsecured Notes | 4.00% | 9/30/10 | 10/1/20 | Make whole | T + 25 | 550,000,000 | (1,102,330) | 160,189 | 548,737,480 | 99.77 | 4.03% | (3,341,000.00) | 583,000.00 | 545,476,000 | 99.18 | 4.10% |
| CEG Senior Notes | 5.15% | 12/14/10 | 12/01/20 | 09/01/20 | T + 30 | 550,000,000 | - | - | 550,000,000 | 100.00 | 5.15% | (4,375,000.00) | 330,000.00 | 545,295,000 | 99.14 | 5.26% |
| 2017 Senior Unsecured Notes | 3.40% | 3/10/17 | 3/15/22 | Make whole | T + 25 | 500,000,000 | (3,419,368) | 913,404 | 495,667,228 | 99.13 | 3.59% | (3,938,000.00) | 1,075,000.00 | 494,987,000 | 99.00 | 3.62% |
| 2012 Senior Unsecured Notes | 4.25% | 6/18/12 | 6/15/22 | Make whole | T + 40 | 523,303,000 | (1,024,901) | 29,410 | 522,248,689 | 99.80 | 4.27% | (2,137,500.00) | 66,000.00 | 521,099,500 | 99.58 | 4.30% |
| CEG Senior Notes | 7.60% | 3/26/02 | 4/1/32 | Make whole | T + 30 | 257,903,000 | - | - | 257,903,000 | 100.00 | 7.60% | (2,617,840.00) | 611,460.00 | 254,673,700 | 98.75 | 7.71% |
| 2009 Senior Unsecured Notes | 6.25% | 9/23/09 | 10/1/39 | Make whole | T + 30 | 900,000,000 | (6,149,475) | 893,180 | 892,957,345 | 99.22 | 6.31% | (3,936,500.00) | 1,233,000.00 | 890,712,000 | 98.97 | 6.33% |
| 2010 Senior Unsecured Notes | 5.75% | 9/30/10 | 10/1/41 | Make whole | T + 35 | 350,000,000 | (2,588,387) | 1,077,739 | 346,333,873 | 98.95 | 5.82% | (3,296,500.00) | 1,407,000.00 | 345,296,500 | 98.66 | 5.84% |
| 2012 Senior Unsecured Notes | 5.60% | 6/18/12 | 6/15/42 | Make whole | T + 45 | 788,203,000 | (4,257,453) | 762,351 | 783,183,196 | 99.36 | 5.64% | (5,025,000.00) | 935,000.00 | 762,243,000 | 99.24 | 5.65% |
| Subtotal | | | | | | 6,019,409,000 | (22,677,672) | 2,481,260 | 5,994,250,068 | | | (44,742,840) | 5,315,460 | 5,969,350,700 | | |
| | | | | | | | | | | | | | | | | |
| **Pollution Control Obligations** | | | | | | | | | | | | | | | | |
| Salem County 1993 A | 2.50% | 6/1/15 | 3/1/25 | 3/1/19 | Par | 23,000,000 | (43,918) | - | 22,956,082 | 99.81 | 2.52% | (139,218.21) | - | 22,860,782 | 99.39 | 2.57% |
| Montgomery Co. IDA 1999 Series A | 2.50% | 6/1/15 | 10/1/30 | 4/1/20 | Par | 91,775,000 | (251,931) | - | 91,523,069 | 99.73 | 2.52% | (535,580.86) | - | 91,239,419 | 99.42 | 2.55% |
| Montgomery Co. IDA 1999 Series B | 2.50% | 6/1/15 | 10/1/34 | 4/1/20 | Par | 13,880,000 | (38,779) | - | 13,841,221 | 99.72 | 2.72% | (82,455.07) | - | 13,797,545 | 99.41 | 2.74% |
| Montgomery Co. IDA 2001 Series A | 2.70% | 6/1/15 | 10/1/34 | 4/1/20 | Par | 13,150,000 | (36,477) | - | 13,113,523 | 99.72 | 2.72% | (77,552.67) | - | 13,072,447 | 99.41 | 2.74% |
| Montgomery Co. IDA Series 2001 B | 2.50% | 6/1/15 | 10/1/30 | 4/1/20 | Par | 68,795,000 | (188,492) | - | 68,606,508 | 99.73 | 2.52% | (400,706.16) | - | 68,394,294 | 99.42 | 2.55% |
| MEDCO Series 2006 B | 2.55% | 6/1/15 | 12/1/25 | 6/1/20 | Par | 47,000,000 | (139,483) | - | 46,860,517 | 99.70 | 2.58% | (285,728.33) | - | 46,714,272 | 99.39 | 2.62% |
| Montgomery Co. IDA 1996 Series A | 2.55% | 6/1/15 | 6/1/29 | 6/1/20 | Par | 82,560,000 | (234,335) | - | 82,325,665 | 99.72 | 2.57% | (479,929.10) | - | 82,080,071 | 99.42 | 2.60% |
| Montgomery Co. IDA 1994 Series B | 2.55% | 6/1/15 | 6/1/29 | 6/1/20 | Par | 13,340,000 | (38,458) | - | 13,301,542 | 99.71 | 2.57% | (78,770.17) | - | 13,261,230 | 99.41 | 2.60% |
| Montgomery Co. IDA Series 2002 A | 2.55% | 6/1/15 | 12/1/29 | 6/1/20 | Par | 29,530,000 | (84,490) | - | 29,445,510 | 99.71 | 2.57% | (173,048.75) | - | 29,356,951 | 99.41 | 2.60% |
| York County 1993 Series A | 2.55% | 6/1/15 | 6/1/34 | 6/1/20 | Par | 18,440,000 | (57,341) | - | 18,382,659 | 99.69 | 2.57% | (117,389.16) | - | 18,322,611 | 99.36 | 2.59% |
| Montgomery Co. IDA 1996 Series A | 2.60% | 6/1/15 | 3/1/34 | 9/1/20 | Par | 34,000,000 | (101,756) | - | 33,898,244 | 99.70 | 2.62% | (198,336.36) | - | 33,801,664 | 99.42 | 2.64% |
| | | | | | | 435,470,000 | (1,215,460) | - | 434,254,540 | | | (2,568,715) | - | 432,901,285 | | |
| | | | | | | | | | | | | | | | | |
| **Total Exelon Generation Senior Unsecured Obligations** | | | | | | 6,454,879,000 | (23,893,132) | 2,481,260 | 6,428,504,608 | | 4.71% | (47,311,555) | 5,315,460 | 6,402,251,985 | | 4.76% |

Note: excludes non-recourse debt, capital leases and fair value adjustments.

**JA347**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Schedule No. 5

| Source of Capital | Balance (as of 12/31/17) | Ratio |
|---|---|---|
| Long-term Debt | $7,734 | 32.72% |
| Common Equity | $15,904 | 67.28% |
| Total | $23,638 | |

Schedule No. 6

| Company | SYM | S&P's Rating | Moody's Rating | Dividend Cut? | +/- Exelon Corp.'s Rating |
|---|---|---|---|---|---|
| ALLETE | ALE | BBB+ | A3 | No | + |
| Alliant Energy | LNT | A- | Baa1 | No | + |
| Amer. Elec. Power | AEP | A- | Baa1 | No | + |
| Ameren Corp. | AEE | BBB+ | Baa1 | No | + |
| AVANGRID, Inc. | AGR | BBB+ | Baa1 | No | + |
| Avista Corp. | AVA | BBB | Baa1 | No | + |
| Black Hills | BKH | BBB | Baa2 | No | = |
| CenterPoint Energy | CNP | A- | Baa1 | No | + |
| CMS Energy Corp. | CMS | BBB+ | Baa1 | No | + |
| Consol. Edison | ED | A- | A3 | No | + |
| Dominion Energy | D | BBB+ | Baa2 | No | + |
| DTE Energy | DTE | BBB+ | Baa1 | No | + |
| Duke Energy | DUK | A- | Baa1 | No | + |
| Edison Int'l | EIX | BBB+ | A3 | No | + |
| El Paso Electric | EE | BBB | Baa1 | No | + |
| Entergy Corp. | ETR | BBB+ | Baa2 | No | + |
| Eversource Energy | ES | A+ | Baa1 | No | + |
| Exelon Corp. | EXC | BBB | Baa2 | No | |
| FirstEnergy Corp. | FE | BBB- | Baa3 | No | - |
| Fortis Inc. | FTS | A- | Baa3 | No | |
| G't Plains Energy | GXP | BBB+ | Baa2 | No | + |
| Hawaiian Elec. | HE | BBB- | Baa2 | No | - |
| IDACORP, INC. | IDA | BBB | Baa1 | No | + |
| MGE Energy | MGEE | AA- | A1 | No | + |
| NextEra Energy | NEE | A- | Baa1 | No | + |
| NorthWestern Corp. | NEW | BBB | Baa1 | No | + |
| OGE Energy | OGE | A- | A3 | No | + |
| Otter Tail Corp. | OTTR | BBB | A3 | No | + |
| PG&E Corp. | PCG | BBB+ | Baa1 | No | + |
| Pinnacle West Capital | PNW | A- | A3 | No | + |
| PNM Resources | PNM | BBB+ | Baa3 | No | + |
| Portland General | POR | BBB | A3 | No | + |
| PPL Corp. | PPL | A- | Baa2 | No | + |
| Public Serv. Enterprise | PEG | BBB+ | Baa1 | No | + |
| SCANA Corp. | SCG | BBB | Ba1 | No | |
| Sempra Energy | SRE | BBB+ | Baa1 | No | + |
| Southern Co. | SO | A- | Baa2 | No | + |
| Unitil Corp. | UTL | BBB+ | Baa2 | No | + |
| Vectren Corp. | VVC | A- | N/A | No | + |
| WEC Energy Group | WEC | A- | A3 | No | + |
| Westar Energy | WR | BBB+ | Baa1 | No | + |
| Xcel Energy Inc. | XEL | A- | A3 | No | + |

**JA349**

## Exhibit No. MYS-012

## Information on Mystic's Interconnected Utility's Return on Equity

Document Accession #: 20180516-5048    Filed Date: 05/16/2018
USCA Case #20-1343    Document #1935613    Filed: 02/17/2021    Page 366 of 580

ORIGINAL

Exhibit No. MYS-012
Page 1 of 215



800 Boylston Street   Boston, Massachusetts 02199

**Boston Edison Company**

Mary E. Grover
Assistant General Counsel
NSTAR Electric & Gas Corporation
Direct Dial: (617) 424-2105
Facsimile: (617) 424-2733
e-mail: mary.grover@nstaronline.com

*Via Overnight Delivery*

March 17, 2004

Honorable Magalie Roman Salas
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

Re:   Boston Edison Company, Docket Nos. ER01-890-004, -005 and ER02-1465-001, -002

Dear Ms. Salas:

Pursuant to Section 205 of the Federal Power Act, 16 U.S.C. § 824d (2003), Boston Edison Company ("Boston Edison") hereby tenders for filing six (6) copies of an Interconnection Agreement ("IA") between Boston Edison and Sithe Mystic Development LLC, now Exelon Mystic Development, LLC ("Sithe/Mystic"), modified in accordance with the directives of the Commission in its Order in the above-referenced dockets, dated February 17, 2004.

<u>Background</u>

On March 28, 2002, Boston Edison filed a substitute, executed IA in Docket Nos. ER01-890-003 and ER02-1465-000.  In a letter order dated May 31, 2002 ("May 31, 2002 Letter Order"), the Commission accepted for filing the executed IA, subject to certain modifications.  On July 3, 2002, Boston Edison filed with the Commission a substitute IA in compliance with the May 31, 2002 Letter Order, notwithstanding the fact Boston Edison also applied for rehearing of certain aspects of the May 31, 2002 Letter Order involving changes directed by the Commission to Section 5.6 and Schedule 2 of the IA.

On February 17, 2004, the Commission issued an order on Boston Edison's July 3, 2002 compliance filing and on its request for rehearing of the May 31, 2002 Letter Order.  The Commission directed Boston Edison to submit a compliance filing, restoring Section 5.6 and Schedule 2 of the IA as originally proposed in the executed IA filed on March 28, 2002.

**JA351**

Exhibit No. MYS-012
Page 2 of 215

Ms. Salas, Secretary
March 17, 2004
Page 2

Current Filing

In this filing, Boston Edison has restored Section 5.6 of the IA to delete the sentence noting that annual facilities charges ("AFCs") will not be assessed for network upgrades. Boston Edison has also revised Schedule 2 of the IA to reinstate the imposition of AFCs, which would assign to Sithe responsibility for the Operation and Maintenance expenses associated with the new facilities built on Boston Edison's system as necessary to accommodate the interconnection of the generators.

List of Materials Enclosed

The following is a list of documents submitted with this filing:

- Clean copy of the revised Interconnection Agreement
- Redlined copy of the revised Interconnection Agreement, redlined against the version of the IA submitted on July 3, 2002
- A form of Notice suitable for publication in the Federal Register, as well as a diskette containing the form of Notice
- Certification of Service

Notice and Correspondence

Boston Edison requests that all communications regarding this filing be directed to the following individuals and that their names be entered on the official service list maintained by the Secretary:

Philip A. Legrow
NSTAR Electric & Gas Corporation
One NSTAR Way, SUMNE220
Westwood, MA 02090
Phone: (781) 441-8055
Fax: (781) 441-8167

Mary E. Grover, Esq.
NSTAR Electric & Gas Corporation
800 Boylston Street, P1700
Boston, MA 02199-8003
Phone: (617) 424-2105
Fax: (617) 424-2733

Conclusion

For the foregoing reasons, Boston Edison Company respectfully requests that the Commission accept the proposed revisions to the Interconnection Agreement with Sithe/Exelon as consistent with the Commission's directive in its February 17, 2004 Order in this docket.

USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 368 of 580

Ms. Salas, Secretary
March 17, 2004
Page 3

Exhibit No. MYS-012
Page 3 of 215

In the event that additional information is required, please contact the undersigned. In addition, please acknowledge receipt of the enclosed materials by date stamping and returning the extra copy of this transmittal letter in the enclosed self-addressed, postage pre-paid envelope. Thank you.

Very truly yours,

Mary E. Grover
Attorney for Boston Edison Company

Enclosure

**JA353**

Exhibit No. MYS-012

Page 4 of 215

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon each person designated on the service list compiled by the Secretary in this proceeding.

Dated at Boston, Massachusetts this 18th day of March 2004.

Mary E. Grover, Esq.
NSTAR Electric & Gas Corporation
800 Boylston Street, P1700
Boston, MA 02199-8003
(617) 424-2105

**JA354**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION


Boston Edison Company    )              Docket Nos. ER01-890-004, -005 and
                                        ER02-1465-001, -002


## NOTICE OF FILING

March __, 2004

　　　　Take notice that on March 18, 2004, Boston Edison Company ("Boston Edison")
tendered for filing a revised Interconnection Agreement between Boston Edison and Sithe Mystic
Development LLC, now Exelon Mystic Development, LLC ("Sithe/Exelon"). Boston Edison
states that the Interconnection Agreement reflects revisions required by the Commission in its
order issued in this proceeding on February 17, 2004, 106 FERC ¶ 61,150 (2004).

　　　　Copies of said filing have been served upon all persons included on the official service
list in this proceeding.

　　　　Any person desiring to intervene or to protest this filing should file with the Federal
Energy Regulatory Commission, 888 First Street, N.E., Washington, D.C. 20426, in accordance
with Rules 211 and 214 of the Commission's Rules of Practice and Procedure (18 C.F.R.
385.211 and 18 C.F.R. 385.214). Protests will be considered by the Commission in determining
the appropriate action to be taken, but will not serve to make protestants parties to the
proceeding. Any person wishing to become a party must file a motion to intervene. All such
motions or protests should be filed on or before the comment date, and to the extent applicable,
must be served on the applicant and on any other person designated on the official service list.
This filing is available for review at the Commission or may be viewed on the Commission's
web site at http://www.ferc.gov using the "RIMS" link, select "Docket#" and follow the
instructions (call 202-208-2222 for assistance). Protests and interventions may be filed
electronically via the Internet in lieu of paper; see 18 CFR 385.2001(a)(1)(iii) and the
instructions on the Commission's web site under the "e-Filing" link.

Comment Date:

                                        Magalie R. Salas
                                        Secretary

**JA355**

Exhibit No. MYS-012

Page 6 of 215

**Boston Edison Company**
**Third Revised Service Agreement No. 71**
**Under FERC Electric Tariff,**
**Second Revised Volume No. 8**

# INTERCONNECTION AGREEMENT
## BETWEEN
## SITHE MYSTIC DEVELOPMENT LLC
### AND
## BOSTON EDISON COMPANY

Issued by: Douglas S. Horan                    Effective: March 6, 2001
　　　　　　Vice President

Issued on: March 18, 2004

Filed to comply with the order of the Federal Energy Regulatory Commission, Docket Nos.
ER01-890-004 and -005 and ER02-1465-001 and -002, issued on February 17, 2004,
106 FERC ¶ 61,150 (2004).

**JA356**

# Table of Contents

Section 1.   Definitions.................................................................................3
Section 2.   Term........................................................................................5
Section 3.   General Considerations ..............................................................6
Section 4.   Construction of Interconnection Facilities ....................................6
Section 5.   Payment for Interconnection Facilities .........................................7
Section 6.   Security ..................................................................................10
Section 7.   Adjustment of Capitalized Interconnection Facilities Costs...........11
Section 8.   Service Availability of Interconnection Facilities..........................12
Section 9.   Partial Service ........................................................................13
Section 10.  Ownership ..............................................................................13
Section 11.  This Section intentionally left blank...........................................14
Section 12.  Construction Power and Station Service......................................14
Section 13.  Delivery and Measurement of Electricity ....................................15
Section 14.  Operations...............................................................................17
Section 15.  Maintenance............................................................................21
Section 16.  Emergencies............................................................................22
Section 17.  Safety....................................................................................23
Section 18.  Future Modifications................................................................24
Section 19.  Force Majeure .........................................................................24
Section 20.  Default....................................................................................25
Section 21.  Notice to Suspend ...................................................................26
Section 22.  Notice to Terminate ................................................................26
Section 23.  Assignment .............................................................................27
Section 24.  Subcontractors.........................................................................28
Section 25.  Insurance................................................................................28
Section 26.  Indemnification ........................................................................30
Section 27.  Limitation of Liability ...............................................................30
Section 28.  Disputes..................................................................................30
Section 29.  Regulatory Approvals ...............................................................31
Section 30.  State and Federal Laws ............................................................31
Section 31.  Amendments............................................................................31
Section 32.  Complete and Full Agreement ...................................................32
Section 33.  No Third Party Beneficiaries .....................................................32
Section 34.  Limited Purpose.......................................................................32
Section 35.  Nonwaiver...............................................................................33
Section 36.  No Dedication of Facilities ........................................................33
Section 37.  Notices....................................................................................33
Schedule 1: Major Milestone Schedule ........................................................35
Schedule 2: Estimate of Major Cost Components ..........................................36
Schedule 3: Calculation of Annual Facilities Cost .........................................38
Schedule 4: Company's System Impact Study for Sithe's Generators ..............41
Figure 1A: Proposed Sithe Generator 345 kV Interconnection .......................51

JA357

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048     Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 373 of 580

Exhibit No. MYS-012
Page 8 of 215

**Figure 1B: Proposed Sithe Generator 115 kV Interconnection**..........................................52

**Figure 2A - Mystic Underground Work Areas Due to Sithe Mystic Interconnection (345 kV Switchyard Areas)**..........................................54

**Figure 2B – NSTAR Underground Work Areas Due to Sithe Mystic Interconnection (Sithe Property between 345 kV Switchyard and 115 kV Switchyard)**..........................................55

**Figure 2C – NSTAR and Sithe Underground Work Areas Due to Sithe Mystic Interconnection   (NSTAR 115 kV Switchyard Easement)**..........................................56

**Attachment 1: Form of Corporate Guaranty Agreement**..........................................57

**JA358**

AGREEMENT entered into as of this _____ day of _____, ____ by and between Sithe Mystic Development LLC, having its principal place of business at 529 Main Street, Suite 605, Charlestown, Massachusetts 02129 (hereinafter referred to as "Sithe"), and Boston Edison Company, a Massachusetts corporation having its principal place of business at 800 Boylston Street, Boston, Massachusetts, 02199 (hereinafter referred to as "Company").

WHEREAS, Sithe plans to construct a new gas fired combined cycle generating station of approximately 1600 megawatt maximum (50°F) output in Everett, Massachusetts (hereinafter referred to as "Sithe's Generators"); and

WHEREAS, the System Impact Study that has been performed for Sithe's Generators by Company identified that upgrades of six (6) 115 kV lines, installation of one new 345 kV line, splitting the existing 345 kV Line 346 X&Y, and extensive substation work at three (3) 345 kV substations and three (3) 115 kV substations, including replacement of a 345/115 kV autotransformer, all as more fully described in Schedule 2 hereof, are all required in order to meet the Minimum Interconnection Standard for Sithe's Generators; and

NOW, THEREFORE, in consideration of the mutual promises and agreements contained herein, Sithe and Company hereby agree as follows:

**Section 1.   Definitions**

Terms used herein that are not defined have the meaning stated in Company's Tariff or its successor, either as amended from time to time.

**1.1     Annual Facilities Charge ("AFC").** Annual charges for ongoing expenses associated with new facilities, the applicability of which are determined pursuant to Section 5.6, and the calculation of which are pursuant to Schedule 3 hereof.

**1.2     Company's Tariff.** The Company's Open Access Transmission Tariff as it may be amended from time to time and accepted or approved by FERC.

**1.3     Company Transmission System.** All the facilities owned or controlled by the Company on the Company's side of the Interconnection Points for the purpose of providing wholesale transmission service under the Company's and/or NEPOOL's Open Access Transmission Tariff.

**1.4     This subsection intentionally left blank.**

**1.5     Emergency.** Any abnormal system condition that requires automatic or immediate manual action to prevent or limit loss of transmission facilities or generation supply that could adversely affect the reliability of the Company Transmission System or the systems to which the Company is directly or indirectly connected.

**1.6     FERC.** The Federal Energy Regulatory Commission, or its successor.

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048        Filed Date: 05/16/2018
USCA Case #20-1343        Document #1935613        Filed: 02/17/2022        Page 375 of 580

Exhibit No. MYS-012
Page 10 of 215

**1.7    Force Majeure.** The failure or imminent threat of failure of facilities or equipment, flood, freeze, earthquake, storm, fire, lightning, other acts of God, epidemic, war, acts of a public enemy, riot, civil disturbance or disobedience, strike, lockout, work stoppages, other industrial disturbance or dispute, sabotage, restraint by court order or other public authority, and action or non-action by, or failure or inability to obtain the necessary authorizations or approvals from, any governmental agency or authority, which by the exercise of due diligence the affected Party could not reasonably have been expected to avoid and by exercise of due diligence its effect can not be overcome. In no event shall the lack of funds or an inability to obtain funds be a Force Majeure event.

**1.8    Good Utility Practice.** Any of the practices, methods and acts engaged in or approved by a significant proportion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in the light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at the lowest reasonable cost consistent with reliability, safety and expedition. Good Utility Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather to be a spectrum of acceptable practices, methods or acts.

**1.9    Hazardous Substances.** Any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "hazardous constituents", "restricted hazardous materials", "extremely hazardous substances", "toxic substances", "contaminants", "pollutants", "toxic pollutants" or words of similar meaning and regulatory effect under any applicable Environmental Law, or any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any applicable Environmental Law. For purposes of this Agreement, the term "Environmental Law" shall mean federal, state and local laws, regulations, rules, ordinances, codes, decrees, judgments, directives, or judicial or administrative orders relating to pollution of the environment, natural resources or human health and safety.

**1.10    Interconnection Facilities.** New and/or upgraded facilities comprised of all the facilities described in Schedule 2, which are the subject of this Agreement

**1.11    Interconnection Points.** The points, identified in Figures 1A and 1B, at which the leads from Sithe's step-up transformers) connect to the bus at the Company's facilities.

**1.12    Interim Agreements.** The agreement between the Parties dated December 23, 1999, which provides for the engineering and procurement of long lead time materials in anticipation of this Agreement (the "First Interim Agreement") and the letter agreement dated October 26, 2000, which provides for extension of the First Interim Agreement to certain construction activities (the "Second Interim Agreement").

**1.13    ISO.** ISO-New England, Inc., the Independent System Operator of the New England Power Pool control area and its successors and assigns.

**1.14    Metering Points.** The points at which the net output of Sithe's Generators are metered (with dynamic compensation to the Interconnection Points).

**1.15    Minimum Interconnection Standard.** A standard of interconnection defined in the NEPOOL Tariff.

**1.16    NEPOOL.** The New England Power Pool and its successors and assigns.

**1.17    NEPOOL Agreement.** The Restated NEPOOL Agreement as it may be amended from time to time and accepted or approved by FERC.

**1.18    NEPOOL Tariff.** The NEPOOL Open Access Transmission Tariff as it may be amended from time to time and accepted or approved by FERC.

**1.19    NERC.** The North American Electric Reliability Council, or its successor.

**1.20    Notice to Proceed.** A written notice given by Sithe to Company that Sithe directs Company to start the work described herein.

**1.21    NPCC.** The Northeast Power Coordinating Council, or its successor.

**1.22    Parties.** Sithe and Company.

**1.23    PTF.** Pool Transmission Facilities, as defined in the NEPOOL Agreement.

**1.24    Secondary Systems.** Control or power circuits that operate below 600 Volts, AC or DC, including, but not limited to, any hardware, control or protective devices, cables, conductors, electric raceways, secondary equipment panels, transducers, batteries, chargers, and voltage and current transformers.

**Section 2.    Term**

**2.1    General.** This Agreement shall take effect as of the day and year first above written, subject to FERC acceptance for filing or approval by FERC, and shall continue in full force and effect until a mutually agreed termination date not to exceed the date on which Sithe's Generators cease commercial operations.

**2.2    Termination Upon Default.** This Agreement may be terminated upon a Party's Default in accordance with the provisions of Section 20.

**2.3    Survival.** The applicable provisions of this Agreement shall continue in effect after expiration, cancellation, or termination hereof to the extent necessary to provide for final billings, billing adjustments, and the determination and enforcement of liability and indemnification obligations arising from acts or events that occurred while this Agreement was in effect.

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048    Filed Date: 05/16/2018
USCA Case #20-1343    Document #1935613    Filed: 02/17/2022    Page 377 of 580

Exhibit No. MYS-012
Page 12 of 215

## Section 3.    General Considerations

Company shall design, engineer, procure, and construct, to the extent not already ordered or constructed pursuant to the Interim Agreements, those Interconnection Facilities that are located on the Company Transmission System in accordance with Good Utility Practice. Such Interconnection Facilities must, at a minimum, satisfy NEPOOL's Minimum Interconnection Standard.    Further, Company shall own, operate and maintain all the Interconnection Facilities that are the subject of this Agreement. Sithe shall make its own arrangements for all additional facilities required to effect its interconnection that are located on the transmission systems of other transmission providers.

Transmission services and related ancillary services are provided pursuant to the NEPOOL Tariff and the Company's and potentially other transmission providers' Tariffs, and not pursuant to this Agreement.

## Section 4.    Construction of Interconnection Facilities

Upon execution of this Agreement, the Company shall initiate its project authorization process.    Company will undertake all work under this Agreement not already in progress pursuant to the Interim Agreements and will purchase the equipment and materials required for the work hereunder only after the later of (a) receiving a Notice to Proceed from Sithe, together with Sithe's payment pursuant to Section 5.1 or (b) Company's approval of the project authorization. Such Company approval of the project authorization should normally occur within 3 weeks of execution hereof. Sithe must issue its Notice to Proceed within ninety (90) days of execution hereof or this Agreement shall terminate as of that date.

Company agrees that time is of the essence in this Agreement to maintain the schedule delineated in Schedule 1 in order to permit interconnection and operation of Sithe's Generators in a timely manner. However, Company shall bear no responsibility whatsoever for delays caused by, but not limited to: repair or replacement of defective equipment and materials; delays caused by vendors; an inability to secure ISO permission to take construction outages when desired; any order of any appropriate court or regulatory body; any event of Force Majeure; or any required environmental remediation. Company shall coordinate its work hereunder with the ISO and any related projects being completed by other transmission providers on behalf of Sithe and/or any other interconnection projects under way in the area. Sithe acknowledges that the ISO may, after consultation with Sithe, other affected generators, and the Company, request and ultimately require that the Company shift its construction outage schedule for any of several reasons. Within the constraints imposed by the priority of maintaining the schedule laid out in Schedule 1, Company agrees to use reasonable efforts to minimize the costs of Interconnection Facilities through such mechanisms as competitive bidding for the procurement of equipment and materials required to complete the work hereunder, as applicable.

In the event that this Agreement is executed prior to approval, pursuant to Section 18.4 of the NEPOOL Agreement, of the Interconnection Facilities and such NEPOOL approval is conditioned on or amended to include a set of interconnection facilities that differs from the Interconnection Facilities listed in Schedule 2, the Parties agree to amend Schedule 2 in

6

**JA362**

conformance with the conditions of such approval. To the extent that such amendment results in the delivery of materials and/or equipment that are no longer useful to the construction of the Interconnection Facilities, as revised, Sithe shall take ownership and possession thereof pursuant to the last paragraph of Section 22. The Parties recognize that such amendment of Schedule 2 may also impact the schedule of work hereunder, and require the adjustment of the milestones listed in Schedule 1. The Company shall bear no responsibility for any schedule delays or cost increases caused by such changes in scope.

Company shall meet periodically with Sithe to update Sithe regarding the status of the work performed to date, as it relates to the schedule of such work, and regarding the monies expended to date as compared to that expected to be expended to date. During and following such meetings, Sithe and Company agree to plan any actions needed or prudent to facilitate the work hereunder, and to consider any and all alternatives identified to work around any delays that may arise. If Company and Sithe jointly decide to pursue alternatives not identified in the Schedules attached hereto, Company and Sithe shall mutually determine their respective responsibilities arising therefrom, provided however, that if the Parties cannot come to agreement regarding such responsibilities, Sithe shall assume responsibility for all effects of such decision, including, but not limited to, its costs and any resulting delays.

### Section 5.    Payment for Interconnection Facilities

**5.1    Initial Payment.** Sithe agrees to pay Company for all costs and fees which are required to enable Company to fulfill its obligations under this Agreement, including without limitation materials, labor, and appropriate overheads, a non-binding estimate of which is provided in Schedule 2, plus any tax liability, and the costs and fees of all permits, licenses, franchises or regulatory or other approvals necessary for the construction of the Interconnection Facilities. An initial payment of $10,000,000.00 less any amounts previously paid pursuant to the Interim Agreements shall be made simultaneously with issuance of the Notice to Proceed. A second payment in the amount of the balance of the total estimated cost as shown in Schedule 2 shall be due and payable on or before December 31, 2000. Sithe shall have the option to make such second payment in the form of a letter of credit ("LOC") that meets all of the standards laid out for the Security in Section 6. Company shall have full access to any such LOC to withdraw as needed the amounts forecast to be required to support the work hereunder during the coming month, plus or minus any adjustment from the previous month. In no event, however, will the Company continue construction of the Interconnection Facilities if, in the Company's reasonable opinion, the remaining funds made available to date by Sithe plus Sithe's Security in place at the time are insufficient to close down the project and restore the Company Transmission System to a viable permanent configuration in accordance with Good Utility Practice. Company must provide Sithe at least 30 days prior notice if Company believes such funding insufficiency is imminent.

**5.2    Schedule 2 Cost Changes.** Company shall notify Sithe of any increases in the estimated total cost in Schedule 2, and shall obtain Sithe's prior written consent for such increases amounting to in the aggregate 5 percent (5%) or more within ten (10) business days of such notice. To the extent that the amount of the increase is more than ten percent (10%) of the Schedule 2 total, as previously amended, Sithe shall have one additional business day

7

**JA363**

per full percentage point by which the increase exceeds ten percent (10%) of the Schedule 2 total to provide its consent. Upon such notification and, when required, Sithe's consent, Sithe shall pay Company the amount of the cost increase, whether directly, or via an increase in its LOC, and shall revise the amount of its Security as discussed in Section 6. If Sithe fails to pay Company the amount of such cost increase within twenty (20) days of Company's notice thereof, or, when required, Sithe's consent, Company may draw on the Security to recover such increase. If Company draws on the Security, Sithe must restore the amount of the Security to the required level within thirty (30) days of Company's draw thereon, or Company may suspend all work hereunder until such restoration.

If Sithe fails to provide the required written consent to individual or cumulative increases of 5 percent (5%) or more within the period defined above, such non-concurrence shall be deemed to be Sithe's notice to terminate pursuant to Section 22 below.

If Company identifies a net decrease in the total cost estimate of Schedule 2 amounting to $250,000 or more, Company shall notify Sithe of such decrease, and shall refund the amount of such cost decrease, or permit Sithe to reduce its LOC, as applicable, within twenty (20) days of Company's notice thereof. Upon such notice Sithe may revise the amount of its Security as discussed in Section 6.

**5.3     Tax Gross-up.** Sithe acknowledges that under Internal Revenue Code Section 118 and Internal Revenue Service's Notice 87-82, transfers made by Sithe to Company hereunder with respect to the construction and installation of new facilities or improvements may, under certain circumstances, cause a taxable event to Company. Sithe agrees to reimburse Company within twenty (20) days of Company's invoice for all tax effects, both state and federal ("Tax Gross-up"), including interest and penalties, if any, if Company, whether in its sole reasonable discretion or at the direction of the IRS, pays state and/or federal taxes on Sithe's payments. Any such calculation will take into account as an offset the depreciation, amortization and other deductions to which Company will be entitled if it is required to report the transfers as income. The Parties agree that no Tax Gross-up is expected to be required hereunder based on their understanding of current IRS policy. If Sithe wishes to minimize its exposure to IRS and Commonwealth of Massachusetts interest charges and penalties pursuant to this Section 5.3, it may request that Company calculate the appropriate Tax Gross-up, and pay such amount to the Company.

Provided that the Company has received Sithe's Notice to Proceed, the Company shall, upon Sithe's request to do so, use reasonable efforts over a reasonable period of time to seek a private letter ruling from the IRS to the effect that Company's performance of this Agreement and receipt of payments hereunder do not result in a Tax Gross-up. Company will provide Sithe with a draft and consider in good faith any suggestions about content and permit Sithe to participate in any conference of right with the IRS about the ruling request. Sithe agrees to reimburse Company for its costs incurred in the pursuit of such ruling, including Company's reasonable internal cost and the costs of expert outside counsel. If Company receives a tax refund as a result of such IRS ruling, Company will return the Tax Gross-up to Sithe, together with interest thereon based on the interest paid, if any, by the IRS or the state.

If Sithe fails to make a reimbursement required pursuant to this Section 5.3 within twenty (20) days of Company's invoice for such reimbursement, Company may draw on the Security for such reimbursement. If Company draws on the Security, Sithe must restore the amount of the Security to the required level within thirty (30) days of Company's draw thereon, or Company may suspend all work hereunder until such restoration.

**5.4     Construction Outage Related Costs.**     Sithe and Company recognize that construction of the Interconnection Facilities will require Company, acting in conjunction with the ISO, to take certain transmission facilities out of service, and that such outages may require the redispatch of other generators. Such redispatch, if any, may result in increased costs attributable to (i) the necessity of running additional units to maintain reliability; (ii) higher dispatch levels on generators in areas rendered constrained by the outages; and (iii) lost opportunity costs from units backed down or forced off line. Pursuant to a Settlement Agreement approved by the FERC in Docket No. ER01-890-000 ("Settlement Agreement"), the Parties agree that to the extent that such type (i) and type (ii) redispatch costs materialize, such costs, if they meet the definition of Upgrade-Related Congestion Costs set forth in the Settlement Agreement, shall be allocated as follows: any Upgrade-Related Congestion Costs incurred prior to October 17, 2001 will be allocated to NEPOOL Network Load consistent with existing NEPOOL rules. From and after October 17, 2001, Upgrade-Related Congestion Costs shall be allocated as follows: a) the first $500,000 shall be allocated to and paid by Sithe; b) the next $1.5 million shall be allocated to NEPOOL Network Load consistent with existing NEPOOL Rules; and c) all such costs in excess of $2 million, from and after October 17, 2001, shall be borne equally between Sithe and NEPOOL Network Load. The Settlement Agreement shall govern how such Upgrade-Related Congestion Costs will be determined.

The Parties acknowledge that FERC has already ruled on type (iii) redispatch costs in the NEPOOL CMS Proceeding in Docket No. ER00-2016, et al.

**5.5.1     Report of Total Costs.**     Company shall provide Sithe a report of the final total Interconnection Facilities costs, as delineated in Schedule 2, in sufficient detail to allow identification of all major cost components. Company shall use best efforts to provide such report within ninety (90) days following the earlier of (a) the date on which the Interconnection Facilities are completed, or (b) the early termination of this Agreement.

**5.5.2     Reconciliation.**     If Sithe's actual payments, whether directly or via its LOC, are less than the total costs identified in Section 5.5.1, Company shall bill Sithe for the balance due. Any such balance due shall be paid to Company within twenty (20) days of receipt of such bill, after which the Company may draw on the Security for any amounts still owing. If the Security cannot fully cover the amount owed, the balance due will accumulate interest charges at the rate specified in Company's Tariff. If Sithe's actual payments exceed the total costs identified above, Company shall authorize termination of the LOC, if any, to the extent the excess resides therein, in writing within twenty (20) days of such final accounting. To the extent Company had previously drawn such excess from the LOC, or otherwise had been overpaid directly by Sithe, Company shall refund such amount. Such refund will include interest thereon at the rate specified in Company's Tariff, from the date of the most recent draw(s) or payment(s) until the date of the refund, if the excess in Company's possession is

9

at least $10,000.00. Sithe shall have the right to audit Company's accounts related to such costs within one year of the reconciliation at its own expense. Company shall have the right to charge Sithe for its reasonable costs of assisting in any such audit.

**5.6     Annual Facilities Charges.**  To the extent that one or more of the Interconnection Facilities are new additions to Company's Transmission System, and not merely higher capacity replacements or upgrades of existing facilities, such new facilities shall be subject to an Annual Facilities Charge ("AFC") for the full service life of Sithe's Generators, or, if shorter, the full service life of the new facilities. Company shall invoice such charges monthly on an estimated basis, and shall true up the charges annually by June 1 of the following year. AFCs shall be calculated pursuant to Schedule 3 hereof, and shall apply to those line items, or indicated percentages thereof, flagged in Schedule 2 with an asterisk.

**5.7     Costs Backstop.**  Provided that Company has received Sithe's Notice to Proceed as specified in Section 4, Sithe agrees to reimburse Company for all reasonable and verifiable costs related hereto that Company has incurred and for which Company is not otherwise reimbursed by NEPOOL. This paragraph does not override Section 5.4 as resolved by FERC, Section 7, or any specific FERC order pertaining to this Agreement.

Furthermore, nothing contained in this Agreement shall affect any provisions of any previous agreements between the Parties or their affiliates, including without limitation any allocation of liability for environmental remediation costs; provided, however, that to the extent that, in the course of effecting Sithe's interconnection, the Company encounters environmental contamination in the Interconnection Work Zone at levels that require remediation or other special processing, as a result of which the Company incurs environmental remediation or other related costs for which the Company would be liable under any such previous agreements, Sithe shall reimburse the Company for all such costs. Within its retained easements (i.e., the Mystic switchyards), the Company shall retain all responsibility for any environmental remediation costs associated with areas outside the Interconnection Work Zone, which shall be defined as the shaded areas indicated in Figures 2A-2C.

**Section 6.   Security**

In recognition of the magnitude of certain potential cost liabilities to be borne by Company hereunder, Company requires that Sithe provide a letter of credit ("Security") for a term and in a form acceptable to Company to assure Company recovery of its entire costs for the Interconnection Facilities. Sithe shall deliver the Security to Company simultaneously with Sithe's second payment as provided in Section 5.1, and shall maintain the Security in accordance with the following provisions until allowed to extinguish it pursuant to the second paragraph of this Section 6. Prior to such second payment, the Security provided by Sithe pursuant to the Interconnection Agreement between Sithe Fore River Development LLC and Boston Edison Company will serve additionally as the Security hereunder. The amount of the Security provided at the time of Sithe's second payment pursuant to Section 5.1 shall be revised from time to time upon Company's notice to Sithe to account for any known increases or decreases in Interconnection Facilities costs. Sithe agrees to make such adjustments to the Security within thirty (30) days of receipt of Company's notice of any such required adjustments. If Sithe fails to make such adjustments to the Security when

required, Company may suspend all work hereunder until such adjustments are made.

The Security shall be in the form of an unconditional irrevocable standby letter of credit drawn on a bank reasonably acceptable to Company. Within the first year from the Notice to Proceed, the Security may have a term of less than one year in order to facilitate Sithe's financing arrangements, and substitutions will be permitted, provided that the issuer and form are satisfactory to the Company and that the coverage is continuous. Thereafter the Security shall have a minimum term of one (1) year. At all times the Security shall designate Company as beneficiary with authority to draw drafts on the issuer for up to the secured amount in accordance with this Section 6. Such Security shall also provide that Company may, upon five days notice, draw the full amount of the Security in the event it has not been renewed, extended or replaced on or before thirty (30) days prior to the expiration date of such Security. The amount of the Security shall be calculated as the higher of (a) 25% of the aggregate costs of the Interconnection Facilities, as estimated in Schedule 2 as amended from time to time, or (b) $1,000,000.00. Sithe may reduce the amount of the Security to ten percent (10%) of the total cost as listed in Schedule 2, as most recently amended, upon the earlier of (a) the date on which the Interconnection Facilities are completed, or (b) the termination of this Agreement, provided that Sithe shall provide a corporate guarantee acceptable to the Company such that the sum of the Security and the corporate guarantee shall be maintained at the higher of (a) twenty-five percent (25%) of such Schedule 2 amount or (b) the Tax Gross-up as adjusted annually for the potential for IRS and Commonwealth of Massachusetts interest and penalties throughout the period covered by the IRS statute of limitations, Section 6501(a) of the Internal Revenue Code of 1986, as amended, including extensions, applicable for the year(s) in which the transfer(s) contemplated in Sections 5.1 and 5.2 hereof occurred. The form of such corporate guarantee is provided in Attachment 1 to this Agreement. Sithe may extinguish the Security upon completion of the settlement contemplated pursuant to Section 5.5.2, provided that Company has issued a notice to Sithe that all amounts owed to Company have been paid to the reasonable satisfaction of Company. In the event that Sithe extinguishes the Security in accordance with the foregoing sentence, Sithe shall replace the corporate guarantee previously issued with a corporate guarantee acceptable to the Company in substantially the form provided in Attachment 1 to this Agreement, and in an amount equal to the higher of (a) twenty-five percent (25%) of the aggregate costs of the Interconnection Facilities as set forth in Schedule 2 or (b) the annually adjusted Tax Gross-up; provided that such corporate guarantee shall be terminated by Sithe upon the earlier of (a) the conclusion of the period covered by the IRS statute of limitations, Section 6501 (a) of the Internal Revenue Code of 1986, as amended, including extensions, applicable for the year(s) in which the transfer(s) contemplated in Sections 5.1 and 5.2 hereof occurred; or (b) the receipt of a Private Letter Ruling from the IRS pursuant to Section 5.3 hereof that confirms that payments hereunder are not taxable income. The amount of the Security shall not be construed to limit amounts otherwise due to Company under this Agreement. The foregoing in this paragraph notwithstanding, if Sithe has paid the Tax Gross-up pursuant to its option in Section 5.3, the amount of the Security shall be computed ignoring the Tax Gross-up, and the required term of the Security shall be determined ignoring the IRS statute of limitations and extensions thereof.

**Section 7.    Adjustment of Capitalized Interconnection Facilities Costs**

11

**JA367**

It is the intent of the Parties that any cost sharing mechanism pursuant to the NEPOOL Tariff, as filed by NEPOOL and approved by FERC upon the exhaustion of all appeals, or specific FERC order pertaining to this Agreement, which is determined to be applicable to the Interconnection Facilities, shall be applied to the Interconnection Facilities pursuant to the applicable NEPOOL and/or ISO procedures. In the event that such procedures result in a refund of costs from the Company to Sithe, such refund shall be made within sixty (60) days following the Company's receipt of its first payment under the NEPOOL Tariff related to such shared costs.

## Section 8. Service Availability of Interconnection Facilities

Company makes no warranties or representations, other than as set forth in Section 4 above, that the Interconnection Facilities undertaken pursuant to this Agreement will be available at any specific time, nor does Company guarantee to transmit a constant supply of electricity under this Agreement. Rather, it is the intent of all provisions of this Agreement that Sithe shall assume the risks of interruption, failure or deficiency in the quality or quantity of service, whether caused by a Force Majeure event as described in Section 1.7, above, or by any other event on the New England transmission system, except to the extent such interruption, failure or deficiency in the quality or quantity of service is caused by the sole negligence of the Company. Sithe acknowledges that from time to time during the term of this Agreement other persons may develop, construct and operate, or acquire and operate generating facilities in the Company's service territory, and such construction or operation by such other persons may adversely affect Sithe's Generators. Sithe further recognizes that conditions on the system, including the necessity to perform maintenance, implement upgrades, or interconnect other generators, may arise that require the ISO, its satellite, REMVEC, or Company to curtail, in whole or in part, the output of Sithe's Generators. When time and available information permit, the ISO will order such curtailments, in its sole discretion, on a non-discriminatory basis among those generators best physically able to address the need for the curtailment(s). Sithe shall hold Company harmless for any such curtailments to Sithe's Generators.

Company agrees to perform routine maintenance and make emergency repairs on the Interconnection Facilities in accordance with Good Utility Practice and any applicable warranties. In the event of damage to any of the Interconnection Facilities, Company will rely first on any applicable warranties, and thereafter make any additional necessary capital expenditures to replace, reconstruct, or otherwise bypass such damaged Interconnection Facilities in accordance with NEPOOL requirements as they exist at the time and in accordance with Good Utility Practice. Except to the extent such expenditures are determined by a court or regulatory authority having jurisdiction to have been made due to the negligence of the Company, Company will invoice Sithe for any required replacements of units of property with respect to which Sithe bears ongoing cost responsibility for AFCs pursuant to Section 5.6.

To the extent permitted to do so pursuant to Good Utility Practice, FERC Standards of Conduct, and applicable NEPOOL rules and practices, Company will apprise Sithe of its planned maintenance activities that may impact Sithe's operations. To the extent the ISO publishes such information in a vehicle that Sithe is entitled to receive, such publication shall

be deemed to satisfy Company's commitment under this paragraph.

## Section 9.    Partial Service

Sithe may request, and if requested will pay for, operating studies to be performed by Company, ISO New England and/or NEPOOL to determine the maximum allowable output of Sithe's Generators should all Interconnection Facilities not be completed prior to the date Sithe's Generators require transmission service. Any interim service will be provided at the ISO's discretion based upon the operating studies' indication of the maximum allowable output.

Similarly, Sithe may request, and if requested will pay for, operating studies to be performed by Company, ISO New England and/or NEPOOL to determine the maximum allowable output of Sithe's Generators under any transmission system operating configurations that may, in the absence of such studies, curtail the output of Sithe's Generators. Use of the results of any such studies will be at the ISO's discretion.

Sithe recognizes that its requests for operating studies will be subject to the policies of the party(ies) to which its request is made regarding the availability of technical staff to perform the requested studies and the priority accorded Sithe's request relative to other ongoing study work.

## Section 10.    Ownership

**10.1    Land Ownership and Eminent Domain Takings:**  Sithe shall furnish at no cost to the Company any necessary access, easements, licenses, and/or rights of way upon, over, under, and across lands owned or controlled by Sithe and/or its affiliated interests for the construction and operation of necessary lines, substations, and other equipment to accomplish interconnection of Sithe's Generators with the Company Transmission System under this Agreement, and shall, at all reasonable times, give the Company, or its agents, free access to such lines, substations and equipment. Sithe grants to Company at all reasonable times and with reasonable supervision, the right of free ingress and egress to Sithe's premises for the purpose of installing, testing, reading, inspecting, repairing, operating, altering, or removing any of Company's property located on Sithe's premises or for other purposes necessary to enable Company to receive electric energy, suspend the receipt thereof, or determine Sithe's compliance with this Agreement.

If any part of Company's facilities are to be installed on property owned by other than the Company or Sithe, Sithe shall, if Company is unable to do so without cost to the Company, procure from the owners thereof any necessary rights of use, licenses, rights of way and easements, in a form reasonably satisfactory to the Company, for the construction, operation, maintenance and replacement of Company facilities upon such property. In the event Sithe is unable to secure them (a) by condemnation proceedings or (b) by other means, Company shall use its best efforts to secure such rights and Sithe shall reimburse Company for all reasonable and documented costs incurred by the Company in securing such rights. See Schedule 5 for the details of the land ownership arrangements between the parties.

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048     Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 385 of 580

Exhibit No. MYS-012
Page 20 of 215

In connection with Company's exercise of rights under this Section 10.1, while on Sithe's premises, Company's personnel shall comply with all applicable safety rules or regulations of Sithe that are communicated by Sithe to Company.

If any conflicts exist between the provisions of this Section 10.1 and the Cross-Easement Agreement dated May 14, 1998 between Company and Sithe Energies, Inc., as amended on May 11, 2000 and as may be further amended from time to time, then the Cross-Easement Agreement, as amended, shall govern.

The Parties acknowledge that an amendment to the Cross-Easement Agreement is required to reflect the construction of the Interconnection Facilities. The Parties hereby agree to further amend the Cross-Easement Agreement to include Sithe's connections to the appropriate Interconnection Facilities once their locations become known.

**10.2   Plant Ownership:**   Sithe will own Sithe's Generators and the associated transformers, switches, and conductors up to, but not including, the inter-company demarcation point.

For Block 8, and Units 9-3 and 9-4 (air insulated terminations) the demarcation point shall be the first operable device within Company's substation (jaw end of the air-insulated disconnect switch).

For Unit 9-6 (gas insulated termination), Sithe shall own the 115 kV cable terminators installed on the gas insulated switchgear, with the demarcation point being the internal connection between the cable terminator conductor and the internal gas insulated switchgear conductor. Company shall own the gas insulator enclosure mounted over the terminators and that portion of the GIS support system supporting these enclosures.

The above ownership by Sithe shall be deemed to provide direct connection to PTF.

Also at Mystic Station, Sithe shall own optical fibers and associated conduits in the various block protection systems up to the splice with the Company's optical fibers for the same systems. The Company will own the associated enclosures and interface boxes, identified as Interface Box 1 and Interface Box 2, and conduits connecting to the Company's conduit, duct and/or tray system.

Company will own any station bridges or any other conductor support or termination structures within the substation. Company will own all the transmission lines and substations and facilities appurtenant thereto which are the subject of this Agreement. See Figures 1A and 1B for a depiction of the ownership of the Interconnection Facilities within the Mystic Station switchyards.

**Section 11.**  This Section intentionally left blank.

**Section 12.  Construction Power and Station Service**

**12.1    Construction Power.**   Sithe shall make its construction power connection

14
**JA370**

arrangements with respect to Sithe's Generators with the local electric distribution provider, and shall make its energy purchase arrangements with the qualified energy supplier of its choice under the applicable state's deregulation rules.

**12.2    Test Power.** At such time as Sithe is ready to test Sithe's Generators, Company will transmit, pursuant to service agreements under the NEPOOL and Company's Tariffs, any test power drawn by or delivered from Sithe's Generators, but Sithe is responsible for the disposition of and related accounting for such test power produced, and for payment for any such power drawn. Sithe shall have made suitable power arrangements for such test power and notified the ISO of such arrangements prior to engaging in such tests.

**12.3    Station Service.** Sithe shall make permanent station service power connection arrangements with the local electric distribution provider and/or shall have designed and built a station service source on its side of the Interconnection Point. If Sithe elects to utilize the latter option, it will be subject to the NEPOOL Tariff as a load customer and, to the extent transition to the full implementation of that tariff is still in progress, it will also be subject to the Company's Tariff. If both sources are utilized, Sithe shall so configure its circuits such that any distribution source can never back-feed the transmission level source(s). For either source, Sithe shall make its own energy supply arrangements with the qualified energy supplier of its choice and this Agreement shall in no way determine the rate for such service.

To the extent that the Interconnection Facilities include a new substation at or adjacent to Sithe's Generators, Sithe shall be responsible for providing such substation with its station service requirements at no cost to Company. Such substation service load shall be deemed to be Sithe's load for all load reporting purposes.

Company shall continue to be responsible for making its own station service arrangements at all other substations at which Interconnection Facilities are being undertaken pursuant to this Agreement.

To the extent that the Interconnection Facilities include facilities that are subject to AFC's pursuant to Section 5.6 other than a new substation at or adjacent to Sithe's Generators, such facilities shall be allocated a portion of the station service energy costs pursuant to Schedule 3.

**Section 13.    Delivery and Measurement of Electricity**

**13.1    Voltage Level:** All electricity that crosses the Interconnection Point shall be in the form of three-phase, sixty hertz, alternating current at a nominal voltage of 115, 230, or 345 thousand volts, as appropriate. Such voltage shall at all times, including during unit startups at Sithe's Generators, be held within the tolerances specified in the ISO's voltage schedules. If Sithe fails to maintain such voltages and frequency, Company may disconnect Sithe's Generators until such time as Sithe remedies its inability to operate within the required voltage tolerances.

**13.2    Generator Reactive Capability:** Sithe's Generators are required to provide reactive capability to regulate and maintain system voltage at the Interconnection Point to the extent

physically able to do so. Compensation for such voltage support is available pursuant to Schedule 2 of the NEPOOL Tariff when the megawatt output of Sithe's Generators must be backed down to produce or absorb reactive power or when the units are asked to motor for this purpose. Company and the ISO shall, from time to time, publish a scheduled range of voltages to be maintained by Sithe's Generators. If Sithe fails to provide such reactive voltage support, Company may disconnect Sithe's Generators until such time as Sithe remedies its ability to provide such support.

Additionally, Sithe must equip Sithe's Generators with stabilizers as part of their excitation systems. The stabilizers will be activated by the ISO when stability studies indicate that they are needed.

**13.3     Metering and Related Equipment:** Sithe's Generators shall be equipped, solely at Sithe's expense, with compatible metering, telemetry, and communication equipment at or distant from the Interconnection Points which measures all electricity flows between Company and Sithe and determines and communicates the status of switching equipment. Metering for each generator and reserve station service load must comply with NEPOOL Operating Procedure 18 and must, pursuant to NEPOOL rules, include a solid state recorder which Company can access remotely via a telephone line provided, paid for, and protected, to the extent necessary, by Sithe.     This requirement for Company access may be deleted with respect to the metering of any generation or reserve station service load connected at 345 kV following expiration of NEPOOL's RNS transition period, on March 1, 2003. Multiple interconnections at the same site by a single generation owner may be netted for metering purposes only if the owner and the ISO have agreed that the market system modeling of these interconnections will be as a single unit. Sithe shall be responsible for all communications required by NEPOOL, and/or the ISO and its designated satellite. All meters, instrument transformers, solid state recording devices, and test switches for the transducer circuits shall be approved by Company before the design is finalized. All such equipment shall be maintained in accordance with NEPOOL market rules and operating procedures.

If the metering equipment is not located at the Interconnection Points (see Figures 1A and 1B for metering locations), the metering equipment shall record delivery of electricity in a manner that accurately accounts for losses occurring between the Metering Points and the Interconnection Points at all output levels. Billing for transmission losses between the Metering Points and the Interconnection Points shall be pursuant to the NEPOOL Tariff's terms, conditions and rates.

All metering equipment installed pursuant to this Agreement and associated with Sithe's Generators shall be tested at least annually by the owning Party at Sithe's expense in accordance with NEPOOL OP-18. If, at any time, any metering equipment is found to be inaccurate by a margin greater than that allowed under NEPOOL OP-18, the owning Party shall cause such metering equipment to be made accurate or replaced at Sithe's expense. Meter readings for the period of inaccuracy shall be adjusted so far as the same can be reasonably ascertained. If the period of inaccuracy cannot be determined, the Parties agree to adjust the meter readings for a period equal to half the time between the last known valid reading and the date of the test which uncovered the inaccuracy and for all time between such test date and the date the metering was made accurate. Each Party shall comply with any

reasonable request of the other concerning the sealing of meters, the presence of a representative of the other Party when the seals are broken and the tests are made, and other matters affecting the accuracy of the measurement of electricity delivered from the Generators. If either Party believes that there has been a meter failure or stoppage, it shall immediately notify the other and require immediate testing at Sithe's sole expense.

**13.3.1 Ownership of Metering Equipment:** The Company shall own all metering equipment used to record separately metered reserve station service load, if any, from its distribution system or from its switchyard if rated at less than 345 kV. The Company shall own the metering and equipment used to record Sithe's Generators net output and the required telemetry and communication equipment unless Sithe is permitted by NEPOOL procedures to own such equipment and expresses its desire to Company to be the owner. Sithe ownership of metering equipment shall not obviate Sithe's responsibilities pursuant to this Section 13.3 or Company's right to inspect and witness the testing of such meters. The Parties agree that Sithe will own the metering for this interconnection.

**13.3.2 Responsibility for Reading Meters:** For interconnections to a switchyard rated 345 kV or above, Sithe shall have the responsibilities of the meter reader pursuant to NEPOOL's Market Rule 20-I for both net generation and reserve station service load.

For interconnections to a switchyard rated less than 345 kV, the Company shall be the assigned meter reader unless Sithe submits a registration request to the ISO to be the assigned meter reader for net generation. If Sithe is the meter reader for net generation, Sithe must provide Company with the upload files it submits into the ISO's market settlement system in accordance with applicable NEPOOL rules, as may be amended from time to time. If Company is the meter reader for net generation, Sithe shall serve as a backup source of hourly data in the event Company is unable to communicate with the meter/recorder, and if called for, such data shall be made available to the Company by 8:00 AM of the following day.

For all interconnections under 345 kV, the Company must be the meter reader for each separately metered reserve station service load. Sithe shall serve as a backup source of hourly station service load data in the event Company is unable to communicate with the meter/recorder, and if called for, such data shall be made available to the Company by 8:00 AM of the following day.

For both net generation and reserve station service loads interconnected below 345 kV, Sithe shall forward month-end meter readings to Company, and Company shall also have local and remote access to the meters at Sithe's expense to take periodic meter readings.

Sithe's responsibilities to supply Company with physical and electronic access to meters and recorders, to supply the Company with upload files, and to supply the Company with month-end meter readings pursuant to this Section 13.3.2 shall continue after any changes in Market Rule 20-I or any related NEPOOL documents until such time as the Company no longer requires these services for its load calculation processes.

**Section 14. Operations.**

17

**JA373**

**14.1    General.**  The Company and Sithe agree that their respective performances of this Agreement shall comply with the current (as amended from time to time) standards and guidelines of NERC, NPCC, and the ISO, or any successor agencies assuming or charged with similar responsibilities related to the operation and reliability of the North American electric interconnected transmission grid.  Each Party shall be responsible for its own performance, compliance, and reporting.

**14.2    Company Obligations.**    The Company shall operate and control the Company Transmission System and other Company facilities (i) in a safe and reliable manner; (ii) in accordance with Good Utility Practice; (iii) in accordance with applicable operational and/or reliability criteria, protocols, and directives, including those of NERC, NPCC, and the ISO; and (iv) in accordance with the provisions of this Agreement.

**14.3    Sithe Obligations.**  Sithe shall operate and control Sithe's Generators and its other facilities (i) in a safe and reliable manner; (ii) in accordance with Good Utility Practice: (iii) in accordance with applicable operational and/or reliability criteria, protocols, and directives, including those of NERC, NPCC, and ISO; and (iv) in accordance with the provisions of this Agreement.

**14.4    Access Rights.**  The Parties shall provide each other such easements and/or access rights as may be necessary for either Party's performance of their respective obligations under this Agreement; provided that, notwithstanding anything stated herein, a Party performing inspections or observations within the boundaries of the other Party's facilities must abide by the rules applicable to that site, including, if applicable, any required use of the owning Party's escorts.

**14.5    Switching and Tagging Rules.**  The Parties shall abide by their respective Switching and Tagging Rules and Safety Practices for obtaining clearances for work or for switching operations on their respective equipment.  The Parties agree to coordinate their actions, expedite ISO market instructions, and communicate with each other, all in accordance with Good Utility Practice, for purposes including, but not limited to: (i) closing breakers to accomplish interconnection, but not synchronization, of Sithe's Generators to the Company Transmission System; (ii) opening breakers to remove Sithe's Generators from service; (iii) operating disconnect and ground switches as required; (iv) in-service relay testing; and (v) battery system testing and maintenance.

**14.6    Operating Expenses.**  Except as otherwise provided pursuant to Section 5.6, and to the extent not superseded by any operating agreement that may be developed between the Parties, each Party shall be responsible for all expenses associated with operating its own property, equipment, facilities, and appurtenances on its side of the Interconnection Points.

**14.7    Protection and System Quality.**  Sithe shall, at its expense, install, maintain, and operate System Protection Facilities, including such protective and regulating devices as are identified below, by order, rule or regulation of any duly-constituted regulatory authority having jurisdiction, or by applicable standards such as the National Electrical Safety Code, or as are otherwise necessary to protect personnel and equipment and to minimize deleterious

effects to Company's electric service operation arising from Sithe's Generators. Any such protective or regulating devices that may be required on Company's facilities in connection with the operation of Sithe's Generators shall be installed by the Company at Sithe's expense. The Company and Sithe shall coordinate the design, set points, and all operating aspects of each Party's protective and regulating devices that could have an impact on the other Party with each other and, as appropriate, with others' devices in close proximity. Furthermore, Sithe shall bear the continuing obligation to upgrade the applicable portions of its protection equipment in cooperation and coordination with the Company when and if conditions on the Company Transmission System require such upgrades. In the event that such upgrades are required by regulatory or reliability authorities or required for the sole benefit of Sithe, they shall be at Sithe's sole expense. To the extent that such upgrades are required for the sole benefit of the Company and at the sole discretion of the Company, they shall be at installed at the Company's sole expense.

**14.7.1 Requirements for Protection.** In compliance with applicable NERC, NPCC, and ISO requirements, Sithe shall provide, install, own and maintain relays, circuit breakers, and all other devices necessary to promptly remove any fault contribution of Sithe's Generators to any short circuit or Company Transmission System disturbance occurring on the Company Transmission System not otherwise isolated by Company equipment. Such protective equipment shall include, without limitation, a disconnecting device or switch with load interrupting capability to be located between Sithe's Generators and the Company Transmission System at an accessible, protected, and satisfactory site selected upon mutual agreement of the Parties. Sithe shall be solely responsible for protection of Sithe's Generators and Sithe's other equipment from all Company Transmission System disturbances and conditions originating from Sithe's equipment, such as, but not limited to generator faults, GSU transformer, station service transformer, negative sequence currents, over- or under-frequency, out of step, sudden load rejection, over- or under-voltage, over-excitation, and generator loss of field. Sithe shall be solely responsible for provisions to disconnect Sithe's Generators and Sithe's other equipment when any of the disturbances described above occur.

**14.7.2 System Quality.** Sithe's facilities and equipment shall not cause excessive voltage excursions nor cause the voltage to deviate further from the nominal voltage at the Interconnection Point than the voltage maintained by the Company at that point without Sithe's generation. Sithe's facilities and equipment shall meet the minimum requirements of IEEE 519-1992 for harmonic levels of power and ANSI Standard C84.1-1995 for voltage distortion or any other applicable superseding electric industry standards. The points of common coupling shall be defined as the Interconnection Points. Sithe's facilities and equipment shall not cause excessive voltage flicker nor introduce excessive distortion to the sinusoidal voltage or current waves. For voltage flicker in the frequency range of 1 to 25 Hz, voltage flicker levels are unacceptable if either of the following conditions exist: (a) the cumulative RMS voltage flicker at the point of common coupling exceeds 0.30% for 1.0% of a representative time period, or (b) the instantaneous voltage flicker level regularly exceeds 0.45% at the point of common coupling (this is approximately equal to a cumulative RMS voltage flicker of 0.45% for 0.01% of a representative time period).

**14.7.3 Inspection.** Company shall have the right, but shall have no obligation or

19

**JA375**

responsibility to: (i) observe Sithe's tests and/or inspections of any of Sithe's protective equipment; (ii) review the settings of Sithe's protective equipment; and (iii) review Sithe's maintenance records relative to its protective equipment. The foregoing rights may be exercised by the Company from time to time as deemed necessary by the Company upon reasonable notice to Sithe. However, the exercise or non-exercise by Company of any of the foregoing rights of observation, review, or inspection shall be construed neither as an endorsement or confirmation of any aspect, feature, element, or condition of Sithe's Generators or Sithe's protective equipment or the operation thereof, nor as a warranty as to the fitness, safety, desirability, or reliability of same.

**14.8    Outages, Interruptions, and Disconnections.** In accordance with Good Utility Practice, each Party may, in close cooperation with the other, remove from service its facilities that may impact the other Party's facilities as necessary to perform maintenance or testing or to install or replace equipment. Absent the existence or imminence of an Emergency, the Party planning to remove a facility from service will schedule such removal through the ISO, in accordance with Good Utility Practice.

**14.8.1 Outage Restoration.** In the event of an outage of a Party's facility that adversely affects the other Party's facilities, the Party that owns or controls the facility out of service will use commercially reasonable efforts to promptly restore that facility to service in accordance with Good Utility Practice, and, if a planned outage, in accordance with its schedule for the work that necessitated the planned outage.

**14.8.2 Interruption.** If, at any time, in Company's reasonable judgment exercised in accordance with Good Utility Practice, the continued operation of Sithe's Generators would cause an Emergency, the Company may curtail, interrupt or reduce energy delivered from Sithe's Generators to the Company Transmission System until the condition that would cause the Emergency is corrected. The Company shall give Sithe as much notice as is reasonably practicable of Company's intention to curtail, interrupt, or reduce energy delivery from Sithe's Generators in response to a condition that would cause an Emergency and, where practicable, allow suitable time for Sithe to remove or remedy such condition before any such curtailment, interruption, or reduction commences. In the event of any curtailment, interruption, or reduction, the Company shall promptly confer with Sithe regarding the conditions that gave rise to the curtailment, interruption, or reduction, and, to the extent known, the expected time of restoration. To the extent appropriate to do so, and without incurring any liability whatsoever, the Company shall give Sithe the Company's recommendation, if any, concerning the timely correction of such conditions. The Company shall promptly cease the curtailment, interruption, or reduction of energy delivery when the condition that would cause the Emergency ceases to exist. Sithe shall not be entitled to compensation for any such interruption.

**14.8.3 Disconnection.**

**14.8.3.1    Disconnection after Agreement Terminates.** Upon termination of this Agreement, Company may disconnect Sithe's Generators from the Company Transmission System. If termination occurs pursuant to Section 2.1, such disconnection shall be in accordance with a plan for disconnection upon which the Parties agree.

**14.8.3.2    Disconnection in Event of Emergency.**  Subject to the provisions of Section 14.8.3.3, Company or Sithe shall have the right to disconnect Sithe's Generators without notice if, in the Company's or Sithe's sole opinion, an Emergency exists and immediate disconnection is necessary to protect persons or property from damage caused by Sithe's interconnection or lack of proper or properly operating protective devices.

**14.8.3.3    Under-frequency Performance.**  Sithe shall comply with all applicable current and future NERC, NPCC and ISO planning and operating criteria which describe the requirements for under-frequency set points and for their coordination.

**14.8.4  Continuity of Service.**  Notwithstanding any other provision of this Agreement, Company shall not be obligated to accept, and Company may require Sithe to curtail, interrupt, or reduce, deliveries of energy if such delivery of energy impairs Company's ability to construct, install, repair, replace or remove any of its equipment or any part of its system or if Company determines that curtailment, interruption or reduction is necessary because of Emergencies, forced outages, operating conditions on its system, or any reason otherwise permitted by applicable rules or regulations promulgated by a regulatory agency having jurisdiction over such matters.  The Company shall coordinate the timing of such curtailments, interruptions, reductions or deliveries with respect to maintenance, investigation, or inspection of Company's equipment or system with the ISO. Sithe reserves all rights under the Federal Power Act and other applicable federal and state laws and regulations to commence a complaint proceeding or other action with the FERC or other governmental authority with appropriate jurisdiction over the Parties to enforce the provisions of this Section 14.8.4.

Except in case of Emergency, in order not to interfere unreasonably with Sithe's operations, the Company shall give Sithe reasonable prior notice of any curtailment, interruption or reduction, the reason for its occurrence, and its probable duration.

**Section 15.  Maintenance.**

**15.1    Company Obligations.**  The Company shall maintain its facilities and equipment: (i) in a safe and reliable manner; (ii) in accordance with Good Utility Practice; (iii) in accordance with applicable operational and/or reliability criteria, protocols, and directives, including those of NERC, NPCC, and the ISO; and (iv) in accordance with the provisions of this Agreement.

**15.2    Sithe Obligations.**  Sithe shall maintain its facilities and equipment to the extent they might reasonably be expected to have an impact on the operation of the Company Transmission System and Company's other systems: (i) in a safe and reliable manner; (ii) in accordance with Good Utility Practice; (iii) in accordance with applicable operational and/or reliability criteria, standards, protocols, and directives, including those of NERC, NPCC, and the ISO; and (iv) in accordance with the provisions of this Agreement.

**15.3    Access Rights.**  The Parties shall provide each other such easements and/or access rights as may be necessary for either Party's performance of their respective maintenance

21

**JA377**

obligations under this Agreement; provided that, notwithstanding anything stated herein, a Party performing maintenance work within the boundaries of the other Party's facilities must abide by the rules applicable to that site. In particular, to the extent that Sithe must access facilities it owns within a Company site, it shall do so only with the escort of a Company operator. In no event shall Sithe work on any Company equipment.

**15.4    Maintenance Expenses.** Except as otherwise provided pursuant to Section 5.6, and to the extent not superseded by any operating agreement that may be developed between the Parties, each Party shall be responsible for all expenses associated with maintaining its own property, equipment, facilities, and appurtenances on its side of the Interconnection Points.

**15.5    Coordination.** The Parties agree to conduct preventive and corrective maintenance activities regularly in accordance with Good Utility Practice, to schedule such activities with the ISO pursuant to its procedures and to notify each other of such schedules to the extent such notifications are permitted pursuant to Good Utility Practice, FERC Standards of Conduct, and applicable NEPOOL rules and practices.

**15.6    Inspections and Testing.** Each Party shall perform routine inspection and testing of its facilities and equipment in accordance with Good Utility Practice as may be necessary to ensure the continued interconnection of Sithe's Generators with the Company Transmission System in a safe and reliable manner.

**15.7    Right to Observe Testing.** Each Party shall, at its own expense, have the right to observe the testing of any of the other Party's facilities and equipment whose performance may reasonably be expected to affect the reliability of the observing Party's facilities and equipment. Each Party shall notify the other Party in advance of its performance of tests of its facilities and equipment, and the other Party may have a representative attend and be present during such testing.

**15.8    Cooperation.** Each Party agrees to cooperate with the other in the inspection, maintenance, and testing of those Secondary Systems directly affecting the operation of a Party's facilities and equipment which may reasonably be expected to impact the other Party. Each Party will provide advance notice to the other Party before undertaking any work in these areas, especially in electrical circuits involving circuit breaker trip and close contacts, current transformers, or potential transformers.

**15.9    Observation of Deficiencies.** If a Party observes any deficiencies or defects on, or becomes aware of a lack of scheduled maintenance and testing with respect to, the other Party's facilities and equipment that might reasonably be expected to adversely affect the observing Party's facilities and equipment, the observing Party shall provide notice to the other Party that is prompt under the circumstance, and the other Party shall make any corrections required in accordance with Good Utility Practice.

**Section 16.  Emergencies.**

**16.1    Obligations.** Each Party agrees to comply with NERC, NPCC, and ISO emergency procedures and Company and Sithe emergency procedures, as applicable, with respect to

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007
Document Accession #: 20180516-5048      Filed Date: 05/16/2018
USCA Case #20-1343      Document #1935613      Filed: 02/17/2022      Page 394 of 580

Emergencies.

**16.2    Notice.** The Company shall provide Sithe with oral notification that is prompt under the circumstances of an Emergency that may be expected to affect Sithe's operation of Sithe's Generators, to the extent the Company is aware of the Emergency. Sithe shall provide the Company with oral notification that is prompt under the circumstances of an Emergency that may be expected to affect the Company Transmission System, to the extent Sithe is aware of the Emergency. To the extent the Party becoming aware of an Emergency is aware of the facts of the Emergency, such notification shall describe the Emergency, the extent of the damage or deficiency, its anticipated duration, and the corrective action taken and/or to be taken, and shall be followed as soon as practicable with written notice.

**16.3    Immediate Action.** In the event of an Emergency, the Party becoming aware of the Emergency may, in accordance with Good Utility Practice and using its reasonable judgment, take such action as is reasonable and necessary to prevent, avoid, or mitigate injury, danger, and loss. In the event Sithe has identified an Emergency involving the Company Transmission System, Sithe shall obtain the consent of Company personnel prior to performing any switching operations at Sithe's facilities unless, in Sithe's reasonable judgment, immediate action is required.

**16.4    Company Authority.** The Company may, consistent with Good Utility Practice, take whatever actions or inactions with regard to the Company Transmission System the Company deems necessary during an Emergency in order to: (i) preserve public health and safety; (ii) preserve the reliability of the Company Transmission System; (iii) limit or prevent damage; and (iv) expedite restoration of service. The Company shall use reasonable efforts to minimize the effect of such actions or inactions on Sithe's Generators.

**16.5    Sithe Authority.** Sithe may, consistent with Good Utility Practice, take whatever actions or inactions with regard to Sithe's Generators Sithe deems necessary during an Emergency in order to: (i) preserve public health and safety; (ii) preserve the reliability of Sithe's Generators; (iii) limit or prevent damage; and (iv) expedite restoration of service. Sithe shall use reasonable efforts to minimize the effect of such actions or inactions on the Company Transmission System.

**16.6    Audit Rights.** Each Party shall keep and maintain records of actions taken during an Emergency that may reasonably be expected to impact the other Party's facilities and make such records available for third party independent audit upon the request and at the expense of the Party affected by such action. Any such request for an audit will be made no later than six (6) months following the action taken and the Party shall make such records available for a reasonable period of time after the request to allow the requesting Party to conduct the audit.

**Section 17.    Safety.**

**17.1    General.** The Company and Sithe agree that all work performed by either Party that may reasonably be expected to affect the other Party shall be performed in accordance with Good Utility Practice and all applicable laws, regulations, and other requirements pertaining

23

**JA379**

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048     Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 395 of 580

Exhibit No. MYS-012
Page 30 of 215

to the safety of persons or property.  A Party performing work within the boundaries of the other Party's facilities must abide by the safety rules applicable to the site.

**17.2    Environmental Releases.**  In addition to complying with applicable reporting regulations, each Party shall notify the other Party, first orally and then in writing, of the release of any Hazardous Substances and that Party's plans to remediate the release, of any asbestos or lead abatement activities, or of any type of remediation activities, each of which may reasonably be expected to affect the other Party or which occur on the other Party's property, as soon as possible but not later than twenty-four (24) hours after the Party becomes aware of the occurrence, and shall promptly furnish to the other Party copies of any reports filed with any governmental agencies addressing such events.

**17.3    Environmental Remediation.**  To the extent that the Company, solely to effect Sithe's interconnection, encounters environmental contamination at levels that require remediation in order for any portion of the interconnection work hereunder to be performed, and provided that Sithe is liable for such contamination under any previous agreements between the Parties or their affiliates, the Company shall not be required to proceed with such portion of the interconnection work until Sithe has taken such actions with respect to the contamination as are necessary to permit the interconnection work to proceed.

**Section 18.  Future Modifications.**

Either Party may undertake modifications to its facilities.  In the event a Party plans to undertake a modification that reasonably may be expected to impact the other Party's facilities, that Party shall provide the other Party with sufficient information regarding such modification so that the other Party can evaluate the potential impact of such modification prior to commencement of the work.  The Party desiring to perform such work shall provide the relevant drawings, plans, and specifications to the other Party at least ninety (90) days in advance of the work or such shorter period upon which the Parties may agree, which agreement will not unreasonably be withheld or delayed.  Either Party planning modifications shall comply fully with Section 18.4 of the NEPOOL Agreement to the extent applicable.

Upon completion of any modifications Sithe may undertake that may reasonably be expected to affect the Company Transmission System, but not later than ninety (90) days thereafter, Sithe shall issue "as built" drawings to Company, unless the Parties reasonably agree that such issuance of drawings is not necessary.

**Section 19.  Force Majeure**

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of a Force Majeure event, that Party shall be excused from whatever performance is affected by the Force Majeure event to the extent so affected, provided that the non-performing Party shall: (i) provide prompt notice to the other Party of the occurrence of the Force Majeure event giving an estimation of its expected duration and the probable impact on the performance of its obligations hereunder and submitting reasonable evidence of the existence of the Force Majeure event; (ii) exercise all reasonable efforts to continue to perform its obligations hereunder; (iii) expeditiously take action to correct or cure the Force

Majeure event and submit reasonable evidence that it is making all reasonable efforts to correct or cure the Force Majeure event; (iv) exercise all reasonable efforts to mitigate or limit damages to the other Party to the extent such action shall not adversely effect its own interests; and (v) provide prompt notice to the other Party of the cessation of the Force Majeure event. Nothing contained herein shall be construed so as to require either Party to settle any strike, lockout, work stoppage or any industrial disturbance or dispute in which it may be involved, or to seek review of or take an appeal from any administrative or judicial action.

**Section 20.  Default**

**20.1     General.**  A breach of this Agreement ("Breach") shall occur upon the failure by a Party to perform or observe any material term or condition of this Agreement.  A default of this Agreement ("Default") shall occur upon the failure of a Party in Breach of this Agreement to cure such Breach in accordance with the provisions of Section 20.4.

**20.2     Events of Breach.**  A Breach of this Agreement shall include:

(a)     The failure to pay amounts due and payable under this Agreement within ten (10) days of when due and payable;

(b)     The failure to comply with any material term or condition hereunder, including but not limited to any material Breach of a representation, warranty or covenant made in this Agreement, and such failure is not excused by Force Majeure;

(c)     A Party's making an assignment or general arrangement for the benefit of creditors, filing a petition, or otherwise commencing any proceeding, in bankruptcy or under similar law, otherwise becoming bankrupt (however evidenced) or being unable to pay its debts as they fall due.

(d)     Assignment of this Agreement in a manner inconsistent with the terms of this Agreement;

(e)     Failure of either Party to provide such access rights, or a Party's attempt to revoke or terminate such access rights, as provided under this Agreement; or

(f)     Failure of either Party to provide information or data to the other Party required under this Agreement, provided the Party entitled to the information under this Agreement requires such information or data to satisfy its obligations hereunder.

**20.3     Continued Operation.**  In the event of a Breach or Default by either Party, the Parties shall continue to operate and maintain, as applicable, such DC power systems, protection and metering equipment, telemetering equipment, SCADA equipment, transformers, Secondary Systems, communications equipment, building facilities, software, documentation, structural components, and other facilities and appurtenances that are

25

reasonably necessary for the Company to operate and maintain the Company Transmission System, or for Sithe to operate and maintain Sithe's Generators, in a safe and reliable manner.

**20.4    Cure and Default.**  Upon the occurrence of an event of Breach, the Party not in Breach (hereinafter the "Non-Breaching Party"), when it becomes aware of the Breach, shall give written notice of the Breach to the Party that has committed the Breach (the "Breaching Party") and to any other person a Party to this Agreement identifies in writing to the other Party in advance.  Such notice shall set forth, in reasonable detail, the nature of the Breach, and where known and applicable, the steps necessary to cure such Breach.  Upon receiving written notice of the Breach hereunder, the Breaching Party shall have thirty (30) days to cure such Breach.  In the event the Breaching Party (a) fails to cure the Breach within such thirty (30) day period, and (b) (except if the Breach is the failure to pay money owed hereunder) fails to demonstrate that it is diligently pursuing such cure if cure cannot be effected within such period; then the Breaching Party will be in Default of the Agreement.  In the event of a Breach by Sithe, the party or parties providing construction or long-term financing for Sithe's Generators and/or for the Interconnection Facilities shall be entitled to exercise any and all rights of Sithe to cure such Breach hereunder, but such rights shall not extend the time period for cure hereunder.

**20.5    Rights of the non-Defaulting Party.**  Upon the occurrence of an event of Default, the non-Defaulting Party shall be entitled to (i) commence an action to require the Defaulting Party to remedy such Default and specifically perform its duties and obligations hereunder in accordance with the terms and conditions hereof; (ii) serve notice on the Defaulting Party that it is terminating this Agreement as of a specified date, provided however, that such termination shall not relieve either Party of any of its rights, liabilities, and obligations arising hereunder prior to the date termination becomes effective; and/or (iii) exercise such other rights and remedies as it may have in equity or at law.

**Section 21.  Notice to Suspend**

Sithe reserves the right, upon its written notice to Company, to suspend all work by Company associated with the Interconnection Facilities. Company will suspend its work as soon as practicable upon its receipt of such notice, giving full consideration to safety issues, system reliability and Good Utility Practice. Sithe will be responsible for payment, whether directly or via its LOC, to Company of one hundred percent (100%) of all costs not otherwise recoverable pursuant to Section 7 that are incurred by Company, including, but not limited to, 100% of all costs pursuant to Section 5.4, up to the date of suspension by Sithe, plus any additional costs resulting from the suspension. Company shall invoice Sithe for all such costs in excess of its payments pursuant to Sections 5.1 and 5.2.  If Sithe fails to pay such costs within twenty (20) days of Company's invoice, Company may draw on the Security for such payment.  If Company draws on the Security, Sithe must restore the amount of the Security to the required level.  In no case will Company resume any work hereunder without the required Security.

**Section 22.  Notice to Terminate**

Prior to completion of the work hereunder, Sithe may terminate this Agreement or work on all or certain of the Interconnection Facilities hereunder upon seven days written notice to Company. Sithe may also terminate this Agreement by refusing to consent to cost increases of 5% or more, pursuant to Section 5.2. Company will terminate its relevant work as soon as practicable, giving full consideration to safety issues, system reliability and Good Utility Practice. Sithe will be responsible for payment, whether directly or via its LOC, to Company of one hundred percent (100%) of all costs, not otherwise recoverable pursuant to Section 7, that are incurred by Company, including, but not limited to, 100% of all costs pursuant to Section 5.4, up to the date of termination by Sithe, as well as any additional costs resulting from the termination. Company shall be entitled to draw on the Security if any amounts owed to Company are not paid within twenty (20) days of receipt of a final invoice from Company. Sithe's Security shall remain in place until Sithe's payment of all amounts due under the final invoice to the reasonable satisfaction of Company. To the extent that the final accounting of Sithe's costs and payments reveals that a net refund is owed to Sithe or that a balance remains on Sithe's LOC, Company shall pay such refund to Sithe or notify Sithe that it may extinguish its LOC, as applicable, within twenty (20) days of such final accounting.

Notwithstanding the foregoing, applicable provisions of this Agreement shall remain in effect after termination hereof, including, but not limited to, Sections 20, 25, 26, and 27 and provisions necessary to provide for final billings, billing adjustments, and payments.

Sithe shall own and take possession of any materials and/or equipment (hereinafter "Materials"), together with any applicable warranties, received by the Company hereunder and fully paid for by Sithe, but which are not installed for any reason, provided that the Company shall take any and all steps reasonably requested by Sithe to effect the assignment to Sithe of Company's rights under any such warranties. Sithe shall remove any such Materials from Company's premises within thirty (30) days of the date Company notifies Sithe that such Materials would not be installed. If Sithe fails to effect such removal within such thirty-day period, Sithe shall be deemed to have relinquished all rights to such Materials, and Company shall have the right to dispose of all such Materials in any manner and at its sole discretion. Company shall maintain its insurance coverage of such Materials until the first to occur of Sithe's physical removal of the Materials or expiration of such thirty-day period.

Company hereby grants a security interest in any Materials fully paid for by Sithe and which are not ultimately installed pursuant to this Agreement. It is Sithe's responsibility to perfect such security interest and the Company shall sign any documentation reasonably required for such purpose.

## Section 23. Assignment

This Agreement shall inure to the benefit of and bind the respective successors and assigns and successors in title of the Parties hereto. No assignment by any Party of its rights and obligations hereunder shall be made or become effective without the prior written consent of the other Party in each case being obtained, which consent shall not be unreasonably withheld or delayed, except that this Agreement may be assigned without such consent to an affiliate or successor of either Party, or to a person acquiring all or a controlling interest in

27

the business assets of such Party. No assignment or transfer of rights shall relieve the assigning Party from full liability and financial responsibility for performance unless both the assignee or transferee and the other Party have so consented in writing. Upon assignment of this Agreement, the Parties and the assignee of this Agreement shall execute an Assignment and Assumption Agreement.

In addition to the foregoing, Sithe shall be entitled in its discretion to assign its interests in this Agreement collaterally as security to the party or parties providing construction or long-term financing for Sithe's Generators and/or for the Interconnection Facilities without the Company's prior written consent, but Sithe shall provide the Company with written notice of such collateral assignment within seven (7) days following such collateral assignment. The Company shall execute any documentation required by such financing parties in connection therewith, so long as such documentation does not diminish Company's rights or increase Company's liabilities under this Agreement.

**Section 24. Subcontractors**

**24.1     General.** Nothing in this Agreement shall prevent a Party from utilizing the services of such contractors as it deems appropriate to perform its obligations under this Agreement; provided, however, that each Party shall require its subcontractors to comply with all applicable terms and conditions of this Agreement in providing such services and each Party shall remain primarily liable to the other Party for the performance of such subcontractor. Except as may be specifically set forth to the contrary herein, no subcontractor is intended to be, nor will it be deemed to be, a third-party beneficiary of this Agreement.

**24.2     Responsibility of Principal.** The creation of any subcontract relationship shall not relieve the hiring Party of any of its obligations under this Agreement. Each Party shall be fully responsible to the other Party for acts or omissions of any subcontractor it hires as if no subcontract had been made. Any applicable obligation imposed by this Agreement upon a Party shall be equally binding upon, and shall be construed as having application to, any subcontractor of such Party.

**24.3     No Limitation by Insurance.** The obligations under this Section 24 will not be limited in any way by any limitation of subcontractor's insurance.

**Section 25. Insurance**

During the term of this Agreement, each Party, at its own cost and expense, shall procure and maintain insurance in the forms and amounts at the following minimum levels of coverage:

(a)     Statutory coverage for workers' compensation, and Employer's Liability Coverage with a limit no less than $1,000,000.00 per accident. Each Party shall also have the ability to self-insure part or all of this exposure, as they deem necessary, and as licensed by the Commonwealth of Massachusetts.

(b)     Commercial General Liability Coverage including Operations, Contractual Liability and Broad Form Property Damage Liability written with limits no less than

$1,000,000.00 combined single limit for Bodily Injury Liability and Property Damage Liability. Each Party shall also have the ability to self-insure part or all of this exposure, as they deem necessary.

(c)     Automobile Liability for Bodily Injury and Property Damage to cover all vehicles used in connection with the work with limits no less than $1,000,000.00 combined single limit for Bodily Injury Liability and Property Damage Liability. Each Party shall also have the ability to self-insure part or all of this exposure, as they deem necessary and as approved by the Commonwealth of Massachusetts.

(d)     Excess Liability with a limit of no less than $5,000,000.00 coverage excess liability over Employers Liability, Commercial General Liability and Automobile Liability.

Each Party waives any and every claim for recovery from the other Party for any and all loss or damage covered by any of the insurance policies to be maintained under this Agreement to the extent that such loss or damage is recovered under any such policy or to the extent that such loss or damage would have been recovered under any such policy had such policy been purchased in accordance with the limits listed above. Inasmuch as the foregoing waiver will preclude the assignment of any such claim to the extent of such recovery, by subrogation (or otherwise), to an insurance company (or other Person), such Party shall give written notice of the terms of such waiver to each insurance company which has issued, or which may issue in the future, any such policy of insurance (if such notice is required by the insurance policy) and shall cause each such insurance policy to be properly endorsed by the issuer thereof to, or to otherwise contain one or more provisions that, prevent the invalidation of the insurance coverage provided thereby by reason of such waiver. This waiver shall also apply to each Party's property policies, including boiler & machinery and physical damage should such insurance be purchased.

Policies shall be purchased from insurance companies with a Best Insurance Reports rating of at least A8 or its equivalent, and either admitted to do business in the Commonwealth of Massachusetts or approved by the National Association of Insurance Commissioners.

In the event of one Party experiencing an incident which may give rise to a claim on or about the sites of the Interconnection Projects, whether or not directly relating to this Agreement, such Party will send a written report of the incident as soon as practicable to the other Party.

Prior to commencing the work, each Party shall have its insurer furnish to the other Party certificates of insurance evidencing the insurance coverage required above.

Every contract of insurance providing the coverages required in this provision shall contain the following or equivalent clause: "No reduction, cancellation or expiration of the policy shall be effective until thirty (30) days from the date written notice thereof is actually received, except for failure to make payment of premium in which event until ten days from the date written notice is actually received." Upon receipt of any notice of reduction, cancellation or expiration, the Party receiving such notice shall immediately notify the other Party.

## Section 26.  Indemnification

Each Party (the "Indemnifying Party") shall defend, indemnify and save the other Party (the "Indemnified Party"), its officers, directors, agents, employees and affiliates and their respective officers, directors, agents and employees harmless from and against any and all claims, liabilities, demands, judgments, losses, costs, expenses (including reasonable attorneys' fees), penalties, suits, or damages asserted against the Indemnified Party by a third party, arising from bodily injury, death or physical damage to property sustained by such third party and caused by or attributable to a breach of this Agreement by the Indemnifying Party or an action of gross negligence or willful misconduct of the Indemnifying Party, or an officer, director, agent or employee of Indemnifying Party.

## Section 27.  Limitation of Liability

Company's liability on all claims of any kind, whether based on contract, indemnity, warranty, tort (including negligence), strict liability or otherwise for all losses or damages arising out of, connected with, or resulting from this Agreement, or from any goods or services covered by or furnished under this Agreement, unless such claims are the result of Company's gross negligence or willful misconduct or otherwise brought by third parties against the indemnified party and which are covered by insurance pursuant to Section 25 or otherwise self-insured by the Party as permitted thereunder, shall be limited to the payment of a refund of all amounts actually received from Sithe by Company pursuant to this Agreement.  Sithe's liability on all claims of any kind, whether based on contract, indemnity, warranty, tort (including negligence), strict liability or otherwise for all losses or damages arising out of, connected with, or resulting from this Agreement, or from any goods or services covered by or furnished under this Agreement, unless such claims are the result of Sithe's gross negligence or willful misconduct or otherwise brought by third parties against the indemnified party and which are covered by insurance pursuant to Section 25 or otherwise self-insured by the Party as permitted thereunder, shall be limited to the payment of an additional sum equal to all amounts due from Sithe on account of the final installed cost of the Interconnection Facilities, including Tax Gross-up plus other costs and charges payable or reimbursable by Sithe under this Agreement.  Except as otherwise specifically provided in this Agreement, neither Party shall be liable to the other Party for claims for indirect, incidental or consequential damages connected with or resulting from performance or non-performance of the Agreement, including, without limitation, claims in the nature of increased costs, lost revenue or profits.

## Section 28.  Disputes

Any claim or dispute which either Party may have against the other arising out of this Agreement shall be submitted in writing to the other Party not later than sixty (60) days after the last to occur of the circumstances which gave rise to the claim or dispute or the discovery of such circumstances.  The submission of any claim or dispute shall include a concise statement of the question or issue in dispute, together with relevant facts and documentation to fully support the claim.  Upon such submission, the Parties shall use their best efforts to resolve the claim or dispute through good faith negotiations.  If, after sixty (60) days from such submission, the Parties have failed to negotiate a resolution to the claim or dispute,

either Party may proceed to submit such claim or dispute for decision by a court or regulatory authority of competent jurisdiction. Nothing in this Section 28 shall restrict the rights of any Party to file a complaint with FERC under relevant provisions of the Federal Power Act.

## Section 29.  Regulatory Approvals

The Company shall file this Agreement with FERC as a rate schedule within the meaning of 18 CFR Part 35. Sithe agrees to reasonably cooperate with the Company with respect to such filing and to provide any information, including the rendering of testimony reasonably requested by the Company, needed to comply with applicable regulatory requirements.

Certain obligations of Company under this Agreement are subject to acceptance for filing of this Agreement by FERC; however, as provided in Section 4 above, Company shall commence work under this Agreement immediately upon Notice to Proceed.  In the event that FERC does not accept this Agreement for filing, Sithe shall be responsible for all expenditures made by Company pursuant to this Agreement through the date of FERC's order, and such additional expenditures that are necessary to close down the work hereunder in an orderly fashion.

On July 22, 1998, NEPOOL filed a Compliance Filing with FERC that proposed, among other things, allocation of PTF costs to new generators. The Parties to this Agreement intend that Sithe's responsibility for the costs of the Interconnection Facilities under this Agreement shall be consistent with FERC's and NEPOOL's implementation of the NEPOOL Tariff. Company also acknowledges that NEPOOL anticipates implementing a congestion pricing regime under which certain customers may acquire transmission rights by virtue of paying for improvements to the transmission system. Such rights, if any, shall be conveyed pursuant to the NEPOOL Tariff and/or NEPOOL Agreement, as applicable, and not pursuant to this Agreement.

Company agrees to file for, and use all reasonable efforts to obtain, any necessary federal, state and local permits and approvals necessary for construction and operation of the Interconnection Facilities.

## Section 30.  State and Federal Laws

This Agreement and all rights and obligations of the Parties hereunder are subject to all applicable state and federal laws and regulations and all duly promulgated orders and duly authorized actions of governmental authorities. The interpretation and performance of this Agreement shall be subject to and determined in accordance with the laws of the Commonwealth of Massachusetts.

## Section 31.  Amendments

This Agreement shall be amended to revise the Interconnection Facilities to be constructed hereunder if and to the extent these facilities are changed by NEPOOL, by any regulatory body, or by the joint decision of the Parties hereto, or if Sithe makes a significant change to the maximum output of Sithe's Generators.  Any such amendment shall include an

31

**JA387**

amendment of Schedule 2. Sithe shall be solely responsible for all costs related to such revised Interconnection Facilities, except that Section 7 may provide a partial refund of such costs.

In the event that such amendment reduces the scope of the Interconnection Facilities, after Sithe has issued its Notice to Proceed and made the payment required pursuant to Section 5.1, Company will refund to Sithe that portion of such payment, or will notify Sithe that it may adjust its LOC to delete amounts, that will not be needed to fund the revised scope to the extent that costs related to the reduction have not already been incurred by the Company.

In the event of a material change in law or regulation that adversely affects, or may be reasonably expected to adversely affect, either Party's performance under this Agreement, the Parties will negotiate in good faith any amendment or amendments to this Agreement necessary to adapt the terms of this Agreement to such change in law or regulation, and the Company shall file such amendment or amendments with FERC. If the Parties are unable to reach agreement on any such amendments, Company shall have the right to make a unilateral filing with FERC to modify this Agreement pursuant to Section 205 or any other applicable provision of the Federal Power Act and FERC's rules and regulations thereunder, and Sithe shall have the right to make a unilateral filing with FERC to modify this Agreement pursuant to Section 206 or any other applicable provision of the Federal Power Act and FERC's rules and regulations thereunder; provided that each Party shall have the right to protest any such filing by the other Party and to participate fully in any proceeding before FERC in which such modifications may be considered. Nothing in this Agreement shall limit the rights of the Parties or of FERC under Sections 205 or 206 of the Federal Power Act and FERC's rules and regulations thereunder. For the purposes of this paragraph, the term "material" or "materially" shall not include any change to a tariff or rate schedule accepted or approved by FERC.

Except as provided in the preceding paragraph, this Agreement may not be modified or amended except in writing signed by or on behalf of the Parties by their duly authorized officers.

## Section 32. Complete and Full Agreement

This Agreement constitutes the entire Agreement between the Parties relating to the subject matter hereof, and all prior or contemporaneous agreements, offers, negotiations, discussions, communications and correspondence with respect to the subject matter hereof are superseded by the execution of this Agreement.

## Section 33. No Third Party Beneficiaries

This Agreement is for the benefit of the Parties hereto and the Parties, by execution of this Agreement, do not intend to create any rights for the benefit of, or grant any remedies to, any third party. Further, nothing in this Agreement is intended to address congestion rights, as that term may come to be defined within NEPOOL.

## Section 34. Limited Purpose

This Agreement lays out the responsibilities of the Parties with respect to constructing the Interconnection Facilities to accommodate the output of Sithe's Generators. In no way is this Agreement intended to create any power purchase obligations on the part of Company. Company's participation in this Agreement does not imply any obligations or representations by Company relating to Sithe's project viability in ongoing or future utility solicitations for the purchase of energy or capacity. Wheeling of power to and from Sithe's Generators is covered by the NEPOOL Tariff and the Company's Tariff, and is not covered by this Agreement.

## Section 35. Nonwaiver

The failure of either Party to require compliance with any term, condition or provision of this Agreement shall not affect that Party's right to later enforce the same. It is agreed that the waiver by either Party of performance of any of the terms of this Agreement or of any breach thereof shall not be held or deemed to be a waiver by that Party of any subsequent failure to perform the same or any other term or condition of this Agreement or of any breach thereof.

## Section 36. No Dedication of Facilities

No undertaking by Company or Sithe hereunder shall be deemed to constitute a dedication of its system, or any portion thereof, to the public or to the other Party.

## Section 37. Notices

Any notice, bill, demand, or request permitted or required under this Agreement shall be delivered in person against receipt, transmitted by electronic means with appropriate confirmation, or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt to:

> To Sithe:
> > Sithe Mystic Development LLC.
> > 24 Dexter Street
> > Charlestown, MA 02129
> > Attn: Jack Hughes
> > Fax: (617) 381-2239
> > E-mail: JHughes@Sithe.com

> With a copy to:
> > William S. Fowler
> > Sigma Consultants Inc.
> > 95 Main Street
> > Maynard, MA 01754
> > Fax: (978) 461-2822
> > E-mail: wfowler@sigmaconsult.com

> To Company:

**33**

**JA389**

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048     Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 405 of 580

Exhibit No. MYS-012
Page 40 of 215

NSTAR Electric & Gas Corporation
800 Boylston Street, P-1603
Boston, MA 02199
Attn: Lead Transmission Asset Management Liaison
Fax: 617-424-3472
E-mail: philip_legrow@nstaronline.com

The Parties may change the name and address of the individual to whom notices are to be given by giving the other Party written notice of such change.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by and through their respective duly authorized representatives as of the day and year first above written.

| BOSTON EDISON COMPANY | SITHE MYSTIC DEVELOPMENT LLC |
|---|---|
| By: _____ | By: _____ |
| Title: _____ | Title: _____ |

**34**
**JA390**

Exhibit No. MYS-012
Page 41 of 215

## Schedule 1: Major Milestone Schedule

| | |
|---|---|
| Notice to Proceed: | 12/1/00 |
| | |
| **345-kV (Block 8):** | |
| Backfeed available: | 4/1/01 |
| Position ready for full load testing: | 4/1/01 |
| Commercial operation: | 1/19/02 |
| | |
| **115-kV (Block 9):** | |
| Backfeed available to Line 9-3: | 4/1/01 |
| Board sections available for terminations: | |
| Line 9-3: | 4/1/01 |
| Line 9-4: | 10/2/01 |
| Line 9-6: | 9/1/01 |
| Positions ready for full load testing: | |
| Line 9-3: | 4/1/01 |
| Line 9-4: | 11/9/01 |
| Line 9-6: | 10/1/01 |
| Commercial operation: | 3/19/02 |

NOTE: All dates are mm/dd/yy and represent best efforts based upon Company receiving a Notice to Proceed on the date indicated. All dates are contingent upon vendors providing equipment according to the lead times estimated at the time project costs and schedules were being developed and on receiving outage permits at the time scheduled. The actual availability for these outages will be based on system operating conditions and requirements at the time outage permits are filed.

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048     Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 407 of 580

## Schedule 2: Estimate of Major Cost Components

**Projected Cost**          **Interconnection Facilities**

**Mystic Station Work**

| | |
|---|---|
| $1,500,000 | * (100%) Second Line to North Cambridge (Station Work) |
| $1,100,000 | * (50%) Double up Breaker #106 |
| $900,000 | * (70%) Double up Breaker #107 |
| $1,600,000 | * (100%) Sithe Interconnection at Dexter Street |
| $3,000,000 | **      Replace Mystic Autotransformer |
| $6,100,000 | * (100%) 5 Breaker 115 kV GIS Ring (Includes Sithe Unit 9-6 Terminator – Leads & Ducts by Sithe) |
| $120,000 | Temporary Line 423-515 Relocation |
| $100,000 | Relocate Line 488-518 to GIS |
| $100,000 | Relocate Line 211-514 to GIS |
| $100,000 | Relocate Line 423-515 to GIS |
| $800,000 | * (90%) Sithe Unit 9-3 115 kV Tie (New Board Section – Leads, SDE Terminator, Duct Bank by Sithe) |
| $350,000 | * (90%) Sithe Unit 9-4 115 kV Tie (Old 488-518 Terminal – Leads, SDE Terminator, Duct Bank by Sithe) |
| $600,000 | Reconnect Transformer 110A |

**North Cambridge Station Work**

| | |
|---|---|
| $1,700,000 | * (100%) Separate Line 346 X&Y into Two Separate Lines |
| $1,600,000 | * (100%) Terminate New 345 kV Line 351 from Mystic |
| $2,400,000 | * (100%) Install 115 kV Shunt Reactor |

**Woburn Station Work**

| | |
|---|---|
| $3,800,000 | * (50%) Split Line 346 X&Y from North Cambridge into 2 Lines |
| $800,000 | * (100%) Install Current Limiting Reactor on Line 211-514 |

**Second Mystic-North Cambridge 345 kV Line**

| | |
|---|---|
| $7,700,000 | * (100%) Install New Line 351 in Spare Pipe |

**North Cambridge-Woburn 346 X&Y Lines**

| | |
|---|---|
| $875,000 | Separate Line into 2 Separate Lines at N. Cambridge |
| $1,200,000 | * (100%) Install Woburn Heat Exchanger for Lines 346 & 3461 |
| $1,200,000 | * (100%) Install N. Camb. Heat Exchanger for Lines 346 & 3461 |

**Mystic 115 kV Line Relocations**

| | |
|---|---|
| $500,000 | Temporary 423-515 Relocation |
| $600,000 | Relocate 488-518 to GIS |
| $640,000 | Relocate 211-514 to GIS |
| $460,000 | Relocate 423-515 to GIS |

**115 kV Line Upgrades**

| | |
|---|---|
| $7,150,000 | Reconductor Mystic/Hawkins Lines 250-516/517 |
| $100,000 | * (100%) Increase LTE Capacity Kingston Transmission/Kingston Network Lines 385-510/511 |
| $150,00 | * (100%) Increase Capacity of Lines 329-510/511: Add Pumps at Somerville |

**Communications Work**

| | |
|---|---|
| $800,000 | * (100%) Communications for Second Mystic-N. Camb. Line |
| $850,000 | * (100%) Communications for Second Woburn-N. Camb. Line |

**Community Relations Work**

| | |
|---|---|
| $40,000 | Community Relations Work with Cities & Towns |

**Environmental Remediation Work**

none expected Remediation associated with Mystic Station Yard Work

**Licensing, Permitting, Environmental, Project Management**

| | |
|---|---|
| $650,000 | * (50%) |

**Salvage/Resale Value of Existing Mystic Autotransformer and Replaced Circuit Breakers**

| | |
|---|---|
| $600,000 | ** Credit to Sithe |

| | |
|---|---|
| **$48,985,000** | **Estimated Total Costs of Interconnection Facilities** |

| | |
|---|---|
| $0 | Estimated Tax Gross-Up (Section 5.3) |
| $0 | Known Construction Outage Related Costs (Section 5.4) |

Notes:

1. Estimate is non-binding and does not reflect other potential costs and charges under the Agreement, including without limitation Tax Gross-up or reimbursements for costs related to pursuit of an IRS ruling or unknown costs arising from construction outages that result in deviations from generator schedules. Estimate does include 5% adder on all equipment purchased direct by Company and on contractor costs (L&M) and a 2.2 multiplier on all Company labor rates for work associated with Company's scope.

2. A "*" indicates that the percentage shown of the line item represents new units of property that are subject to Annual Facility Charges.

3. A "**" indicates that the cost indicated is a firm fixed price.

### Schedule 3: Calculation of Annual Facilities Cost

The Annual Facilities Cost shall be calculated for each calendar year and shall equal the sum of (1) Carrying Costs and Associated Income Taxes related to Material and Supplies and Cash Working Capital, (2) Municipal Tax expense, (3) Operation and Maintenance Expense, (4) Station Service Load Expense, and (5) Administrative and General Expense.

(1) Carrying Costs and Associated Income Taxes will be equal to the product of (A) the Materials and Supplies Investment Base times (B) the Cost of Capital Rate.

   (A) Materials and Supplies Investment Base
   The Investment Base consists of (i) Materials and Supplies plus (ii) Cash Working Capital.

   (i) Materials and Supplies shall equal the product of (a) the ratio of the investment in the Interconnection Facilities that Sithe supports to the average of Company's total depreciable transmission plant for the year, and (b) of Company's transmission plant materials and supplies for the year, as shown in Account 154.

   (ii) Cash Working Capital shall be the product of (a) a 12.5% allowance (45 days/ 360 days) of Transmission Operation and Maintenance Expense and Administrative and General Expense and (b) the ratio of the investment in the Interconnection Facilities that Sithe supports to the average of Company's total depreciable transmission plant for the year.

(B) Cost of Capital Rate
   The Cost of Capital Rate shall equal (i) the weighted cost of capital, plus (ii) the effect of Federal Income Taxes, plus (iii) the effect of State Income Taxes.

   (i) the Weighted Cost of Capital will be calculated based upon Company's capital structure at the end of each year and will equal the sum of:

   (a) the Long Term Debt Component, which equals the product of the actual weighted embedded cost to maturity of Long Term Debt then outstanding and the ratio that Long Term Debt is to Total Capital.

   (b) the Preferred Stock Component, which equals the product of the actual weighted average embedded cost to maturity of Preferred Stock then outstanding and the ratio that Preferred Stock is to Total Capital.

(c) the Return on Common Equity Component, which equals the product of Company's Return on Common Equity and the ratio that Common Equity is to Total Capital. The Return on Common Equity shall be the greater of 11.75% or the current return allowed by FERC pursuant to the Company's Tariff.

(ii) Federal Income Taxes shall equal:

$$\frac{A \times FT}{1 - FT}$$

Where FT is the Federal Income Tax Rate (35% currently) and A is the sum of the Preferred Stock Component and the Return on Common Equity Component, as determined above.

(iii)    State Income Taxes shall equal:

$$\frac{(A + Federal\ Income\ Tax) \times ST}{1 - ST}$$

Where ST is the State Income Tax Rate (currently 6.5%) and A is the sum of the Preferred Stock Component and the Return on Common Equity Component, as determined above.

(2) Municipal Tax Expense shall equal the product of (a) the ratio of the investment in the Interconnection Facilities that Sithe supports to the average for the year of Company's total plant investment in the municipalities in which such facilities are located, and (b) the total Municipal Taxes from such municipalities charged to operations during the year. Municipal Taxes are defined to include and be limited to ad velorem, real and personal property and similar taxes assessed on property by municipalities in which such facilities are located.

(3) Operation and Maintenance Expense shall equal the product of (a) the expenses charged to FERC Accounts 560 through 573 (excluding Accounts 565 and 567) and (b) the ratio of the investment in the Interconnection Facilities that Sithe supports to the average of Company's total depreciable transmission plant for the year.

(4) Station Service Load Expense shall be the summation, over all substations at which Interconnection Facilities subject to this expense pursuant to Section 12.3 of this Agreement are located, of the product of (a) the ratio of the number of circuit breakers subject to this expense to the total number of transmission level circuit breakers in service at the substation and (b) the annual cost of station service energy allocated to transmission operations at the substation.

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-012

Page 46 of 215

(5) Administrative and General Expense shall consist of a share of the charges to FERC Accounts 920 through 935 and Account 408 for Federal Unemployment Compensation, Federal Insurance Contribution Act and State Unemployment Insurance. The Interconnection Facilities that Sithe supports shall be allocated that fraction of the above FERC Accounts equal to the product of (a) the ratio of such Interconnection Facilities investment to the average of Company's total depreciable transmission investment for the year and (b) the ratio of transmission payroll to Company's total operation and maintenance payroll excluding Customer Accounts and Administrative and General Payroll.

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 412 of 580

**Schedule 4: Company's System Impact Study for Sithe's Generators**

**JA397**



**Boston Edison**
AN NSTAR COMPANY

# Sithe Mystic Development, LLC.
## System Impact Study
### Steady State and Short Circuit

**Report 2000-BE-5A**
**October 17, 2000**

**Sri Pillutla (PTI)**
**Manos Obessis (PTI)**
**Hantz A. Présumé**

## Executive Summary

This report presents results obtained from steady-state analysis for the addition of two generator sets proposed by Sithe Mystic Development LLC at the Mystic station in Everett, Massachusetts. Each generator set will have a maximum 50°F gross output of 817 MW consisting of one 310 MW steam turbine generator and two 253.5 MW gas turbine generators. The net rating of each generator set will be 800 MW, with the gas turbines supplying 17 MW of station load. One generator set (Block 8, or sometimes referred to herein as Units 8, 9 and 10) will be connected at the 345 kV level and the other (Block 9, or sometimes referred to herein as Units 11, 12 and 13) at the 115 kV level. Each unit will have a power factor of 0.85. The output of the three 345 kV units will be aggregated on one generator lead and each of the 115 kV units will have its own breaker position. The proposed in service date for the 345 kV set (Block 8) is winter 2002 and for the 115 kV set (Block 9) is spring 2002. The new facilities are referred to herein as "Sithe."

Based on the results of the study, the Sithe plant will have varying impacts on transmission facilities in the Boston underground system and in the Golden Hills area depending on the dispatch. Throughout this study, Mystic 4, 5 and 6 were dispatched off because of expected thermal and short circuit limitation and emissions restrictions. These small Mystic units will be restricted to run up to the hourly equivalent of 30 days per year. They will not be allowed to ramp up while the Sithe 115 kV units are operating. With all units running, except the small Mystic units, overloads were very severe. Dispatching Cabot off resulted in eliminating overloads on 345 kV lines from Mystic to North Cambridge to Woburn.

The Sithe 115 kV steam unit will cause overloads on the Mystic to Woburn 115 kV line (211-514). These overloads will be addressed by retaining the permanently connected series reactor proposed in the Cabot study, by backing down the extra power provided by the duct firing process for loss of the Woburn autotransformer and by tripping the steam unit for a stuck breaker contingency that causes the steam unit to be connected radially to line 211-514. Only the reactor on the Woburn line was retained. The other reactors proposed in the Cabot study did not provide substantial benefits.

With New Boston, Mystic 7 and Sithe dispatched on (Cabot and Mystic 4, 5 and 6 are off), overloads occurred on the Mystic to Brighton 115 kV lines (329-510 and 329-511). These overloads were addressed by turning off New Boston. Consistent with the minimum interconnection guidelines, Sithe can be dispatched against New Boston. The Brighton to Waltham 115 kV lines (282-520 and 282-521) overloaded as well. These overloads were addressed by turning off one New Boston unit.

With New Boston dispatched off (Mystic 7 and Sithe are on, Cabot and Mystic 4, 5 and 6 are off), overloads occurred on the Mystic to Hawkins 115 kV lines (250-516 and 250-517). These lines will be reconductored. Sithe also has the potential to increase the minimum required generation associated with overloads on the Kingston to High Street 115 kV lines (385-510 and 385-511), Mystic to Kingston Street 345 kV lines (324 and 372), the Mystic autotransformer and the Golden Hills to Maplewood 115 kV line (F-

43

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048     Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 415 of 580

Exhibit No. MYS-012

Page 50 of 215

158N). The ratings of lines 385-510, 385-511, 324 and 372 will be increased. The Mystic autotransformer will be replaced. The Mystic 115 kV tie breaker will be closed to address overloads on line F-158N when New Boston and the Sithe 115 kV steam unit are dispatched off.

With Salem Harbor dispatched off and New Boston dispatched on (Mystic 7 and Sithe are on, Cabot and Mystic 4, 5 and 6 are off), overloads occurred on the Golden Hills autotransformers and the Golden Hills to Wakefield junction 115 kV lines (S-145 and T-146). In addition, results of the line out analysis showed that post 1st contingency generation back downs were greater than 1,200 MW due to overloads on the Golden Hills autotransformers for this dispatch. With New Boston dispatched off as well, overloads did not occur under N-1 conditions and required back downs under N-2 conditions were maintained below 1,200 MW.

Based on the results described above, almost none of the Sithe Mystic additions can be exported out of the Boston area. The downtown Boston export level is limited by overloads on lines 329-510 and 329-511 for loss of either line. These lines are loaded close to 100% of their LTE rating with Sithe dispatched on and New Boston, Cabot, Mystic 4, 5 and 6 dispatched off. Neglecting the 400 MW combined output of Mystic 4, 5 and 6, the total amount of available generation in downtown Boston is approximately 3,250 MW = Mystic 345 kV generation [Cabot (380 MW) + Mystic 7 (565 MW) + Sithe Block 8 (800 MW)] + Mystic 115 kV generation [Sithe Block 9 (800 MW)] + New Boston 1 & 2 (700 MW). Under minimum interconnection guidelines, dispatching Sithe against Cabot and New Boston is acceptable. There is a net generation increase of approximately 100 MW after accounting for the small Mystic units (400 MW), Cabot (380 MW) and New Boston (700 MW). The maximum amount of generation that can run in the downtown Boston area is approximately 2,150 MW. This amount will be somewhat higher at 75% load levels. The post contingency loading on line 329-510 is approximately 6% lower at 75% load levels than at peak load levels. Upgrades are proposed to mitigate overloads with the downtown Boston generation interface at its maximum. To mitigate potential thermal overloads, voltage and short circuit impacts, the following upgrades are required:

- Split line 346XY (North Cambridge – Woburn 345 kV) into two separate lines, 346 and 365. The proposed Normal/LTE/STE ratings are 419/692/1022 MVA. The LTE rating for these two lines is good for four hours.
- Install a 345 kV line parallel to line 358 (Mystic – North Cambridge 345 kV), to be named 351. The proposed Normal/LTE/STE ratings for line 358 are 522/696/1030 MVA. The proposed Normal/LTE/STE ratings for line 351 are 570/777/1076 MVA. The LTE rating of these two lines is good for four hours.
- Install an 80 MVAr 115 kV shunt reactor to compensate the additional cable charging from line 351.
- Split the Mystic 115 kV station so that the steam unit, lines 211-514, 423-515 and 488-518 connect to a new ring bus, which is isolated from the old ring by a normally open breaker. This breaker can only be closed when there are no short circuit or thermal concerns. These three lines extend from Mystic 115 kV to Woburn, Everett and Chelsea, respectively.

- Install a Type III SPS to trip the 115 kV steam unit for a stuck breaker contingency on the new bus to prevent STE violations on lines 423-515 and 488-518. This SPS will trigger immediately on detection of a stuck breaker condition. Inter-area impact is not expected during a potential failure of the SPS. The SPS will be made redundant. The SPS meets the NEPOOL SPS guidelines.

- Retain the permanently connected 2.75-ohm series reactor that was proposed in the Cabot study on line 211-514.

- Reconductor 115 kV lines 250-516 and 250-517 between Mystic and Hawkins Street. The proposed Normal/LTE/STE ratings are 175/252/381 MVA. This upgrade is 10% above the observed loading.

- Improve cable cooling on lines 329-510 and 329-511 from Mystic to Somerville to Brighton in order to maintain ratings near their present values. Without this improvement, line ratings will be lower because of future operating conditions, and Mystic generation will be more restricted. In addition, a significant reduction in transmission capability is considered unacceptable. The proposed Normal/LTE/STE ratings for the Mystic to Somerville section are 175/183/239/ MVA. The LTE rating is 3 MVA lower than the present LTE rating but 3% higher than the overloads observed. The proposed ratings for the Somerville to Brighton section are 140/171/232 MVA.

- Improve cable cooling on lines 385-510 and 385-511 between Kingston Street and High Street. The proposed Normal/LTE/STE ratings for the Kingston Street T to Kingston Street N section are 305/345/447 MVA. This upgrade is 5% above the observed loading. The proposed ratings for the Kingston Street N to High Street section are 155/242/374 MVA.

- Increase the rating of lines 324 and 372 between Kingston Street and Mystic. The proposed Normal/LTE/STE ratings are 550/844/1205 MVA. The LTE rating of these two lines is good for four hours and is 8% above the observed loading.

- Replace the Mystic autotransformer to achieve Normal/LTE/STE cyclic ratings of approximately 360/420/550 MVA

The installation of the series reactor on line 211-514, the requirement that Mystic 4, 5 and 6 do not ramp up while the Sithe units are running, and the separation of the Mystic 115 kV station appear to be effective in keeping short circuit currents below breaker interrupting ratings except at Golden Hills. Two 115 kV breakers associated with line Q-169 will be upgraded at Golden Hills when Cabot goes into service. Kingston Street breakers did not appear to be overstressed after taking into account line contributions. Putnam and several 13.8 kV stations supplying the Cambridge system exceeded their breaker interrupting capabilities before Sithe.

The proposed upgrades are solely for the interconnection of the Sithe Mystic project and are not intended to address system reliability concerns for NSTAR or concerns that may be caused by the retirement of any generators in the Boston area. Studies and transmission reinforcements may be required if any of the existing generators are proposed to be retired.

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007
Document Accession #: 20180516-5048    Filed Date: 05/16/2018
USCA Case #20-1343    Document #1935613    Filed: 02/17/2022    Page 417 of 580

The margin between some of the proposed upgrades and the observed loadings can be as low as 5%. Some of the LTE rating upgrades proposed for limiting 345 kV cables will be valid for only four hours. Mystic generation is expected to back down post contingency to the normal rating of the affected lines when high loading conditions persist to the point of reaching maximum cable temperatures. Normal ratings will also be applicable when transmission facilities are out of service for an extended period of time. As a result, generation congestion is expected to occur at the Mystic plant from time to time.

Based on the conditions studied, Sithe Mystic will have no significant adverse impacts on the transmission system with the recommended system changes. Results of this analysis are based on assumptions available at the time of this study. If any of the assumptions provided by the developer or represented in the load flow models change, the results provided in this report may not apply.

USCA Case #20-1343      Document #1935613      Filed: 02/17/2022      Page 418 of 580



# Sithe Mystic Development, LLC.

## System Impact Study
### Stability and Short Circuit

**Report 2000-BE-5B**
**October 17, 2000**

**Baldwin Lam (PTI)**
**Hantz A. Présumé**

### Executive Summary

This report presents results obtained from stability analysis for the addition of two generator sets proposed by Sithe Mystic Development LLC at the Mystic 345/115 kV Station in Everett, Massachusetts. Each generator set will have a maximum gross output of 867 MW consisting of one 312 MW steam turbine generator and two 277 MW gas turbine generators. The net 20°F ratings will be 850 MW, with the gas turbines supplying 17 MW of station load. One generator set (Block 8, or sometimes referred to herein as Units 8, 9 and 10) will be connected at the 345 kV level and the other (Block 9, or sometimes referred to herein as Units 11, 12 and 13) at the 115 kV level. Each unit will have a power factor of 0.85. The output of the three 345 kV units will be aggregated on one generator lead and each of the 115 kV units will have its own breaker position. The proposed in service date for the 345 kV set (Block 8) is winter 2002 and for the 115 kV set (Block 9) is spring 2002. The new facilities are referred to herein as "Sithe."

Stability testing was performed with all generators in the greater Boston area running at full output, except the small Mystic units #4, #5 and #6, irrespective of thermal concerns at 45% load. Since the addition of Sithe would increase the Boston export level at 45% load from 800 MW to approximately 2,100 MW, reduction of the export level was explored where appropriate. The thermal analysis identified a downtown Boston interface with a maximum generation limit of approximately 2,150 MW. This limit can be maintained by dispatching Sithe against New Boston and Cabot or their equivalent. Testing with Cabot or New Boston out of service showed some improvements in system response.

Throughout this study, Mystic 4, 5 and 6 were dispatched off because of expected thermal and short circuit limitations and emissions restrictions. These small Mystic units will be restricted to run up to the hourly equivalent of 30 days per year. They will not be allowed to ramp up while the Sithe 115 kV units are operating. Two potential generation scenarios were identified where the small Mystic units may be dispatched. One small Mystic unit may be dispatched when one Sithe 115 kV gas unit is unavailable, or the three small Mystic units may be dispatched when the three Sithe 115 kV units (Block 9) are unavailable. Thermal and short circuit concerns are not expected with these two scenarios. Stability analysis will be performed in an operations study to determine whether there will be any stability concerns with the small Mystic units running.

While we can compare the transfer capabilities before and after the interconnection of Sithe, the topology of the system is significantly different before and after Sithe. To accommodate the addition of Sithe, the Mystic 115 kV station was split into two ring stations isolated with a normally open tie breaker. Lines 211-514 to Woburn, 423-515 to Everett and 488-518 to Chelsea and the Sithe 115 kV steam unit are connected to the new Mystic 115 kV bus. The practice of de-energizing one to three 345 kV cables, e.g. 346Y, 349Y and 324, to facilitate voltage control at light load levels will no longer be possible with the addition of Sithe. Therefore, the system with Sithe in service contained four additional cables including a new 345 kV cable proposed to be installed between Mystic and North Cambridge.

Near the completion of this study, the model used to represent the line 396 special protection system and the Keswick GCX relay was modified as directed by the ISO. The study was performed again for the system after Sithe using the corrected model. The most severe contingencies were tested with the corrected model for the system before Sithe for comparison purposes.

Based on the results of the study, the potential exists for Sithe to cause an unacceptable system response for three-phase stuck breaker and design criteria contingencies. These stability concerns are thought to be largely caused by the very high export levels with the addition of Sithe and inadequate reactive compensation with all 345 kV cables energized.

The breakers at the new Mystic 115 kV station will have IPT capability. The Sithe 115 kV steam unit did not lose synchronism when IPT capability was modeled for three-phase stuck breaker faults. A Type III SPS was proposed to mitigate thermal concerns for stuck breaker faults at the new 115 kV station. This SPS will trip the steam unit upon detection of a stuck breaker condition.

Three-phase stuck breaker faults on a line adjacent to the generator lead of the 345 kV generator set caused the 345 kV set and the NB – NE tie to trip. This loss of source exceeded the 1,400 MW loss of source limit established by the Stability Task Force as part of their Extreme Contingency Criteria. With Maine Independence Station (MIS) running, the amount of source loss may reach 2,100 MW. To mitigate the source loss concern, we propose to double breakers 101, 106 and 107.

Three-phase stuck breaker faults involving two exporting facilities from the Mystic station resulted in an unstable system response. In addition, single-phase stuck breaker faults caused either the Keswick GCX relay to be entered or the NB – NE tie to trip. To mitigate these concerns, clearing times will be reduced.

In summary the following upgrades are proposed to mitigate potential stability concerns:

- Install out-of-step (OOS) protection on the Sithe units to minimize potential system impacts resulting from a loss of synchronism condition following three-phase stuck breaker contingencies.
- Enable the stabilizers to facilitate system damping for 3ph stuck breaker faults.
- Increase the VRMAX exciter limit of the Sithe units to 9/8.1 to improve system response.
- Install two 80 MVAr 115 kV shunt reactors at Woburn station. These reactors will be installed by NSTAR as part of a separate project.
- Include Independent Pole Tripping capability in the 115 kV breakers to be installed at the new Mystic 115 kV ring station.
- Install a 345 kV breaker adjacent to each of breakers 101, 106 and 107.
- Reduce stuck breaker clearing times at Mystic station by 1.25 cycles to improve system response.
- Limit the amount of generation that can run in the Boston area to 2,700 MW, which would result from Sithe being dispatched against Mystic 4, 5 and 6 and New Boston 1

49

and 2 or their equivalent. That amount of generation is approximately 25% above the thermal limit and corresponds to a Boston export of 1,350 MW at 45% load. With the Sithe 115 kV units off, the Boston export level was reduced by an additional 400 MW, which was achieved by turning off Cabot, Salem 4 or one New Boston unit.

The installation of the series reactor on line 211-514, the requirement that Mystic 4, 5 and 6 not be synchronized while the Sithe units are running, and the separation of the Mystic 115 kV station were effective in keeping short circuit currents below breaker interrupting ratings except at Golden Hills. Two 115 kV breakers associated with line Q-169 will be upgraded at Golden Hills when Cabot goes into service. Kingston Street breakers were not overstressed after taking into account line contributions. Putnam and several 13.8 kV stations supplying the Cambridge system exceeded their breaker interrupting capabilities before Sithe.

The proposed upgrades are solely for the interconnection of the Sithe Mystic project and are not intended to address system reliability concerns for NSTAR or concerns that may be caused by the retirement of any generators in the Boston area. Studies and transmission reinforcements may be required if any of the existing generators are proposed to be retired.

Based on the conditions studied, Sithe Mystic will have no significant adverse impacts on the transmission system with the recommended system changes. Results of this analysis are based on assumptions available at the time of this study. If any of the assumptions provided by the developer or represented in the load flow models change, the results provided in this report may not apply.

**Figure 1A:  Proposed Sithe Generator 345 kV Interconnection**



USCA Case #20-1343     Document #1935613         Filed: 02/17/2022      Page 423 of 580

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-012
Page 58 of 215

**Figure 1B:  Proposed Sithe Generator 115 kV Interconnection**

52

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

JA408

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-012
Page 59 of 215



FIGURE 1B
115KV ONE LINE DIAGRAM
MODIFICATIONS AND SITHE INTERCONNECTIONS
(BKR #7 AS SPLIT FEEDING NEW GIS)
STATION #250 (MYSTIC), CHARLESTOWN

53

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

JA409

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048      Filed Date: 05/16/2018
USCA Case #20-1343      Document #1935613      Filed: 02/17/2022      Page 425 of 580

Exhibit No. MYS-012
Page 60 of 215

### Figure 2A - Mystic Underground Work Areas Due to Sithe Mystic Interconnection (345 kV Switchyard Areas)



**SITHE EXCAVATIONS BETWEEN 345KV SWITCHYARD FENCE AND DEXTER STREET FENCE NOT SHOWN**

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048        Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 426 of 580

Exhibit No. MYS-012
Page 61 of 215

## Figure 2B – NSTAR Underground Work Areas Due to Sithe Mystic Interconnection
### (Sithe Property between 345 kV Switchyard and 115 kV Switchyard)



USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 427 of 580

Exhibit No. MYS-012
Page 62 of 215

**Figure 2C – NSTAR and Sithe Underground Work Areas Due to Sithe Mystic Interconnection   (NSTAR 115 kV Switchyard Easement)**



## Attachment 1: Form of Corporate Guaranty Agreement

This Guaranty Agreement (this "Guaranty"), dated as of _____, 2002, is made and entered into by Sithe Boston Generating, LLC ("Guarantor") and Boston Edison Company.

### WITNESSETH:

WHEREAS, Sithe Mystic Development LLC ("Company") has entered into the Interconnection Agreement (the "Agreement") dated _____ with Boston Edison Company ("Counterparty"), related to interconnection of the 1600 MW Mystic combined cycle power project; and

WHEREAS, Guarantor will directly or indirectly benefit from the Agreement.

NOW THEREFORE, in consideration of Counterparty entering into the Agreement, Guarantor hereby covenants and agrees as follows:

1.     GUARANTY.  Subject to the provisions hereof, Guarantor hereby irrevocably and unconditionally guarantees the timely payment when due of the obligations of Company to Counterparty under Section 5.3 of the Agreement (the "Obligations") in accordance with Section 6 of the Agreement.  To the extent that Company shall fail to pay any Obligations, Guarantor shall promptly pay to Counterparty the amount due.  This Guaranty shall constitute a guaranty of payment and not of collection.  The liability of Guarantor under the Guaranty shall be subject to the following:

(a)     Guarantor's liability hereunder shall be limited to payments required to be made in accordance with Section 5.3 of the Agreement (even if such payments are deemed to be damages) and, except to the extent specifically provided in the Agreement, in no event shall Guarantor be subject hereunder to consequential, exemplary, loss of profits, or punitive damages.

(b)     Notwithstanding any other provision to the contrary set forth herein, the aggregate amount covered by this Guaranty in respect of Counterparty shall not exceed _____ [Specific amount to be inserted as of initiation of Guaranty; provided that the maximum amount covered by the Guaranty shall not at any time exceed 25% of the total amount listed in Schedule 2 of the Agreement]

2.     NOTICE.     If Company fails or refuses to pay any Obligations, Counterparty shall notify Guarantor of such non-payment in writing and Guarantor shall, after receipt of such written notice from Counterparty, forthwith pay such Obligation or cause such Obligation to be paid.

3.     REPRESENTATIONS AND WARRANTIES.     Guarantor represents and warrants that:

(a)     it is a limited liability company and duly organized and validly existing under

57

**JA413**

the laws of the State of Delaware and has the corporate power and authority to execute, deliver and carry out the terms and provisions of the Guaranty;

(b)     no authorization, approval, consent or order of, or registration or filing with, any court or other governmental body having jurisdiction over Guarantor is required on the part of Guarantor for the execution, delivery and performance of this Guaranty;

(c)     this Guaranty constitutes a valid and legally binding agreement of Guarantor, except as the enforceability of this Guaranty may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditor's rights generally and by general principles of equity.

4.     <u>SETOFFS AND COUNTERCLAIMS</u>.     Without limiting Guarantor's own defenses and rights hereunder, Guarantor reserves to itself all rights, setoffs, counterclaims and other defenses to which Company and any other affiliate of Guarantor is or may be entitled to arising from or out of the Agreement except for defenses arising out of the bankruptcy, insolvency, dissolution or liquidation of Company.

5.     <u>AMENDMENT OF GUARANTY</u>.  No term or provision of this Guaranty shall be amended, modified, altered, waived, or supplemented except in writing signed by the parties hereto.

6.     <u>WAIVERS</u>.   Guarantor hereby waives (a) notice of acceptance of this Guaranty; (b) presentment and demand concerning the liabilities of Guarantor, except as expressly herein above set forth; and (c) any right to require that any action or proceeding be brought against Company or any other person, or except as expressly hereinabove set forth, to require that Counterparty seek enforcement of any performance against Company or any other person, prior to any action against Guarantor under the terms thereof.  Guarantor further waives all suretyship defenses.

Except as to applicable statutes of limitation, no delay of Counterparty in the exercise of, or failure to exercise, any rights hereunder shall operate as a waiver of such rights, a waiver of any other rights or a release of Guarantor from any obligations hereunder.

Guarantor consents to and waives any defenses based on the renewal, compromise, extension, acceleration or other changes in the time of payment of or other changes in the terms of the Obligations, or any part thereof, or any changes or modifications to the terms of the Agreement.

Guarantor may terminate this Guaranty in accordance with the provisions of Section 6 of the Agreement.

7.     <u>NOTICE</u>.  Any Payment Demand, notice, request, instruction, correspondence or other document to be given hereunder by any party to another (herein collectively called "Notice") shall be in writing and delivered personally or mailed by certified mail, postage prepaid and return receipt requested, or by telegram or telecopier, as follows:

Exhibit No. MYS-012
Page 65 of 215

| To Counterparty: | NSTAR Services Company |
| | 800 Boylston Street, P-1603 |
| | Boston MA 02199 |
| | Attn: Lead Transmission Asset Management |
| | Liaison |
| | Fax: (617) 424-3472 |
| | |
| To Guarantor: | Sithe Boston Generating, LLC |
| | c/o Sithe Energies, Inc. |
| | 335 Madison Avenue |
| | New York, NY 10017 |
| | Attn: General Counsel |
| | Fax: (212) 351-0800 |

Notice given by personal delivery or mail shall be effective upon actual receipt. Notice given by telegram or telecopier shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next business day after receipt if not received during the recipient's normal business hours. All Notices by telegram or telecopier shall be confirmed promptly after transmission in writing by certified mail or personal delivery. Any party may change any address to which Notice is to be given to it by giving notice as provided above of such change of address.

8.     MISCELLANEOUS.  THIS GUARANTY SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MASSACHUSETTS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS. This Guaranty shall be binding upon Guarantor, its successors and assigns and inure to the benefit of and be enforceable by Counterparty, its successors and assigns. The Guaranty embodies the entire agreement and understanding between Guarantor and Counterparty and supersedes all prior agreements and understandings relating to the subject matter hereof. The headings in this Guaranty are for purposes of reference only, and shall not affect the meaning hereof. This Guaranty may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

EXECUTED as a sealed instrument by a duly authorized officer of Guarantor as of the day and year first above written.

Sithe Boston Generating, LLC.

By:_____
Name:
Title:

59

**JA415**

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048     Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 431 of 580

Boston Edison Company
~~Second~~ Third Revised Service Agreement No. 71
Under FERC Electric Tariff,
Second Revised Volume No. 8

# INTERCONNECTION AGREEMENT
## BETWEEN
# SITHE MYSTIC DEVELOPMENT LLC
## AND
# BOSTON EDISON COMPANY

Issued by:  Douglas S. Horan                    Effective: March 6, 2001
            Vice President

Issued on:  ~~July 3, 2002~~March 18, 2004

Filed to comply with the order of the Federal Energy Regulatory Commission, Docket Nos.
ER01-890-~~003~~ -004 and -005 and ER02-1465-~~000~~001 and -002, issued on ~~May 31,
2002~~February 17, 2004, ~~99 FERC ¶ 61,241 (2002)~~106 FERC ¶ 61,150 (2004).

JA416

# Table of Contents

Section 1.    Definitions.................................................................3
Section 2.    Term.....................................................................5
Section 3.    General Considerations .................................................6
Section 4.    Construction of Interconnection Facilities ............................6
Section 5.    Payment for Interconnection Facilities ................................7
Section 6.    Security .................................................................10
Section 7.    Adjustment of Capitalized Interconnection Facilities Costs.........11
Section 8.    Service Availability of Interconnection Facilities....................12
Section 9.    Partial Service .........................................................13
Section 10.   Ownership..............................................................13
Section 11.   This Section intentionally left blank. ...............................14
Section 12.   Construction Power and Station Service..............................14
Section 13.   Delivery and Measurement of Electricity .............................15
Section 14.   Operations.............................................................18
Section 15.   Maintenance............................................................21
Section 16.   Emergencies............................................................22
Section 17.   Safety. .................................................................23
Section 18.   Future Modifications...................................................24
Section 19.   Force Majeure .........................................................24
Section 20.   Default..................................................................25
Section 21.   Notice to Suspend .....................................................26
Section 22.   Notice to Terminate ...................................................26
Section 23.   Assignment ............................................................27
Section 24.   Subcontractors.........................................................28
Section 25.   Insurance...............................................................28
Section 26.   Indemnification........................................................30
Section 27.   Limitation of Liability..................................................30
Section 28.   Disputes................................................................30
Section 29.   Regulatory Approvals ..................................................31
Section 30.   State and Federal Laws ................................................31
Section 31.   Amendments...........................................................31
Section 32.   Complete and Full Agreement .........................................32
Section 33.   No Third Party Beneficiaries ..........................................32
Section 34.   Limited Purpose.......................................................33
Section 35.   Nonwaiver.............................................................33
Section 36.   No Dedication of Facilities............................................33
Section 37.   Notices.................................................................33
Schedule 1: Major Milestone Schedule ..............................................35
Schedule 2: Estimate of Major Cost Components ...................................36
Schedule 3: Calculation of Annual Facilities Cost ..................................38
Schedule 4: Company's System Impact Study for Sithe's Generators ..............41
Figure 1A:  Proposed Sithe Generator 345 kV Interconnection ......................51

i

**JA417**

Document Accession #: 20180516-5048          Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 433 of 580

Figure 1B:  Proposed Sithe Generator 115 kV Interconnection.........................................52
Figure 2A - Mystic Underground Work Areas Due to Sithe Mystic Interconnection (345 kV Switchyard  Areas)...............................................................................................54
Figure 2B – NSTAR Underground Work Areas Due to Sithe Mystic Interconnection (Sithe Property between 345 kV Switchyard and 115 kV Switchyard) ...........................55
Figure 2C – NSTAR and Sithe Underground Work Areas Due to Sithe Mystic Interconnection   (NSTAR 115 kV Switchyard Easement) ................................................56
Attachment 1: Form of Corporate Guaranty Agreement ................................................57

**JA418**

AGREEMENT entered into as of this _____ day of _____, ____ by and between Sithe Mystic Development LLC, having its principal place of business at 529 Main Street, Suite 605, Charlestown, Massachusetts 02129 (hereinafter referred to as "Sithe"), and Boston Edison Company, a Massachusetts corporation having its principal place of business at 800 Boylston Street, Boston, Massachusetts, 02199 (hereinafter referred to as "Company").

WHEREAS, Sithe plans to construct a new gas fired combined cycle generating station of approximately 1600 megawatt maximum (50°F) output in Everett, Massachusetts (hereinafter referred to as "Sithe's Generators"); and

WHEREAS, the System Impact Study that has been performed for Sithe's Generators by Company identified that upgrades of six (6) 115 kV lines, installation of one new 345 kV line, splitting the existing 345 kV Line 346 X&Y, and extensive substation work at three (3) 345 kV substations and three (3) 115 kV substations, including replacement of a 345/115 kV autotransformer, all as more fully described in Schedule 2 hereof, are all required in order to meet the Minimum Interconnection Standard for Sithe's Generators; and

NOW, THEREFORE, in consideration of the mutual promises and agreements contained herein, Sithe and Company hereby agree as follows:

**Section 1.   Definitions**

Terms used herein that are not defined have the meaning stated in Company's Tariff or its successor, either as amended from time to time.

**1.1     Annual Facilities Charge ("AFC").** Annual charges for ongoing expenses associated with new facilities, the applicability of which are determined pursuant to Section 5.6, and the calculation of which are pursuant to Schedule 3 hereof.

**1.2     Company's Tariff.** The Company's Open Access Transmission Tariff as it may be amended from time to time and accepted or approved by FERC.

**1.3     Company Transmission System.** All the facilities owned or controlled by the Company on the Company's side of the Interconnection Points for the purpose of providing wholesale transmission service under the Company's and/or NEPOOL's Open Access Transmission Tariff.

**1.4     This subsection intentionally left blank.**

**1.5     Emergency.** Any abnormal system condition that requires automatic or immediate manual action to prevent or limit loss of transmission facilities or generation supply that could adversely affect the reliability of the Company Transmission System or the systems to which the Company is directly or indirectly connected.

**1.6     FERC.** The Federal Energy Regulatory Commission, or its successor.

3

**JA419**

USCA Case #20-1343    Document #1935613    Filed: 02/17/2022    Page 435 of 580

**1.7    Force Majeure.**  The failure or imminent threat of failure of facilities or equipment, flood, freeze, earthquake, storm, fire, lightning, other acts of God, epidemic, war, acts of a public enemy, riot, civil disturbance or disobedience, strike, lockout, work stoppages, other industrial disturbance or dispute, sabotage, restraint by court order or other public authority, and action or non-action by, or failure or inability to obtain the necessary authorizations or approvals from, any governmental agency or authority, which by the exercise of due diligence the affected Party could not reasonably have been expected to avoid and by exercise of due diligence its effect can not be overcome.  In no event shall the lack of funds or an inability to obtain funds be a Force Majeure event.

**1.8    Good Utility Practice.**  Any of the practices, methods and acts engaged in or approved by a significant proportion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in the light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at the lowest reasonable cost consistent with reliability, safety and expedition.  Good Utility Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather to be a spectrum of acceptable practices, methods or acts.

**1.9    Hazardous Substances.**  Any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "hazardous constituents", "restricted hazardous materials", "extremely hazardous substances", "toxic substances", "contaminants", "pollutants", "toxic pollutants" or words of similar meaning and regulatory effect under any applicable Environmental Law, or any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any applicable Environmental Law.  For purposes of this Agreement, the term "Environmental Law" shall mean federal, state and local laws, regulations, rules, ordinances, codes, decrees, judgments, directives, or judicial or administrative orders relating to pollution of the environment, natural resources or human health and safety.

**1.10    Interconnection Facilities.**  New and/or upgraded facilities comprised of all the facilities described in Schedule 2, which are the subject of this Agreement

**1.11    Interconnection Points.**  The points, identified in Figures 1A and 1B, at which the leads from Sithe's step-up transformers) connect to the bus  at the Company's facilities.

**1.12    Interim Agreements.**  The agreement between the Parties dated December 23, 1999, which provides for the engineering and procurement of long lead time materials in anticipation of this Agreement (the "First Interim Agreement") and the letter agreement dated October 26, 2000, which provides for extension of the First Interim Agreement to certain construction activities (the "Second Interim Agreement").

**1.13    ISO.**  ISO-New England, Inc., the Independent System Operator of the New England Power Pool control area and its successors and assigns.

**1.14    Metering Points.** The points at which the net output of Sithe's Generators are metered (with dynamic compensation to the Interconnection Points).

**1.15    Minimum Interconnection Standard.** A standard of interconnection defined in the NEPOOL Tariff.

**1.16    NEPOOL.** The New England Power Pool and its successors and assigns.

**1.17    NEPOOL Agreement.** The Restated NEPOOL Agreement as it may be amended from time to time and accepted or approved by FERC.

**1.18    NEPOOL Tariff.** The NEPOOL Open Access Transmission Tariff as it may be amended from time to time and accepted or approved by FERC.

**1.19    NERC.** The North American Electric Reliability Council, or its successor.

**1.20    Notice to Proceed.** A written notice given by Sithe to Company that Sithe directs Company to start the work described herein.

**1.21    NPCC.** The Northeast Power Coordinating Council, or its successor.

**1.22    Parties.** Sithe and Company.

**1.23    PTF.** Pool Transmission Facilities, as defined in the NEPOOL Agreement.

**1.24    Secondary Systems.** Control or power circuits that operate below 600 Volts, AC or DC, including, but not limited to, any hardware, control or protective devices, cables, conductors, electric raceways, secondary equipment panels, transducers, batteries, chargers, and voltage and current transformers.

**Section 2.    Term**

**2.1    General.** This Agreement shall take effect as of the day and year first above written, subject to FERC acceptance for filing or approval by FERC, and shall continue in full force and effect until a mutually agreed termination date not to exceed the date on which Sithe's Generators cease commercial operations.

**2.2    Termination Upon Default.** This Agreement may be terminated upon a Party's Default in accordance with the provisions of Section 20.

**2.3    Survival.** The applicable provisions of this Agreement shall continue in effect after expiration, cancellation, or termination hereof to the extent necessary to provide for final billings, billing adjustments, and the determination and enforcement of liability and indemnification obligations arising from acts or events that occurred while this Agreement was in effect.

5

**JA421**

## Section 3.     General Considerations

Company shall design, engineer, procure, and construct, to the extent not already ordered or constructed pursuant to the Interim Agreements, those Interconnection Facilities that are located on the Company Transmission System in accordance with Good Utility Practice. Such Interconnection Facilities must, at a minimum, satisfy NEPOOL's Minimum Interconnection Standard.  Further, Company shall own, operate and maintain all the Interconnection Facilities that are the subject of this Agreement.  Sithe shall make its own arrangements for all additional facilities required to effect its interconnection that are located on the transmission systems of other transmission providers.

Transmission services and related ancillary services are provided pursuant to the NEPOOL Tariff and the Company's and potentially other transmission providers' Tariffs, and not pursuant to this Agreement.

## Section 4.     Construction of Interconnection Facilities

Upon execution of this Agreement, the Company shall initiate its project authorization process.  Company will undertake all work under this Agreement not already in progress pursuant to the Interim Agreements and will purchase the equipment and materials required for the work hereunder only after the later of (a) receiving a Notice to Proceed from Sithe, together with Sithe's payment pursuant to Section 5.1 or (b) Company's approval of the project authorization.  Such Company approval of the project authorization should normally occur within 3 weeks of execution hereof.  Sithe must issue its Notice to Proceed within ninety (90) days of execution hereof or this Agreement shall terminate as of that date.

Company agrees that time is of the essence in this Agreement to maintain the schedule delineated in Schedule 1 in order to permit interconnection and operation of Sithe's Generators in a timely manner.  However, Company shall bear no responsibility whatsoever for delays caused by, but not limited to: repair or replacement of defective equipment and materials; delays caused by vendors; an inability to secure ISO permission to take construction outages when desired; any order of any appropriate court or regulatory body; any event of Force Majeure; or any required environmental remediation.  Company shall coordinate its work hereunder with the ISO and any related projects being completed by other transmission providers on behalf of Sithe and/or any other interconnection projects under way in the area.  Sithe acknowledges that the ISO may, after consultation with Sithe, other affected generators, and the Company, request and ultimately require that the Company shift its construction outage schedule for any of several reasons.  Within the constraints imposed by the priority of maintaining the schedule laid out in Schedule 1, Company agrees to use reasonable efforts to minimize the costs of Interconnection Facilities through such mechanisms as competitive bidding for the procurement of equipment and materials required to complete the work hereunder, as applicable.

In the event that this Agreement is executed prior to approval, pursuant to Section 18.4 of the NEPOOL Agreement, of the Interconnection Facilities and such NEPOOL approval is conditioned on or amended to include a set of interconnection facilities that differs from the Interconnection Facilities listed in Schedule 2, the Parties agree to amend Schedule 2 in

conformance with the conditions of such approval. To the extent that such amendment results in the delivery of materials and/or equipment that are no longer useful to the construction of the Interconnection Facilities, as revised, Sithe shall take ownership and possession thereof pursuant to the last paragraph of Section 22. The Parties recognize that such amendment of Schedule 2 may also impact the schedule of work hereunder, and require the adjustment of the milestones listed in Schedule 1. The Company shall bear no responsibility for any schedule delays or cost increases caused by such changes in scope.

Company shall meet periodically with Sithe to update Sithe regarding the status of the work performed to date, as it relates to the schedule of such work, and regarding the monies expended to date as compared to that expected to be expended to date. During and following such meetings, Sithe and Company agree to plan any actions needed or prudent to facilitate the work hereunder, and to consider any and all alternatives identified to work around any delays that may arise. If Company and Sithe jointly decide to pursue alternatives not identified in the Schedules attached hereto, Company and Sithe shall mutually determine their respective responsibilities arising therefrom, provided however, that if the Parties cannot come to agreement regarding such responsibilities, Sithe shall assume responsibility for all effects of such decision, including, but not limited to, its costs and any resulting delays.

## Section 5.    Payment for Interconnection Facilities

**5.1    Initial Payment.** Sithe agrees to pay Company for all costs and fees which are required to enable Company to fulfill its obligations under this Agreement, including without limitation materials, labor, and appropriate overheads, a non-binding estimate of which is provided in Schedule 2, plus any tax liability, and the costs and fees of all permits, licenses, franchises or regulatory or other approvals necessary for the construction of the Interconnection Facilities. An initial payment of $10,000,000.00 less any amounts previously paid pursuant to the Interim Agreements shall be made simultaneously with issuance of the Notice to Proceed. A second payment in the amount of the balance of the total estimated cost as shown in Schedule 2 shall be due and payable on or before December 31, 2000. Sithe shall have the option to make such second payment in the form of a letter of credit ("LOC") that meets all of the standards laid out for the Security in Section 6. Company shall have full access to any such LOC to withdraw as needed the amounts forecast to be required to support the work hereunder during the coming month, plus or minus any adjustment from the previous month. In no event, however, will the Company continue construction of the Interconnection Facilities if, in the Company's reasonable opinion, the remaining funds made available to date by Sithe plus Sithe's Security in place at the time are insufficient to close down the project and restore the Company Transmission System to a viable permanent configuration in accordance with Good Utility Practice. Company must provide Sithe at least 30 days prior notice if Company believes such funding insufficiency is imminent.

**5.2    Schedule 2 Cost Changes.** Company shall notify Sithe of any increases in the estimated total cost in Schedule 2, and shall obtain Sithe's prior written consent for such increases amounting to in the aggregate 5 percent (5%) or more within ten (10) business days of such notice. To the extent that the amount of the increase is more than ten percent (10%) of the Schedule 2 total, as previously amended, Sithe shall have one additional business day

per full percentage point by which the increase exceeds ten percent (10%) of the Schedule 2 total to provide its consent. Upon such notification and, when required, Sithe's consent, Sithe shall pay Company the amount of the cost increase, whether directly, or via an increase in its LOC, and shall revise the amount of its Security as discussed in Section 6. If Sithe fails to pay Company the amount of such cost increase within twenty (20) days of Company's notice thereof, or, when required, Sithe's consent, Company may draw on the Security to recover such increase. If Company draws on the Security, Sithe must restore the amount of the Security to the required level within thirty (30) days of Company's draw thereon, or Company may suspend all work hereunder until such restoration.

If Sithe fails to provide the required written consent to individual or cumulative increases of 5 percent (5%) or more within the period defined above, such non-concurrence shall be deemed to be Sithe's notice to terminate pursuant to Section 22 below.

If Company identifies a net decrease in the total cost estimate of Schedule 2 amounting to $250,000 or more, Company shall notify Sithe of such decrease, and shall refund the amount of such cost decrease, or permit Sithe to reduce its LOC, as applicable, within twenty (20) days of Company's notice thereof. Upon such notice Sithe may revise the amount of its Security as discussed in Section 6.

**5.3     Tax Gross-up.** Sithe acknowledges that under Internal Revenue Code Section 118 and Internal Revenue Service's Notice 87-82, transfers made by Sithe to Company hereunder with respect to the construction and installation of new facilities or improvements may, under certain circumstances, cause a taxable event to Company. Sithe agrees to reimburse Company within twenty (20) days of Company's invoice for all tax effects, both state and federal ("Tax Gross-up"), including interest and penalties, if any, if Company, whether in its sole reasonable discretion or at the direction of the IRS, pays state and/or federal taxes on Sithe's payments. Any such calculation will take into account as an offset the depreciation, amortization and other deductions to which Company will be entitled if it is required to report the transfers as income. The Parties agree that no Tax Gross-up is expected to be required hereunder based on their understanding of current IRS policy. If Sithe wishes to minimize its exposure to IRS and Commonwealth of Massachusetts interest charges and penalties pursuant to this Section 5.3, it may request that Company calculate the appropriate Tax Gross-up, and pay such amount to the Company.

Provided that the Company has received Sithe's Notice to Proceed, the Company shall, upon Sithe's request to do so, use reasonable efforts over a reasonable period of time to seek a private letter ruling from the IRS to the effect that Company's performance of this Agreement and receipt of payments hereunder do not result in a Tax Gross-up. Company will provide Sithe with a draft and consider in good faith any suggestions about content and permit Sithe to participate in any conference of right with the IRS about the ruling request. Sithe agrees to reimburse Company for its costs incurred in the pursuit of such ruling, including Company's reasonable internal cost and the costs of expert outside counsel. If Company receives a tax refund as a result of such IRS ruling, Company will return the Tax Gross-up to Sithe, together with interest thereon based on the interest paid, if any, by the IRS or the state.

If Sithe fails to make a reimbursement required pursuant to this Section 5.3 within twenty (20) days of Company's invoice for such reimbursement, Company may draw on the Security for such reimbursement. If Company draws on the Security, Sithe must restore the amount of the Security to the required level within thirty (30) days of Company's draw thereon, or Company may suspend all work hereunder until such restoration.

**5.4      Construction Outage Related Costs.**    Sithe and Company recognize that construction of the Interconnection Facilities will require Company, acting in conjunction with the ISO, to take certain transmission facilities out of service, and that such outages may require the redispatch of other generators. Such redispatch, if any, may result in increased costs attributable to (i) the necessity of running additional units to maintain reliability; (ii) higher dispatch levels on generators in areas rendered constrained by the outages; and (iii) lost opportunity costs from units backed down or forced off line. Pursuant to a Settlement Agreement approved by the FERC in Docket No. ER01-890-000 ("Settlement Agreement"), the Parties agree that to the extent that such type (i) and type (ii) redispatch costs materialize, such costs, if they meet the definition of Upgrade-Related Congestion Costs set forth in the Settlement Agreement, shall be allocated as follows: any Upgrade-Related Congestion Costs incurred prior to October 17, 2001 will be allocated to NEPOOL Network Load consistent with existing NEPOOL rules. From and after October 17, 2001, Upgrade-Related Congestion Costs shall be allocated as follows: a) the first $500,000 shall be allocated to and paid by Sithe; b) the next $1.5 million shall be allocated to NEPOOL Network Load consistent with existing NEPOOL Rules; and c) all such costs in excess of $2 million, from and after October 17, 2001, shall be borne equally between Sithe and NEPOOL Network Load. The Settlement Agreement shall govern how such Upgrade-Related Congestion Costs will be determined.

The Parties acknowledge that FERC has already ruled on type (iii) redispatch costs in the NEPOOL CMS Proceeding in Docket No. ER00-2016, et al.

**5.5.1      Report of Total Costs.**    Company shall provide Sithe a report of the final total Interconnection Facilities costs, as delineated in Schedule 2, in sufficient detail to allow identification of all major cost components. Company shall use best efforts to provide such report within ninety (90) days following the earlier of (a) the date on which the Interconnection Facilities are completed, or (b) the early termination of this Agreement.

**5.5.2      Reconciliation.**    If Sithe's actual payments, whether directly or via its LOC, are less than the total costs identified in Section 5.5.1, Company shall bill Sithe for the balance due. Any such balance due shall be paid to Company within twenty (20) days of receipt of such bill, after which the Company may draw on the Security for any amounts still owing. If the Security cannot fully cover the amount owed, the balance due will accumulate interest charges at the rate specified in Company's Tariff. If Sithe's actual payments exceed the total costs identified above, Company shall authorize termination of the LOC, if any, to the extent the excess resides therein, in writing within twenty (20) days of such final accounting. To the extent Company had previously drawn such excess from the LOC, or otherwise had been overpaid directly by Sithe, Company shall refund such amount. Such refund will include interest thereon at the rate specified in Company's Tariff, from the date of the most recent draw(s) or payment(s) until the date of the refund, if the excess in Company's possession is

9

at least $10,000.00. Sithe shall have the right to audit Company's accounts related to such costs within one year of the reconciliation at its own expense. Company shall have the right to charge Sithe for its reasonable costs of assisting in any such audit.

**5.6    Annual Facilities Charges.** To the extent that one or more of the Interconnection Facilities are new additions to Company's Transmission System, and not merely higher capacity replacements or upgrades of existing facilities, such new facilities shall be subject to an Annual Facilities Charge ("AFC") for the full service life of Sithe's Generators, or, if shorter, the full service life of the new facilities. Company shall invoice such charges monthly on an estimated basis, and shall true up the charges annually by June 1 of the following year. AFCs shall be calculated pursuant to Schedule 3 hereof, and shall apply to those line items, or indicated percentages thereof, flagged in Schedule 2 with an asterisk. ~~Note, however, that AFCs will not be assessed for network upgrades.~~                                                     |

**5.7    Costs Backstop.** Provided that Company has received Sithe's Notice to Proceed as specified in Section 4, Sithe agrees to reimburse Company for all reasonable and verifiable costs related hereto that Company has incurred and for which Company is not otherwise reimbursed by NEPOOL. This paragraph does not override Section 5.4 as resolved by FERC, Section 7, or any specific FERC order pertaining to this Agreement.

Furthermore, nothing contained in this Agreement shall affect any provisions of any previous agreements between the Parties or their affiliates, including without limitation any allocation of liability for environmental remediation costs; provided, however, that to the extent that, in the course of effecting Sithe's interconnection, the Company encounters environmental contamination in the Interconnection Work Zone at levels that require remediation or other special processing, as a result of which the Company incurs environmental remediation or other related costs for which the Company would be liable under any such previous agreements, Sithe shall reimburse the Company for all such costs. Within its retained easements (i.e., the Mystic switchyards), the Company shall retain all responsibility for any environmental remediation costs associated with areas outside the Interconnection Work Zone, which shall be defined as the shaded areas indicated in Figures 2A-2C.

## Section 6.    Security

In recognition of the magnitude of certain potential cost liabilities to be borne by Company hereunder, Company requires that Sithe provide a letter of credit ("Security") for a term and in a form acceptable to Company to assure Company recovery of its entire costs for the Interconnection Facilities. Sithe shall deliver the Security to Company simultaneously with Sithe's second payment as provided in Section 5.1, and shall maintain the Security in accordance with the following provisions until allowed to extinguish it pursuant to the second paragraph of this Section 6. Prior to such second payment, the Security provided by Sithe pursuant to the Interconnection Agreement between Sithe Fore River Development LLC and Boston Edison Company will serve additionally as the Security hereunder. The amount of the Security provided at the time of Sithe's second payment pursuant to Section 5.1 shall be revised from time to time upon Company's notice to Sithe to account for any known increases or decreases in Interconnection Facilities costs. Sithe agrees to make such adjustments to the Security within thirty (30) days of receipt of Company's notice of any

10

**JA426**

such required adjustments. If Sithe fails to make such adjustments to the Security when required, Company may suspend all work hereunder until such adjustments are made.

The Security shall be in the form of an unconditional irrevocable standby letter of credit drawn on a bank reasonably acceptable to Company. Within the first year from the Notice to Proceed, the Security may have a term of less than one year in order to facilitate Sithe's financing arrangements, and substitutions will be permitted, provided that the issuer and form are satisfactory to the Company and that the coverage is continuous. Thereafter the Security shall have a minimum term of one (1) year. At all times the Security shall designate Company as beneficiary with authority to draw drafts on the issuer for up to the secured amount in accordance with this Section 6. Such Security shall also provide that Company may, upon five days notice, draw the full amount of the Security in the event it has not been renewed, extended or replaced on or before thirty (30) days prior to the expiration date of such Security. The amount of the Security shall be calculated as the higher of (a) 25% of the aggregate costs of the Interconnection Facilities, as estimated in Schedule 2 as amended from time to time, or (b) $1,000,000.00. Sithe may reduce the amount of the Security to ten percent (10%) of the total cost as listed in Schedule 2, as most recently amended, upon the earlier of (a) the date on which the Interconnection Facilities are completed, or (b) the termination of this Agreement, provided that Sithe shall provide a corporate guarantee acceptable to the Company such that the sum of the Security and the corporate guarantee shall be maintained at the higher of (a) twenty-five percent (25%) of such Schedule 2 amount or (b) the Tax Gross-up as adjusted annually for the potential for IRS and Commonwealth of Massachusetts interest and penalties throughout the period covered by the IRS statute of limitations, Section 6501(a) of the Internal Revenue Code of 1986, as amended, including extensions, applicable for the year(s) in which the transfer(s) contemplated in Sections 5.1 and 5.2 hereof occurred. The form of such corporate guarantee is provided in Attachment 1 to this Agreement. Sithe may extinguish the Security upon completion of the settlement contemplated pursuant to Section 5.5.2, provided that Company has issued a notice to Sithe that all amounts owed to Company have been paid to the reasonable satisfaction of Company. In the event that Sithe extinguishes the Security in accordance with the foregoing sentence, Sithe shall replace the corporate guarantee previously issued with a corporate guarantee acceptable to the Company in substantially the form provided in Attachment 1 to this Agreement, and in an amount equal to the higher of (a) twenty-five percent (25%) of the aggregate costs of the Interconnection Facilities as set forth in Schedule 2 or (b) the annually adjusted Tax Gross-up; provided that such corporate guarantee shall be terminated by Sithe upon the earlier of (a) the conclusion of the period covered by the IRS statute of limitations, Section 6501 (a) of the Internal Revenue Code of 1986, as amended, including extensions, applicable for the year(s) in which the transfer(s) contemplated in Sections 5.1 and 5.2 hereof occurred; or (b) the receipt of a Private Letter Ruling from the IRS pursuant to Section 5.3 hereof that confirms that payments hereunder are not taxable income. The amount of the Security shall not be construed to limit amounts otherwise due to Company under this Agreement. The foregoing in this paragraph notwithstanding, if Sithe has paid the Tax Gross-up pursuant to its option in Section 5.3, the amount of the Security shall be computed ignoring the Tax Gross-up, and the required term of the Security shall be determined ignoring the IRS statute of limitations and extensions thereof.

**Section 7.  Adjustment of Capitalized Interconnection Facilities Costs**

It is the intent of the Parties that any cost sharing mechanism pursuant to the NEPOOL Tariff, as filed by NEPOOL and approved by FERC upon the exhaustion of all appeals, or specific FERC order pertaining to this Agreement, which is determined to be applicable to the Interconnection Facilities, shall be applied to the Interconnection Facilities pursuant to the applicable NEPOOL and/or ISO procedures. In the event that such procedures result in a refund of costs from the Company to Sithe, such refund shall be made within sixty (60) days following the Company's receipt of its first payment under the NEPOOL Tariff related to such shared costs.

**Section 8.    Service Availability of Interconnection Facilities**

Company makes no warranties or representations, other than as set forth in Section 4 above, that the Interconnection Facilities undertaken pursuant to this Agreement will be available at any specific time, nor does Company guarantee to transmit a constant supply of electricity under this Agreement. Rather, it is the intent of all provisions of this Agreement that Sithe shall assume the risks of interruption, failure or deficiency in the quality or quantity of service, whether caused by a Force Majeure event as described in Section 1.7, above, or by any other event on the New England transmission system, except to the extent such interruption, failure or deficiency in the quality or quantity of service is caused by the sole negligence of the Company. Sithe acknowledges that from time to time during the term of this Agreement other persons may develop, construct and operate, or acquire and operate generating facilities in the Company's service territory, and such construction or operation by such other persons may adversely affect Sithe's Generators. Sithe further recognizes that conditions on the system, including the necessity to perform maintenance, implement upgrades, or interconnect other generators, may arise that require the ISO, its satellite, REMVEC, or Company to curtail, in whole or in part, the output of Sithe's Generators. When time and available information permit, the ISO will order such curtailments, in its sole discretion, on a non-discriminatory basis among those generators best physically able to address the need for the curtailment(s). Sithe shall hold Company harmless for any such curtailments to Sithe's Generators.

Company agrees to perform routine maintenance and make emergency repairs on the Interconnection Facilities in accordance with Good Utility Practice and any applicable warranties. In the event of damage to any of the Interconnection Facilities, Company will rely first on any applicable warranties, and thereafter make any additional necessary capital expenditures to replace, reconstruct, or otherwise bypass such damaged Interconnection Facilities in accordance with NEPOOL requirements as they exist at the time and in accordance with Good Utility Practice. Except to the extent such expenditures are determined by a court or regulatory authority having jurisdiction to have been made due to the negligence of the Company, Company will invoice Sithe for any required replacements of units of property with respect to which Sithe bears ongoing cost responsibility for AFCs pursuant to Section 5.6.

To the extent permitted to do so pursuant to Good Utility Practice, FERC Standards of Conduct, and applicable NEPOOL rules and practices, Company will apprise Sithe of its planned maintenance activities that may impact Sithe's operations. To the extent the ISO

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048     Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 444 of 580
Exhibit No. MYS-012
Page 79 of 215

publishes such information in a vehicle that Sithe is entitled to receive, such publication shall be deemed to satisfy Company's commitment under this paragraph.

## Section 9.    Partial Service

Sithe may request, and if requested will pay for, operating studies to be performed by Company, ISO New England and/or NEPOOL to determine the maximum allowable output of Sithe's Generators should all Interconnection Facilities not be completed prior to the date Sithe's Generators require transmission service. Any interim service will be provided at the ISO's discretion based upon the operating studies' indication of the maximum allowable output.

Similarly, Sithe may request, and if requested will pay for, operating studies to be performed by Company, ISO New England and/or NEPOOL to determine the maximum allowable output of Sithe's Generators under any transmission system operating configurations that may, in the absence of such studies, curtail the output of Sithe's Generators. Use of the results of any such studies will be at the ISO's discretion.

Sithe recognizes that its requests for operating studies will be subject to the policies of the party(ies) to which its request is made regarding the availability of technical staff to perform the requested studies and the priority accorded Sithe's request relative to other ongoing study work.

## Section 10.   Ownership

**10.1    Land Ownership and Eminent Domain Takings:** Sithe shall furnish at no cost to the Company any necessary access, easements, licenses, and/or rights of way upon, over, under, and across lands owned or controlled by Sithe and/or its affiliated interests for the construction and operation of necessary lines, substations, and other equipment to accomplish interconnection of Sithe's Generators with the Company Transmission System under this Agreement, and shall, at all reasonable times, give the Company, or its agents, free access to such lines, substations and equipment. Sithe grants to Company at all reasonable times and with reasonable supervision, the right of free ingress and egress to Sithe's premises for the purpose of installing, testing, reading, inspecting, repairing, operating, altering, or removing any of Company's property located on Sithe's premises or for other purposes necessary to enable Company to receive electric energy, suspend the receipt thereof, or determine Sithe's compliance with this Agreement.

If any part of Company's facilities are to be installed on property owned by other than the Company or Sithe, Sithe shall, if Company is unable to do so without cost to the Company, procure from the owners thereof any necessary rights of use, licenses, rights of way and easements, in a form reasonably satisfactory to the Company, for the construction, operation, maintenance and replacement of Company facilities upon such property. In the event Sithe is unable to secure them (a) by condemnation proceedings or (b) by other means, Company shall use its best efforts to secure such rights and Sithe shall reimburse Company for all reasonable and documented costs incurred by the Company in securing such rights. See Schedule 5 for the details of the land ownership arrangements between the parties.

## JA429

In connection with Company's exercise of rights under this Section 10.1, while on Sithe's premises, Company's personnel shall comply with all applicable safety rules or regulations of Sithe that are communicated by Sithe to Company.

If any conflicts exist between the provisions of this Section 10.1 and the Cross-Easement Agreement dated May 14, 1998 between Company and Sithe Energies, Inc., as amended on May 11, 2000 and as may be further amended from time to time, then the Cross-Easement Agreement, as amended, shall govern.

The Parties acknowledge that an amendment to the Cross-Easement Agreement is required to reflect the construction of the Interconnection Facilities. The Parties hereby agree to further amend the Cross-Easement Agreement to include Sithe's connections to the appropriate Interconnection Facilities once their locations become known.

**10.2    Plant Ownership:**    Sithe will own Sithe's Generators and the associated transformers, switches, and conductors up to, but not including, the inter-company demarcation point.

For Block 8, and Units 9-3 and 9-4 (air insulated terminations) the demarcation point shall be the first operable device within Company's substation (jaw end of the air-insulated disconnect switch).

For Unit 9-6 (gas insulated termination), Sithe shall own the 115 kV cable terminators installed on the gas insulated switchgear, with the demarcation point being the internal connection between the cable terminator conductor and the internal gas insulated switchgear conductor. Company shall own the gas insulator enclosure mounted over the terminators and that portion of the GIS support system supporting these enclosures.

The above ownership by Sithe shall be deemed to provide direct connection to PTF.

Also at Mystic Station, Sithe shall own optical fibers and associated conduits in the various block protection systems up to the splice with the Company's optical fibers for the same systems. The Company will own the associated enclosures and interface boxes, identified as Interface Box 1 and Interface Box 2, and conduits connecting to the Company's conduit, duct and/or tray system.

Company will own any station bridges or any other conductor support or termination structures within the substation.   Company will own all the transmission lines and substations and facilities appurtenant thereto which are the subject of this Agreement. See Figures 1A and 1B for a depiction of the ownership of the Interconnection Facilities within the Mystic Station switchyards.

**Section 11.**  This Section intentionally left blank.

**Section 12.  Construction Power and Station Service**

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007
Document Accession #: 20180516-5048    Filed Date: 05/16/2018
USCA Case #20-1343    Document #1935613    Filed: 02/17/2022    Page 446 of 580

Exhibit No. MYS-012
Page 81 of 215

**12.1    Construction Power.**    Sithe shall make its construction power connection arrangements with respect to Sithe's Generators with the local electric distribution provider, and shall make its energy purchase arrangements with the qualified energy supplier of its choice under the applicable state's deregulation rules.

**12.2    Test Power.**    At such time as Sithe is ready to test Sithe's Generators, Company will transmit, pursuant to service agreements under the NEPOOL and Company's Tariffs, any test power drawn by or delivered from Sithe's Generators, but Sithe is responsible for the disposition of and related accounting for such test power produced, and for payment for any such power drawn. Sithe shall have made suitable power arrangements for such test power and notified the ISO of such arrangements prior to engaging in such tests.

**12.3    Station Service.**    Sithe shall make permanent station service power connection arrangements with the local electric distribution provider and/or shall have designed and built a station service source on its side of the Interconnection Point. If Sithe elects to utilize the latter option, it will be subject to the NEPOOL Tariff as a load customer and, to the extent transition to the full implementation of that tariff is still in progress, it will also be subject to the Company's Tariff. If both sources are utilized, Sithe shall so configure its circuits such that any distribution source can never back-feed the transmission level source(s). For either source, Sithe shall make its own energy supply arrangements with the qualified energy supplier of its choice and this Agreement shall in no way determine the rate for such service.

To the extent that the Interconnection Facilities include a new substation at or adjacent to Sithe's Generators, Sithe shall be responsible for providing such substation with its station service requirements at no cost to Company. Such substation service load shall be deemed to be Sithe's load for all load reporting purposes.

Company shall continue to be responsible for making its own station service arrangements at all other substations at which Interconnection Facilities are being undertaken pursuant to this Agreement.

To the extent that the Interconnection Facilities include facilities that are subject to AFC's pursuant to Section 5.6 other than a new substation at or adjacent to Sithe's Generators, such facilities shall be allocated a portion of the station service energy costs pursuant to Schedule 3.

**Section 13.    Delivery and Measurement of Electricity**

**13.1    Voltage Level:**    All electricity that crosses the Interconnection Point shall be in the form of three-phase, sixty hertz, alternating current at a nominal voltage of 115, 230, or 345 thousand volts, as appropriate. Such voltage shall at all times, including during unit startups at Sithe's Generators, be held within the tolerances specified in the ISO's voltage schedules. If Sithe fails to maintain such voltages and frequency, Company may disconnect Sithe's Generators until such time as Sithe remedies its inability to operate within the required voltage tolerances.

**13.2    Generator Reactive Capability:**    Sithe's Generators are required to provide reactive

15

**JA431**

capability to regulate and maintain system voltage at the Interconnection Point to the extent physically able to do so. Compensation for such voltage support is available pursuant to Schedule 2 of the NEPOOL Tariff when the megawatt output of Sithe's Generators must be backed down to produce or absorb reactive power or when the units are asked to motor for this purpose. Company and the ISO shall, from time to time, publish a scheduled range of voltages to be maintained by Sithe's Generators. If Sithe fails to provide such reactive voltage support, Company may disconnect Sithe's Generators until such time as Sithe remedies its ability to provide such support.

Additionally, Sithe must equip Sithe's Generators with stabilizers as part of their excitation systems. The stabilizers will be activated by the ISO when stability studies indicate that they are needed.

**13.3   Metering and Related Equipment:** Sithe's Generators shall be equipped, solely at Sithe's expense, with compatible metering, telemetry, and communication equipment at or distant from the Interconnection Points which measures all electricity flows between Company and Sithe and determines and communicates the status of switching equipment. Metering for each generator and reserve station service load must comply with NEPOOL Operating Procedure 18 and must, pursuant to NEPOOL rules, include a solid state recorder which Company can access remotely via a telephone line provided, paid for, and protected, to the extent necessary, by Sithe.   This requirement for Company access may be deleted with respect to the metering of any generation or reserve station service load connected at 345 kV following expiration of NEPOOL's RNS transition period, on March 1, 2003. Multiple interconnections at the same site by a single generation owner may be netted for metering purposes only if the owner and the ISO have agreed that the market system modeling of these interconnections will be as a single unit. Sithe shall be responsible for all communications required by NEPOOL, and/or the ISO and its designated satellite. All meters, instrument transformers, solid state recording devices, and test switches for the transducer circuits shall be approved by Company before the design is finalized. All such equipment shall be maintained in accordance with NEPOOL market rules and operating procedures.

If the metering equipment is not located at the Interconnection Points (see Figures 1A and 1B for metering locations), the metering equipment shall record delivery of electricity in a manner that accurately accounts for losses occurring between the Metering Points and the Interconnection Points at all output levels. Billing for transmission losses between the Metering Points and the Interconnection Points shall be pursuant to the NEPOOL Tariff's terms, conditions and rates.

All metering equipment installed pursuant to this Agreement and associated with Sithe's Generators shall be tested at least annually by the owning Party at Sithe's expense in accordance with NEPOOL OP-18. If, at any time, any metering equipment is found to be inaccurate by a margin greater than that allowed under NEPOOL OP-18, the owning Party shall cause such metering equipment to be made accurate or replaced at Sithe's expense. Meter readings for the period of inaccuracy shall be adjusted so far as the same can be reasonably ascertained. If the period of inaccuracy cannot be determined, the Parties agree to adjust the meter readings for a period equal to half the time between the last known valid reading and the date of the test which uncovered the inaccuracy and for all time between such

test date and the date the metering was made accurate. Each Party shall comply with any reasonable request of the other concerning the sealing of meters, the presence of a representative of the other Party when the seals are broken and the tests are made, and other matters affecting the accuracy of the measurement of electricity delivered from the Generators. If either Party believes that there has been a meter failure or stoppage, it shall immediately notify the other and require immediate testing at Sithe's sole expense.

**13.3.1 Ownership of Metering Equipment:** The Company shall own all metering equipment used to record separately metered reserve station service load, if any, from its distribution system or from its switchyard if rated at less than 345 kV. The Company shall own the metering and equipment used to record Sithe's Generators net output and the required telemetry and communication equipment unless Sithe is permitted by NEPOOL procedures to own such equipment and expresses its desire to Company to be the owner. Sithe ownership of metering equipment shall not obviate Sithe's responsibilities pursuant to this Section 13.3 or Company's right to inspect and witness the testing of such meters. The Parties agree that Sithe will own the metering for this interconnection.

**13.3.2 Responsibility for Reading Meters:** For interconnections to a switchyard rated 345 kV or above, Sithe shall have the responsibilities of the meter reader pursuant to NEPOOL's Market Rule 20-I for both net generation and reserve station service load.

For interconnections to a switchyard rated less than 345 kV, the Company shall be the assigned meter reader unless Sithe submits a registration request to the ISO to be the assigned meter reader for net generation. If Sithe is the meter reader for net generation, Sithe must provide Company with the upload files it submits into the ISO's market settlement system in accordance with applicable NEPOOL rules, as may be amended from time to time. If Company is the meter reader for net generation, Sithe shall serve as a backup source of hourly data in the event Company is unable to communicate with the meter/recorder, and if called for, such data shall be made available to the Company by 8:00 AM of the following day.

For all interconnections under 345 kV, the Company must be the meter reader for each separately metered reserve station service load. Sithe shall serve as a backup source of hourly station service load data in the event Company is unable to communicate with the meter/recorder, and if called for, such data shall be made available to the Company by 8:00 AM of the following day.

For both net generation and reserve station service loads interconnected below 345 kV, Sithe shall forward month-end meter readings to Company, and Company shall also have local and remote access to the meters at Sithe's expense to take periodic meter readings.

Sithe's responsibilities to supply Company with physical and electronic access to meters and recorders, to supply the Company with upload files, and to supply the Company with month-end meter readings pursuant to this Section 13.3.2 shall continue after any changes in Market Rule 20-I or any related NEPOOL documents until such time as the Company no longer requires these services for its load calculation processes.

## Section 14. Operations.

**14.1    General.**  The Company and Sithe agree that their respective performances of this Agreement shall comply with the current (as amended from time to time) standards and guidelines of NERC, NPCC, and the ISO, or any successor agencies assuming or charged with similar responsibilities related to the operation and reliability of the North American electric interconnected transmission grid.  Each Party shall be responsible for its own performance, compliance, and reporting.

**14.2    Company Obligations.**  The Company shall operate and control the Company Transmission System and other Company facilities (i) in a safe and reliable manner; (ii) in accordance with Good Utility Practice; (iii) in accordance with applicable operational and/or reliability criteria, protocols, and directives, including those of NERC, NPCC, and the ISO; and (iv) in accordance with the provisions of this Agreement.

**14.3    Sithe Obligations.**  Sithe shall operate and control Sithe's Generators and its other facilities (i) in a safe and reliable manner; (ii) in accordance with Good Utility Practice: (iii) in accordance with applicable operational and/or reliability criteria, protocols, and directives, including those of NERC, NPCC, and ISO; and (iv) in accordance with the provisions of this Agreement.

**14.4    Access Rights.**  The Parties shall provide each other such easements and/or access rights as may be necessary for either Party's performance of their respective obligations under this Agreement; provided that, notwithstanding anything stated herein, a Party performing inspections or observations within the boundaries of the other Party's facilities must abide by the rules applicable to that site, including, if applicable, any required use of the owning Party's escorts.

**14.5    Switching and Tagging Rules.**  The Parties shall abide by their respective Switching and Tagging Rules and Safety Practices for obtaining clearances for work or for switching operations on their respective equipment.  The Parties agree to coordinate their actions, expedite ISO market instructions, and communicate with each other, all in accordance with Good Utility Practice, for purposes including, but not limited to: (i) closing breakers to accomplish interconnection, but not synchronization, of Sithe's Generators to the Company Transmission System; (ii) opening breakers to remove Sithe's Generators from service; (iii) operating disconnect and ground switches as required; (iv) in-service relay testing; and (v) battery system testing and maintenance.

**14.6    Operating Expenses.**  Except as otherwise provided pursuant to Section 5.6, and to the extent not superseded by any operating agreement that may be developed between the Parties, each Party shall be responsible for all expenses associated with operating its own property, equipment, facilities, and appurtenances on its side of the Interconnection Points.

**14.7    Protection and System Quality.**  Sithe shall, at its expense, install, maintain, and operate System Protection Facilities, including such protective and regulating devices as are identified below, by order, rule or regulation of any duly-constituted regulatory authority having jurisdiction, or by applicable standards such as the National Electrical Safety Code, or

as are otherwise necessary to protect personnel and equipment and to minimize deleterious effects to Company's electric service operation arising from Sithe's Generators. Any such protective or regulating devices that may be required on Company's facilities in connection with the operation of Sithe's Generators shall be installed by the Company at Sithe's expense. The Company and Sithe shall coordinate the design, set points, and all operating aspects of each Party's protective and regulating devices that could have an impact on the other Party with each other and, as appropriate, with others' devices in close proximity. Furthermore, Sithe shall bear the continuing obligation to upgrade the applicable portions of its protection equipment in cooperation and coordination with the Company when and if conditions on the Company Transmission System require such upgrades. In the event that such upgrades are required by regulatory or reliability authorities or required for the sole benefit of Sithe, they shall be at Sithe's sole expense. To the extent that such upgrades are required for the sole benefit of the Company and at the sole discretion of the Company, they shall be at installed at the Company's sole expense.

**14.7.1  Requirements for Protection.**  In compliance with applicable NERC, NPCC, and ISO requirements, Sithe shall provide, install, own and maintain relays, circuit breakers, and all other devices necessary to promptly remove any fault contribution of Sithe's Generators to any short circuit or Company Transmission System disturbance occurring on the Company Transmission System not otherwise isolated by Company equipment. Such protective equipment shall include, without limitation, a disconnecting device or switch with load interrupting capability to be located between Sithe's Generators and the Company Transmission System at an accessible, protected, and satisfactory site selected upon mutual agreement of the Parties. Sithe shall be solely responsible for protection of Sithe's Generators and Sithe's other equipment from all Company Transmission System disturbances and conditions originating from Sithe's equipment, such as, but not limited to generator faults, GSU transformer, station service transformer, negative sequence currents, over- or under-frequency, out of step, sudden load rejection, over- or under-voltage, over-excitation, and generator loss of field. Sithe shall be solely responsible for provisions to disconnect Sithe's Generators and Sithe's other equipment when any of the disturbances described above occur.

**14.7.2  System Quality.**  Sithe's facilities and equipment shall not cause excessive voltage excursions nor cause the voltage to deviate further from the nominal voltage at the Interconnection Point than the voltage maintained by the Company at that point without Sithe's generation. Sithe's facilities and equipment shall meet the minimum requirements of IEEE 519-1992 for harmonic levels of power and ANSI Standard C84.1-1995 for voltage distortion or any other applicable superseding electric industry standards. The points of common coupling shall be defined as the Interconnection Points. Sithe's facilities and equipment shall not cause excessive voltage flicker nor introduce excessive distortion to the sinusoidal voltage or current waves. For voltage flicker in the frequency range of 1 to 25 Hz, voltage flicker levels are unacceptable if either of the following conditions exist: (a) the cumulative RMS voltage flicker at the point of common coupling exceeds 0.30% for 1.0% of a representative time period, or (b) the instantaneous voltage flicker level regularly exceeds 0.45% at the point of common coupling (this is approximately equal to a cumulative RMS voltage flicker of 0.45% for 0.01% of a representative time period).

19

**JA435**

USCA Case #20-1343    Document #1935613    Filed: 02/17/2022    Page 451 of 580

**14.7.3 Inspection.** Company shall have the right, but shall have no obligation or responsibility to: (i) observe Sithe's tests and/or inspections of any of Sithe's protective equipment; (ii) review the settings of Sithe's protective equipment; and (iii) review Sithe's maintenance records relative to its protective equipment. The foregoing rights may be exercised by the Company from time to time as deemed necessary by the Company upon reasonable notice to Sithe. However, the exercise or non-exercise by Company of any of the foregoing rights of observation, review, or inspection shall be construed neither as an endorsement or confirmation of any aspect, feature, element, or condition of Sithe's Generators or Sithe's protective equipment or the operation thereof, nor as a warranty as to the fitness, safety, desirability, or reliability of same.

**14.8    Outages, Interruptions, and Disconnections.** In accordance with Good Utility Practice, each Party may, in close cooperation with the other, remove from service its facilities that may impact the other Party's facilities as necessary to perform maintenance or testing or to install or replace equipment. Absent the existence or imminence of an Emergency, the Party planning to remove a facility from service will schedule such removal through the ISO, in accordance with Good Utility Practice.

**14.8.1 Outage Restoration.** In the event of an outage of a Party's facility that adversely affects the other Party's facilities, the Party that owns or controls the facility out of service will use commercially reasonable efforts to promptly restore that facility to service in accordance with Good Utility Practice, and, if a planned outage, in accordance with its schedule for the work that necessitated the planned outage.

**14.8.2 Interruption.** If, at any time, in Company's reasonable judgment exercised in accordance with Good Utility Practice, the continued operation of Sithe's Generators would cause an Emergency, the Company may curtail, interrupt or reduce energy delivered from Sithe's Generators to the Company Transmission System until the condition that would cause the Emergency is corrected. The Company shall give Sithe as much notice as is reasonably practicable of Company's intention to curtail, interrupt, or reduce energy delivery from Sithe's Generators in response to a condition that would cause an Emergency and, where practicable, allow suitable time for Sithe to remove or remedy such condition before any such curtailment, interruption, or reduction commences. In the event of any curtailment, interruption, or reduction, the Company shall promptly confer with Sithe regarding the conditions that gave rise to the curtailment, interruption, or reduction, and, to the extent known, the expected time of restoration. To the extent appropriate to do so, and without incurring any liability whatsoever, the Company shall give Sithe the Company's recommendation, if any, concerning the timely correction of such conditions. The Company shall promptly cease the curtailment, interruption, or reduction of energy delivery when the condition that would cause the Emergency ceases to exist. Sithe shall not be entitled to compensation for any such interruption.

**14.8.3 Disconnection.**

**14.8.3.1        Disconnection after Agreement Terminates.** Upon termination of this Agreement, Company may disconnect Sithe's Generators from the Company Transmission System. If termination occurs pursuant to Section 2.1, such disconnection shall be in

accordance with a plan for disconnection upon which the Parties agree.

**14.8.3.2** **Disconnection in Event of Emergency.** Subject to the provisions of Section 14.8.3.3, Company or Sithe shall have the right to disconnect Sithe's Generators without notice if, in the Company's or Sithe's sole opinion, an Emergency exists and immediate disconnection is necessary to protect persons or property from damage caused by Sithe's interconnection or lack of proper or properly operating protective devices.

**14.8.3.3** **Under-frequency Performance.** Sithe shall comply with all applicable current and future NERC, NPCC and ISO planning and operating criteria which describe the requirements for under-frequency set points and for their coordination.

**14.8.4 Continuity of Service.** Notwithstanding any other provision of this Agreement, Company shall not be obligated to accept, and Company may require Sithe to curtail, interrupt, or reduce, deliveries of energy if such delivery of energy impairs Company's ability to construct, install, repair, replace or remove any of its equipment or any part of its system or if Company determines that curtailment, interruption or reduction is necessary because of Emergencies, forced outages, operating conditions on its system, or any reason otherwise permitted by applicable rules or regulations promulgated by a regulatory agency having jurisdiction over such matters. The Company shall coordinate the timing of such curtailments, interruptions, reductions or deliveries with respect to maintenance, investigation, or inspection of Company's equipment or system with the ISO. Sithe reserves all rights under the Federal Power Act and other applicable federal and state laws and regulations to commence a complaint proceeding or other action with the FERC or other governmental authority with appropriate jurisdiction over the Parties to enforce the provisions of this Section 14.8.4.

Except in case of Emergency, in order not to interfere unreasonably with Sithe's operations, the Company shall give Sithe reasonable prior notice of any curtailment, interruption or reduction, the reason for its occurrence, and its probable duration.

**Section 15. Maintenance.**

**15.1** **Company Obligations.** The Company shall maintain its facilities and equipment: (i) in a safe and reliable manner; (ii) in accordance with Good Utility Practice; (iii) in accordance with applicable operational and/or reliability criteria, protocols, and directives, including those of NERC, NPCC, and the ISO; and (iv) in accordance with the provisions of this Agreement.

**15.2** **Sithe Obligations.** Sithe shall maintain its facilities and equipment to the extent they might reasonably be expected to have an impact on the operation of the Company Transmission System and Company's other systems: (i) in a safe and reliable manner; (ii) in accordance with Good Utility Practice; (iii) in accordance with applicable operational and/or reliability criteria, standards, protocols, and directives, including those of NERC, NPCC, and the ISO; and (iv) in accordance with the provisions of this Agreement.

**15.3** **Access Rights.** The Parties shall provide each other such easements and/or access

rights as may be necessary for either Party's performance of their respective maintenance obligations under this Agreement; provided that, notwithstanding anything stated herein, a Party performing maintenance work within the boundaries of the other Party's facilities must abide by the rules applicable to that site. In particular, to the extent that Sithe must access facilities it owns within a Company site, it shall do so only with the escort of a Company operator. In no event shall Sithe work on any Company equipment.

**15.4     Maintenance Expenses.** Except as otherwise provided pursuant to Section 5.6, and to the extent not superseded by any operating agreement that may be developed between the Parties, each Party shall be responsible for all expenses associated with maintaining its own property, equipment, facilities, and appurtenances on its side of the Interconnection Points.

**15.5     Coordination.** The Parties agree to conduct preventive and corrective maintenance activities regularly in accordance with Good Utility Practice, to schedule such activities with the ISO pursuant to its procedures and to notify each other of such schedules to the extent such notifications are permitted pursuant to Good Utility Practice, FERC Standards of Conduct, and applicable NEPOOL rules and practices.

**15.6     Inspections and Testing.** Each Party shall perform routine inspection and testing of its facilities and equipment in accordance with Good Utility Practice as may be necessary to ensure the continued interconnection of Sithe's Generators with the Company Transmission System in a safe and reliable manner.

**15.7     Right to Observe Testing.** Each Party shall, at its own expense, have the right to observe the testing of any of the other Party's facilities and equipment whose performance may reasonably be expected to affect the reliability of the observing Party's facilities and equipment. Each Party shall notify the other Party in advance of its performance of tests of its facilities and equipment, and the other Party may have a representative attend and be present during such testing.

**15.8     Cooperation.** Each Party agrees to cooperate with the other in the inspection, maintenance, and testing of those Secondary Systems directly affecting the operation of a Party's facilities and equipment which may reasonably be expected to impact the other Party. Each Party will provide advance notice to the other Party before undertaking any work in these areas, especially in electrical circuits involving circuit breaker trip and close contacts, current transformers, or potential transformers.

**15.9     Observation of Deficiencies.** If a Party observes any deficiencies or defects on, or becomes aware of a lack of scheduled maintenance and testing with respect to, the other Party's facilities and equipment that might reasonably be expected to adversely affect the observing Party's facilities and equipment, the observing Party shall provide notice to the other Party that is prompt under the circumstance, and the other Party shall make any corrections required in accordance with Good Utility Practice.

**Section 16.  Emergencies.**

**16.1     Obligations.** Each Party agrees to comply with NERC, NPCC, and ISO emergency

22

**JA438**

procedures and Company and Sithe emergency procedures, as applicable, with respect to Emergencies.

**16.2    Notice.** The Company shall provide Sithe with oral notification that is prompt under the circumstances of an Emergency that may be expected to affect Sithe's operation of Sithe's Generators, to the extent the Company is aware of the Emergency. Sithe shall provide the Company with oral notification that is prompt under the circumstances of an Emergency that may be expected to affect the Company Transmission System, to the extent Sithe is aware of the Emergency. To the extent the Party becoming aware of an Emergency is aware of the facts of the Emergency, such notification shall describe the Emergency, the extent of the damage or deficiency, its anticipated duration, and the corrective action taken and/or to be taken, and shall be followed as soon as practicable with written notice.

**16.3    Immediate Action.** In the event of an Emergency, the Party becoming aware of the Emergency may, in accordance with Good Utility Practice and using its reasonable judgment, take such action as is reasonable and necessary to prevent, avoid, or mitigate injury, danger, and loss. In the event Sithe has identified an Emergency involving the Company Transmission System, Sithe shall obtain the consent of Company personnel prior to performing any switching operations at Sithe's facilities unless, in Sithe's reasonable judgment, immediate action is required.

**16.4    Company Authority.** The Company may, consistent with Good Utility Practice, take whatever actions or inactions with regard to the Company Transmission System the Company deems necessary during an Emergency in order to: (i) preserve public health and safety; (ii) preserve the reliability of the Company Transmission System; (iii) limit or prevent damage; and (iv) expedite restoration of service. The Company shall use reasonable efforts to minimize the effect of such actions or inactions on Sithe's Generators.

**16.5    Sithe Authority.** Sithe may, consistent with Good Utility Practice, take whatever actions or inactions with regard to Sithe's Generators Sithe deems necessary during an Emergency in order to: (i) preserve public health and safety; (ii) preserve the reliability of Sithe's Generators; (iii) limit or prevent damage; and (iv) expedite restoration of service. Sithe shall use reasonable efforts to minimize the effect of such actions or inactions on the Company Transmission System.

**16.6    Audit Rights.** Each Party shall keep and maintain records of actions taken during an Emergency that may reasonably be expected to impact the other Party's facilities and make such records available for third party independent audit upon the request and at the expense of the Party affected by such action. Any such request for an audit will be made no later than six (6) months following the action taken and the Party shall make such records available for a reasonable period of time after the request to allow the requesting Party to conduct the audit.

**Section 17. Safety.**

**17.1    General.** The Company and Sithe agree that all work performed by either Party that may reasonably be expected to affect the other Party shall be performed in accordance with

23

Good Utility Practice and all applicable laws, regulations, and other requirements pertaining to the safety of persons or property. A Party performing work within the boundaries of the other Party's facilities must abide by the safety rules applicable to the site.

**17.2    Environmental Releases.** In addition to complying with applicable reporting regulations, each Party shall notify the other Party, first orally and then in writing, of the release of any Hazardous Substances and that Party's plans to remediate the release, of any asbestos or lead abatement activities, or of any type of remediation activities, each of which may reasonably be expected to affect the other Party or which occur on the other Party's property, as soon as possible but not later than twenty-four (24) hours after the Party becomes aware of the occurrence, and shall promptly furnish to the other Party copies of any reports filed with any governmental agencies addressing such events.

**17.3    Environmental Remediation.** To the extent that the Company, solely to effect Sithe's interconnection, encounters environmental contamination at levels that require remediation in order for any portion of the interconnection work hereunder to be performed, and provided that Sithe is liable for such contamination under any previous agreements between the Parties or their affiliates, the Company shall not be required to proceed with such portion of the interconnection work until Sithe has taken such actions with respect to the contamination as are necessary to permit the interconnection work to proceed.

**Section 18. Future Modifications.**

Either Party may undertake modifications to its facilities. In the event a Party plans to undertake a modification that reasonably may be expected to impact the other Party's facilities, that Party shall provide the other Party with sufficient information regarding such modification so that the other Party can evaluate the potential impact of such modification prior to commencement of the work. The Party desiring to perform such work shall provide the relevant drawings, plans, and specifications to the other Party at least ninety (90) days in advance of the work or such shorter period upon which the Parties may agree, which agreement will not unreasonably be withheld or delayed. Either Party planning modifications shall comply fully with Section 18.4 of the NEPOOL Agreement to the extent applicable.

Upon completion of any modifications Sithe may undertake that may reasonably be expected to affect the Company Transmission System, but not later than ninety (90) days thereafter, Sithe shall issue "as built" drawings to Company, unless the Parties reasonably agree that such issuance of drawings is not necessary.

**Section 19. Force Majeure**

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of a Force Majeure event, that Party shall be excused from whatever performance is affected by the Force Majeure event to the extent so affected, provided that the non-performing Party shall: (i) provide prompt notice to the other Party of the occurrence of the Force Majeure event giving an estimation of its expected duration and the probable impact on the performance of its obligations hereunder and submitting reasonable evidence of the existence of the Force Majeure event; (ii) exercise all reasonable efforts to continue to

perform its obligations hereunder; (iii) expeditiously take action to correct or cure the Force Majeure event and submit reasonable evidence that it is making all reasonable efforts to correct or cure the Force Majeure event; (iv) exercise all reasonable efforts to mitigate or limit damages to the other Party to the extent such action shall not adversely effect its own interests; and (v) provide prompt notice to the other Party of the cessation of the Force Majeure event. Nothing contained herein shall be construed so as to require either Party to settle any strike, lockout, work stoppage or any industrial disturbance or dispute in which it may be involved, or to seek review of or take an appeal from any administrative or judicial action.

## Section 20.  Default

**20.1    General.**  A breach of this Agreement ("Breach") shall occur upon the failure by a Party to perform or observe any material term or condition of this Agreement. A default of this Agreement ("Default") shall occur upon the failure of a Party in Breach of this Agreement to cure such Breach in accordance with the provisions of Section 20.4.

**20.2    Events of Breach.**  A Breach of this Agreement shall include:

(a)    The failure to pay amounts due and payable under this Agreement within ten (10) days of when due and payable;

(b)    The failure to comply with any material term or condition hereunder, including but not limited to any material Breach of a representation, warranty or covenant made in this Agreement, and such failure is not excused by Force Majeure;

(c)    A Party's making an assignment or general arrangement for the benefit of creditors, filing a petition, or otherwise commencing any proceeding, in bankruptcy or under similar law, otherwise becoming bankrupt (however evidenced) or being unable to pay its debts as they fall due.

(d)    Assignment of this Agreement in a manner inconsistent with the terms of this Agreement;

(e)    Failure of either Party to provide such access rights, or a Party's attempt to revoke or terminate such access rights, as provided under this Agreement; or

(f)    Failure of either Party to provide information or data to the other Party required under this Agreement, provided the Party entitled to the information under this Agreement requires such information or data to satisfy its obligations hereunder.

**20.3    Continued Operation.**  In the event of a Breach or Default by either Party, the Parties shall continue to operate and maintain, as applicable, such DC power systems, protection and metering equipment, telemetering equipment, SCADA equipment, transformers, Secondary Systems, communications equipment, building facilities, software,

25

**JA441**

documentation, structural components, and other facilities and appurtenances that are reasonably necessary for the Company to operate and maintain the Company Transmission System, or for Sithe to operate and maintain Sithe's Generators, in a safe and reliable manner.

**20.4    Cure and Default.** Upon the occurrence of an event of Breach, the Party not in Breach (hereinafter the "Non-Breaching Party"), when it becomes aware of the Breach, shall give written notice of the Breach to the Party that has committed the Breach (the "Breaching Party") and to any other person a Party to this Agreement identifies in writing to the other Party in advance. Such notice shall set forth, in reasonable detail, the nature of the Breach, and where known and applicable, the steps necessary to cure such Breach. Upon receiving written notice of the Breach hereunder, the Breaching Party shall have thirty (30) days to cure such Breach. In the event the Breaching Party (a) fails to cure the Breach within such thirty (30) day period, and (b) (except if the Breach is the failure to pay money owed hereunder) fails to demonstrate that it is diligently pursuing such cure if cure cannot be effected within such period; then the Breaching Party will be in Default of the Agreement. In the event of a Breach by Sithe, the party or parties providing construction or long-term financing for Sithe's Generators and/or for the Interconnection Facilities shall be entitled to exercise any and all rights of Sithe to cure such Breach hereunder, but such rights shall not extend the time period for cure hereunder.

**20.5    Rights of the non-Defaulting Party.** Upon the occurrence of an event of Default, the non-Defaulting Party shall be entitled to (i) commence an action to require the Defaulting Party to remedy such Default and specifically perform its duties and obligations hereunder in accordance with the terms and conditions hereof; (ii) serve notice on the Defaulting Party that it is terminating this Agreement as of a specified date, provided however, that such termination shall not relieve either Party of any of its rights, liabilities, and obligations arising hereunder prior to the date termination becomes effective; and/or (iii) exercise such other rights and remedies as it may have in equity or at law.

**Section 21.  Notice to Suspend**

Sithe reserves the right, upon its written notice to Company, to suspend all work by Company associated with the Interconnection Facilities. Company will suspend its work as soon as practicable upon its receipt of such notice, giving full consideration to safety issues, system reliability and Good Utility Practice. Sithe will be responsible for payment, whether directly or via its LOC, to Company of one hundred percent (100%) of all costs not otherwise recoverable pursuant to Section 7 that are incurred by Company, including, but not limited to, 100% of all costs pursuant to Section 5.4, up to the date of suspension by Sithe, plus any additional costs resulting from the suspension. Company shall invoice Sithe for all such costs in excess of its payments pursuant to Sections 5.1 and 5.2. If Sithe fails to pay such costs within twenty (20) days of Company's invoice, Company may draw on the Security for such payment. If Company draws on the Security, Sithe must restore the amount of the Security to the required level. In no case will Company resume any work hereunder without the required Security.

**Section 22.  Notice to Terminate**

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048     Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 458 of 580

Exhibit No. MYS-012
Page 93 of 215

Prior to completion of the work hereunder, Sithe may terminate this Agreement or work on all or certain of the Interconnection Facilities hereunder upon seven days written notice to Company. Sithe may also terminate this Agreement by refusing to consent to cost increases of 5% or more, pursuant to Section 5.2. Company will terminate its relevant work as soon as practicable, giving full consideration to safety issues, system reliability and Good Utility Practice. Sithe will be responsible for payment, whether directly or via its LOC, to Company of one hundred percent (100%) of all costs, not otherwise recoverable pursuant to Section 7, that are incurred by Company, including, but not limited to, 100% of all costs pursuant to Section 5.4, up to the date of termination by Sithe, as well as any additional costs resulting from the termination. Company shall be entitled to draw on the Security if any amounts owed to Company are not paid within twenty (20) days of receipt of a final invoice from Company. Sithe's Security shall remain in place until Sithe's payment of all amounts due under the final invoice to the reasonable satisfaction of Company. To the extent that the final accounting of Sithe's costs and payments reveals that a net refund is owed to Sithe or that a balance remains on Sithe's LOC, Company shall pay such refund to Sithe or notify Sithe that it may extinguish its LOC, as applicable, within twenty (20) days of such final accounting.

Notwithstanding the foregoing, applicable provisions of this Agreement shall remain in effect after termination hereof, including, but not limited to, Sections 20, 25, 26, and 27 and provisions necessary to provide for final billings, billing adjustments, and payments.

Sithe shall own and take possession of any materials and/or equipment (hereinafter "Materials"), together with any applicable warranties, received by the Company hereunder and fully paid for by Sithe, but which are not installed for any reason, provided that the Company shall take any and all steps reasonably requested by Sithe to effect the assignment to Sithe of Company's rights under any such warranties. Sithe shall remove any such Materials from Company's premises within thirty (30) days of the date Company notifies Sithe that such Materials would not be installed. If Sithe fails to effect such removal within such thirty-day period, Sithe shall be deemed to have relinquished all rights to such Materials, and Company shall have the right to dispose of all such Materials in any manner and at its sole discretion. Company shall maintain its insurance coverage of such Materials until the first to occur of Sithe's physical removal of the Materials or expiration of such thirty-day period.

Company hereby grants a security interest in any Materials fully paid for by Sithe and which are not ultimately installed pursuant to this Agreement. It is Sithe's responsibility to perfect such security interest and the Company shall sign any documentation reasonably required for such purpose.

Section 23.  Assignment

This Agreement shall inure to the benefit of and bind the respective successors and assigns and successors in title of the Parties hereto. No assignment by any Party of its rights and obligations hereunder shall be made or become effective without the prior written consent of the other Party in each case being obtained, which consent shall not be unreasonably withheld or delayed, except that this Agreement may be assigned without such consent to an

27

**JA443**

affiliate or successor of either Party, or to a person acquiring all or a controlling interest in the business assets of such Party. No assignment or transfer of rights shall relieve the assigning Party from full liability and financial responsibility for performance unless both the assignee or transferee and the other Party have so consented in writing. Upon assignment of this Agreement, the Parties and the assignee of this Agreement shall execute an Assignment and Assumption Agreement.

In addition to the foregoing, Sithe shall be entitled in its discretion to assign its interests in this Agreement collaterally as security to the party or parties providing construction or long-term financing for Sithe's Generators and/or for the Interconnection Facilities without the Company's prior written consent, but Sithe shall provide the Company with written notice of such collateral assignment within seven (7) days following such collateral assignment. The Company shall execute any documentation required by such financing parties in connection therewith, so long as such documentation does not diminish Company's rights or increase Company's liabilities under this Agreement.

## Section 24. Subcontractors

**24.1    General.** Nothing in this Agreement shall prevent a Party from utilizing the services of such contractors as it deems appropriate to perform its obligations under this Agreement; provided, however, that each Party shall require its subcontractors to comply with all applicable terms and conditions of this Agreement in providing such services and each Party shall remain primarily liable to the other Party for the performance of such subcontractor. Except as may be specifically set forth to the contrary herein, no subcontractor is intended to be, nor will it be deemed to be, a third-party beneficiary of this Agreement.

**24.2    Responsibility of Principal.** The creation of any subcontract relationship shall not relieve the hiring Party of any of its obligations under this Agreement. Each Party shall be fully responsible to the other Party for acts or omissions of any subcontractor it hires as if no subcontractor had been made. Any applicable obligation imposed by this Agreement upon a Party shall be equally binding upon, and shall be construed as having application to, any subcontractor of such Party.

**24.3    No Limitation by Insurance.** The obligations under this Section 24 will not be limited in any way by any limitation of subcontractor's insurance.

## Section 25. Insurance

During the term of this Agreement, each Party, at its own cost and expense, shall procure and maintain insurance in the forms and amounts at the following minimum levels of coverage:

(a)    Statutory coverage for workers' compensation, and Employer's Liability Coverage with a limit no less than $1,000,000.00 per accident. Each Party shall also have the ability to self-insure part or all of this exposure, as they deem necessary, and as licensed by the Commonwealth of Massachusetts.

(b)    Commercial General Liability Coverage including Operations, Contractual Liability

and Broad Form Property Damage Liability written with limits no less than $1,000,000.00 combined single limit for Bodily Injury Liability and Property Damage Liability. Each Party shall also have the ability to self-insure part or all of this exposure, as they deem necessary.

(c)  Automobile Liability for Bodily Injury and Property Damage to cover all vehicles used in connection with the work with limits no less than $1,000,000.00 combined single limit for Bodily Injury Liability and Property Damage Liability. Each Party shall also have the ability to self-insure part or all of this exposure, as they deem necessary and as approved by the Commonwealth of Massachusetts.

(d)  Excess Liability with a limit of no less than $5,000,000.00 coverage excess liability over Employers Liability, Commercial General Liability and Automobile Liability.

Each Party waives any and every claim for recovery from the other Party for any and all loss or damage covered by any of the insurance policies to be maintained under this Agreement to the extent that such loss or damage is recovered under any such policy or to the extent that such loss or damage would have been recovered under any such policy had such policy been purchased in accordance with the limits listed above. Inasmuch as the foregoing waiver will preclude the assignment of any such claim to the extent of such recovery, by subrogation (or otherwise), to an insurance company (or other Person), such Party shall give written notice of the terms of such waiver to each insurance company which has issued, or which may issue in the future, any such policy of insurance (if such notice is required by the insurance policy) and shall cause each such insurance policy to be properly endorsed by the issuer thereof to, or to otherwise contain one or more provisions that, prevent the invalidation of the insurance coverage provided thereby by reason of such waiver. This waiver shall also apply to each Party's property policies, including boiler & machinery and physical damage should such insurance be purchased.

Policies shall be purchased from insurance companies with a Best Insurance Reports rating of at least A8 or its equivalent, and either admitted to do business in the Commonwealth of Massachusetts or approved by the National Association of Insurance Commissioners.

In the event of one Party experiencing an incident which may give rise to a claim on or about the sites of the Interconnection Projects, whether or not directly relating to this Agreement, such Party will send a written report of the incident as soon as practicable to the other Party.

Prior to commencing the work, each Party shall have its insurer furnish to the other Party certificates of insurance evidencing the insurance coverage required above.

Every contract of insurance providing the coverages required in this provision shall contain the following or equivalent clause: "No reduction, cancellation or expiration of the policy shall be effective until thirty (30) days from the date written notice thereof is actually received, except for failure to make payment of premium in which event until ten days from the date written notice is actually received." Upon receipt of any notice of reduction, cancellation or expiration, the Party receiving such notice shall immediately notify the other Party.

Exhibit No. MYS-012

Page 96 of 215

**Section 26.  Indemnification**

Each Party (the "Indemnifying Party") shall defend, indemnify and save the other Party (the "Indemnified Party"), its officers, directors, agents, employees and affiliates and their respective officers, directors, agents and employees harmless from and against any and all claims, liabilities, demands, judgments, losses, costs, expenses (including reasonable attorneys' fees), penalties, suits, or damages asserted against the Indemnified Party by a third party, arising from bodily injury, death or physical damage to property sustained by such third party and caused by or attributable to a breach of this Agreement by the Indemnifying Party or an action of gross negligence or willful misconduct of the Indemnifying Party, or an officer, director, agent or employee of Indemnifying Party.

**Section 27.  Limitation of Liability**

Company's liability on all claims of any kind, whether based on contract, indemnity, warranty, tort (including negligence), strict liability or otherwise for all losses or damages arising out of, connected with, or resulting from this Agreement, or from any goods or services covered by or furnished under this Agreement, unless such claims are the result of Company's gross negligence or willful misconduct or otherwise brought by third parties against the indemnified party and which are covered by insurance pursuant to Section 25 or otherwise self-insured by the Party as permitted thereunder, shall be limited to the payment of a refund of all amounts actually received from Sithe by Company pursuant to this Agreement. Sithe's liability on all claims of any kind, whether based on contract, indemnity, warranty, tort (including negligence), strict liability or otherwise for all losses or damages arising out of, connected with, or resulting from this Agreement, or from any goods or services covered by or furnished under this Agreement, unless such claims are the result of Sithe's gross negligence or willful misconduct or otherwise brought by third parties against the indemnified party and which are covered by insurance pursuant to Section 25 or otherwise self-insured by the Party as permitted thereunder, shall be limited to the payment of an additional sum equal to all amounts due from Sithe on account of the final installed cost of the Interconnection Facilities, including Tax Gross-up plus other costs and charges payable or reimbursable by Sithe under this Agreement.  Except as otherwise specifically provided in this Agreement, neither Party shall be liable to the other Party for claims for indirect, incidental or consequential damages connected with or resulting from performance or non-performance of the Agreement, including, without limitation, claims in the nature of increased costs, lost revenue or profits.

**Section 28.  Disputes**

Any claim or dispute which either Party may have against the other arising out of this Agreement shall be submitted in writing to the other Party not later than sixty (60) days after the last to occur of the circumstances which gave rise to the claim or dispute or the discovery of such circumstances.  The submission of any claim or dispute shall include a concise statement of the question or issue in dispute, together with relevant facts and documentation to fully support the claim.  Upon such submission, the Parties shall use their best efforts to resolve the claim or dispute through good faith negotiations.  If, after sixty (60) days from

30

**JA446**

such submission, the Parties have failed to negotiate a resolution to the claim or dispute, either Party may proceed to submit such claim or dispute for decision by a court or regulatory authority of competent jurisdiction. Nothing in this Section 28 shall restrict the rights of any Party to file a complaint with FERC under relevant provisions of the Federal Power Act.

### Section 29. Regulatory Approvals

The Company shall file this Agreement with FERC as a rate schedule within the meaning of 18 CFR Part 35. Sithe agrees to reasonably cooperate with the Company with respect to such filing and to provide any information, including the rendering of testimony reasonably requested by the Company, needed to comply with applicable regulatory requirements.

Certain obligations of Company under this Agreement are subject to acceptance for filing of this Agreement by FERC; however, as provided in Section 4 above, Company shall commence work under this Agreement immediately upon Notice to Proceed. In the event that FERC does not accept this Agreement for filing, Sithe shall be responsible for all expenditures made by Company pursuant to this Agreement through the date of FERC's order, and such additional expenditures that are necessary to close down the work hereunder in an orderly fashion.

On July 22, 1998, NEPOOL filed a Compliance Filing with FERC that proposed, among other things, allocation of PTF costs to new generators. The Parties to this Agreement intend that Sithe's responsibility for the costs of the Interconnection Facilities under this Agreement shall be consistent with FERC's and NEPOOL's implementation of the NEPOOL Tariff. Company also acknowledges that NEPOOL anticipates implementing a congestion pricing regime under which certain customers may acquire transmission rights by virtue of paying for improvements to the transmission system. Such rights, if any, shall be conveyed pursuant to the NEPOOL Tariff and/or NEPOOL Agreement, as applicable, and not pursuant to this Agreement.

Company agrees to file for, and use all reasonable efforts to obtain, any necessary federal, state and local permits and approvals necessary for construction and operation of the Interconnection Facilities.

### Section 30. State and Federal Laws

This Agreement and all rights and obligations of the Parties hereunder are subject to all applicable state and federal laws and regulations and all duly promulgated orders and duly authorized actions of governmental authorities. The interpretation and performance of this Agreement shall be subject to and determined in accordance with the laws of the Commonwealth of Massachusetts.

### Section 31. Amendments

This Agreement shall be amended to revise the Interconnection Facilities to be constructed hereunder if and to the extent these facilities are changed by NEPOOL, by any regulatory body, or by the joint decision of the Parties hereto, or if Sithe makes a significant change to

31

the maximum output of Sithe's Generators. Any such amendment shall include an amendment of Schedule 2. Sithe shall be solely responsible for all costs related to such revised Interconnection Facilities, except that Section 7 may provide a partial refund of such costs.

In the event that such amendment reduces the scope of the Interconnection Facilities, after Sithe has issued its Notice to Proceed and made the payment required pursuant to Section 5.1, Company will refund to Sithe that portion of such payment, or will notify Sithe that it may adjust its LOC to delete amounts, that will not be needed to fund the revised scope to the extent that costs related to the reduction have not already been incurred by the Company.

In the event of a material change in law or regulation that adversely affects, or may be reasonably expected to adversely affect, either Party's performance under this Agreement, the Parties will negotiate in good faith any amendment or amendments to this Agreement necessary to adapt the terms of this Agreement to such change in law or regulation, and the Company shall file such amendment or amendments with FERC. If the Parties are unable to reach agreement on any such amendments, Company shall have the right to make a unilateral filing with FERC to modify this Agreement pursuant to Section 205 or any other applicable provision of the Federal Power Act and FERC's rules and regulations thereunder, and Sithe shall have the right to make a unilateral filing with FERC to modify this Agreement pursuant to Section 206 or any other applicable provision of the Federal Power Act and FERC's rules and regulations thereunder; provided that each Party shall have the right to protest any such filing by the other Party and to participate fully in any proceeding before FERC in which such modifications may be considered. Nothing in this Agreement shall limit the rights of the Parties or of FERC under Sections 205 or 206 of the Federal Power Act and FERC's rules and regulations thereunder. For the purposes of this paragraph, the term "material" or "materially" shall not include any change to a tariff or rate schedule accepted or approved by FERC.

Except as provided in the preceding paragraph, this Agreement may not be modified or amended except in writing signed by or on behalf of the Parties by their duly authorized officers.

## Section 32. Complete and Full Agreement

This Agreement constitutes the entire Agreement between the Parties relating to the subject matter hereof, and all prior or contemporaneous agreements, offers, negotiations, discussions, communications and correspondence with respect to the subject matter hereof are superseded by the execution of this Agreement.

## Section 33. No Third Party Beneficiaries

This Agreement is for the benefit of the Parties hereto and the Parties, by execution of this Agreement, do not intend to create any rights for the benefit of, or grant any remedies to, any third party. Further, nothing in this Agreement is intended to address congestion rights, as that term may come to be defined within NEPOOL.

.

## Section 34.  Limited Purpose

This Agreement lays out the responsibilities of the Parties with respect to constructing the Interconnection Facilities to accommodate the output of Sithe's Generators.  In no way is this Agreement intended to create any power purchase obligations on the part of Company. Company's participation in this Agreement does not imply any obligations or representations by Company relating to Sithe's project viability in ongoing or future utility solicitations for the purchase of energy or capacity.  Wheeling of power to and from Sithe's Generators is covered by the NEPOOL Tariff and the Company's Tariff, and is not covered by this Agreement.

## Section 35.  Nonwaiver

The failure of either Party to require compliance with any term, condition or provision of this Agreement shall not affect that Party's right to later enforce the same.  It is agreed that the waiver by either Party of performance of any of the terms of this Agreement or of any breach thereof shall not be held or deemed to be a waiver by that Party of any subsequent failure to perform the same or any other term or condition of this Agreement or of any breach thereof.

## Section 36.  No Dedication of Facilities

No undertaking by Company or Sithe hereunder shall be deemed to constitute a dedication of its system, or any portion thereof, to the public or to the other Party.

## Section 37.  Notices

Any notice, bill, demand, or request permitted or required under this Agreement shall be delivered in person against receipt, transmitted by electronic means with appropriate confirmation, or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt to:

> To Sithe:
> > Sithe Mystic Development LLC.
> > 24 Dexter Street
> > Charlestown, MA 02129
> > Attn: Jack Hughes
> > Fax: (617) 381-2239
> > E-mail: JHughes@Sithe.com

> With a copy to:
> > William S. Fowler
> > Sigma Consultants Inc.
> > 95 Main Street
> > Maynard, MA 01754
> > Fax: (978) 461-2822
> > E-mail: wfowler@sigmaconsult.com

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

To Company:

     NSTAR Electric & Gas Corporation
     800 Boylston Street, P-1603
     Boston, MA 02199
     Attn: Lead Transmission Asset Management Liaison
     Fax: 617-424-3472
     E-mail: philip_legrow@nstaronline.com

The Parties may change the name and address of the individual to whom notices are to be given by giving the other Party written notice of such change.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by and through their respective duly authorized representatives as of the day and year first above written.

BOSTON EDISON COMPANY    SITHE MYSTIC DEVELOPMENT LLC

By: _____    By: _____

Title: _____    Title: _____

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048    Filed Date: 05/16/2018
USCA Case #20-1343    Document #1935613    Filed: 02/17/2022    Page 466 of 580

Exhibit No. MYS-012
Page 101 of 215

## Schedule 1: Major Milestone Schedule

| | |
|---|---|
| **Notice to Proceed:** | **12/1/00** |
| | |
| **345-kV (Block 8):** | |
| **Backfeed available:** | **4/1/01** |
| **Position ready for full load testing:** | **4/1/01** |
| **Commercial operation:** | **1/19/02** |
| | |
| **115-kV (Block 9):** | |
| **Backfeed available to Line 9-3:** | **4/1/01** |
| **Board sections available for terminations:** | |
| Line 9-3: | **4/1/01** |
| Line 9-4: | **10/2/01** |
| Line 9-6: | **9/1/01** |
| **Positions ready for full load testing:** | |
| Line 9-3: | **4/1/01** |
| Line 9-4: | **11/9/01** |
| Line 9-6: | **10/1/01** |
| **Commercial operation:** | **3/19/02** |

**NOTE:** All dates are mm/dd/yy and represent best efforts based upon Company receiving a Notice to Proceed on the date indicated. All dates are contingent upon vendors providing equipment according to the lead times estimated at the time project costs and schedules were being developed and on receiving outage permits at the time scheduled. The actual availability for these outages will be based on system operating conditions and requirements at the time outage permits are filed.

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048     Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 467 of 580
Exhibit No. MYS-012
Page 102 of 215

## Schedule 2: Estimate of Major Cost Components

| **Projected Cost** | **Interconnection Facilities** |
|---|---|
| **Mystic Station Work** | |
| $1,500,000 | * (100%) Second Line to North Cambridge (Station Work) |
| $1,100,000 | * (50%) Double up Breaker #106 |
| $900,000 | * (70%) Double up Breaker #107 |
| $1,600,000 | * (100%) Sithe Interconnection at Dexter Street |
| $3,000,000 | ** Replace Mystic Autotransformer |
| $6,100,000 | * (100%) 5 Breaker 115 kV GIS Ring (Includes Sithe Unit 9-6 Terminator – Leads & Ducts by Sithe) |
| $120,000 | Temporary Line 423-515 Relocation |
| $100,000 | Relocate Line 488-518 to GIS |
| $100,000 | Relocate Line 211-514 to GIS |
| $100,000 | Relocate Line 423-515 to GIS |
| $800,000 | * (90%) Sithe Unit 9-3 115 kV Tie (New Board Section – Leads, SDE Terminator, Duct Bank by Sithe) |
| $350,000 | * (90%) Sithe Unit 9-4 115 kV Tie (Old 488-518 Terminal – Leads, SDE Terminator, Duct Bank by Sithe) |
| $600,000 | Reconnect Transformer 110A |
| | |
| **North Cambridge Station Work** | |
| $1,700,000 | * (100%) Separate Line 346 X&Y into Two Separate Lines |
| $1,600,000 | * (100%) Terminate New 345 kV Line 351 from Mystic |
| $2,400,000 | * (100%) Install 115 kV Shunt Reactor |
| | |
| **Woburn Station Work** | |
| $3,800,000 | * (50%) Split Line 346 X&Y from North Cambridge into 2 Lines |
| $800,000 | * (100%) Install Current Limiting Reactor on Line 211-514 |
| | |
| **Second Mystic-North Cambridge 345 kV Line** | |
| $7,700,000 | * (100%) Install New Line 351 in Spare Pipe |
| | |
| **North Cambridge-Woburn 346 X&Y Lines** | |
| $875,000 | Separate Line into 2 Separate Lines at N. Cambridge |
| $1,200,000 | * (100%) Install Woburn Heat Exchanger for Lines 346 & 3461 |
| $1,200,000 | * (100%) Install N. Camb. Heat Exchanger for Lines 346 & 3461 |
| | |
| **Mystic 115 kV Line Relocations** | |
| $500,000 | Temporary 423-515 Relocation |
| $600,000 | Relocate 488-518 to GIS |
| $640,000 | Relocate 211-514 to GIS |
| $460,000 | Relocate 423-515 to GIS |

**115 kV Line Upgrades**

| | |
|---|---|
| $7,150,000 | Reconductor Mystic/Hawkins Lines 250-516/517 |
| $100,000 | * (100%) Increase LTE Capacity Kingston Transmission/Kingston Network Lines 385-510/511 |
| $150,00 | * (100%) Increase Capacity of Lines 329-510/511: Add Pumps at Somerville |

**Communications Work**

| | |
|---|---|
| $800,000 | * (100%) Communications for Second Mystic-N. Camb. Line |
| $850,000 | * (100%) Communications for Second Woburn-N. Camb. Line |

**Community Relations Work**

| | |
|---|---|
| $40,000 | Community Relations Work with Cities & Towns |

**Environmental Remediation Work**

none expected Remediation associated with Mystic Station Yard Work

**Licensing, Permitting, Environmental, Project Management**

| | |
|---|---|
| $650,000 | * (50%) |

**Salvage/Resale Value of Existing Mystic Autotransformer and Replaced Circuit Breakers**

| | |
|---|---|
| $600,000 | ** Credit to Sithe |

| | |
|---|---|
| **$48,985,000** | **Estimated Total Costs of Interconnection Facilities** |

| | |
|---|---|
| $0 | Estimated Tax Gross-Up (Section 5.3) |
| $0 | Known Construction Outage Related Costs (Section 5.4) |

Notes:   1.  Estimate is non-binding and does not reflect other potential costs and charges under the Agreement, including without limitation Tax Gross-up or reimbursements for costs related to pursuit of an IRS ruling or unknown costs arising from construction outages that result in deviations from generator schedules. Estimate does include 5% adder on all equipment purchased direct by Company and on contractor costs (L&M) and a 2.2 multiplier on all Company labor rates for work associated with Company's scope.

2.  A "*" indicates that the percentage shown of the line item represents new units of property that are subject to Annual Facility Charges.

3.  A "**" indicates that the cost indicated is a firm fixed price.

### Schedule 3: Calculation of Annual Facilities Cost

The Annual Facilities Cost shall be calculated for each calendar year and shall equal the sum of (1) Carrying Costs and Associated Income Taxes related to Material and Supplies and Cash Working Capital, (2) Municipal Tax expense, (3) Operation and Maintenance Expense, (4) Station Service Load Expense, and (5) Administrative and General Expense.

(1) Carrying Costs and Associated Income Taxes will be equal to the product of (A) the Materials and Supplies Investment Base times (B) the Cost of Capital Rate.

  (A) Materials and Supplies Investment Base
  The Investment Base consists of (i) Materials and Supplies plus (ii) Cash Working Capital.

    (i)   Materials and Supplies shall equal the product of (a) the ratio of the investment in the Interconnection Facilities that Sithe supports to the average of Company's total depreciable transmission plant for the year, and (b) of Company's transmission plant materials and supplies for the year, as shown in Account 154.

    (ii)  Cash Working Capital shall be the product of (a) a 12.5% allowance (45 days/ 360 days) of Transmission Operation and Maintenance Expense and Administrative and General Expense and (b) the ratio of the investment in the Interconnection Facilities that Sithe supports to the average of Company's total depreciable transmission plant for the year.

  (B) Cost of Capital Rate
  The Cost of Capital Rate shall equal (i) the weighted cost of capital, plus (ii) the effect of Federal Income Taxes, plus (iii) the effect of State Income Taxes.

    (i)   the Weighted Cost of Capital will be calculated based upon Company's capital structure at the end of each year and will equal the sum of:

      (a)  the Long Term Debt Component, which equals the product of the actual weighted embedded cost to maturity of Long Term Debt then outstanding and the ratio that Long Term Debt is to Total Capital.

      (b)  the Preferred Stock Component, which equals the product of the actual weighted average embedded cost to maturity of Preferred Stock then outstanding and the ratio that Preferred Stock is to Total Capital.

(c) the Return on Common Equity Component, which equals the product of Company's Return on Common Equity and the ratio that Common Equity is to Total Capital. The Return on Common Equity shall be the greater of 11.75% or the current return allowed by FERC pursuant to the Company's Tariff.

(ii) Federal Income Taxes shall equal:

$$\frac{A \ x \ FT}{1 \ - \ FT}$$

Where FT is the Federal Income Tax Rate (35% currently) and A is the sum of the Preferred Stock Component and the Return on Common Equity Component, as determined above.

(iii)     State Income Taxes shall equal:

$$\frac{(A \ + \ Federal \ Income \ Tax) \ x \ ST}{1 - ST}$$

Where ST is the State Income Tax Rate (currently 6.5%) and A is the sum of the Preferred Stock Component and the Return on Common Equity Component, as determined above.

(2) Municipal Tax Expense shall equal the product of (a) the ratio of the investment in the Interconnection Facilities that Sithe supports to the average for the year of Company's total plant investment in the municipalities in which such facilities are located, and (b) the total Municipal Taxes from such municipalities charged to operations during the year. Municipal Taxes are defined to include and be limited to ad velorem, real and personal property and similar taxes assessed on property by municipalities in which such facilities are located.

(3) Operation and Maintenance Expense shall equal the product of (a) the expenses charged to FERC Accounts 560 through 573 (excluding Accounts 565 and 567) and (b) the ratio of the investment in the Interconnection Facilities that Sithe supports to the average of Company's total depreciable transmission plant for the year.

(4) Station Service Load Expense shall be the summation, over all substations at which Interconnection Facilities subject to this expense pursuant to Section 12.3 of this Agreement are located, of the product of (a) the ratio of the number of circuit breakers subject to this expense to the total number of transmission level circuit breakers in service at the substation and (b) the annual cost of station service energy allocated to transmission operations at the substation.

(5) Administrative and General Expense shall consist of a share of the charges to FERC Accounts 920 through 935 and Account 408 for Federal Unemployment Compensation, Federal Insurance Contribution Act and State Unemployment Insurance. The Interconnection Facilities that Sithe supports shall be allocated that fraction of the above FERC Accounts equal to the product of (a) the ratio of such Interconnection Facilities investment to the average of Company's total depreciable transmission investment for the year and (b) the ratio of transmission payroll to Company's total operation and maintenance payroll excluding Customer Accounts and Administrative and General Payroll.

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

USCA Case #20-1343    Document #1935613    Filed: 02/17/2022    Page 472 of 580

**Schedule 4: Company's System Impact Study for Sithe's Generators**



**Boston Edison**
AN NSTAR COMPANY

# Sithe Mystic Development, LLC.

## System Impact Study

### Steady State and Short Circuit

**Report 2000-BE-5A**
**October 17, 2000**

**Sri Pillutla (PTI)**
**Manos Obessis (PTI)**
**Hantz A. Présumé**

## Executive Summary

This report presents results obtained from steady-state analysis for the addition of two generator sets proposed by Sithe Mystic Development LLC at the Mystic station in Everett, Massachusetts. Each generator set will have a maximum 50°F gross output of 817 MW consisting of one 310 MW steam turbine generator and two 253.5 MW gas turbine generators. The net rating of each generator set will be 800 MW, with the gas turbines supplying 17 MW of station load. One generator set (Block 8, or sometimes referred to herein as Units 8, 9 and 10) will be connected at the 345 kV level and the other (Block 9, or sometimes referred to herein as Units 11, 12 and 13) at the 115 kV level. Each unit will have a power factor of 0.85. The output of the three 345 kV units will be aggregated on one generator lead and each of the 115 kV units will have its own breaker position. The proposed in service date for the 345 kV set (Block 8) is winter 2002 and for the 115 kV set (Block 9) is spring 2002. The new facilities are referred to herein as "Sithe."

Based on the results of the study, the Sithe plant will have varying impacts on transmission facilities in the Boston underground system and in the Golden Hills area depending on the dispatch. Throughout this study, Mystic 4, 5 and 6 were dispatched off because of expected thermal and short circuit limitation and emissions restrictions. These small Mystic units will be restricted to run up to the hourly equivalent of 30 days per year. They will not be allowed to ramp up while the Sithe 115 kV units are operating. With all units running, except the small Mystic units, overloads were very severe. Dispatching Cabot off resulted in eliminating overloads on 345 kV lines from Mystic to North Cambridge to Woburn.

The Sithe 115 kV steam unit will cause overloads on the Mystic to Woburn 115 kV line (211-514). These overloads will be addressed by retaining the permanently connected series reactor proposed in the Cabot study, by backing down the extra power provided by the duct firing process for loss of the Woburn autotransformer and by tripping the steam unit for a stuck breaker contingency that causes the steam unit to be connected radially to line 211-514. Only the reactor on the Woburn line was retained. The other reactors proposed in the Cabot study did not provide substantial benefits.

With New Boston, Mystic 7 and Sithe dispatched on (Cabot and Mystic 4, 5 and 6 are off), overloads occurred on the Mystic to Brighton 115 kV lines (329-510 and 329-511). These overloads were addressed by turning off New Boston. Consistent with the minimum interconnection guidelines, Sithe can be dispatched against New Boston. The Brighton to Waltham 115 kV lines (282-520 and 282-521) overloaded as well. These overloads were addressed by turning off one New Boston unit.

With New Boston dispatched off (Mystic 7 and Sithe are on, Cabot and Mystic 4, 5 and 6 are off), overloads occurred on the Mystic to Hawkins 115 kV lines (250-516 and 250-517). These lines will be reconductored. Sithe also has the potential to increase the minimum required generation associated with overloads on the Kingston to High Street 115 kV lines (385-510 and 385-511), Mystic to Kingston Street 345 kV lines (324 and 372), the Mystic autotransformer and the Golden Hills to Maplewood 115 kV line (F-

43

158N). The ratings of lines 385-510, 385-511, 324 and 372 will be increased. The Mystic autotransformer will be replaced. The Mystic 115 kV tie breaker will be closed to address overloads on line F-158N when New Boston and the Sithe 115 kV steam unit are dispatched off.

With Salem Harbor dispatched off and New Boston dispatched on (Mystic 7 and Sithe are on, Cabot and Mystic 4, 5 and 6 are off), overloads occurred on the Golden Hills autotransformers and the Golden Hills to Wakefield junction 115 kV lines (S-145 and T-146). In addition, results of the line out analysis showed that post 1st contingency generation back downs were greater than 1,200 MW due to overloads on the Golden Hills autotransformers for this dispatch. With New Boston dispatched off as well, overloads did not occur under N-1 conditions and required back downs under N-2 conditions were maintained below 1,200 MW.

Based on the results described above, almost none of the Sithe Mystic additions can be exported out of the Boston area. The downtown Boston export level is limited by overloads on lines 329-510 and 329-511 for loss of either line. These lines are loaded close to 100% of their LTE rating with Sithe dispatched on and New Boston, Cabot, Mystic 4, 5 and 6 dispatched off. Neglecting the 400 MW combined output of Mystic 4, 5 and 6, the total amount of available generation in downtown Boston is approximately 3,250 MW = Mystic 345 kV generation [Cabot (380 MW) + Mystic 7 (565 MW) + Sithe Block 8 (800 MW)] + Mystic 115 kV generation [Sithe Block 9 (800 MW)] + New Boston 1 & 2 (700 MW). Under minimum interconnection guidelines, dispatching Sithe against Cabot and New Boston is acceptable. There is a net generation increase of approximately 100 MW after accounting for the small Mystic units (400 MW), Cabot (380 MW) and New Boston (700 MW). The maximum amount of generation that can run in the downtown Boston area is approximately 2,150 MW. This amount will be somewhat higher at 75% load levels. The post contingency loading on line 329-510 is approximately 6% lower at 75% load levels than at peak load levels. Upgrades are proposed to mitigate overloads with the downtown Boston generation interface at its maximum. To mitigate potential thermal overloads, voltage and short circuit impacts, the following upgrades are required:

- Split line 346XY (North Cambridge – Woburn 345 kV) into two separate lines, 346 and 365. The proposed Normal/LTE/STE ratings are 419/692/1022 MVA. The LTE rating for these two lines is good for four hours.
- Install a 345 kV line parallel to line 358 (Mystic – North Cambridge 345 kV), to be named 351. The proposed Normal/LTE/STE ratings for line 358 are 522/696/1030 MVA. The proposed Normal/LTE/STE ratings for line 351 are 570/777/1076 MVA. The LTE rating of these two lines is good for four hours.
- Install an 80 MVAr 115 kV shunt reactor to compensate the additional cable charging from line 351.
- Split the Mystic 115 kV station so that the steam unit, lines 211-514, 423-515 and 488-518 connect to a new ring bus, which is isolated from the old ring by a normally open breaker. This breaker can only be closed when there are no short circuit or thermal concerns. These three lines extend from Mystic 115 kV to Woburn, Everett and Chelsea, respectively.

- Install a Type III SPS to trip the 115 kV steam unit for a stuck breaker contingency on the new bus to prevent STE violations on lines 423-515 and 488-518. This SPS will trigger immediately on detection of a stuck breaker condition. Inter-area impact is not expected during a potential failure of the SPS. The SPS will be made redundant. The SPS meets the NEPOOL SPS guidelines.

- Retain the permanently connected 2.75-ohm series reactor that was proposed in the Cabot study on line 211-514.

- Reconductor 115 kV lines 250-516 and 250-517 between Mystic and Hawkins Street. The proposed Normal/LTE/STE ratings are 175/252/381 MVA. This upgrade is 10% above the observed loading.

- Improve cable cooling on lines 329-510 and 329-511 from Mystic to Somerville to Brighton in order to maintain ratings near their present values. Without this improvement, line ratings will be lower because of future operating conditions, and Mystic generation will be more restricted. In addition, a significant reduction in transmission capability is considered unacceptable. The proposed Normal/LTE/STE ratings for the Mystic to Somerville section are 175/183/239/ MVA. The LTE rating is 3 MVA lower than the present LTE rating but 3% higher than the overloads observed. The proposed ratings for the Somerville to Brighton section are 140/171/232 MVA.

- Improve cable cooling on lines 385-510 and 385-511 between Kingston Street and High Street. The proposed Normal/LTE/STE ratings for the Kingston Street T to Kingston Street N section are 305/345/447 MVA. This upgrade is 5% above the observed loading. The proposed ratings for the Kingston Street N to High Street section are 155/242/374 MVA.

- Increase the rating of lines 324 and 372 between Kingston Street and Mystic. The proposed Normal/LTE/STE ratings are 550/844/1205 MVA. The LTE rating of these two lines is good for four hours and is 8% above the observed loading.

- Replace the Mystic autotransformer to achieve Normal/LTE/STE cyclic ratings of approximately 360/420/550 MVA

The installation of the series reactor on line 211-514, the requirement that Mystic 4, 5 and 6 do not ramp up while the Sithe units are running, and the separation of the Mystic 115 kV station appear to be effective in keeping short circuit currents below breaker interrupting ratings except at Golden Hills. Two 115 kV breakers associated with line Q-169 will be upgraded at Golden Hills when Cabot goes into service. Kingston Street breakers did not appear to be overstressed after taking into account line contributions. Putnam and several 13.8 kV stations supplying the Cambridge system exceeded their breaker interrupting capabilities before Sithe.

The proposed upgrades are solely for the interconnection of the Sithe Mystic project and are not intended to address system reliability concerns for NSTAR or concerns that may be caused by the retirement of any generators in the Boston area. Studies and transmission reinforcements may be required if any of the existing generators are proposed to be retired.

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

The margin between some of the proposed upgrades and the observed loadings can be as low as 5%. Some of the LTE rating upgrades proposed for limiting 345 kV cables will be valid for only four hours. Mystic generation is expected to back down post contingency to the normal rating of the affected lines when high loading conditions persist to the point of reaching maximum cable temperatures. Normal ratings will also be applicable when transmission facilities are out of service for an extended period of time. As a result, generation congestion is expected to occur at the Mystic plant from time to time.

Based on the conditions studied, Sithe Mystic will have no significant adverse impacts on the transmission system with the recommended system changes. Results of this analysis are based on assumptions available at the time of this study. If any of the assumptions provided by the developer or represented in the load flow models change, the results provided in this report may not apply.

USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 478 of 580



# Sithe Mystic Development, LLC.

## System Impact Study
### Stability and Short Circuit

**Report 2000-BE-5B**
**October 17, 2000**

**Baldwin Lam (PTI)**
**Hantz A. Présumé**

## Executive Summary

This report presents results obtained from stability analysis for the addition of two generator sets proposed by Sithe Mystic Development LLC at the Mystic 345/115 kV Station in Everett, Massachusetts. Each generator set will have a maximum gross output of 867 MW consisting of one 312 MW steam turbine generator and two 277 MW gas turbine generators. The net 20°F ratings will be 850 MW, with the gas turbines supplying 17 MW of station load. One generator set (Block 8, or sometimes referred to herein as Units 8, 9 and 10) will be connected at the 345 kV level and the other (Block 9, or sometimes referred to herein as Units 11, 12 and 13) at the 115 kV level. Each unit will have a power factor of 0.85. The output of the three 345 kV units will be aggregated on one generator lead and each of the 115 kV units will have its own breaker position. The proposed in service date for the 345 kV set (Block 8) is winter 2002 and for the 115 kV set (Block 9) is spring 2002. The new facilities are referred to herein as "Sithe."

Stability testing was performed with all generators in the greater Boston area running at full output, except the small Mystic units #4, #5 and #6, irrespective of thermal concerns at 45% load. Since the addition of Sithe would increase the Boston export level at 45% load from 800 MW to approximately 2,100 MW, reduction of the export level was explored where appropriate. The thermal analysis identified a downtown Boston interface with a maximum generation limit of approximately 2,150 MW. This limit can be maintained by dispatching Sithe against New Boston and Cabot or their equivalent. Testing with Cabot or New Boston out of service showed some improvements in system response.

Throughout this study, Mystic 4, 5 and 6 were dispatched off because of expected thermal and short circuit limitations and emissions restrictions. These small Mystic units will be restricted to run up to the hourly equivalent of 30 days per year. They will not be allowed to ramp up while the Sithe 115 kV units are operating. Two potential generation scenarios were identified where the small Mystic units may be dispatched. One small Mystic unit may be dispatched when one Sithe 115 kV gas unit is unavailable, or the three small Mystic units may be dispatched when the three Sithe 115 kV units (Block 9) are unavailable. Thermal and short circuit concerns are not expected with these two scenarios. Stability analysis will be performed in an operations study to determine whether there will be any stability concerns with the small Mystic units running.

While we can compare the transfer capabilities before and after the interconnection of Sithe, the topology of the system is significantly different before and after Sithe. To accommodate the addition of Sithe, the Mystic 115 kV station was split into two ring stations isolated with a normally open tie breaker. Lines 211-514 to Woburn, 423-515 to Everett and 488-518 to Chelsea and the Sithe 115 kV steam unit are connected to the new Mystic 115 kV bus. The practice of de-energizing one to three 345 kV cables, e.g. 346Y, 349Y and 324, to facilitate voltage control at light load levels will no longer be possible with the addition of Sithe. Therefore, the system with Sithe in service contained four additional cables including a new 345 kV cable proposed to be installed between Mystic and North Cambridge.

Near the completion of this study, the model used to represent the line 396 special protection system and the Keswick GCX relay was modified as directed by the ISO. The study was performed again for the system after Sithe using the corrected model. The most severe contingencies were tested with the corrected model for the system before Sithe for comparison purposes.

Based on the results of the study, the potential exists for Sithe to cause an unacceptable system response for three-phase stuck breaker and design criteria contingencies. These stability concerns are thought to be largely caused by the very high export levels with the addition of Sithe and inadequate reactive compensation with all 345 kV cables energized.

The breakers at the new Mystic 115 kV station will have IPT capability. The Sithe 115 kV steam unit did not lose synchronism when IPT capability was modeled for three-phase stuck breaker faults. A Type III SPS was proposed to mitigate thermal concerns for stuck breaker faults at the new 115 kV station. This SPS will trip the steam unit upon detection of a stuck breaker condition.

Three-phase stuck breaker faults on a line adjacent to the generator lead of the 345 kV generator set caused the 345 kV set and the NB – NE tie to trip. This loss of source exceeded the 1,400 MW loss of source limit established by the Stability Task Force as part of their Extreme Contingency Criteria. With Maine Independence Station (MIS) running, the amount of source loss may reach 2,100 MW. To mitigate the source loss concern, we propose to double breakers 101, 106 and 107.

Three-phase stuck breaker faults involving two exporting facilities from the Mystic station resulted in an unstable system response. In addition, single-phase stuck breaker faults caused either the Keswick GCX relay to be entered or the NB – NE tie to trip. To mitigate these concerns, clearing times will be reduced.

In summary the following upgrades are proposed to mitigate potential stability concerns:

- Install out-of-step (OOS) protection on the Sithe units to minimize potential system impacts resulting from a loss of synchronism condition following three-phase stuck breaker contingencies.
- Enable the stabilizers to facilitate system damping for 3ph stuck breaker faults.
- Increase the VRMAX exciter limit of the Sithe units to 9/8.1 to improve system response.
- Install two 80 MVAr 115 kV shunt reactors at Woburn station. These reactors will be installed by NSTAR as part of a separate project.
- Include Independent Pole Tripping capability in the 115 kV breakers to be installed at the new Mystic 115 kV ring station.
- Install a 345 kV breaker adjacent to each of breakers 101, 106 and 107.
- Reduce stuck breaker clearing times at Mystic station by 1.25 cycles to improve system response.
- Limit the amount of generation that can run in the Boston area to 2,700 MW, which would result from Sithe being dispatched against Mystic 4, 5 and 6 and New Boston 1

and 2 or their equivalent. That amount of generation is approximately 25% above the thermal limit and corresponds to a Boston export of 1,350 MW at 45% load. With the Sithe 115 kV units off, the Boston export level was reduced by an additional 400 MW, which was achieved by turning off Cabot, Salem 4 or one New Boston unit.

The installation of the series reactor on line 211-514, the requirement that Mystic 4, 5 and 6 not be synchronized while the Sithe units are running, and the separation of the Mystic 115 kV station were effective in keeping short circuit currents below breaker interrupting ratings except at Golden Hills. Two 115 kV breakers associated with line Q-169 will be upgraded at Golden Hills when Cabot goes into service. Kingston Street breakers were not overstressed after taking into account line contributions. Putnam and several 13.8 kV stations supplying the Cambridge system exceeded their breaker interrupting capabilities before Sithe.

The proposed upgrades are solely for the interconnection of the Sithe Mystic project and are not intended to address system reliability concerns for NSTAR or concerns that may be caused by the retirement of any generators in the Boston area. Studies and transmission reinforcements may be required if any of the existing generators are proposed to be retired.

Based on the conditions studied, Sithe Mystic will have no significant adverse impacts on the transmission system with the recommended system changes. Results of this analysis are based on assumptions available at the time of this study. If any of the assumptions provided by the developer or represented in the load flow models change, the results provided in this report may not apply.

USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 482 of 580

Exhibit No. MYS-012
Page 117 of 215

## Figure 1A: Proposed Sithe Generator 345 kV Interconnection



Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-012
Page 118 of 215

**Figure 1B:  Proposed Sithe Generator 115 kV Interconnection**

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

52

**JA468**



FIGURE 1B
115KV ONE LINE DIAGRAM
MODIFICATIONS AND SITHE INTERCONNECTIONS
(BKR #7 AS SPLIT FEEDING NEW (GIS)
STATION #260 (MYSTIC), CHARLESTOWN

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

SITHE EXCAVATIONS BETWEEN 345KV SWITCHYARD FENCE AND DEXTER
STREET FENCE NOT SHOWN



**Figure 2A - Mystic Underground Work Areas Due to Sithe Mystic Interconnection (345 kV Switchyard Areas)**

**JA470**

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048    Filed Date: 05/16/2018
USCA Case #20-1343    Document #1935613    Filed: 02/17/2022    Page 486 of 580

Exhibit No. MYS-012
Page 121 of 215

## Figure 2B – NSTAR Underground Work Areas Due to Sithe Mystic Interconnection
### (Sithe Property between 345 kV Switchyard and 115 kV Switchyard)



USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 487 of 580

Exhibit No. MYS-012
Page 122 of 215

## Figure 2C – NSTAR and Sithe Underground Work Areas Due to Sithe Mystic Interconnection   (NSTAR 115 kV Switchyard Easement)



Unofficial FERC-Generated PDF of 20040319-0099 Received by FERC OSEC 03/18/2004 in Docket#: ER01-890-007

Document Accession #: 20180516-5048     Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 488 of 580

Exhibit No. MYS-012
Page 123 of 215

## Attachment 1: Form of Corporate Guaranty Agreement

This Guaranty Agreement (this "Guaranty"), dated as of _____, 2002, is made and entered into by Sithe Boston Generating, LLC ("Guarantor") and Boston Edison Company.

### WITNESSETH:

WHEREAS, Sithe Mystic Development LLC ("Company") has entered into the Interconnection Agreement (the "Agreement") dated _____ with Boston Edison Company ("Counterparty"), related to interconnection of the 1600 MW Mystic combined cycle power project; and

WHEREAS, Guarantor will directly or indirectly benefit from the Agreement.

NOW THEREFORE, in consideration of Counterparty entering into the Agreement, Guarantor hereby covenants and agrees as follows:

1. **GUARANTY**. Subject to the provisions hereof, Guarantor hereby irrevocably and unconditionally guarantees the timely payment when due of the obligations of Company to Counterparty under Section 5.3 of the Agreement (the "Obligations") in accordance with Section 6 of the Agreement. To the extent that Company shall fail to pay any Obligations, Guarantor shall promptly pay to Counterparty the amount due. This Guaranty shall constitute a guaranty of payment and not of collection. The liability of Guarantor under the Guaranty shall be subject to the following:

   (a) Guarantor's liability hereunder shall be limited to payments required to be made in accordance with Section 5.3 of the Agreement (even if such payments are deemed to be damages) and, except to the extent specifically provided in the Agreement, in no event shall Guarantor be subject hereunder to consequential, exemplary, loss of profits, or punitive damages.

   (b) Notwithstanding any other provision to the contrary set forth herein, the aggregate amount covered by this Guaranty in respect of Counterparty shall not exceed _____ **[Specific amount to be inserted as of initiation of Guaranty; provided that the maximum amount covered by the Guaranty shall not at any time exceed 25% of the total amount listed in Schedule 2 of the Agreement]**

2. **NOTICE.** If Company fails or refuses to pay any Obligations, Counterparty shall notify Guarantor of such non-payment in writing and Guarantor shall, after receipt of such written notice from Counterparty, forthwith pay such Obligation or cause such Obligation to be paid.

3. **REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants that:

   (a) it is a limited liability company and duly organized and validly existing under

57

**JA473**

the laws of the State of Delaware and has the corporate power and authority to execute, deliver and carry out the terms and provisions of the Guaranty;

(b)    no authorization, approval, consent or order of, or registration or filing with, any court or other governmental body having jurisdiction over Guarantor is required on the part of Guarantor for the execution, delivery and performance of this Guaranty;

(c)    this Guaranty constitutes a valid and legally binding agreement of Guarantor, except as the enforceability of this Guaranty may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditor's rights generally and by general principles of equity.

4.    <u>SETOFFS AND COUNTERCLAIMS</u>.    Without limiting Guarantor's own defenses and rights hereunder, Guarantor reserves to itself all rights, setoffs, counterclaims and other defenses to which Company and any other affiliate of Guarantor is or may be entitled to arising from or out of the Agreement except for defenses arising out of the bankruptcy, insolvency, dissolution or liquidation of Company.

5.    <u>AMENDMENT OF GUARANTY</u>.  No term or provision of this Guaranty shall be amended, modified, altered, waived, or supplemented except in writing signed by the parties hereto.

6.    <u>WAIVERS</u>.    Guarantor hereby waives (a) notice of acceptance of this Guaranty; (b) presentment and demand concerning the liabilities of Guarantor, except as expressly herein above set forth; and (c) any right to require that any action or proceeding be brought against Company or any other person, or except as expressly hereinabove set forth, to require that Counterparty seek enforcement of any performance against Company or any other person, prior to any action against Guarantor under the terms thereof.  Guarantor further waives all suretyship defenses.

Except as to applicable statutes of limitation, no delay of Counterparty in the exercise of, or failure to exercise, any rights hereunder shall operate as a waiver of such rights, a waiver of any other rights or a release of Guarantor from any obligations hereunder.

Guarantor consents to and waives any defenses based on the renewal, compromise, extension, acceleration or other changes in the time of payment of or other changes in the terms of the Obligations, or any part thereof, or any changes or modifications to the terms of the Agreement.

Guarantor may terminate this Guaranty in accordance with the provisions of Section 6 of the Agreement.

7.    <u>NOTICE</u>. Any Payment Demand, notice, request, instruction, correspondence or other document to be given hereunder by any party to another (herein collectively called "Notice") shall be in writing and delivered personally or mailed by certified mail, postage prepaid and return receipt requested, or by telegram or telecopier, as follows:

| To Counterparty: | NSTAR Services Company |
| | 800 Boylston Street, P-1603 |
| | Boston MA 02199 |
| | Attn: Lead Transmission Asset Management |
| | Liaison |
| | Fax: (617) 424-3472 |
| | |
| To Guarantor: | Sithe Boston Generating, LLC |
| | c/o Sithe Energies, Inc. |
| | 335 Madison Avenue |
| | New York, NY 10017 |
| | Attn: General Counsel |
| | Fax: (212) 351-0800 |

Notice given by personal delivery or mail shall be effective upon actual receipt. Notice given by telegram or telecopier shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next business day after receipt if not received during the recipient's normal business hours. All Notices by telegram or telecopier shall be confirmed promptly after transmission in writing by certified mail or personal delivery. Any party may change any address to which Notice is to be given to it by giving notice as provided above of such change of address.

8.    MISCELLANEOUS. THIS GUARANTY SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MASSACHUSETTS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS. This Guaranty shall be binding upon Guarantor, its successors and assigns and inure to the benefit of and be enforceable by Counterparty, its successors and assigns. The Guaranty embodies the entire agreement and understanding between Guarantor and Counterparty and supersedes all prior agreements and understandings relating to the subject matter hereof. The headings in this Guaranty are for purposes of reference only, and shall not affect the meaning hereof. This Guaranty may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

EXECUTED as a sealed instrument by a duly authorized officer of Guarantor as of the day and year first above written.

Sithe Boston Generating, LLC.

By:_____

Name:

Title:

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

**SCHEDULE 21 - NSTAR**

**NSTAR ELECTRIC COMPANY**

**LOCAL SERVICE SCHEDULE**

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

# I     COMMON SERVICE PROVISIONS

## 1.0     DEFINITIONS

Whenever used in this Local Service Schedule, in either the singular or plural number, the following capitalized terms shall have the meanings specified in this Section 1. Terms used in this Local Service Schedule that are not defined in this Local Service Schedule shall have the meanings set forth in the Tariff or customarily attributed to such terms by the electric utility industry in New England. Where there is a conflict between this Local Service Schedule and the Tariff, the terms here shall apply.

### 1.1     Annual Transmission Revenue Requirements

The total annual cost of the Transmission System shall be the amount specified in Attachment D until amended by NSTAR or modified by the Commission.

### 1.2     Annual True-Up

The reconciliation to actual costs of the estimated costs used for billing purposes under Section 4.0 of this Local Service Schedule for any Service Year.

### 1.3     Designated Agent

Any entity that performs actions or functions on behalf of NSTAR, an Eligible Customer, or the Transmission Customer required under the Local Service Schedule.

### 1.4     Firm Local Point-To-Point Service

Transmission service under this Local Service Schedule that is reserved and/or scheduled between specified Points of Receipt and Delivery pursuant to this Local Service Schedule.

### 1.5     Load Ratio Share

Ratio of a Transmission Customer's most recently reported Monthly Network Load in the case of Network Customers and including, where applicable, the Reserved Capacity of Transmission Customers taking Firm Local Point-To-Point Service, to the total load of Network Customers and the Reserved Capacity of Transmission Customers taking Firm Local Point-To-Point Service.

**JA477**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

1.6     Local Network

All transmission facilities constituting NSTAR's non-Pool Transmission Facilities (Non-PTF), excluding the Phase I/II HVDC-TF, which is defined in Schedule 20A of this OATT.


1.7     Local Network Load

The load that a Network Customer designates for Local Network Service under this Local Service Schedule. The Network Customer's Local Network Load shall include all load designated by the Network Customer, (including losses).  A Network Customer may elect to designate less than its total load as Local Network Load but may not designate only part of the load at a discrete Point of Delivery. Where an Eligible Customer has elected not to designate a particular load at discrete Points of Delivery as Local Network Load, the Eligible Customer is responsible for making separate arrangements under this Local Service Schedule for any Local Point-To-Point Service that may be necessary for such non-designated load.


1.8     Local Network Service

The transmission service provided under this Local Service Schedule over NSTAR's Local Network.


1.9     Local Network Upgrades

Modifications or additions to transmission-related facilities that are integrated with and support NSTAR's overall Transmission System for the general benefit of all users of such Transmission System.


1.10     Local Point-To-Point Service

The reservation and transmission of capacity and energy on either a firm or non-firm basis from the Point(s) of Receipt to the Point(s) of Delivery under this Local Service Schedule over NSTAR's Local Network.


1.11     Long-Term Firm Local Point-To-Point Service

Document Accession #: 20180516-5048     Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 494 of 580

Firm Local Point-To-Point Service provided under this Local Service Schedule with a term of one year or more.

## 1.12    Monthly Network Load

A Network Customer's hourly load (including its designated Local Network Load not physically interconnected with NSTAR under Section 15.2 of this Local Service Schedule) coincident with NSTAR's Monthly Transmission System Peak.

## 1.13    Native Load Customers

The wholesale and retail power customers of NSTAR on whose behalf NSTAR, by statute, franchise, regulatory requirement, or contract, has undertaken an obligation to construct and operate NSTAR's system to meet the reliable electric needs of such customers.

## 1.14    NERC

North American Electric Reliability Council, the Electric Reliability Organization of the United States.

## 1.15    Non-Firm Local Point-To-Point Service

Local Point-To-Point Service under this Local Service Schedule that is reserved and scheduled on an as-available basis and is subject to Curtailment or Interruption as set forth in this Local Service Schedule.  Non-Firm Local Point-To-Point Service is available on a stand-alone basis for periods ranging from one hour to one month.

## 1.16    NPCC

Northeast Power Coordinating Council, a regional reliability council of NERC.

## 1.17    NSTAR

NSTAR Electric Company, a Massachusetts Corporation with offices located at 800 Boylston Street, Boston, Massachusetts 02199.  NSTAR owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce.  For purposes of this Schedule 21-

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

NSTAR, all references to NSTAR shall mean NSTAR (East), denoting NSTAR Electric Company's eastern Massachusetts geographic region, and specifically shall exclude NSTAR (West), its western Massachusetts geographic region formerly owned by Western Massachusetts Electric Company.  NSTAR provides service pursuant to the rates, terms and conditions of this Local Service Schedule and the applicable terms and conditions of this Local Service Schedule.

1.18    <u>NSTAR's Monthly Transmission System Load</u>

NSTAR's Monthly Transmission System Peak minus the coincident peak usage of all Firm Local Point-To-Point Service customers pursuant to Part II of this Local Service Schedule plus the Reserved Capacity of all Firm Local Point-To-Point Service customers.

1.19    <u>NSTAR's Monthly Transmission System Peak</u>

The maximum firm usage of NSTAR's Transmission System in a calendar month.

1.20    <u>Parties</u>

NSTAR and the Transmission Customer receiving service under this Local Service Schedule.

1.21    <u>Point(s) of Delivery</u>

Point(s) on NSTAR's Transmission System where capacity and energy transmitted by NSTAR will be made available to the Receiving Party under this Local Service Schedule.  The Point(s) of Delivery shall be specified in the Transmission Service Agreement.

1.22    <u>Point(s) of Receipt</u>

Point(s) of interconnection on NSTAR's Transmission System where capacity and energy will be made available to NSTAR by the Delivering Party under this Local Service Schedule.  The Point(s) of Receipt shall be specified in the Transmission Service Agreement.

1.23    <u>Service Year</u>

The calendar year in which the Transmission Customer is receiving service under this Local Service Schedule.

1.24    Short-Term Firm Local Point-To-Point Service

Firm Local Point-To-Point Service under this Local Service Schedule with a term of less than one year.

1.25    Transmission System

The facilities owned, controlled or operated by NSTAR that are used to provide transmission service under this Local Service Schedule.

## 2.0    ANCILLARY SERVICES

Ancillary Services are needed with transmission service to maintain reliability within and among the Control Areas affected by the transmission service. NSTAR is required to provide and the Transmission Customer is required to purchase the following Ancillary Services (i) Scheduling, System Control and Dispatch, and (ii) Supplemental End-Use Reactive Support Service.

In addition, the Transmission Customer is required to purchase additional Ancillary Services under the terms and conditions of the Tariff. The Transmission Customer may not decline the Transmission Provider's offer of Ancillary Services unless it demonstrates that it has acquired the Ancillary Services from another source. The Transmission Customer must list in its Application which Ancillary Services it will purchase from the Transmission Provider. A Transmission Customer that exceeds its firm reserved capacity at any Point of Receipt or Point of Delivery or an Eligible Customer that uses Transmission Service at a Point of Receipt or Point of Delivery that it has not reserved is required to pay for all of the Ancillary Services identified in this section that were provided by the Transmission Provider associated with the unreserved service. The Transmission Customer or Eligible Customer will pay for Ancillary Services based on the amount of transmission service it used but did not reserve. NSTAR shall also assess a penalty for any unauthorized use of Ancillary Services by the Transmission Customer, based on the amount of transmission service it used but did not reserve, using the rate shown for such Ancillary Service.

The prices and/or compensation methods for Local System Control and Dispatch Services and

Document Accession #: 20180516-5048     Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 497 of 580

Exhibit No. MYS-012
Page 132 of 215

Supplemental End-Use Reactive Support Service are described in Attachment D and Schedule 2, respectively, attached to and made a part of this Local Service Schedule.  Three principal requirements apply to discounts for Ancillary Services provided by NSTAR in conjunction with its provision of transmission service as follows:  (1) any offer of a discount made by NSTAR must be announced to all Eligible Customers solely by posting on the OASIS, (2) any customer-initiated requests for discounts (including requests for use by one's wholesale merchant or an Affiliate's use) must occur solely by posting on the OASIS, and (3) once a discount is negotiated, details must be immediately posted on the OASIS.  A discount agreed upon for an Ancillary Service must be offered for the same period to all Eligible Customers on NSTAR's system.

## 3.0     CREDITWORTHINESS

NSTAR's creditworthiness procedures are specified in Attachment L to this Local Service Schedule.

## 4.0     BILLING AND PAYMENT

### 4.1     Billing Procedure

Within a reasonable time after the first day of each month, NSTAR shall submit an invoice to the Transmission Customer for the charges for all services furnished under this Local Service Schedule during the preceding month.  The invoice shall be paid by the Transmission Customer within twenty (20) days of receipt. All payments shall be made in immediately available funds payable to NSTAR, or by wire transfer to a bank named by NSTAR.

Billings hereunder shall be based on cost estimates made by NSTAR subject to Annual True-up when actual costs for the Service Year are known.  Such Annual True-up shall occur no later than six (6) months after the close of the Service Year to which the Annual True-up relates.  To the extent bill adjustments are required pursuant to the Annual True-up, such adjustments shall bear interest calculated in accordance with the methodology specified for interest on refunds in the Commission's regulations at 18 C.F.R. § 35.19a(a)(2)(iii).

(i)        The Annual True-Up shall be performed by recalculation of the costs for the Service Year

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

based on actual cost and load information as reported in the FERC Form 1 for that Service Year and shall develop thereby an Embedded Cost Charge, defined in Section 16.1, to be used in the said Annual True-Up. The Annual True-Up shall also include the CWIP Supplement referred to in clause (ix).

(ii)     The Annual True-Up will be filed with FERC by NSTAR in an informational filing on or before May 31 of the year following the Service Year and posted on NSTAR's website. The Annual True-Up so filed and posted shall include the actual report showing the basis for the computation of the Postretirement Benefits Other Than Pensions ("PBOP") component of "Administrative and General Expense" and shall also show the basis for the allocation of the PBOP expense to the service provided under this Local Service Schedule; provided that the information so filed and posted shall not include confidential information. The informational filing shall include a Benefits Labor Loader showing the basis for such allocation of both PBOP and prepaid pension costs. On request, NSTAR shall provide any Network Customer the Annual True-Up by May 31 of the year following the Service Year. Any difference between the estimated Embedded Cost Charge and the actual Embedded Cost Charge shall be collected from or refunded to the Network Customer in the month of June of the calendar year following the Service Year.

(iii)     The Annual True-Up provided pursuant to Section 4.1(ii) shall include an attestation by a Company officer that "to the best of the affiant's knowledge, information and belief the data employed in the Annual True-Up reflect NSTAR's per book costs for the Service Year, conform to NSTAR's FERC Form 1 Report for the Service Year, conform in all material respects to the FERC Uniform System of Accounts, and have been developed in accordance with the provisions of this rate schedule."

(iv)     The Annual True-Up shall also be accompanied by supplementary information which shall (i) detail any data used in the Annual True-Up not directly taken from NSTAR's FERC Form 1 Report and (ii) identify any FERC Form 1 Account used to record expenses during the Service Year that was not used in the preceding Service Year. The supplementary information

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

shall be certified by an officer of NSTAR.

(v)      There shall be an "Audit Period" that will extend from July 1 through September 30 of the year following the Service Year; provided that NSTAR and the Network Customer may agree to extend the Audit Period beyond September 30 by their mutual written agreement. During the Audit Period, any Network Customer shall have the right to conduct an audit or other inspection of the actual data used in the Annual True-Up and/or request additional information not included with the Annual True-Up. NSTAR shall not withhold information, including PBOP information, on grounds of confidentiality, but is entitled to make such information available pursuant to a confidentiality agreement and to restrict access to non-competitive duty personnel and to other personnel whose receipt of the information would not be in violation of the Standards and/or Code of Conduct as prescribed by FERC. During the Audit Period, NSTAR shall exercise all commercially reasonable efforts to provide the Network Customer, within 10 business days, such additional information as the Network Customer may request in order to understand the Annual True-Up. To the extent requested, NSTAR shall meet with any Network Customer to provide such additional information, explanation, and/or clarification regarding the Annual True-Up as the Network Customer may request.

(vi)     During the Audit Period, the Network Customer shall have the right to request NSTAR to adjust the Annual True-Up, and any refunds it received or payments it made, pursuant to the Annual True-Up to the extent of any discrepancy between the data employed by NSTAR in performing the Annual True-Up and the actual data for the Service Year or in the event NSTAR developed the Annual True-Up in a manner that is inconsistent with this rate schedule.

(vii)    If NSTAR does not agree to the Network Customer's request, as set forth in subparagraph (vi), and if NSTAR and the Network Customer are in disagreement as to any component of the Annual True-Up, the Network Customer within thirty days following the conclusion of the Audit Period may request and NSTAR shall agree to non-binding dispute resolution either conducted with the FERC Staff or otherwise at the Network Customer's choice. The Network Customer may file a complaint with the Commission within thirty days following

**JA484**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

completion of the audit period or the dispute resolution process and shall specify in that complaint the component or components of the Annual True Up that the Network Customer disputes. In the event such a complaint is filed, the disputed component or components of the Annual True Up shall be subject to refund as of the first day of the Service Year pending the results of the Commission investigation instituted as a result of such complaint. If the Network Customer fails to object to the Annual True-Up within thirty days following conclusion of the Audit Period, NSTAR's costs for the Service Year shall be deemed final, and its revenues from the Network Customer for the Service Year shall not be subject to refund; provided that the deadline for such an objection shall (i) be extended for ninety days following the date NSTAR makes any subsequent change to its Form 1 data for the Service Year that affects the Annual True-Up and (ii) shall not apply if the Commission prior to December 31st of the calendar year following the Service Year institutes its own investigation of NSTAR's Service Year costs.

(viii)    Subject to the limitation that the Massachusetts Attorney General does not make or receive transmission payments or refunds, the Massachusetts Attorney General shall have the same procedural rights under this Section 4.0 as a Network Customer. This in no way obligates the Massachusetts Attorney General to the dispute resolution or arbitration procedures outlined in Sections 5.1 and 5.2.

(ix)    The Annual True-Up shall include a CWIP Supplement, which shall apply to the Service Year, shall be filed with FERC by NSTAR in an informational filing on or before June 30 of the year following the Service Year and posted on NSTAR's website to the extent it does not include critical energy infrastructure information or other confidential information. The CWIP Supplement shall include NSTAR Electric's most recent annual construction forecast. The CWIP Supplement shall provide for each project included in rate base during the Service Year the actual amounts of CWIP recorded for each project, the related accounts, such as AFUDC and regulatory liability, inclusive of all subaccounts, and the resulting effect on the CWIP revenue requirement in line item detail. The CWIP Supplement shall also identify any changes in NSTAR's accounting practices related to the accrual of AFUDC and the inclusion of CWIP in rate base or related to ensuring that AFUDC is not accrued on CWIP balances that have been included in rate

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

base.

For each "new project" (a project that is estimated to enter rate base for the first time in the Service Year), the CWIP Supplement shall provide, to the extent not included in the construction forecast, a detailed statement of the reasons for undertaking the project, the benefits to be derived from the project, and the alternatives to or consequences of not undertaking the project. For each "pre-existing project" (a project that entered rate base prior to the Service Year), the CWIP Supplement shall include an update on the status of the project including any material change regarding the estimated cost of the project, the estimated in-service date and/or project timelines, and whether there is any change in the need for the project or in alternatives to the project. CWIP associated with a project cannot be included in the rate base for a Service Year unless it is included in the CWIP Supplement applicable to the Service Year.

The CWIP Supplement applicable to a Service Year shall include a CWIP Work Order/Project Reference Aid ("Reference Aid") that distinguishes between new projects and pre-existing projects and that provides for each project, whether new or pre-existing, ISO information, to the extent such information is available and applies to a project, and NSTAR information. The ISO information shall include a short description of the project, the year the project was approved through the ISO process, and the project identification number for ISO purposes. The NSTAR information shall include reference to the most recent NSTAR construction planning forecast in which the project appeared, the page of the plan at which the project description begins, the NSTAR numeric project designation, the NSTAR description of the project, the work order or work orders associated with the project, and a description of each work order. The Reference Aid shall present this information in a format so that the ISO information related to a project can be correlated with the NSTAR information related to a project. The Reference Aid, as described above, is based on current ISO and NSTAR tracking systems for projects under or proposed for construction and is to be modified to present equivalent information if and to the extent the ISO and/or NSTAR tracking system is modified.

The 50% of transmission-related CWIP included in rate base is subject to the Annual True-Up

**JA486**

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

and dispute resolution provisions of this Section 4.1 regarding differences between actual and estimated costs. In addition, the CWIP included in rate base for a project shall be subject to refund as provided below to the extent the Commission makes a finding that the inclusion of such CWIP in rate base is unjust and unreasonable. In the case of a new project, the refund amount shall be the CWIP actually recovered from customers from the date of collection to the date of refund. In any proceeding regarding a new project, NSTAR shall bear the burden of proving that inclusion of CWIP related to the new project in rate base is just and reasonable. In the case of a pre-existing project, the refund amount shall be for the CWIP actually recovered from customers from the prospective refund effective date specified by the Commission pursuant to the provisions of Section 206 of the Federal Power Act to the date of refund. All refunds shall include interest at the rate specified in 18 C.F.R. § 35.19a(a)(2)(iii). Any customer and/or the Massachusetts Attorney General can request that the Commission institute an investigation into the justness and reasonableness of including CWIP for any project in rate base and the Commission may institute such an investigation sua sponte.

Nothing in this Clause (ix) authorizes the inclusion in rate base of more than 50% of the CWIP balance attributable to a project. Absent a Commission finding of imprudence, NSTAR shall be entitled to accrue AFUDC as to any CWIP that is excluded from rate base. The Commission's institution of an investigation as to the justness and reasonableness of including CWIP associated with a project in rate base does not affect the timing or the finality of other components of the Annual True-Up as established by clause (vii) hereof.

With the exception of curtailment penalty charges pursuant to Section 16.2 and Schedule 3, paragraph 5 and Schedule 4, paragraph 6, any Annual True-Up rendered under this Local Service Schedule and any other monthly bill to which the Annual True-Up relates shall be binding on both Parties one (1) year from the date of NSTAR's Annual True-Up, unless previously disputed pursuant to this section or Section 4.3 of this Local Service Schedule.

4.2     Interest on Unpaid Balances

Interest on any unpaid amounts (including amounts placed in escrow) shall be calculated in

accordance with the methodology specified for interest on refunds in the Commission's regulations at 18 C.F.R. § 35.19a(a)(2)(iii). Interest on delinquent amounts shall be calculated from the due date of the bill to the date of payment.  When payments are made by mail, bills shall be considered as having been paid on the date of receipt by NSTAR.

4.3     Customer Default

In the event the Transmission Customer fails, for any reason other than a billing dispute as described below, to make payment to NSTAR on or before the due date as described above, and such failure of payment is not corrected within thirty (30) calendar days after NSTAR notifies the Transmission Customer to cure such failure, a default by the Transmission Customer shall be deemed to exist. Upon the occurrence of a default, NSTAR may initiate a proceeding with the Commission to terminate service but shall not terminate service until the Commission so approves any such request.

In the event of a billing dispute between NSTAR and the Transmission Customer, NSTAR will continue to provide service under the Service Agreement as long as the Transmission Customer (i) continues to make all payments not in dispute, and (ii) pays into an independent escrow account the portion of the invoice in dispute, pending resolution of such dispute.  If the Transmission Customer fails to meet these two requirements for continuation of service, then NSTAR may provide notice to the Transmission Customer of its intention to suspend service in sixty (60) days, in accordance with Commission policy.

5.0     **DISPUTE RESOLUTION PROCEDURES**

5.1     Internal Dispute Resolution Procedures

Any dispute between a Transmission Customer and NSTAR involving transmission service under this Local Service Schedule (excluding applications for rate changes or other changes to this Local Service Schedule, or to any Service Agreement entered into under this Local Service Schedule, which shall be presented directly to the Commission for resolution) shall be referred to a designated senior representative of NSTAR and a senior representative of the Transmission

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Customer for resolution on an informal basis as promptly as practicable. In the event the designated representatives are unable to resolve the dispute within thirty (30) days [or such other period as the Parties may agree upon] by mutual agreement, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedures set forth below.

5.2    External Arbitration Procedures

Any arbitration initiated under this Local Service Schedule shall be conducted before a single neutral arbitrator appointed by the Parties. If the Parties fail to agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, each Party shall choose one arbitrator who shall sit on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to chair the arbitration panel. In either case, the arbitrators shall be knowledgeable in electric utility matters, including electric transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any party to the arbitration (except prior arbitration). The arbitrator(s) shall provide each of the Parties an opportunity to be heard and, except as otherwise provided herein, shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association and any applicable Commission regulations or ISO rules.

5.3    Arbitration Decisions

Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of appointment and shall notify the Parties in writing of such decision and the reasons therefore. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Local Service Schedule and any Service Agreement entered into under this Local Service Schedule and shall have no power to modify or change any of the above in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction.  The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards set forth in the Federal Arbitration Act and/or the Administrative Dispute Resolution Act. The final decision of the arbitrator must also be filed with the Commission if it affects jurisdictional rates, terms and conditions of service or facilities.

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

5.4     <u>Costs</u>

Each Party shall be responsible for its own costs incurred during the arbitration process and for the following costs, if applicable:

(a)     the cost of the arbitrator chosen by the Party to sit on the three member panel and one half of the cost of the third arbitrator chosen; or

(b)     one half the cost of the single arbitrator jointly chosen by the Parties.

5.5     <u>Rights Under The Federal Power Act</u>

Nothing in this section shall restrict the rights of any party to file a complaint with the Commission under relevant provisions of the Federal Power Act.

**II      LOCAL POINT-TO-POINT SERVICE**

**6.0     NATURE OF FIRM LOCAL POINT-TO-POINT SERVICE**

6.1     <u>Curtailment of Firm Local Point-To-Point Service</u>

In the event a Transmission Customer (including Third-Party Sales by NSTAR) fails to curtail a transaction when requested to do so by NSTAR, the Local Control Center and/or ISO, as appropriate and pursuant to this Section, NSTAR shall assess a penalty charge to the Transmission Customer.  Said penalty charge will be determined in accordance with this Local Service Schedule.

In the event NSTAR, the Local Control Center or ISO exercises their rights to effect a Curtailment, in whole or in part, of Firm Local Point-To-Point Service, no credit or other adjustment shall be provided as a result of the Curtailment with respect to the charge payable by the Transmission Customer.

**JA490**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

6.2    Classification of Firm Local Point-To-Point Service

(a)    The Transmission Customer taking Firm Local Point-To-Point Service may, (1) change its Points of Receipt and Delivery to obtain service on a non-firm basis consistent with the terms of Part I, Section 10(a) of Schedule 21 of the OATT or (2) request a modification of the Points of Receipt or Delivery on a firm basis pursuant to the terms of Part I, Section 10(b) of Schedule 21 of the OATT; provided that NSTAR continues to be compensated for any costs associated with the construction or upgrading of facilities associated with the original firm service.

(b)    In the event that a Transmission Customer's use of the Transmission System (including Third-Party Sales by NSTAR) exceeds that Transmission Customer's Reserved Capacity at any Point of Receipt or Point of Delivery in any hour, NSTAR will charge the Transmission Customer a penalty charge in accordance with Section 10 and Schedule 3 of this Local Service Schedule.

(c)    Under no circumstance will NSTAR be obligated to provide Control Area Ancillary Services to the Transmission Customer in support of any excess capacity (i.e., capacity in excess of Transmission Customer's Reserved Capacity).

## 7.0    NATURE OF NON-FIRM LOCAL POINT-TO-POINT SERVICE

7.1    Classification of Non-Firm Local Point-To-Point Service

In the event that a Transmission Customer's use of the Transmission System (including Third-Party Sales by NSTAR) exceeds that Transmission Customer's non-firm Reserved Capacity at any Point of Receipt or Point of Delivery, NSTAR will charge the Transmission Customer a penalty charge in accordance with Section 10 and Schedule 4 of this Local Service Schedule for such excess.  Under no circumstance will NSTAR be obligated to provide Control Area Ancillary Services to the Transmission Customer in support of any excess capacity (i.e., capacity in excess of Transmission Customer's Reserved Capacity).

USCA Case #20-1343    Document #1935613    Filed: 02/17/2022    Page 507 of 580

7.2    Curtailment or Interruption of Service

In the event a Transmission Customer (including Third-Party Sales by NSTAR) fails to implement a Curtailment or Interruption when requested to do so by NSTAR, the Local Control Center and/or ISO, as appropriate and pursuant to this Section, NSTAR shall assess a penalty charge.  Said penalty charge will be determined in accordance with Section 10 and Schedule 4 of this Local Service Schedule.

In the event NSTAR, the Local Control Center and/or ISO exercises its rights to effect a Curtailment, in whole or part, of Non-Firm Local Point-To-Point Service, no credit or other adjustment shall be provided as a result of the Curtailment with respect to the charge payable by the Transmission Customer.

In the event NSTAR, the Local Control Center and/or ISO exercises its rights to effect an Interruption, in whole or part, of Non-Firm Local Point-To-Point Service, the charge payable by the Transmission Customer shall be computed as if the term of service actually rendered were the term of service reserved; provided that an adjustment of the charge shall be made only when the Interruption is initiated by NSTAR, the Local Control Center and/or ISO, not when the customer fails to deliver energy to NSTAR.

## 8.0    **SERVICE AVAILABILITY**

### 8.1    Real Power Losses

Real power losses associated with transactions on NSTAR's Local Network shall be determined based on estimated average system losses for metering points on NSTAR's Local Network; the loss factor will be three and one tenth percent (3.1%).

### 8.2    Load Shedding

To the extent that a system contingency exists on the NSTAR Transmission System or the New England Transmission System and NSTAR, the Local Control Center or ISO, as appropriate, determines that it is necessary to shed load, the Parties shall shed load in accordance with the

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

procedures specified by NSTAR, the Local Control Center and/or ISO.

## 9.0   METERING

Unless otherwise agreed, the Transmission Customer shall be responsible for installing and maintaining compatible metering and communications equipment to accurately account for the capacity and energy being transmitted under the Local Service Schedule and to communicate the information to NSTAR. However, NSTAR reserves the right to determine and approve any and all metering equipment and the metering installation design, such approval not to be unreasonably withheld.

All meters, including any recording devices or telemetry equipment must be operated and maintained in accordance with ISO Operating Procedures.  Unless otherwise agreed, such equipment shall remain the property of NSTAR.

If at any time any metering equipment owned by NSTAR (or the Transmission Customer, if so agreed) is found to be inaccurate in excess of two percent (2%), up or down, the owner of the metering equipment shall cause it to be made accurate or replaced and the meter readings and rate computation for the period of inaccuracy shall be adjusted to correct such inaccuracy so far as the same can be reasonably ascertained, but no adjustment prior to the beginning of the next preceding month shall be made except by agreement of the Parties.  In addition to an annual routine test, the owner of the metering equipment shall cause such equipment to be tested at any time upon written request of the other Party.  If such equipment proves accurate within two percent (2%), up or down, the expense of the test shall be borne by the Party requesting the test.  The determination of percent accuracy shall be in accordance with the weighted average percent registration as described in ANSI C12.1-1988, Section 6.1.8.1.  The owner of the metering equipment shall comply with any reasonable request of the other Party concerning the sealing of meters, the presence of a representative when the seals are broken and tests are made, and other matters affecting the accuracy of the measurement of electricity hereunder.

## 10.0   COMPENSATION FOR LOCAL POINT-TO-POINT SERVICE

Rates for Firm and Non-Firm Local Point-To-Point Service shall be determined as set forth in the

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Schedules appended to this Local Service Schedule: Firm Local Point-To-Point Service (Schedule 3) and Non-Firm Local Point-To-Point Service (Schedule 4). Such rates shall be determined on the basis of estimated costs for each Service Year until the actual costs for such Service Year are determined. Thereafter, payments made on such estimated costs shall be recalculated based on actual data for that Service Year, and an appropriate billing adjustment shall be made pursuant to Section 4 of this Local Service Schedule.

NSTAR shall use this Local Service Schedule to make its Third-Party Sales to be transmitted as Local Point-To-Point Service. NSTAR shall account for such use at the applicable rates, pursuant to Section II.8.5 of the Tariff.

## 11.0   STRANDED COST RECOVERY

NSTAR may seek to recover stranded costs from the Transmission Customer pursuant to this Local Service Schedule in accordance with the terms, conditions and procedures set forth in FERC Order No. 888. However, NSTAR must separately file any specific proposed stranded cost charge under Section 205 of the Federal Power Act.

## III   LOCAL NETWORK SERVICE

## 12.0   NATURE OF LOCAL NETWORK SERVICE

### 12.1   Real Power Losses

Real power losses associated with transactions on Non-PTF shall be determined based on estimated average system losses for metering points on NSTAR's Local Network; the loss factor will be three and one tenth percent (3.1%).

### 12.2   Metering

Unless agreed otherwise, all meters, including any recording devices or telemetry equipment shall be owned, operated, maintained and tested by NSTAR or its Designated Agent in accordance

**JA494**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

with ISO Operating Procedures at the Transmission Customer's expense.  NSTAR shall provide access to metering data, including telephone line access, which may reasonably be required to facilitate measurement and billing under a Service Agreement at the requesting Party's expense.

NSTAR reserves the sole right to determine appropriate metering installations.  When new metering equipment is required, it shall be supplied by NSTAR, at the Transmission Customer's expense, including applicable taxes, and overhead costs, in conformity with ISO Operating Procedures.

If at any time any metering equipment owned by NSTAR (or Transmission Customer, if so agreed) is found to be inaccurate in excess of two percent (2%), up or down, the owner of the metering equipment shall cause it to be made accurate or replaced and the meter readings and rate computation for the period of inaccuracy shall be adjusted to correct such inaccuracy so far as the same can be reasonably ascertained, but no adjustment prior to the beginning of the next preceding month shall be made except by agreement of the Parties.  In addition to an annual routine test, the owner of the metering equipment shall cause such equipment to be tested at any time upon written request of the other Party.

If such equipment proves accurate within two percent (2%), up or down, the expense of the test shall be borne by the Party requesting the test.  The determination of percent accuracy shall be in accordance with the weighted average percent registration as described in ANSI C12.1-1988, Section 6.1.8.1.  The owner of the metering equipment shall comply with any reasonable request of the other Party concerning the sealing of meters, the presence of a representative when the seals are broken and tests are made, and other matters affecting the accuracy of the measurement of electricity hereunder.

## 13.0    NETWORK RESOURCES

### 13.1    Operation of Network Resources

The Network Customer shall not operate its designated Network Resources located in the

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Network Customer's or NSTAR's Control Area such that the output of those facilities exceeds its designated Local Network Load, plus Non-Firm Sales delivered pursuant to Part II of this Local Service Schedule, plus losses. This limitation shall not apply to changes in the operation of a Transmission Customer's Network Resources at the request of NSTAR to respond to an emergency or other unforeseen condition which may impair or degrade the reliability of the Transmission System.

13.2    Transmission Arrangements for Network Resources Not Physically Interconnected With NSTAR

The Network Customer shall be responsible for any arrangements necessary to deliver capacity and energy from a Network Resource not physically interconnected with NSTAR's Transmission System. NSTAR will undertake reasonable efforts to assist the Network Customer in obtaining such arrangements, including without limitation, providing any information or data required by such other entity pursuant to Good Utility Practice.

13.3    Use of Interface Capacity by the Network Customer

Unless otherwise provided under the Tariff, there is no limitation upon a Network Customer's use of NSTAR's Transmission System at any particular interface to integrate the Network Customer's Network Resources (or substitute economy purchases) with its Local Network Loads. However, unless otherwise provided by the Tariff, a Network Customer's use of NSTAR's total interface capacity with other transmission systems may not exceed the Network Customer's Load.

13.4    Network Customer Owned Transmission Facilities

The Network Customer that owns existing transmission facilities that are integrated with NSTAR's Transmission System may be eligible to receive consideration either through a billing credit or some other mechanism. In order to receive such consideration the Network Customer must demonstrate that its transmission facilities are integrated into the plans or operations of NSTAR to serve its power and transmission customers. For facilities constructed by the Network Customer subsequent to the Service Commencement Date under this Local Service Schedule, the Network Customer shall receive credit where such facilities are jointly planned and installed in

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

coordination with NSTAR. Calculation of the credit shall be addressed in either the Network
Customer's Service Agreement or any other agreement between the Parties.

## 14.0    DESIGNATION OF LOCAL NETWORK LOAD

### 14.1    Local Network Load

The Network Customer must designate the individual Local Network Loads on whose behalf
NSTAR will provide Local Network Service.  The Local Network Loads shall be specified in the
Service Agreement.

### 14.2    Local Network Load Not Physically Interconnected with NSTAR

This section applies to both initial designation pursuant to Section 15.1 and the subsequent
addition of new Local Network Load not physically interconnected with NSTAR. To the extent
that the Network Customer desires to obtain transmission service for a load outside NSTAR's
Transmission System, the Network Customer shall have the option of (1) electing to include the
entire load as Local Network Load for all purposes under this Local Service Schedule and
designating Network Resources in connection with such additional Local Network Load, or (2)
excluding that entire load from its Local Network Load and purchasing Local Point-To-Point
Service under this Local Service Schedule.

To the extent that the Network Customer gives notice of its intent to add a new Local Network
Load as part of its Local Network Load pursuant to this section, the request must be made
through a modification of service pursuant to a new Application.

## 15.0    LOAD SHEDDING AND CURTAILMENTS

### 15.1    Procedures

Prior to the Service Commencement Date, NSTAR and the Network Customer shall establish
Load Shedding and Curtailment procedures pursuant to the OATT with the objective of
responding to contingencies on the Transmission System.  The Parties will implement such

programs during any period when NSTAR, the Local Control Center or ISO, as appropriate, determines that a system contingency exists and such procedures are necessary to alleviate such contingency. NSTAR will notify all affected Network Customers in a timely manner of any scheduled Curtailment.

### 15.2    Allocation of Curtailments

NSTAR shall, on a non-discriminatory basis, effect a Curtailment of the transaction(s) that effectively relieves the constraint.  However, to the extent practicable and consistent with Good Utility Practice, any Curtailment will be shared by NSTAR and Network Customer in proportion to their respective Load Ratio Shares.  NSTAR shall not direct the Network Customer to effect a Curtailment of schedules to an extent greater than NSTAR would effect a Curtailment of NSTAR's schedules under similar circumstances.

### 15.3    Load Shedding

To the extent that a system contingency exists on NSTAR's Transmission System and ISO, the Local Control Center or NSTAR, as appropriate, determines that it is necessary for NSTAR, Local Point-to-Point Customers and Network Customers to shed load, the Parties shall shed load in accordance with the OATT.

### 15.4    System Reliability

Any Curtailment of Local Network Service will be not unduly discriminatory relative to NSTAR's use of the Transmission System on behalf of its Native Load Customers.  In the event that the Network Customer fails to respond to established Load Shedding and Curtailment procedures, NSTAR shall assess a penalty charge.  Said penalty charge will be determined in accordance with Section 16.2.

### 16.0    RATES AND CHARGES

Rates for Local Network Service shall be determined as set forth in this Section 16 on the basis of estimated costs for each Service Year until the actual costs for such Service Year are determined. Thereafter, payments made on such estimated costs shall be recalculated based on actual data for that

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Service Year, and all appropriate billing adjustments shall be made pursuant to Section 4 of this Local Service Schedule.

The Network Customer shall pay NSTAR for any Direct Assignment Facilities, Ancillary Services, and applicable study costs, consistent with Commission policy, along with the following:

16.1    Monthly Demand Charge

The Network Customer shall pay a Monthly Demand Charge which shall be the Embedded Cost Charge. The Embedded Cost Charge shall be determined by multiplying the Network Customer's Load Ratio Share by one twelfth (1/12) of NSTAR's Annual Transmission Revenue Requirements, as determined in accordance with Attachment D of this Local Service Schedule and as subject to an Annual True-up pursuant to Section 4. The Embedded Cost Charge is based on NSTAR's system average embedded cost. In the event NSTAR seeks to apply a rate based on a methodology other than average embedded cost to all or any part of a Network Customer's service, either already being provided or proposed to be provided, NSTAR shall provide the affected Network Customer thirty days advance written notice of any filing with the Commission seeking to implement such a rate and shall comply with all applicable requirements of the Commission and the Tariff. Any dispute as to NSTAR's position concerning proposed cost allocation shall be addressed as provided in Section II.7(g) of Schedule 21-Local Service to Section II of the Tariff; provided that nothing in this provision prevents NSTAR from filing with the Commission at any time to establish new rates pursuant to the provisions of Section 205 of the FPA or a Network Customer from opposing such a filing, and nothing in this provision is intended to reflect a Network Customer's agreement that NSTAR has the rights set out in this Section 16.1 or is intended to prevent the affected Network Customer from filing a complaint with the Commission at any time pursuant to the provisions of Section 206 of the FPA or NSTAR from opposing such a filing.

16.2    Curtailment Penalty Charge

If the Transmission Customer fails to respond to established emergency load shedding and curtailment procedures to relieve emergencies on the transmission system, NSTAR may assess a

USCA Case #20-1343    Document #1935613    Filed: 02/17/2022    Page 515 of 580

penalty charge to the Transmission Customer. Said penalty charge will be equal to two (2) times the Monthly Demand Charge for Local Network Service, as calculated in accordance with Section 16.1 of this Local Service Schedule, for the month in which such service was not curtailed or interrupted.

16.3    [Reserved]

16.4    Taxes and Fees Charge

16.4.1    If NSTAR incurs tax liability currently for which it will in subsequent years receive tax benefits (for example, a taxable contribution in aid of construction) then Transmission Customer shall pay to NSTAR an amount sufficient to reimburse NSTAR, on a net present value basis, for the reasonably projected costs resulting from the tax liability incurred in the current year less the reasonably projected tax benefits received by NSTAR in future years.  Sections 16.4.1 and 16.4.2 are intended to apply to those Transmission Customers for whom Direct Assignment Facilities are constructed pursuant to this Local Service Schedule and to any Transmission Customer's appropriate share of the cost of any required Local Network Upgrades to the extent that any such Local Network Upgrade is identified pursuant to the study procedures outlined in Schedule 21-Local Service, Section II.7(d) and permitted or required by Commission ruling to be paid as a contribution in aid of construction.

16.4.2    If NSTAR takes a position that any particular transaction under any section of the Local Service Schedule does not constitute a transaction of the type described immediately above, and that position is subsequently reversed by Treasury ruling or regulation or court action, then the Transmission Customer shall pay to NSTAR an amount calculated as described above, but additionally taking into account any interest assessment required to be paid by NSTAR.

16.4.3    At its effective date, this Section 16.4 applies only to contributions in aid of construction

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

("CIAC"). NSTAR reserves the right to file under Section 205 of the FPA to modify this provision to apply to items other than CIAC and the Network Customer reserves the right to oppose any such filing.

## 17.0   OPERATING ARRANGEMENTS

17.1   Operating Requirements

The terms and conditions under which the Network Customer shall operate its facilities and the technical and operational matters associated with the implementation of this Local Service Schedule shall be specified in the OATT.  The OATT shall provide for the Parties to:

(i)      operate and maintain equipment necessary for integrating the Network Customer within NSTAR's Transmission System (including, but not limited to, remote terminal units, metering, communications equipment and relaying equipment),

(ii)     transfer data between NSTAR and the Network Customer (including, but not limited to, heat rates and operational characteristics of Network Resources, generation schedules for units outside NSTAR's Transmission System, interchange schedules, unit outputs for redispatch required under Section 15, voltage schedules, loss factors and other real time data),

(iii)    use software programs required for data links and constraint dispatching,

(iv)     exchange data on forecasted loads and resources necessary for long-term planning, and

(v)      address any other technical and operational considerations required for implementation of this Local Service Schedule, including scheduling protocols.

The OATT will recognize that the Network Customer shall either:

**JA501**

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

(i)     operate as a Control Area under applicable guidelines of the Electric Reliability Organization (ERO), as defined in 18 CFR 38.1, and ISO,

(ii)    satisfy its Control Area requirements, including all necessary Ancillary Services, by contracting with NSTAR, or

(iii)   satisfy its Control Area requirements, including all necessary Ancillary Services, by contracting with another entity, consistent with Good Utility Practice, which satisfies the applicable reliability guidelines of the ERO and ISO. NSTAR shall not unreasonably refuse to accept contractual arrangements with another entity for Ancillary Services.

17.2    Network Operating Committee

A Network Operating Committee (Committee) shall be established to coordinate operating criteria for the Parties' respective responsibilities under the OATT. Each Network Customer shall be entitled to have at least one representative on the Committee. The Committee shall meet from time to time as need requires, but no less than once each calendar year.

USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 518 of 580

**SCHEDULE 2**

**SUPPLEMENTAL END-USE REACTIVE SUPPORT SERVICE**

In the event that power factor levels and reactive supply requirements set forth in the service agreement or other associated operating or interconnect agreement are not maintained by the Delivering Party (or, as appropriate, the Receiving Party), in accordance with applicable ISO standards and practices then NSTAR shall charge the Transmission Customer to take corrective action. The Transmission customer shall compensate NSTAR for installing the necessary equipment, whether in the form of generating units or other non-generating resources, such as demand resources, to correct the incremental difference between the Transmission Customer's lowest (or highest) power factor level and that which is an acceptable level in accordance with ISO standards and practices. The charges will be based upon the necessary level of reactive power supply required to correct the deficiency in the power factor level.

For the KVAR demand supplied to the Transmission Customer, the charge shall be the greater of a) the market price of installing leading reactive power supply expressed in terms of $/KVAR or b) $50/KVAR of installed (leading) reactive power reflecting current NSTAR cost.

For the KVAR demand absorbed by NSTAR the charge shall be the greater of a) the market price of installing lagging reactive power supply expressed in terms of $/KVAR or b) $22.5/KVAR of installed (lagging) reactive power reflecting current NSTAR cost.

Document Accession #: 20180516-5048    Filed Date: 05/16/2018
USCA Case #20-1343    Document #1935613    Filed: 02/17/2022    Page 519 of 580

Exhibit No. MYS-012
Page 154 of 215

## SCHEDULE 3

## LONG-TERM FIRM AND SHORT-TERM FIRM
## LOCAL POINT-TO-POINT SERVICE

The Transmission Customer shall compensate NSTAR for any Direct Assignment Facilities, Ancillary Services, and applicable study costs, consistent with Commission policy, along with the following charges as applicable:

1)      <u>Annual Rate</u>

The Annual Rate for Firm Local Point-To-Point Service shall consist of the higher of (i) the Embedded Cost Charge or (ii) the Incremental Cost Charge, as set forth below:

(i)      <u>The Embedded Cost Charge</u> shall be determined by dividing NSTAR's Annual Transmission Revenue Requirements (determined in accordance with Attachment D of this Local Service Schedule) by the maximum amount of NSTAR's Monthly Transmission System Load during such Service Year.

(ii)      <u>The Incremental Cost Charge</u> shall be determined from the total costs of all Local Network Upgrades plus other incremental costs incurred provided for in the Service Agreement application to a transaction.  If the Incremental Cost Charge is higher, the Transmission Customer shall pay for the facilities necessary to provide it with service during an amortization period, with the Transmission Customer paying the Embedded Cost Charge upon completion of the amortization. Such amortization period shall be coterminous with the Service Agreement.

2)      <u>Firm Local Point-To-Point Service for Monthly Transactions or Longer Term Transactions</u>

The charge for each month applicable to a monthly transaction or longer term transaction (the "Monthly Rate") shall be determined as the product of: (a) NSTAR's Annual Rate for Firm Local Point-To-Point Service divided by twelve (12) months and (b) the Reserved Capacity set forth in the Transmission Customer's applicable Service Agreement for such month, expressed in kilowatts.

**JA504**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

3)    <u>Firm Local Point-To-Point Service for Less Than One Month</u>

NSTAR's Weekly Rate is equal to NSTAR's Annual Rate for Firm Local Point-To-Point Service divided by fifty-two (52) weeks.  NSTAR's Daily Rate is equal to NSTAR's Annual Rate for Firm Local Point-To-Point Service divided by three hundred and sixty-five (365) days.  NSTAR's Hourly Rate is equal to NSTAR's Annual Rate for Firm Local Point-To-Point Service divided by eight thousand seven hundred and sixty (8,760) hours.

The Transmission Customer shall pay the Weekly, Daily or Hourly Rate, as applicable, times the Reserved Capacity set forth in the Transmission Customer's Applicable Service Agreement.

4)    <u>Penalty</u>

When the Transmission Customer exceeds its Reserved Capacity or uses Transmission Service at a Point of Receipt or Point of Delivery that it has not reserved (Excess Incident), NSTAR will charge the Transmission Customer 200% of the rate determined as follows for each kilowatt of the Excess Incident:

- The unreserved use penalty for a single hour of unreserved use shall be based on the rate for daily Firm Point-to Point Transmission Service.

- If there is more than one assessment for a given duration (e.g., daily) for the Transmission Customer, the penalty shall be based on the next longest duration (e.g., weekly).

- The unreserved penalty charge for multiple instances of unreserved use (i.e., more than one hour) within a day shall be based on the daily rate for Firm Point-To-Point Transmission Service.

- The unreserved penalty charge for multiple instances of unreserved use isolated to one calendar week shall be based on the charge for weekly Firm Point-To-Point Transmission Service.

- The unreserved use penalty charge for multiple instances of unreserved use during more than one week during a calendar month shall be based on the charge for monthly Firm Point-To-Point Transmission Service.

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

- The unreserved use penalty charge for multiple instances of unreserved use during more than one month during a calendar year shall be based on the charge for yearly Firm Point-To-Point Transmission Service.

All Excess Incidents will be recorded by NSTAR, and if in any calendar year more than ten (10) Excess Incidents occur in connection with service for the Transmission Customer, then NSTAR may require the Transmission Customer to apply for additional Firm Local Point-To-Point Service under this Local Service Schedule in the amount equal to the highest Excess Incident during that Service Year. Charges for such additional transmission service will relate back to the first day of the month following the month of NSTAR's notice.

5)      Curtailment Penalty Charge

If the Transmission Customer fails to respond to established emergency load shedding and curtailment procedures to relieve emergencies on the Transmission System, NSTAR may assess a penalty charge to the Transmission Customer. Said penalty charge will be equal to two (2) times the Monthly Rate for Firm Local Point-To-Point Service for the month in which such service was not curtailed or interrupted.

6)      Taxes and Fees Charge

A)      If any governmental authority requires the payment of any fee or assessment not specifically provided for in any of the charge or rate provisions under this Local Service Schedule or imposes a sales, gross revenue, or other form of tax with respect to payments made for service provided under this Local Service Schedule, including any applicable interest charged on any deficiency assessment made by the taxing authority, together with any further tax on such payments, the obligation to make payment for any such fee, assessment, or tax shall be borne by the Transmission Customer. NSTAR will make a separate filing with the Commission for recovery of any such costs in accordance with Part 35 of the Commission's Regulations.

B)      If NSTAR incurs tax liability currently for which it will, in subsequent years, receive tax benefits

(for example, a taxable contribution in aid of construction), the Transmission Customer shall pay to NSTAR an amount sufficient to reimburse NSTAR, on a net present value basis, for the reasonably projected costs resulting from the tax liability incurred in the current year less the reasonably projected tax benefits received by NSTAR in future years.

C)    If NSTAR takes a position that any particular transaction under any section of this Local Service Schedule does not constitute a transaction of the type described immediately above, and that position is subsequently reversed by Treasury ruling or regulation, or court action, then the Transmission Customer shall pay to NSTAR an amount calculated as described above but additionally taking into account any interest assessment required to be paid by NSTAR.

7)    <u>Regulatory Expense Charge</u>

NSTAR shall have the right to make a Section 205 filing for recovery of regulatory expenses associated with this Local Service Schedule and the Service Agreement(s).

8)    <u>Customer-Related Expense Charge</u>

NSTAR shall charge the Transmission Customer, in addition to the other charges assessed pursuant to this Local Service Schedule, and as set forth in its Service Agreement for those costs attributable to the billing, meter reading, record keeping, (all from FERC Uniform System of Accounts Nos. 901-905) and an allocation of administrative and general expenses (FERC Uniform System of Accounts Nos. 920-935) associated with each of these costs, all of which are related to the Transmission Customer's Local Point-To-Point Service and allocated on the basis of the total number of customers served by NSTAR.

9)    <u>Exchanges</u>

With respect to any transactions that involve an exchange, each party to such transaction shall be an individual Transmission Customer under this Local Service Schedule.  Accordingly, a transmission charge, as applicable, will be calculated for, and a separate bill will be rendered to, each such Transmission Customer.

10)    <u>Discounts</u>

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Three principal requirements apply to discounts for transmission service as follows: (1) any offer of a discount made by NSTAR must be announced to all Eligible Customers solely by posting on the OASIS, (2) any customer-initiated requests for discounts (including requests for use by one's wholesale merchant or an Affiliate's use) must occur solely by posting on the OASIS, and (3) once a discount is negotiated, details must be immediately posted on the OASIS.  For any discount agreed upon for service on a path, from point(s) of receipt to point(s) of delivery, NSTAR must offer the same discounted transmission service rate for the same time period to all Eligible Customers on all unconstrained transmission paths that go to the same point(s) of delivery on the Transmission System.

11)     <u>Resales</u>

The rates and rules governing charges and discounts shall not apply to resales of transmission service, compensation for which shall be governed by § I.11(a) of Schedule 21.

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

## SCHEDULE 4

## NON-FIRM LOCAL POINT-TO-POINT SERVICE

The Transmission Customer shall compensate NSTAR for any Ancillary Services and for Non-Firm Local Point-To-Point Service up to the sum of the applicable charges set forth below:

1)      The Annual Rate for Non-Firm Local Point-To-Point Service shall be NSTAR's Annual Transmission Revenue Requirements (determined in accordance with Attachment D of this Local Service Schedule) for the Service Year divided by NSTAR's Monthly Transmission System Load during such Service Year.

2)      <u>Non-Firm Local Point-To-Point Service for Monthly Transactions or Longer Term Transactions</u>
The charge for each month applicable to a monthly transaction or longer term transaction (the "Monthly Rate") shall be determined as the product of: (a) NSTAR's Annual Rate for Non-Firm Local Point-To-Point Service divided by twelve (12) months and (b) the Reserved Capacity set forth in the Transmission Customer's applicable Service Agreement for such month, expressed in kilowatts.

3)      <u>Non-Firm Local Point-To-Point Service for Less Than One Month</u>
NSTAR's Weekly Rate is equal to NSTAR's Annual Rate for Non-Firm Local Point-To-Point Service divided by fifty-two (52) weeks.

NSTAR's Daily Rate is equal to NSTAR's Annual Rate for Non-Firm Local Point-To-Point Service divided by three hundred and sixty-five (365) days.  NSTAR's Hourly Rate is equal to NSTAR's Annual Rate for Non-Firm Local Point-To-Point Service divided by eight thousand seven hundred and sixty (8,760) hours.

The Transmission Customer shall pay the Weekly, Daily or Hourly Rate, as applicable, time the Reserved Capacity set forth in the Transmission Customer's Applicable Service Agreement.

4)      <u>Credit to the Transmission Charge</u>

Whenever service provided hereunder is interrupted or curtailed by NSTAR, or its Designated Agent including ISO, the Transmission Charges to the Transmission Customer calculated pursuant to Sections 2 and 3 of this Schedule 4 shall be credited by an amount equal to the sum of the credits calculated for each hour of interruption or curtailment in service. The credit to the Transmission Customer for each hour of interruption or curtailment shall be calculated as the product of (a) NSTAR's Hourly Rate and (b) the kilowatts of service interruption or curtailment during such hour.

5)      Penalty

When the Transmission Customer exceeds its Reserved Capacity or uses Transmission Service at a Point of Receipt or Point of Delivery that it has not reserved (Excess Incident), NSTAR will charge the Transmission Customer 200% of the rate determined as follows for each kilowatt of the Excess Incident:

- The unreserved use penalty for a single hour of unreserved use shall be based on the rate for daily Firm Point-to Point Transmission Service.

- If there is more than one assessment for a given duration (e.g., daily) for the Transmission Customer, the penalty shall be based on the next longest duration (e.g., weekly).

- The unreserved penalty charge for multiple instances of unreserved use (i.e., more than one hour) within a day shall be based on the daily rate for Firm Point-To-Point Transmission Service.

- The unreserved penalty charge for multiple instances of unreserved use isolated to one calendar week shall be based on the charge for weekly Firm Point-To-Point Transmission Service.

- The unreserved use penalty charge for multiple instances of unreserved use during more than one week during a calendar month shall be based on the charge for monthly Firm Point-To-Point Transmission Service.

- The unreserved use penalty charge for multiple instances of unreserved use during more than one month during a calendar year shall be based on the charge for yearly Firm Point-To-Point

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Transmission Service.

All Excess Incidents will be recorded by NSTAR, and if in any calendar year more than ten (10) Excess Incidents occur in connection with service for the Transmission Customer, then NSTAR may require the Transmission Customer to apply for additional Non-Firm Local Point-To-Point Service under this Local Service Schedule in the amount equal to the highest Excess Incident during that Service Year. Charges for such additional Non-Firm Local Point-To-Point Service will relate back to the first day of the month following the month of NSTAR's notice.

6)      Curtailment Penalty Charge.

If the Transmission Customer fails to respond to established emergency load shedding and curtailment procedures to relieve emergencies on the Transmission System, NSTAR may assess a penalty charge to the Transmission Customer. Said penalty charge will be equal to two (2) times the monthly demand charge for Non-Firm Local Point-To-Point Service for the month in which such service was not curtailed or interrupted.

7)      Taxes and Fees Charge

A)      If any governmental authority requires the payment of any fee or assessment not specifically provided for in any of the charge or rate provisions under this Local Service Schedule or imposes a sales, gross revenue, or other form of tax with respect to payments made for service provided under this Local Service Schedule, including any applicable interest charged on any deficiency assessment made by the taxing authority, together with any further tax on such payments, the obligation to make payment for any such fee, assessment, or tax shall be borne by the Transmission Customer. NSTAR will make a separate filing with the Commission for recovery of any such costs in accordance with Part 35 of the Commission's Regulations.

B)      If NSTAR incurs tax liability currently for which it will, in subsequent years, receive tax benefits (for example, a taxable contribution in aid of construction), the Transmission Customer shall pay to NSTAR an amount sufficient to reimburse NSTAR, on a net present value basis, for the

**JA511**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

reasonably projected costs resulting from the tax liability incurred in the current year less the reasonably projected tax benefits received by NSTAR in future years.

C)     If NSTAR takes a position that any particular transaction under any section of this Local Service Schedule does not constitute a transaction of the type described immediately above, and that position is subsequently reversed by Treasury ruling or regulation, or court action, then the Transmission Customer shall pay to NSTAR an amount calculated as described above but additionally taking into account any interest assessment required to be paid by NSTAR.

8)     <u>Regulatory Expense Charge</u>

NSTAR shall have the right to make a Section 205 filing for recovery of regulatory expenses associated with this Local Service Schedule and the Service Agreement(s).

9)     <u>Customer-Related Transaction Charge</u>

NSTAR shall charge the Transmission Customer, in addition to the other charges assessed pursuant to this Local Service Schedule, and as set forth in its Service Agreement for those costs attributable to the billing, meter reading, record keeping, (from FERC Uniform System of Accounts Nos. 901-905) and an allocation of administrative and general expenses (Nos. 920-935) associated with each of these costs, all of which are related to the Transmission Customer's Local Point-To-Point Service and allocated on the basis of the total number of customers served by NSTAR.

10)     <u>Exchanges</u>

With respect to any transactions that involve an exchange, each party to such transaction shall be an individual Transmission Customer under this Local Service Schedule.  Accordingly, a transmission charge, as applicable, will be calculated for, and a separate bill will be rendered to, each such Transmission Customer.

11)     <u>Discounts</u>

Three principal requirements apply to discounts for transmission service as follows: (1) any offer of a discount made by NSTAR must be announced to all Eligible Customers solely by posting on the OASIS,

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

(2) any customer-initiated requests for discounts (including requests for use by one's wholesale merchant or an Affiliate's use) must occur solely by posting on the OASIS, and (3) once a discount is negotiated, details must be immediately posted on the OASIS.  For any discount agreed upon for service on a path, from point(s) of receipt to point(s) of delivery, NSTAR must offer the same discounted transmission service rate for the same time period to all Eligible Customers on all unconstrained transmission paths that go to the same point(s) of delivery on the Transmission System.

12)    <u>Resales</u>

The rates and rules governing charges and discounts shall not apply to resales of transmission service, compensation for which shall be governed by § I.11(a) of Schedule 21.

**JA513**

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

## ATTACHMENT A

## METHODOLOGY TO ASSESS AVAILABLE TRANSFER CAPABILITY

1.    <u>Introduction</u>

ISO is the regional transmission organization ("RTO"), serving the New England Control Area.  ISO is responsible for development, oversight, and fair administration of New England's wholesale market and management of bulk electric power system and wholesale markets' planning processes.  The ISO serves as the Balancing Authority for the New England Control Area.  The New England Control Area is interconnected to three neighboring Balancing Authority Areas: New Brunswick System Operator Area ("NBSO Area"), New York Independent System Operator Area ("NYISO Area"), and Hydro-Québec TransÉnergie Area ("HQTÉ Area").

As part of its RTO responsibilities, the ISO is registered with the North American Electric Reliability Corporation ("NERC") as several functional model entities that have responsibilities related to the calculation of ATC as defined in the following NERC Standards: MOD-001 – Available Transmission System Capability ("MOD-001"), MOD-004 – Capacity Benefit Margin ("MOD-004"), and MOD-008 – Transmission Reliability Margin Calculation Methodology ("MOD-008"). The extent of those responsibilities is based on various Commission-approved transmission operating agreements and the provisions of the ISO New England Operating Documents.

While the ISO is the transmission provider for transmission service associated with PTF, the Participating Transmission Owners (PTOs) under the Transmission Operating Agreement, such as NSTAR, provide local transmission service over Non-Pool Transmission Facilities within the RTO footprint and are responsible for calculating TTC and ATC associated with Local Service provided under Schedule 21.  Pursuant to CFR § 37.6(b)[1] of the Commission's regulations, NSTAR as a Transmission Provider is obligated to calculate and post ATC and TTC for certain local facilities over which Point-to-Point transmission service is provided under Schedule 21-NSTAR.  These are primarily radial paths that provide transmission service to directly interconnected generators.

_____

Document Accession #: 20180516-5048          Filed Date: 05/16/2018

[1]§37.6(b) Posting transfer capability.  The available transfer capability (ATC) on the Transmission Provider's system and the total transfer capability (TTC) of that system shall be calculated and posted for each Posted Path as set forth in this section.

Posted Path is defined as any control area-to-control area interconnection; any path for which service is denied, curtailed or interrupted for more than 24 hours in the past 12 months; and any path for which a customer requests to have ATC or TTC posted.  For this last category, the posting must continue for 180 days and thereafter until 180 days have elapsed from the most recent request for service over the requested path.  For purposes of this definition, an hour includes any part of any hour during which serviced was denied, curtailed or interrupted.  §37.6(b)(1)(i).

NSTAR does not currently have any Posted Paths based on the above definition.  However, to the extent that NSTAR does in the future have any Posted Path(s), NSTAR will calculate ATC and TTC using NERC Standard MOD-029-1 Rated System Path Methodology as outlined below.

## 1.1   Scope of Document

The scope of this document is limited to the following functions which are performed or utilized by NSTAR in order to provide Local Point-to Point Service under Schedule 21-NSTAR: Total Transfer Capability (TTC) methodology; Available Transfer Capability (ATC) methodology; Existing Transmission Commitment (ETC); Use of Transmission Reliability Margin (TRM); Use of Capacity Benefit Margin (CBM); and Use of Rollover Rights (ROR) in the calculation of ETC.

TTC and ATC are required to be calculated only for certain non-PTF internal paths over which Local Point-to-Point Service is provided under Schedule 21-NSTAR.  TTC and ATC are not calculated by NSTAR for Local Network Service because ISO employs a market model for economic, security constrained dispatch of generation, and NSTAR does not require advance reservation for such network service.

## 2.   Transmission Service in the New England Markets

Since the inception of the open access transmission tariff for New England, the process by which generation located inside New England supplies energy and/or capacity to the bulk electric system has differed from the Commission's pro forma open access transmission tariff.  The fundamental difference is

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

that internal generation is dispatched in an economic, security constrained manner by the ISO rather than utilizing a system of physical rights, advance reservations and point-to-point transmission service. Through this process, internal generation provides offers that are utilized by the ISO in the Real-Time Energy Market dispatch software. This process provides the least-cost dispatch to satisfy Real-Time load on the system.

In addition to offers from generation within New England, entities may submit energy transactions that move into the New England Control Area, out of the New England Control Area or through the New England Control Area. The Real-Time Energy Market clears these External Transactions based on forecast LMPs and the transfer capability of the associated external interfaces. With those External Transactions in place, the Real-Time Energy Market dispatches internal generation in an economic, security constrained manner to meet Real-Time load within the region.

The process for submitting External Transactions into the Real-Time Energy Market does not require an advance physical reservation for use of the PTF. In the event that the net of economic External Transactions is greater than the transfer capability of the associated external interface, the ExternalTransactions selected to flow are selected based on the rules specified in the Tariff. For any External Transactions that are confirmed to flow in Real-Time based on the economics of the system, a transmission reservation for RNS and Through-or-Out Service is created after-the-fact to satisfy the transparency needs of the market.

The process described above is applicable to the PTF within the New England Control Area, and non-PTF where utilized for Local Network Service by generation or load. However, NSTAR owns local transmission facilities over which an advance transmission service reservation for firm or non-firm transmission service may be required. On those facilities, Market Participants may obtain a transmission service reservation from NSTAR under Schedule 21-NSTAR prior to delivery of energy and/or capacity into the New England markets pursuant to Schedule 18, 20A or 20B of the Tariff. This document addresses the calculation of ATC and TTC for these non-PTF internal paths.

3.      NSTAR Total Transfer Capability (TTC)

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

TTC is the amount of electric power that can be moved or transferred reliably from one area to another area of the interconnected transmission systems by way of all transmission lines (or paths) between those areas under specified system conditions. TTC for Schedule 21-NSTAR is calculated using NERC Standard MOD-029-1 Rated System Path Methodology and posted on the NSTAR OASIS site.

The TTC on NSTAR's Non-PTF that requires Local Point-to-Point Service reservations are relatively static values. NSTAR calculates the TTC for Posted Paths as the rating of the particular radial transmission path.NSTAR will calculate and post TTC on its OASIS site for all non-PTF Posted Paths that are eligible for Local Point-to-Point Service reservations. TTC is calculated as the transfer capability rating of the particular radial transmission path less the most limiting element within the PostedPath.

4.    Capacity Benefit Margin (CBM)

CBM is defined as the amount of firm transmission transfer capability set aside by a Transmission Provider for use by the Load Serving Entities. The ISO does not set aside any CBM for use by the Load Serving Entities, because of the New England approach to capacity planning requirements in the ISO New England Operating Documents, and in any event, ISO's determination of CBM does not apply directly to the determination of ATC for Local Service. Load Serving Entities operating with the New England Control Area are required to arrange for their Capacity Requirements prior to the beginning of any given month in accordance with the Tariff, Section III.13.7.3.1 (Calculation of Capacity Requirement and Capacity Load Obligation). Load Serving Entities do not utilize CBM to ensure that their capacity needs are met; therefore, CBM is not applicable within the New England market design. Accordingly, for purposes of NSTAR's ATC calculation and because CBM for the New England Control Area is set to zero (0), NSTAR utilizes a zero (0) CBM value.

5.    Transmission Reliability Margin (TRM)

TRM is the amount of transmission transfer capability set aside to provide reasonable assurance that the interconnected transmission network will be secure. TRM accounts for the inherent uncertainty in system conditions and the need for operating flexibility to ensure reliable system operation as system conditions change. It is used only for external interfaces under the New England market design. As NSTAR does not have any external interfaces, TRM for its non-PTF facilities is presently set to zero.

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

6.      Existing Transmission Commitments

6.1     Existing Transmission Commitments, Firm (ETC$_F$)

ETC$_F$ are confirmed Firm Local Point-To-Point Transmission Service reservations (PTP$_F$) plus any exercised rollover rights for Firm Point-To-Point Transmission Service reservations (ROR$_F$).  There are no allowances necessary for Native Load forecast commitments (NL$_F$), Network Integration Transmission Service (NITS$_F$), grandfathered Transmission Service (GF$_F$), and other services, contracts or agreements (OS$_F$) to be considered in the ETC$_F$ calculation.

6.2     Existing Transmission Commitments, Non-Firm (ETC$_{NF}$)

ETC$_{NF}$ are confirmed Non-Firm transmission reservations (PTP$_{NF}$).  There are no allowances necessary for Non-Firm Network Integration Transmission Service (NITS$_{NF}$), Non-Firm grandfathered Transmission Service (GF$_{NF}$), or other services, contracts or agreements (OS$_{NF}$).

7.      Calculation of ATC for NSTAR's Transmission System

NERC Standards MOD-001-1 – Available Transmission System Capability and MOD-029-1 – Rated System Path Methodology define the required items to be identified when describing a Transmission Provider's ATC methodology.  As a practical matter, the ratings of the radial transmission paths are always higher than the transmission requirements of the Transmission Customers connected to that path.  As such, transmission services over these posted paths are considered to be always available.

Common practice is not to calculate or post firm and non-firm ATC values for the Non-PTF assets, as ATC is positive and listed as 9999.  Transmission Customers are not restricted from reserving Firm or Non-Firm Point-to-Point Service on Non-PTF facilities.

As Real-Time approaches, the ISO utilizes the Real-Time Energy Market rules to determine which of the submitted energy transactions will be scheduled in the coming hour.  Basically, the ATC of the non-PTF assets in the New England market is almost always positive.  The ATC is equal to the amount of net energy and/or capacity transactions that the ISO will schedule on an interface for the designated hour.  With this simplified version of ATC, there is no detailed algorithm to be described or posted other than:

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

ATC equals TTC. Thus, for those non-PTF that serve as a path for NSTAR's Transmission Customers taking Local Point-to-Point Service, NSTAR has posted the ATC as 9999, consistent with industry practice. ATC on these paths varies depending on the time of day. However, it is posted with an ATC of "9999" to reflect the fact that there are no restrictions on these paths for commercial transactions.

### 7.1    Calculation of Schedule 21-NSTAR Firm ATC ($ATC_F$)

#### 7.1.1    Calculation of $ATC_F$ in the Planning Horizon (PH)

For purposes of this Attachment A, PH is any period before the Operating Horizon.

Consistent with the NERC definition, $ATC_F$ is the capability for Firm transmission reservations that remain after allowing for TRM, CBM, $ETC_F$, Postbacks$_F$ and counterflows$_F$. As discussed above, TRM and CBM are zero. Firm Transmission Service under Schedule 21-NSTAR that is available in the PH includes: Yearly, Monthly, Weekly and Daily. Postbacks$_F$ and counterflows$_F$ of Schedule 21-NSTAR transmission reservations are not considered in the ATC calculation. Therefore, $ATC_F$ in the PH is equal to the TTC minus $ETC_F$.

#### 7.1.2    Calculation of $ATC_F$ in the Operating Horizon (OH)

For purposes of this Attachment A, OH begins noon eastern prevailing time each day. At that time, the OH spans from noon through midnight of the next day for a total of 36 hours. As time progresses, the total hours remaining in the OH decrease until noon the following day when the OH is once again reset to 36 hours.

Consistent with the NERC definition, $ATC_F$ is the capability for Firm transmission reservations that remain after allowing for $ETC_F$, CBM, TRM, Postbacks$_F$ and counterflows$_F$. As discussed above, TRM and CBM are zero. Daily Firm Transmission Service under Schedule 21-NSTAR is the only firm service offered in the OH. Postbacks$_F$ and counterflows$_F$ of Schedule 21-NSTAR transmission reservations are not considered in the $ATC_F$ calculation. Therefore, $ATC_F$ in the OH is equal to the TTC minus $ETC_F$.

#### 7.1.3    Calculation of $ATC_F$ in the Scheduling Horizon (SH)

Because Firm Schedule 21-NSTAR transmission service is not offered in the SH, $ATC_F$ in the SH is zero.

Document Accession #: 20180516-5048          Filed Date: 05/16/2018
USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 535 of 580

Exhibit No. MYS-012
Page 170 of 215

7.2     Calculation of Schedule 21-NSTAR Non-Firm ATC (ATC$_{NF}$)

7.2.1     Calculation of ATC$_{NF}$ in the PH

ATC$_{NF}$ is the capability for Non-Firm transmission reservations that remain after allowing for ETC$_F$, ETC$_{NF}$, scheduled CBM (CBM$_S$), unreleased TRM (TRM$_U$), Non-Firm Postbacks (Postbacks$_{NF}$) and Non-Firm counterflows (counterflows$_{NF}$). As discussed above, the TRM and CBM for Schedule 21-NSTAR are zero. ATC$_{NF}$ available in the PH includes: Monthly, Weekly, Daily and Hourly. TRM$_U$, Postbacks$_{NF}$ and counterflows$_{NF}$ of Schedule 21-NSTAR transmission reservations are not considered in this calculation. Therefore, ATC$_{NF}$ in the PH is equal to the TTC minus ETC$_F$ and ETC$_{NF}$.


7.2.2     Calculation of ATC$_{NF}$ in the OH

ATC$_{NF}$ available in the OH includes: Daily and Hourly. As discussed above, the TRM and CBM for Schedule 21-NSTAR are zero. TRM$_U$, counterflows$_{NF}$ and ETC$_{NF}$ of Schedule 21-NSTAR transmission reservations are not considered in this calculation. Therefore, ATC$_{NF}$ in the OH is equal to the TTC minus ETC$_F$ plus postbacks of PTP$_F$ in the OH as PTP$_{NF}$ (Postbacks$_{NF}$).


7.3     Negative ATC

As stated above, the ratings of the radial transmission paths are always higher than the transmission requirements of the Transmission Customers connected to that path. As such, transmission services over these posted paths are considered to be always available. As also stated above, NSTAR's Non-PTF are primarily radial paths that provide transmission service to directly interconnected generators. It is possible that in the future a particular radial path may interconnect more nameplate capacity generation than the path's TTC. For the local facilities modeled by ISO, and consistent with ISO's economic, security-constrained dispatch methodology, the ISO will only dispatch an amount of generation interconnected to such path so as not to incur a reliability or stability violation on the subject path. Therefore, ATC in the PH, OH and SH could become zero, but will never be negative.


8.     Posting of Schedule 21-NSTAR ATC

8.1     Location of ATC Posting

ATC values are posted on the NSTAR OASIS site.

Document Accession #: 20180516-5048          Filed Date: 05/16/2018
USCA Case #20-1343      Document #1935613      Filed: 02/17/2022      Page 536 of 580

8.2    Updates to ATC

When any of the variables in the ATC equations change, the ATC values are recalculated and immediately posted.

8.3    Coordination of ATC Calculations

NSTAR's Non-PTF has no external interfaces.  Therefore, it is not necessary to coordinate the values.

8.4    Mathematical Algorithms

The mathematical algorithms for the calculation of ATC can be found on NSTAR's web site at http://www.nstar.com/business/rates_tariffs/open_access/docs/ATC_Algorithm-Sch_21.pdf

**JA521**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**Non-PTF Transmission Path ATC Process Flow Diagram**



Document Accession #: 20180516-5048    Filed Date: 05/16/2018

## ATTACHMENT B

## METHODOLOGY FOR COMPLETING A SYSTEM IMPACT STUDY

When NSTAR determines on a non-discriminatory basis that a System Impact Study is needed because its Transmission System will be inadequate to accommodate a Completed Application for service, the following outlines the study methodology that NSTAR will employ to estimate the Transmission System impact of a Completed Application for Firm Local Point-To-Point Service, Network Integration Service and/or any costs associated with Direct Assignment Facilities and/or Local Network Upgrades that would be incurred in order to accommodate the service requested in the Completed Application.

1.    <u>System Impact will be estimated based on consideration of reliability requirements to</u>:

- meet obligations under agreements that predate this Local Service Schedule;
- meet obligations of existing and pending Completed Application under this  Local Service Schedule;
- maintain thermal, voltage and stability system performance within acceptable regional practices.

2.    <u>Guidelines and Principles followed by NSTAR</u>:  When performing the System Impact Study, NSTAR will apply the following, as amended and/or adopted from time to time.

- Good Utility Practice;
- Criteria, rules and reliability standards applicable to the New England Transmission System;
- NPCC criteria and guidelines; and
- NSTAR criteria and guidelines.

3.    <u>Transmission System Model Representation</u>:  The Transmission System model will be based on a library of load flow cases prepared by ISO for studies of the New England area.   The models may include representations of other NPCC and neighboring systems.  These load flow cases include individual system model representations provided by Transmission Owners and represent forecasted system conditions for up to ten (10) years into the future.  This library of load flow cases is maintained and updated as appropriate by ISO, and is consistent with information filed under FERC Form 715.  NSTAR

**JA523**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

will use system models that it deems appropriate for study of the Completed Application for service. Additional system models and operating conditions, including assumptions specific to a particular analysis, may be developed for conditions not available in the library of load flow cases. The system models may be modified, if necessary, to include additional system information on load, transfers and configuration, as it becomes available.

4.    <u>System Conditions</u>:  Loading of all Transmission System elements shall be less than normal ratings for pre-contingency conditions and less than long-term emergency (LTE) ratings for post-contingency conditions.  Post-contingency loading above LTE rating and less than short-term emergency (STE) rating may be allowed where demonstrated that loading can be reduced below the LTE rating within fifteen (15) minutes.  Transmission System voltage shall be within the applicable design ratings of connected equipment for normal and emergency conditions.  Normal and post-contingency voltages shall be in accordance with NSTAR and ISO standards.

5.    <u>Short Circuits</u>:  Transmission System short circuit currents shall be within the applicable equipment design ratings.

6.    <u>Study Analysis</u>:  System impact of the integration of new load will be evaluated to meet the requirements of design, identified in the guidelines and principles under Item 2 above, to provide sufficient transmission capability to maintain stability and to maintain thermal and voltage levels of lines and equipment within applicable limits.  The same applies to the evaluation of Firm Point-To-Point Service when it has been determined that insufficient transfer capability is available and the Eligible Customer requests a System Impact Study be conducted.

7.    <u>Loss Evaluation</u>:  The impact of losses on the Transmission System will be taken into account in the System Impact Study to ensure Good Utility Practice in the design and operation of its system.

8.    <u>System Protection</u>:  Protection requirements will be evaluated by NSTAR in accordance with ISO, NPCC, and NSTAR criteria.

**JA524**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

9.    <u>Approvals</u>:  NSTAR will conduct the System Impact Study to ensure compliance with its planning and design policies and practices.  However, the actions to be taken by the Parties to implement the recommendations of the System Impact Study are subject to approval under the Tariff.

10.    <u>Study Scope and Reporting</u>:  The study will determine the impacts and identify changes required, if any, to NSTAR's existing Transmission System.  NSTAR will provide the Eligible Customer with a written report of the physical interconnection alternative(s), required NSTAR system additions and/or modifications, if any, associated study grade cost estimates (+/- 25%) and the results of the analysis.

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

## ATTACHMENT C

### INDEX OF LOCAL POINT-TO-POINT SERVICE CUSTOMERS

| Customer | Date of Service Agreement |
|---|---|
| AIG Trading Corporation | October 29, 1996 |
| Altresco Pittsfield Light Plant | December 26, 1996 |
| Aquila Power Company | February 26, 1997 |
| Axia Energy, LP | June 20, 2001 |
| Baltimore Gas & Electric Co. | January 14, 1997 |
| Bangor Hydro-Electric Co. | October 1, 1996 |
| Belmont Municipal Light Dept. | December 11, 1996 |
| Central Vermont Public Service | January 3, 1997 |
| Chicopee Municipal Light Dept. | October 2, 1996 |
| CINERGY Capital and Trading, Inc. | January 1, 1998 |
| CINERGY Operating Companies | December 1, 1997 |
| Citizens Lehman Power Sales | November 6, 1996 |
| Constellation Power Source, Inc. | July 11, 1997 |
| Duke Energy Solutions, Inc. | March 19, 1999 |
| DukeSolutions, Inc. | May 18, 1999 |
| Edison Source | June 9, 1997 |
| Electric Clearinghouse, Inc. | October 7, 1996 |
| Entergy Nuclear Generation Company | April 10, 2003 |
| Equitable Power Services Company | October 29, 1996 |
| Green Mountain Power Corporation | January 10, 1997 |
| HQ Energy Services (US) Inc. | February 8, 1999 |
| LG&E Power Marketing, Inc. | October 8, 1996 |
| Maine Public Service Company | September 30, 1996 |
| Massachusetts Bay Transportation Authority | May 1, 1999 |
| Massachusetts Municipal Wholesale Electric Co. | September 6, 1996 |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

| | |
|---|---|
| Merchant Energy Group of the Americas, Inc. | August 16, 1998 |
| Mirant Canal, LLC | July 6, 1998 |
| Mirant Americas Energy Marketing, LP | April 28, 2004 |
| Montaup Electric Co. | October 15, 1996 |
| Morgan Stanley Capital Group, Inc. | October 29, 1996 |
| NEPOOL on Behalf of NEPOOL Participants | June 1, 1997 |
| New England Power Company | December 30, 1996 |
| New York State Gas & Electric Corp. | December 16, 1997 |
| NorAm Energy Services | November 14, 1997 |
| Northeast Energy Services, Inc. | June 17, 1997 |
| NP Energy, Inc. | August 1, 1997 |
| NRG Power Marketing, Inc. | January 1, 2001 |
| NSTAR Electric Company | December 24, 1996 |
| PECO Energy Power Team | January 3, 1997 |
| Rainbow Energy Power Marketing | November 7, 1996 |
| Reading Municipal Light Department | September 6, 1996 |
| Sithe New England Holdings, LLC | January 3, 1998 |
| Sonat Power Marketing, Inc. | November 14, 1997 |
| Southern Energy Trading and Marketing, Inc. | March 10, 1997 |
| Strategic Energy Ltd. | May 11, 1999 |
| The Power Company of America | November 18, 1996 |
| Town of Braintree Electric Light Dept. | September 6, 1996 |
| Town of Hingham Municipal Light Plant | September 9, 1996 |
| Town of Hull Municipal Light Plant | December 11, 1996 |
| Trans Alta Energy Marketing | November 24, 1998 |
| Trans Canada Power Corporation | January 27, 1997 |
| Western Power Services, Inc. | December 24, 1996 |
| Williams Energy Services Company | July 17, 1997 |
| VTEC Energy, Inc. | March 24, 1998 |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

## ATTACHMENT D

## ANNUAL TRANSMISSION REVENUE REQUIREMENTS

The Transmission Revenue Requirements for NSTAR ("the Company") will reflect the costs for its Transmission System, including costs attributable to those incurred by the Company in owning, leasing, maintaining and supporting the Transmission System net of revenues for transmission services provided under any other FERC accepted tariff or under any contract with other parties that provides reimbursement to the Company for transmission related services. Under no circumstances shall the Company's Local Network Service rates include costs that are charged through any other rate or tariff. The Transmission Revenue Requirements will be an annual calculation based on the estimated costs for its Transmission System during the Service Year.

The Company shall make an annual informational filing with the FERC on or before May 31 of each year which shall include a True-up of estimated costs and revenues, and actual costs and revenues for the preceding Service Year. Actual costs will be determined using data required to be reported annually in the FERC Form 1 and recorded on the Company's books in accordance with FERC's Uniform System of Accounts; unless the use of other data, such as subaccount balances, is specifically required by the provisions below, in which case an officer of the Company, shall certify that the development, accuracy and application of such other data is in accordance with the provisions of this Local Service Schedule. Such certification will be included with the annual informational filing along with adequate detail that supports the values contained within the True-up calculation. References to specific FERC Form 1 pages, line numbers and columns included in this Local Service Schedule are based on the 2006 Form 1 of the Company's predecessor entities. Subsequent FERC changes to Form 1 may be adopted to the extent they are consistent with the provisions and terms of this Local Service Schedule and not otherwise prohibited by FERC.

## I.    DEFINITIONS

Capitalized terms not otherwise defined in Section II.1 of the OATT or the Local Service Schedule and as used herein have the following definitions:

**JA528**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

A.     ALLOCATION FACTORS

    1.     <u>Transmission Wages and Salaries Allocation Factor</u> shall equal the ratio of transmission-related direct wages and salaries including those of affiliated companies as reported in the Company's annual FERC Form 1, page 354, line 21, column (b) to the Company's total direct wages and salaries including those of the affiliated companies as reported in the Company's FERC Form 1, page 354, line 28, column (b), and excluding administrative and general wages and salaries as reported in the Company's FERC Form 1, page 354, line 27, column (b).

    2.     <u>Plant Allocation Factor</u> shall equal the ratio of the sum of Transmission Plant, excluding HQ leases, plus Transmission Related Intangible and General Plant to Total Plant in Service excluding HQ Leases.

B.     TERMS

<u>Administrative and General Expense</u> shall equal the expenses as reported in the Company's FERC Form 1, page 323, line 197, column (b), excluding Property Insurance included in FERC Account No. 924, Regulatory Commission Expense included in FERC Account No. 928, and Advertising Expense included in FERC Account No. 930.1 and excluding Merger-Related Costs included in FERC Account Nos. 920-935 (other than those in FERC Account Nos. 924, 928 and 930.1, which have already been excluded). The amount of Postretirement Benefits Other Than Pensions ("PBOP") expense in FERC Account No. 926 shall be separately stated as a footnote to the Company's FERC Form 1, page 323, line 187, column (b):  Current Year and column (c):  Previous Year.

<u>Amortization of Gain on Reacquired Debt</u> shall equal the amortization amount recorded in FERC Account No. 429.1.

<u>Amortization of Loss on Reacquired Debt</u> shall equal the expenses as recorded in FERC Account No. 428.1.

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

<u>Amortization of Investment Tax Credits</u> shall equal the credits as recorded in FERC Account No. 411.4.

<u>Depreciation Expense for Transmission Plant</u> shall equal the transmission expenses as recorded in FERC Account No. 403 as reported in the Company's annual FERC Form 1 page 336, line 7, column (f).

<u>General Plant</u> shall equal the gross plant balance as recorded in FERC Account Nos. 389-399.

<u>General Plant Depreciation and Amortization Expense</u> shall equal the general plant expenses as recorded in FERC Account Nos. 403 for depreciable items and 404 for items subject to amortization as reported in the Company's annual FERC Form 1, page 336, line 10, column (f).

<u>General Plant Depreciation Reserve</u> shall equal the general reserve balance as recorded in FERC Account No. 108 and reported in the Company's annual FERC Form 1, page 219, line 28, column (b).

<u>General Plant Amortization Reserve</u> shall equal the general reserve balance as recorded in FERC Account No. 111 and reported in the Company's annual FERC Form 1, page 200 in a footnote to line 14.

<u>Hydro-Quebec DC Facilities (HQ Leases)</u> shall equal the balance in capital leases as recorded in FERC Account Nos. 350-359 and FERC Account Nos. 389-399.

<u>Intangible Plant</u> shall equal the gross plant balance as recorded in FERC Account No. 303 as reported in the Company's annual FERC Form 1, page 205, line 4, column (g).  The only allowable Intangible Plant for inclusion in the Local Service Schedule are software, patent or rights costs.

<u>Intangible Plant Amortization Expense</u> shall equal amortization expenses as recorded in FERC Account Nos. 404-405 as reported in the Company's annual FERC Form 1, page 336, line 1, column (f).  The only allowable Intangible Plant Amortization Expense for inclusion in the Local Service Schedule is the amortization of software, patent or rights costs.

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

<u>Intangible Plant Amortization Reserve</u> shall equal the amortization reserve balance as recorded in FERC Account No. 111.  The only allowable Intangible Plant Amortization Reserve for inclusion in the Local Service Schedule is that related to the amortization of software, patent or rights costs.

<u>Merger-Related Costs</u> shall equal NSTAR Electric's amortized merger-related costs as authorized by FERC or by state regulatory order.

<u>Other Regulatory Assets/Liabilities - FAS 106</u> shall equal the net of the FAS 106 balance as recorded in FERC Account No. 182.3 and any FAS 106 balance as recorded in the FERC Account No. 254.

<u>Other Regulatory Assets/Liabilities - FAS 109</u> shall equal the net of the FAS 109 asset and any FAS 109 balance liability.

<u>Payroll Taxes</u> shall equal those payroll expenses as recorded in the FERC Account No. 408.1.

<u>Plant Held for Future Use</u> shall equal the balance in FERC Account No. 105 that relates to land and land rights which have been purchased for future transmission use, or transmission related projects that were included in this account before January 1, 2007.

<u>Prepayments</u> shall equal the prepayment balance as recorded in FERC Account No. 165, plus any prepayment specifically related to the Company's Pension plans related to electric company operations recorded in FERC Account No. 182.3, Other Regulatory Assets.

<u>Property Insurance</u> shall equal the expenses as recorded in FERC Account No. 924.

<u>Total Accumulated Deferred Income Taxes</u> shall equal the net of the deferred tax balance as recorded in FERC Account Nos. 281-283 and 190 for those balances that are directly related to transmission, excluding those directly related to distribution or other businesses.

<u>Total Gain on Reacquired Debt</u> shall equal the gain as recorded in FERC Account No. 257.

Total Loss on Reacquired Debt shall equal the expenses as recorded in FERC Account No. 189.

Total Municipal Tax Expense shall equal the municipal tax expenses as recorded in FERC Account No. 408.1 as reported in the Company's annual FERC Form 1, page 263, line 10, column (i).

Total Plant in Service shall equal the total gross plant balance as recorded in FERC Account Nos. 301-399 excluding HQ Leases recorded in those accounts.

Total Transmission Depreciation Reserve shall equal the transmission reserve balance as recorded in FERC Account No. 108 as reported in the Company's annual FERC Form 1, page 219, line 25, column (b), excluding HQ-related amounts recorded in that account.

Transmission Depreciation Expense shall be the annual depreciation expense for transmission accounts computed using the following rates, as approved by FERC in Docket No. ER03-1274:

| Account | Description | Rate |
|---------|-------------|------|
| 352 | Structures and Improvements | 2.19% |
| 353 | Station Equipment | 2.53% |
| 354 | Towers and Fixtures | 2.03% |
| 355 | Poles and Fixtures | 2.25% |
| 356 | Overhead Conductors and Devices | 2.19% |
| 357 | Underground Conduit | 2.06% |
| 358 | Underground Conductors and Devices | 2.15% |
| 359 | Roads and Trails | 1.63% |

Transmission Merger-Related Costs shall equal NSTAR Electric's amortized merger-related transmission costs as authorized by FERC.

Transmission Operation and Maintenance Expense shall equal all transmission-related expenses as recorded in FERC Account Nos. 560-564 and 566-576.5, and shall exclude; (i) all HQ HVDC expenses

**JA532**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

recorded in those accounts, and (ii) expenses billed to the Company by ISO-NE for Scheduling and Dispatch Service.

Transmission Plant shall equal the balance as recorded in FERC Account Nos. 350-359.1, adjusted to exclude the capital leases in the Hydro-Quebec DC Facilities (HQ Leases).

Transmission Plant Materials and Supplies shall equal the balance as assigned to transmission, as recorded in FERC Account No. 154 as reported in the Company's annual FERC Form 1, page 227, lines 5 and 8, column (c).

## II.     CALCULATION OF TRANSMISSION REVENUE REQUIREMENTS

The Transmission Revenue Requirement shall equal the sum of (A) Return and Associated Income Taxes, (B) Transmission Depreciation and Amortization Expense, (C) Transmission Related Amortization of Gain/Loss on Reacquired Debt, (D) Transmission Related Amortization of Investment Tax Credits, (E) Transmission Related Municipal Tax Expense, (F) Transmission Related Payroll Tax Expense, (G) Transmission Operation and Maintenance Expense, (H) Transmission Related Administrative and General Expenses, (I) Transmission Related Integrated Facilities Charges, minus (J) Transmission Support Revenue, plus (K) Transmission Support Expense, plus (L) Transmission-Related Expense from Generators, minus (M) Transmission Rents Received from Electric Property, minus (N) Short-Term and Non-Firm Point-To-Point Service Revenues, minus (O) Regional Network Services (RNS) Revenues, minus (P) Through or Out Revenues, minus (Q) ISO-NE Scheduling and Dispatch Revenues.

A.     Return and Associated Income Taxes shall equal the product of the Transmission Investment Base and the Cost of Capital Rate.

      1.     Transmission Investment Base

      The Transmission Investment Base will be the year end balances of (a) Transmission Plant, plus (b) Transmission Related Intangible and General Plant, plus (c) Transmission Plant Held for Future Use, plus (d) 50 percent of Transmission Related Construction

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Work In Progress (CWIP), less (e) Transmission Related Depreciation and Amortization Reserve, less (f) Transmission Related Accumulated Deferred Taxes, less, (g) AFUDC Regulatory Liability, plus (h) Transmission Related Gain/Loss on Reacquired Debt, plus (i) Other Regulatory Assets/Liabilities, plus (j) Transmission Prepayments, plus (k) Transmission Materials and Supplies, plus (l) Transmission Related Cash Working Capital.

(a)     <u>Transmission Plant</u> will equal the balance of the investment in Transmission Plant. This value excludes the capital leases in the Hydro-Quebec DC Facilities (HQ Leases).

(b)     <u>Transmission Related Intangible and General Plant</u> shall equal the sum of the balance of investment in Intangible Plant and General Plant multiplied by the Transmission Wages and Salaries Allocation Factor.

(c)     <u>Transmission Plant Held for Future Use</u> shall equal the land and land rights portion of the balance of Transmission-related Plant Held for Future Use (FERC Account No. 105) plus the non-land Plant Held for Future Use related to projects that were included in Account No. 105 prior to January 1, 2007 to the extent such non-land plant has not been closed to Plant In Service; such balances to be provided in conformance with the FERC Uniform System of Accounts, Instruction E, Account No. 105 which requires that "…property included in this account shall be classified according to detail accounts (301-399)…and shall be maintained in such detail as though the property were in service."

(d)     <u>50 Percent of Transmission Related Construction Work in Process (CWIP)</u> shall equal the balance of Transmission related investment in FERC Account 107 multiplied by 50%, subject to any exclusions pursuant to the provisions of Section 4.1 of this Local Service Schedule.

(e)     <u>Transmission Related Depreciation and Amortization Reserve</u> shall equal the balance of Total Transmission Depreciation Reserve as reported in the Company's annual FERC

**JA534**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Form 1, page 219 line 25, column (b), plus the balance of Transmission Related Intangible Plant Amortization Reserve, Transmission Related General Plant Depreciation Reserve and Transmission Related General Plant Amortization Reserve. Transmission Related Intangible Plant Amortization Reserve, Transmission Related General Plant Depreciation Reserve and Transmission Related General Plant Amortization Reserve shall equal the product of (i) the sum of the Intangible Plant Amortization Reserve, General Plant Depreciation Reserve and General Plant Amortization Reserve and (ii) the Transmission Wages and Salaries Allocation Factor. The Total Transmission Depreciation Reserve balance excludes any amounts related to the capital leases in the Hydro-Quebec DC Facilities (HQ Leases).

(f)     <u>Transmission Related Accumulated Deferred Taxes</u> shall equal the electric balance of Total Accumulated Deferred Income Taxes (for those balances that are directly related to transmission, plus the balances not directly related to other businesses), with the remaining accumulated deferred taxes not directly related to other businesses being allocated on the same basis used for the related rate base assets.

(g)     <u>AFUDC Regulatory Liability</u> shall equal 50% of the capitalized AFUDC booked on transmission projects as recorded in FERC Account No. 254.

(h)     <u>Transmission Related Gain/Loss on Reacquired Debt</u> shall equal the electric balance of Total Gain/Loss on Reacquired Debt multiplied by the Plant Allocation Factor.

(i)     <u>Other Transmission Related Regulatory Assets/Liabilities</u> shall equal the electric balance of any deferred rate recovery of FAS 106 expenses multiplied by the Transmission Wages and Salaries Allocation Factor, plus the electric balance of FAS 109 multiplied by the Plant Allocation Factor.

(j)     <u>Transmission Prepayments</u> shall equal the electric balance of Prepayments multiplied by the Transmission Wages and Salaries Allocation Factor.

**JA535**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

(k)  <u>Transmission Materials and Supplies</u> shall equal the electric balance of Transmission Plant Materials and Supplies.

(l)  <u>Transmission Related Cash Working Capital</u> shall be a 12.5% allowance (45 days/360 days) of the Transmission Operation and Maintenance Expense included in Section II.G, Transmission Related Administrative and General Expenses included in Section II.H, and Transmission Support Expenses included in Section II.K.

2.  <u>Cost of Capital Rate</u>

The Cost of Capital Rate will equal (a) the Weighted Cost of Capital, plus (b) Federal Income Tax plus (c) State Income Tax.

(a)  <u>The Weighted Cost of Capital</u> for Service Years ending before January 1, 2013 will be calculated based 70% upon the capital structure at the end of each year and 30% upon a pro-forma capital structure consisting of 50% debt, 0% preferred, and 50% common equity; thereafter the pro-forma capital structure will be the same as the actual capital structure, and will equal the sum of (i), (ii) and (iii) below.  Notwithstanding the foregoing, for Service Years ending before January 1, 2013, NSTAR's Weighted Cost of Capital will be the lower of the blended rate as calculated herein or the actual rate.

(i)  <u>the long-term debt component</u>, which equals the product of: the actual weighted average embedded cost to maturity of the long-term debt then outstanding; and the sum of (a)  the ratio that long-term debt is to the total capital multiplied by 70%, plus (b) 50% pro-forma capital structure multiplied by 30%.

(ii)  <u>the preferred component</u> shall be the product of: the embedded cost of preferred stock outstanding at the end of each year; and the sum of (a) the ratio that preferred stock is to the total capital multiplied by 70%, plus (b) 0% pro-forma capital structure multiplied by 30%.

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

(iii)   <u>the return on equity component</u> shall be the product of: the allowed ROE of the common equity; and the sum of (a) the ratio that common equity is to the total capital multiplied by 70%, plus (b) 50% pro-forma capital structure multiplied by 30%. The allowed ROE shall be 10.57%, plus any additional incentive ROE adders as may be applied to specific investment approved by the Commission pursuant to Order No. 679, provided that the total ROE for any project, including any such ROE incentives, shall be capped by the top of the applicable zone of reasonableness determined by FERC for the relevant period. The allowed ROE shall be subject to revision at any time by unilateral filing by NSTAR under Section 205 of the FPA or by such Section 205 filing by NSTAR on a joint basis with other New England transmission owners. In either case, the revised ROE shall become effective no later than sixty days after the filing in accordance with the provisions of the FPA and also subject to any suspension or refund condition which the Commission may order pursuant to its authority under that Section. Any filing made by NSTAR to revise the ROE in compliance with a Commission order shall become effective as of the date specified in such order and shall raise no issue regarding this Local Service Schedule other than the compliance with the Commission order. The allowed ROE is also subject to revision pursuant to the authority of the Commission under Sections 205 and 206 of the FPA.

(b)   <u>Federal Income Tax</u> shall equal

$$\frac{(A+[(C+B)/D])(FT)}{1-FT}$$

where FT is the Federal Income Tax Rate and A is the weighted return on equity component, including preferred, as determined in Sections II.A.2.(a)(ii) and (iii) above, B is Transmission Related Amortization of Investment Tax Credits, as determined in Section II.D below, C is the equity AFUDC component of Transmission Depreciation and Amortization Expense, as defined in Section II.B below, and D is Transmission

USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 553 of 580

Investment Base, as determined in Section II.A.1 above.

(c)     <u>State Income Tax</u> shall equal

$$\frac{(A+[(C+B)/D] + \text{Federal Income Tax})(ST)}{1 - ST}$$

where ST is the State Income Tax Rate, A is the weighted return on equity component, including preferred, determined in Sections II.A.2.(a)(ii) and (iii) above, B is the Amortization of Investment Tax Credits as determined in Section II.D below, C is the equity AFUDC component of Transmission Depreciation and Amortization Expense, as defined in Section II.B below, D is the Transmission Investment Base, as determined in II.A.1 above and Federal Income Tax is the rate determined in Section II.A.2.(b) above.

B.     <u>Transmission Depreciation and Amortization Expense</u> shall equal the sum of (i) the Depreciation Expense for Transmission Plant and (ii) an allocation of Intangible Plant Amortization Expense and General Plant Depreciation Expense, which is calculated by multiplying the sum of (a) Intangible Plant Amortization Expense and (b) General Plant Depreciation Expenses by the Transmission Wages and Salaries Allocation Factor; less the Amortization of AFUDC Regulatory Credit as recorded in FERC Account No. 407.4.

C.     <u>Transmission Related Amortization of Gain/Loss on Reacquired Debt</u> shall equal the electric Amortization of Gain/Loss on Reacquired Debt multiplied by the Plant Allocation Factor.

D.     <u>Transmission Related Amortization of Investment Tax Credits</u> shall equal the electric Amortization of Investment Tax Credits multiplied by the Plant Allocation Factor.

E.     <u>Transmission Related Municipal Tax Expense</u> shall equal the total electric municipal tax expense reported in the Company's FERC Form 1, page 263, Local Real Estate and Personal Property Taxes, column (i), multiplied by the Plant Allocation Factor.

**JA538**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

F.     <u>Transmission Related Payroll Tax Expense</u> shall equal the total electric payroll tax expense reported in the Company's FERC Form 1, page 263, Service Company Allocations and Capitalization, column (i), multiplied by the Transmission Wages and Salaries Allocation Factor.

G.     <u>Transmission Operation and Maintenance Expense</u> shall equal the Transmission Operation and Maintenance Expenses in Section I.B above.

H.     <u>Transmission Related Administrative and General Expenses</u> shall equal the sum of the (1) Administrative and General Expense multiplied by the Transmission Wages and Salaries Allocation Factor, (2) Property Insurance included in FERC Account No. 924, line 156 multiplied by the Transmission Plant Allocation Factor, (3) expenses included in Account No. 928(excluding Merger-Related Costs included in Account No. 928), line 160 related to (i) transmission related FERC Assessments, plus (ii) any other Federal and State transmission related expenses or assessments, plus (iii) the cost of any independent audit requested by the Mass AG as the representative for NSTAR's retail customers and (4) Transmission Merger-Related Costs.  The amount of PBOP expense shall be separately stated.  NSTAR commits to adhere to: (i) the Commission's PBOP policy as expressed in the Commission's December 17, 1992, Statement of Policy in Docket No. PL93-1-000, as the Commission may amend that policy from time to time in the future; and (ii) the provisions of Financial Accounting Statement 106, Employers' Accounting for Postretirement Benefits Other Than Pensions.

I.     <u>Transmission Related Integrated Facilities Charges</u> shall equal the transmission payments to Affiliates for use of the integrated transmission facilities of those Affiliates included in FERC Account No. 565.

J.     <u>Transmission Support Revenues</u> shall equal the revenue received for transmission support included or includable in FERC Account Nos. 454 and 456 but excluding any revenue received for use of the Company's entitlement in the Hydro-Quebec Facilities.

K.     <u>Transmission Support Expense</u> shall equal the expense paid by the Company for transmission

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

support included in FERC Account No. 565, but excluding expenses for the Hydro-Quebec DC Facilities.

L.    <u>Transmission-Related Expense from Generators</u> shall equal the expenses from generators that are reflected in a filing made by the Company with the Commission under Section 205 of the Federal Power Act and accepted by the Commission for recovery under the Local Service Schedule and included or includable in FERC Account No. 565.

M.    <u>Transmission Rents Received from Electric Property</u> shall equal any FERC Account Nos. 454 and 456 Rents from Electric Property, associated with Transmission Plant but not reflected as a credit in Transmission Support Revenues in Section II.J.

N.    <u>Short-Term and Non-Firm Point-to-Point Service Revenues</u> shall equal the applicable wheeling revenues received for Local Point-To-Point Service provided under this Local Service Schedule, including the transmission component of the Company's Third-Party Sales, as recorded in FERC Account Nos. 447 and 456.1.

O.    <u>Regional Network Services (RNS) Revenues</u> shall equal the Company's RNS revenues pursuant to the Tariff, as included or includable in FERC Account Nos. 454, 456 and 456.1 but excluding any incremental revenues associated with FERC-approved adders for RTO participation and new investment.

P.    <u>Through or Out Revenues</u> shall equal the distribution of revenues received by the Company for Through or Out Service pursuant to the Tariff as included or includable in FERC Account Nos. 454 and 456.1.

Q.    <u>ISO-NE Scheduling and Dispatch Revenues</u> shall be the amount of revenues received by the Company from ISO-NE for scheduling and dispatch services pursuant to the Tariff as included or includable in FERC Account Nos. 454, 456 and 456.1.

**JA540**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**ATTACHMENT E**

**INDEX OF LOCAL NETWORK SERVICE CUSTOMERS**

| Customer | Date of Service Agreement |
|---|---|
| ANP Blackstone Energy Company | October 1, 2000 |
| Entergy Nuclear Generation Company | September 1, 1999 |
| New England Power Company | September 6, 1996 |
| NSTAR Electric Company | December 24, 1996 |
| Sithe New Boston LLC | September 1, 1998 |
| Sithe Framingham LLC | September 1, 1998 |
| Sithe Mystic LLC | September 1, 1998 |
| Sithe Edgar LLC | September 1, 1998 |
| Sithe West Medway LLC | September 1, 1998 |
| Town of Braintree Municipal Light Dept. | March 1, 1997 |
| Town of Concord Municipal Light Plant | June 21, 2002 |
| Town of Hingham Municipal Light Plant | March 1, 1997 |
| Town of Hull Municipal Light Plant | March 1, 1997 |
| Town of Norwood Municipal Light Dept. | September 6, 1996 |
| Town of Reading Municipal Light Plant | March 1, 1997 |
| Town of Wellesley Municipal Light Plant | June 21, 2002 |

**JA541**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**ATTACHMENT F**

**<u>FORMULA RATE TEMPLATE</u>**



**NSTAR Electric Company**

**Annual Local Network Service Revenue Requirement**

**Service Year Ended December 31, xxxx**

This template does not change the other provisions of this Schedule 21. The template is not a substitute for Schedule 21 language. If an inconsistency between the Schedule 21 language and the template arises, the Schedule 21 language is controlling. The template is illustrative and the actual true-up filing as made from time to time may include format changes or reflect non-material changes required by the Uniform System of Accounts.

**Sheet 1**

| Line | Description (a) | Section (b) | Amount (c) | Reference (d) |
|---|---|---|---|---|
| 1 | **Investment Base** | II.A.1 | | |
| 2 | Transmission Plant | II.A.1.a | $    - | Sheet 3, Line 1, Col (f) |
| 3 | Transmission Related Intangible & General Plant | II.A.1.b | - | Sheet 3, Line 4, Col (f) |
| 4 | Transmission Plant Held for Future Use | II.A.1.c | - | Sheet 3, Line 5, Col (f) |
| 5 | Transmission Related Construction Work in Progress | II.A.1.d | - | Sheet 3, Line 6, Col (f) |
| 6 | Total Plant | | - | Sum Lines 2 thru 5 |
| | | | | |
| 7 | Trans Related Depreciation and Amortization Reserve | II.A.1.e | - | Sheet 3, Line 12, Col (f) |
| 8 | Transmission Related Accumulated Deferred Taxes | II.A.1.f | - | Sheet 3, Line 20, Col (f) |
| 9 | AFUDC Regulatory Liability | II.A.1.g | - | Sheet 3, Line 21, Col (f) |
| 10 | Total Net Plant | | - | Sum Lines 6 thru 9 |
| | | | | |
| 11 | Transmission Related Gain/Loss on Reacquired Debt | II.A.1.h | - | Sheet 3, Line 22, Col (f) |
| 12 | Other Trans Related Regulatory Assets/Liabilities | II.A.1.i | - | Sheet 3, Line 28, Col (f) |
| 13 | Transmission Prepayments | II.A.1.j | - | Sheet 3, Line 29, Col (f) |
| 14 | Transmission Materials & Supplies | II.A.1.k | - | Sheet 3, Line 30, Col (f) |
| 15 | Transmission Related Cash Working Capital | II.A.1.l | - | Sheet 3, Line 35, Col (f) |
| 16 | **Total Investment Base** | | $    - | Sum Lines 10 thru 15 |
| | | | | |
| 17 | **Revenue Requirement** | | | |
| 18 | Investment Return and Income Taxes | II.A.2 | $    - | Sheet 2, Line 39, Col (c) |
| 19 | Transmission Depreciation and Amortization Expense | II.B | - | Sheet 4, Line 7, Col (f) |
| 20 | Amortization of Gain/Loss on Reacquired Debt | II.C | - | Sheet 4, Line 8, Col (f) |
| 21 | Transmission Related Amort. of Investment Tax Credits | II.D | - | Sheet 4, Line 9, Col (f) |
| 22 | Transmission Related Municipal Tax Expense | II.E | - | Sheet 4, Line 10, Col (f) |
| 23 | Transmission Related Payroll Tax Expense | II.F | - | Sheet 4, Line 11, Col (f) |
| 24 | Transmission Operation & Maintenance Expense | II.G | - | Sheet 4, Line 30, Col (f) |
| 25 | Trans Related Administrative and General Expense | II.H | - | Sheet 4, Line 44, Col (f) |
| 26 | Transmission Related Integrated Facilities Charges | II.I | - | Sheet 5, Line 10, Col (e) |
| 27 | Transmission Support Revenues | II.J | - | Sheet 5, Line 15, Col (e) |
| 28 | Transmission Support Expense | II.K | - | Sheet 5, Line 20, Col (e) |
| 29 | Transmission Related Expense from Generators | II.L | - | Sheet 5, Line 23, Col (e) |
| 30 | Transmission Rents Received from Electric Property | II.M | - | Sheet 5, Line 28, Col (e) |
| 31 | Short-Term and Non-Firm P-T-P Service Revenues | II.N | - | Sheet 5, Line 31, Col (e) |
| 32 | Regional Network Services (RNS) Revenues | II.O | - | Sheet 5, Line 36, Col (e) |
| 33 | Through or Out Revenues | II.P | - | Sheet 5, Line 39, Col (e) |
| 34 | ISO-NE Scheduling and Dispatch Revenues | II.Q | - | Sheet 5, Line 43, Col (e) |
| 35 | **Total LNS Revenue Requirement** | | $    - | Sum Lines 18 thru 34 |
| | | | | |
| 36 | Wholesale LNS Revenues Received: | | | |
| 37 | Item # 1 | | - | |
| 38 | Item #2 | | - | |

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

| 39 | Last Item | | - | |
| 40 | Total Wholesale LNS Revenue | $ | - | Sum Lines 37 thru 39 |
| 41 | **Total Retail LNS Revenue Requirement** | $ | - | Line 35 - Line 40 |
| | | | | |
| 42 | Average 12 CP | | | |
| 43 | Sum of Monthly Peaks (kw) | | - | FF1: 400.17(b) |
| 44 | Average Peak | | - | Line 43 / 12 |
| | | | | |
| 45 | Annual Rate per kw | $ | - | Line 35 / Line 44 |
| 46 | Monthly Rate per kw | $ | - | Line 45 / 12 |
| 47 | Daily Rate per kw | $ | - | Line 45 / 365 |

**NSTAR Electric Company**
**Investment Return and Income Taxes**
**Service Year Ended December 31, xxxx**
**Sheet 2**

| | (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) |
|---|---|---|---|---|---|---|---|---|
| | | **Tariff** | | **Capitalization** | | **Weighted** | **Equity** | |
| **Line** | **Description** | **Section** | **Balance** | **Ratio \*** | **Cost \*** | **Cost \*** | **Cost** | **Reference** |
| 1 | **Weighted Cost of Capital** | II.A.2.a | | | | | | |
| 2 | Long Term Debt | II.A.2.a.i | $        - | | 0.0000% | 0.0000% | | FF1: Page 112.24(c) |
| 3 | Preferred Stock | II.A.2.a.ii | - | | 0.0000% | 0.0000% | 0.0000% | FF1: Page 112.16(c) |
| | | | | | | | | FF1: Page 112.16(c) - Line |
| 4 | Common Equity | II.A.2.a.iii | _____- | | 0.0000% | 0.0000% | 0.0000% | 3(c) |
| 5 | Total | | $        - | | | 0.0000% | 0.0000% | Sum Lines 2 thru 4 |
| | | | | | | | | |
| 6 | **Investment Return** | II.A.2 | | | | | | |
| 7 | Total Investment Base | | $        - | | | | | Sheet 1, Line 16, Col (c) |
| 8 | Weighted Cost of Capital | | 0.0000% | | | | | Line 5, Col (f) |
| 9 | Total Return on Investment | | $        - | | | | | Line 7 \* Line 8 |
| | | | | | | | | |
| 10 | **Federal Income Tax** | II.A.2.b | | | | | | |
| 11 | A = Equity Cost | | 0.0000% | | | | | Line 5, Col (g) |
| | B = Transmission | | | | | | | |
| 12 | Amortization of ITC | | $        - | | | | | Sheet 1, Line 21, Col (c) |
| 13 | C = Equity AFUDC | | - | | | | | FF1: Page 117.38 |
| 14 | Total B + C | | - | | | | | Line 12 + Line 13 |
| 15 | D = Investment Base | | - | | | | | Line 7 |
| 16 | (B + C) / D | | 0.00% | | | | | Line 14 / Line 15 |
| 17 | (A + [(C + B) / D] | | 0.00% | | | | | Line 11 + Line 16 |
| | FT = Federal Income Tax | | | | | | | |
| 18 | Rate | | 35.00% | | | | | Federal corporate tax rate |
| 19 | 1 - FT | | 65.00% | | | | | 1 - Line 18 |
| 20 | Federal Tax Factor | | 0.00000% | | | | | Line 17 \* Line 18 / Line 19 |
| 21 | Total Federal Income Taxes | | $        - | | | | | Line 15 \* Line 20 |
| | | | | | | | | |
| 22 | **State Income Tax** | II.A.2.c | | | | | | |
| 23 | A = Equity Cost | | 0.0000% | | | | | Line 5, Col (g) |
| | B = Transmission | | | | | | | |
| 24 | Amortization of ITC | | $        - | | | | | Sheet 1, Line 21, Col (c) |
| 25 | C = Equity AFUDC | | - | | | | | |
| 26 | Total B + C | | - | | | | | Line 24 + Line 25 |
| 27 | D = Investment Base | | - | | | | | Line 7 |
| 28 | (B + C) / D | | 0.00% | | | | | Line 26 / Line 27 |
| 29 | (A + [(C + B) / D] | | 0.00% | | | | | Line 23 + Line 28 |
| | ST = State Income Tax | | | | | | | Massachusetts corporate tax |
| 30 | Rate | | 6.50% | | | | | rate |
| 31 | 1 - ST | | 93.50% | | | | | 1 - Line 30 |
| 32 | Federal Tax Factor | | 0.00000% | | | | | Line 23 |
| | | | | | | | | (Line 29 + Line 32) \* Line 30 |
| 33 | State Tax Factor | | 0.00000% | | | | | / Line 31 |
| 34 | Total State Income Taxes | | $        - | | | | | Line 27 \* Line 33 |
| | | | | | | | | |
| 35 | **Investment Return and Income Taxes** | II.A.2 | | | | | | |
| 36 | Return on Investment | | $        - | | | | | Line 9 |

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

| | | | | |
|---|---|---|---|---|
| 37 | Federal Income Taxes | - | | Line 21 |
| 38 | State Income Taxes | - | | Line 34 |
| | **Total Return and Income** | | | |
| 39 | **Taxes** | $ - | | Sum Lines 36 thru 38 |

\*    Note that weighting and cost are determined on Sheet 7

**JA546**



**NSTAR Electric Company**
**Investment Base**
**Service Year Ended December 31, xxxx**
**Sheet 3**

| | (a) | (b) | (c) | (d) | (e) | (f) | (g) |
|---|---|---|---|---|---|---|---|
| | | **Tariff** | | | **Allocations** | | |
| | | | | | **LNS** | | |
| **Line** | **Description** | **Section** | **Total** | **Allocator** | **Factor** | **Amount** | **Reference** |
| 1 | **Transmission Plant** | II.A.1.a | $    - | Direct | 100.0000% | - | FF1: Page 207.58(g) |
| 2 | General Plant | | - | W&S | 0.0000% | - | FF1: Page 207.99(g) |
| 3 | Intangible Plant | | - | W&S | 0.0000% | - | FF1: Page 205.5(g) |
| 4 | **Total Intangible & General Plant** | II.A.1.b | - | | | - | Sum Lines 2 thru 3 |
| 5 | **Transmission Plant Held for Future Use** | II.A.1.c | | Direct | 100.0000% | - | FF1: Page 214.10&.23(d) |
| 6 | **Transmission Related CWIP** | II.A.1.d | - | CWIP | 50.0000% | - | FF1: Page 216(b) Trans only |
| 7 | **Transmission Related Dep & Amort Reserve** | II.A.1.e | | | | | |
| 8 | Transmission Accumulated Depreciation | | - | Direct | 100.0000% | - | FF1: Page 219.25(b) |
| 9 | General Plant Accumulated Depreciation | | - | W&S | 0.0000% | - | FF1: Page 219.28(b) |
| 10 | General Plant Accumulated Amortization | | - | W&S | 0.0000% | - | FF1: Page 200.21(c) Footnote |
| 11 | Intangible Plant Accumulated Amortization | | - | W&S | 0.0000% | - | FF1: Page 200.21(c) Footnote |
| 12 | Total Transmission Related Depreciation Reserve | | - | | | - | Sum Lines 8 thru 11 |
| 13 | **Transmission Accumulated Deferred Taxes** | II.A.1.f | | | | | |
| 14 | Accumulated Deferred Taxes (190) | | - | | 0.0000% | - | Sheet 8, Line 5, col (d) |
| 15 | Accumulated Deferred Income Taxes (281) | | - | | | - | FF1: Page 113.62(c) |
| 16 | Accumulated Deferred Taxes - Property (282) | | - | | | | FF1: Page 275.9(k) |
| 17 | Less Transition Property | | - | | | | FF1: Page 275.4(k) |
| 18 | Net Acc. Def. Income Taxes - Other Property (282) | | - | Plant | 0.0000% | - | Sum Lines 16 thru 17 |
| 19 | Accumulated Deferred Income Taxes - Other (283) | | - | | 0.0000% | - | Sheet 8, Line 10, col (d) |
| 20 | Total | | | | | - | Sum Lines 17 thru 19 |
| 21 | **AFUDC Regulatory Liability** | II.A.1.g | - | Direct | 100.00% | - | FF1: Page 278.6(f) |
| 22 | **Gain/Loss on Reacquired Debt** | II.A.1.h | - | Plant | 0.0000% | - | FF1: Page 111.81(c)+113.61(c) |
| 23 | **Other Regulatory Assets** | II.A.1.i | | | | | |
| 24 | FAS 106 (182.3 & 254) | | - | W&S | 0.0000% | - | FF1: Page 232.1.39(f)+278.(f) |
| 25 | FAS 109 (182.3 & 254) | | - | | | | FF1: Page 232.1.29(f) |
| 26 | Less FAS 109 - Liability (182.3 & 254) | | - | | | | FF1: Page 278.2(f) |
| 27 | Net FAS 109 (182.3 & 254) | | - | Plant | 0.0000% | - | Sum Lines 25 thru 26 |

**JA547**



| 28 | Total Other Regulatory Assets | | | | | | Line 24 + line 27 |
|---|---|---|---|---|---|---|---|

|  |  |  |  |  |  |  | FF1: Page 111.57(c)+ |
|---|---|---|---|---|---|---|---|
| 29 | **Prepayments** | II.A.1.j | - | W&S | 0.0000% | - | 232.2.8(f) |

|  |  |  |  |  |  |  | FF1: Page 227.8(c)+227.5(c) |
|---|---|---|---|---|---|---|---|
| 30 | **Transmission Materials & Supplies** | II.A.1.k | - | Direct | 100.0000% | - | Trans |

| 31 | **Cash Working Capital** | II.A.1.l | | | | | |
|---|---|---|---|---|---|---|---|
| 32 | Operation & Maintenance Expense | | - | WC | 12.50% | - | Sheet 1, Line 24, col (c) |
| 33 | Administrative & General Expense | | - | WC | 12.50% | - | Sheet 1, Line 25, col (c) |
| 34 | Transmission Support Expenses | | - | WC | 12.50% | - | Sheet 1, Line 28, col (c) |
| 35 | Total Cash Working Capital | | - | | | - | Sum Lines 32 thru 33 |

|  | **Allocation** | | |
|---|---|---|---|
| 36 | **Description** | **Factor** | **Reference** |
| 37 | Direct Allocation (Direct) | 100.0000% | |
| 38 | Wages & Salary (W&S) | 0.0000% | Sheet 6, Line 6(c) |
| 39 | Plant Allocation (Plant) | 0.0000% | Sheet 6, Line 14(c) |
| 40 | Construction Work in Progress Allocation (CWIP) | 50.0000% | Sheet 6, Line 15(c) |
| 41 | Cash Working Capital (WC) | 12.50% | Tariff Section II.A.1.l |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-012
Page 199 of 215

**NSTAR Electric Company**
**Transmission Expenses**
**Service Year Ended December 31, xxxx**
**Sheet 4**

| | (a) | (b) | (c) | (d) | (e) | (f) | (g) |
|---|---|---|---|---|---|---|---|
| | | **Tariff** | | | | **Allocations** | |
| **Line** | **Description** | **Section** | **Total** | **Allocator** | **Factor** | **LNS Amount** | **Reference** |
| 1 | **Transmission Depreciation Expense** | II.B | | | | | |
| 2 | Transmission Depreciation | II.B.i | | Direct | 100.00% | $ - | FF1: Page 336.7(f) |
| 3 | General Plant Depreciation and Amortization | II.B.ii | | W&S | 0.00% | - | FF1: Page 336.10(f) |
| 4 | Amortization of Transmission Related Intangible Plant | | | W&S | 0.00% | - | FF1: Page 336.1(f) |
| 5 | Amortization of AFUDC Regulatory Credit | | - | | | - | FF1: Page 278.6(d) (amort) |
| 6 | Net Amortization of Transmission Related Intangible Plant | | - | | | - | Sum Lines 4 and 5 |
| 7 | Total Transmission Depreciation Expense | | $ - | | | $ - | Sum Lines 2, 3 and 6 |
| 8 | **Amortization of Gain/Loss on Reacquired Debt** | II.C | | Plant | 0.00% | $ - | FF1: Page 117.64c |
| 9 | **Transmission Related Amortization of ITC** | II.D | | Plant | 0.00% | - | FF1: Page 114.19(c) |
| 10 | **Transmission Related Municipal Tax Expense** | II.E | | Plant | 0.00% | - | FF1: Page 263.5(i) |
| 11 | **Transmission Related Payroll Tax Expense** | II.F | | W&S | 0.00% | - | FF1: Page 263.8i |
| 12 | **Transmission Operation and Maintenance Expense** | II.G | | | | | |
| 13 | Operation Supervision & Engineering (560) | | | Direct | 100.00% | $ - | FF1: Page 321.83(b) |
| 14 | Load Dispatching (561) | | - | Internal Costs | | - | FF1: Page 321.83(b) |
| 15 | Load Dispatch - Reliability (561.1) | | - | Internal Costs | | - | FF1: Page 321.85(b) footnote |
| 16 | Load Dispatch-Mon and Oper Trans System (561.2) | | - | Internal Costs | | - | FF1: Page 321.86(b) footnote |
| 17 | Load Dispatch-Trans Service and Scheduling (561.3) | | - | Internal Costs | | - | FF1: Page 321.87(b) footnote |
| 18 | Scheduling, System Control and Dispatch Services (561.4) | | - | Internal Costs | | - | FF1: Page 321.88(b) footnote |

**JA549**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-012
Page 200 of 215

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 19 | Reliability, Planning and Standards Development (561.5) | | - | Internal Costs | | - | FF1: Page 321.89(b) |
| 20 | Transmission Service Studies (561.6) | | - | Internal Costs | | - | FF1: Page 321.90(b) |
| 21 | Generation Interconnection Studies (561.7) | | - | Internal Costs | | - | FF1: Page 321.91(b) |
| 22 | Reliability, Planning and Standards Development (561.8) | | - | Internal Costs | | - | FF1: Page 321.92(b) footnote |
| 23 | Station Expenses (562) | | - | Direct | 100.00% | - | FF1: Page 321.93(b) |
| 24 | Overhead Lines Expenses (563) | | - | Direct | 100.00% | - | FF1: Page 321.94(b) |
| 25 | Underground Lines Expenses (564) | | - | Direct | 100.00% | - | FF1: Page 321.95(b) |
| 26 | Miscellaneous Transmission Expenses (566) | | - | Direct | 100.00% | - | FF1: Page 321.97(b) |
| 27 | Rents (567) | | - | Direct | 0.00% | - | Sheet 5, Line 7, col (d) |
| 28 | Transmission Maintenance (568 - 573) | | - | Direct | 100.00% | - | FF1: Page 321.111(b) |
| 29 | Regional Market Expense (575) | | - | Internal Costs | 0.00% | - | FF1: Ppage 322.131(b) |
| 30 | Total Transmission O&M Expense | | $ - | | | $ - | Sum Lines 13 thru 28 |
| | | | | | | | |
| 31 | **Transmission Related A&G Expenses** | II.H | | | | | |
| 32 | Administrative and General Expenses | | $0 | | | | FF1: Page 323.197(b) |
| 33 | Property Insurance (924) | | - | | | | FF1: Page 323.185(b) |
| 34 | Employee Pension and Benefits (926) | | - | | | | FF1: Page 323.187(b) |
| 35 | Regulatory Commission Expense (928) | | - | | | | FF1: Page 323.189(b) |
| 36 | General Advertising Expense (930.1) | | - | | | | FF1: Page 323.191(b) |
| 37 | Merger Related Costs | | - | | | | FF1: Page 320 FN |
| 38 | Sub-Total | | - | W&S | 0.00% | | Sum Lines 32 thru 37 |
| 39 | Property Insurance (924) | II.H.2 | - | Plant | 0.00% | - | Line 33 |
| 40 | Employee Pension and Benefits (926) - Note 1 | II.H.1 | - | W&S | 0.00% | - | Line 34 |
| 41 | Regulatory Commission Expense (928) | II.H.3 | - | Footnote | 0.00% | - | Line 59 |
| 42 | General Advertising Expense (930.1) | II.H | - | Direct | 0.00% | - | Line 36 |
| 43 | Transmission Merger Related Costs | | - | Direct | 100.00% | - | FF1: Page 320 FN |
| 44 | Total Transmission Related A&G Expenses | | $ - | | | $ - | Sum Lines 39 thru 43 |
| | | | | | | | |
| 45 | Regulatory Commission Expense (928) | II.H.3 | | | | | |
| 46 | DPU - General Assessment | | $ - | | 0.00% | $ - | FF1: Page 350.1 (d) |
| 47 | DPU - Appropriation Account | | - | | 0.00% | - | FF1: Page 350.2 (d) |
| 48 | DPU - AGO Assessment #1 | | - | | 0.00% | - | FF1: Page 350.3 (d) |

**JA550**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

| | Description | | Allocation Factor | Reference | |
|---|---|---|---|---|---|
| 49 | DPU - AGO Assessment #2 | - | | 0.00% | - | FF1: Page 350.4 (d) |
| 50 | DPU - Outage Reporting Assessment | - | | 0.00% | - | FF1: Page 350.5 (d) |
| 51 | DPU - Manhole Cover Assessment | - | | 0.00% | - | FF1: Page 350.6 (d) |
| 52 | DPU - Stray Voltage Assessment | - | | 0.00% | - | FF1: Page 350.7 (d) |
| 53 | MA Emergency Management Agency | - | | 0.00% | - | FF1: Page 350.8 (d) |
| 54 | FERC Assessment | - | Direct | 100.00% | - | FF1: Page 350.9 (d) |
| 55 | FER LICAP Docket | - | Direct | 100.00% | - | FF1: Page 350.10 (d) |
| 56 | FERC RMR Docket | - | Direct | 100.00% | - | FF1: Page 350.11 (d) |
| 57 | FERC Docket ER07-549, Including cost of audit | - | Direct | 100.00% | - | FF1: Page 350.12 (d) |
| 58 | DPU Regulatory Proceeding Costs 05-85 | - | | 0.00% | - | FF1: Page 350.13 (d) |
| 59 | Total Regulatory Commission Expenses | II.H.3 - | | 0.00% | - | Sum Lines 46 thru 58 |

| | | Allocation Factor | Reference |
|---|---|---|---|
| | **Description** | **Factor** | **Reference** |
| 60 | Direct Allocation (Direct) | 100.0000% | |
| 61 | Wages & Salaries Allocation (W&S) | 0.0000% | Sheet 6, Line 6(c) |
| 62 | Plant Allocation (Plant) | 0.0000% | Sheet 6, Line 14(c) |

63 **Note 1**

64 Included in the Employee Pension and Benefits Expenses are costs related to Post Retirement Benefits other than Pension (PBOP). PBOP costs are determined

65 by an independent actuary as required by FASB 106. The PBOP expense included in Account 926 for 20xx was $xx,xxx,xxx as compared to $xx,xxx,xxx in the prior year;

66 as shown

67 on the FF1, Page 323, footnote. Applying the labor allocator to the total PBOP expense results in $x,xxx,xxx of PBOP expense being recovered through the LNS Tariff

68 in 20xx as compared to $x,xxx,xxx in the prior year.

**JA551**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018



**NSTAR Electric Company**
**Support Expense & Revenue Detail**
**Service Year Ended December 31, xxxx**
**Sheet 5**

| Line | (a) Description | (b) Tariff Section | (c) Amount | (d) Includable Amount | (e) Reference |
|---|---|---|---|---|---|
| 1 | Transmission Rents (Account 567) | II.G | | | |
| 2 | Hydro Quebec DC Phase I Support | | | - | FF1: Page 320.98 (b) Footnote |
| 3 | Hydro Quebec DC Phase II Support | | | - | FF1: Page 320.98 (b) Footnote |
| 4 | New England Power Support | | | - | FF1: Page 320.98 (b) Footnote |
| | Hydro Quebec Phase II NEP AC, Chester | | | | |
| 5 | SVC | | | - | FF1: Page 320.98 (b) Footnote |
| 6 | Transmission Line Rents | | - | - | FF1: Page 320.98 (b) Footnote |
| 7 | Total Transmission Rents Received | | - | - | Sum Lines 2 thru 6 |
| | Transmission Related Integrated Facilities | | | | |
| 8 | Charges | II.I | - | - | |
| 9 | - none - | | | | |
| 10 | Total Trans Related Integrated Facilities Charges | | - | - | Sum Lines 9 thru 9 |
| 11 | Transmission Support Revenues 456 & 456.1 | II.J | | | |
| 12 | Item #1 | | $ - | | FF1: Page 300.21(b) Footnote |
| 13 | Item # 2 | | | - | FF1: Page 300.21(b) Footnote |
| 14 | Last Item | | - | - | FF1: Page 300.22(b) Footnote |
| 15 | Total Short Term & Non-Firm PTP Revenues | | $ - | $ - | Sum Lines 12 thru 14 |
| 16 | Transmission Support Expense (565) | II.K | | | |
| 17 | Item #1 | | | - | FF1 Q2: Page 332.2(h) |
| 18 | Item # 2 | | | - | FF1 Q3: Page 332.2(h) |
| 19 | Last Item | | - | - | FF1: Page 332.2(h) |
| 20 | Total Transmission Support Expense | | - | - | Sum Lines 17 thru 19 |
| 21 | Transmission Related Expense from Generators | II.L | | | N/A |
| 22 | - none - | | | - | |
| 23 | Total Trans Related Expense from Generators | | | - | Sum Lines 22 thru 22 |
| 24 | Rents Received from Electric Property (454) | II.M | | | |
| 25 | Item #1 | | | - | FF1: Page 300.19(b) Footnote |
| 26 | Item # 2 | | | - | FF1: Page 300.19(b) Footnote |
| 27 | Last Item | | | - | FF1: Page 300.19(b) Footnote |
| 28 | Total Rents Received | | - | - | Sum Lines 25 thru 27 |
| 29 | Short-Term and Non-Firm Point-to-Point Rev | II.N | $ - | $ - | N/A |
| 30 | - none - | | | | |
| 31 | Total ST and Non-Firm Point-to-Point Revenues | | - | - | Sum Lines 30 thru 30 |
| 32 | Regional Network Service Revenues (456): | II.O | | | |
| 33 | RNS Transmission Revenue | | - | - | |
| 34 | RNS PTF Post 2003 investment 1 % Adder | | - | - | RNS Revenue Requirement |
| 35 | RNS PTF RTO Participation 0.5% Adder | | - | - | RNS Revenue Requirement |

| | | | | | |
|---|---|---|---|---|---|
| 36 | Total Regional Network Services Revenues | | ___ - | ___ - | Sum Lines 33 thru 35 |
| 37 | Through or Out Revenues | II.P | $ - | $ - | N/A |
| 38 | - none - | | ___ - | ___ - | |
| 39 | Total Through or Out Revenue | | ___ - | ___ - | Sum Lines 38 thru 38 |
| 40 | ISO-NE Scheduling & Dispatch Revenue | II.Q | | | |
| 41 | Nepool Scheduling & Dispatch Revenue | | - | - | |
| 42 | RTO Participation 0.5% Adder | | ___ - | ___ - | Reguional Schedule 1 Revenue Requirement |
| 43 | Total ISO-NE Scheduling & Dispatch Revenue | | ___ - | ___ - | Sum Lines 42 thru 42 |

**JA553**

USCA Case #20-1343     Document #1935613     Filed: 02/17/2022     Page 569 of 580

**NSTAR Electric Company**

**Allocation Factors**

**Service Year Ended December 31, xxxx**

**Sheet 6**

| | | (a) | (b) | (c) | | (d) |
|---|---|---|---|---|---|---|
| | | | **Tariff** | | | |
| **Line** | | **Description** | **Section** | **Amount** | | **Reference** |
| | | **Transmission Wages & Salaries Allocation** | | | | |
| 1 | | **Factor** | I.A.1 | | | |
| 2 | | Transmission Related Direct Wages & Salaries | | $ - | | FF1: Page 354.21(b) |
| 3 | | Total Direct Wages & Salaries | | - | | FF1: Page 354.28(b) |
| 4 | | Administrative & General Wages & Salaries | | <u>-</u> | | FF1: Page 354.27(b) |
| 5 | | Net Total Direct Wages & Salaries | | - | | Line 3 less Line 4 |
| 6 | | Transmission Wages & Salaries Allocation Factor | | **0.0000%** | | Line 2 / Line 5 |
| 7 | | **Plant Allocation Factor** | I.A.2 | | | |
| 8 | | Transmission Plant Investment | | $ - | | FF1: Page 207.58(g) |
| 9 | | HQ Leases | | - | | |
| 10 | | Transmission Related General Plant | | - | | Sheet 3, Line 2, Col (f) |
| 11 | | Transmission Related Intangible Plant | | <u>-</u> | | Sheet 3, Line 3, Col (f) |
| 12 | | Total Transmission Plant Investment | | - | | Sum Lines 8 thru 11 |
| 13 | | Total Plant in Service | | - | | FF1: Page 207.104(g) |
| 14 | | Plant Allocation Factor | | **0.0000%** | | Line 12 / Line 13 |

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

**Construction Work in Progress Allocation**

15 **Factor** II.A.1.d **50.0000%**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-012
Page 206 of 215

**NSTAR Electric Company**
**Cost of Long Term Debt**
**Service Year Ended December 31, xxxx**
**Sheet 7**

| Line | Series | Dated | Term (Years) | Coupon Rate | Original Issue | Principal Amount Outstanding | Percent of Total | Debt Disc & Exp | Call Premium on Debt | Net Proceeds | Cost to Maturity | Weighted Cost | Reference |
|------|--------|-------|------|------|------|------|------|------|------|------|------|------|------|
| | | (a) FF1:256(a) | (b) FF1:256(d) Long Term Debt | (c) | (d) FF1:256(e) | (e) FF1:256(b) | (f) FF1:256(h) | (g) | (h) FF1:256(c) | (i) | (j) | (k) | (l) | (m) |
| | | | | | | | | Col f / Col f Total | | | Col f - Col h - Col i | Col d + ((Col h + Col i) / (Col e / Col d)) | Col h * Col g | |
| 1 | MIFA Bonds | 2/8/94 | 20 | 5.75% | | | 0.00% | | | | 0.0000% | 0.0000% | FF1: Page 256 & 257 |
| 2 | 4.875% Debentures | 4/13/04 | 10 | 4.875% | | | 0.00% | | | | 0.0000% | 0.0000% | FF1: Page 256 & 257 |
| 3 | 7.8% Debentures | 5/10/95 | 15 | 7.80% | | | 0.00% | | | | 0.0000% | 0.0000% | FF1: Page 256 & 257 |
| 4 | 4.875 Debentures | 10/9/02 | 10 | 4.875% | | | 0.00% | | | | 0.0000% | 0.0000% | FF1: Page 256 & 257 |
| 5 | 5.75% Debentures | 3/13/06 | 30 | 5.750% | | | 0.00% | | | | 0.0000% | 0.0000% | FF1: Page 256 & 257 |
| 6 | 5.625% Debentures | 11/19/07 | 10 | 5.63% | | | 0.00% | | | | 0.0000% | 0.0000% | FF1: Page 256 & 257 |
| 7 | Total | | | | $    - | $    - | 0.00% | $    - | $    - | $    - | | 0.0000% | Sum Lines 1 Thru 6 |

**Cost of Preferred Stock**

**JA556**

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

Exhibit No. MYS-012
Page 207 of 215

| | Series | Dated | Term | Coupon Rate | Original Issue | Principal Amount Outstanding | Percent of Total | | Weighted Cost | Reference |
|---|---|---|---|---|---|---|---|---|---|---|
| | FF1:250(a) | Preferred Stock | | | FF1:250(a) | | FF1:250(f) | | | |
| 8 | 4.25% | 6/13/1956 | N/A | 4.25% | | 0 | | | 0.0000% | FF1: Page 250 & 251 |
| 9 | 4.78% | 7/10/1958 | N/A | 4.78% | | 0 | | | 0.0000% | FF1: Page 250 & 251 |
| 10 | Total | | | $ - | $ - | | 0.00% | | 0.0000% | Sum Lines 8 Thru 9 |

**Effective NSTAR ROI**

Tariff Section II.A.2.a

| | (a) | (b) | (c) | (d) | (e) | (f) |
|---|---|---|---|---|---|---|
| Line | Description | Common | Preferred | LTD | Total | Reference |
| 11 | Amount | | | $ | - | Sheet 2, lines 2 thru 4 |
| 12 | Cost | 0.0000% | 0.0000% | 0.0000% | | See Note |
| 13 | Actual Weighting | 0.0000% | 0.0000% | 0.0000% | | 0.0000% Line 11 / Total Line 11 |
| 14 | Weighted Cost | 0.0000% | 0.0000% | 0.0000% | | 0.0000% Line 12 * Line 13 |
| 15 | 70% of Weighted Cost | 0.0000% | 0.0000% | 0.0000% | | Line 14 * 70% |
| 16 | Tariff Weighting | 50.0000% | 0.0000% | 50.0000% | | 100.0000% Tariff Section II.A.2.a |
| 17 | Weighted Cost | 0.0000% | 0.0000% | 0.0000% | | 0.0000% Line 12 * Line 16 |
| 18 | 30% of Weighted Cost | 0.0000% | 0.0000% | 0.0000% | | Line 17 * 30% |
| 19 | Blended Cost of Capital | 0.0000% | 0.0000% | 0.0000% | | 0.0000% Line 15 + Line 18 |

Document Accession #: 20180516-5048    Filed Date: 05/16/2018

| 20 | **Lower of Blended or Actual** | **0.0000%** | **0.0000%** | **0.0000%** | **0.0000%** Lower of line 14, col (e) or line 19, col (e) |

Tariff Section II.A.2.a

21   Note:

22   The Return on Equity component is specified in Tariff Section II.A.2.a.iii

23   The Cost of Preferred Stock is calculated on line 10

24   The Cost of Long Term Debt is calculated on line 7

**JA558**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Exhibit No. MYS-012
Page 209 of 215

**NSTAR Electric Company**
**Annual Local Network Service Revenue Requirement**
**Service Year Ended December 31, xxxx**
**Sheet 8**

Transmission Related ADIT - Tariff Section II.A.1.f

| Line | (a) Description | (b) Amount | (c) Allocator | (d) Rate Base | (e) Notes |
|------|------|------|------|------|------|
| 1 | **Account 190** | | | | |
| 2 | Item # 1 | | 0.0000% $ | - | FF1: Page 234.2(c) Footnote |
| 3 | Item #2 | | 0.0000% | - | FF1: Page 234.2(c) Footnote |
| 4 | Last Item | - | 0.0000% | - | FF1: Page 234.2(c) Footnote |
| 5 | Total 190 | $ - | 0.0000% $ | - | Sum Lines 2 thru 4 |
| | | | | | |
| 6 | **Account 283** | | | | |
| 7 | Item # 1 | | 0.0000% | - | FF1: Page 276.3(k) Footnote |
| 8 | Item #2 | | 0.0000% | - | FF1: Page 276.3(k) Footnote |
| 9 | Last Item | - | 0.0000% | - | FF1: Page 276.3(k) Footnote |
| 10 | Total 283 | $ - | 0.0000% $ | - | Sum Lines 7 thru 9 |
| | | | | | |
| 11 | Wages & Salary Allocator | 0.0000% | | | Sheet 6, Line 6, Col (d) |
| 12 | Plant Allocator | 0.0000% | | | Sheet 6, Line 14, Col (d) |

**JA559**

**ATTACHMENT L**

**CREDITWORTHINESS POLICY**

I.     General Information:

This Attachment L details the specific requirements for the creditworthiness procedures of NSTAR.  All customers taking (i) any service under Schedule 21-NSTAR or (ii) any FERC-regulated interconnection service from NSTAR must meet the terms of this Policy (where all the above, collectively, are referred to as "Services").  The creditworthiness of each customer must be established prior to receiving service from NSTAR.  A customer will be evaluated at the time its application for service is provided to NSTAR.  A credit review shall be conducted for each transmission customer not less than annually or upon reasonable request by the transmission customer.  This Attachment L, when updated, will be done so in accordance with Section 10 of this Policy and as posted on NSTAR's OASIS.

All customers must comply with the terms of this Attachment L.  Each customer should refer to NSTAR's web site at www.nstar.com, or NSTAR's OASIS site, for the NSTAR representative to whom to forward the information required by this Attachment L.

Upon receipt of a customer's information, NSTAR will review it for completeness and will notify the customer if additional information is required.  Upon completion of an evaluation of a customer, NSTAR will notify the customer of its Financial Assurance requirements.  NSTAR will provide a written evaluation, upon request, to customers who are not required to provide Financial Assurance.

II.     Financial Information:

Customers receiving transmission service or requesting interconnection service must submit, if available, the following:

- All current rating agency reports from Standard and Poor's ("S&P"), Moody's and/or Fitch of the customer.
- Audited financial statements provided by a registered independent auditor for the two most recent years, or the period of its existence, if shorter, for the customer.

III.     Creditworthiness Requirements:

**JA560**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

A.    The customer must meet at least one of the following quantitative criteria in order to receive unsecured credit equivalent to 3 months of transmission charges or, for interconnections, the credit equivalent of 3 months of the annual facilities charges and other ongoing charges:

i)    If rated, the customer must have either for itself or for its outstanding debt the following:

- Standard and Poor's or Fitch rating of at least a BBB, or
- Moody's rating of at least a Baa2.

ii)    If un-rated or if rated below BBB/Baa2, as stated in a), the customer must meet all of the following:

- A Current Ratio of at least 1.0 times (current assets divided by all current liabilities);
- A Total Capitalization Ratio of less that 60% debt: total debt (including all short-term borrowing) divided by total shareholders' equity plus total debt;
- "Earnings before interest, taxes, depreciation and amortization" in most recent fiscal quarter divided by expense for interest" (EBITDA-to-Interest Expense Ratio) of at least 2.0 times; and
- Audited Financial Statement with an unqualified audit opinion.

iii)    If the customer relies on the creditworthiness of a parent company, the customer's parent company must meet the criteria set out in (a) or (b) above, and must provide to NSTAR a written guarantee that it will be unconditionally responsible for all financial obligations associated with the customer's receipt of transmission service from NSTAR.

iv)    If the customer is a municipal that is a member of the Massachusetts Municipals Wholesale Electric Cooperative (MMWEC), MMWEC must meet the criteria set out in (a) or (b) above and provide to NSTAR a written guarantee that MMWEC will be unconditionally responsible for all financial obligations associated with the customer's receipt of transmission service from NSTAR.

B.    If the customer does not qualify for unsecured credit under Section A, the customer will qualify

for unsecured credit equivalent to two months of transmission service charges, or for interconnections, the credit equivalent of two months of the annual facilities charges and other ongoing charges, if one of the following qualitative factors is met:

§       The customer has, on a rolling basis, 12 consecutive months of payments to NSTAR with no missed, late or defaults in payment; or

§       The customer has an executed long-term contract for the sale of the full output (energy and capacity) of its generating unit and either has executed a corresponding service agreement under Schedule 21-NSTAR for the transmission of that output or the execution of such a service agreement is pending the customer's demonstration of creditworthiness pursuant to this Attachment L.

IV.     <u>Financial Assurance</u>:

If the customer does not meet the applicable requirements for Creditworthiness set out in Section III above, then the customer must either:

•       Pay in advance for service an amount equal to the lesser of the total charge for Transmission Service or the charge for three months of Transmission Service not less than 5 days in advance of the commencement of service; or

•       Obtain Financial Assurance in the form of a: letter of credit, performance bond, or corporate guarantee equal to the equivalent of 3 months of Transmission Service charges prior to receiving service.

If the customer pays for service in advance, NSTAR will pay to the customer interest on the amounts not yet due to NSTAR , computed in accordance with the Commission's regulations at 18 CFR ? 35.191(a)(2)(iii).

V.      <u>Contesting Creditworthiness Determination</u>:

The Transmission Customer may contest NSTAR's determination of creditworthiness by submitting a written request for re-evaluation within 20 calendar days of being notified of the creditworthiness determination.  Such request should provide information supporting the basis for a request to re-evaluate a

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

Transmission Customer's creditworthiness.  NSTAR will review and respond to the request within 20 calendar days.

VI.    Process for Changing Credit Requirements:

In the event that NSTAR plans to revise its requirements for credit levels or collateral requirements as detailed in this Attachment L, NSTAR shall submit such changes in a filing to the Commission under Section 205 of the Federal Power Act.  NSTAR shall follow the notification requirements pursuant to Section 3.04(a) of the Transmission Operating Agreement and reflected herein.

A.    General Notification Process

i)    NSTAR shall provide written notification to ISO-NE and stakeholders of any filing described above, at least 30 days in advance of such filing.

ii)    Filing notifications shall include a detailed description of the filing, including a redlined document containing revised change(s).

iii)    NSTAR shall consult with interested stakeholders upon request.

iv)    Following Commission acceptance of such filing and upon the effective date, NSTAR shall revise Attachment L and an updated version of Schedule 21-NSTAR shall be posted the ISO-NE website.

B.    Transmission Customer Responsibility

When there is a change in requirements pursuant to this Attachment L, it is the responsibility of the customers to forward updated financial information to NSTAR at the address noted on NSTAR's OASIS site and indicate whether the change affects their ability to meet the requirements of this Attachment L. In such cases where the customer's status has changed, the customer must take the necessary steps to comply with the revised requirements of the Attachment L by the effective date of the change.

VII.    Posting Collateral Requirements:

Document Accession #: 20180516-5048      Filed Date: 05/16/2018

A.      Changes in Customer's Financial Condition

Each customer must inform NSTAR, in writing, within five (5) business days of any material change in its financial condition, and, if the customer qualifies under Section III.A(c), that of its parent company.  A material change in financial condition may include, but is not limited to, the following:

- Change in ownership by way of a merger, acquisition or substantial sale of assets;
- A downgrade of long- or short-term debt rating by a major rating agency;
- Being placed on a credit watch with negative implications by a major rating agency;
- A bankruptcy filing;
- Any action requiring filing of a Form 8-K;
- A declaration of or acknowledgement of insolvency;
- A report of a significant quarterly loss or decline in earnings;
- The resignation of key officer(s);
- The issuance of a regulatory order and/or the filing of a lawsuit that could materially adversely impact current or future financial results.

B.      Change in Creditworthiness Status

- A customer who has been extended unsecured credit under this policy must comply with the terms of Financial Assurance in Section IV above if one or more of the following conditions apply:
- The customer no longer meets the applicable criteria for Creditworthiness in Section III above;
- The customer exceeds the amount of unsecured credit extended by NSTAR, in which case Financial Assurance equal to the amount of excess must be provided within 5 business days; or
- The customer has missed two or more payments for any of the services offered by NSTAR in the last 12 months.

In the event that NSTAR determines that there is a change in the credit level or collateral requirements, the customer may request a written explanation of the basis for this change.  Such notification should be

**JA564**

Document Accession #: 20180516-5048     Filed Date: 05/16/2018

sent to the NSTAR contact indicated on the NSTAR OASIS site. NSTAR shall respond to such request within 20 days of receipt of such notification.

Unless otherwise noted above, when there is a change in a customer's Creditworthiness Status requiring the customer to provide Financial Assurance, the customer must provide such Financial Assurance within 20 business days from the date the customer either notifies NSTAR, as required in Section VI.B above, or receives notice from NSTAR.

VIII.    Ongoing Financial Review:

Each customer is required to submit to NSTAR annually or when issued, as applicable:

- Current rating agency report;
- Audited financial statements from a registered independent auditor; and
- 10-Ks and 8-Ks, promptly upon their issuance.

IX.    Suspension of Service:

NSTAR may immediately suspend service (with notification to Commission) to a customer, and may initiate proceedings with Commission to terminate service, if the customer does not meet the terms described in Sections III through VIII above at any time during the term of service or if the customer's payment obligations to NSTAR exceed the amount of unsecured or secured credit to which it is entitled under this Attachment L.  A customer is not obligated to pay for transmission service that is not provided as a result of a suspension of service.