ORAL ARGUMENT SCHEDULED MAY 5, 2022

No. 20-1343 (LEAD)
Consolidated with 20-1361, 20-1362, 20-1365, 20-1368, 21-1067, 21-1070

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

CONSTELLATION MYSTIC POWER, LLC,
*Petitioner,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

---

BRAINTREE ELECTRIC LIGHT DEPARTMENT, ET AL.,
*Intervenors.*

---

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

---

**BRIEF OF INTERVENORS BRAINTREE ELECTRIC LIGHT
DEPARTMENT, ET AL., MASSACHUSETTS MUNICIPAL WHOLESALE
ELECTRIC COMPANY, AND NEW HAMPSHIRE ELECTRIC
COOPERATIVE, INC. IN SUPPORT OF RESPONDENT**

**PUBLIC COPY - SEALED MATERIAL DELETED**

Scott H. Strauss
Jeffrey A. Schwarz
Amber L. Martin Stone
SPIEGEL & MCDIARMID LLP
1875 Eye Street, N.W.
Suite 700
Washington, D.C. 20006
Telephone: (202) 879-4000

*Counsel for Intervenors Massachusetts
Municipal Wholesale Electric Company and
New Hampshire Electric Cooperative, Inc.*

Dated: February 24, 2022

John P. Coyle
DUNCAN & ALLEN LLP
1730 Rhode Island Avenue, N.W.
Suite 700
Washington, D.C. 20036
Telephone: (202) 289-8400

*Counsel for Intervenors Braintree
Electric Light Department, et al.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    **Parties and Amici**

All parties, intervenors, and amici appearing before the Federal Energy Regulatory Commission and in this Court are listed in the Brief for the State Petitioners, filed September 7, 2021.

### B.    **Rulings Under Review**

References to the rulings at issue appear in Brief for the Federal Energy Regulatory Commission, filed December 6, 2021.

### C.    **Related Cases**

This case has not previously been before this Court or any other court. Other than those consolidated with the petition in this case by the Court's Order of February 24, 2021, intervenors are not aware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C). On July 15, 2021, FERC issued an order in its discrete paper hearing proceeding, setting the just and reasonable return on common equity under the Agreement at 9.33 percent. *Constellation Mystic Power, LLC*, 176 FERC ¶ 61,019 (2021). Petitions for review of that order are presently pending before the Court, consolidated under Case Nos. 21-1198, *et al.* On November 18, 2021, FERC issued an order addressing arguments raised on requests for rehearing of that order, and reduced the return on common equity to 9.19 percent.

*Constellation Mystic Power, LLC*, 177 FERC ¶ 61,106 (2021).  Petitions for review of FERC's November 18, 2021, if any, must be filed no later than January 17, 2022.

Respectfully submitted,

/s/ Scott H. Strauss                                    /s/ John P. Coyle

Scott H. Strauss                                         John P. Coyle
Jeffrey A. Schwarz                                     DUNCAN & ALLEN LLP
Amber L. Martin Stone                              1730 Rhode Island Avenue, NW, Suite 700
SPIEGEL & MCDIARMID LLP                     Washington, DC 20036
1875 Eye Street, NW, Suite 700                Telephone:  (202) 289-8400
Washington, DC 20006                             jpc@duncanallen.com
Telephone:  (202) 879-4000
scott.strauss@spiegelmcd.com               *Counsel for Eastern New England*
jeffrey.schwarz@spiegelmcd.com          *Consumer-Owned Systems*
amber.martin@spiegelmcd.com

*Counsel for Massachusetts*
*Municipal Wholesale Electric*
*Company and New Hampshire*
*Electric Cooperative, Inc.*

Dated: February 24, 2022

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ....     ii

TABLE OF CONTENTS …………………………………………………….     iv

TABLE OF AUTHORITIES …………………………………………………     v

GLOSSARY…………………………………………………….....................     viii

STATEMENT OF ISSUES …………………………………………………..     1

STATUTORY AND REGULATORY PROVISIONS ………………………     2

STATEMENT OF THE CASE …………………………………………....     2

    A.  Changes in Ownership of Mystic 8 and 9 …………………………     2

    B.  Exelon's Acquisition of Everett Marine Terminal ………………..     5

SUMMARY OF ARGUMENT …………………………………………....     7

ARGUMENT…………………………………………………….....................     10

I.    FERC REASONABLY REQUIRED THAT MYSTIC'S RATES BE SET APPLYING THE "ORIGINAL COST" TEST…………………..     10

II.    THE COMMISSION PROPERLY EXCLUDED ExGEN'S COST OF ACQUIRING THE EVERETT MARINE TERMINAL FROM RECOVERY THROUGH THE FUEL SUPPLY AGREEMENT…….     15

III.    FERC CORRECTLY IMPUTED EXELON'S CAPITAL STRUCTURE AND COST OF DEBT TO MYSTIC ………………...     17

IV.    MYSTIC'S COMPLAINTS CONCERNING THE SCOPE OF THE "TRUE-UP" OF ITS CLAIMED COSTS ARE UNSOUND AND PREMATURE …………………………………………………...     20

CONCLUSION ……………………………………………………………     22

CERTIFICATE OF COMPLIANCE ………………………………………...     23

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Court Cases**

*Alcoa Inc. v. FERC*,
564 F.3d 1342 (D.C. Cir. 2009) …………………………………………….. 10

*Am. Tel. & Tel. Co. v. United States*,
299 U.S. 232 (1936) ………………………………………………………... 15

*Butler v. Barnhart*,
353 F.3d 992 (D.C. Cir. 2004) …………………………………………………10

*Clark-Cowlitz Joint Operating Agency v. FERC*,
826 F.2d 1074 (D.C. Cir. 1987) …………………………………………… 20

*Clifton Power Corp. v. FERC*,
294 F.3d 108 (D.C. Cir. 2002) …………………………………………….. 10

*FPC v. Hope Natural Gas Co.*,
320 U.S. 591 (1943) ………………………………………………………... 13

*In re Boston Generating LLC*,
440 B.R. 302 (Bankr. S.D.N.Y. 2010) ……………………………………… 4

*KN Energy, Inc. v. FERC*,
968 F.2d 1295 (D.C. Cir. 1992) …………………………………………… 16

*Mont. Power Co. v. FERC*,
599 F.2d 295 (9th Cir. 1979) …………………………………………….. 15

*Montana v. United States*,
440 U.S. 147 (1979) ………………………………………………………... 21

*N. Border Pipeline Co. v. FERC*,
129 F.3d 1315 (D.C. Cir. 1997) ……………………………………….. 7, 11, 12

*Rio Grande Pipeline Co. v. FERC*,
178 F.3d 533 (D.C. Cir. 1999) …………………………………………….. 11

v

**Page(s)**

*Sierra Club v. FERC*,
867 F.3d 1357 (D.C. Cir. 2017) …………………………………………… 18

*Western Area Power Admin. v. FERC*,
525 F.3d 40 (D.C. Cir. 2008) …………………………………………… 16

**Federal Agency Cases**

*Constellation Mystic Power, LLC*,
165 FERC ¶ 61,267 (2018) ………………………… 5,6,7,8, 9, 11, 15, 17, 18, 21

*Constellation Mystic Power, LLC*,
172 FERC ¶ 61,044 (2020) ………………………... 7, 8, 9, 12, 16, 17, 18, 19, 21

*Constellation Mystic Power, LLC*,
172 FERC ¶ 61,045 (2020) ……………………………………………... 9, 12, 21

*Constellation Mystic Power, LLC*,
175 FERC ¶ 61,069 (2021) ………………………………………………… 3, 12

*Constellation Mystic Power, LLC*,
176 FERC ¶ 61,019 (2021) ………………………………………………….. ii

*Constellation Mystic Power, LLC*,
177 FERC ¶ 61,106 (2021) ………………………………………………… iii

*Fore River Dev., LLC*,
133 FERC ¶ 61,248 (2010) ………………………………………………….. 4

*ISO New England, Inc.*,
147 FERC ¶ 61,172 (2014),
*reh'g denied,* 153 FERC ¶ 61,223 (2015) …………………………………….. 19

*ISO New England, Inc.*,
174 FERC ¶ 61,252 (2021) ………………………………………………… 19

*Ky. W. Va. Gas Co.*, Opinion No. 7,
2 FERC ¶ 61,139 (1978) …………………………………………………… 20

**Page(s)**

*La. Pub. Serv. Comm'n v. Entergy Corp.*,
149 FERC ¶ 61,245 (2014) …………………………………………………… 9, 21

*La. Pub. Serv. Comm'n v. Sys. Energy Res., Inc.*,
166 FERC ¶ 61,022 (2019) ………………………………………………... 9-10, 21

*Mich. Gas Storage Co.*,
87 FERC ¶ 61,038 (1999) …………………………………………………….. 9, 20

*Mystic Dev., LLC*,
116 FERC ¶ 61,168 (2006) ………………………………………………… 18

*PacifiCorp*,
124 FERC ¶ 61,046 (2008) …………………………………………………….. 7

*Transcontinental Gas Pipe Line Corp.*, Opinion No. 414,
80 FERC ¶ 61,157 (1997),
*order on reh'g*, Opinion No. 414-A, 84 FERC ¶ 61,084 (1998) ……………... 18

*United Gas Pipe Line Co.*,
25 F.P.C. 26 (1961) ………………………………………………….. 11, 12

**Federal Statutes**

5 U.S.C. § 706(2)(A) …………………………………………………….. 18

# GLOSSARY

| Abbreviation/Term | Definition |
|---|---|
| Agreement | The Cost of Service Agreement among Constellation Mystic Power, LLC, Exelon Generation Company, LLC, and ISO New England Inc., as amended from time to time. |
| Commission or FERC | Federal Energy Regulatory Commission |
| Connecticut Parties | Petitioners Connecticut Public Utilities Regulatory Authority, Connecticut Department of Energy and Environmental Protection, and Connecticut Office of Consumer Counsel, collectively |
| Consumer-Owned Utility Ratepayers | Braintree Electric Light Department, Concord Municipal Light Plant, Georgetown Municipal Light Department, Hingham Municipal Lighting Plant, Littleton Electric Light & Water Department, Middleborough Gas and Electric Department, Middleton Electric Light Department, Norwood Municipal Light Department, Pascoag Utility District, Reading Municipal Light Department, Taunton Municipal Lighting Plant and Wellesley Municipal Light Plant, Massachusetts Municipal Wholesale Electric Company, and New Hampshire Electric Cooperative, Inc. |
| December 2018 Order | *Constellation Mystic Power, LLC*, Order Accepting Agreement, Subject to Condition and Directing Briefs, 165 FERC ¶ 61,267 (Dec. 20, 2018), R.313, JA1260. |
| December 2020 Order | *Constellation Mystic Power, LLC*, Order Addressing Arguments Raised on Rehearing, and Setting Aside Prior Order, in Part, 173 FERC ¶ 61,261 (Dec. 21, 2020), R.420, JA1917. |

| Abbreviation/Term | Definition |
|---|---|
| Eastern New England Consumer-Owned Systems | Intervenors Braintree Electric Light Department, Concord Municipal Light Plant, Georgetown Municipal Light Department, Hingham Municipal Lighting Plant, Littleton Electric Light & Water Department, Middleborough Gas and Electric Department, Middleton Electric Light Department, Norwood Municipal Light Department, Pascoag Utility District, Reading Municipal Light Department, Taunton Municipal Lighting Plant and Wellesley Municipal Light Plant |
| Everett | Everett Marine Terminal, the liquefied natural gas facility in Everett, Massachusetts owned by Exelon and used to serve the Mystic Units |
| Exelon | Exelon Corporation, the holding company owner of, *inter alia*, ExGen and Mystic |
| ExGen | Exelon Generation Company, LLC, the corporate parent of Mystic |
| FERC Br. | Brief of Respondent Federal Energy Regulatory Commission, filed December 6, 2021 |
| FPA | Federal Power Act |
| Fuel Supply Agreement | The Fuel Supply Agreement between Mystic's affiliate, Constellation LNG, LLC, and Mystic under which Everett will be used to supply the fuel requirements of the Mystic Units. |
| GAAP | Generally Accepted Accounting Principles |
| ISO-NE | ISO New England, Inc., the New England Regional Transmission Organization. |

| Abbreviation/Term | Definition |
|---|---|
| July 2018 Order | *Constellation Mystic Power, LLC*, Order Accepting and Suspending Filing and Establishing Hearing Procedures, 164 FERC ¶ 61,022 (July 13, 2018), R.75, JA566. |
| July 2020 Rehearing Order I | *Constellation Mystic Power, LLC*, Order Granting Clarification in Part, Denying Clarification in Part, and Addressing Arguments Raised on Rehearing, 172 FERC ¶ 61,043 (July 17, 2020), R.374, JA1516. |
| July 2020 Compliance Order | *Constellation Mystic Power, LLC*, Order on Compliance and Directing Further Compliance, 172 FERC ¶ 61,045 (July 17, 2020), R.376, JA1626. |
| July 2020 Rehearing Order II | *Constellation Mystic Power, LLC*, Order on Clarification, Directing Compliance, and Addressing Arguments Raised on Rehearing, 172 FERC ¶ 61,044 (July 17, 2020), R.375, JA1549. |
| Massachusetts AG | Petitioner Massachusetts Attorney General |
| MMcf/d | Million cubic feet per day, a unit of measurement of the amount of natural gas flowed or consumed per day. |
| Mystic | Constellation Mystic Power, LLC, owner of the Mystic Units |
| Mystic Br. | Initial Brief of Petitioner Constellation Mystic Power, LLC, filed September 7, 2021 |
| Mystic Units | Mystic Units 8 and 9 gas-fired power plants located adjacent to Everett and owned by Mystic |
| States Committee | Petitioner the New England States Committee on Electricity, Inc. |
| State Petitioners | Collectively, Massachusetts AG, Connecticut Parties, and the States Committee |

Pursuant to the Court's March 26 and June 23, 2021 Orders, intervenors Braintree Electric Light Department, Concord Municipal Light Plant, Georgetown Municipal Light Department, Hingham Municipal Lighting Plant, Littleton Electric Light & Water Department, Middleborough Gas and Electric Department, Middleton Electric Light Department, Norwood Municipal Light Department, Pascoag Utility District, Reading Municipal Light Department, Taunton Municipal Lighting Plant and Wellesley Municipal Light Plant, Massachusetts Municipal Wholesale Electric Company, and New Hampshire Electric Cooperative, Inc. (collectively, Consumer-Owned Utility Ratepayers) submit their brief in support of Respondent Federal Energy Regulatory Commission (Commission or FERC).

## STATEMENT OF ISSUES

Consumer-Owned Utility Ratepayers adopt in their entirety Statement of Issue Nos. 1(a) and 1(b), and 4 in the Brief of Respondent Commission. [FERC Br. 3-4]. Additionally, Consumer-Owned Utility Ratepayers adopt Statement of Issue No. 2 in the Commission's Brief solely as to the appropriateness of disallowing recovery of the acquisition cost of the Everett Marine Terminal. Consumer-Owned Utility Ratepayers defer their response to the Commission's Statement of Issue Nos. 2 (as to issues other than disallowance of recovery of the acquisition cost of the Everett Marine Terminal) and 3 to their Reply Brief in Support of State Petitioners, due February 3, 2022.

## STATUTORY AND REGULATORY PROVISIONS

The pertinent statutory and regulatory provisions are set forth in the Addendum accompanying the Brief of Respondent Commission, filed December 6, 2021.

## STATEMENT OF THE CASE

Except as otherwise supplemented below, Consumer-Owned Utility Ratepayers generally accept Parts II.A.1 through 3, II.B.1 and III of the Commission's Statement of Facts. The supplemental information provided immediately below details the history of the ownership changes involving Mystic 8 and 9. This history is relevant because it supports the Commission's (1) rejection of Mystic's challenge to the application of the "original cost" test to the setting of rates under the Agreement; and (2) decision to disallow recovery of the acquisition cost of the Everett Marine Terminal.

### A.    Changes in Ownership of Mystic 8 and 9

The Mystic 8 and 9 generating units—the subject of the Agreement— began construction in 1999 and entered commercial operation in April (Mystic 8) and June (Mystic 9) of 2003.  R.153 [Ex. ENC-0032 (Chronology of Ownership Transfers for Mystic 8 and 9 and Fore River)], JA736-42.  Between November 2002 and March 2012, Mystic 8 and 9 changed ownership six times.  R.153, [Ex. ENC-0030 at 26:6-9 (Steffen), Ex. ENC-0032], JA714, JA736-42.  As explained in testimony by Eastern New England Consumer-Owned

2

Systems expert witness Boris Steffen, "[i]n connection with each change of ownership, there has been a change in plant accounting or valuation that affects the net property, plant and equipment values for Mystic 8 and 9." R.153 [Ex. ENC-0030 at 28:9-12 (Steffen)], JA715.

By July 12, 2003, Exelon subsidiary Boston Generating, LLC, the holding company owner of Mystic 8 and 9 at the time, failed to achieve "Project Completion" by the date specified in its $1.25 billion non-recourse credit facility for the construction of Mystic 8 and 9 and a sister facility, Fore River. R.153 [Ex. ENC-0034 at 36 (2003 Exelon Corporation Form 10-Q)], JA743. Exelon ultimately negotiated a transfer in lieu of foreclosure of all three units (Mystic 8 and 9 and Fore River), plus two others—Mystic 7 and Mystic Jet—to a special purpose entity owned by the project finance lenders (Mystic Development, LLC). R.153 [Ex. ENC-0030 at 31-36 (Steffen)], JA716-21; R.153 [Ex. ENC-0036 at 44 (2004 Exelon Corporation Form 10-Q)], JA744. The transfer in lieu of foreclosure closed on May 25, 2004, resulting in the forgiveness of $1,129,205,000 in non-recourse debt, and a downward adjustment of $444,418,636 in the depreciated original cost of Mystic 8 and 9. *See Constellation Mystic Power, LLC*, 175 FERC ¶ 61,069 at PP 21-24 (2021); R.153 [Ex. ENC-0030 at 33:6—36:2 (Steffen)], JA718-21.

On August 7, 2010, Constellation Energy Group entered into an Asset Purchase Agreement with Boston Generating, LLC (the parent of Mystic

**Material Under Seal Deleted**

Development and indirect owner of Mystic 8 and 9) to purchase Mystic Units 7, 8 and 9, Mystic Jet, and Fore River for a total price of $1.1 billion. Boston Generating, LLC then filed for protection under Chapter 11 of the Bankruptcy Code. During the course of that bankruptcy proceeding, Constellation's purchase of the Boston Generating facilities was approved by the United States Bankruptcy Court for the Southern District of New York. *In re Boston Generating LLC*, 440 B.R. 302, 310-11, 322-29 (Bankr. S.D.N.Y. 2010); *Fore River Dev., LLC*, 133 FERC ¶ 61,248 (2010). █████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████    ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

On March 12, 2012, Constellation Energy Group merged with Exelon Corporation. R.153 [Ex. ENC-0030 at 46-48 (Steffen)], JA722-24. █████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

**Material Under Seal Deleted**

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

**B.**    **Exelon's   Acquisition   of   Everett   Marine   Terminal**

On January 17, 2018, ISO-NE issued its *Operational Fuel Security Analysis*. R.313 [December 2018 Order at P 8, nn.14-15], JA1264-65. In that study, ISO-NE "concluded that, if Mystic 8 and 9 retired, Everett might no longer be financially viable and that, if Everett also retired, the region's risk of operating reserves depletion and load shedding would increase, as would the length and severity of such events." R.313 [December 2018 Order at P 8 (footnotes omitted)], JA1264-65.

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

**Material Under Seal Deleted**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

On March 23, 2018, Exelon submitted a Retirement De-List Bid in ISO-NE's Forward Capacity Auction 12, effectively announcing its intention to retire Mystic 8 and 9 permanently effective May 31, 2022. R.313 at P 7, JA1263-64. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████. Exelon acquired the Everett Marine Terminal in order to fulfill Capacity Supply Obligations attached to one or both of Mystic 8 and 9 in the ISO-NE Forward Capacity Auction through May 31, 2022—prior to the

Agreement's term. R.313 at PP 148-51, JA1327-29; R.2 [Ex. MYS-0001 at 11 (Berg)], JA202; R.375 at PP 117-20, JA1603-05.

## SUMMARY OF ARGUMENT

**Mystic Rate Base.**  The Commission correctly determined that the May 2004 transfer to Exelon's lenders of Mystic 8 and 9 in lieu of foreclosure effectively "sold Mystic 8 and 9 to the lenders for the amount of debt outstanding on the facilities, which was less than Exelon's [Uniform System of Accounts] net book value (and therefore requires an increase to accumulated depreciation added to the units' net book values)." R.375 at P 112, JA1600. This result is consistent with settled principles of Commission ratemaking.  *See N. Border Pipeline Co. v. FERC*, 129 F.3d 1315, 1318 (D.C. Cir. 1997); *PacifiCorp*, 124 FERC ¶ 61,046, P 28 (2008) (explaining that the "original cost principle is a long-standing accounting policy adopted in response to widespread abuses in the electric utility industry . . . through the practice of selling properties at large profits to other public utilities followed by the acquiring utilities' inflating plant accounts (and rate base) by the premium paid"). Mystic's lengthy claims aside [Mystic Br. 18-34], it must live with the choice it made by pursuing the Agreement. Having opted for cost-of-service compensation for Mystic 8 and 9 as of May 31, 2022, Mystic has no legitimate basis to challenge the application of long-established rules that govern such compensation to the development of the rates imposed under the Agreement.

**Everett Rate Base.**  The Commission properly excluded ExGen's cost (if any) of acquiring the Everett Marine Terminal from the cost recovery permitted under the Fuel Supply Agreement.  This ruling is amply supported by the Commission's findings that "ExGen's original investment in Everett was intended to satisfy its prior capacity supply obligations and not to meet Mystic's fuel supply obligations under the terms of this Agreement," and that as a result it is "unjust and unreasonable for Mystic to pass through Everett's gross plant-in-service value, whatever that value may be." R.313 at P 148, JA1327-28.  Again, Mystic must bear the consequences of its choices. The foundation for the Commission's finding is the testimony of Mystic's own witness, who explained the reasons for its acquisition of the Everett Marine Terminal. R.2 [Ex. MYS-0001 at 6:9-16, 11:3-9 (Berg)], JA197, JA202; R.313 P 148, n.322, JA1327-28. Mystic's arguments to the contrary [Mystic Br. 47-54] overlook that testimony.

**Imputed Capital Structure and Cost of Debt.**  The Commission properly rejected Mystic's proposal to impute for ratemaking purposes the equity-heavy capital structure of Mystic's immediate parent, ExGen (67.28 percent equity, 32.72 percent debt), and instead imputed the capital structure of Mystic's ultimate holding company parent, Exelon (47.6 percent equity, 52.4 percent debt). There is ample support in the record for the Commission's determination, as it is based on the findings that "ExGen's capital structure is excessively skewed toward equity such

8

that it is not reflective of the industry," and that, "as reported by *Value Line*, only two electric utilities have equity ratios higher than 59 percent." R.313 PP 50, 52, JA1286; R.375 PP 132-33, JA1610-12; R.146 [Ex. S-0009 at 48-52 (Keyton)], JA651-55.    Having correctly determined that Exelon's capital structure, not ExGen's, should be imputed to Mystic for ratemaking purposes, the Commission also logically imputed Exelon's cost of debt to Mystic for those purposes. *See Mich. Gas Storage Co.*, 87 FERC ¶ 61,038 at 61,165 (1999).    Mystic's contrary arguments [Mystic Br. 35-47] are premised on erroneous claims about "risks" associated with operating under the Agreement. These allegations do not support setting rates using a skewed capital structure that is inconsistent with electric utility industry norms.

**Scope of True-Up Challenges.**    Mystic complains that the scope of the Commission's "true-up" review of its annual revenue requirement may somehow involve "re-litigation" of matters already decided in these proceedings.   [Mystic Br. 54-58].  Mystic fails to identify any specific Commission ruling that actually decides any issue that Mystic claims is subject to preclusion.  Mystic also fails to acknowledge numerous Commission rulings that appear to reserve all rate base issues to the annual true-up process. R.313 P 65, JA1292; R.375 P 86, JA1589; R.376 PP 47-48, JA1644-45].  But *res judicata* and collateral estoppel "only apply 'where the issues presented have been fully litigated and decided on the merits, and no new circumstances would justify relitigation.'" *See La. Pub. Serv. Comm'n v.*

9

*Sys. Energy Res., Inc.*, 166 FERC ¶ 61,022 at P 27 (2019) (*quoting La. Pub. Serv. Comm'n v. Entergy Corp.*, 149 FERC ¶ 61,245 at P 25 (2014)). In any event, as the Commission points out [FERC Br. 85-88], Mystic is currently pursuing its challenge to the appropriate scope of the true-up process before the Commission, rendering its effort to do so here "incurably premature." *Clifton Power Corp. v. FERC*, 294 F.3d 108, 111-12 (D.C. Cir. 2002).

## ARGUMENT

Commission decisions are entitled to be upheld on review if supported by substantial evidence in the record – "such evidence as a reasonable mind might accept as adequate to support a conclusion," *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004) – and by reasoned decision making, including an examination of the relevant data and a reasoned explanation supported by a stated connection between the facts found and the choice made. *See Alcoa Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009). As concerns the specific claims raised here by Mystic, the challenged Commission Orders satisfy both of these criteria; Mystic's assertions to the contrary are without merit.

## I. FERC REASONABLY REQUIRED THAT MYSTIC'S RATES BE SET APPLYING THE "ORIGINAL COST" TEST

Under settled Commission ratemaking principles, "normally when a facility is acquired by one regulated entity from another, the purchaser may only include the seller's depreciated original cost in its rate base, even though the price paid by the

10

purchaser may exceed that amount." *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 541 (D.C. Cir. 1999). "The concept of original cost accounting is a bedrock principle of the Uniform System" which "rests on the notion that the purchaser of a facility simply inherits the previous owner's 'claims to a return of and on the capital originally devoted to the public service.'" *N. Border Pipeline Co. v. FERC*, 129 F.3d 1315, 1318 (D.C. Cir. 1997) (*quoting United Gas Pipe Line Co.,* 25 F.P.C. 26, 64 (1961)).

Mystic's proposed rate base did not comport with this precedent. The Commission succinctly stated the fatal flaw with Mystic's formulation: "Mystic did not incorporate prior purchases into its analysis." R.313 P 63, JA1291-92. For that reason, the Commission directed Mystic "to reflect the impact of an original cost test for each time the Mystic 8 and 9 units changed ownership since the units were first devoted to public service, which we find to be in April and June of 2003." R.313 at P 64, JA1292. The Commission further instructed that for "any such transaction, the excess of net original cost over the purchase price shall be added to accumulated depreciation, while excesses of purchase price over net original cost shall be regarded as acquisition premiums not includable in rates and ignored for the purpose of the test." R.313 at P 64, JA1292.

When Mystic failed to implement the Commission's original cost directive with respect to the May 2004 transfer in lieu of foreclosure in its initial compliance

11

filing, the Commission specified that "Mystic should have included the transfer in lieu of foreclosure in its original cost study," and directed a further compliance filing. R.376 at P 45, JA1643-44; R.375 at P 112, JA1600.  Ultimately, Mystic established to the Commission's satisfaction that the May 2004 transfer in lieu resulted in the forgiveness of $1,129,205,000 in non-recourse debt, which in turn required a downward adjustment of $444,418,636 in the depreciated original cost of Mystic 8 and 9 when effect of the transfer in lieu was prorated among the various generating units involved.  *See Constellation Mystic Power, LLC*, 175 FERC ¶ 61,069, PP 21-24 (2021); R.153 [Ex. ENC-0030, 33:6-36:2 (Steffen)], JA718-21.

Mystic complains vociferously that the Commission's use of depreciated original cost to set cost-of-service rates is somehow unfair and should not apply to what Mystic calls "merchant-to-merchant" transfers of utility property [Mystic Br. at 18-34].  The answer to Mystic's complaints appears, among other places, in the 1961 Federal Power Commission decision cited by Judge Silberman in *Northern Border Pipeline v. FERC*, 129 F.3d at 1318.  The cited decision, *United Gas Pipe Line Co.*, 25 F.P.C. at 64, explains:

> [W]here a plant has been built and put into public service and where such plant is sold later the investors in the buying company are simply taking over the former company's claims to a return of and on the capital originally devoted to the public service.  Were it otherwise, all that need be done to raise rates and obtain greater income would be to have one company buy utility properties from another at a higher price than original cost and in this very simple way increase the size of the rate base  and

**Material Under Seal Deleted**

increase the cost of service to consumers.

****

> The nature of rate regulation under the prudent investment standard precludes the adoption of the transfer price of a utility property presented under the guise of actual cost to the present accounting company as a proper measure of the rate base. Public utility properties, particularly during the twenties and thirties were, and even now are, bought and sold at times at prices reflecting the expectations of the buyers and sellers as to what the properties can be made to earn in the future, *i.e.,* such properties like other properties are sold normally on the basis of capitalized expected earning power.

Mystic's real grievance is not with the Commission orders at issue here—it is instead with the well-settled principles that govern the cost-of-service rates Mystic has opted to pursue in this case. Capitalized expected earning power is not a permissible basis for setting cost-of-service rates, as the Supreme Court explained in *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 601 (1943): "The heart of the matter is that rates cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated."

Capitalized earnings (along with expected tax benefits of accelerated depreciation, and premia paid to acquire the facilities) are precisely the components of Mystic's claim that "Exelon paid $925 million for Mystic 8 and 9" [Mystic Br. 18]. As was made plain at the hearing in this proceeding, ▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇

**Material Under Seal Deleted**

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████ None of those

factors is an appropriate consideration in the establishment of cost-of-service rates.

Mystic correctly points out that it was not required to apply the Uniform System of Accounts while Mystic 8 and 9 were operating under market-based rate authorization [Mystic Br. 30]. There is nothing objectionable about the use of GAAP accounting or valuation in the context of market-based rates. This is because, under market-based rate authorization, it is the free interplay of market forces that determines the rates charged for the electricity produced by the facility, and not the

valuation of the property involved in producing the electricity. But when Mystic chose to shift from market to cost-based compensation, it was required to comply with cost-based rate making principles. Even if the Court were to credit Mystic's litany of grievances with original cost ratemaking, they are insufficient to establish grounds for overturning the Commission's application of its original cost rule in this case. "To constitute an abuse of discretion 'it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse.'" *Mont. Power Co. v. FERC*, 599 F.2d 295, 299 (9th Cir. 1979) (*quoting Am. Tel. & Tel. Co. v. United States*, 299 U.S. 232, 236-37 (1936)).

## II.    THE COMMISSION PROPERLY EXCLUDED ExGEN'S COST OF ACQUIRING THE EVERETT MARINE TERMINAL FROM RECOVERY THROUGH THE FUEL SUPPLY AGREEMENT.

The Commission found that "ExGen's original investment in Everett was intended to satisfy its prior capacity supply obligations and not to meet Mystic's fuel supply obligations under the terms of this Agreement." R.313 at P 148, JA1327-28. The Commission further found that it is "unjust and unreasonable for Mystic to pass through Everett's gross plant-in-service value, whatever that value may be, given that ExGen purchased Everett to ensure that it could comply with ExGen's existing [capacity supply obligations], and not for Everett to provide service to ISO-NE ratepayers during the term of this Agreement." [R.313 at P 148, JA1327-28].

The Commission's ruling on this point appropriately follows the cost-causation principle: "[s]imply put, it has been traditionally required that all approved rates reflect to some degree the costs actually caused by the customer who must pay them." *Accord KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992), *with Western Area Power Admin. v. FERC*, 525 F.3d 40, 57-58 (D.C. Cir. 2008).  Here, ExGen acquired the Everett Marine Terminal to ensure that Mystic 8 and 9 could fulfill their pending Capacity Supply Obligations during the period October 1, 2018, through May 31, 2022 – prior to the effective date of the Agreement.  [R.2, Ex. MYS-0001 at 6, 11 (Berg), JA197,202].  As the Commission explained, "Exelon was aware that, absent the Commission's acceptance of the Mystic Agreement, Exelon would have had to absorb the cost of its purchase of Everett during the terms of its existing Capacity Supply Obligations."  [R.375 at P 118, JA1603-04].  Thus, the (if any) to ExGen was, in the words of Exelon witness Berg, a "sunk cost" prior to the Agreement coming into effect. [R.2, Ex. MYS-0001 at 11 (Berg), JA202]. As such, customers subject to charges under the Agreement neither could nor did cause ExGen's incurrence of that acquisition cost. Mystic errs in claiming that the resolution of this issue requires an examination of "subjective intent" [Mystic Br. 52]. The Commission properly found that treatment of the Everett acquisition cost turns instead on questions of cost-causation.

16

## III.  FERC CORRECTLY IMPUTED EXELON'S CAPITAL STRUCTURE AND COST OF DEBT TO MYSTIC

Mystic neither issues its own, non-guaranteed debt nor has a freestanding credit rating.  For these reasons, it lacks a capital structure eligible to use in setting rates.  R.313 at P 48, JA1327-28.  Mystic proposed to impute to itself the capital structure of its immediate parent, ExGen (at 67.28 percent equity, 32.72 percent debt) in the rates under the Agreement.  The Commission found that "ExGen's capital structure is excessively skewed toward equity such that it is not reflective of the industry," noting that only two electric utilities listed in the *Value Line Investment Survey* had capital structures composed of higher levels of equity than ExGen, and that "Mystic's proposed capital structure was by definition anomalous because it contained 67.28% equity, higher than any other capital structure accepted by the Commission."  R.313 at PP 50, 52, JA1286, JA1287; R.375 at PP 132-33, JA1610-12; R.146 [Ex. S-0009 at 48-52 (Keyton)], JA651-55.  The Commission therefore "require[d] the use of the capital structure of the ultimate parent of Mystic, Exelon," (47.6 percent equity, 52.4 percent debt), "because it is more consistent with the capital structures previously approved by the Commission for publicly-traded companies." R.313 at PP 49, 52, JA1286, JA1287; R.375 at PP 132-33, JA1610-12.

This Court reviews "FERC's capital-structure decision under the deferential standard of the Administrative Procedure Act, and may disturb that decision only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law.'"  *Sierra Club v. FERC*, 867 F.3d 1357, 1377 (D.C. Cir. 2017) (*quoting* 5 U.S.C. § 706(2)(A)).  The Commission applied appropriately reasoned decision making to this issue in its order, measuring the parties' competing positions in light of its longstanding analysis of the appropriateness of a hypothetical capital structure and the debt and equity composition of that capital structure in this case, and carefully explained its reasoning.  R.313 at PP 49-50, JA1286 (*citing Transcontinental Gas Pipe Line Corp.*, Opinion No. 414, 80 FERC ¶ 61,157 at 61,664-66 (1997), *order on reh'g*, Opinion No. 414-A, 84 FERC ¶ 61,084 at 61,415 (1998)); R.375 at PP 132-33, JA1610-12.

Mystic's challenges to the Commission's capital structure determination fall well short of showing any abuse of the Commission's discretion [Mystic Br. 36-47]. Specifically, Mystic is not a "merchant generator" in the context of the Agreement [Mystic Br. 38-39].  During the two-year term of the Agreement—the only period relevant to assessing Mystic's "risk"—Mystic is to receive cost-of-service compensation and is not subject to the vicissitudes of market-based pricing. Mystic's potential exposure to contractual penalties for non-performance does not justify an increased return on equity, [Mystic Br. 39-40], particularly since those risks are within Mystic's control and it will receive cost-of-service compensation for managing them.  *Cf. Mystic Dev., LLC*, 116 FERC ¶ 61,168, P 39 (2006) ("Mystic's customers should not be responsible for liquidated damages resulting from Mystic's

business decision to enter into a contract with a must-take provision to receive a price discount. Mystic has the opportunity to self-schedule (and operate out-of-merit) to take as much gas as possible to attempt to avoid its liquidated damages penalties.")  Potential exposure to pay-for-performance penalties for failure to supply energy during capacity shortage events apply to all New England capacity suppliers other than energy efficiency resources, *ISO New England, Inc.*, 174 FERC ¶ 61,252, PP 26-33 (2021), and may be offset by bonus payments for performance in excess of that contemplated by a generating resource's Capacity Supply Obligation.  *ISO New England, Inc.*, 147 FERC ¶ 61,172, P 64 (2014) ("We generally agree with ISO-NE that under this market design suppliers, not consumers, are in the best position to assess and price the performance risk associated with their resources"), *reh'g denied,* 153 FERC ¶ 61,223 (2015).

Mystic's efforts to support its requested relief by invoking Commission decisions accepting relatively more equity-heavy capital structures for various natural gas pipelines are unavailing. [Mystic Br. 44-46].  As the Commission observed, those cases are not "reflective of what publicly-traded companies consider the optimal mixture of debt and equity financing today."  R.375 at P 133, JA1611-12; R.187 [ Ex. CT-001 at 19 (Parcell)], JA810.  Nor does Mystic's invocation of Avangrid as a counterexample to the Commission's findings advance its cause. The Commission had ample evidence before it that establishes why Avangrid is not an

appropriate comparison to Mystic or Exelon.  R.129 [Ex. ENC-0001 at 24:1—28:6 (Lesser)], JA623-27.

Finally, Mystic's throwaway complaint concerning the Commission's imputation of Exelon's cost of debt to Mystic, along with Exelon's capital structure, is unsound. [Mystic Br. 45-46].  "[W]hen the Commission imputes the capital structure of a corporate parent to a subsidiary, it also will impute the parent's costs of debt and preferred stock."  *Mich. Gas Storage Co.*, 87 FERC ¶ 61,038 at 61,165 (1999); *Ky. W. Va. Gas Co.*, Opinion No. 7, 2 FERC ¶ 61,139, 61,32-27 (1978).

## IV. MYSTIC'S COMPLAINTS CONCERNING THE SCOPE OF THE "TRUE-UP" OF ITS CLAIMED COSTS ARE UNSOUND AND PREMATURE

Finally, Mystic complains that the Commission's provision for an annual review of, and opportunity for rate paying parties to contest, the actual inputs Mystic applies to the formula rate– called a "true-up" – is "overbroad" because it allows challenges to Mystic's claimed historical capital expenditures. [Mystic Br. 54-59].  Mystic's argument fails for three reasons.

First, a "fundamental requisite of issue preclusion is an identity of the issue decided in the earlier action and that sought to be precluded in a later action. Similarly, to preclude a party's raising a claim, it must be shown that the claim was (or could have been) raised in a prior proceeding."  *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1079 (D.C. Cir. 1987).  Both issue preclusion and

20

claim preclusion require a determination of an issue by a tribunal of competent jurisdiction. *Montana v. United States*, 440 U.S. 147, 153 (1979). FERC applies these same principles in proceedings before it: *res judicata* and collateral estoppel "only apply 'where the issues presented have been fully litigated and decided on the merits, and no new circumstances would justify relitigation.'" *La. Pub. Serv. Comm'n v. Sys. Energy Res., Inc.*, 166 FERC ¶ 61,022, P 27 (2019) (*quoting La. Pub. Serv. Comm'n v. Entergy Corp.*, 149 FERC ¶ 61,245, P 25 (2014)). Mystic points to a lengthy hearing, with many pages of exhibits and transcripts, but it points to no ruling adjudicating the propriety of its claimed "Rate Base Capex" from 2004 forward. That is because the Commission made no such ruling.

Second, Mystic's larger problem is that the Commission at numerous points in its orders in this proceeding, expressly reserved to the true-up the issues that Mystic now claims those orders foreclosed. R.313 at P 65, JA1292; R.375 at P 86, JA1589; R.376 at PP 47-48, JA1644-45. This is hardly surprising, given that it took three compliance filings for Mystic to state the impact of the May 2004 transfer in lieu of foreclosure correctly for purposes of original cost ratemaking. In the context of an evidentiary proceeding aggressively expedited at Mystic's insistence, it was reasonable for the Commission to have decided to reserve a potentially complex set of factual questions on historical claimed capital expenditures to later scrutiny in the true-up process.

Third, Mystic's claim here is also incurably premature as it is currently litigating its preclusion contentions before the Commission.  For this reason, the Commission will have to determine in the first instance whether it meant what it said about historical capital expenditures in its orders in this proceeding.

## CONCLUSION

For the foregoing reasons, the Court should deny Mystic's petition for review in all respects, and uphold those aspects of the Commission's orders that Mystic's petition for review attempts unsuccessfully to challenge.

Respectfully submitted,

/s/ Scott H. Strauss                                    /s/ John P. Coyle

Scott H. Strauss                                        John P. Coyle
Jeffrey A. Schwarz                                     DUNCAN & ALLEN LLP
Amber L. Martin Stone                                1730 Rhode Island Avenue, Suite 700
SPIEGEL & MCDIARMID LLP                          Washington, DC 20036
1875 Eye Street, NW                                    (202) 289-8400
Suite 700                                                    jpc@duncanallen.com
Washington, D.C.  20006
Telephone:  (202) 879-4000                        *Counsel for Eastern New England*
                                                                *Consumer-Owned Systems*

*Counsel for Massachusetts*
*Municipal Wholesale Electric*
*Company and New Hampshire*
*Electric Cooperative, Inc.*

Dated: February 24, 2022

22

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 29(a)(4)(G), Fed. R. App. P. 29(a)(5), and the Court's June 23, 2021 order establishing briefing formats and schedule, I certify that this Brief of Intervenors Braintree Electric Light Department, et al., Massachusetts Municipal Wholesale Electric Company, and New Hampshire Electric Cooperative, Inc. in Support of State Petitioners complies with the type-volume limitations because its textual portions, including headings, footnotes, and quotations, contain 4506 words, as counted by the "Word Count" feature of Microsoft Word 2016, the program with which this brief was prepared. This word count excludes: (1) the cover page; (2) the table of contents; (3) the Rule 26.1 corporate disclosure statement; (4) certificates; (5) the glossary; and (6) the signature block.

Respectfully submitted,

*/s/ John P. Coyle*
John P. Coyle
DUNCAN & ALLEN LLP
1730 Rhode Island Avenue, NW
Suite 700
Washington, D.C.  20036
(202) 289-8400
jpc@duncanallen.com

*Counsel for the Eastern New England Consumer-Owned Systems*

Dated: February 24, 2022

**CERTIFICATE OF SERVICE OF BRIEF UNDER SEAL**

I hereby certify that I have this 24th day of February 2022 caused two

copies of the foregoing brief under seal to be served on counsel of record for each

Petitioner and Intervenor in this proceeding by first class United States mail.


*/s/ John P. Coyle*
_____
John P. Coyle (Cir. Bar No. 32182)
Duncan & Allen LLP
1730 Rhode Island Avenue, N.W.
Suite 700
Washington, D.C.  20036
Tel. (202) 289-8400

Washington, D.C.
February 24, 2022